UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE CATTLE AND BEEF<br>ANTITRUST LITIGATION | Case No. 22-md-3031 (JRT/JFD)<br>Case No. 20-cv-1319 (JRT/JFD)[1] |
| This Document Relates To: ALL CASES | ORDER<br>FILED UNDER SEAL |

This matter is before the Court on Plaintiffs'[2] Motion to Compel the Production of Data and Documents (Dkt. No. 591). Plaintiffs move to compel Defendants[3] to produce the following documents:

1. From the Cargill Defendants, structured data related to the terms on which they purchased non-Fed Cattle slaughtered at their two regional plants located in Wyalusing, Pennsylvania, and Fresno, California;

2. From the Cargill Defendants, the Tyson Defendants, and Defendant National Beef, the following categories of documents:

---

[1] This Order is filed in Case No. 20-cv-1319 as well as Case No. 22-md-3031 because the Motion to Compel the Production of Data and Documents (Dkt. No. 591) remains pending in the earlier case.

[2] For the purposes of this motion, "Plaintiffs" are the Cattle Plaintiffs, Direct Purchaser Plaintiffs, Commercial Indirect Plaintiffs, Consumer Plaintiffs, and Winn-Dixie Plaintiffs. (Pls.' Mem. Supp. Mot. Compel at 2 n.1, Dkt. No. 597.)

[3] For the purposes of this motion, "Defendants" are Cargill Meat Solutions Corporation, Cargill, Inc., National Beef Packing Company, Swift Beef Company, Tyson Foods, Inc., and Tyson Fresh Meats, Inc. (Pls.' Mem. Supp. at 3 n.4.)

      a. Unstructured data related to the capacity and utilization of Defendants' case-ready plants;

      b. Unstructured data related to the storage capacity of Defendants' case-ready plants;

      c. Structured or unstructured data concerning Defendants' inventory of case-ready beef; and

      d. Unstructured data related to the opening, construction, expansion, and/or sale of case-ready plants; and

   3. From Defendants Tyson and National Beef, profit-and-loss reports related to their case-ready beef business.[4]

(Pls.' Mot. Compel at 1–2, Dkt. No. 591; *see* Defs.' Mem. Opp'n Mot. Compel at 25 & n.30 (explaining this part of Plaintiffs' motion applies to both National Beef and Tyson, even though it was directed only at National Beef), Dkt. No. 618.) For the reasons set forth below, the motion is granted in part and denied in part.

## I. Legal Standards

Federal Rule of Civil Procedure 26(b)(1) establishes the scope and limitations of discovery. "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The party seeking the discovery must meet a threshold burden to show

---

[4] The parties resolved a dispute regarding whether Tyson must produce certain structured data regarding further processed products before the hearing. (*See* Defs.' Mem. Opp'n at 28.)

relevance. *Sherman v. Sheffield Fin., LLC*, 338 F.R.D. 247, 252 (D. Minn. 2021). "Once the party seeking the discovery has made a threshold showing of relevance, the court generally looks to the party resisting discovery to show specific facts demonstrating lack of relevancy or undue burden." *Baker v. Cenlar FSB*, No. 20-CV-0967 (JRT/HB), 2021 WL 2493767, at *3 (D. Minn. June 18, 2021).

Rule 26 also requires information sought in discovery to be proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1). Factors important to the proportionality analysis include "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id*.

**II.    Discussion**

    **A.    Structured Data Related to the Terms on which the Cargill Defendants Purchased Non-Fed Cattle Slaughtered at Their Regional Plants in Wyalusing, Pennsylvania, and Fresno, California**

Plaintiff seeks to compel Cargill to produce purchase data for non-fed cattle slaughtered at Cargill's plants in Fresno, California, and Wyalusing, Pennsylvania. "[F]ed cattle are steers and heifers raised and fed for the production and sale of high-quality beef." (Third Consol. Am. Class Action Compl. ¶ 3, Dkt. No. 312, Case No. 19-cv-1222 (JRT/JFD); *see also* Defs.' Mem. Opp'n at 3; Zhao Decl. ¶ 3, Dkt. No. 620.) "Non-fed cattle," on the other hand, "refers to 'culled' cows and bulls that are not raised for the purpose of producing high-quality beef but that are harvested after fulfilling their main purpose (such as producing milk)." (Defs.' Mem. Opp'n at 1 n.1.) Plaintiffs refer to non-

3

fed cattle as "commercial cattle" (Pls.' Mem. Supp. Mot. Compel at 2, Dkt. No. 597), which Plaintiffs define as "cattle harvested for beef other than fed cattle," including culled cows, bulls, and grass-fed cattle (*id.* at 6). The Court will use the term "non-fed cattle" in this Order. Defendants purchase both fed and non-fed cattle as part of their operations. (Defs.' Mem. Opp'n at 3.)

"Structured data" includes data such as transactional cattle procurement and purchase data, slaughter data, and beef sales data. (*See id.* at 10.) Data such as profit-and-loss statements, slaughter plant operation data, beef inventory data, and beef import data can be maintained in either structured or unstructured[5] form. (*Id.* at 10–11.)

Plaintiffs argue the purchase data for non-fed cattle is relevant and proportional for three reasons. First, Plaintiffs point out that beef from non-fed cattle is mixed with beef from fed cattle to produce ground beef, which is a product at issue in this litigation. (Pls.' Mem. Supp. at 9.) Plaintiffs argue that their experts need to know the price Cargill paid for both inputs of ground beef, one of which is beef from non-fed cattle, to evaluate and control for the potential impact of non-fed cattle prices on the market price of ground beef.

Cargill responds that all Direct and Indirect Purchaser Plaintiffs have specifically excluded ground beef made with non-fed cattle from their claims, and only the Consumer

---

[5] Defendants have agreed to produce unstructured data such as communications between Defendants, communications with producers of fed cattle, fed cattle production and supply information, fed cattle pricing and contract terms, profit-and-loss reports, trade associations, market factors, compliance policies, communications with nonparties about cattle futures, policies for purchasing and selling futures and options, documents produced in government investigations, and documents about those investigations. (*See* Defs.' Mem. Opp'n at 9–10, Zhao Decl. ¶ 2.)

4

Plaintiffs have included mixed ground beef in their claims. (Defs.' Mem. Opp'n at 15.) Cargill also argues that even if *some* ground beef contains beef from non-fed cattle, that does not make *all* purchase data for non-fed cattle proportional. Finally, Cargill points out that it has agreed to produce sales data, documentation about the combination of beef from fed and non-fed cattle in ground beef, and profit-and-loss data for the Fresno and Wyalusing plants. The latter, according to Cargill, contains costs for both fed and non-fed cattle, which will allow Plaintiffs to determine the costs of the inputs of mixed ground beef.

Defendants acknowledged in both their memorandum of law and at the motion hearing that ground beef made with meat from non-fed cattle is included in the Consumer Plaintiffs' claims and class definition. Purchase data for non-fed cattle used in ground beef sold to the Consumer Plaintiffs is therefore relevant to the Consumer Plaintiffs' claims.[6] On the other side of the coin, purchase data for non-fed cattle not used in ground beef sold to the Consumer Plaintiffs is not relevant. This distinction leads to the proportionality consideration raised by Defendants: that even if some ground beef contains meat from non-fed cattle, that does not make all purchase data for non-fed cattle discoverable. This point is well-taken and will factor in the Court's decision on the scope of data to be produced.

With respect to Cargill's agreement to produce sales and profit-and-loss data for the Fresno and Wyalusing plants, Plaintiffs argued at the hearing that all raw material costs for

---

[6] To be clear, relevance here is not based on whether Plaintiffs have alleged that Defendants engaged in anticompetitive conduct in the non-fed cattle market. The purchase data for non-fed cattle is relevant because meat from non-fed cattle was mixed with meat from fed cattle to produce ground beef, and ground beef is a product at issue in the Consumer Plaintiffs' claims.

ground beef, including meat from non-fed cattle, are aggregated into a single category, which is not useful. Cargill responded, however, that the data to be produced will allow Plaintiffs to separate the purchase information for fed cattle from non-fed cattle. Plaintiffs gave no reason to doubt this representation, and the Court accepts that Plaintiffs would be able to separate the data for the two inputs for ground beef.

But Plaintiffs also argued at the hearing that the profit-and-loss reports aggregated monthly purchase data, meaning that short-term fluctuations in non-fed cattle prices would not be reflected. Given the Consumer Plaintiffs' allegations that Defendants purposely chose locations and timed the purchases of non-fed cattle in coordination with each other, the Court agrees that more detailed information about purchases of non-fed cattle is important to the issues at stake in the litigation. The Court also agrees with Plaintiffs that raw data generally is preferable to financial reports.

The Court next considers burden. Plaintiffs explained at the hearing that they are seeking non-fed cattle purchase data that is stored in six fields of a database, and those six fields correspond to the data Cargill will produce for its fed cattle purchases. The data is limited to Cargill's Fresno and Wyalusing plants. The Court finds that the data sought by Plaintiffs is limited appropriately in scope. Cargill, on the other hand, fears that producing the requested data for non-fed cattle purchases will be the tip of the iceberg and will "inevitably result in numerous additional questions from Plaintiffs about how to interpret [the] data" and lead to additional discovery requests. (Defs.' Mem. Opp'n at 18.) The Court does not find this speculative argument persuasive and is confident that this litigation can be appropriately managed to allow discovery of only relevant, proportional information.

6

The Court now turns to Plaintiffs' second argument: that purchase data for non-fed cattle will allow the parties to test and control for the market forces and conditions (such as drought and a global pandemic) that Defendants claim contributed to a steep decline in fed cattle prices during the class period. (Pls.' Mem. Supp. at 9–10.) Plaintiffs argue that non-fed cattle prices presumably were susceptible to the same market forces and conditions as fed cattle prices, and thus want information about changes in Cargill's purchasing and pricing behavior for non-fed cattle. Plaintiffs contend any such changes "may tend to support" their claims. (*Id.* at 10.)

Cargill responds that this basis for relevance is speculative and too far-fetched. The Court agrees. Fed cattle and non-fed cattle prices are not necessarily affected by the same weather patterns and external events because non-fed cattle have different life cycles, procurement methods, and uses and purposes than fed cattle. (*See* Defs.' Mem. Opp'n at 6–8, 16; Consumer Pls.' Fourth Am. Compl. ¶¶ 76, 78–79, 83, Dkt. No. 258; Third Consol. Am. Class Action Compl. ¶¶ 3, 5, 81 n.20, 82.) Plaintiffs even use tentative language ("may tend to support") in arguing relevance. As the magistrate judge previously assigned to this case, U.S. Magistrate Judge Hildy Bowbeer, reasoned in a previous hearing when denying from the bench a motion to compel, "[A]rguments about conceivable relevance [are] just too speculative" under the current version of Rule 26(b)(1), which eliminated the "reasonably calculated to lead to the discovery of admissible evidence" language that had formerly been in the rule. (Hr'g Tr. at 163:16–21, Mar. 24, 2022, Dkt. No. 482.) In contrast, *In re Peanut Farmers Antitrust Litigation*, in which the court granted a motion to compel structured data and on which Plaintiffs rely, quoted the old Rule 26(b) "reasonably

7

calculated" language. No. 2:19-CV-00463, 2020 WL 9216019, at *1 (E.D. Va. July 24, 2020). Thus, the Court does not find the case persuasive.

Plaintiffs' third argument for relevance is related to their second: that purchase data for non-fed cattle may allow them to "assess the impact of Defendants' alleged conspiracy to depress fed cattle prices using the 'yardstick' method due to similarities" in the non-fed and fed cattle markets. (Pls.' Mem. Supp. at 11.) Plaintiffs propose to measure their damages by comparing the prices of non-fed cattle with fed cattle during the same period of time. Plaintiffs concede the markets might be dissimilar but contend they cannot determine whether the markets are comparable without seeing the purchase data for non-fed cattle. Cargill responds that this argument is speculative and that the standard for discoverability does not allow a party to examine data in order to determine its relevance. The Court agrees and finds Plaintiffs' third relevance argument too speculative.

To conclude, Plaintiffs have shown that purchase data for non-fed cattle used in ground beef sold to the Consumer Plaintiffs is relevant to the Consumer Plaintiffs' claims but have not shown that other purchase data for non-fed cattle is relevant. Cargill may choose to limit its production accordingly, but if parsing the data becomes too burdensome, Cargill may, of course, opt to respond in full. Therefore, Plaintiffs' motion is granted as to structured data concerning the terms on which Cargill purchased non-fed cattle used in ground beef sold to the Consumer Plaintiffs and slaughtered at its plans in Wyalusing, Pennsylvania, and Fresno, California, in response to All Plaintiffs' Request for Production No. 1.

## B.     Structured and Unstructured Data Related to Case-Ready Plants

Plaintiffs ask the Court to compel Defendants to produce several categories of structured and unstructured data related to Defendants' case-ready plants. (Pls.' Mem. Supp. at 13.) Defendants do not slaughter live cattle in case-ready plants; rather, they process and package prime and subprime cuts, known as boxed beef, into retail "case-ready" products that can be placed directly into a retail meat case without the retailer needing to further process or package the beef. (*See* Pls.' Mem. Supp. at 13 n.8.)

Plaintiffs point out that the parties have agreed that the definition of "beef" for the purpose of unstructured data production includes case-ready beef. (Herrera Decl. Ex. H at 5, Dkt. No. 599-5; *e.g.*, Herrera Decl. Ex. O at 5, Dkt. No. 599-9.) In addition, case-ready beef is expressly included in the Beef Plaintiffs' class definitions. (*E.g.*, Direct Purchaser Plaintiffs' Third Consol. Am. Compl. ¶ 1 n.1, 330, Dkt. No. 303; Erbert & Gerbert's, Inc.'s Second Am. Class Action Compl. ¶ 1 n.1, 326–27, Dkt. No. 261.) Plaintiffs further argue that Defendants' alleged conspiracy to constrain the purchase and slaughter of fed cattle affected the volume and price of case-ready beef in the same way as boxed beef, and observe that Defendants have agreed to produce unstructured data for boxed beef. (Pls.' Mem. Supp. at 14.) Plaintiffs next surmise that Defendants could have constrained supply by operating their plants at lower capacities and that such a supply constraint can be measured only if Defendants produce capacity and utilization data from all facilities where all products were processed. (*Id.* at 15.) Plaintiffs further argue that data on capacity and utilization could refute defenses that operational decisions were driven by economic conditions, changes in seasonal demand, and fluctuations in storage capacity. (*Id.*)

9

Inventory and storage data are also relevant to Defendants' defenses, according to Plaintiffs, to "test the interplay between slaughter and fabrication operations and beef prices." (*Id.* at 16.) Finally, data about the opening, construction, expansion, and sale of case-ready plants is necessary, Plaintiffs contend, to understand the scope of Defendants' operations. (*Id.* at 17.)

Defendants respond that Plaintiffs are not entitled to data about case-ready plants because Plaintiffs' claims are about a conspiracy to constrain the supply of beef by reducing slaughter volumes at slaughter plants; there are no claims about case-ready plants. (Defs.' Mem. Opp'n at 20.) The proposed class definitions' reference to case-ready products is not material, Defendants explain, because Plaintiffs have not claimed anticompetitive conduct relating to case-ready products. Even so, Defendants have agreed to provide some case-ready sales and pricing data to Plaintiffs. (*Id.* at 20–21.) As to the parties' agreement that the definition of "beef" includes case-ready beef, Defendants agreed to include case-ready beef in the definition of "beef" only for discovery purposes and did "not concede the relevance of any products derived from fed cattle [such as case-ready beef] other than boxed beef." (Herrera Decl. Ex. H at 4.) Defendants describe Plaintiffs' contention that Defendants constrained supply by operating downstream plants at below-capacity levels as pure conjecture. (Defs.' Mem. Opp'n at 21.) As for testing their defenses, Defendants argue that Plaintiffs have not shown that similar economic or weather conditions affect both slaughter and case-ready plants, nor are there any such allegations in the complaints. (*Id.* at 22.) Finally, Defendants emphasize that Plaintiffs have received

capacity, utilization, inventory, construction, expansion, and sales data for Defendants' slaughter plants, which are the plants at issue. (*Id.* at 22–23.)

The Court denies Plaintiffs' motion to compel data about Defendants' case-ready plants. First, Plaintiffs have not established relevance. Plaintiffs allege that Defendants conspired to constrain the supply of beef by reducing slaughter volumes at slaughter plants. Plaintiffs do not allege Defendants conspired with respect to case-ready plants. As to Plaintiffs' argument that case-ready plant data could be relevant to the alleged conspiracy to constrain the purchase and slaughter of fed cattle, Plaintiffs' own choice of language shows how speculative and conjectural their argument is. (*E.g.*, Pls.' Mem. Supp. at 15 (speculating that Defendants *could* constrain supply by operating plants below capacity); *id.* at 18 (conjecturing that overt acts "*likely* included idling plants at below full capacity levels"); *id.* (speculating that "decisions at the case-ready level . . . *could have* informed Defendants' decisions to restrict the supply of beef").) (emphases added.) Plaintiffs' argument that economic conditions, changes in seasonal demand, and fluctuations in storage capacity impacted slaughter and case-ready plants in similar ways is likewise speculative. Slaughter plants and case-ready plants differ in nearly every aspect of their operations. Nor have Plaintiffs shown how data relating to the opening, construction, expansion, or sale of case-ready facilities is relevant. Plaintiffs merely (and broadly) speculate that such data is "necessary to understand the scope of Defendants' operations." (Pls.' Mem. Supp. at 17.)

Further, although case-ready beef is mentioned in Plaintiffs' class definitions, the term is mentioned only once or twice in any complaint, and Plaintiffs do not claim that

Defendants conspired with respect to case-ready products. Plaintiffs concede that data about case-ready beef is one step removed from even boxed beef (Pls.' Mem. Supp. at 14), which itself is one step removed from fed cattle. "The subject matter scope of discovery . . . is limited to the patents, products, entities, and instances of anti-competitive conduct specific[ally] alleged in support of the claims or defenses identified in the pleadings." *Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, No. 15-CV-3183 (ADM/LIB), 2016 WL 7042117, at *6 (D. Minn. July 25, 2016), *objs. overruled*, 2016 WL 6534394 (D. Minn. Nov. 2, 2016).

Finally, as to relevance, the Court finds that Defendants did not waive their right to object to discovery as irrelevant by agreeing to include case-ready beef in the definition of beef for the purpose of discovery. To the contrary, they explicitly retained that right.

Second, even if Plaintiffs had established the relevance of case-ready plant information, the data sought is not proportional to the needs of the case. Defendants have already produced extensive discovery related to case-ready beef including:

(1) the negotiations, setting, and final pricing of case-ready beef;

(2) the profitability of sales of case-ready products in the United States;

(3) import and exports of beef (including case-ready beef);

(4) types of case-ready products sold in the United States;

(5) actual and forecasted demand for beef (including case-ready beef);

(6) the relationship between the price of fed cattle and boxed beef or case-ready beef;

(7) reports and studies analyzing profits, revenues, and costs of beef (including case-ready beef); and

12

>   (8) reports, presentations, and studies relating to beef pricing or output and the effect of changes in the supply of fed cattle on the price of beef (all including case-ready beef).

(Defs.' Mem. Opp'n at 26.) Defendants are searching the documents of 144 custodians for documents containing this information. (*Id.* at 27.) With particular respect to case-ready sales and pricing data, Plaintiffs can assess the impact of any slaughter reduction conspiracy on the price of case-ready beef from that data.

Defendants have made a showing of some burden. Case-ready plant discovery will expand the number of facilities at issue by 36%. (Defs.' Mem. Opp'n at 27.) Some case-ready plants produce products other than case-ready products, and Defendants intend to exclude that data from production. (*Id.* at 27–28.) Defendants will also want to review and redact confidential information about other protein operations. (*Id.* at 28.)

Continuing with the proportionality factors, Plaintiffs have not established that case-ready plant data is significant to the issues at stake in this litigation or that the benefit of the data likely outweighs the burden in producing it. Other proportionality factors such as the amount in controversy, the parties' relative access to relevant information, and the parties' resources are not material to the analysis. On balance, even if Plaintiffs had shown the case-ready data to be relevant, the Court finds it is not proportional to the needs of the case. Therefore, this aspect of Plaintiffs' motion is denied.

### C.  Case-Ready Profit-and-Loss Statements

Plaintiffs seek to compel National Beef and Tyson to produce profit-and-loss reports for case-ready operations. (Pls.' Mem. Supp. at 25; *see* Defs.' Mem. Opp'n at 25 & n.30.)

Plaintiff relies on the same arguments for relevance and proportionality as they made in support of their request for other case-ready operations data. (Pls.' Mem. Supp. at 25.) For the reasons given in Part II.B. *supra*, the Court finds National Beef's and Tyson's profit-and-loss reports neither relevant nor proportional.

Accordingly, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' Motion to Compel the Production of Data and Documents (Dkt. No. 591) is **GRANTED IN PART** and **DENIED IN PART**, as set forth fully above.

2. This Order shall be unsealed in its entirety 30 days from the date it is filed, unless the parties show in writing good cause to keep specific portions of the Order under seal. Accordingly, the parties shall promptly meet and confer regarding any redactions that may be required to protect confidential information referred to in this Order, and shall file a joint letter and proposed redacted order within 14 days from the date this Order is filed, identifying with specificity the redactions they believe are required and the basis for those redactions.

Date: October 14, 2022

*s/ John F. Docherty*
JOHN F. DOCHERTY
United States Magistrate Judge