# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| *IN RE: CATTLE AND BEEF ANTITRUST LITIGATION,* | Case No. 22-md-3031 (JRT/JFD) |
| This Document Relates To: | |
| ALL DIRECT ACTION CASES, | JURY TRIAL DEMANDED |

## DIRECT ACTION PLAINTIFFS' CONSOLIDATED COMPLAINT

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .................................................................................1

II.   CHART OF DIRECT ACTION PLAINTIFFS, DEFENDANTS, AND  CAUSES OF ACTION ...................................................................................2

III. NATURE OF THIS ACTION ...........................................................................6

IV. JURISDICTION AND VENUE .....................................................................14

V.   PARTIES .........................................................................................................15

      A.      Plaintiffs .................................................................................15

      B.      Defendants and Their Subsidiaries and Affiliates ....................32

      C.      Defendants' Co-Conspirators...................................................36

      D.      Reciprocal Agency of Defendants and Co-Conspirators ...........36

      E.      Defendant Parent and Subsidiary Companies Share a Unity of Interests .................................................................................36

VI. INDUSTRY BACKGROUND .......................................................................43

VII. DEFENDANTS' ANTITRUST AND PSA VIOLATIONS................................45

      A.      Direct Evidence of Defendants' Conspiracy..............................46

      B.      The Available Data Corroborates Witness 1's Account ............50

      C.      Defendants Idled and Closed Plants, and Refrained From Expanding Processing Capacity...............................................61

      D.      Defendants' Parallel Reductions in Cash Cattle Purchases and Anticompetitive Queuing Conventions.......................................62

VIII. ADDITIONAL PLUS FACTORS ENCOURAGING THE REASONABLE INFERENCE OF DEFENDANTS' CONSPIRACY ........................................64

      A.      Defendants Signaled Their Conspiracy and Encouraged Each Other to Maintain It .................................................................64

      B.      The Beef Market is Highly Concentrated ..................................66

      C.      The Beef Market Has High Barriers to Entry ...........................67

      D.      Beef is a Commodity Product...................................................67

      E.      The Demand for Beef is Inelastic .............................................68

# TABLE OF CONTENTS (cont'd)

**Page**

F.     Defendants Had Multiple Opportunities to Collude ...................................69

G.     Defendants' Market Share Stability is Indicative of a Conspiracy............74

IX. THE BEEF INDUSTRY FACES GOVERNMENTAL INQUIRIES AND INVESTIGATIONS ...........................................................................................75

X.  DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONSPIRACY ....................77

A.     The Cargill Defendants ...............................................................................79

B.     The JBS Defendants.....................................................................................79

C.     National Beef ...............................................................................................80

D.     The Tyson Defendants .................................................................................82

E.     Plaintiffs' Claims Are Timely......................................................................83

XI.  DEFENDANTS ENGAGED IN CONTINUING VIOLATIONS .........................................84

XII.  CLAIMS AND CAUSES OF ACTION.............................................................................85

XIII.  JURY TRIAL DEMANDED .........................................................................................92

## I.  <u>INTRODUCTION</u>

This pleading (the "Complaint") is filed pursuant to this Court's order directing Direct Action Plaintiffs ("DAPs" or "Plaintiffs")[1] to submit a consolidated Complaint.  Dkt. No. 91 at 4. The Court ordered the filing of this Complaint over DAPs' opposition and objections.  See Oct. 18, 2022 Transcript, ECF No. 56.

The submission of this Complaint should not be construed as a waiver or relinquishment of any DAP's rights, including the due process right to proceed outside of the putative class in this case and to prosecute claims separately in a direct action with counsel of each DAP's choosing or for each DAP to be remanded for trial to the Court where it filed suit.[2]

Each DAP whose case was transferred to this Court under MDL No. 3031 expressly reserves the right, following remand to the transferor court after pretrial proceedings, to file its own complaint for purposes of proceeding to trial.  28 U.S.C. § 1407(a).

This Complaint is organized as follows: <u>Section II</u> sets out a chart identifying (1) each Direct Action Plaintiff Group, (2) each Group's respective Plaintiffs, and (3) for each Plaintiff, the named Defendants and the asserted causes of action. <u>Sections III</u> through XI set out the factual allegations. <u>Section XII</u> states all the causes of action asserted by any DAP.

---

[1]  Given the consolidated nature of this Complaint, the plural usage of the term "Plaintiffs" is used throughout to generally describe one or more DAPs but should not be construed to necessarily refer to all DAPs for purposes of all factual allegations or legal causes of action as explained *infra* in this document.

[2]  In submitting this Complaint, DAPs continue to maintain their "separate legal existence" and object to any loss of their individual due process rights. *In re Fluidmaster*, 149 F. Supp. 3d 940, 947 (N.D. Ill. 2016) (quoting *In re Refrigerant Compressors Antitrust Litig.*, 731 F.3d 586, 590-91 (6th Cir. 2013)); *In re Zimmer Nexgen Knee Implant Prods. Liab. Litig.*, MDL 2272, 2012 WL 3582708, at *3 (N.D. Ill. Aug. 16, 2012) (collecting cases stating that "a master or consolidated complaint is a procedural device used to promote judicial efficiency and economy, not to be given the same effect as an ordinary complaint or considered to merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another") (internal quotation marks omitted).

II.   **CHART OF DIRECT ACTION PLAINTIFFS, DEFENDANTS, AND CAUSES OF ACTION**

| Direct Action Plaintiff Group | Plaintiff | Named Defendants (not previously dismissed) | Cause(s) of Action |
|---|---|---|---|
| CF DAPs | Cheney Brothers, Inc. | Cargill, Inc., Cargill Meat Solutions Corporation (A/K/A Cargill Protein A/K/A Cargill Protein – North America), JBS S.A., JBS USA Food Company, Swift Beef Company, JBS Packerland, Inc., National Beef Packing Company, Tyson Foods, Inc., Tyson Fresh Meats, Inc. | 15 U.S.C. § 1 |
| CF DAPs | Subway Protein Litigation Corp. as litigation trustee for the Subway Protein Litigation Trust | Cargill, Inc., Cargill Meat Solutions Corporation (A/K/A Cargill Protein A/K/A Cargill Protein – North America), JBS S.A., JBS USA Food Company, Swift Beef Company, JBS Packerland, Inc., National Beef Packing Company, Tyson Foods, Inc., Tyson Fresh Meats, Inc. | 15 U.S.C. § 1 |
| CF DAPs | Restaurant Services, Inc. | Cargill, Inc., Cargill Meat Solutions Corporation (A/K/A Cargill Protein A/K/A Cargill Protein – North America), JBS S.A., JBS USA Food Company, Swift Beef Company, JBS Packerland, Inc., National Beef Packing Company, Tyson Foods, Inc., Tyson Fresh Meats, Inc. | 15 U.S.C. § 1 |
| CF DAPs | Sonic Industries Services Inc. | Cargill, Inc., Cargill Meat Solutions Corporation, JBS S.A., JBS USA Food Company, Swift Beef Company, JBS Packerland, Inc., National Beef Packing | 15 U.S.C. § 1 |

| Direct Action Plaintiff Group | Plaintiff | Named Defendants (not previously dismissed) | Cause(s) of Action |
|---|---|---|---|
| | | Company, Tyson Foods, Inc., Tyson Fresh Meats, Inc. | |
| CF DAPs | Whatabrands LLC, Whataburger Restaurants LLC, WB Supply & Merchandising LLC | Cargill, Inc., Cargill Meat Solutions Corporation, JBS S.A., JBS USA Food Company, Swift Beef Company, JBS Packerland, Inc., National Beef Packing Company, Tyson Foods, Inc., Tyson Fresh Meats, Inc. | 15 U.S.C. § 1 |
| CF DAPs | ARCOP, Inc. | Cargill, Inc., Cargill Meat Solutions Corporation, JBS S.A., JBS USA Food Company, Swift Beef Company, JBS Packerland, Inc., National Beef Packing Company, Tyson Foods, Inc., Tyson Fresh Meats, Inc. | 15 U.S.C. § 1 |
| CF DAPs | CKE Restaurants Holdings, Inc. | Cargill Inc., Cargill Meat Solutions Corporation, JBS S.A., JBS USA Food Company, Swift Beef Company, JBS Packerland, Inc., National Beef Packing Company, Tyson Foods, Inc., Tyson Fresh Meats, Inc. | 15 U.S.C. § 1 |
| Affiliated Foods DAPs | Associated Grocers, Inc., Action Meat Distributors, Inc., Affiliated Foods, Inc., Alex Lee, Inc., Associated Food Stores, Inc., Big Y Foods, Inc., Brookshire Brothers, Inc., Brookshire Grocery Company, Colorado Boxed Beef Co., Prefco Distribution, | Cargill, Inc., Cargill Meat Solutions Corporation (A/K/A Cargill Protein A/K/A Cargill Protein – North America), JBS S.A., JBS USA Food Company, Swift Beef Company, JBS Packerland, Inc., National Beef Packing Company, Tyson Foods, Inc., Tyson Fresh Meats, Inc. | 15 U.S.C. § 1<br><br>Packers and Stockyard Act 7 U.S.C. §§ 181-229 and 9 C.F.R. 201-206 these Affiliated Foods DAPs have not previously asserted Packers and Stockyard |

3

| Direct Action Plaintiff Group | Plaintiff | Named Defendants (not previously dismissed) | Cause(s) of Action |
|---|---|---|---|
| | LLC, The Golub Corporation, Nicholas & Co, Inc., PFD Enterprises, Inc., Springfield Grocer Company, The Distribution Group, Inc., Topco Associates, LLC., Troyer Foods, Inc., Unipro Foodservice, Inc., URM Stores, Inc | | Act claims, but do so now via this Direct Action Plaintiffs' Consolidated Complaint) |
| Affiliated Foods DAPs | Giant Eagle, Inc. | Cargill, Inc., Cargill Meat Solutions Corporation (A/K/A Cargill Protein A/K/A Cargill Protein – North America), JBS S.A., JBS USA Food Company, Swift Beef Company, JBS Packerland, Inc., National Beef Packing Company, Tyson Foods, Inc., Tyson Fresh Meats, Inc. | 15 U.S.C. § 1  Packers and Stockyard Act 7 U.S.C. §§ 181-229 and 9 C.F.R. 201-206. |
| Affiliated Foods DAPs | SpartanNash Company | Cargill, Inc., Cargill Meat Solutions Corporation (A/K/A Cargill Protein A/K/A Cargill Protein – North America), National Beef Packing Company, Tyson Foods, Inc., Tyson Fresh Meats, Inc. | 15 U.S.C. § 1  Packers and Stockyard Act 7 U.S.C. §§ 181-229 and 9 C.F.R. 201-206. |
| BSF DAPs | Sysco Corporation | Cargill, Inc., Cargill Meat Solutions Corporation (A/K/A Cargill Protein A/K/A Cargill Protein – North America), JBS S.A., JBS USA Food Company, Swift Beef Company, JBS Packerland, Inc., National Beef Packing Company, Tyson Foods, Inc., Tyson Fresh Meats, Inc. | 15 U.S.C. § 1 |

| Direct Action Plaintiff Group | Plaintiff | Named Defendants (not previously dismissed) | Cause(s) of Action |
|---|---|---|---|
| BSF DAPs | Amory Investments LLC | Cargill, Inc., Cargill Meat Solutions Corporation (A/K/A Cargill Protein A/K/A Cargill Protein – North America), JBS S.A., JBS USA Food Company, Swift Beef Company, JBS Packerland, Inc., National Beef Packing Company, Tyson Foods, Inc., Tyson Fresh Meats, Inc. | 15 U.S.C. § 1 |
| Sperling / Kenny Nachwalter DAPs | The Kroger Co., Hy-Vee, Inc., Save Mart Supermarkets LLC, US Foods, Inc. Albertsons Companies, Inc. | Cargill, Inc., Cargill Meat Solution (A/K/A Cargill Protein A/K/A Cargill Protein – North America), JBS S.A., JBS USA Food Company, JBS Packerland, Inc., National Beef Packing Company, Tyson Foods, Inc., Tyson Fresh Meats, Inc., Swift Beef Company | 15 U.S.C. § 1<br><br>Packers and Stockyard Act 7 U.S.C. §§ 181-229 and 9 C.F.R. 201-206 |
| Sperling / Kenny Nachwalter DAPs | Associated Grocers of the South, Meijer, Inc., Meijer Distribution, Inc., Publix Super Markets, Inc., Raley's Arizona, LLC, Moran foods, LLC, SUPERVALU, Inc., and Wakefern Food Corporation | Cargill, Inc., Cargill Meat Solution (A/K/A Cargill Protein A/K/A Cargill Protein – North America), JBS S.A., JBS USA Food Company, Swift Beef Company, JBS Packerland, Inc., National Beef Packing Company LLC, Tyson Foods, Inc., Tyson Fresh Meats, Inc. | 15 U.S.C. § 1<br><br>Packers and Stockyard Act 7 U.S.C. §§ 181-229 and 9 C.F.R. 201-206 |

| Direct Action Plaintiff Group | Plaintiff | Named Defendants (not previously dismissed) | Cause(s) of Action |
|---|---|---|---|
| CWT DAPs | Kraft Heinz Foods Company | Cargill, Inc., Cargill Meat Solution (A/K/A Cargill Protein), National Beef Packing Company LLC, Tyson Foods, Inc., Tyson Fresh Meats, Inc. | 15 U.S.C. § 1 |
| CWT DAPs | Aramark Food and Support Services Group, Inc. | Cargill, Inc., Cargill Meat Solution (A/K/A Cargill Protein), JBS S.A., JBS USA Food Company, JBS Packerland, Inc., National Beef Packing Company LLC, Tyson Foods, Inc., Tyson Fresh Meats, Inc., and Swift Beef Company. | 15 U.S.C. § 1 |

### III.   NATURE OF THIS ACTION

1.      As alleged more fully below, beginning at a time uncertain, but at least as early as approximately January 1, 2015, and continuing through present and with an effect thereafter, Defendants[3] and their co-conspirators engaged in a contract, combination or conspiracy in restraint of trade or commerce in violation of Section One of the Sherman Act.  The goal of their conspiracy

---

[3]      Tyson Foods, Inc. ("Tyson Foods"), Tyson Fresh Meats, Inc. ("Tyson Fresh"), Cargill, Inc. ("Cargill"), Cargill Meat Solutions Corporation (a/k/a Cargill Protein) (a/k/a Cargill Protein – North America) ("CMS"), JBS S.A., JBS USA Food Company ("JBS USA"), Swift Beef Company ("Swift"), JBS Packerland, Inc. ("Packerland"), and National Beef Packing Company LLC ("National Beef") (collectively, "Defendants").

was to fix, raise, stabilize and/or maintain the price of beef[4] sold to Plaintiffs and others at supra-competitive levels – that is, prices artificially higher than beef prices would have been in the absence of their conspiracy.  Defendants' conspiracy was effective and achieved that goal.  Ascertaining the full scope and measure of the conspiracy will require discovery.  However, as alleged in this Complaint, Defendants and their co-conspirators implemented their conspiracy through one or more anticompetitive means.   For example, and without limitation, they implemented their conspiracy by coordinating, manipulating, or agreeing to pay less than competitive prices for the main or primary input in producing beef, namely, slaughter-ready cattle (*i.e.*, fed cattle), for the purpose and with the effect of fixing, increasing, stabilizing or maintaining above competitive levels their margins on, and the price of beef sold to, Plaintiffs and others.  Additionally, or in the alternative, as a further example, Defendants and their co-conspirators implemented their conspiracy by collusively reducing the slaughter-ready cattle and beef supply, which over time artificially elevated the price of beef that they sold to Plaintiffs and others.  Also, as more fully described below, certain Plaintiffs allege that Defendants' and their co-conspirators' conduct as alleged in this Complaint violates the Packers and Stockyards Act.

2.    Each Plaintiff purchased beef in the United States directly from one or more of the Defendants and co-conspirators, from at least January 1, 2015, until the present (the "Relevant Period").

3.    Defendants are the world's largest meat processing and packing companies, known in the industry as meatpackers or packers.  In 2018, Defendants sold approximately 80% of the

---

[4]    In this Complaint, "beef" includes boxed and case-ready meat processed by Defendants and other smaller, non-Defendant producers from fed cattle, including primal cuts, trim or sub-primal products, further-processed and value-added products, offal or variety products, and rendered products and by products.  "Beef" also includes ground beef to the extent that it is processed, in whole or in part, from fed cattle.  "Fed cattle" means steers and heifers raised in feedlots on concentrated diets to be produced and sold as beef.

more than 25 million pounds of beef supplied to the U.S. market. Collectively, they controlled approximately 81-85% of the domestic market-ready fed cattle processed (or slaughtered) during the Relevant Period.[5] The next largest, non-Defendant meatpacker had only a 2-3% market share.

4.      The U.S. Department of Justice ("DOJ") and U.S. Department of Agriculture ("USDA") have launched investigations into whether Defendants fixed beef prices in the United States. In June 2020, news sources reported that the DOJ's Antitrust Division sent civil subpoenas to Defendants JBS S.A., Tyson Foods, Cargill, and National Beef Inc. (a company related to Defendant National Beef), seeking information relating to their pricing practices dating back to January 2015.

5.      The DOJ's investigation followed a March 12, 2020, Senate Subcommittee hearing,[6] during which Secretary of Agriculture Sonny Perdue announced that the USDA had begun an investigation into suspiciously high beef prices. Secretary Perdue expressed concern that meatpackers, such as Defendants, were paying lower prices for cattle without passing the cost savings on to beef purchasers such as Plaintiffs. As he explained, the difference between prices for cattle and prices for wholesale beef was "historically high."

6.      The DOJ and USDA investigations reflect activities by federal agencies with limited resources. Accordingly, there is no assurance that either the DOJ or USDA will commence criminal or other proceedings against Defendants.[7] However, at a minimum, the existence of one or both investigations support the plausibility of Plaintiffs' claims in this Complaint.

---

[5]      In 1977, the largest four beef-packing firms controlled just 25% of the market, compared to 85% of the market by 2018.

[6]      The March 12, 2020, hearing was before the Senate Subcommittee on Agriculture, Rural Development, Food and Drug Administration, and Related Agencies.

[7]      Recently, a coalition of elected officials called on the USDA and DOJ to provide an update on their investigations. *See* https://www.marshall.senate.gov/newsroom/press-releases/kansas-delegation-calls-on-usda-and-doj-to-provide-update-on-investigation-of-the-meat-packing-industry/ (last accessed on August 18, 2022).

7.     The Government's concern over the impact of Defendants' anticompetitive conduct in the cattle and beef market was laid bare in a June 1, 2021 letter from 26 U.S. Senators to the DOJ.  In that letter, the Senators asked "the government to determine whether the stranglehold large meatpackers have over the beef processing market violate our antitrust laws and principles of fair competition."  They described Defendants' actions as follows: "From our perspective, the anticompetitive practices occurring in the industry today are unambiguous and either our antitrust laws are not being enforced or they are not capable of addressing the apparent oligopoly that so plainly exists."  The letter also noted that "[f]or far too long, cattle producers and consumers have been hurt by the increasing concentration of market power and anticompetitive actions of just a few meatpacking companies.  Their collective power over the cattle and beef processing industry allows them to seemingly control prices at their will."  The Senators requested the DOJ and the USDA to investigate potential market manipulation and other illegal activity by Defendants.

8.     Plaintiffs understand from recently unsealed information and court filings in the litigation brought by cattle ranchers[8] that a confidential witness ("Witness 1"), who was previously employed by Swift at its Cactus, Texas slaughter plant, has confirmed the existence of a conspiracy among Defendants.

9.     Witness 1, who has been identified as Jason F., confirmed that all Defendants agreed to reduce their cattle purchases and slaughter volumes for the purpose and effect of increasing their margins (*i.e.*, the spread between what Defendants pay cattle ranchers for fed cattle and the price they charge Plaintiffs and other direct purchasers for beef).

---

[8]     Plaintiffs' allegations relating to Witness 1 and Witness 2 set forth in this Complaint are made upon information and belief based on allegations contained in the Third Consolidated Amended Class Action Complaint filed in the District of Minnesota by Plaintiffs, including the Ranchers Cattlemen Action Legal Fund, and the Court's Order denying Defendants' motion to dismiss. *Ranchers Cattlemen Action Legal Fund, et al. v. Tyson Foods, et al.*, No. 19-1222, Dkt. 312 (D. Minn.); *In re Cattle Antitrust Litigation*, No. 20-cv-1319, Dkt. 238 (denying motions to dismiss, based, at least in part, on similar allegations relating to Witness 1 and 2).

10.     Information published by the USDA, and Defendants' public calls for industrywide slaughter and capacity reductions, corroborate Witness 1's account of Defendants' anticompetitive agreement.

11.     In addition to the high concentration in the wholesale beef industry,[9] other structural characteristics of the domestic beef market facilitated Defendants' conspiracy.  Defendants sit atop the supply and distribution chain that ultimately delivers beef to the market.  More specifically, Defendants purchase cattle from the nation's feedlots, slaughter and pack cattle into beef, and ultimately sell beef to purchasers such as Plaintiffs.  Defendants have exploited their pivotal role in the process of buying cattle to produce beef to collusively control upstream cattle pricing and downstream beef pricing during the Relevant Period.

12.     Other market characteristics serve as "plus factors" supporting the inference that Defendants conspired during the Relevant Period.   As explained more fully below, these characteristics include producer concentration, high barriers to entry, inelastic demand, the commodity nature of beef, frequent opportunities to conspire, strong demand, and/or market stability.  These economic factors made the market for the production and sale of beef conducive to cartelization.

13.     Defendants' increased profit margins during the Relevant Period were aided by the way supply and demand operate in the beef industry.  The supply of cattle is insensitive to short-term price changes because of the long lifecycle of cattle, cattle's perishable nature, and the lack of any alternative use for cattle.  Beef demand is also relatively insensitive to price fluctuations.

---

[9]      According to the Senators' June 2021 letter to the DOJ, "The U.S. meatpacking industry is more consolidated today than it was in 1921 when the Packers and Stockyards Act was enacted.  Four companies operate 18 of the top 20 beef slaughter facilities in this country, which constitutes 94% of this capacity."  *See also supra* note 2.

As a result, Defendants' margins were (and are) very responsive to changes in the aggregate volume of slaughtered cattle.

14.     As alleged in detail below, by at least the beginning of 2015, Defendants began exploiting favorable market conditions to launch their conspiracy.  More specifically, Defendants began to coordinate on the prices they would pay for fed cattle.  They also coordinated on their respective cattle slaughter volumes.  Thus, over time, the output of beef was reduced resulting in higher beef prices for purchasers like Plaintiffs during the Relevant Period.  Industry data shows Defendants' transition from competition to collusion by managing the price of fed cattle and the industry slaughter volumes.

15.     Starting in approximately 2015, the beef market experienced a change in price behavior.  Before 2015, prices of cattle and beef predictably moved in tandem, which was the natural economic relationship in a competitive market because beef is processed cattle.

16.     But beginning in approximately 2015, this fundamental economic relationship between cattle and beef prices changed.  The degree of correlation of cattle and beef prices diverged (to Defendants' benefit) without any credible, non-collusive explanation.  The relevant supply and demand factors in the industry no longer explained the prices charged to direct purchasers such as Plaintiffs.

17.     Starting in 2015, the margins earned on beef sales sold directly to purchasers, such as Plaintiffs, began to show trends that can now be seen as unusual.  The per-pound price of cattle had historically stayed within 20 to 40 dollars of the per-pound average wholesale price of beef. However, in 2015, the spread between those prices increased significantly, as demonstrated by Figures 1 and 2 below.

**Figure 1**



*Source: USDA*

**Figure 2**

| Years | Farm to Wholesale Price Spread | Proportional Increase |
|---|---|---|
| 2010 - 2014 | $34.10 | |
| 2015 - 2019 | $60.20 | 77% |
| 2020 | $122.00 | 103% |
| 2021 | $156.50 | 28% |

18.     According to USDA Economic Research Service data, the average spread between the average farm value of cattle and wholesale value of beef was substantially higher from January 2015 through 2021 than during the preceding five years.  From 2010 to 2014, the average farm-

12

to-wholesale spread was about $34.  But from 2015 to 2021, the average spread was about $82.78 – a 143% increase.

19.     Defendants' ability to reduce the prices of fed cattle over time while maintaining inflated beef prices during the Relevant Period provides compelling, circumstantial evidence of their conspiracy.  In a competitive beef market, if a competitor reduces its price paid for fed cattle, then other competitors would be expected to increase purchases, so they could boost output and increase their profit and market shares.

20.     Only colluding meatpackers would expect to benefit by reducing their prices and purchases of slaughtered cattle because they would know that their conspiracy would shield them from the dynamics of a competitive marketplace.  By collusively underpaying suppliers for fed cattle, and over time reducing beef output, Defendants have been able to increase their margins and profit, confident that none of them would take volume from each other.

21.     United by their conspiracy, Defendants were confident that none of them would defect and disproportionately expand their beef production to satisfy unmet demand.  Armed with this assurance, Defendants achieved unprecedented meat margins (*i.e.*, the gap between what they paid for cattle and what they charged for beef sold to direct purchasers like Plaintiffs).

22.     For example, by the end of 2021, the two largest Defendants, Tyson Foods and JBS USA, were reporting record margins or net revenue in their beef business.  Tyson Foods reported that its beef business' operating margin was nearly 18% – nearly nine times its 2014 operating margin of 2.1%.  Meanwhile, JBS USA reported net revenue of $27.18 billion in 2021, which is a 25.8% increase over the $21.6 billion of net revenue it reported for its beef operation in 2014.

23.     Given these bloated margins, it is unsurprising that a leading industry reporter remarked that Defendants "no longer compete against each other," which has enabled them to reap "gangbuster profits."[10]

## IV.   JURISDICTION AND VENUE

24.     Plaintiffs bring this action under Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and Section 308 of the Packers and Stockyard Act ("PSA"), 7 U.S.C. § 209, for the injuries sustained by each Plaintiff as a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 and for certain Plaintiffs Section 202 of the PSA, 7 U.S.C. § 192.

25.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and Section 308 of the PSA, 7 U.S.C. § 209.

26.     Venue is proper in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26 and 28 U.S.C. § 1391(b), (c) and (d), and Section 308 of the PSA, 7 U.S.C. § 209, because: (a) one or more Defendants reside or resided, is found, transact or transacted business in this District, or is licensed to do business, or is doing business, in this District; (b) a substantial portion of the affected interstate commerce described in this Complaint occurred in this District; (c) each Defendant is subject to personal jurisdiction in this District; and/or (d) to the extent that there is no District in which this action may otherwise be brought, venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because one or more Defendants is/are found in this District.

27.     This Court has personal jurisdiction over each of the Defendants because, among other reasons, each Defendant: (a) inhabits, transacts business in, has continued or systematic

---

[10]     Cassandra Fish, "Whatever Happened to a Fair Fight," The Beef (Nov. 10, 2015), https://www.thebeefread.com/2015/11/10/whatever-happened-to-a-fair-fight/.

contacts with, or is found in this District; (b) has sufficient minimum contacts in the United States

sufficient to satisfy due process; (c) manufactured, sold, shipped, and delivered or directed the

manufacture, sale, shipment, and delivery of substantial quantities of beef throughout the United

States, including in this District; (d) belonged to the conspiracy alleged in this Complaint, and one

or more of them, and their co-conspirators, performed unlawful acts in furtherance of the

conspiracy in this District, including, without limitation, selling beef to one or more Plaintiffs and

others in this District at artificially inflated prices; and/or (e) engaged in unlawful conduct that was

directed at, and had a direct, foreseeable, and intended effect of causing injury to, the business or

property of persons residing in, located in, or doing business throughout the United States,

including in this District.

## V.     **PARTIES**

### A.     **Plaintiffs**

28.     Plaintiff Aramark Food and Support Services Group, Inc. ("Aramark") is a

Delaware corporation with its principal place of business in Philadelphia, Pennsylvania. Aramark

is a food service provider operating in all 50 states and in 19 countries around the world. Aramark

brings this action on its own behalf and pursuant to assignments with Sysco Corporation, Single

Source, Inc., and their affiliates and predecessors with respect to direct purchases from Defendants

made for Aramark's food services. Sysco Corporation and Single Source, Inc., on behalf of

themselves and their affiliates and predecessors, have assigned federal antitrust claims based on

those direct purchases to Aramark. Aramark brings this action under the federal antitrust laws

against the Defendants identified below.

29.     Plaintiff Associated Grocers, Inc. ("AGI") is a Louisiana corporation with its

principal place of business in Baton Rouge, Louisiana. During the Relevant Period, AGI and/or its

affiliates purchased beef at artificially inflated prices directly from one or more of the Defendants and/or their affiliates or agents, and suffered injury, harm, and damages to its business or property as a direct and/or proximate result of Defendants' above-described wrongful actions.

30.     Plaintiff Action Meat Distributors, Inc. ("Action Meat") is a Texas corporation with its principal place of business in Houston, Texas. During the Relevant Period, Action Meat and/or its affiliates purchased beef at artificially inflated prices directly from one or more of the Defendants and/or their affiliates or agents, and suffered injury, harm, and damages to its business or property as a direct and/or proximate result of Defendants' above-described wrongful actions and the antitrust violations alleged in this Complaint.

31.     Plaintiff Affiliated Foods, Inc. ("AFI") is a Texas corporation with its principal place of business in Amarillo, Texas. During the Relevant Period, AFI and/or its affiliates purchased beef at artificially inflated prices directly from one or more of the Defendants and/or their affiliates or agents, and suffered injury, harm, and damages to its business or property as a direct and/or proximate result of Defendants' above-described wrongful actions and the antitrust violations alleged in this Complaint.

32.     Plaintiff Alex Lee, Inc., and its subsidiaries and affiliates, including Merchants Distributors, LLC, Lowe's Food Stores, Inc., and W. Lee Flowers & Company (collectively, "Alex Lee") is a North Carolina corporation with its principal place of business in Hickory, North Carolina. During the Relevant Period, Alex Lee and/or its affiliates purchased beef at artificially inflated prices directly from one or more of the Defendants and/or their affiliates or agents, and suffered injury, harm, and damages to its business or property as a direct and/or proximate result of Defendants' above-described wrongful actions and the antitrust violations alleged in this Complaint.

33.     Plaintiff Associated Food Stores, Inc. ("AFS") is a Utah corporation with its principal place of business in Salt Lake City, Utah. During the Relevant Period, AFS and/or its affiliates purchased beef at artificially inflated prices directly from one or more of the Defendants and/or their affiliates or agents, and suffered injury, harm, and damages to its business or property as a direct and/or proximate result of Defendants' above-described wrongful actions and the antitrust violations alleged in this Complaint.

34.     Plaintiff Big Y Foods, Inc., and its subsidiaries and affiliates, including Table & Vine, Big Y Express, and Fresh Acres Markets (collectively, "Big Y"), is a Massachusetts corporation with its principal place of business in Springfield, Massachusetts. During the Relevant Period, Big Y and/or its affiliates purchased beef at artificially inflated prices directly from one or more of the Defendants and/or their affiliates or agents, and suffered injury, harm, and damages to its business or property as a direct and/or proximate result of Defendants' above-described wrongful actions and the antitrust violations alleged in this Complaint.

35.     Plaintiff Brookshire Brothers, Inc. ("BBI") is a Texas corporation with its principal place of business in Lufkin, Texas. During the Relevant Period, BBI and/or its affiliates purchased beef at artificially inflated prices directly from one or more of the Defendants and/or their affiliates or agents, and suffered injury, harm, and damages to its business or property as a direct and/or proximate result of Defendants' above-described wrongful actions and the antitrust violations alleged in this Complaint.

36.     Plaintiff Brookshire Grocery Company ("BGC") is a Texas corporation with its principal place of business in Tyler, Texas. During the Relevant Period, BGC and/or its affiliates purchased beef at artificially inflated prices directly from one or more of the Defendants and/or their affiliates or agents, and suffered injury, harm, and damages to its business or property as a

direct and/or proximate result of Defendants' above-described wrongful actions and the antitrust violations alleged in this Complaint.

37.     Plaintiff Colorado Boxed Beef Co. ("CBBC") is a Florida corporation with its principal place of business in Lakeland, Florida. During the Relevant Period, CBBC and/or its affiliates purchased beef at artificially inflated prices directly from one or more of the Defendants and/or their affiliates or agents, and suffered injury, harm, and damages to its business or property as a direct and/or proximate result of Defendants' above-described wrongful actions and the antitrust violations alleged in this Complaint.

38.     Plaintiff Prefco Distribution, LLC ("Prefco") is a Florida limited liability company with its principal place of business in Lakeland, Florida. During the Relevant Period, Prefco and/or its affiliates purchased beef at artificially inflated prices directly from one or more of the Defendants and/or their affiliates or agents, and suffered injury, harm, and damages to its business or property as a direct and/or proximate result of Defendants' above-described wrongful actions and the antitrust violations alleged in this Complaint.

39.     Plaintiff Giant Eagle, Inc. ("Giant Eagle") is a Pennsylvania Corporation with its principal place of business in Pittsburgh, Pennsylvania. During the Relevant Period, Giant Eagle and/or its affiliates purchased beef at artificially inflated prices directly from one or more of the Defendants and/or their affiliates or agents, and suffered injury, harm, and damages to its business or property as a direct and/or proximate result of Defendants' above-described wrongful actions and the antitrust violations alleged in this Complaint.

40.     Plaintiff The Golub Corporation ("Golub"), which does business under the banners Price Chopper Supermarkets, Market Bistro, and Market 32, is a New York corporation with its principal place of business in Schenectady, New York.  During the Relevant Period, Golub and/or its affiliates purchased beef at artificially inflated prices directly from one or more of the

Defendants and/or their affiliates or agents, and suffered injury, harm, and damages to its business or property as a direct and/or proximate result of Defendants' above-described wrongful actions and the antitrust violations alleged in this Complaint.

41.     Plaintiff Nicholas & Co., Inc. ("Nicholas") is a Utah corporation with its principal place of business in Salt Lake City, Utah. During the Relevant Period, Nicholas and/or its affiliates purchased beef at artificially inflated prices directly from one or more of the Defendants and/or their affiliates or agents, and suffered injury, harm, and damages to its business or property as a direct and/or proximate result of Defendants' above-described wrongful actions and the antitrust violations alleged in this Complaint.

42.     Plaintiff PFD Enterprises, Inc. d/b/a Pacific Food Distributors ("PFD") is an Oregon corporation with its principal place of business in Clackamas, Oregon.   During the Relevant Period, PFD and/or its affiliates purchased beef at artificially inflated prices directly from one or more of the Defendants and/or their affiliates or agents, and suffered injury, harm, and damages to its business or property as a direct and/or proximate result of Defendants' above-described wrongful actions and the antitrust violations alleged in this Complaint.

43.     Plaintiff SpartanNash Company ("SpartanNash"), formerly known as Spartan Stores, Inc., is a Michigan corporation with its principal place of business in Byron Center, Michigan.  As used herein, "SpartanNash" refers to SpartanNash Company, Spartan Stores, Inc., Nash-Finch Company, Spartan Stores Distribution, LLC, and their affiliated companies. During the Relevant Period, SpartanNash and/or its affiliates purchased beef at artificially inflated prices directly from one or more of the Defendants and/or their affiliates or agents, and suffered injury, harm, and damages to its business or property as a direct and/or proximate result of Defendants' above-described wrongful actions and the antitrust violations alleged in this Complaint.  Spartan Nash does not bring these claims against the JBS Defendants.

44.     Plaintiff Springfield Grocer Company, Inc. ("SGC") is a Missouri corporation with its principal place of business in Springfield, Missouri. During the Relevant Period, SGC and/or its affiliates purchased beef at artificially inflated prices directly from one or more of the Defendants and/or their affiliates or agents, and suffered injury, harm, and damages to its business or property as a direct and/or proximate result of Defendants' above-described wrongful actions and the antitrust violations alleged in this Complaint.

45.     Plaintiff The Distribution Group, d/b/a Van Eerden Foodservice Co. ("Van Eerden") is a Michigan corporation with its principal place of business in Grand Rapids, Michigan. During the Relevant Period, Van Eerden and/or its affiliates purchased beef at artificially inflated prices directly from one or more of the Defendants and/or their affiliates or agents, and suffered injury, harm, and damages to its business or property as a direct and/or proximate result of Defendants' above-described wrongful actions and the antitrust violations alleged in this Complaint.

46.     Plaintiff Topco Associates, LLC ("Topco") is privately held Illinois limited liability company with its principal place of business in Elk Grove Village, Illinois (within this District). During the Relevant Period, Topco and/or its affiliates purchased beef at artificially inflated prices directly from one or more of the Defendants and/or their affiliates or agents, and suffered injury, harm, and damages to its business or property as a direct and/or proximate result of Defendants' above-described wrongful actions and the antitrust violations alleged in this Complaint.

47.     Plaintiff Troyer Foods, Inc. ("Troyer") is an Indiana corporation with its principal place of business in Goshen, Indiana. During the Relevant Period, Troyer and/or its affiliates purchased beef at artificially inflated prices directly from one or more of the Defendants and/or their affiliates or agents, and suffered injury, harm, and damages to its business or property as a

direct and/or proximate result of Defendants' above-described wrongful actions and the antitrust violations alleged in this Complaint.

48.     Plaintiff UniPro Foodservice, Inc. ("UniPro") is a Delaware corporation with its principal place of business in Atlanta, Georgia. During the Relevant Period, UniPro and/or its affiliates purchased beef at artificially inflated prices directly from one or more of the Defendants and/or their affiliates or agents, and suffered injury, harm, and damages to its business or property as a direct and/or proximate result of Defendants' above-described wrongful actions and the antitrust violations alleged in this Complaint.

49.     Plaintiff URM Stores, Inc. ("URM") is a Washington corporation with its principal place of business in Spokane, Washington. During the Relevant Period, URM and/or its affiliates purchased beef at artificially inflated prices directly from one or more of the Defendants and/or their affiliates or agents, and suffered injury, harm, and damages to its business or property as a direct and/or proximate result of Defendants' above-described wrongful actions and the antitrust violations alleged in this Complaint.

50.     Plaintiff Associated Grocers of the South, Inc. ("AGS") is an Alabama corporation with its principal place of business in Birmingham, Alabama.  AGS brings this action on its own behalf as a direct purchaser of beef from one or more Defendants and their co-conspirators during the conspiracy alleged in this Complaint.  AGS is a grocery cooperative that sells beef to its members.  During the Relevant Period, AGS directly purchased beef in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of Defendants' conduct and violations of law alleged in this Complaint.

51.     Plaintiff Kraft Heinz Foods Company ("Kraft Heinz") is a Pennsylvania limited liability company co-headquartered in Pittsburgh, Pennsylvania and Chicago, Illinois. Kraft Heinz is the third largest food and beverage company in the United States and the fifth largest in the

21

world. In October 2012, Kraft Foods, Inc. spun off Kraft Foods Group, Inc., as a North American grocery business, before changing its name from Kraft Foods, Inc. to Mondelez International, Inc. On July 2, 2015, through a series of transactions, Kraft Foods Group, Inc. merged with and into Kraft Heinz Foods Company (formerly known as H.J. Heinz Company). The Kraft Heinz Company is the parent company of operating entity Kraft Heinz Foods Company. In addition to the well-known Kraft and Heinz brands, Kraft Heinz's U.S. food brands include, among others, Oscar Mayer, Lunchables, Smart Made, and Smart Ones. Kraft Heinz brings this action on its own behalf and on behalf of its parents, subsidiaries, affiliates, and other owned or controlled entities and predecessors in interest (hereinafter collectively referred to as "Kraft Heinz" or "Plaintiff"). During the Relevant Period, Plaintiff purchased beef at artificially inflated prices directly from one or more Defendants, and their affiliates and co-conspirators, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct. Plaintiff has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

52.     Plaintiffs Meijer, Inc. and Meijer Distribution, Inc. (individually and collectively, "Meijer") are Michigan corporations with their principal place of business located in Grand Rapids, Michigan. Meijer brings this action on its own behalf and its assignor (Topco Associates, LLC), each of which directly purchased beef from one or more Defendants and their co-conspirators during the conspiracy alleged in this Complaint. The reference in this Complaint to "Meijer" includes Meijer's assignor but only to with respect to the assigned claims. Meijer owns and operates retail stores that sell beef. During the Relevant Period, Meijer and its assignor directly purchased beef in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of Defendants' conduct and violations of law alleged in this Complaint.

53.     Plaintiff Publix Super Markets, Inc. ("Publix") is a Florida corporation with its principal place of business in Lakeland, Florida.  Publix brings this action on its own behalf as a direct purchaser of beef from one or more Defendants and their co-conspirators during the conspiracy alleged in this Complaint.  Publix owns and operates retail stores that sell beef.  During the Relevant Period, Publix directly purchased beef in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of Defendants' conduct and violations of law alleged in this Complaint.

54.     Plaintiff Raley's Arizona LLC ("Raley's AZ") is an Arizona limited liability company with its principal place of business in Chandler, Arizona.  The reference in this Complaint to "Raley's AZ" refers to certain of its subsidiaries and banners under which it does business, including, without limitation, Bashas', Bashas' Supermarket, Bashas' Diné Market, Food City, AJ's Fine Foods, and Eddie's Country Store.  Raley's AZ owns and operates retail stores that sell beef.  During the Relevant Period, Raley's AZ directly purchased beef in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of Defendants' conduct and violations of law alleged in this Complaint.

55.     Plaintiff Moran Foods, LLC (d/b/a Save-A-Lot, Ltd.) ("Moran Foods") is a Missouri limited liability company with a principal place of business in Earth City, Missouri.  Moran Foods brings this action on its own behalf as a direct purchaser of beef from one or more Defendants and their co-conspirators during the conspiracy alleged in this Complaint.  Moran Foods is a wholesale grocery distribution company and retail store operator that sells beef.  During the Relevant Period, Moran Foods directly purchased beef in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of Defendants' conduct and violations of law alleged in this Complaint.

56.     Plaintiff SUPERVALU, Inc. ("SUPERVALU") is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota.  SUPERVALU brings this action on its own behalf and its assignors (including, without limitation, United Natural Foods, Inc., Associated Grocers of Florida, Inc., Unified Grocers, Inc., and Tony's Fine Foods), each of which directly purchased beef from one or more Defendants and their co-conspirators during the conspiracy alleged in this Complaint.  SUPERVALU is a wholesale distribution company and retail store operator that sells beef.   The reference in this Complaint to "SUPERVALU" includes SUPERVALU'S assignors but only with respect to the assigned claims.  During the Relevant Period, SUPERVALU, including its assignors, directly purchased beef in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of Defendants' conduct and violations of law alleged in this Complaint.

57.     Plaintiff Wakefern Food Corporation ("Wakefern") is a New Jersey corporation with its principal place of business in Elizabeth, New Jersey.  Wakefern brings this action on its own behalf as a direct purchaser of beef from one or more Defendants and their co-conspirators during the conspiracy alleged in this Complaint.  Wakefern is a retailer-owned cooperative that sells beef to its members.  During the Relevant Period, Wakefern directly purchased beef in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of Defendants' conduct and violations of law alleged in this Complaint.

58.     Plaintiff Sysco Corporation ("Sysco") is a Delaware corporation with its principal place of business in Houston, Texas.  Sysco is one of the leading marketers and distributors of food products and food services in the United States.  During the Relevant Period, Sysco purchased beef or beef products at artificially inflated prices directly from various Defendants, and/or their

affiliates, agents, or co-conspirators and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

59.     Plaintiff Amory Investments LLC ("Amory") is a Delaware limited liability company.  Amory brings this action asserting claims assigned by Maines Paper & Food Service, Inc. ("Maines") and John Soules Foods, Inc. ("John Soules Foods").  During the Relevant Period, Maines had its principal place of business in Conklin, New York, and purchased beef or beef products at artificially inflated prices directly from various Defendants, and/or their affiliates, agents, or co-conspirators and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.  During the Relevant Period, John Soules Foods had its principal place of business in Tyler, Texas, and purchased beef or beef products at artificially inflated prices directly from various Defendants, and/or their affiliates, agents, or co-conspirators and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

60.     Plaintiff The Kroger Co. ("Kroger") is an Ohio corporation with its principal place of business in Cincinnati, Ohio.  Kroger brings this action on its own behalf and on behalf of its assignors (including, without limitation: Kroger Limited Partnership I; KRGP Inc.; Kroger Texas L.P.; The Kroger Co. of Michigan; Fred Meyer, Inc.; Fred Meyer Stores, Inc.; Food 4 Less Holdings, Inc.; Ralph's Grocery Company; Smith's Food & Drug Centers, Inc.; Dillon Companies, LLC; Dillon Companies, Inc.; Roundy's Inc.; Junior Food Stores of West Florida, Inc.; Kroger Limited Partnership II; FMJ, Inc.; Healthy Options, Inc.; Pay Less Super Markets, Inc.; City Market, LLC; Harris Teeter, Inc.; Harris Teeter Supermarkets, Inc.; and Harris Teeter, LLC), each of which directly purchased beef from one or more Defendants and their co-conspirators during the conspiracy alleged in this Complaint.  The reference in this Complaint to "Kroger" refers to The Kroger Co. and its assignors.  Kroger owns and operates retail stores that sell beef.  During

the time period relevant to Plaintiffs' claims, Kroger directly purchased beef in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the conduct and violations of law alleged in this Complaint.

61.     Plaintiff Hy-Vee, Inc. ("Hy-Vee") is an Iowa corporation with its principal place of business in West Des Moines, Iowa.  Hy-Vee brings this action on its own behalf, on behalf of certain subsidiaries, including Perishable Distributors of Iowa, Ltd., and on behalf of its assignor (Topco Associates, LLC), each of which directly purchased beef from one or more Defendants and their co-conspirators during the conspiracy alleged in this Complaint.  The reference in this Complaint to "Hy-Vee" includes Hy-Vee's subsidiaries and assignor.  Hy-Vee owns and operates retail stores that sell beef.  During the time period relevant to Plaintiffs' claims, Hy-Vee and its subsidiaries, and Topco, directly purchased beef in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the conduct and violations of law alleged in this Complaint.

62.     Plaintiff Save Mart Supermarkets LLC ("Save Mart") is a California limited liability corporation with its principal place of business in Modesto, California.  The reference in this Complaint to "Save Mart" refers to Save Mart Supermarkets and banners under which it does business, including, without limitation, Save Mart, Lucky Supermarkets, FoodMaxx, and MaxxValue Foods.  Save Mart owns and operates retail stores that sell beef.  During the time period relevant to Plaintiffs' claims, Save Mart directly purchased beef in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the conduct and violations of law alleged in this Complaint.

63.     Plaintiff US Foods, Inc. is a Delaware corporation ("US Foods") with its principal place of business in Rosemont, Illinois.  US Foods is a food distributor that sells beef.  During the time period relevant to Plaintiffs' claims, US Foods, including its subsidiaries, directly purchased

beef in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the conduct and violations of law alleged in this Complaint.

64.     Plaintiff Albertsons Companies, Inc. is a Delaware limited liability company with its principal place of business in Boise, Idaho.   Albertsons Companies, Inc. is the parent corporation of Albertsons LLC, New Albertsons Inc., and Safeway Inc. (collectively "Albertsons").  Albertsons Companies, Inc. brings this action on its own behalf and on behalf of its assignors (including, without limitation: Safeway Inc.; Balducci's Food Lovers Markets; Carr-Gottstein Foods Co.; Dominick's Finer Foods, LLC; Genuardi's Family Markets LP; Kings Food Markets; Lucerne Foods, Inc.; Randall's Food & Drugs LP; The Vons Companies, Inc.; New Albertsons, Inc.; Albertsons LLC; ACME Markets, Inc.; Jewel Food Stores, Inc.; Shaw's Supermarkets, Inc.; United Supermarkets, LLC; American Stores Company, LLC; American Drug Stores Delaware, LLC; American Drug Stores LLC; and Star Market Company, Inc.), each of which directly purchased beef from one or more Defendants and their co-conspirators during the conspiracy alleged in this Complaint.  The reference in this Complaint to "Albertsons" includes Albertsons' assignors.  Albertsons owns and operates retail stores that sell beef.  During the time period relevant to Plaintiffs' claims, Albertsons directly purchased beef in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the conduct and violations of law alleged in this Complaint.

65.     Plaintiff Cheney Brothers, Inc. ("Cheney") is a Florida corporation with its principal place of business in Riviera Beach, Florida. Cheney brings this action on its own behalf, and on behalf of its affiliates, predecessors and subsidiaries.  Cheney directly purchased beef or beef products from one or more Defendants and/or their co-conspirators during the Relevant Period, and suffered antitrust injury as a result of the violations alleged in this Complaint.

66.     Plaintiff Subway Protein Litigation Corp. as the litigation trustee for the Subway® Protein Litigation Trust ("SPLC") is a Delaware corporation. Independent Purchasing Cooperative, Inc. (IPC) serves as the purchasing and services cooperative for Subway® restaurants in the United States and other countries. IPC utilizes distributors and suppliers, including Lineage Logistics Holding LLC, Performance Food Group, Inc., Saladino's Inc., Suisan Company, Ltd., Astra Foods Inc., Ed Miniat LLC, West Liberty Foods, LLC, Viau Foods Products Inc. and Vincent Giordano Corporation (the "SPLC Assignors") to acquire beef and beef products for Subway® restaurants. The SPLC Assignors assigned to IPC all right, title, and interest in the claims and causes of action arising from their purchases of beef or beef products on behalf of Subway® restaurants, and IPC has assigned those rights, title, and interest in the claims and causes of action to SPLC.  During the Relevant Period, the SPLC Assignors directly purchased beef or beef products on behalf of Subway® restaurants from one or more Defendants, and/or their affiliates, agents, or co-conspirators, and suffered antitrust injury as a result of the violations alleged in this Complaint.

67.     Restaurant Services, Inc. ("RSI") is a Delaware corporation with its principal place of business in Miami, Florida. RSI serves as the exclusive supply chain management and distribution cooperative for the BURGER KING® system of company-owned and franchisee-owned restaurants in the United States ("BK Restaurants"). BURGER KING® is the second largest fast food hamburger chain in the world. During the Relevant Period, RSI utilized suppliers including CLW Foods, Inc., Kenosha Beef International Ltd. and its subsidiaries and affiliates including Birchwood Foods, and SSI Foods, LLC, who directly purchased beef from Defendants for the production and supply of beef and beef products for BK Restaurants. RSI also utilized distributors to supply BK Restaurants with beef and beef products purchased on their behalf. These distributors include Lineage Foodservice Solutions, LLC; Maines Paper & Food Service, Inc.,

including its wholly owned subsidiaries, Maines Paper & Food Service - Maryland, Inc., Maines Paper & Food Service - New England, Inc., Maines Paper & Food Service - Ohio, Inc., Maines Paper & Food Service - NY Metro, Inc., Maines Paper & Food Service – Mid - Atlantic, Inc., and Maines Paper & Food Service-Tennessee, Inc.; McLane Foodservice, Inc. and McLane Foodservice Distribution, Inc.; Performance Food Group Co. and all its affiliates, including Reinhart Foodservice LLC; Sysco Corporation and The SYGMA Network, Inc. These suppliers and distributors including their respective subsidiaries, affiliates, divisions, predecessors and assigns ("RSI Assignors") have conveyed, assigned, and transferred to RSI all rights, title, and interest in and to all claims and causes of action arising out of or relating to the RSI Assignors' purchase of beef or beef products on behalf of RSI and BK Restaurants. During the Relevant Period, RSI and/or the RSI Assignors directly purchased beef or beef products from one or more Defendants, and/or their affiliates, agents, or co-conspirators, and suffered antitrust injury as a result of the violations alleged in this Complaint.

68.    Sonic Industries Services Inc. ("Sonic") is an Oklahoma corporation with its headquarters in Oklahoma City, Oklahoma. Sonic is the largest drive-in chain in the United States, well-known for its unique drive-in format, carhop service model, and broad menu of food and beverages. During the Relevant Period, Sonic utilized suppliers including CLW Foods, Inc. and SSI Foods, LLC, who purchased beef from Defendants for the production and supply of beef and beef products for Sonic restaurants. Sonic also utilized distributors to supply its restaurants with beef and beef products purchased on its behalf, including Ben E. Keith Company; McLane Foodservice, Inc. and McLane Foodservice Distribution, Inc.; Performance Food Group, Inc. and its affiliates; Shamrock Foods Company; Nicholas & Co., Inc.; and Gordon Food Service, Inc. These suppliers and distributors (collectively, the "Sonic Assignors") have conveyed, assigned, and transferred to Sonic all rights, title, and interest in and to all claims and causes of action arising

out of or relating to the Sonic Assignors' purchase of beef or beef products on behalf of Sonic. During the Relevant Period, Sonic and/or the Sonic Assignors directly purchased beef or beef products from one or more Defendants and/or their affiliates, agents, or co-conspirators, and suffered antitrust injury as a result of the violations alleged in this Complaint.

69.     Whatabrands LLC ("Whatabrands"), Whataburger Restaurants LLC ("WBR"), and WB Supply & Merchandising LLC ("WBSM") (collectively "WAB") are Texas limited liability companies with their headquarters in San Antonio, Texas. WAB owns, operates, and franchises more than 800 restaurants in Texas, New Mexico, and the southern United States under the "Whataburger" brand (the "Whataburger System"). WAB purchased beef and beef products for the Whataburger System through its supplier, Surlean Meat Company d/b/a Surlean Foods ("Surlean"). Surlean has conveyed, assigned, and transferred to WBSM all rights, title, and interest in and to all claims and causes of action arising out of or relating to the purchase of beef or beef products pursuant to its supply agreement with WBSM.  During the Relevant Period, WAB and Surlean directly purchased beef or beef products from one or more Defendants and/or their affiliates, agents, or co-conspirators, and suffered antitrust injury as a result of the violations alleged in this Complaint.

70.     ARCOP, Inc. ("ARCOP") is an Ohio not-for-profit corporation with its headquarters in Atlanta, Georgia. ARCOP is the national supply chain cooperative for Arby's franchised and company-owned restaurants. During the Relevant Period, ARCOP utilized distributors to supply its restaurants with beef and beef products purchased on its behalf. These distributors include I Supply Co.; McLane Foodservice, Inc. and McLane Foodservice Distribution, Inc.; Performance Food Group, Inc.; Shamrock Foods Company; and their affiliates (the "ARCOP Assignors"). The ARCOP Assignors have conveyed, assigned, and transferred to ARCOP all rights, title, and interest in and to all claims and causes of action arising out of or

relating to the ARCOP Assignors' purchase of beef or beef products on behalf of ARCOP. During the Relevant Period, ARCOP and/or the ARCOP Assignors directly purchased beef or beef products on behalf of ARCOP restaurants from one or more Defendants, and/or their affiliates, agents, or co-conspirators, and suffered antitrust injury as a result of the violations alleged in this Complaint.

71.     CKE Restaurants Holdings, Inc. ("CKE") is a Delaware corporation with its headquarters in Franklin, Tennessee. During the Relevant Period, CKE utilized suppliers including CLW Foods, Inc., Kenosha Beef International Ltd. and its subsidiaries and affiliates including Birchwood Foods, and SSI Foods, LLC, who purchased beef from Defendants, for the production and supply of beef and beef products for CKE restaurants. CKE also utilized distributors to supply its restaurants with beef and beef products purchased on their behalf. These distributors include Gordon Food Service, Inc.; McLane Foodservice, Inc. and McLane Foodservice Distribution, Inc.; Nicholas & Co., Inc.; Shamrock Foods Company; and their affiliates. These suppliers and distributors (collectively, the "CKE Assignors") have conveyed, assigned, and transferred to CKE all rights, title, and interest in and to all claims and causes of action arising out of or relating to the CKE Assignors' purchase of beef or beef products on behalf of CKE. During the Relevant Period, CKE and/or the CKE Assignors directly purchased beef or beef from one or more Defendants, and/or their affiliates, agents, or co-conspirators, and suffered antitrust injury as a result of the violations alleged in this Complaint.

72.     Each Plaintiff is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) & 26, and Section 209(b) of the Packers and Stockyards Act, 7 U.S.C. § 209(b).

B. **Defendants and Their Subsidiaries and Affiliates**

73.     The term "Defendants" includes Defendants and all their predecessors, successors, assigns, including cattle purchasers and beef meatpackers that merged with or were acquired by any Defendant, and each Defendant's current or former wholly owned or controlled subsidiaries or affiliates that bought cattle or sold beef in interstate commerce directly to purchasers in the United States, including sales to one or more Plaintiffs in this District, during the Relevant Period.

74.     Each Defendant bought cattle (*i.e.*, livestock, and therefore is a "packer" under the PSA), and sold or distributed beef to direct purchasers and/or participated in the conspiracy alleged in this Complaint.  All Defendants were active, knowing participants in the alleged conspiracy, and their conduct, to the extent committed by Defendants, was known to, and approved by, their co-Defendant parent companies.

1. **The Cargill Defendants**

75.     Defendant Cargill, Inc. ("Cargill") is a privately held Delaware corporation with its principal place of business at 15407 McGinty Road, Wayzata, Minnesota 55391.  During the Relevant Period, Cargill, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through Cargill, Inc.'s wholly owned or controlled affiliates, to purchasers in the United States, including to one or more Plaintiffs.  Cargill, Inc. is the parent company of CMS.

76.     Defendant Cargill Meat Solutions Corporation (a/k/a Cargill Protein) (a/k/a Cargill Protein – North America) ("CMS") is a wholly owned Cargill subsidiary.  CMS is a Delaware corporation with its principal place of business at 825 East Douglas Avenue, Wichita, Kansas 67202.  CMS is the principal operating entity within Cargill's U.S. cattle and beef business. CMS owns directly, or indirectly through its subsidiaries, Cargill's U.S. fed cattle slaughter plants, and contracts for the purchase of cattle slaughtered there.

77.     During the Relevant Period, Cargill wholly owned CMS, as a direct or indirect subsidiary, and sold, along with CMS, beef in interstate commerce, directly or through this wholly owned or controlled affiliate, to purchasers in the United States, including to one or more Plaintiffs.

78.     During the Relevant Period, Cargill and CMS (together, "Cargill Defendants") shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy alleged in this Complaint that purposefully directed conduct causing injury to, and derived direct benefit from, purchasers in the United States and this District, including to one or more Plaintiffs.

### 2.     The JBS Defendants

79.     Defendant JBS S.A. is a Brazilian corporation with its principal place of business at Av. Marginal Direta do Tiete, 500 Bloco 3-30 andar, Vila Jaguara, Sao Paulo 05.118-100, Brazil. During the Relevant Period, JBS S.A. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through JBS S.A.'s wholly owned or controlled affiliates, to purchasers in the United States, including one or more Plaintiffs. JBS S.A. is the parent company of JBS USA, Swift, and Packerland.

80.     JBS USA Food Company ("JBS USA") is a Delaware corporation with its principal place of business at 1770 Promontory Circle, Greeley, Colorado 80634.  JBS USA is the principal operating entity of JBS S.A.'s U.S. cattle-and-beef business.  On information and belief, it is the principal operating entity within JBS S.A.'s United States cattle and beef business and the contracting entity for certain of JBS S.A.'s purchases of fed cattle in the United States.

81.     Defendant Swift Beef Company ("Swift") is a Delaware corporation with its principal place of business at 1770 Promontory Circle, Greeley, Colorado 80634.  Swift owns directly, or indirectly through its subsidiaries, certain of JBS S.A.'s United States fed cattle slaughter plants including the Cactus, Texas; Greeley, Colorado; Grand Island, Nebraska; and

Hyrum, Utah plants.  On information and belief, Swift contracts for the majority of fed cattle to be slaughtered at these plants.

82.     Defendant JBS Packerland, Inc. ("Packerland") is a Delaware corporation with its principal place of business at 1770 Promontory Circle, Greeley, Colorado 80634.  On information and belief, Packerland owns directly, or indirectly through its subsidiaries, certain of JBS S.A.'s United States fed and dairy cattle slaughter plants, including the Packerland packing plants in Green Bay, Wisconsin and Plainwell, Michigan, the Sun Land beef plant in Tolleson, Arizona, and the Moyer Packing plant in Souderton, Pennsylvania.  On information and belief, Packerland contracts for the majority of fed cattle to be slaughtered at these plants.  Packerland operates a Regional Beef business unit.

83.     Various senior staff and executives responsible for the operation of JBS S.A.'s United States fed cattle and beef business during the Relevant Period were employed by each of JBS USA, Swift, and Packerland (collectively with JBS S.A., the "JBS Defendants").

84.     During the Relevant Period, JBS S.A., along with and/or through its wholly owned direct or indirect subsidiaries – JBS USA, Swift, and Packerland, sold beef in interstate commerce, directly or through these wholly owned or controlled affiliates, to purchasers in the United States, including to one or more Plaintiffs.

85.     During the Relevant Period, the JBS Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy alleged in this Complaint that purposefully directed conduct causing injury to and derived direct benefit from purchasers in the United States and in this District, including to one or more Plaintiffs.

### 3.     The Tyson Defendants

86.     Tyson Foods, Inc. ("Tyson Foods") is a publicly traded Delaware corporation headquartered in Springdale, Arkansas.  During the Relevant Period, Tyson Foods and/or its

predecessors, wholly owned or controlled subsidiaries, and/or affiliates sold beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including one or more Plaintiffs.

87.     Defendant Tyson Fresh Meats, Inc. ("Tyson Fresh") is a wholly owned subsidiary of Tyson Foods.  Tyson Fresh is a Delaware corporation with its principal place of business at 800 Stevens Port Drive, Dakota Dunes, South Dakota 57049.  Tyson Fresh is the principal operating entity within Tyson Foods' U.S. cattle and beef business.

88.     On information and belief, Tyson Fresh owns directly, or indirectly through its subsidiaries, Tyson Foods' U.S. fed cattle slaughter plants and contracts for the purchase of cattle slaughtered there.

89.     During the Relevant Period, Tyson Foods wholly owned Tyson Fresh as a direct or indirect subsidiary, and sold, along with Tyson Fresh, beef in interstate commerce, directly or through this wholly owned or controlled affiliate, to purchasers in the United States, including to one or more Plaintiffs.

90.     During the Relevant Period, Tyson Foods and Tyson Fresh (together, "Tyson Defendants") shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy alleged in this Complaint that purposefully directed conduct causing injury to and derived direct benefit from purchasers in the United States and in this District, including to one or more Plaintiffs.

### 4.     National Beef Packing Company

91.     National Beef Packing Company LLC ("National Beef") is a privately owned Delaware limited liability company with its principal place of business located at 12200 North Ambassador Drive, Suite 500, Kansas City, Missouri 64163.  During the Relevant Period, National Beef and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in

interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including to one or more Plaintiffs.

92.     On information and belief, National Beef owns directly, or indirectly through its subsidiaries, National Beef's United States fed cattle slaughter plants and contracts for the purchase of cattle slaughtered there.

### C.     Defendants' Co-Conspirators

93.     Unknown persons, firms, and entities not named as Defendants in this Complaint participated as co-conspirators with Defendants and performed acts and made statements in furtherance of Defendants' conspiracy.  Defendants are jointly and severally liable for the acts of their co-conspirators whether or not Plaintiffs name these co-conspirators as defendants.

### D.     Reciprocal Agency of Defendants and Co-Conspirators

94.     Each Defendant and co-conspirator acted by or through its officers, directors, agents, employees, or representatives while actively engaged in the management, direction, control, or transaction of the company's business or affairs.

95.     Each Defendant and co-conspirator acted as the agent of the other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct Plaintiffs allege in this Complaint.

### E.     Defendant Parent and Subsidiary Companies Share a Unity of Interests

96.     During the Relevant Period, the coordinated activity of a parent and its wholly owned subsidiary is viewed as that of a single enterprise for purposes of Section 1 of the Sherman Act.

97.     A parent and its wholly owned subsidiary have a complete unity of interest and purpose.  Their objectives are common, not disparate, and their general corporate actions are

guided or determined by one corporate consciousness.  Accordingly, the coordinated activity of a parent and its wholly owned subsidiary is conduct of a single enterprise.

98.     By controlling, dictating, or encouraging their subsidiaries' anticompetitive conduct in advancement of a common scheme for an illegal and anticompetitive purpose, the parent Defendants independently participated in the illegal enterprise alleged in this Complaint. In doing so, the parent Defendants engaged in sufficient independent conduct and had sufficient knowledge, intent, and involvement in Defendants' conspiracy to be liable under the Sherman Act as a single enterprise with their subsidiaries.

### 1.     The Cargill Defendants

99.     Cargill created CMS to conduct its business in the meat industry that Cargill previously operated itself.

100.     Cargill presents itself and its subsidiaries to the public as a single unified enterprise. For example, in its Letter to Stakeholders included in Cargill's 2021 Annual Report, it explains, in a section entitled "How we work," that "[o]ur integrated operating approach enables our businesses to provide industry-leading products and services in their specific sections while also drawing on the full work of Cargill's expertise."  Additionally, on its website, Cargill reports that it employs 155,000 workers in 70 countries.  Plaintiffs are informed and therefore believe and allege that these numbers include CMS employees.  Cargill has also publicly announced consolidated revenues, earnings, and cash flow that Plaintiffs believe include CMS's beef operations.

101.     In the Letter to Stakeholders included in Cargill's 2019 Annual Report, Cargill reported that it "delivered $2.82 billion in adjusted operating earnings in fiscal 2019…. Revenues dipped 1% to $113.5 billion.  Cash flow from operations totaled $5.19 billion."  On information and belief, those statistics include earnings, revenues, and cash flows from all Cargill subsidiaries

as well as Cargill itself.  In the same document, Cargill reported that its "[e]arnings were led by our North American protein businesses.  With steady domestic and export demand, and plentiful cattle supplies, the beef business posted its third consecutive year of strong performance."

102.    A single unified system processes both companies' purchase orders, which further demonstrates the intertwined relationship between Cargill and CMS.  Cargill also operates other business services, including information technology, human resources, finance, transportation and logistics, and procurement, with and for CMS.

103.    Cargill plays an active role in managing CMS's business operations.  For example, Cargill's 2021 Annual Report states that its Executive Team is responsible for the company's strategic direction, talent development and overall financial performance" and it is "[l]ed by Board Chari and CEO David MacLennan . . . ."

104.    Cargill's slaughter plants in Fresno, California, Wyalusing, Pennsylvania, and Friona, Texas all list either "Cargill" or "Cargill Beef" as DBAs with the USDA Food Safety Inspection Service.

105.    Cargill's extensive involvement in CMS's management and operations demonstrates these entities' unity of purpose (*e.g.*, to profit from their price fixing) and common objectives.  Cargill's involvement in CMS's management and operations demonstrates that Cargill created CMS as its instrumentality to execute Cargill's directives.  During the Relevant Period, Cargill exerted, and had the right to exert, control over CMS.  Thus, Cargill independently participated in the illegal enterprise with CMS and, accordingly, has sufficient knowledge, intent, and involvement in Defendants' conspiracy to be found liable under the Sherman Act with CMS as a single enterprise.

2.      **The JBS Defendants**

106.    JBS S.A. is not merely a holding company whose business is restricted to investments in operating subsidiaries.  JBS S.A. established or acquired subsidiaries, including JBS USA (which it formed), Swift (which it acquired), and Packerland (which it acquired), to conduct its business, including the purchase and processing of cattle and the sale of beef.  Had JBS S.A. not created or acquired these subsidiaries, it would have performed these functions itself.

107.    JBS S.A. presents itself as a unified enterprise and conducts consolidated earnings calls on which its corporate representatives discuss the operations and profits of JBS S.A., including JBS USA, Swift, and Packerland.  On these calls, JBS S.A. executives have described the beef business it conducts through JBS USA, referring to it as "JBS beef" and as a "division" or "business unit."  JBS S.A. states on its website that it "produces and sells beef through two Business Units: Friboi, in Brazil, and JBS USA Beef."  As reported on JBS USA's financial statements, JBS USA conducts its United States beef and pork processing businesses through its wholly owned subsidiaries, Swift and JBS Packerland.

108.    During the Relevant Period, JBS USA's CEO and President reported directly to JBS S.A.'s President, Chief Executive of Global Operations, and CEO.

109.    Defendants Swift and Packerland are fully integrated into the JBS USA enterprise. They are under the complete control of JBS USA, and in turn, JBS S.A.  JBS USA's financial statements are replete with references to notes, loans, and credit facilities guaranteed by its parent, JBS S.A.

110.    Credit rating agencies have also factored in rating JBS USA in connection with issuance of notes guaranteed by JBS USA's parent, JBS S.A.  For example, credit rating agency Moody's recently reported that JBS USA was a co-issuer (along with two other JBS related

entities) of proposed $500 million senior unsecured 10-year notes to be guaranteed by the parent, JBS S.A.

111.    Swift's and JBS Packerland's packing operations are presented as those of JBS USA.  For example, they appear on USDA's list of Bonded Packers as "JBS USA Food Company, Swift Beef Company" and "JBS USA Food Company, JBS Packerland, Inc.," respectively.  The USDA's Food Safety and Inspection Service's Inspection Directory lists "JBS," "JBS USA," and "JBS USA Food Company" amongst other DBAs for Swift.

112.    JBS S.A.'s extensive involvement in JBS USA's, Swift's, and Packerland's management and operations demonstrates these entities' unity of purpose (*e.g.*, to profit from their price fixing) and common objectives.  JBS S.A.'s involvement in JBS USA's, Swift's, and Packerland's management and operations also reveal that these entities' general corporate actions are guided and determined by one corporate consciousness.  JBS S.A. does more than provide long-term strategy and guidance to JBS USA, Swift, and Packerland.  The entire purpose of these subsidiaries is to serve as JBS S.A.'s instrumentalities for executing JBS S.A.'s directives within the greater JBS enterprise.  During the Relevant Period, JBS S.A. exerted, and had the right to exert, total control over JBS USA, Swift, and Packerland.  In this manner, JBS S.A. independently participated in the unlawful enterprise with JBS USA, Swift, and Packerland.  Accordingly, JBS S.A. has sufficient knowledge, intent, and involvement in Defendants' conspiracy to be found liable under the Sherman Act as a single enterprise with JBS USA, Swift, and Packerland.

### 3.    The Tyson Defendants

113.    Tyson Foods is not a mere holding company whose business is restricted to investments in operating subsidiaries.  Rather, Tyson Foods formed subsidiaries to act as its agents and representatives to conduct business activities that Tyson Foods would have otherwise

conducted.   With respect to Tyson Foods' subsidiary Tyson Fresh, such activities include purchasing and processing cattle and selling beef.

114.   Tyson Foods holds itself out to the public as a single unified enterprise, describing the beef business it conducts through Tyson Fresh as a mere "business unit."

115.   On its quarterly earnings calls, Tyson Foods' corporate representatives include Tyson Fresh when discussing the company's financial performance.  On these calls, Tyson Foods announces operating income and returns on sales from its beef segment business that Tyson Fresh operates.  Specifically, on earnings calls, Tyson Foods attributes improved returns to actions at plants that Tyson Fresh owns and operates.

116.   During a January 31, 2014, earnings call, for example, Tyson Foods management employees explained to investors that Tyson Foods had generated $58 million in operating income and a 1.6% return on sales from its beef segment business, despite that business being operated directly by Tyson Fresh Meats.  On the same call, Tyson Foods' managers stated that "as the calf crop declines ... [we'll] probably have to curtail production."  Production of beef from the calf crop is an activity undertaken by Tyson Fresh.

117.   On other earnings calls, Tyson Foods has described actions taken by Tyson Fresh to advance Defendants' conspiracy.  For example, on its August 10, 2015, earnings call, Tyson Foods explained its strategy for cattle purchasing implemented by Tyson Fresh as "we run for margin and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and added costs."

118.   Similarly, on Tyson Foods' May 7, 2018, earnings call, with respect to beef production plants owned and operated by Tyson Fresh, Tyson Foods explained that "[w]e had to stop production[], [w]e had to close plants several times in the quarter, not every plant, but several plants several times in the quarter."

119.     Tyson Foods and Tyson Fresh also guarantee each other's debts.  Tyson Fresh has issued multiple debt securities guaranteed by Tyson Foods.  In a registration statement filed with the SEC in 2009, Tyson Foods notified investors that Tyson Fresh pledged not only its own assets to guarantee debt instruments, but also those of Tyson Foods and certain "other domestic operation subsidiaries of Tyson [Foods]."

120.     Similarly, in a 2014 prospectus filed with the SEC, Tyson Foods stated that Tyson Fresh would act as a guarantor of Tyson Foods' debt securities, including debentures, notes, and all other types of debt.  Tyson Foods has issued multiple senior notes under this arrangement.

121.     Finally, in registrations with the USDA's Food Safety Inspection Service, Tyson Fresh slaughter plants in Dakota City, Nebraska, Lexington, Nebraska, and Amarillo, Texas, identify Tyson Foods as a business name of Tyson Fresh.

122.     Tyson Foods' extensive involvement in Tyson Fresh's management and operations demonstrates these entities' unity of purpose (*e.g.*, to profit from their price fixing) and common objectives.  Tyson Foods' involvement in Tyson Fresh's management and operations also reveals that these entities' general corporate actions are guided and determined by one corporate consciousness.  Tyson Foods does not merely provide long-term strategy and guidance to Tyson Fresh.  Tyson Fresh's entire purpose is to execute Tyson Foods' directives within the greater Tyson enterprise and to serve as an instrumentality of Tyson Foods.  During the Relevant Period, Tyson Foods exerted, and had the right to exert, control over Tyson Fresh.  In this manner, Tyson Foods independently participated in the unlawful enterprise with Tyson Fresh and, as a result, has sufficient knowledge, intent, and involvement in Defendants' conspiracy to be found liable under the Sherman Act with Tyson Fresh as a single enterprise.

## VI.    **INDUSTRY BACKGROUND**

123.    The United States is the largest producer of beef in the world – primarily "high quality, grain-fed beef for domestic and export use."[11]

124.    The market for fed cattle in the United States is substantial.  In 2017 alone, for example, 25.8 million fed cattle were slaughtered and processed into beef products, which accounted for 80% of the 32.2 million cattle slaughtered across the United States.[12]

125.    The size of cattle herds in the United States is influenced by what is known as the "cattle cycle," which is a process in which the size of the national cattle herd increases and decreases over time.  Variation in herd size is often caused by the lengthy gestation period of cattle relative to hogs and poultry, which constrains cattle producers' response to profit fluctuations.  In general, the cattle cycle is determined by the combined effects of cattle prices, the gestation period, the time needed for raising calves to market weight, and climatic conditions.  If cattle producers expect the price of cattle to be high, they slowly build up their herd sizes, but if they expect prices to be low, they will reduce their herds by culling older cows and keeping fewer heifers.

126.    Production of cattle raised for beef takes considerable time and investment.  The cattle production cycle, running from birth to slaughter, typically ranges between 15 to 24 months, and is the longest of all animals raised for meat.  Fed cattle progresses through three interrelated stages prior to slaughter: cow/calf, stocking and background, and feedlots.  Calves are first raised by their mothers for about six months.  When they weigh about 500 pounds, the calves are weaned and sold to the stocker-yearling sector where they eat a diet of forage, wheat pasture, and silage.

---

[11]    *See* the "Cattle & Beef" section of the USDA website (hereafter "USDA Cattle & Beef"), *available at* https://www.ers.usda.gov/topics/animal-products/cattle-beef/.

[12]    The  non-fed  volume is comprised of slaughter cows (female cattle that have birthed a calf) and bulls, whose meat is typically used for lesser quality beef products.

When a steer or heifer reaches 600 - 800 pounds, it is sold to a feedlot where it eats corn and protein supplements in addition to roughage.

127.    Once cattle reach approximately 1,200 - 1,400 pounds, they are sold as fed cattle to the beef producers/packers, including Defendants.  Defendants and other beef producers/packers then slaughter and process the cattle into edible boxed beef and primal and smaller case-ready consumer cuts.  A steer weighing 1,200 pounds typically yields about 490 pounds of edible beef.

128.    Cattle are sold to beef processors, including Defendants, through two channels. About 70% of cattle are sold through supply contracts (known as captive-cattle agreements) with feedlots or, to a lesser extent, ranching operations.  The rest of the cattle are sold on the spot market, which is typically the benchmark for prices of cattle sold under captive-cattle agreements.  Thus, by increasing the volume of cattle they purchased under captive-cattle agreements, and decreasing their spot purchases, Defendants, with their considerable market power, were able to depress the price they paid under both spot and captive-cattle agreements.

129.    In the final stage of the farm to market journey, Defendants and other meatpackers sell the beef to wholesalers, grocery chains, food distributors, food processors, restaurants, and other large retailers, including Plaintiffs.

130.    On information and belief, during the Relevant Period, Tyson Fresh, JBS USA, Swift, Packerland, CMS, and National Beef each conducted daily meetings, typically from their head offices, attended by representatives of their respective cattle procurement, plant operations, scheduling, beef sales, and risk management teams, among others, to make decisions regarding their respective cattle and beef operations.  Among other matters, the attendees at these meetings discussed the number of cattle their fed cattle business will procure, the terms on which they would be bought, plant scheduling (including slaughter volume) across each of their slaughter facilities, and beef sales strategy.

131.    Because the cost of beef production is predominately made up of the cost of fed cattle, Defendants' profitability is driven by the "meat margin," which is the spread between the price they pay for fed cattle and the price they charge for beef.  The meat margin is sensitive to changes in industry aggregate slaughter levels, and Tyson Fresh, Swift, Packerland, CMS, and National Beef can (and have through collusion) increased it.  As noted by the DOJ, "[a]ll else being equal, when the meat packing industry reduces production levels, feedlots and cattle producers are paid less for fed cattle because fewer fed cattle are demanded and customers pay more for [] beef because less is available for purchase.  Because the supply of fed cattle and demand for [] beef are relatively insensitive to short term changes in price, even small changes in industry production levels can significantly affect packer profits."[13]

132.    As a result of these sensitivities, during the Relevant Period, Tyson Fresh, Swift, Packerland, CMS, and National Beef, on behalf of their respective Defendant parent companies, can (and did) improve their profitability by coordinating what they paid for slaughter-ready cattle and the resulting supply of fed cattle, at the expense of buyers of beef, including Plaintiffs, who paid more than they would have but for Defendants' illegal conduct.

## VII.    DEFENDANTS' ANTITRUST AND PSA VIOLATIONS

133.    By approximately late 2014 or early 2015, Defendants were experiencing shrinking profit margins on their beef sales.  In earnings calls or annual reports, the two largest Defendants, Tyson Foods and JBS S.A., reported slumping profitability of their beef operations.

134.    For example, on a November 17, 2014, earnings release, Tyson Foods reported a quarterly operating margin for its beef division that was less than half the margin enjoyed by its poultry division.  Similarly, in its 2014 Earnings Release, JBS S.A. announced that its U.S. beef

---

[13]    *U.S. v. JBS*, No. 08-cv-5992 (N.D. Ill., Nov. 7, 2008), Dkt. 48 ("Amended Complaint"), ¶¶ 26-27. *See also* <u>Section VII(B)</u> below regarding the elasticities of fed cattle and beef.

segment (JBS USA) was underperforming relative to its chicken segment (which had "performed really well in 2014") and pork segment (which in 2014 was the "best result in the pork industry in the US").  Its beef quarterly margin was less than one-third of its chicken segment and less than one-half of its pork segment's margin.

135.    Rather than trying to improve profitability through independent conduct pursuant to unilateral business interests, Defendants instead agreed to collectively reduce and manage their respective slaughter volumes, which, in turn, resulted in a reduction in the supply of beef.  The artificial beef shortages ushered in a new era of supra-competitive prices paid by Plaintiffs and other direct purchasers of beef.

A.      **Direct Evidence of Defendants' Conspiracy**

136.    Information recently unsealed in public filings confirms Defendants' conspiracy, as witnessed by a former Swift employee known as Witness 1.  The allegations below concerning Witness 1 are based on those filings and other recently unsealed information.

137.    Based on conversations with James Hooker, head of fabrication at Swift's Cactus, Texas plant, Witness 1 states that Defendants agreed with each other to periodically reduce their respective purchase and slaughter volumes, resulting in beef prices above competitive levels paid by direct purchasers, including Plaintiffs.

138.    During his decade-long employment, including several years during the Relevant Period, Witness 1 was a head quality assurance officer with primary responsibility for the Swift plant's kill floor, hotboxes, and coolers.  The kill floor is where cattle are slaughtered and dressed, *i.e.*, where head, hide, and internal organs removed.  The carcasses are then moved to the hotboxes to cool down, before being stored in the coolers ahead of fabrication, where they are broken down into smaller cuts.

139.    According to Witness 1, he learned of Defendants' collusive purchase and slaughter reduction agreement from Mr. Hooker, who was employed as the head of fabrication at the same Cactus, Texas plant as Witness 1.  As explained below, Mr. Hooker was positioned to know (and did know) about Defendants' unlawful agreement.

140.    Witness 1 regularly spoke with Mr. Hooker before starting his shift to learn the slaughter and fabrication numbers for that day and the upcoming days, which information Witness 1 and his team needed to execute their responsibilities, including the placement of his team, arrangement of hotbox and cooler space, the number of carcasses they would process through the hotbox and coolers that day, and interactions with USDA inspectors.

141.    In addition to the fabrication plan, Mr. Hooker, like Witness 1, also needed to understand the number of cattle scheduled to be slaughtered each day.  Among other matters, if the kill volume was lower but the price of beef remained favorable, the fabrication floor would continue to process carcasses at typical rates.  However, when kill volumes were reduced and the price of beef was unfavorable, Mr. Hooker might order the carcasses to stay longer in the hotboxes and coolers before being processed into beef cuts to improve grading performance.  In such a case, Witness 1 and his team would allow more space between each carcass in the hotboxes.

142.    But if the kill volume were higher, Mr. Hooker increased the number of carcasses processed.  To ensure there was sufficient space in the hotboxes and coolers, Witness 1 spaced the carcasses closer together when filling the hotboxes.  The number of carcasses expected to be put into the hotboxes also dictated the amount of air and water Witness 1 and his team used to ensure proper cooling speeds.

143.    In sum, it was essential for both Mr. Hooker and Witness 1 to know the plant's planned slaughter figures to coordinate and perform their core job duties.  Witness 1 reported having had a "decent" working relationship with Mr. Hooker.

      1.      **<u>Mr. Hooker Was Positioned to Know About Defendants' Unlawful Agreement</u>**

144.    On information and belief, Mr. Hooker continues to work at Swift's Cactus, Texas plant, where he has worked for over 15 years, including a short stint as head of slaughter operations. Witness 1 reports that before working for Swift in the early 2000s, Mr. Hooker worked at Tyson Fresh's Amarillo, Texas slaughter plant, where he was also responsible for beef fabrication.

145.    As a fabrication manager for Swift, Mr. Hooker reported directly to both Cactus's General Manager, Manny Guerrero, and directly to the beef production department of JBS USA/Swift/Packerland's head office in Greeley, Colorado.

146.    As head of fabrication, Mr. Hooker needed to be informed as to cattle buying/scheduling, cattle slaughter, and beef selling aspects of JBS USA/Swift/Packerland's fed cattle business. Mr. Hooker also spoke directly to other managers within the JBS corporate office about plant operations, including scheduled slaughter and fabrication volumes, and fabrication priorities.

147.    For example, during the Relevant Period, Mr. Hooker regularly spoke directly to Mr. Sergio Sampaio Nogueira, Head of Operations and Executive Vice President of Beef Operations at JBS, when Mr. Nogueira visited the Cactus, Texas plant. Witness 1 understands that Mr. Hooker also spoke to Mr. Nogueira at other times. Mr. Hooker's contact with senior management confirms that JBS USA/Swift/Packerland senior executives maintained direct connection with plant-level managers, like Mr. Hooker, during the Relevant Period.

148.    Mr. Hooker, along with Ryan Wagnon (Head of Slaughter Operations at Swift's Cactus, Texas plant), was also responsible for operations at the plant in the absence of Mr. Guerrero and the Plant Engineer. When acting as the Cactus, Texas plant's General Manager, Mr.

Hooker worked closely with beef executives from across JBS's head office.  As such, Mr. Hooker regularly spoke to, and had a close working relationship with, high-ranking individuals at JBS.

149.    On information and belief, in addition to having corporate information for JBS, Mr. Hooker had information regarding other Defendants.  Mr. Hooker regularly told Witness 1 that he was in contact with his former colleagues at Tyson Fresh's Amarillo, Texas plant, including his replacement there.  Mr. Hooker also told Witness 1 that he had friends and former colleagues at other Defendants' plants with whom he stayed in touch.  Mr. Hooker often provided Witness 1 with detailed information regarding current and future operations of Tyson Fresh's, CMS's, and National Beef's nearby packing plants.

### 2.    Witness 1 Learns of Defendants' Unlawful Agreement

150.    During the Relevant Period, Witness 1 reports having multiple discussions with Mr. Hooker during which Mr. Hooker explained that Defendants reduced their purchase and slaughter volume to reduce fed cattle prices when Defendants viewed fed cattle prices as being or becoming "too high" for their liking.  During one such conversation in 2015, Mr. Hooker specifically admitted that Defendants had an "agreement" to reduce their purchase and slaughter volumes in response to what they perceived to be high cattle prices.

151.    According to Witness 1's account, he was in Mr. Hooker's office when Mr. Hooker received an angry phone call from his immediate supervisor who worked out of JBS USA/Swift/Packerland's central office in Greeley, Colorado.  After the call concluded, Witness 1 asked Mr. Hooker how "many are we [Swift's Cactus plant] cutting [*i.e.*, fabricating]?"  Witness 1 reports that Mr. Hooker replied the "cut" was going to be steady that day, but that the "kills are getting cut back, [because the] price is getting too high" (or words to that effect).

152.    Witness 1 further reports that there was typically a lag between commencement of a slaughter reduction and the reduction of fabrication activities.  Among other reasons, this

phenomenon reflected the fact that a slaughter plant's fabrication team had to continue processing the carcasses already hanging in the coolers.

153.    Witness 1 also recalls asking Mr. Hooker whether Swift's competitors were also cutting back their kill.   Witness 1 recalls that Mr. Hooker answered Witness 1's question as follows: "Yes, they are.  We have had that agreement that we don't kill while prices are up for a while" (or words to that effect).

154.    Witness 1 is certain that Mr. Hooker intended to convey that all Defendants were reducing their slaughter volumes by agreement, and not simply commenting on the fact that one or some of the Defendants had independently decided to reduce slaughter.

155.    Witness 1 stated that Swift's Cactus, Texas plant had a 5,500 - 6,000 head per day slaughtering capacity but might drop its kill level to around 4,800 - 5,200 head per day when implementing Defendants' unlawful agreement.  In furtherance of the agreement, Swift bought and slaughtered fewer cattle, which entailed running its slaughter plants at reduced hours, operating the plants at lower "chain speeds," and/or scheduling maintenance shutdowns.

156.    Witness 1 recalls management at Swift's Cactus, Texas plant, including Messrs. Guerrero and Wagnon, pretextually telling staff during periods of reduced slaughter during the Relevant Period that kill levels were being reduced in response to fed cattle prices.  As further described below, Defendants coordinated and agreed to refrain from expanding their slaughtering and processing capacity, thereby further restricting the supply of beef.

**B.**    **The Available Data Corroborates Witness 1's Account**

157.    Public reports and data confirm that Defendants reduced and rationed their slaughter volumes during the Relevant Period, resulting in supra-competitive beef prices sold to Plaintiffs and others.  Defendants also managed their respective slaughter volumes during the

Relevant Period in relative lockstep to ensure the supply of beef remained lower than the corresponding, increasing demand.  Defendants did so despite record margins being earned.

158.  The slaughter reductions took place at various points during the Relevant Period. Defendants collectively moderated their slaughter volume during the second and third quarters of most years in a successful effort to expand their margins.

159.  Defendants' joint slaughter management was not a reaction to changes in beef demand, which, as admitted by Tyson Fresh's head of procurement in 2018, had been "off the charts."[14]

160.  Nor did any Defendant defect from the agreement and buy more cattle to capture greater market share, despite all Defendants posting profit margins demonstrating that no Defendant was running at or near their marginal cost of production.  Indeed, from the end of the first quarter of 2015 through the end of the Relevant Period, Defendants posted record per head net margins.  Moreover, market events and conditions do not explain Defendants' unusually high profit margins – even excluding 2019 and 2020, which saw Defendants' margins increase in the aftermath of the Tyson Holcomb, Kansas plant fire and COVID disruption (discussed below). Defendants' average per head margins during the Relevant Period vastly exceeded their averages before approximately 2015.

161.  Tyson Fresh, Swift/Packerland, and National Beef each reduced their slaughter volumes during 2015, while Cargill held its slaughter volumes relatively steady following its 2014 cuts.  These artificial reductions occurred at approximately the same time as the collusive

---

[14]  Tyson Fresh Meats: What the Consumer Demands - John Gerber, VP, Cattle Procurement, Tyson Foods; Kevin Hueser, VP, Beef Pricing, Tyson Foods, from the 2018 NIAA Antibiotic Symposium: New Science & Technology Tools for Antibiotic Stewardship, November 13-15, 2018, Overland Park, KS, USA, https://www.youtube.com/watch?v=qCip3WBcqzo.

decline in fed cattle prices starting in 2015 and during the Relevant Period, while beef prices were relatively stabilized or increased.

162.    While the quarterly reporting period obscures certain shorter reductions described below, it confirms the extent to which Defendants' quarter-to-quarter slaughter volume changes moved in lockstep with each other.  This parallelism is consistent with, and the product of, Defendants' anticompetitive agreement to jointly manage and reduce their slaughter levels below a competitive level.

163.    The nature of Defendants' slaughter reductions in 2015 and 2016 is startling compared with historic production (2012-2014).  In 2015, production decreased in the year overall and each quarter.  For 2016, production decreased overall and for three of the four quarters.  Tyson Fresh, Swift/Packerland, CMS, and National Beef's production was down comparing year-on-year changes against an average of 2012-2014.

164.    Defendants' strategy was successful, with lower slaughter volumes and lower beef output resulting in artificially high beef prices, despite cattle prices falling.  Defendants' meat margin expanded as a result.

165.    Each Defendant's conduct stands apart from independent packers, who increased their annual slaughter volume in 2015 by 7.8% year-on-year.

166.    Defendants slaughtered fewer cattle during the Relevant Period than they did before that period.  Although Defendants gradually increased their slaughter volumes year-over-year during the Relevant Period, their rates of increase lagged far behind the rates of other producers' rates, and far behind the rate of change that would have occurred in a competitive market.[15] Fully

---

[15]    *See* Cattle Buyers Weekly, "Top 30 Beef Packers" Annual Reports, 2008-2019, 2018 Meat & Poultry Facts, 47th Ed., NORTH AMERICAN MEAT INSTITUTE, 2019, at 11 (National Beef acquired Iowa Premium in June 2019, adding 300,000 head to its annual fed cattle slaughter volume.  Absent that acquisition, its 2019 slaughter volume was flat versus 2018.  At the same time, independent packers' collective slaughter volume rose by approximately 100,000 head (net of the Iowa Premium acquisition)).

five years after the start of the conspiracy, none of the Defendants had returned to their pre-2015 slaughter levels despite record profitability while independent packers' slaughter volume increased nearly 50% against their pre-2015 average, and 25% against their 2015 levels.

### 1.   Defendants Slash Production in 2015

167.   As evidenced by publicly available data, the impact of Defendants' conspiracy was significant.  Each Defendant cut its annual cattle slaughter volumes during the Relevant Period by an average of about 13% compared to 2007-2014.

168.   Data breaking out slaughter volumes for the Relevant Period highlights Defendants' reductions in 2015, while other beef producers maintained or increased their volumes that year.  For example, despite a slight uptick in the final quarter of 2015, Tyson Fresh's overall 2015 slaughter volume was down by 4% as compared with 2014.  Similarly, Swift/Packerland's volume was down by 17% and National Beef's volume was down by 6%.  CMS's 2015 production was flat compared to 2014, but still 11.3% below historical levels.  All this occurred during a sustained recovery in the broader economy, featuring steady U.S. population and growing beef demand.

169.   In the first quarter of 2015, Tyson Fresh's, Swift/Packerland's, and National Beef's slaughter volumes were down by approximately -1.8%, -11.2%, and -8.6%, respectively from first quarter 2014.  CMS's quarterly slaughter volume was down against a 2012-2014 average and its first quarter 2015 slaughter volume, like that of its co-Defendants, decreased compared to its fourth quarter 2014 volume.

170.   These declines were reflected in Defendants' public reporting.  Tyson's May 4, 2015 10-Q noted that its "sales volume decreased [in the quarter ending March 28, 2015,

year-on-year] due to a reduction in live cattle processed."[16]   Jefferies Financial Group, Inc. ("Jefferies"), National Beef's then majority shareholder, noted in its May 8, 2015 10-Q that "fewer cattle were processed."[17]

171.    JBS S.A.'s earnings presentation for the first quarter of 2015 noted a 1.1% year-on-year decline in the "number of animals processed" by its JBS USA beef unit.[18]

172.    Expanding on their respective cuts, each Defendant extended its joint slaughter reductions during the second quarter and into the third quarter of 2015.  Across the second quarter, Tyson Fresh's, Swift/Packerland's, and National Beef's year-on-year slaughter volume was down by approximately -5.4%, -12.8%, and -6.2%, respectively.  CMS continued to maintain its 2014 slaughter volume, posting an essentially flat year-on-year growth of 1.8% in the second quarter, and -12.7% against its 2012-2014 average second quarter production.

---

[16]    Tyson Foods Inc. 10-Q, May 4, 2015 at 37, https://d1lge852tjjqow.cloudfront.net/CIK-0000100493/593a568a-359d-470d-b48e-3a1fe35419f7.pdf.

[17]    Jefferies 10-Q, May 8, 2015 at 57, http://ir.jefferies.com/reports-filings/sec-filings/sec-filings-details/default.aspx?FilingId=10683755.

[18]    JBS S.A., 1Q 2015 Results, May 13, 2015 at 15, https://sec.report/otc/financial-report/141980. JBS USA Beef segment also encompasses JBS S.A.'s much smaller Australian and Canadian beef businesses and Australian sheep operations.  The presentation also noted a -1.1% decline in cattle processing (both fed and non-fed) across its U.S., Australian, and Canadian beef businesses.  JBS USA's fed cattle to non-fed cattle slaughter ratio during the Relevant Period was 80% fed, 20% non-fed.

173.    Defendants' reductions were also reflected in Tyson Foods',[19] JBS S.A.'s,[20] and Jefferies' (National Beef's)[21] financial reporting.

174.    During the remainder of 2015, Defendants continued to restrain their slaughter levels and curtail their purchases of cash cattle even after it became clear that there was an abundant supply of slaughter-ready cattle available to purchase at historically low prices, and processed beef prices remained high.[22]   They did so even though it meant under-utilizing their plants, which is inconsistent with individual profitability but has the benefit of higher overall industry profitability.

175.    On August 3, 2015, Tyson's CEO admitted that plants were not running at full capacity, when discussing Tyson's decreased purchases over the preceding quarter, noting: "[b]ecause we run for margin and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and added costs.  In the short-term, we are negatively impacted, but markets will equilibrate, and conditions are expected to improve for the long term."   In response to a question regarding the impact of Tyson's underutilized plant capacity, Tyson's CEO elaborated: "In terms of quantifying the impact, ... we

---

[19]    Tyson's 10-Q for its quarter ending June 27, 2015 recorded year-on-year declines in sales in its beef segment revenue due to a "reduction in live cattle processed." *See* Tyson Foods 10-Q filed August 3, 2015, at 38; *see also* 10-K filed November 23, 2015, at 29 (noting reduction in sales revenue in FY 2015 as against FY 2014 due to lower cattle processing).

[20]    JBS S.A., 2Q 2015 Results, August 13, 2015 at 15, https://mz-filemanager.s3.amazonaws.com/043a77e1-0127-4502-bc5b-21427b991b22/central-de-resultadoscentral-de-downloads/02fd1b6f7f1cee632e5af617767bc7a98017ead954465d63d1e8633b2ec5a3cd/2q15_earnings_release.pdf (noting -0.9% decline in cattle processing (both fed and non- fed) across its US, Australian and Canadian beef businesses).

[21]    Jefferies 10-Q, August 5, 2015 at 52, http://d18rn0p25nwr6d.cloudfront.net/CIK-0000096223/6f776d2a-f247-4868-a18b-32f9e3b4eefe.html (noting revenues for three and six month 2015 periods decreased year-on-year "due primarily to lower sales volume, as fewer cattle were processed"); Jefferies 10-Q, November 5, 2015 at 53 (noting the same in relation to 3Q 2015 and first three quarters of 2015).

[22]    Cassandra Fish, Kills Too Small for Too Long, THE BEEF (Sep. 8, 2015), https://www.thebeefread.com/2015/09/08/kills-too-small-for-too-long/.

know when we're running 34s and 36s a week in our plants that does cost us in – it raises the cost in our plant, makes us a lot less efficient, so it does have a cost to us.  I don't know that I can quantify that right off the bat, but it does impact margin."

### 2.   Defendants Continued to Artificially Limit Supply in 2016

176.   By collusively "ration[ing] their new purchases [of cattle]" and running shorter 32-hour weeks in early January 2016, Defendants dampened rising cattle prices and extended the rally in beef prices.[23]

177.   Tyson Fresh, Swift/Packerland, CMS, and National Beef reduced their slaughter volumes in the first quarter of 2016: Tyson Fresh (-1.1%), CMS (-3.7%), Swift/Packerland (-16.6%), National Beef (-4.7%).  Moreover, all Defendants slaughtered fewer cattle than their average first quarter volume compared to 2012-2014: Tyson Fresh (-4.5%), Swift/Packerland (-5.3%), CMS (-9.3%), and National Beef (-14.8%).

178.   Beef prices continued to increase into March 2016, despite continuing depressed cattle prices.  By collusively reducing their slaughter volume, Defendants were able to post average weekly margins of approximately $63 per head, which was, at that time, one of their "best Q1 in history" and well above their pre-Relevant Period first quarter average of $0 per head.[24]

179.   In the second and third quarters of 2016, each Defendant's kill volume remained below their 2012 to 2014 averages.

180.   Despite an increase in the availability of fed cattle, Defendants' 2016 slaughter volume remained below their 2014 levels (Tyson Fresh (-6%) and Swift/Packerland (-6%)) or flat

---

[23]   Cassandra Fish, Global Sell-Off Smacks Cattle, THE BEEF (Jan. 4, 2016), https://www.thebeefread.com/2016/01/04/global-sell-off-smacks-cattle/.

[24]   Cassandra Fish, Sell-Off Accelerates THE BEEF (Mar. 22, 2016), https://www.thebeefread.com/2016/03/22/sell-off-accelerates/.

(National Beef).[25]  Cargill's 2016 slaughter remained significantly below its 2012-2014 average at -3.7%.

181.    Each Defendant's refusal to break the collusive agreement among Defendants and co-conspirators is noteworthy given the margins Defendants realized across 2016.  In the third and fourth quarter alone, Defendants were realizing average per head margins on their fed cattle purchases of $123 and $153 per head, respectively.  Not only were these margins significantly above pre-2015 averages ($25 and -$16 per head, respectively), they also exceeded Defendants' most profitable third and fourth quarters in recent history by about $30 and $100 per head, respectively.  Thus, it was against Defendants' unilateral self-interest not to buy and slaughter more cattle because each Defendant could have increased its profits by doing so.

### 3.    After Historic Cuts, Defendants Continued Restraining the Supply of Beef, Resulting in Higher Beef Prices in 2017 and 2018

182.    During 2017, Defendants worked to ensure that any increase in their collective slaughter volumes did not outpace the growth in slaughter weight cattle availability or beef demand.  Tyson, Swift/Packerland, CMS, and National Beef each reduced their volumes in lockstep during the first quarter of 2017 before raising them together during the second quarter. While cattle prices increased from $119/cwt (hundredweight) at the beginning of February 2017 to a high of $144/cwt in the first week of May 2017 (like spring highs before 2015), Defendants responded by reducing their slaughter volumes.

183.    As with 2016, Defendants enjoyed substantial profits in 2017, posting substantial per-head margins in the second and third quarters ($128 and $147 per head, respectively).  Indeed, Defendants' average per head margins for the first and fourth quarter of 2017, $42 and $88 per head, respectively, stood second only to the quarterly profits they generated in 2016.  Once again,

---

[25]    2018 Meat & Poultry Facts, 47th Ed., NORTH AMERICAN MEAT INSTITUTE, 2019, at 11.

each Defendant refused to expand its market share despite the obvious profit potential.  Instead, they all kept their production in lockstep with one another and limited their purchases of cattle to ensure the continued suppression of cattle prices and a corresponding increase in beef prices.

184.    Defendants' scheme continued into 2018.  Defendants reduced their respective kill schedules during the first quarter of 2018 compared to 2017.[26]  As industry analyst Cassandra Fish reported, "Looking back at March's fed slaughter rate, it underperformed expectations…. Packers appear to have responded to the tight supply of market-ready cattle in the north by keeping the kill constrained and margins profitable and stable."

185.    Defendants' slaughter reductions occurred despite record strong beef prices and Defendants' under-utilized capacity.

186.    As a result of their commitment to limiting their purchases of cattle, in 2017 and 2018, Tyson Fresh, Swift/Packerland, CMS, and National Beef's annual slaughter volumes remained 5.4-7.2%, 10.2%, 9.1% and 12.0-12.8% below their pre-2015 averages, respectively.  By sharp contrast, independent packers' slaughter volume in 2017 and 2018 increased 46.5% and 56.1%, respectively, as compared to their collective pre-2015 averages.

### 4.    In 2019 and 2020, Defendants' Continued to Limit Slaughter in Parallel, Against Their Independent Self-Interest

187.    Entering 2019, beef demand remained high, thus encouraging packers to run plants to meet customer's demand.[27]  In a competitive environment absent a conspiracy, Defendants would compete to secure as much cattle as possible to expand profitable production.

---

[26]    Cassandra Fish, Futures Trade Both Sides; Cash Poised To Trade Lower, THE BEEF (Apr. 2, 2018), https://www.thebeefread.com/ 2018/04/02/futures-trade-both-sides-cash-poised-to-trade-lower/.

[27]    Cassandra Fish, How About That, THE BEEF (Feb. 11, 2019), https://www.thebeefread.com/ 2019/02/11/how-about-that-3/ ("Rather obviously, beef demand is terrific.  Even in February, notoriously a slow beef demand month.  Packer margins are record wide for February.").

188.    Instead, Defendants continued to collude to limit slaughter volumes despite market conditions that encouraged market participants to increase, not decrease, slaughter volumes.  In the first quarter of 2019, each Defendant reduced its slaughter volume levels, posting significant quarter-on-quarter declines: Tyson Fresh (-3.5%), National Beef (-4.0%), CMS (-3.8%), and Swift/Packerland (-4.1%).  Defendants maintained comparably lighter slaughter volumes across the first three months of 2019.  These supply restraints included taking downtime or reducing slaughtering plant hours.  Defendants continued to constrain their weekly kill volume and declined to increase production of beef to meet rising demand, thereby collusively and artificially inflating the price of beef.[28]

189.    Defendants' ongoing collusive slaughter volume restraint in 2019 caused beef prices to increase, even though prices for cattle continued to decline to an apparent bottom of about $109-110/cwt by the end of June 2019.  This allowed Defendants to achieve an estimated per head profit of $257.[29]

190.    Amidst robust beef demand, Defendants' restrained production resulted in higher beef prices on a year-on-year basis, even though fed cattle prices had declined.  Industry analyst Ms. Fish reported that beef prices were "sizzling" despite most cattle producers losing money.[30]

191.    A fire at Tyson's Holcomb, Kansas slaughter and processing plant in August 2019, provided an opportunity for Defendants to further reduce the beef supply and reduce cattle prices.

---

[28]    *See, e.g.*, Cassandra Fish, And the Beat Goes On, THE BEEF (Feb. 14, 2019), https://www.thebeefread.com/2019/02/14/and-the-beat-goes-on-2/.

[29]    Sterling Beef Profit Tracker: week ending June 21, 2019, STERLING MARKETING INC. (June 26, 2019), https://www.drovers.com/news/industry/ profit-tracker-feeding-losses-reach-triple-digits.

[30]    Cassandra Fish, Packers Press and Cash Softens, THE BEEF (August 9, 2019), https://www.thebeefread.com/2019/08/09/packers-press-and-cash-softens/.

Tyson closed the Holcomb plant indefinitely after the fire.[31]  Tyson's Holcomb plant processed about 6,000 head of cattle per day and was one of seven U.S. plants capable of processing that capacity.  Only Tyson's Dakota City, Nebraska, plant is larger, processing up to 7,000 head of cattle per day.  The fire created a shortfall in the national packing capacity of approximately 30,000 heads per week, or approximately 6% of the total U.S. fed cattle packing capacity.

192.    However, following the plant fire, Tyson Fresh, Swift/Packerland, CMS, and National Beef reduced their fed cattle bids and hiked their beef prices.  These actions caused a ~$5/cwt drop in fed cattle prices and a ~$14/cwt rise in wholesale beef prices the following trading week.[32]  Defendants' per head margins nearly doubled from $191 to $358 in the week ending August 16.  The following week, Defendants' margins continued to expand, with the spread between fed cattle prices and beef values extending to a then-record high of $67.17/cwt, $39.51/cwt above the average spread for the same week across 2016-2018.

193.    Tyson Fresh, Swift/Packerland, CMS, and National Beef reaped record high margins in the weeks following the Holcomb fire with reduced fed cattle prices and increased beef prices.  As cattle prices bottomed out in the week ending September 13, 2019, the spread between Defendants' and cattle producers' per head margin exceeded $600, with packers making over $400 per head while cattle producers sustained $200 per head losses.[33]

---

[31]    Over 3,800 workers at Tyson Foods beef plant in Kansas out of work after fire, REUTERS (Aug. 11, 2019, 1:30 PM), https://www.reuters.com/article/us-tyson-foods-fire/over-3800-workers-at-tyson-foods-beef-plant-in-kansas-out-of-work-after-fire-idUSKCN1V10J1?  source=content_type%3Areact%7Cfirst_level_url%3Anews% 7Csection%3Amain_content% 7Cbutton%3Abody_link.

[32]    Sterling Beef Profit Tracker: week ending August 16, 2019, STERLING MARKETING INC. (August 20, 2019), https://cdn.farmjournal.com/s3fs-public/inline-files/Beef%20Tracker%2081919.pdf.  Live cattle futures contracts were also negatively impacted, with the market responding with two limit-down trading days on September 12 and 13, 2019.

[33]    *See* https://www.drovers.com/markets/profit-tracker/packer/feeder-margin-spread-now-exceeds-600-head.

C.   **Defendants Idled and Closed Plants, and Refrained From Expanding Processing Capacity**

194.   Another anticompetitive technique by which Defendants and co-conspirators implemented their conspiracy involved a longer-term strategy to restrict beef supplies. Defendants permanently closed processing facilities without replacing most of the lost capacity. These include, for example:

- On September 11, 2015, Cargill announced it would sell the Plainview, Texas, plant that it idled in February 2013 because it did not "make sense to reopen [the plant], especially with excess processing capacity remaining in the region."[34]

- In August 2015, Tyson Food decreased the industry's slaughter capacity by another 2,000 cattle per day by shuttering its Denison, Iowa plant.

195.   By idling plants, Defendants slashed the industry's annual slaughter capacity by some two million cattle per year.

196.   While overall industry slaughter capacity increased slightly from 2015 to 2018, this nominal gain was primarily attributable to other, non-conspiratorial beef-processing companies. For example, One World Beef Packing restored about 2,000 cattle per day by reopening the Brawley, California plant closed by National Beef in 2016.

197.   In sharp contrast to Defendants' behavior, non-conspiratorial beef processing companies acted consistent with their competitive interests by increasing their capacity and output in response to reduced costs of cattle and increased prices for beef. However, their efforts to supply the market with beef had little effect on the prices due to their small market share. Defendants' market dominance and stranglehold on the industry meant that these output expansions by the few remaining independent processors increased availability only in isolated

---

[34]     *Available at* https://www.meatpoultry.com/articles/13418-cargill-to-sell-texas-plant.

instances and places and had negligible effects on restoring supply (and thereby reducing beef prices) in most locations.[35]

### D.    Defendants' Parallel Reductions in Cash Cattle Purchases and Anticompetitive Queuing Conventions

198.    Defendants procure their fed cattle in three ways: (1) on the cash cattle trade market (the industry's version of the spot market); (2) through formula or forward contracts; and – for Swift/Packerland and CMS – (3) by relying on their own cattle.

199.    To increase their meat margin, Defendants jointly managed their purchases of domestic cash cattle in parallel to purchase amounts below the available supply, including by reducing the number and volume of purchases.  Defendants took advantage of the supply glut to lower cash cattle prices and increase their meat margin.  Defendants expanded their meat margin by refusing to pass on the savings from the reduced cattle prices to their beef customers, including Plaintiffs, which would normally happen in a competitive market.  Instead, beef prices remained high while prices paid to cattle producers decreased, indicating a collusive agreement among Defendants.

200.    In addition to Defendants' reduced cash cattle purchases, each employed an antiquated "queuing convention" during the Relevant Period, which served to limit cattle producers' ability to generate price competition for their cattle.

201.    This convention, which operated predominantly in relation to those cattle sold in the cash market, works as follows: Once a cattle producer receives a bid from a meat packer, such as one of the Defendants, the producer may either accept the bid or pass on it, but may not "shop" that bid to other packers, *i.e.*, require competition for the bidding process.  If another meat packer

---

[35]    JBS was the only Defendant that made any capital investment to increase industry slaughter capacity during the Relevant Period.  JBS expanded its Hyrum, Utah plant in 2015 and 2016.  However, according to JBS's press releases and several industry publications, the purpose of this expansion was to increase its capacity to process culled dairy cows and not fed cattle.

offers the same bid or lower price as the original bidding meat packer, then the cattle producer must give the original meat packer the right of first refusal.

202.    The obligation to give a right of first refusal without consideration was collectively imposed by Defendants under the threat of boycott.  Defendants have adhered to, and enforced, the convention for decades, including during the Relevant Period, treating it as a mandatory industry custom.

203.    On information and belief, one former feedlot manager, Matt T. ("Witness 2"), has confirmed that the field buyers from Tyson Fresh (Brian Alsup), Swift (Levi Canales, and prior to him, Chad Miller), CMS (Rick Vogel, and prior to him, Steve Brown), and National Beef (Richard Duffy), all of whom visited his feedlot, enforced strict adherence to this convention with threats of retaliation.  Each of these field buyers individually spoke to him about the importance of his feedlot complying with the convention, and that they would not "come by" anymore should he break with it.

204.    Witness 2 further reports that, when he took over management of the feedlot in 2012, the feedlot would only receive bids from National Beef and CMS.  When he subsequently spoke to the buyers from Tyson Fresh (Mr. Alsup) and Swift (Mr. Miller) responsible for his region in the fall of 2012, they both told him that they had stopped visiting the feedlot because Witness 2's predecessor had broken with the convention by "shopping" their bids.  Witness 2 reports that the Tyson Fresh and Swift field buyers re-commenced visiting the feedlot after he confirmed his commitment to following the convention.

205.    Witness 2 also heard from Defendants' field buyers and other industry participants about other cattle producers being "blackballed" for breaking with the queuing convention.  In those circumstances, Witness 2 understood that the Defendant who was "on the cattle" would be

tipped off as to the producer's "breach" of the convention by the field buyer contacted while shopping the Defendant's bid, or would later pressure the producer for details of its sale.

206.    As evidenced by the expanding meat margin, Defendants collectively manipulated the entire market, keeping the ill-gotten gains for themselves.

## VIII.   ADDITIONAL PLUS FACTORS ENCOURAGING THE REASONABLE INFERENCE OF DEFENDANTS' CONSPIRACY

207.    The beef meatpacking industry contains several characteristics, which individually, or one or more in combination, make it conducive to cartelization.  This plausibly supports the inference that the alleged conspiracy existed.  These characteristics, or "plus factors," include: (i) the ability to signal through public communications; (ii) high producer concentration; (iii) high barriers to entry; (iv) commodity products; (v) inelastic demand; and/or (vi) opportunities to collude.  Each of the beef industry plus factors was present in 2015 (if not earlier) and throughout the Relevant Period.

### A.    Defendants Signaled Their Conspiracy and Encouraged Each Other to Maintain It

208.    One method that Defendants used to coordinate, promote, and monitor their conspiracy was to signal their activities and plans during earnings calls.  Examples of such communications include:

- During a May 2014 earnings call, JBS S.A. offered this industry forecast: "For 2015, I think beef will keep [being] tight.  I don't see any big – an increase in beef supply in 2015[.]"

- During a May 2014 Q4 earnings call, Tyson Foods communicated that it was striving for margin and not market share: "For FY15, we expect fed cattle supply to be down 5% to 6% from last year, and we think we've experienced the bottom of the beef supply cycle.  After this year, we believe we'll see slow incremental improvement in supply.  Our beef segment results should improve in the back half of the year, and while profitable for the year, FY15 results are expected to be below FY14.  It is important to

remember that we'll continue to run our beef business for margin, not market share."

- During Tyson Foods' Q4 2015 earnings call, its CEO further acknowledged that "[You've got] relatively low cattle supply, you've got too much -- well, I should not say too much, that's probably not the right way to say it -- but you've got excess industry capacity and that limits our ability to drive margins above the 1.5% to 3%, we think."

- On Tyson Foods's August 3, 2015, Q3 earnings call, its CEO admitted that it was underutilizing its plants, despite hurting its margins. He discussed Tyson's decreased purchases over the preceding quarter, noting "[b]ecause we run for margin and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and added costs. In the short term, we are negatively impacted, but markets will equilibrate and conditions are expected to improve for the long term." He also admitted that "industry capacity utilization, [was] probably in the low 70s" in line with Tyson. In response to a question regarding the impact of Tyson underutilizing its plant capacity, Tyson's CEO elaborated: "In terms of quantifying the impact, we know when we're running 34s and 36s a week in our plants that that does cost us. It raises the cost in our plant, makes us a lot less efficient, so it does have a cost to us. I don't know that I can quantify that right off the bat, but it does impact margin."

- On its November 12, 2015, Q3 earnings call, JBS USA's CEO publicly praised Defendants' efforts to reduce industrywide slaughter capacity through plant closures, remarking that "the reduction that we saw in the cutbacks of production in U.S. ... that was with the shutdown of nine plants the last two years reduced the cattle. (inaudible) cost us [$3.5 million]. I think that will be a very good position balancing the industry in 2016, 2017 and 2018."

- On a May 2016 JBS S.A. Q1 earnings call, JBS USA's CEO described the company's supply strategy: "So I don't see any imbalance in the near future, even cattle – is coming back and we're going to see a little bit more production of beef this year and next year, it's still way, way below how it was few years ago. And we will be balancing at this side because a lot of plants was shut, but it's still way below our historical production level."

- On its November 2016, Q4 earnings call, Tyson Foods acknowledged the widening of the meat margin: "The dynamic is that the livestock prices, they've come down faster than the retail prices have, which has allowed us to make the margins that we have right now in [] beef…."

### B.   The Beef Market is Highly Concentrated

209.   Market concentration facilitates collusion.  Conspiracies are easier to organize and sustain when only a few firms control a large share of the market.  Practical matters, such as coordinating cartel meetings, exchanging information, and monitoring compliance are simpler with a small number of players.

210.   In this case, high market concentration coupled with Defendants' substantial collective market share in the beef market simplifies coordination, because little outside competitive presence exists to undermine the cartel, and Defendants can more easily monitor each other's actions related to supply and pricing.

211.   The beef industry experienced significant consolidation leading up to and during the Relevant Period.  In 2001, Tyson Foods purchased IBP, Inc., then the nation's largest beef packer.  In 2002, Cargill purchased Taylor Packing Co.  In 2007 and 2008, JBS USA acquired Swift & Co. and Smithfield Beef Group, Inc. (renamed JBS Packerland, Inc. after the acquisition), the third- and fifth-largest U.S. beef packers.  JBS S.A. also sought to acquire National Beef but decided to end the acquisition after a challenge by the United States Department of Justice.  The DOJ publicly stated that the takeover would result in lower prices paid to cattle suppliers and higher beef prices for consumers at a time when the beef industry had become increasingly consolidated, with a handful of companies accounting for most of the nation's beef production.

212.   Through these purchases, Defendants collectively controlled about 81-85% of the beef market during the Relevant Period while the next largest meatpacker had only a 2-3% market share.  Defendants' control of the market enabled them to launch their conspiracy no later than 2015 and prosper ever since.

### C.     The Beef Market Has High Barriers to Entry

213.     Barriers to entry are obstacles that prevent new competitors from easily entering a market.  They restrict competition in a market and make it easier for incumbents to collude.

214.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from supra-competitive prices.  However, when significant barriers to entry exist, new entrants are less likely to enter the market.  Thus, barriers to entry help facilitate the formation and maintenance of a cartel.

215.     Barriers to entry kept would-be competitors out of the beef-packing industry.  The construction of a large packing plant requires an investment of approximately $300 million.  For example, in the summer of 2021, Cattlemen's Heritage announced plans to build a meatpacking plant at a cost of approximately $325 million.  It normally takes about two years to plan and build such a facility, and the investment is not easily reversible or convertible to other uses.  Moreover, new entrants must also comply with numerous regulations, recruit and train a large workforce, and develop and execute a successful marketing plan.  Relative insulation from the threat of new competitors has enabled Defendants to maintain their conspiracy.

### D.     Beef is a Commodity Product

216.     A commodity product is a basic item or good used in commerce that is interchangeable with other goods of the same type.

217.     Markets for commodity products are susceptible to collusion.  Demand for a commodity depends primarily on price, as opposed to other attributes such as product quality or customer service.  As a result, cartel members can more easily monitor compliance and detect defectors.

218.    Price discrepancies for commodity products are more likely to expose defection from a conspiracy because qualitative factors such as special product features, quality, reliability, durability, and other terms of a transaction are unlikely to explain price discrepancies.

219.    Beef is a commodity product.  The USDA grades beef.  For example, prime beef roasts from Tyson and Cargill are virtually indistinguishable and have nearly identical nutritional content.  The USDA recognizes beef as a commodity and posts daily beef prices.  Options and futures for the cattle from which beef is produced are traded as commodities on the Chicago Mercantile Exchange.

### E.    The Demand for Beef is Inelastic

220.    Price elasticity describes the sensitivity of suppliers or consumers to changes in the price of a good or service.  Demand is inelastic if an increase in the price of a product results in only a small decline in the demand for that product.

221.    A cartel profits from raising prices above competitive levels when demand is relatively inelastic at competitive prices.  An increase in price for a product with inelastic demand increases the seller's revenue, while the reduction in output lowers costs.  For a product with elastic demand, increased prices would result in declining revenues, as customers purchase substitute products or decline to buy altogether.

222.    Inelastic demand is a market characteristic that facilitates anticompetitive conspiracies because it allows producers to raise their prices without lowering sales volume or triggering customer substitution to alternatives.  Thus, from the standpoint of conspiring producers, inelastic demand facilitates the profitability of a supply-reducing conspiracy.

223.    Beef demand is relatively insensitive to price changes.  According to a recent study of beef demand, "[s]ince beef has an inelastic demand, industry total revenue increases when prices rise as there comparatively is a limited reduction in volume purchased."[36]

224.    The same study concluded that the relative impact of pork and chicken prices on beef demand is economically small.  Thus, Defendants' supra-competitive beef prices to its direct purchasers do not significantly reduce beef sales or lead purchasers to seek protein from other meat sources.

### F.    **Defendants Had Multiple Opportunities to Collude**

225.    Defendants are members of industry trade associations and forums and regularly attend industry events, including the events listed below.  If rivals are together at trade association meetings and exchange competitively sensitive information or agree on the production, pricing or sale of a good or service, then the antitrust laws are implicated.  Further, because trade groups necessarily bring together competitors ostensibly for purposes of trade association activities, such trade groups and their activities provide cover for competitors to collude with seeming impunity.  As noted earlier, discovery will be necessary to determine the full extent of Defendants' communications at or through trade association activities in furtherance of the conspiracy.  However, as demonstrated below, Defendants had multiple opportunities to collude at various trade association meetings.

226.    For example, the National Cattlemen's Beef Association ("NCBA") holds an annual convention, CattleCon during which various meetings take place.[37]  The NCBA Product Council, which includes Defendants' representatives and representatives from other packers,

---

[36]    Glynn Tonsor, Jason Lusk, Ted Schroeder, Assessing Beef Demand Determinants, (Jan. 18, 2018) at 7-9, https://www.beefboard.org/wp-content/uploads/2019/06/Assessing-Beef-Demand-Determinants_FullReport.pdf.

[37]    NCBA Allied Industry Membership, NAT'L CATTLEMEN'S BEEF ASS'N (2019), https://convention.ncba.org/.

meets quarterly for the invitation-only Beef Executive Forum.  Two of Defendants' executives, a former CMS/Cargill Vice President of Cattle Procurement and a former Tyson SVP of Beef Margin Management and VP of Boxed Beef Pricing, were officers, board members, or formally designated participants of the NCBA during the Relevant Period.  Defendants also participate in Beef Checkoff program meetings.  The Beef Checkoff program is run by the Federation of State Beef Councils and the programs meetings are held contemporaneously with the NCBA summer and winter meetings.

227.    The U.S. Meat Export Federation ("USMEF") is another example of a trade association at which Defendants regularly met during the Relevant Period.  The USMEF develops export opportunities for U.S. protein producers and holds both spring and fall conferences and monthly international trade shows.[38]  USMEF leadership includes current and former employees and officers of Defendants.  For example, a former CMS/Cargill Vice President of International Sales was an officer, board member, or formally designated participant of the USMEF; a former Tyson Foods SVP of International Sales served as the Chair, Vice Chair, and on the Executive Committee of the USMEF; a former Tyson Foods SVP of International Sales and VP International Sales was a formal participant of the USMEF; a National Beef International President and a former Vice President of International Sales served on the Export Committee of the USMEF; and a former National Beef NBP International Sales President served on the Export Committee of the USMEF.

---

[38]    Events: Meetings, U.S. MEAT EXP. FED'N (2019), http://www.usmef.org/ events/bod-meetings/; Events: Trade Show Calendar, U.S. MEAT EXP. FED'N (2019), http://www.usmef.org/events/trade-shows/. Defendants know the identity of each person identified by title throughout this and later sections of the Complaint, and thus we decline to name them here.

In November 2017, Tyson's SVP of International Sales and CMS's VP of International Sales both attended the USMEF Strategic Planning Conference in Tucson, Arizona.[39]

228.    Defendants were among the founding members of the Global and U.S. Roundtables for Sustainable Beef, and they remain members.  Defendants participate in its annual meetings each spring, and JBS and Cargill have leadership positions in some of the working groups.

229.    Defendants also met for multiple meetings, conferences, conventions, and expositions sponsored by the North American Meat Institute ("NAMI") and its predecessor, the American Meat Institute.  NAMI is a national trade association that represents companies that process 95% of red meat.[40]  Executives and employees of Defendants also participated and held leadership positions in the NAMI.  For example, CMS's President of Business Operations & Supply Chain and former Cargill Beef President was an officer, board member, or formally designated participant of the NAMI; a former Tyson Foods CEO, Group President of Fresh Meats & International, and COO served on the Executive Committee of the NAMI; a former Tyson Foods CEO and President also served on the Executive Committee of the NAMI; National Beef's President and CEO served on the Executive Committee of the NAMI; and JBS USA's CEO served on the Board of Directors of the NAMI.

230.    The NAMI and the Food Industry Association host an annual Meat Conference, attended by various executives and employees of Defendants every year.[41]  In 2017, National

---

[39]    USMEF Members Examine Challenges ahead, Elect New Officer Team, U.S. MEAT EXP. FED'N (Nov. 3, 2017), https://www.usmef.org/news-statistics/member-news-archive/usmef-members-examine-challenges-ahead-elect-new-officer-team/.

[40]    *See* About NAMI, NAT'L AM. MEAT ASS'N (2019), https://www.meatinstitute.org/index.php?ht=d/sp/i/204/pid/204; Events, NAT'L AMERICAN MEAT ASS'N (2019), https://www.meatinstitute.org/index.php?ht=d/sp/i/10422/pid/10422.

[41]    Meat Conference, NORTH AM. MEAT INST. AND FOOD INDUS. ASS'N, http://meatconference.com/ (last visited May 23, 2022).

Beef's President and CEO, Tyson's Vice President of Boxed Beef Pricing, JBS USA's CEO, and CMS's Vice President of Sales, among other Defendant executives, were listed as attendees of the Meat Conference.[42]   In 2018, these executives from National Beef, Tyson and JBS USA, and Cargill Vice President of Retail Beef Business attended the Meat Conference.[43]   In 2019, these executives from JBS USA, Tyson, National Beef, and Cargill were listed as attendees.[44]   In 2020, these executive from Tyson and National Beef again signed up to attend the Meat Conference along with various other Cargill and JBS executives and employees.[45]

231.   Until April 2017, NAMI sponsored an annual Meat Industry Management Conference, which offered topics such as economics and general business.  That conference was then replaced by an annual Meat Industry Summit.  This summit has sponsored "networking opportunities and social events" including a golf tournament, receptions, an "Issues, Answers, Actions Breakfast," the annual NAMI board meeting, and what one publication described as "closed door committee meetings to discuss policies and association business."  The 2017 summit included a presentation by John Nalivka of Sterling Marketing entitled "Economic Outlook for the Red Meat Industry," described as an "analysis of supply and demand and price forecasts" to "cover all aspects of the supply chain, and help your business prepare for the years ahead."

---

[42]   2017 Annual Meat Conference: Registered Attendees, FOOD INDUS. ASS'N (Last visited May 23, 2022) https://www.fmi.org/forms/meeting/MeetingRosterPublic/viewRoster?meetingId=43A35D00000DFE&sortBy=name.

[43]   2018 Annual Meat Conference Attendee List as of 2.9.2018, MEAT CONFERENCE (Feb. 9, 2018), http://meatconference.com/sites/default/files/books/2018%20Annual%20Meat%20Conference%20Attendee%20List.pdf.

[44]   Meat Conference 2019 Attendee List (as of 2/27), MEAT CONFERENCE (Feb. 27, 2019), http://meatconference.com/sites/default/files/ books/2019-AMC-Attendee-List.pdf.

[45]   2020 Annual Meat Conference: Registered Attendees, FOOD INDUS. ASS'N (Dec. 9, 2020), https://www.fmi.org/forms/meeting/MeetingRosterPublic/viewRoster?meetingId=571D81000004FF&includeUnpaid=1&sortBy=title.

232.   The beef industry's Annual Meat Conference – described on the event's website as "a complete education and networking experience" – provided another opportunity for Defendants to collude.  Many of Defendants' high-level executives have been attending this conference for years.  The list of registered attendees in 2012, for example, included various executives from JBS, Tyson Foods' then-CEO, and twelve other Tyson executives.

233.   Defendants' executives and employees also attended "AgCon," a joint conference from the Commodity Futures Trading Commission and the Center for Risk Management Education and Research at Kansas State University, in 2018.[46]  CMS's and Tyson's executives were listed as attendees of the 2018 AgCon, along with other Defendants' executives and employees, including Tyson Fresh's VP of Sourcing & Risk Management; Tyson Fresh's VP of Cattle Procurement; National Beef's Vice President of Cattle Procurement; National Beef's Vice President of Procurement and Risk Management; and JBS USA's Head of Risk Management.[47]

234.   Executives from Tyson, JBS, and Cargill also had ample opportunities to meet privately, particularly at the beginning of the conspiracy, as a result of JBS's acquisition of Tyson and Cargill's Mexican and Brazilian chicken and U.S. pork operations, respectively.  JBS S.A.'s purchase of Tyson's Brazilian and Mexican chicken operations was announced on July 28, 2014, and closed on December 1, 2014 and June 29, 2015, respectively,[48] while its purchase of Cargill's U.S. pork operations was announced on July 1, 2015 and closed on October 30, 2015.  Cargill, Tyson, and JBS executives with responsibilities relating to beef and cattle, such as the then-Tyson

---

[46]   Inaugural AgCon brings business, government together to discuss ag futures markets, KANSAS STATE UNIV. (Mar. 8, 2018), https://www.ksre.k-state.edu/ news/stories/2018/03/AgCon2018.html.

[47]   2018 AgCon Attendees, KANSAS STATE UNIV. (Mar. 28, 2018), https://www.k-state.edu/riskmanagement/documents/Ag_Con_2018_Attendees_ Mar30.pdf.

[48]   JBS Foods Int'l B.V., Registration Statement (Form F-1) at 112 (Dec. 5, 2016), https://www.sec.gov/Archives/edgar/data/1691004/ 000119312516785274/d304020df1.htm.

CEO and President,[49] JBS USA CEO,[50] and then-Cargill Senior Vice President,[51] were all involved in the acquisition discussions. JBS S.A.'s CEO stated in July 2015 that its "courtship" with Cargill in relation to its U.S. pork operations "started years ago," with discussions intensifying at the beginning of 2015.[52]

235.    These events afforded Defendants' top executives and other employees frequent opportunities to discuss pricing, production, and other proprietary information in furtherance of the conspiracy in an informal setting and monitor compliance with their conspiracy.

## G.    Defendants' Market Share Stability is Indicative of a Conspiracy

236.    In a competitive market, market shares typically fluctuate as producers compete for and gain business from each other. Relatively stable market shares over time is a "plus factor" plausibly supporting the alleged conspiracy.

237.    Relative market-share stability in a commodity market suggests operation of an effective cartel that has agreed not to compete. A marked decline in market-share volatility over time may suggest a conspiracy in a previously competitive market.

238.    On information and belief, Defendants' relative market shares, measured by wholesale beef sales, became more stable after 2014 and during the Relevant Period. The same is true for Defendants' market shares as measured by slaughter capacity.

---

[49]    Tyson to sell Mexico, Brazil poultry businesses to JBS, REUTERS (July 29, 2014, 1:32 PM), https://www.reuters.com/article/us-tyson-foods-results/tyson-to-sell-mexico-brazil-poultry-businesses-to-jbs-idUKKBN0FX0UR20140729.

[50]    Lawrence Aylward, Inside the JBS, Cargill deal, MEAT + POULTRY (July 2, 2015), https://www.meatpoultry.com/articles/13164-inside-the-jbs-cargill-deal.

[51]    Press Release, Cargill, JBS USA Pork agrees to purchase Cargill Pork business (July 1, 2015), https://www.cargill.com/news/releases/ 2015/NA31861255.jsp.

[52]    Luciana Magalhaes, With Cargill Purchase, Brazil's JBS Poised to Become No. 2 Pork Producer in U.S., WALL STREET JOURNAL (July 2, 2015, 3:18 PM), https://www.wsj.com/articles/with-cargill-purchase-brazils-jbs-poised-to-become-no-2-pork-producer-in-u-s-1435864508.

239.     Defendants did not attempt to capture each other's market share by offering lower prices as their costs declined, as would be expected in a competitive market.

## IX.     THE BEEF INDUSTRY FACES GOVERNMENTAL INQUIRIES AND INVESTIGATIONS

240.     In August 2019, the USDA opened an investigation into the beef industry following the fire at Tyson's Holcomb, Kansas plant.  The USDA took notice after the reduction in available supply simultaneously caused cattle prices to fall while elevating beef prices.

241.     On March 19, 2020, U.S. Senators Mike Rounds of South Dakota, Kevin Cramer and John Hoeven of North Dakota, and Steve Daines of Montana sent a letter to the DOJ urging the department to launch an investigation into price-fixing in the cattle market.  The Senators highlighted Defendants' harm to upstream producers and downstream consumers.

242.     On a conference call reported in the press, Senator Rounds stated the request was for the DOJ "to definitively answer whether a packer oligarchy exists within the cattle market and inherently creates an anticompetitive marketplace that unfairly disadvantages the cattle producer and the consumer."  Senator Rounds further commented: "These margins just don't make any sense.  The reality is there is an inverse correlation between the producer's price and the consumer's price."

243.     On April 8, 2020, Reuters reported that the USDA had extended its investigation to include the observed pricing dynamic in which Defendants paid reduced prices to ranchers for cattle coupled with surging retail beef prices.  The USDA extended its investigation in the wake of announced production shortages associated with the COVID-19 outbreak.

244.     On April 17, 2020, state-level cattle production trade associations from 23 states signed a letter to then-Attorney General William Barr requesting that the DOJ coordinate with the

USDA and launch its own investigation into "fraudulent business practices within the meatpacking industry." Signatories included the Minnesota State Cattlemen's Association.

245.    The letter described the two extraordinary pricing episodes, identified by the USDA, following the Holcomb fire and during the COVID-19 outbreak. The state trade associations not only reported their own situation but also observed that: "The nature of previous and current concern in both situations is extreme market degradation to the producer segment quickly followed by sharp increases and unseasonable profitability to the packing segment through boxed beef prices."

246.    With respect to the most recent manipulations, the letter explained that: "We are now seeing that same type of price action [observed after the Holcomb fire] repeated – only in a more extreme manner and during a time of crisis that includes logistical stressors on the nation's food production and distribution system."

247.    On May 5, 2020, 11 state attorneys general, including the Montana attorney general, signed a joint letter to then-Attorney General Barr urging the DOJ to open a coordinated federal antitrust investigation into "anticompetitive practices by the meat packers in the cattle industry." This letter noted that: "Cattle ranchers ... often struggle to survive. Consumers, moreover, do not realize the benefits from a competitive market."

248.    On June 4, 2020, Bloomberg reported that the DOJ had served civil investigative demands on Tyson Foods, JBS S.A., Cargill, and National Beef in connection with an investigation into antitrust violations consistent with the earlier requests by the producer trade associations and state attorneys general.

249.    In a letter dated May 17, 2021, sixteen members of the Senate and Congress, including Senator Daines and Congressman Matthew Rosendale, Sr. of Montana, urged Attorney General Merrick Garland to continue the DOJ investigation into the nation's four biggest

meatpackers and provide Congress with updates.  The letter also noted that the fire at the Tyson Holcomb, Kansas facility "created significant market disruptions."

## X.   **DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONSPIRACY**

250.    Defendants took affirmative actions to fraudulently conceal their conspiracy from Plaintiffs through at least the filing of the first related complaint.

251.    Defendants used various means and methods to fraudulently conceal their conspiracy from Plaintiffs, including, but not limited to, secret meetings, surreptitious communications between Defendants by telephone or in person meetings to prevent the existence of written records, statements to Plaintiffs designed to deceive Plaintiffs about the real factors involved in the prices that Plaintiffs paid for beef, and not disclosing their supply-restraint agreement in communications on documents.

252.    As set forth above, Defendants engaged in secret behaviors intended to further their conspiracy.  Defendants' conspiracy – based on behaviors known only to Defendants to be unlawful at the time they performed them – plausibly suggest that Defendants engaged in a fraudulent concealment campaign.

253.    Defendants concealed their illegal behavior from Plaintiffs by, among other measures:

- communicating privately by telephone or text about their purchases and slaughter volumes, so to avoid creating a paper trail, as well as relying on nonpublic forms of communication;

- offering false or pretextual explanations for the low fed cattle prices;

- providing pretextual justifications for their plant closures, slaughter reductions, and withdrawal from the cash cattle trade;

- explicitly and implicitly representing that the beef bids and contract terms offered to Plaintiffs were the product of honest competition and not a conspiracy;

- misrepresenting that Defendants complied with applicable laws and regulations, including antitrust laws; and

- misrepresenting the nature of Defendants' agreements (and purported adherence to competitive safeguards) to government officials and the public.

254. Defendants also affirmatively misrepresented their compliance with antitrust laws. For example:

- Tyson's Code of Conduct represents that "[w]e compete in the market with integrity and comply with competition laws [and w]e comply with the letter and spirit of competition laws (also referred to as "antitrust" laws) wherever we do business."

- JBS's 2014 Annual Report asserts that the company has clear policies "[t]o ensure ethical conduct and integrity in the management of its business," including a Manual of Ethical Conduct "that addresses issues related to violations, conflicts of interest, third-party contracts, employment practices, receiving gifts, decision making, anti-corruption practices, and other sensitive topics."

- Cargill stressed in its 2015 Corporate Responsibility report that "[w]e obey the law. Obeying the law is the foundation on which our reputation and Guiding Principles are built. We conduct our business with integrity. We compete vigorously but do so fairly and ethically. We ... comply with the laws and regulations that support fair competition and integrity in the marketplace." Cargill reaffirmed this commitment in subsequent Corporate Responsibility reports.

- National Beef's former majority shareholder, Jefferies, acknowledged in its 2014 Annual Report that National Beef was "subject to extensive governments regulations," including by the USDA and "is subject to the Packers and Stockyard Acts of 1921."

255. Regarding Cargill's, JBS S.A.'s, and Tyson Foods's conduct involving false/pretextual statements or false/pretextual financial data, Cargill did so for the benefit of CMS, JBS S.A. did so for the benefit of JBS USA, Swift, and Packerland, and Tyson Foods did so for the benefit of Tyson Fresh.

256.    In addition to Defendants' affirmatively concealing their conspiracy, Defendants' conspiracy was inherently self-concealing because it depended on secrecy for its successful operation.

257.    Defendants also misrepresented the real reasons for their plant closures, slaughter reductions, and withdrawal from the cash cattle trade as follows:

A.    **The Cargill Defendants**

258.    As alleged earlier, the Cargill Defendants shared a unity of corporate interest and operated as part of a single enterprise to advance their conspiracy.

259.    To facilitate Defendants' conspiracy, Cargill made public statements offering pretextual explanations to conceal Defendants' unlawful activity.  For example, Cargill used its 2017 Annual Report to explain that "[r]enewed consumer demand for beef [produced] favorable market conditions in North America."

260.    The following year, Cargill proclaimed that its Animal and Nutrition & Protein segment's "strong performance" in 2018 was "fueled by rising domestic and export demand for North American beef" rather than because of Defendants' anticompetitive conduct.

261.    Cargill made these false public statements to conceal its role and participation in the conspiracy alleged in this Complaint.  Instead of disclosing that its "strong performance" stemmed from illegal behavior and tainted profits, Cargill provided pretextual business justifications such as "favorable market conditions" and "rising domestic and export demand."

B.    **The JBS Defendants**

262.    As discussed above, the JBS Defendants shared a unity of corporate interest and operated as part of a single enterprise to advance the conspiracy.

263.    To facilitate the conspiracy, JBS USA made public statements to conceal Defendants' unlawful activity.  For example, in November 2015, JBS USA CEO declared that

79

"[c]attle price will go down" in the United States because "we are going to see more cattle available."

264.    Similarly, on an earnings call in March 2016, JBS S.A.'s founder and CEO stated that JBS would see "better margin[s]" due to an "increase in the herd in the U.S."

265.    JBS executives made similar statements throughout 2016 and 2017 and into 2018, regularly stating that JBS's strong financial performance in the United States was a result of "more cattle available in the U.S.," "cattle price[s being] back to the normal level," and "strong demand for beef."

266.    On earnings calls, JBS offered pretextual business justification for its "improvement in EBITDA margin" and favorable financial projections/results, instead of disclosing that they were the result of Defendants' conspiracy.

### C.    National Beef

267.    To facilitate the conspiracy, National Beef, through its majority shareholders Jefferies (until 2018 when it sold a majority of its stake) and later Marfrig Global Foods S.A. ("Marfrig"), used public statements to conceal Defendants' unlawful activity.

268.    For example, in October 2015, Jefferies stated that the anticipated expansion of the cow herd "bodes well for [meatpacking industry] margins as it will lead to an increase in the number of fed cattle available for slaughter."

269.    In October 2016, Jefferies explained that the "rebuilding of the domestic US cattle herd ha[d] dramatically affected the market for fed cattle" when justifying how, "[f]rom June 27, 2015 to June 25, 2016, the average market price per pound of fed cattle ha[d] fallen from $1.48 to $1.16."

270.    Jefferies offered similar pretextual justifications throughout 2017 and 2018, such as "National Beef generated record results for [the last 12 months] on the back of a more balanced

supply of cattle and robust end market demand," "an increased supply of cattle in 2017 has driven higher margins and greater capacity utilization versus 2016," "pre-tax income grew by $78.3 million, as increased cattle availability and strong demand for beef continued to support strong margins," and "because the peak in supply of fed cattle ready for slaughter lags the peak size of the beef cowherd, throughput should continue to increase for at least the next several years, supporting continued above-average packer margins."

271.    These statements were made during Jefferies' Investor Day presentations in 2015, 2016, and 2017, at which National Beef's CEO and President was scheduled to speak on topics related to National Beef's performance.

272.    Marfrig similarly offered false justifications for high beef prices and low cattle prices caused by the conspiracy after Marfrig acquired a controlling stake in National Beef.

273.    For example, Marfrig reported in November 2018 that, "[i]n the United States, the cattle availability combined with stronger domestic and international demand has been supporting better margins."

274.    In 2018, during a third-quarter company earnings call, Marfrig executives reiterated the preceding paragraph's point by claiming that "the U.S. beef industry has delivered record results" because of "an ample supply of cattle" and "strong demand in both the domestic and international markets." Although Marfrig declared that it had attained record results and better margins while reducing cattle slaughter volumes, it misrepresented that these results were due to "fewer weeks in the third quarter '18 compared to the third quarter 2017."

275.    National Beef's CEO, President and Director of National Beef (but referred to by Marfrig CEO as "CEO of [Marfrig's] North American operation") – participated in the 2018 earnings call.

276.    Jefferies and Marfrig made these pretextual public statements on behalf of National Beef – which, as alleged above, was the original source of the pretextual public statements – to conceal their role and participation in the conspiracy.  Instead of disclosing that their record results and better margins stemmed from the conspiracy alleged in this Complaint, Jefferies and Marfrig claimed these results were due to non-conspiratorial reasons.

### D.    The Tyson Defendants

277.    As discussed above, the Tyson Defendants shared a unity of corporate interest and operated as part of a single enterprise to advance the conspiracy.

278.    To facilitate the conspiracy, Tyson Foods made public statements to conceal Defendants' unlawful activity.  For example, Tyson Foods used its SEC filings from 2015 to 2018 to declare that it had "limited or no control" over the pricing and production of cattle because prices were "determined by constantly changing market forces of supply and demand."

279.    As for the factors that influence the cost of cattle, Tyson identified "weather patterns throughout the world, outbreaks of disease, the global level of supply inventories and demand for grains and other feed ingredients, as well as agricultural and energy policies of domestic and foreign governments."

280.    Tyson further stated that it "ceased operations at our Denison, Iowa plant" to "better align our overall production capacity with current cattle supplies."  Tyson claimed that "[t]he beef segment earnings improved ... due to more favorable market conditions associated with an increase in cattle supply which resulted in lower fed cattle costs."

281.    Rather than truthfully disclosing that the conspiracy improved its earnings, Tyson Foods issued pretextual business justifications, such as lower fed cattle costs and favorable market conditions.  Tyson Foods made these misrepresentations to conceal its role and participation in the conspiracy.

282.    Defendants made these pretextual statements to mislead Plaintiffs into believing Defendants were acting legally, because, by concealing their conspiracy, Defendants were able to reap supra-competitive profits.

**E.      Plaintiffs' Claims Are Timely**

283.    Plaintiffs' Sherman Act and PSA claims are timely because they had neither actual, nor constructive, knowledge of Defendants' conspiracy during the time covered by the statute of limitations.  Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged in this Complaint until at least the filing of the cattle ranchers' complaint in the U.S. District Court for the Northern District of Illinois on April 23, 2019.  Defendants engaged in a secret conspiracy that did not reveal facts that would have put Plaintiffs on inquiry notice about the existence of the conspiracy alleged in this Complaint.  Throughout the Relevant Period, Defendants fraudulently concealed their unlawful conduct and conspiracy from Plaintiffs.

284.    Plaintiffs only recently learned about Witness 1 and Witness 2 on or about April 23, 2019, upon the filing of cattle ranchers' complaint.  Witness 1 offer direct evidence that Defendants have been colluding to fix prices.

285.    Plaintiffs did not learn, and could not have learned, about the USDA and DOJ investigations into price fixing in the beef industry at any time before March 12, 2020, when Secretary of Agriculture Sonny Perdue announced that the USDA had begun an investigation into suspiciously high beef prices as alleged above.

286.    Before Witness 1's accounts were revealed by the cattle ranchers' complaint and the government's investigations revealed, Plaintiffs did not have facts that would have put them on reasonable notice, or inquiry notice, of the existence of Defendants' conspiracy.  Accordingly,

a reasonable person under the circumstances would not have been alerted to begin investigating the legitimacy of Defendants' beef prices and conduct before these recent revelations.

287.    Further, throughout the conspiracy, each Plaintiff engaged in due diligence in seeking to ensure that it was receiving competitive pricing for beef.  For example, and without limitation, each Plaintiff used a method of purchasing beef – including, for example and without limitation, seeking price quotes and bids from their suppliers and/or investigating reasonably available public information – that caused it to believe in good faith that at the time that it was receiving competitive prices for beef that it purchased from Defendants and co-conspirators.

288.    Plaintiffs' claims are also timely by virtue of tolling by, among other means, operation of law.

## XI.    DEFENDANTS ENGAGED IN CONTINUING VIOLATIONS

289.    Independent of Defendants' fraudulent concealment, which tolled the statute of limitations on Plaintiffs' claims, Plaintiffs' Sherman Act and PSA claims are timely because the statute of limitations period was restarted each time Defendants committed an overt act.

290.    From the start of their conspiracy, Defendants sold beef to Plaintiffs at prices that were artificially raised above the competitive level, resulting from Defendants' continually renewed and adjusted unlawful agreement.

291.    Defendants' conspiratorial meetings and misrepresentations, as alleged above, were each among the new and independent overt acts in furtherance of the conspiracy that restarted the statute of limitations each time they occurred because they advanced the objectives of Defendants' conspiracy and inflicted new and accumulating injury on each Plaintiff.  Indeed, every statement involved different facts and suggestions yet sprang from the same seed – Defendants' conspiracy.

292.     Defendants' conduct during the conspiracy, including, without limitation, coordinating the price to pay suppliers for fed cattle and/or slaughter volumes, were each also new and independent acts in furtherance of the conspiracy that inflicted new and accumulating injury on each Plaintiff.

293.     Each sale of beef by a Defendant to each Plaintiff at a supra-competitive price was also a new and independent overt act in furtherance of the conspiracy and an antitrust and PSA violation that injured Plaintiffs and reset the applicable statutory period.

294.     Defendants' overt acts, or one or more of them in combination, including, but not limited to those alleged above, were new and independent acts that perpetuated their agreement and kept it current with market conditions; they were not merely reaffirmations of Defendants' previous acts.  By constantly renewing and refining their agreement (and overt acts such as those alleged in this Complaint) to reflect market conditions, Defendants inflicted new and accumulating injuries on Plaintiffs.

## XII.   <u>CLAIMS AND CAUSES OF ACTION</u>

### <u>COUNT I</u>

### <u>VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1</u>

**(Brought by all Plaintiffs against all Defendants)**

295.     Plaintiffs incorporate by reference the allegations in paragraphs 1 through 294 above.

296.     "The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade," and "the policy unequivocally laid down by the Act is competition."  *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958); *see also NCAA v. Alston*, 141 S. Ct. 2141, 2144 (2021) ("In the Sherman

Act, Congress tasked courts with enforcing a policy of competition on the belief that market forces 'yield the best allocation' of the Nation's resources.").

297.    "The Sherman Act adopted the term 'restraint of trade' along with its dynamic potential," which "refers not to a particular list of agreements, but to a particular economic consequence, which may be produced by quite different sorts of agreements in varying times and circumstances." *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 731-32 (1988); *see also Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948) ("The [Sherman] Act is comprehensive in its terms and coverage, protecting all who are made victim of the forbidden practices by whomever they may be perpetrated.").

298.    Therefore, the Sherman Act reaches any concerted scheme to affect prices.  *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940) (The Sherman Act covers "agreements to raise or lower prices whatever machinery for price-fixing was used.").  Its target is any of the "many forms of restraint upon commercial competition" which "tend to raise prices or otherwise take from buyers or consumers the advantages which accrue to them from free competition in the market." *Apex Hosiery*, 310 U.S. 469, 495, 497 (1940).

299.    Beginning at a time yet to be determined, but no earlier than approximately 2015, and continuing in force and effect, or both, thereafter, Defendants and their co-conspirators entered and engaged in a continuing agreement, understanding, and conspiracy in unreasonable restraint of trade to fix, raise, increase, and/or stabilize the wholesale price for beef sold to Plaintiffs and others in the United States at artificially elevated levels, in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

300.    The contract, combination and conspiracy among Defendants and their co-conspirators described in the immediately preceding paragraph consisted of a continuing course,

pattern and practice of conduct regarding the pricing and production of fed cattle, and the sale price of beef, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

301.   Defendants' acts in furtherance of their contract, combination or conspiracy in restraint of trade described above were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

302.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following: (a) to fix, stabilize, maintain and/or increase the price of beef sold to Plaintiffs and others in the United States; (b) to allocate the volume of beef sales in the U.S. and/or market shares of beef sales and/or purchased fed cattle; (c) to control slaughter volumes and/or beef supply in the U.S.; and/or (d) to earn supra-competitive profits on the price of beef sold to Plaintiffs and others in the U.S. that resulted from Defendants' collusion.

303.   In order to formulate and effect the foregoing unlawful combination and conspiracy, during the Relevant Period, Defendants and their co-conspirators engaged in one or more of the overt acts alleged above in this Complaint: (a) they agreed to exchange, and did exchange, current and/or future information concerning cattle slaughter volume, prices to purchase fed cattle, and/or the prices of beef sold to purchasers in the U.S.; (b) they agreed to coordinate, and did coordinate, price levels, price terms, and/or price movements for purchase of fed cattle and/or the sale of beef sold in the U.S.; (c) they agreed on prices, price levels, margin levels, and/or production or slaughter levels of fed cattle and/or beef sold in the U.S.; and/or (d) they agreed to fix, raise, maintain and/or stabilize, and did fix, raise, maintain and/or stabilize, the wholesale price of beef sold to Plaintiffs and others in the United States.

304.    Defendants and their co-conspirators entered into and refined their unlawful combination or conspiracy through, among other conduct, the overt acts detailed above.

305.    As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, during the Relevant Period: (a) price competition among Defendants and their co-conspirators in the sale of beef to Plaintiffs and others in the U.S. was (and continues to be) restrained, suppressed and/or eliminated; (b) prices for beef sold by Defendants, their divisions, subsidiaries, and affiliates, and their co-conspirators, to Plaintiffs and others, were (and continue to be) fixed, raised, stabilized, and/or maintained at artificially high, non-competitive levels throughout the United States; and/or (c) Plaintiffs, who directly purchased beef from Defendants, their divisions, subsidiaries, and affiliates, and co-conspirators, were (and continue to be) deprived of the benefits of free and open competition in the purchase of beef.

306.    Defendants' anticompetitive acts described in this Complaint had a direct, substantial, and foreseeable effect on interstate commerce by raising, increasing, maintaining and/or fixing beef prices throughout the United States because Defendants sell their beef in every state.

307.    The conspiratorial acts and combinations alleged above have caused (and continue to cause) unreasonable restraints in the beef market.

308.    Each Plaintiff has been injured in its business or property by reason of Defendants' and their co-conspirators' antitrust violations alleged in this Complaint in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of beef is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' and their co-conspirators' conduct unlawful.

## **PRAYER FOR RELIEF AS TO COUNT I**

WHEREFORE, Plaintiffs pray for the following relief:

A.      A jury verdict in the amount of compensatory damages sustained by each Plaintiff;

B.      A judgment for Plaintiffs and against Defendants, jointly and severally, by the Court in treble the amount of the jury verdict, in accordance with Section 4 of the Clayton Act, 15 U.S.C. §§ 15, and for attorneys' fees, litigation expenses, court costs, and interest at the highest rate allowed by law; and

C.      Such other and further relief as the Court may deem just and proper.

## **COUNT II**

## **VIOLATION OF THE PACKERS AND STOCKYARD ACT ("PSA")**

## **(Brought by Certain Plaintiffs Against all Defendants, *See* Chart Herein at § II)**

309.    Plaintiffs incorporate by reference the allegations in paragraphs 1 through 294 above.

310.    The purpose of the PSA is, among other things, to provide for fair trade practices in the sale and marketing of livestock and meat products.  The PSA is remedial legislation and should be construed liberally to give effect its purposes.  *E.g.*, *Armour and Co. v. United States*, 402 F.2d 712, 717, 722 (7th Cir. 1968); *Swift & Co. v. United States*, 393 F.2d 247, 253 (7th Cir. 1968).  The PSA provides for a private right of action for persons injured by a violation of its provisions.  7 U.S.C. § 209.

311.    Each Defendant and co-conspirator is a "packer" as that term is defined in Section 201 of the PSA, 7 U.S.C. § 191, in that each of them are persons engaged in the business of: (a) buying livestock in commerce for purposes of slaughter; (b) manufacturing or preparing meats or meat food products for sale or shipment in commerce; and/or (c) marketing meats, meat

food products, or livestock products in an unmanufactured form acting as a wholesale broker, dealer, or distributor in commerce.

312.    Under Section 202 of the PSA, 7 U.S.C. § 192, it is unlawful for any packer with respect to livestock, meats, meat food products, or livestock products in unmanufactured form to:

    (a)    Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device;

    (b)    Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect whatsoever, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect whatsoever;

    (c)    Sell or otherwise transfer to or for any other packer, swine contractor, or any live poultry dealer, or buy or otherwise receive from or for any other packer, swine contractor, or any live poultry dealer, any article for the purpose or with the effect of apportioning the supply between any such persons, if such apportionment has the tendency or effect of restraining commerce or of creating a monopoly;

    (d)    Sell or otherwise transfer to or for any other person, or buy or otherwise receive from or for any other person, any article for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce;

    (e)    Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce;

    (f)    Conspire, combine, agree, or arrange with any other person (1) to apportion territory for carrying on business, (2) to apportion purchases or sales of any article, or (3) to manipulate or control prices; and/or

    (g)    Conspire, combine, agree, or arrange with any other person to do, or aid and abet the doing of, any act made unlawful by subdivision (a), (b), (c), (d) or (e).

313.    The PSA's enacting regulations contain further restrictions.  For example, the regulations limit packers' rights to share pricing information with competitors.

> No packer, dealer, or market agency, in connection with transactions subject to the provisions of the act, shall, in person, or through employed buyers, for the purpose of restricting or limiting competition, manipulating livestock prices, or controlling the movement of livestock, prior to, or during the conduct of, his buying operations: (a) Furnish competitor packers, dealers, market agencies, or their buyers or representatives, similarly engaged in buying livestock, with information concerning his proposed buying operations, such as the species, classes, volume of livestock to be purchased, or prices to be paid; or (b) furnish any other buying information to competitor buyers.

9 C.F.R. § 201.69.

314.    The regulations also require that "each packer and dealer engaged in purchasing livestock, in person or through employed buyers, shall conduct his buying operations in competition with, and independently of, other packers and dealers similarly engaged."  9 C.F.R. § 201.70.

315.    The competitively sensitive information that Defendants and co-conspirators privately sent to or received from one another in support of their conspiracy, including information about their cattle purchases, prices paid for fed cattle, and/or cattle slaughter volumes, was an "article" under the PSA.

316.    During the Relevant Period, Defendants and their co-conspirators sent or received this competitively sensitive information for the purpose and with the effect of manipulating the price of beef sold to Plaintiffs and others in the United States.

317.    During the Relevant Period, Defendants and their co-conspirators also engaged in other conduct, including, without limitation, communicating, arranging, or signaling or otherwise coordinating with each other on cattle purchases and/or beef production in the United States to increase, fix, stabilize, and/or maintain the price of beef sold to Plaintiffs and others in the United States.

318.   The actions of each Defendant and co-conspirator, as set forth above, constitute one or more violations of 7 U.S.C. § 192 and the enacting regulations of the PSA.

319.   Section 308 of the PSA, 7 U.S.C. § 209, provides that if any person subject to the PSA violates any of its provisions, such person shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such violation.  Section 308 of the PSA, 7 U.S.C. § 209 also provides that such liability may be enforced by suit in any District Court of the United States of competent jurisdiction.

320.   The violations of 7 U.S.C. § 192 committed by Defendants and their co-conspirators during the Relevant Period, including as relating to the purchase, sale, or handling of livestock,  have unlawfully limited the supply of beef and/or manipulated the price of beef, injured Plaintiffs, and caused Plaintiffs damages by forcing them to pay inflated, supra-competitive prices for beef.

## **PRAYER FOR RELIEF AS TO COUNT II**

WHEREFORE, Plaintiffs demand judgment against each Defendant as follows:

A.   Damages to the maximum extent allowed under law in consequence of the violations of the PSA, and a joint and several judgment in favor of Plaintiffs and against all Defendants;

B.   Attorneys' fees, litigation expenses, costs of suit, and interest at the maximum rate allowed by law; and

C.   Such other and further relief as the Court may deem just and proper.

## **XIII.   JURY TRIAL DEMANDED**

In accordance with Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury of all issues so triable.

Dated: January 30, 2023

Respectfully submitted,

By:  */s/ Douglas H. Patton*

Richard Alan Arnold
William J. Blechman
Kevin J. Murray
Douglas H. Patton
Samuel J. Randall
Michael A. Ponzoli
KENNY NACHWALTER, P.A.
441 Brickell Avenue, Suite 1100
Miami, FL 33131
Tel: (305) 373-1000
Fax: (305) 372-1861
Email: rarnold@knpa.com
Email: wblechman@knpa.com
Email: kmurray@knpa.com
Email: dpatton@knpa.com
Email: srandall@knpa.com
Email: mponzoli@knpa.com

***Counsel for Direct Action Plaintiffs The Kroger Co., Hy-Vee, Inc., Save Mart Supermarkets US Foods, Inc. and Albertsons Companies, Inc.***

By:  */s/ David B. Esau*

David B. Esau
Kristin A. Gore
Garth T. Yearick
Amanda R. Jesteadt
CARLTON FIELDS, P.A.
525 Okeechobee Blvd., Suite 1200
West Palm Beach, FL 33401
Tel: (561) 659-7070
Fax: (561) 659-7368
Email: desau@carltonfields.com
Email: kgore@carltonfields.com
Email: gyearick@carltonfields.com
Email: ajesteadt@carltonfields.com

By:  */s/ David P. Germaine*

Paul E. Slater
Joseph M. Vanek
David P. Germaine
Phillip F. Cramer
Alberto Rodriguez
SPERLING & SLATER, P.C.
55 W. Monroe St., Suite 3200
Chicago, IL 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
Email: pes@sperling-law.com
Email: jvanek@sperling-law.com
Email: dgermaine@sperling-law.com
Email: pcramer@sperling-law.com
Email: arodriguez@sperling-law.com

***Counsel for Direct Action Plaintiffs Associated Grocers of the South, Inc., Dollar General Corporation, Dolgencorp, LLC, Meijer, Inc., Meijer Distribution, Inc., Publix Super Markets, Inc., Raley's, United Natural Foods, Inc., Supervalu, Inc., Associated Grocers of Florida, Inc., Unified Grocers, Inc., Tony's Fine Foods, and Wakefern Food Corp.***

Aaron A. Holman
CARLTON FIELDS, P.A.
200 S. Orange Avenue, Suite 1000
Orlando, FL 32801
Tel: (407) 244-8229
Fax: (407) 648-9099
Email: aholman@carltonfields.com


Scott L. Menger
CARLTON FIELDS, LLP
2029 Century Park East, Suite 1200
Los Angeles, CA 90067
Tel: (310) 843-6300
Fax: (310) 843-6301
Email: smenger@carltonfields.com

*Counsel for Direct Action Plaintiffs Cheney Brothers, Inc. and Subway Protein Litigation Corp., as Litigation Trustee of the Subway® Protein Litigation Trust, Restaurant Services, Inc., Sonic Industries Services Inc., Whatabrands LLC, Whataburger Restaurants LLC, WB Supply & Merchandising LLC, ARCOP, Inc., and CKE Restaurants Holdings, Inc.*

By: /s/ Eric R. Lifvendahl

Eric R. Lifvendahl
 LAW, LLC
265 Latrobe Ave.
Northfield, IL 60093
Tel: (847) 830-7002
Email: eric@liflaw.com


By: /s/ Richard L. Coffman

Richard L. Coffman
THE COFFMAN LAW FIRM
3355 W. Alabama Street, Suite 240
Houston, TX 77098
Tel: (713) 528-6700
Email: rcoffman@coffmanlawfirm.com


By: /s/ Robert N. Kaplan

Robert N. Kaplan
Elana Katcher
Matthew P. McCahill
KAPLAN FOX & KILSHEIMER, LLP
850 Third Avenue, 14th Floor
New York, NY 10022
Tel: (212) 687-1980
Email: rkaplan@kaplanfox.com
Email: ekatcher@kaplanfox.com
Email: mmccahill@kaplanfox.com

By: /s/ Bernard D. Marcus

Bernard D. Marcus
Moira Cain-Mannix
Brian C. Hill
MARCUS & SHAPIRA LLP
One Oxford Center, 35th Floor
Pittsburgh, PA 15219
Tel: (412) 471-3490
Fax: (412) 391-8758
Email: marcus@marcus-shapira.com
Email: cain-mannix@marcus-shapira.com
Email: hill@marcus-shapira.com

*Counsel for Direct Action Plaintiffs Action Meat Distributors, Inc., Affiliated Foods, Inc., Alex Lee, Inc., Associated Food Stores, Inc., Big Y Foods, Inc., Brookshire Brothers, Inc., Brookshire Grocery Company, Colorado Boxed Beef Co., Prefco Distribution, LLC, The Golub Corporation, Nicholas & Co., Inc., PFD Enterprises, Inc., SpartanNash Company, Springfield Grocer Company, The Distribution Group, Inc., Topco Associates, LLC, Troyer Foods, Inc., Unipro Foodservice, Inc., URM Stores, Inc. and Giant Eagle, Inc.*

By:   */s/ Scott E. Gant*
Scott E. Gant
Michael S. Mitchell
Cameron C. Miller
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, N.W.
Washington, DC  20005
Tel: (202) 237-2727
Email: sgant@bsfllp.com
Email: mmitchell@bsfllp.com
Email: cmiller@bsfllp.com

Colleen Harrison
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, N.Y.  10504
Tel: (914) 749-8204
Email: charrison@bsfllp.com

Sarah L. Jones
BOIES SCHILLER FLEXNER LLP
725 S Figueroa Street, 31st Floor
Los Angeles, CA  90017
Tel: (213) 629-9040
Email: sjones@bsfllp.com

**Counsel for Direct Action Plaintiffs Sysco
Corporation and Amory Investments LLC**

By:   */s/ Patrick J. Ahern*
Patrick J. Ahern
Theodore B. Bell
AHERN & ASSOCIATES, P.C.
Willoughby Tower
8 South Michigan Ave., Suite 3600
Chicago, IL 60603
Tel: (312) 404-3760
Email: patrick.ahern@ahernandassociatespc.com
Email: theo.bell@ahernandassociatespc.com

**Counsel for Direct Action Plaintiffs Winn-Dixie
Stores, Inc., Bi-Lo Holdings, LLC and Co-
Counsel for Kraft Heinz Foods Company**

By:   */s/ Philip J. Iovieno*
Philip J. Iovieno
Nicholas A. Gravante, Jr.
Lawrence S. Brandman
Jack G. Stern
Gillian Groarke Burns
Mark A. Singer
Justin V. Arborn
Elizabeth R. Moore
CADWALADER, WICKERSHAM & TAFT  LLP
200 Liberty Street
New York, N.Y.  10281
Tel: (212) 504-6000
Email: philip.iovieno@cwt.com
Email: nicholas.gravante@cwt.com
Email: lawrence.brandman@cwt.com
Email: jack.stern@cwt.com
Email: gillian.burns@cwt.com
Email: mark.singer@cwt.com
Email: justin.arborn@cwt.com
Email: elizabeth.moore@cwt.com

**Counsel for Direct Action Plaintiffs
Aramark Food and Support Services
Group, Inc., and Co-Counsel for Kraft
Heinz Foods Company**