# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| **IN RE: CATTLE AND BEEF ANTITRUST LITIGATION** | **MDL No. 22-md-3031 (JRT/JFD)** |
| *This document relates to:* | JURY TRIAL DEMANDED |
| INDIRECT SELLERS | |

## INDIRECT SELLERS' FIRST AMENDED CLASS ACTION COMPLAINT

TABLE OF CONTENTS

NATURE OF THE CASE...............................................................................7

PARTIES ..................................................................................................19

I.  Plaintiffs ......................................................................................19

II.  Defendants ..................................................................................21

A. The Tyson Defendants ...........................................................21

B. The JBS Defendants ...............................................................22

C. The Cargill Defendants ..........................................................23

D. National Beef Packing Company, LLC....................................24

E. The Defendants Conspired With Each Other .................................25

F. Agents and Affiliates...............................................................26

JURISDICTIONS, VENUE AND COMMERCE.............................................27

THE BEEF PRODUCTION PROCESS .........................................................29

DEFENDANTS CONSPIRED TO DEPRESS FED CATTLE PRICES..............................40

I.  Defendants Agreed to Reduce and Restrain Their Collective

Slaughter Volumes to Pressure Cash Cattle Sellers................................41

A. Hooker Was Well Positioned to Know about Defendants'

Agreement.............................................................................43

B. Witness 1 Learns of an Agreement Among Defendants.................46

2

C. The Available Data Corroborated Witness 1's Account .................49

**II.   Defendants Agreed to Coordinated Slaughter Reductions .................54**

A. Defendants Agreed to Slash Cash Cattle Purchases During

Slaughter Reductions ..........................................................................56

B. Defendants Coordinated Their Procurement Practices for

Cash Cattle ...........................................................................................59

C. Defendants Uneconomically Imported Foreign Live Catte to

Depress Demand for U.S. Fed Cattle .................................................71

D. Defendants Agreed Not to Expand Their

Slaughtering Capacity..........................................................................75

**III.  Defendants' Conduct Precipitated the Collapse in Prices in 2015 .....78**

A. Defendants' Ongoing Conduct Continues to Depress

Fed Cattle Prices...................................................................................91

B. 2019 Brings continued Parallel Slaughter and Pricing Behavior, a

Fire at a Plant, and Regulatory Investigations .................................97

1. Defendants react to a processing plant fire by suppressing

cattle prices and inflating beef prices. ........................................102

2. USDA continues to investigate Defendants'

price manipulation.........................................................................108

C.  Defendants Publicly Signaled Their Commitment to Supply

Restraint ...........................................................................................110

D.  Defendants' Conduct Directly Caused the Depression of Feeder

Cattle Prices .....................................................................................112

E.  Economic Analysis Supports the Existence of the Alleged

Conspiracy ........................................................................................115

F.  Supply  and  Demand  Drivers  Do  Not  Explain  the  2015  Price

Collapse or Subsequent Low Prices ................................................115

G.  Other Explanations for the Drop in Prices Do Not

Withstand Scrutiny ..........................................................................119

THE CATTLE MARKET IS CONDUCTIVE TO COLLUSION .....................................121

I.  The Beef Packer Industry is Highly Consolidated and Highly

Concentrated .........................................................................................121

A.  The  Supply  of  Cattle  and  Demand  for  Beef  are  Relatively

Insensitive to Short-Term Changes in Price ...................................122

B.  Producers Face Significant Market Access Risk .............................123

C. There Are Many Trade Organizations and Opportunities for Defendants to Meet and Collude ......................................................124

D. Defendants Benefit from High Barriers to Entry ...........................130

DEFENDANTS HAVE SIMILAR COST STRUCTURES AND HAVE SIGNIFICANT OVERSIGHT OF EACH OTHER'S PRICE AND PRODUCTION DECISIONS .......132

DEFENDANTS ARE RECIDIVISTS WITH A HISTORY OF COLLUSION ...................134

DEFENDANTS' CONDUCT IS THE SUBJECT OF ONGOING INVESTIGATIONS .....135

I.   The DOJ is Investigating Defendants for Price-Fixing, Market Manipulation and Unfair practices in the Cattle and Beef Markets ...............................................................................................135

A. The USDA is Investigating Defendants' Activities in Light of Fire at Tyson's Holcomb Plant and Covid-19 related Market Disruptions ...........................................................................138

B. JBS S.A.'s Brazilian Parent and Related Companies are Guilty of Bribery and Corruption ...................................................................140

STATUTE OF LIMITATIONS AND TOLLING ............................................................142

I.   Fraudulent Concealment ...........................................................................142

CLASS ALLEGATIONS.......................................................................................152

CLAIMS FOR RELIEF ........................................................................................154

COUNT I: MAKE ALLOCATION AND PRICE-FIXING IN VIOLATION OF THE

SHERMAN ACT, 15 U.S.C. §1 (ON BEHALF OF THE NATIONWIDE INJUNCTIVE

RELIEF CLASSES) ...........................................................................................154

COUNT II: VIOLATIONS OF PACKERS AND STOCKYARDS ACT, 7 U.S.C. §§ 192 AND

209 (ON BEHALF OF PLAINTIFF AND THE NATIONWIDE DAMAGES

CLASSES)........................................................................................................156

COUNT III: VIOLATION OF STATE ANTITRUST LAW (ON BEHALF OF STATE LAW

DAMAGES CLASSES) ......................................................................................158

COUNT IV: VIOLATION OF STATE CONSUMER PROTECTION LAW (ON behalf of

STATE LAW DAMAGES CLASSES) ...................................................................160

PRAYER FOR RELIEF .......................................................................................162

JURY DEMAND ...............................................................................................162

On behalf of themselves and all those similarly situated, plaintiffs James Specht; Jerry Kelsey; Richard Settlemyer; and David Hyatt, bring this action against defendants Tyson Foods, Inc.; Tyson Fresh Meats, Inc.; JBS S.A.; JBS USA Food Company; Swift Beef Company; JBS Packerland, Inc.; Cargill, Inc.; Cargill Meat Solutions Corporation; and National Beef Packing Company, LLC, state:

## NATURE OF THE CASE

1. This case arises from Defendants' unlawful conspiracy, beginning no later than January 2015 and continuing today, to suppress the price of fed cattle in the United States, causing a corresponding suppression of the price of feeder cattle.[1]

2. Plaintiffs are producers of feeder cattle whose livelihoods depend on getting competitive prices for their cattle. Plaintiffs indirectly sold cattle to one or more Defendants in a market directly manipulated by Defendants' collusive conduct.

3. Plaintiffs have been damaged by Defendants' anticompetitive conduct because the prices that Defendants pay for fed cattle have a direct impact on the price that ranchers receive for feeder cattle. In fact, historical prices show that any suppression of the future price of fed cattle reduces the price of feeder cattle:

---

[1] "Feeder cattle" means calves, steers, or heifers raised by cow-calf entities, ranchers, or backgrounders in the United States, which feedlots use to produce fed cattle. Feeder cattle and fed cattle are referred to collectively as "cattle."



**Figure 1: Comparison of Fed Cattle and Feeder Cattle Futures Prices.[2]**

4. Defendants' coordinated conduct, including slashing their respective slaughter volumes and curtailing their buying of fed cattle in the cash cattle market, led to a parallel collapse in prices of feeder cattle. Defendants continue to suppress the price of fed cattle, and thereby the price of feeder cattle, through coordinated buying and periodic slaughter restraint. USDA market data reflects the highly correlated impact of Defendants' conspiracy on all aspects of the beef cattle market, including fed and feeder cattle:

---

[2]  https://www.beefmagazine.com/feedlots/feeder-cattle-prices-versus-fed-cattle-futures, last accessed Aug. 22, 2023.



**Figure 2: Price Comparison of Cattle.**[3]

5. As middle-men in the supply chain, Defendants' profits are driven by the "meat margin," which is the spread between the price packers pay for fed cattle and the price they charge for beef. Because the supply of fed cattle is insensitive to short-term price changes – owing to the long life cycle of cattle, their perishable nature, and the lack of any alternative use – and as beef demand is relatively insensitive to changes in price, the meat margin is very sensitive to changes in industry slaughter levels. Defendants increased their meat margin, and their profits, by colluding to reduce their respective slaughter volumes. Reduced demand for fed cattle in turn reduces demand for feeder cattle.

---

[3]   https://www.nass.usda.gov/Charts_and_Maps/Agricultural_Prices/priceca.php   (last accessed Oct. 26, 2022).

6. Because Defendants have not passed on their illicitly gained lower prices to their customers (indeed such a pass-through would defeat the purpose of their conspiracy), producers and end consumers both lose: producers such as Plaintiffs are deprived of fair price competition at the top of the supply chain, and consumers are overcharged at the bottom. Defendants reap all the profits from using their collective market power to squeeze both producers and consumers. As the DOJ has noted, the Sherman Act was enacted to prevent such buying cartels:

> The 1890 debates in both houses of the United States Congress demonstrated concern with the exercise of market power on both the buying and selling sides of the market. Many legislators singled out large meat packers for condemnation, and they were condemned as much for reducing the prices paid to cattle farmers as for raising prices to consumers. In response, Congress passed the Sherman Act, aimed at preserving free and unfettered competition as the rule of trade. The Act is comprehensive in its terms and coverage….

> The Sherman Act prohibits anticompetitive agreements and exclusionary conduct and both may be found unlawful on the basis of effects on the buying side of the market. Buyer cartels are unlawful *per se* and prosecuted criminally….

> One of the earliest Sherman Act cases involved, among other things, a conspiracy among meat packers to reduce the price they paid for cattle.[4]

---

[4] Note by the United States at 1, 3 Roundtable on Monopsony and Buyer Power, available at https://www.ftc.gov/sites/default/files/attachments/us-submissions-oecd-and-other-international-competition-fora/monopsony.pdf (internal quotations and citations omitted).

7. Feeder cattle are the animals that ultimately are sold as "fat" or "fed" cattle. Fed cattle are steers and heifers fed for slaughter, for the production and sale of beef products. Defendants then process the resulting carcasses into beef for sale to other processers, wholesalers, and retail outlets. Cattle ranchers raise beef cattle through their life cycle, typically until selling to a Defendant or to a feedlot, as depicted below:



**Figure 3: Cattle and Beef Industry from Breeding to Consumption.[5]**

---

[5] U.S. Gov't Accountability Off., GAO-18-296, U.S. Department of Agriculture: Additional Data Analysis Could Enhance Monitoring of U.S. Cattle Market (Apr. 2018) ("2018 GAO Report"), at 6, https://www.gao.gov/assets/700/691178.pdf.

8. Defendants purchase the overwhelming number of slaughter-weight fed cattle in the United States. Since 2011, Defendants have annually slaughtered over 80% of all fed cattle sold within the United States. The chart below demonstrates Defendants' overwhelming market share for the purchase of fed cattle.



**Figure 4: Defendants' Market Share of U.S. Fed Cattle Slaughter Volumes.[6]**

9. Defendants procure most of their fed cattle though alternative marketing agreements ("AMAs"), such as "formula" and "forward" contracts. Under these contracts, the producer agrees to deliver its cattle to a Defendant once they have reached slaughter-weight, at a price to be determined at or around the time of

---

[6] Cattle Buyers Weekly, "Steer And Heifer Slaughter Market Share", http://www.cattlebuyersweekly.com/users/rankings/packerssteerheifer.php.

delivery. The price formulas used by formula contracts typically incorporate reported prices of fed cattle sold in the weekly cash cattle trade, the industry's spot market. The price formulas used by forward contracts incorporate live cattle futures prices, which, in turn, are directly impacted by reported cash cattle prices. As a result, the prices paid for fed cattle in the cash cattle trade – which constitute a minority (a mere 20-25%) of all fed cattle sold in the United States – determines the price of almost all fed cattle bought by Defendants.

10. Feeder and fed cattle prices rose steadily from 2009 to 2014 due to strong beef demand and a shortage of cattle following the droughts of 2011 through 2013. After prices peaked in November 2014, the industry expected the price of cattle to stabilize in 2015 and continue at or around that higher level for years.

11. This widely predicted price stability did not occur. Instead, Defendants used their market power, price sensitivities, and the thin cash cattle trade to their advantage and conspired to depress fed cattle prices. Defendants' conspiracy to depress fed cattle prices directly and nearly simultaneously caused feeder cattle prices to decline.

12. Defendants' conspiracy to reduce fed cattle prices, and thereby increase the meat margin, was carried out through at least the following coordinated conduct:

(1) Defendants periodically reduced their slaughter volumes to reduce demand for fed cattle; (2) Defendants curtailed their purchase and slaughter of cash cattle during those same periods; (3) Defendants coordinated their procurement practices for cash cattle; (4) Defendants imported foreign cattle at a loss so as to reduce domestic demand; and (5) Defendants closed and idled plants.

13. Defendants' collusion on parallel slaughter volumes and reductions is demonstrated in the figure below. It shows they consistently reduced slaughter in the late winter/spring each year and details the remarkable extent to which Defendants' quarter-to-quarter slaughter changes move in lockstep consistent with an agreement to jointly manage collective demand:



**Figure 5: Defendants' Quarterly Fed Cattle Slaughter Volume.**

14. Defendants' slaughter reductions and agreement to manage their demand below the available cattle supply directly impacted their annual slaughter volumes as illustrated in the figures below. Figure 6 compares the average annual slaughter volume before and after the conspiracy compared to independent regional packers ("Independent Packers"). It shows that Defendants have all reduced their annual slaughter volumes relative to the beginning of the conspiracy, while Independent Packers increased their slaughter volume as a whole:



**Figure 6: Average Pre-/Post-Conspiracy Fed Cattle Slaughter–Defendants vs Others**

15. Figure 7 compares Defendants' and Independent Packers' annual slaughter volumes before and after the conspiracy. The graph confirms that Defendants each slaughtered less fed cattle in every year after the conspiracy began than before. It also shows that Independent Packers increased their slaughter volume from 2016 on, as the supply of fed cattle increased, at a far greater rate than Defendants. Defendants used periodic slaughter reductions and underutilized plant capacity to ensure their demand for fed cattle never outstripped the supply of slaughter weight fed cattle to ensure the continued suppression of fed cattle prices.



**Figure 7: Average Pre- & Post-Conspiracy Fed Cattle Slaughter.[7]**

---

[7] National Beef acquired Iowa Premium in June 2019, adding 300,000 head to its annual fed cattle slaughter volume. Excluding that, its slaughter volume was flat against 2018, while Regional Packers' slaughter volume rose by approximately 100,000 head (netting out National Beef's acquisition of Iowa Premium).

16. The figures above show that each Defendant slaughtered significantly less fed cattle in 2015 than their respective prior averages and then maintained artificially low slaughter levels from that point forward.

17. Defendants' conspiracy succeeded in causing an unprecedented collapse in fed and feeder cattle prices in the second half of 2015 and continued to suppress fed and feeder cattle prices thereafter.

18. Despite this drastic collapse in fed and feeder cattle prices, Defendants benefitted from record beef prices. This disconnect allowed Defendants to reap record per-head meat margins at the expense of fed and feeder cattle producers.

19. Witness accounts confirm the existence of Defendants' price-fixing conspiracy. To begin with, a witness previously employed by Swift at its Cactus, Texas slaughter plant confirmed that each Defendant expressly agreed to periodically reduce its respective purchase and slaughter volumes to reduce the prices it would otherwise pay for fed cattle. *In re Cattle Antitrust Litig.*, No. CV 19-1129 (JRT/HB), 2021 WL 7757881, *3 (D. Minn. Sept. 14).

20. Available transaction data and slaughter volume, both Defendant-specific as well as the aggregated data published by the United States Department of Agriculture ("USDA"), corroborate the witnesses' account. *Id.* at *6–*8.

21. This conduct occurred in a market that is highly conducive to collusion due to the small number of large beef packers, high barriers to entry, and Defendants' frequent communications. Defendants' field buyers had opportunity to meet and exchange commercially sensitive information when they inspected feedlots in their territories. Field buyers reported "market color" obtained in the field – including reports of their competitors' activities – back to their head office and their firms' other field buyers through daily conference calls. Defendants had more opportunities to conspire as members of various trade and industry organizations.

22. Economic evidence further supports the existence of the alleged conspiracy:

    a. Supply and demand drivers of fed cattle prices, and other commonly proffered explanations, do not explain the 2015 collapse in fed cattle prices or the low prices that have prevailed since then; and

    b. Fed cattle prices have been artificially depressed since January 2015.

23. In support of their claims, Plaintiffs put forth (1) direct evidence of a conspiracy through eyewitness recollections; (2) parallel conduct involving periodic slaughter restraint and coordinated fed cattle procurement practices; (3) plus factors showing the market is susceptible to collusion; and (4) economic analysis showing anticompetitive effects on cattle prices and Defendants' margins.

**PARTIES**

**I.      Plaintiffs**

24. During the Class Period, plaintiff James Specht, doing business as Specht Farms, has owned and operated a farm in Piqua, Kansas. Mr. Specht has raised and sold approximately 70 feeder cattle in each year since 2015. Mr. Specht sells the majority of his feeder cattle at local sale barns and auctions in Kansas to buyers who, on information and belief, later sold to one or more of the Defendants. Mr. Specht generally sells his feeder cattle as an indirect seller to one or more of the Defendants when they are between 600 to 700 pounds.

25. Plaintiff Jerry Kelsey owns and operates a farm in Sparta, Tennessee. Mr. Kelsey partners with his wife, Mary Ruth Kelsey, to do business as Kelsey Farm. Mr. Kelsey sold between 12 and 20 feeder cattle each year during the Class Period at auctions in Tennessee. On information and belief, Mr. Kelsey's cattle are purchased by buyers who later sold to one or more of the Defendants. Mr. Kelsey generally sells his feeder cattle as an indirect seller to one or more of the Defendants when they are around 450 pounds, and approximately 9-12 months old.

26. Plaintiff Richard Settlemyer, doing business as Settlemyer Farm, owns and operates a feeder cattle ranch in Colony, Kansas where he raises calves and sold approximately 100 feeder cattle each year during the Class Period at local sale barns. On information and belief, Mr. Settlemyer's cattle are purchased by buyers who later sold to one or more of the Defendants. Mr. Settlemyer generally sells his feeder cattle as an indirect seller to one or more of the Defendants when they are around 500-600 pounds, and approximately 12 months old.

27. Plaintiff David Hyatt, d/b/a Hyatt Farms, owns and operates a farm in Amity, Missouri. Mr. Hyatt raised and sold approximately 100 feeder cattle every year during the Class Period. For the past two years, Mr. Hyatt has sold one to two loads of feeder cattle directly to a feedlot in Missouri, where they are fed to slaughter weight and sold directly to one or more of the Defendants, with most of the sales being to Defendant Tyson. On information and belief, a majority of Mr. Hyatt's feeder cattle are eventually slaughtered at Tyson's Dakota City packing plant in Nebraska. He has also sold feeder cattle in Iowa, Kansas, and Nebraska.

## II.   Defendants

### A.   The Tyson Defendants.

29. Defendant Tyson Foods, Inc. ("Tyson Foods") is a Delaware corporation with its principal place of business in Springdale, Arkansas. Tyson Foods is the parent company of the Tyson group.

30. Defendant Tyson Fresh Meats, Inc. ("Tyson Fresh Meats" and collectively with Tyson Foods, "Tyson" or the "Tyson Defendants") is a wholly owned subsidiary of Tyson Foods. Tyson Fresh Meats is a Delaware corporation with its principal place of business in Dakota Dunes, South Dakota. Tyson Fresh Meats is the contracting entity for fed cattle bought and slaughtered at its numerous slaughter plants throughout the United States and is the principal operating entity within Tyson Foods' cattle and beef business.

31. At all relevant times, the Tyson Defendants shared a unity of corporate interest and operated as part of a single enterprise to further the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from Plaintiffs.

32. The Tyson defendants collectively participated in the agreement, understanding, and conspiracy alleged herein.

21

**B.     The JBS Defendants.**

33. Defendant JBS S.A. ("JBS") is a Brazilian corporation with its principal place of business located in Sao Paulo, Brazil. JBS is the parent company of the JBS group.

34. Defendant JBS USA Food Company ("JBS USA") is a Delaware corporation with its principal place of business in Greeley, Colorado. JBS USA acts as both an operating entity and holding company within JBS's U.S. cattle and beef business. JBS USA is the contracting entity for JBS's fed cattle purchases in the United States.

35. Defendant Swift Beef Company ("Swift") is a Delaware corporation with its principal place of business in Greeley, Colorado. Swift operates JBS's fed cattle slaughter plants throughout the United States and also contracts for the majority of fed cattle purchases to be slaughtered at these plants.

36. Defendant JBS Packerland, Inc. ("JBS Packerland") is a Delaware corporation with its principal place of business in Greeley, Colorado. JBS Packerland operates JBS's Regional Beef business unit. In that capacity, JBS Packerland owns, directly or indirectly through its subsidiaries, JBS slaughter plants throughout the U.S., and contracts for the majority of purchases of fed cattle to be slaughtered at these plants.

37. JBS has admitted that JBS USA, Swift, and JBS Packerland each employed or engaged various senior staff and executives responsible for the operation of JBS's U.S. fed cattle and beef business during the relevant time period.

38. Defendants JBS USA, Swift, and JBS Packerland were, throughout the relevant time period, wholly owned, direct or indirect subsidiaries of JBS. Defendants JBS, JBS USA, Swift, and JBS Packerland are referred to collectively herein as the "JBS Defendants."

39. During the relevant time period, the JBS Defendants shared a unity of corporate interest and operated as a single enterprise to further the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from Plaintiffs.

40. The JBS defendants collectively participated in the agreement, understanding, and conspiracy alleged herein.

**C.    The Cargill Defendants.**

40. Defendant Cargill, Incorporated ("Cargill") is a Delaware corporation with its principal place of business in Wayzata, Minnesota. Cargill is the parent company of the Cargill group.

41. Defendant Cargill Meat Solutions Corporation ("CMS" and, collectively with Cargill, the "Cargill Defendants"), a subsidiary of Cargill, is a Delaware corporation with its principal place of business in Wichita, Kansas. CMS is the principal operating entity for Cargill's U.S. cattle and beef business and owns and operates, directly or indirectly through its subsidiaries, Cargill's fed cattle slaughter plants in the United States. CMS is the contracting entity for fed cattle purchased and slaughtered at these plants.

42. At all relevant times, the Cargill Defendants shared a unity of interest and operated as part of a single enterprise to further the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from Plaintiffs.

43. The Cargill defendants collectively participated in the agreement, understanding, and conspiracy alleged herein.

### D. National Beef Packing Company, LLC.

43. Defendant National Beef Packing Company, LLC ("National Beef") is a Delaware limited liability company with its principal place of business in Kansas City, Missouri. National Beef owns and operates, directly or through its subsidiaries, fed cattle slaughter plants in the U.S. and is the contracting entity for fed cattle slaughtered at these plants.

44. Marfrig Global Foods S.A. ("Marfrig") is a Brazilian meatpacking conglomerate with operations around the world and, since June 2018, owns a controlling interest in National Beef. Before this sale, Jeffries Financial Group, Inc. ("Jeffries Financial Group") was National Beef's controlling shareholder. Throughout this period, U.S. Premium Beef, LLC, was a minority shareholder in National Beef.

### E.    The Defendants Conspired With Each Other.

45. During the relevant time period, each Defendant purchased fed cattle in the United States and sold the resultant beef. In 2017, the Tyson, JBS, Cargill, and National Beef Defendants accounted for 26%, 21%, 22%, 12.5% of the total U.S. fed cattle slaughter, respectively.[8] In their 2017 fiscal years, the Tyson, JBS, Cargill, National Beef Defendants had approximately $14.8 billion, $13.4 billion, $13.1 billion, $7.3 billion, in sales in their respective beef segments.[9]

---

[8] CBW Market Share.

[9] Jefferies 2018 Annual Report at 38; Nat'l Cattlemen's Beef Ass'n "Directions statistics", at 2, http://www.beefusa.org/CMDocs/BeefUSA/Publications/CattleFaxSection.pdf; Cattle Buyers Weekly; "Top 30 Beef Packers 2018," http://www.cattlebuyersweekly.com/users/rankings/beefpackers2018.php.

46. Each Defendant exploited the relationship between physical cash cattle and the CME Live Cattle market and transacted in cattle futures and/or options at prices they had suppressed, including futures for feeder cattle.

47. Each Defendant was a co-conspirator with the other Defendants and committed overt acts in furtherance of the conspiracy alleged herein in the United States and in both this District and the Transferor District.

## F.    Agents and Affiliates.

48. "Defendants" refers to and includes each of the named Defendants' predecessors, successors, parents, wholly-owned or controlled subsidiaries or affiliates, employees, officers, and directors.

49. All references to any act, deed, or transaction of any corporate group, corporation, or partnership, mean that the corporate group, corporation, or partnership engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, representatives, parents, predecessors, or successors-in-interest while they were actually engaged in the management, direction, control, or transaction of business or affairs of the corporation or partnership.

## JURISDICTION, VENUE AND COMMERCE

50. Subject matter jurisdiction over Plaintiffs' claim for injunctive relief exists under Section 16 of the Clayton Act, 15 U.S.C. § 26, and under 28 U.S.C. §§ 1331, 1332(d), 1337(a), and 1367.

51. Both this Court and the Transferor Court have personal jurisdiction over Defendants because they purposefully directed their business activities toward both jurisdictions and had substantial contacts with each jurisdiction, and because Plaintiffs' claims for relief arise from and relate to illegal acts committed by Defendants within each jurisdiction.

52. Defendants' activities were within the flow of, and were intended to and did have a substantial effect on, interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

53. By reason of the unlawful activities alleged herein, Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and the geographically dispersed Class members. Defendants, directly and through their agents, engaged in activities affecting all states.

54. Plaintiffs seek injunctive relief, compensatory damages, all damages available under applicable statutes, costs, and reasonable attorneys' fees.

55. Venue is proper in both this District and the Transferor District under 15 U.S.C. §§ 15 and 22 and 28 U.S.C. §1391(b), (c), and (d) because at all times relevant to the Complaint: (a) Defendants transacted business, were found, or acted through subsidiaries or agents present in both Districts; (b) a substantial part of the events giving rise to Plaintiffs' claims occurred in each District; and (c) a substantial portion of the affected interstate trade and commerce described herein has been carried out in both Districts. Among other relevant conduct, Defendants indirectly purchased feeder cattle owned or located in both Districts, processed the resultant beef at plants located in each District, and/or sold resultant beef products to customers located in both Districts.

56. During the relevant period, all Defendants, both foreign and domestic, engaged in conduct within the United States related to these allegations. Defendants' misconduct was purposefully directed at the United States and was specifically intended to affect the prices of fed and feeder cattle bought within the United States. Defendants' acts were acts in furtherance of the conspiracy that, because they occurred in the United States by Defendants' domestic entities, provide specific personal jurisdiction over all conspirators.

57. The conspiracy and the overt acts in furtherance of it, were directed at, and had the intended effect of, causing injury to persons residing in or doing business in the United States, including in this District and the Transferor District.

58. Defendants' conspiracy was motivated by profits. As members of the conspiracy, foreign-based Defendants are liable for acts taken to further the conspiracy by domestic Defendants, as well as their own actions taken in the United States, and personal jurisdiction attaches, regardless of whether some portion of the conduct to further the conspiracy might have occurred overseas.

## THE BEEF PRODUCTION PROCESS

59.  As used in the American agricultural industry, *cattle* means live animals of the bovine genus.[10] Cattle begin life as calves, typically weighing between sixty-five and ninety pounds and will nurse from its dam. At six to nine months or between five hundred to seven hundred pounds, cattle are weaned and transitioned to forage and, sometimes, supplemental feed. At approximately twelve months or nine-hundred pounds, cattle are transitioned to grain and

---

[10] *Cattle* is a plural form, and there is no universally used term for a single head of cattle in the American agricultural industry. The term *bovine*, though, is often used to refer to cattle in the singular. While cattle are often classified for purposes unrelated to this litigation, e.g., heifers, cows, and steers, all are encompassed by the term *cattle* and all are slaughtered to produce beef. As used herein, calves (juvenile cattle of either sex) are distinguished from adult cattle as necessary.

roughage. Cattle are typically slaughtered at approximately twelve to fourteen months or 1,300-1,500 pounds, and the carcass is processed into beef.

60. Until the moment of slaughter, a bovine is a unitary organism. It grows, as all living things do, but it does not change in type, for it remains a bovine throughout its life. Moreover, its essential character as an agricultural product—an animal raised for consumption as food—remains the same throughout its life. And this is so even though a bovine's ownership may change along its journey to slaughter weight because, in the context of the beef industry, a calf has no other purpose than to become a young adult bovine, and a young adult bovine has no other purpose than to be raised to slaughter weight. That is, feeder cattle and fed cattle are alike in *nature* even if only the latter are marketable to beef processors.[11]

61. Thus, though operational distinctions may be drawn between calving, backgrounding, stocking, and finishing, each exists as part of an integrated whole in a *single-product supply chain* designed to raise an animal from birth to slaughter weight. Accordingly, while one may distinguish, for purposes of economic

---

[11] Consider the lab-grown diamond. It is a diamond at the moment it forms its first isometrically crystalline layer. As it grows, its nature does not change. It remains a diamond. But it is not ready to be sold until it has reached a marketable carat weight. So it is with cattle. Feeder cattle and fed cattle are not different products. They are the same product. Feeder cattle simply represent a version of the product that is not ready to be marketed in final form.

analysis, between the sale of feeder cattle to finishers and the sale of fed cattle to beef processors (whenever title actually passes), the market for Feeder Cattle and Fed Cattle are so intrinsically intertwined that the distinction between them is irrelevant for purposes of assessing Defendants' antitrust liability.[12]

62. As noted above, the beef production process begins with cow-calf operations in which a farmer or rancher maintains a permanent herd of mature cattle that produce calves that are raised to become fed cattle. The herd produce one cattle crop per year, usually in the spring.[13]

63. The calves are weaned between 6 and 10 months of age and are then raised until large enough for "finishing," generally between 600 and 800 pounds. A single rancher can do this work or may sell the feeder cattle to a stocker or backgrounder to raise the feeder cattle until it is time for "finishing."

64. Feed lots or "finishing operations" are the final phase of the beef production system where feeder cattle move at 12 to 18 months of age and are fed to harvest

---

[12] The economic evidence for the entwinement between the market for feeder cattle and the market for fed cattle is discussed at length elsewhere in this Complaint.

[13] Womach, Jasper. *Agriculture: A Glossary of Terms, Programs, and Laws*, CONGRESSIONAL RESEARCH SERVICE, LIBRARY OF CONGRESS (2005 ed.).

weight, generally between 950 and 1,500 pounds, becoming fed cattle. This process generally takes less than six months.[14]

65. Because the stage of cattle is heavily dependent on weight, the price of feeder cattle is primarily driven by two things: (1) the expected value of fed cattle in the future, and (2) the cost of getting feeder cattle to that point.[15]

66. Once cattle reach between around 950 and 1,500 pounds they are marketed, transported to, and slaughtered at a packing plant operated by a beef packer such as Defendants. Defendants process the carcasses into various primal cuts that are then vacuum-packed and boxed for sale to customers of "boxed beef" who process it into cuts that are ultimately sold to consumers at retail, restaurants, and other foodservice operations. Purchasers of boxed beef include foodservice companies such as Sysco and U.S. Foods and large retailers such as Costco and Sam's Club.

---

[14] *U.S. Feedlot Processing Practices for Arriving Cattle*, Centers for Epidemiology and Animal Health, (Oct. 2012), available at https://www.aphis.usda.gov/animal_health/nahms/feedlot/downloads/feedlot2011/Feed11_is_ArrProc_1.pdf.

[15] Kenny Burdine, *Rising Feed Prices Create Divergence Between Fed and Feeder Cattle Futures*, Ohio State University Beef Cattle Letter, (May 5, 2021), available at https://u.osu.edu/beef/2021/05/05/rising-feed-prices-create-divergence-between-fed-and-feeder-cattle-values/.

67. In 2017, roughly 25.8 million fed cattle were slaughtered and processed into beef products, accounting for 80% of the roughly 32.2 million commercial cattle slaughtered across the United States.[16]

68. The cattle production cycle, running from birth to slaughter, ranges from 15 to 24 months. Fed and feeder cattle availability varies seasonally, with supplies being more plentiful in the summer because most calves are born in the spring.

69. Fed cattle producers face significant pressure to sell their cattle within a matter of weeks once they reach slaughter-weight or face increased risk of death loss, particularly after they spend 5-6 months at the feedlot. As noted by the Grain Inspection, Packers and Stockyards Administration (now a part of the AMS), "[c]attle held beyond the optimal marketing period begin to decrease in value because of excessive fat gain and the rising cost of grain."[17] This pressure limits fed cattle producers' ability to hold out for higher prices.[18]

---

[16] The remaining volume comprised slaughter cows (female cattle that have birthed a calf) and bulls, whose meat is typically used for lesser quality beef products such as hamburger patties. 2017 Meat & Poultry Facts, 46th Ed., NORTH AMERICAN MEAT INSTITUTE, 2018, at 11 ("2017 Meat & Poultry Facts").

[17] RTI Int'l, *GIPSA Livestock and Meat Marketing Study, Vol. 3: Fed Cattle and Beef Industries*, prepared for U.S.D.A. GRAIN INSPECTION, PACKERS AND STOCKYARD ADMIN. (2007), at 5-4, https://www.gipsa.usda.gov/psp/publication/livemarketstudy/LMMS_Vol_3.pdf.

[18] David Cooper, *Feedyard data reveals higher death losses*, PROGRESSIVE CATTLEMAN (Dec. 24, 2015), https://www.progressivecattle.com/topics/herd-health/feedyard-data-reveals-higher-death-losses.

70. Boxed beef is a commodity product, and competition to sell boxed beef is primarily on price as between boxes of equivalent USDA quality and yield grades. Defendants also process boxed beef in-house and sell case-ready beef and other value-added products (*e.g.*, sausages) directly to retailers, restaurants, hospitals, and others at a premium over boxed beef prices.

71. As a perishable product, most domestic beef is sold on short-term contracts. Some large purchasers buy some of their beef on "forward" contracts (where beef is sold before delivery) and other long-term supply agreements.

72. Historically, beef-packing was a high volume, low margin business.[19]

73. Each Defendant operates a live cattle procurement team, run by a head buyer, who is supported by "field buyers" who are responsible for territories. Field buyers buy cattle from feedlots situated inside their territory. They conduct negotiations directly with the fed cattle producers and their agents within the parameters set by their head buyer.[20]

---

[19] *See* Amended Complaint, ¶24, *U.S. v. JBS SA* (N.D. Ill.) (08-cv-05992), filed on Nov. 7, 2008 ("*U.S. v. JBS* Amended Complaint").

[20] Producers commonly delegate marketing authority to the commercial feedlot or to third-party marketing cooperatives. A small portion of the fed cattle sales to Defendants also occur at public auctions.

74. Each Defendant seeks to procure sufficient fed cattle fed cattle to operate its slaughter plants at its chosen utilization rates without interruption. Weekly plant capacity is determined both by plant size and the number and length of shifts run in a given week. Defendants' average cost of production increases if they underutilize their plant capacity, thereby reducing efficiency.

75. Before the packing industry became consolidated, almost all fed cattle was sold through the "cash" or "negotiated" cattle trade. Meat packers' buyers went to feedlots and auctions and paid a price set each day at the dollar mark where supply and demand met.

76. However, by 2015, the cash cattle trade had drastically thinned, and now it accounts for a minority of national fed cattle sales. Despite this, the cash cattle trade remains the industry's price discovery mechanism and continues to determine the price of fed cattle bought using "formula" or "forward" contracts – which now constitutes most fed cattle sales. Under these agreements, commonly referred to as "captive supply" agreements, producers commit to deliver their cattle to a packer once they reach slaughter-weight at a price to be determined at or around the point of delivery using an agreed formula.



**Figure 8: USDA Records of Fed Cattle Procurement Methods – 2005 to 2019.**[21]

77. The price of fed cattle delivered under formula contracts is determined by reference to a stipulated measure of cash cattle prices at, or just before, the date of delivery. These contracts commonly incorporate a specified average cash price reported by the USDA Agricultural Marketing Service's ("AMS") Livestock Mandatory Reporting's ("LMR") cattle transaction price summaries.[22]

---

[21]    Under negotiated grid contracts, the seller and buyer negotiate a base price, which is then raised or lowered through the application of premiums or discounts after slaughter based on carcass performance. Negotiated grid contracts' base prices move in parallel with cash cattle prices.

[22] These price series collate the information Defendants and others are required to submit to the USDA on a daily and weekly basis regarding their live cattle purchases and deliveries under the Livestock Mandatory Reporting Act of 1999. The Act imposes similar reporting obligations on packers for boxed beef sales.

78. The price of fed cattle delivered under forward contracts is typically set by referring to the price of the live cattle futures contract settling in the month of or adjacent to the expected delivery date. The price of live cattle futures contracts is directly impacted by current and expected cash cattle prices. The price of cash cattle thus sets or drives the price of the bulk of Defendants' fed cattle purchases, despite constituting only a small percentage of total fed cattle purchases.[23]

79. Each Defendant uses captive supply agreements for most of its purchases. Captive supply agreements have incentivized and enabled Defendants' suppression of cash cattle prices. The greater a Defendant's supply of captive cattle, the less reliant it is on participating in the cash cattle trade to procure enough cattle to operate its slaughter plants at its desired throughput. This, in turn, allows a Defendant to abstain from buying cash cattle when prices are too high. Abstaining from buying cash cattle in this way also gives Defendants leverage over those who would be cash sellers to instead agree to a formula contract. All things being equal, reduced demand for cash cattle reduces cash cattle prices, as producers are forced to lower their asking price to attract a buyer willing to purchase and slaughter the producer's perishable product. And because cash

---

[23] The base prices used in negotiated grid contracts are also impacted by changes in cash cattle prices.

cattle prices are used to set the prices paid under formula contracts and directly impact the live cattle futures prices used in forward agreements, reduced cash cattle prices reduce the price Defendants pay for cattle bought on such contracts.

80. As the cost of fed cattle constitutes most of their costs of production, Defendants' profitability is driven by the "meat margin," which is the spread between the price packers pay for fed cattle and the price they charge for beef.[24] The meat margin is very sensitive to changes in industry aggregate slaughter levels, and Defendants can, through cooperation, increase it. As noted by the U.S. Department of Justice ("DOJ"):

> all else being equal, when the meat Packer industry reduces production levels, feedlots and cattle producers are paid less for fed cattle because fewer fed cattle are demanded and customers pay more for [beef] because less is available for purchase. Because the supply of fed cattle and demand for [beef] are relatively insensitive to short-term changes in price, even small changes in industry production levels can significantly affect packer profits.[25]

As a result, Defendants can improve their profitability by coordinating their respective slaughter levels at or below the supply of slaughter-weight fed cattle.

---

[24] Jefferies Financial Group Inc., Annual Report, (Form 10-K) (Jan. 10, 2019) https://www.sec.gov/Archives/edgar/data/96223/000009622319000009/jfg2018113010kco mbodoc.htm at 38 ("National Beef's profitability is dependent, in large part, on the spread between its costs for live cattle, the primary raw material for its business, and the value received from selling boxed beef and other products, coupled with its overall volume.").

[25] *U.S. v. JBS* Amended Complaint, ¶¶ 26-27.

81. As also noted by the DOJ:

> The major packers obtain significant information about each other's past and future output decisions, including the number of days and shifts that competitors' plants operate. Information about production levels is obtained by directly observing plant operation and from third party sources, including USDA reports showing aggregate industry slaughter of fed cattle. Major packers use this information to calculate market shares based on output and consider this information when setting their own production schedules.[26]

82. The fed cattle market is highly concentrated. In fact, since 2015, Defendants have collectively purchased and slaughtered between 81 to 85% of the 23 to 27 million fed cattle slaughtered in the United States annually.[27]

83. Since 2015, each Defendant's share of annual fed cattle slaughter has been stable. The remainder of the U.S.'s fed cattle slaughter capacity is primarily provided by small Independent Packers,[28] but they cannot process the excess cattle created by Defendants' decrease in slaughter production, leaving cattle producers to sell cattle at small facilities yielding significantly reduced prices.[29]

---

[26] *Id.* at ¶27.

[27] 2017 Meat & Poultry Facts at 11; CBW Market Share.

[28] Lee Schulz, *et al.*, "Economic Importance of Iowa's Beef Industry," IOWA STATE UNIV. (Dec. 2017), https://store.extension.iastate.edu/product/Economic-Importance-of-Iowas-Beef-Industry; and CBW Market Share.

[29] Jen Skerritt, et al., *Meat Shortages Reopen Costly Path to Smaller U.S. Plants*, BLOOMBERG (June 26, 2020, 5:00 AM), https://www.bloomberg.com/news/articles/2020-06-26/meat-shortages-reopen-costly-path-to-small-u-s-slaughterhouses.

**DEFENDANTS CONSPIRED TO DEPRESS FED CATTLE PRICES**

84. Fed cattle prices increased consistently from 2009 through 2014, peaking in November 2014 at approximately $170 per one hundred pounds, *i.e.*, hundredweight ("CWT").[30] Market analysts, such as the USDA Economic Research Service, predicted that 2014 price levels would continue for a number of years before experiencing a gradual decline.[31] Some forecasters even foresaw no drastic change from 2014 prices "barring any outside market shocks like drought or a U.S. economic recession."[32] Such predictions show knowledge in the industry of beef demand getting higher while slaughter rates would stay low.

---

[30] Cattle are typically priced on a live-weight basis (the price/CWT applied to the live-weight of the animal before slaughter, typically right before delivery) or a carcass-weight or "dressed" basis (the price/CWT applied to the animal once "dressed," *i.e.*, slaughtered with its head, hide, and internal organs removed). References to fed cattle prices in this Complaint are on a live-weight basis unless otherwise stated. Live-weight and carcass-weight prices typically move together.

[31] U.S. Dep't of Agric., OCE-2015-1, Off. of the Chief Economist: USDA Agricultural Projections to 2024, Interagency Agricultural Projections Comm. (Feb. 2015) at 81, https://www.usda.gov/oce/commodity/projections/USDA_Agricultural_Projections_to_2024.pdf.

[32] "Livestock Monitor, A Newsletter for Extension Staff," LIVESTOCK MARKETING INFORMATION CENTER, STATE EXTENSION SERVICES IN COOPERATION WITH USDA (Jan. 12, 2015), at 2; and "Cattle Fax Predicts Strong Prices to Remain in 2015," AGWEB (Feb. 6, 2015), https://www.agweb.com/article/cattlefax-predicts-strong-prices-to-remain-in-2015-naa-news-release/ ("Analyst[s] . . . expect fed cattle prices averaging in the mid-$150s [per CWT in 2015], slightly higher than last year. Prices will trade in a range from the near $140 [per CWT] in the lows to near $170 [per CWT] in the highs in the year ahead.").

85. While Defendants initially benefited from the rise in fed cattle prices because wholesale beef prices rose in parallel, the meat margin fell to a low of approximately $50 leading up to 2015, sending the packers' margins into the red.

86. In response, Defendants commenced or accelerated their conspiracy to depress and stabilize the price of fed cattle bought in the United States. At the heart of the conspiracy was an agreement to reduce and then manage their respective slaughter volumes: a classic monopsony abuse and a classic feature of buying cartels. Defendants implemented their buying cartel by, among other conduct, agreeing to: (1) periodically restrain or reduce slaughter numbers to reduce demand for fed cattle; (2) limit their purchases of cash cattle during these periods; (3) coordinate their buying practices of cash cattle; (4) import foreign cattle to depress demand for cheaper domestic cattle; and (5) close or idle slaughter plant and refrain from expanding their remaining slaughtering capacity.

## I. Defendants Agreed to Reduce and Restrain their Collective Slaughter Volumes to Pressure Cash Cattle Sellers

87. As confirmed by Jason F. ("Witness 1"), each of the Defendants expressly agreed to periodically reduce their respective purchase and slaughter volumes to reduce the prices they would otherwise pay for fed cattle. *See In re Cattle Antitrust Litig.*, No. CV 19-1129 (JRT/HB), 2021 WL 7757881, at *3 (D. Minn. Sept. 14, 2021).

88. Witness 1 is a former employee of Swift. Witness 1 was a quality assurance officer ("QA") at Swift's Cactus slaughter plant located in the Texas Panhandle for over 10 years until his employment ceased in early 2018. *Id.*

89. Witness 1 was a head QA with primary responsibility for the kill floor, hotboxes, and coolers. The kill floor is where cattle are slaughtered and dressed. The carcasses are then moved to the hotboxes to cool down, before being stored in the coolers ahead of fabrication, where they are broken down into smaller cuts, and thus Witness 1 was well-positioned to know about slaughter volumes. *Id.*

90. Witness 1 learned of Defendants' collusive purchase and slaughter reduction agreement from James Hooker. Mr. Hooker was the head of fabrication at Swift's Cactus plant and, as explained below, was thus in a position to know about the unlawful agreement. *Id.*

91. Witness 1 regularly went to Mr. Hooker's office before his shift to learn the slaughter and fabrication numbers for that day and the upcoming days. These numbers affected Witness 1 and his team's responsibilities, including the placement of his team, arrangement of hotbox and cooler space, number of carcasses needed to process through the hotbox and coolers that day, and his interactions to USDA inspectors. In addition to the fabrication plan, Mr. Hooker,

like Witness 1, also needed to understand the number of cattle scheduled to be slaughtered each day. Among other matters, if the kill volume was lower, Mr. Hooker might order the carcasses to spend longer in the coolers before being fabricated into beef cuts to improve grading performance, and Witness 1 and his team spaced out carcasses in the hotboxes. If it were higher, Mr. Hooker might increase the carcasses fabricated to ensure sufficient space in the hotboxes and coolers, and Witness 1 would space the carcasses closer when filling the hotboxes. Further, the number of carcasses expected to be put into the hotboxes would dictate the amount of air and water Witness 1 and his team used to ensure proper cooling speeds. In sum, it was essential to both Mr. Hooker and Witness 1 that they know the plant's planned slaughter figures to perform their core job duties.

92. Witness 1 and Mr. Hooker had a good working relationship.

**A.    Hooker Was Well Positioned to Know About Defendants' Agreement.**

93. Plaintiffs understand that Mr. Hooker continues to work at Swift's Cactus plant, where he has worked for over 15 years in that role, including a short stint as head of slaughter operations. Witness 1 reports that before working for Swift in the early 2000s, Mr. Hooker worked at Tyson Fresh's Amarillo, Texas slaughter plant, where he was also responsible for fabrication.

94. As a fabrication manager for Swift, Mr. Hooker reported directly both to Cactus's General Manager, Manny Guerrero[33], and directly to the beef production department of JBS USA/Swift/Packerland's head office at Greeley, Colorado.

95. Mr. Hooker needed to know about cattle buying/scheduling, slaughter, and beef selling aspects of JBS USA/Swift/Packerland's fed cattle business. He thus spoke with JBS USA/Swift/Packerland personnel. In addition to his direct reports, Mr. Hooker spoke directly to other managers in the JBS corporate office about plant operations, including scheduled slaughter and fabrication volumes. For example, Mr. Hooker often spoke to Sergio Sampaio Nogueira, Head of Operations and EVP of Plant Operations for JBS's Fed Beef Business, as JBS had direct connections between plant-level managers, like Hooker, and senior executives, like Mr. Nogueira. Mr. Nogueira was installed by Wesley Batista, JBS S.A.'s former CEO,[34] who made him primarily responsible for Swift's fed cattle plant scheduling and/or operations.

---

[33]  Mr. Guerrero worked for CMS for about 17 years before moving to JBS's Cactus Plant. He was Plant Manager for CMS's Fresno, CA plant until early 2012.

[34]  Wesley Batista is one of the sons of JBS S.A. founder Jose Batista Sobrinho. Wesley Batista and his brother Joesley Batista took control of JBS S.A. in the early 2000s, before JBS' acquisition of Swift and Pilgrim's Pride. Wesley became CEO and directed JBS' takeover of Swift. He remained in that role, and as a director and senior executive of JBS USA, Swift and Packerland, until he was implicated in a 2017 bribery and corruption scandal in Brazil, for which he was imprisoned. That same conduct led to FCPA fines.

96. Mr. Hooker was also responsible for the Cactus plant in the absence of Mr. Guerrero and the Plant Engineer, along with Ryan Wagnon, Head of Slaughter Operations at Cactus. When acting as the Cactus plant's General Manager, Mr. Hooker would liaise closely with fed beef executives from across JBS's head office.

97. Mr. Hooker spoke regularly to individuals very highly placed at JBS. The following photo shows his close working relationship with management:[35]



---

[35] From right to left: James Hooker - Cactus Fabrication Operations Manager; Donna Estrada - Cactus Technical Services Manager; Al Almanza - JBS Global Food Safety Director; Sergio Sampaio - JBS Corporate Director of Operations; Paul Kieker - FSIS Undersecretary USDA Operations; Dr Hafeez - Texas USDA FLS; Dr. Mindy Brashears - FSIS Undersecretary USDA FS; Brian McFarlane - JBS Corporate Director of Technical Services; Mark DeRaad - Cactus Value Added Manager; Ryan Wagnon - JBS Slaughter Operations Manager. *See* https://www.facebook.com/jbsbeefcactus/photos/a.760788460716768/2857652041030389/?type=3&is_lookaside=1 (last visited Aug. 22, 2022).

98. Mr. Hooker, Mr. Nogueria, and Mr. Wagnon are respectively pictured on the far left, fourth from the left, and far right.

99. In addition to having corporate information for JBS, Mr. Hooker had information regarding the other Defendants. Mr. Hooker regularly told Witness 1 that he was in contact with his former colleagues at Tyson Fresh's Amarillo plant, including his replacement there. Mr. Hooker also told Witness 1 that he had friends and former colleagues with whom he stayed in touch at other Defendants' plants. Mr. Hooker would often provide Witness 1 with detailed information as to the current and future operations of Tyson Fresh, CMS, and National Beef's nearby packing plants.

## B.    Witness 1 Learns of an Agreement Among Defendants.

100. Witness 1 reports having multiple discussions with Mr. Hooker during which Mr. Hooker explained that all Defendants reduced their purchase and slaughter volume to reduce fed cattle prices when Defendants viewed prices as being or becoming "too high." During one conversation, Mr. Hooker specifically admitted that Defendants had an "agreement" to reduce their purchase and slaughter volumes in response to what they perceived to be high cattle prices.

101. That conversation occurred sometime in 2015 or early 2016. Witness 1 reports that he was in Mr. Hooker's office when Mr. Hooker received an angry phone call from his immediate supervisor, who worked out of JBS USA/Swift/Packerland's central office in Greeley, Colorado.

102. After the call concluded, Witness 1 reports that he asked Mr. Hooker how "many are we [Swift, Cactus] cutting [*i.e.*, fabricating]?" Witness 1 reports that Mr. Hooker replied the "cut" was going to be steady that day, but that the "kills are getting cut back, [because the] price is getting too high" (or words to that effect).[36] Witness 1 then reports asking Mr. Hooker whether Swift Cactus's competitor plants were also cutting back their kill, to which Mr. Hooker responded: "Yes, they are. **We have had that agreement that we don't kill while prices are up for a while**" (or words to that effect).

103. Witness 1 is certain that Mr. Hooker intended to convey that all of the Defendants were reducing their slaughter volumes by agreement in response to high prices, and was not simply commenting on the fact that one or some of the Defendants had independently decided to do so.

---

[36] Witness 1 reports that there was typically a lag between the commencement of a slaughter reduction and the reduction of fabrication activities. Among other reasons, this reflected the fact that Slaughter Plant 1's fabrication team had to continue to process the carcasses that were already hanging in the coolers.

104. Witness 1 stated that the purpose of the agreed slaughter reductions was to force cattle producers (in particular, cash cattle producers) to feed their cattle for longer periods, and in doing so, create a condition of oversupply that would encourage producers to either accept lower cash prices for their cattle or commit their cattle in advance on captive supply agreements. Put another way, by creating and encouraging an apprehension among producers that they might not be able to "get their cattle dead," Tyson Fresh, Swift/Packerland, CMS, and National Beef sought to increase their collective leverage over producers. As Witness 1 noted, once cattle are fed beyond their ideal slaughter-weight, producers face increasing "pressure to drop their prices in order to get rid of their [perishable] cattle."

105. Witness 1 stated that Swift's Cactus plant had a 5,500 to 6,000 head/day slaughtering capacity and might reduce its kill level to 4,800 to 5,200 head/day as part of Defendants' agreement around November and maintain kill volumes through April the following year. When Swift bought fewer cattle, it reduced hours at its slaughter plants, operated its plants at lower "chain speeds," and/or scheduled maintenance shutdowns. Witness 1 recalls management at Swift's Cactus plant, including Mr. Guerrero and Mr. Wagnon, telling staff when reducing slaughter that kill levels were being reduced due to fed cattle prices.

### C.    The Available Data Corroborates Witness 1's Account.

106. Public reports, Defendants' slaughter data, and other data reflecting cattle sales indicate that all Defendants reduced and rationed their slaughter volumes during periods of high or rising prices to suppress price rises in fed cattle. Defendants also managed their respective slaughter volumes in relative lockstep to ensure that their collective demand for cattle did not exceed the available supply. Defendants did so even as the supply of cattle grew and Defendants' margins ballooned.

107. The slaughter reductions, while most obvious at the start of each year to suppress the seasonal rise in fed cattle prices typically experienced in late winter/ early spring, occurred at various points over the past several years. In particular, Defendants moderated their slaughter volume in the second and third quarters of most years in a successful attempt to both lower and to extend the yearly price trough, historically reached annually in July, across a number of months, thereby also forestalling both the onset and minimizing the effect of the seasonal rise in fed cattle prices that historically occurs in Fall. Defendants also reacted to short one-to-two week rallies in prices, and to one-off opportunities presented by market shocks such as the fire at Tyson's Holcomb plant in August 2019.

108. Defendants joint slaughter management was not a reaction to changes in beef demand, which, as admitted by Tyson Fresh's head of procurement in 2018, had been "off the charts."[37] Nor did any Defendants break from Defendants' collective restraint and buy more cattle in an attempt to capture greater margin share, despite all posting profit margins clearly demonstrating that no Defendant was running at or near their marginal cost of production. From the end of the first quarter of 2015 through the years that followed, Defendants posted record per head net margins. Even excluding 2019 and 2020, which saw Defendants' margins skyrocket in the aftermath of the Holcomb fire and COVID disruption (discussed below), Defendants average per head margins in the first, second, third and fourth quarters ($37, $127, $134 and $116, respectively) vastly exceeded their pre-conspiracy averages ($0, $21, $25, -$16, respectively).[38]

---

[37] Tyson Fresh Meats: What the Consumer Demands - John Gerber, VP, Cattle Procurement, Tyson Foods; Kevin Hueser, VP, Beef Pricing, Tyson Foods, from the 2018 NIAA Antibiotic Symposium: New Science & Technology Tools for Antibiotic Stewardship, Nov. 13-15, 2018, Overland Park, KS, USA, https://www.youtube.com/watch?v=qCip3WBcqzo.

[38] Per-head net margin estimates cited in this Complaint were sourced from the Sterling Profit Tracker produced by Sterling Marketing Inc. and published weekly on www.drovers.com unless stated otherwise. Pre-2015 average per head margins calculated across 1997 to 2014.

109. Defendants' rationing of the fed cattle supply amongst themselves is demonstrated through Figure 9 below, which records each Defendant's estimated quarterly slaughter volume.



**Figure 9: Defendants' Quarterly Fed Cattle Slaughter Volume.**[39]

---

[39]   To derive Tyson, JBS and National Beef's slaughter volumes, Defendants' (in the case of National Beef, its shareholders') financial disclosures and Cattle Buyers Weekly's record of each Defendant's fed cattle and non-fed cattle slaughter ratio were used to isolate the portion of their reported quarterly revenue figures attributed to beef and by-products produced from fed cattle slaughtered within the United States. The volume of fed cattle (and beef) necessary to generate the disclosed revenue were then analyzed, taking into account prevailing beef and by-product prices (as reported by USDA AMS boxed beef cutout reports and USDA drop-credit values), carcass weights, carcass grading performance (by region), and hot carcass/dressing percentages. Having derived Tyson, JBS, and National Beef's quarterly slaughter volumes, Cargill's quarterly slaughter figures were derived by reference to Cargill's market share over time.

110. These data show the consistent reductions made by Defendants in the winter/spring to constrain the seasonal rise in fed cattle prices historically witnessed at this time. It also shows that Tyson Fresh, Swift/Packerland, and National Beef each dramatically reduced their slaughter across 2015, while Cargill held its slaughter volumes steady following its 2014 cuts. These artificial reductions worked to cause the dramatic decline in fed cattle prices throughout 2015.

111. While the quarterly reporting period obscures certain shorter reductions described below, it details the remarkable extent to which Defendants' quarter-to-quarter slaughter changes move in lockstep with each other. This parallelism is consistent with an agreement to jointly manage their collective demand.

112. The impact of Defendants' periodic coordinated slaughter reductions is further illustrated in Figure 10 below. Figure 10 compares Defendants' average annual slaughter volume before the conspiracy and the portion of the after the conspiracy for which data exists against that of the other U.S. beef packers. It shows that Tyson Fresh, Swift/Packerland, CMS, and National Beef each reduced their annual slaughter volumes relative to before the initiation of the conspiracy.



**Figure 10: Average Pre- & Post-Conspiracy Period Fed Cattle Slaughter – Defendants vs. Others.**[40]

113. As shown above, each Defendant slaughtered significantly less cattle in 2015 than their previous average and maintained low slaughter levels in the years that followed. That Defendants each slowly raised their slaughter levels as the availability of fed cattle increased only reinforces the plausibility of a collective agreement to manage slaughter levels after their initial cut – over five years later, none of the Defendants have returned to their pre-2015 levels, while Regional Packers slaughter is up nearly 25% against their previous averages, and 20%

---

[40]    CBW Top 30 Beef Packers; 2018 Meat & Poultry Facts, at 11. National Beef acquired Iowa Premium in June 2019, adding 300,000 head to its annual fed cattle slaughter volume. Absent that acquisition its 2019 slaughter volume was flat as against 2018, while Regional Packers' collective slaughter volume rose by approximately 100,000 head (net of Iowa Premium disposal).

against their 2015 levels. The purpose of such action was not necessarily to reduce their respective slaughter volume in the long run – which is, in part, a function of the cattle supply. Rather, the purpose was to manage Defendants' collective demand such that it never outpaced supply, ensuring constant downward pressure on producers' prices, and to enable Defendants to act in coordinated fashion to depress prices, stall price rallies and extend price troughs. This coordinated action is further outlined below.

## II.    Defendants Agreed to Coordinated Slaughter Reductions

114. On information and belief, Defendants agreed to periodically reduce slaughter volumes in response to actual or anticipated rises in fed cattle prices.

115. On information and belief, on multiple occasions, beginning in or around 2015, Defendants agreed to collectively reduce their slaughter volumes in response to rising fed cattle prices.

116. The purpose of the agreed slaughter reductions was to force fed cattle producers (in particular, cash cattle producers) to feed their cattle for longer periods, and in doing so, create a condition of oversupply that would force producers to either accept lower cash prices for their fed cattle or commit their fed cattle in advance on captive supply agreements. Put another way, by creating and

encouraging fear for producers that they might not be able to "get their cattle dead," Defendants aimed to increase their collective leverage over producers because once cattle are fed beyond their ideal slaughter-weight, producers face increasing pressure to drop their prices to get rid of their highly perishable cattle.

117. On information and belief, the slaughter reduction varied from plant to plant, depending on, among other things, its slaughter capacity and the supply of fed cattle in the surrounding region. Slaughter plants appear to have implemented Defendants' agreement through planned and unplanned maintenance shutdowns, as well as deliberately reducing slaughter output below slaughter capacity.

118. On information and belief, Defendants' agreement extended to proportionate slaughter reductions designed to suppress seasonal rises in fed cattle prices, such as those traditionally experienced in late winter, early spring, and fall.[41]

---

[41] *See, e.g.*, Cassie Fish, "And the Beat Goes On," THE BEEF (Feb. 14, 2019), https://www.thebeefread.com/2019/02/14/and-the-beat-goes-on-2/ ("Packers also know that February is typically the lightest slaughter month and even though they are killing more cattle than a year ago – some plant 'dark days' began yesterday as plans to keep the balance between supply and demand are paramount. Some plants will undertake maintenance or upgrade projects and some will honor holidays such as Monday's President's Day. Others will pull back hours to 36-hour work week.").

## A.    Defendants Agreed to Slash Cash Cattle Purchases During Slaughter Reductions.

119. To further depress fed cattle prices, Defendants, on information and belief, agreed to drastically reduce their purchase of cash cattle during periods of agreed slaughter reduction or restraint. When doing so, Defendants could still obtain the cattle needed to satisfy their curtailed kill numbers by leaning on their own cattle and cattle deliverable under previously-agreed formula and forward contracts.[42] And, because Defendants had successfully thinned the cash cattle trade in the decade preceding 2015, even small reductions in their cash cattle purchases had an outsized impact on cash cattle demand.

120. By reducing their purchases of cash cattle, Defendants sought to reduce the price of all cattle by utilizing the link between cash cattle prices and the prices paid under formula and forward contracts. By reducing their cash cattle purchases for a period of weeks or months, Defendants could back-up the volume of slaughter-ready cash cattle, thereby coercing producers to overfeed their cattle

---

[42] *See* Cassie Fish, "Futures Treading Water; Packers Keep Pressure On" The Beef (June 17, 2015), https://www.thebeefread.com/2015/06/17/futures-treading-water-packers-keep-pressure-on/ ("The news is well known this week and the packer has the upper hand. Boxes are higher and margins are black but packers are keeping kills small. The reliance of packers on captive supply coupled with enormous kill cuts enabled the packer to buy a limited number of negotiated cattle in June and to buy them cheaper.").

and/or accept lower prices or enter captive supply agreements to timely market their perishable product.[43]

121. In addition to this, Defendants at times used their control over the market to force fed cattle producers to accept formula and forward contracts as a condition to getting their cattle sold. This further reduced the number of cash cattle Defendants needed to purchase and thus further reduced cattle producers' leverage.

122. Fed cattle producers have limited if any meaningful leverage to bid up Defendants in such circumstances, because if producers don't accept basis bids,[44] and thereby add to the packers' captive supply, they bear the risk that the cash price will drop.

---

[43] Cassie Fish, "Whatever Happened to a Fair Fight," THE BEEF (Nov. 10, 2015), https://www.thebeefread.com/2015/11/10/whatever-happened-to-a-fair-fight/ ("The conversation is no longer, what's cash going to be, but rather, who needs any.... The smaller feeder is left to fight it out. Hoping he can get a buyer to come by and look at his cattle. Pressured to sell cattle with time. Anything to get cattle gone. Those that attempt to fight the market run the risk of making cattle too big even by today's standards or worse, alienate their local buyer. Powerlessness is widely felt by smaller producers on a regular basis.").

[44] The "basis bid" is a form of most favored nation contract under which the packer agrees to pay the producer some variant of that week's top reported cash price, with or without a premium. Defendants used such bids during the relevant time period to further reduce the number of cattle they needed to purchase during the weekly cash cattle trade, thereby putting further pressure on cash cattle prices.

123. In turn, producers' incentive to avoid the risk of a price drop creates downward pressure on the cash price, which in turn creates downward pressure on the formula and forward contracts.

124. The lower reported cash prices were then incorporated into Defendants' formula and forward contacts – the latter via a depression of live cattle future prices – thereby lowering the costs of all cattle delivered to Defendants' plants.[45] And once a condition of actual or perceived oversupply had been created, Defendants could gradually increase their cash cattle purchases (and slaughter volumes) without putting any significant upward pressure on prices. Defendants even moved back towards a preference of buying cash cattle in 2016, as they had already pushed cash cattle prices to significantly lower prices compared to earlier years at this point.

125. Defendants' implementation of their conspiracy precipitated the dramatic collapse in fed and feeder cattle prices in 2015 and continued to suppress cattle prices in the years that followed.

---

[45] Cassie Fish, "Cash Trade Volume Tiny; Futures Shake it Off," THE BEEF (Jun. 8, 2015), https://www.thebeefread.com/2015/06/08/cash-trade-volume-tiny-futures-shake-it-off/ ("A historically small number of negotiated fed cattle traded at the eleventh hour late Friday and Saturday at $155-$156, though the official USDA tally isn't out yet. But at least at this writing it appears it was enough to price formulas $4 lower than last week, jerking packer margins back to a positive.").

**B.      Defendants Coordinated Their Procurement Practices for Cash Cattle.**

126. A third prong of Defendants' conspiracy involved coordinating how each Defendant purchased cash cattle.

127. First, Defendants collectively enforced a queuing convention via threats of boycott. That convention works as follows: once Packer A provides a bid, the producer may either accept the bid or pass. But the producer may not "shop" that bid to other packers. If the producer passes on the bid to seek further bids from other packers, the producer must inform them that he was bid "X" by Packer A and that he can, therefore, only accept bids of X+$1.[46] If Packer B is only willing to bid X or if the producer wants to alter its reservation price, the producer is obligated to first return to Packer A, who is "on the cattle" at price X and offer it a right-of-first-refusal. Only if Packer A declines can the producer offer to sell to Packer B at X or the new reservation price. At this point, however, Packer B is under no obligation to purchase from the producer. This would continue if a third Packer C also made a bid on the cattle at the same price X, with the producer only being able to sell to Packer C if both Packer A and B refused to re-offer their bid price, and Packer C was still under no obligation to purchase at price X.

---

[46] In certain instances, it may be acceptable to offer/accept bids in $0.50 per CWT increments.

128. Further, if the producer returned to the packer "on the cattle," the field buyer would often refuse to renew their bid, citing that their employer was "full," having already secured the necessary cash cattle supply for the week. This mantra was echoed by the other packers who had previously made offers down the line. As a result, producers who attempted to negotiate a higher price were unable to sell their highly perishable cattle at the end of the week. Producers were thus conditioned to automatically accept the first bid they received.[47]

129. The effects of the queuing convention were amplified by the other market conditions existing at the time, especially the thin cattle trade and Defendants' trading windows and regional shunning discussed below.

130. Defendants enforced strict adherence to this convention with threats of retaliation. Defendants who were "on the cattle" would be tipped off as to the producer's "breach" of the convention by the field buyer whom the producer contacted out of turn. **This queuing convention enabled Defendants to monitor each other's behavior and depress fed cattle prices by limiting competition among the packers.**

---

[47] Economic literature finds that sellers, here the producers, tend to accept lower prices when they feel time is running out and their other options are relatively unattractive. Ariel Rubinstein, *Perfect Equilibrium in a Bargaining Model*, 50 ECONOMETRICA 97 (1982).

131. Witness 2 confirmed that field buyers from Tyson Fresh (Brian Alsup), Swift (Levi Canales and Chad Miller), CMS (Rick Vogel and Steve Brown), and National Beef (Richard Duffy) who visited his feedlot enforced strict adherence to this convention with threats of retaliation. Each of these field buyers individually spoke to him about the importance of his feedlot complying with the convention, and that they would not "come by" anymore should he break with it.[48]

132. Witness 2 further reports that when he took over management of the feedlot in 2012, the feedlot would only receive bids from National Beef and CMS. When he subsequently spoke to the field buyers from Tyson Fresh (Mr. Alsup) and Swift (Mr. Miller) responsible for his region in the fall of 2012, they both told him that they had stopped visiting the feedlot because Witness 2's predecessor had broken with the convention by "shopping" their bids. Witness 2 reports that the Tyson Fresh and Swift field buyers re-commenced visiting the feedlot after he confirmed his commitment to following the convention.

---

[48] Again, this shows that the queuing convention is unsustainable through a Defendant's unilateral conduct, and its enforcement requires explicit, coordinated action. A coordinated boycott is a mechanism for supporting collusion. *See, e.g.*, *Group Boycotts*, FEDERAL TRADE COMM'N, https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/dealings-competitors/group-boycotts; G. W. Stocking, and M. W. Watkins, CARTELS IN ACTION: CASE STUDIES IN INTERNATIONAL BUSINESS DIPLOMACY 190, 403 (1991).

133. Witness 2 also heard from Defendants' field buyers and other industry participants about other producers being "blackballed" for breaking with the queuing convention. In those circumstances, Witness 2 understood that the Defendant who was "on the cattle" would be tipped off as to the producer's "breach" of the convention by the field buyer whom the producer contacted while shopping the Defendant's bid or would ex-post pressure the producer for details of its sale.

134. Witness 2 reports that very few producers or their agents were willing to break with the convention for fear of alienating one or more of the Defendant field buyers who visited his yard. He reports never breaking the convention for this reason. He said that commercial feedlots or third-party marketing bodies, such as his feedlot, were unwilling to risk Defendants' retaliation given the duties they owed to their clients. Cattle owners are unwilling to feed their cattle at commercial yards or market their cattle with organizations that have poor relations with the Defendants, who constitute most producers' only marketing outlet. Producers and their agents thus fear breaking with the convention for these reasons. Tyson Fresh, Swift/Packerland, CMS, and National Beef's threats of boycott were sufficient to ensure adherence to the convention.

135. Further, Witness 2 elaborated on further examples of artificial market dynamics. For example, he reports that in late 2014 or early 2015, the Tyson Fresh (Mr. Alsup), Swift (Mr. Canales), CMS (Mr. Vogel), and National Beef (Mr. Duffy) field buyers who attended his feedlot jointly demanded that he determine who had the right to make the first bid each week by having them draw cards in his office. Witness 2 reports he felt obligated to acquiesce, as he remained anxious to ensure that each Defendant visited his feedlot.

136. Thereafter, and at least until Witness 2 left the feedlot in or around July 1, 2015, the Defendant field buyers wishing to bid on the cattle being marketed by the feedlot during that week would draw cards to determine who could place the first bid.[49] Witness 2 cannot recall a single week during this period in which one of the other three Defendant field buyers actually raised the initial bid placed by the field buyer who won the card draw. That is, Witness 2 reports that during this period Tyson Fresh, Swift/Packerland, CMS, and National Beef did not engage in any price competition for the cattle sold by Witness 2's feedlot.

---

[49] Randomization devices like this have been used by other cartels. For example, the electrical contractors cartel used the phase of the moon to determine which bidding ring member had the right to bid, free from competition from other members. *See*, *e.g.*, J. Asker, *Bidding Rings, in* THE NEW PALGRAVE DICTIONARY OF ECONOMICS (In: Palgrave Macmillan eds., 2010); R. Preston McAfee and John McMillan, *Bidding Rings*, 82 AMERICAN ECONOMIC REVIEW 580, 585 (June 1992).

137. The field buyers tried to justify the card drawing scheme to Witness 2 by saying it would allow them to avoid attending the feedlot at increasingly early hours to try to place the first bid. In a competitive market, however, in which the purchasers engaged in genuine competition to acquire a producer's products, no purchaser would have a unilateral incentive to propose or adhere to such a scheme (nor would a producer have an incentive to agree to such a scheme). Rather, each purchaser would instead have a unilateral incentive to preserve the right to make an offer to the producer and rely on its ability to offer the best terms to acquire the producer's products. This is especially true when the first bid at a given price carries with it an automatic right of first refusal, which has commercial value.

138. Second, on information and belief, a Defendant would, for periods of time, sometimes extending across many months, offer the only bid (or the only credible bid) for a particular feedlot's fed cattle (or substantially all its fed cattle) week to week, ensuring that the feedlots affected could not regularly procure credible bids from the other Defendants. Buyers for these other Defendants would even routinely fail to take or return calls from the producer until after the Friday trading window had closed. This happened even where the buyers' employers operated a closer geographical slaughter plant than the Defendant making the singular bid.

These arrangements – akin to a "home-market" market allocation scheme – indicate an agreement among Defendants to respect each other's relationships with each Defendant's preferred suppliers.

139. Third, Defendants periodically stopped buying cash cattle from feedlots in a specific region for weeks to back-up cash cattle in that region and break the resolve of producers to hold-out for higher prices. Having boycotted a region for weeks, Defendants then began purchasing cattle from that region again during the same week. When executing this scheme, Defendants often sought to initiate their weekly cash cattle trade in the region recently boycotted. This allowed them to use lower prices in that region to set the "market" for the remainder of the trade. In doing so, Defendants influenced fed cattle prices across the United States.

140. Defendants' conduct across Nebraska, Kansas, and Colorado in late March to early May 2016 is particularly illustrative of this practice. The average live steer price in Nebraska for the weeks ending Sunday, March 27 and Sunday, April 3, was steady at around $136/CWT. On information and belief, in the two trading weeks that followed, Tyson Fresh, Swift/Packerland, CMS and National Beef each reduced their purchase of cash cattle across Nebraska. The AMS reported that negotiated Nebraska sales during those two weeks were 17% and 10% lower than

the average reported volume for those corresponding weeks between 2011 and 2014. In the subsequent trading week, ending Sunday, April 24, 2019, Defendants were able to take advantage of the artificial surplus of Nebraskan cattle carried over from the prior weeks by buying significantly more cattle at a lower price of $126/CWT. Consistent with AMS reporting, just 1,176 and 1,340 cash cattle were sold in Nebraska in weeks ending Sunday, March 27, 2016 and Sunday, April 3, 2016 respectively. The Defendant buyers were Swift and National Beef. By contrast 5,156 cash cattle were sold in Nebraska the week ending Sunday April 24, 2016, all on Friday April 22, 2016, with each of Tyson Fresh, Swift, CMS and National Beef purchasing lots.

141. After isolating Nebraska producers, Defendants shifted to isolate Kansas feedlots. The average live steer price in Kansas across the weeks ending Sundays, April 10 and 17, 2016 was steady at around $133/CWT. In the two trading weeks that followed, Tyson Fresh, Swift/Packerland, CMS and National Beef each reduced their purchase of cash cattle across Kansas and, at least Tyson Fresh, trucked Texas captive cattle to its Holcomb, Kansas plant.[50] As a result, AMS

---

[50] "the radical left of cattle twit" (@trdaaron), TWITTER, (Apr. 14, 2016, 4:36 PM), https://twitter.com/trdaaron/status/720712349338832896?s=20 ("So tyson pulling lots of contract cattle from TX up to KS next two weeks which pushes rest of my cattle into first week of May.").

reported 44% and 28% fewer cash cattle sales in Kansas during those weeks as compared to the average reported volume for those corresponding weeks between 2011 and 2014. Aided by the price suppression begun by Defendants' prior isolation of Nebraska, live Kansas steer prices were also suppressed, dropping to $127/CWT for the week ending Sunday, April 24, before falling again to $124/CWT for the week ending Sunday, May 1, 2016.

142. Each of Tyson Fresh, Swift/Packerland, CMS, and National Beef then increased their purchase of cash cattle in Kansas in the first week of May, taking advantage of the artificial supply glut they had created across the course of the two prior weeks. For this week, AMS reported a total of 24,000 cash sales in Kansas, a 7,000 head increase from the average reported sales of the two prior weeks, and a 2,000 head increase on the weekly average for the period between 2011 and 2014. Despite this significant uptake in purchases, the average price for live steers in Kansas remained low at $127/CWT.[51]

143. Again, sales in Kansas to Defendants during this period are recorded with AMS reporting. In the weeks ending Sundays April 24 and May 1, records indicate

---

[51]  USDA Market News Service Report: LM_CT164 Kansas Weekly Weighted Average Direct Slaughter Cattle - Negotiated. Any of the USDA Market News Service Reports referenced in this complaint can be generated at https://marketnews.usda.gov/mnp/ls-report-config.

9,666 and 4,119 cash cattle respectively to Defendants, against 5,148 in week ending May 8. In this regard, it's important to note that the 9,666 head recorded as sold in the week ending April 24 constituted 64% of the reported AMS total, while the figures for weeks ending May 1 and 8 constituted only 22% and 21% of the weekly AMS total, respectively.

144. Defendants then moved to isolate Colorado feedlots. Colorado reported 41% and 67% relative declines in cash sales for the trading weeks ending Sundays, May 1 and 8, 2016 compared to the average reported volume for those corresponding weeks from 2011 to 2014. In the following trading week, Colorado cash sales rose from 3,000 head to 4,000 head, 7% above historical averages.[52]

145. Fourth, Defendants suspiciously all chose to reserve most of their weekly cash trade procurement for Friday, typically after the CME had closed. This practice deprives producers of a price discovery mechanism and limits their ability to hedge their cattle on the CME to manage their positions. While the exact time on Friday varied from week to week, Defendants consistently conducted all, or substantially all, of their weekly cash cattle trade during the same 30- to 60-minute window on a Friday. During that window, Defendants typically adhered to the

---

[52] Records indicate less than 100 sold across these weeks.

price level established by the Defendant that opened the weekly cash cattle trade, which would quickly circulate across the market via word-of-mouth and industry reporting. If a Defendant felt it necessary to offer prices above this price level to secure the cattle it required, it would often hold such bids until after the core trading window had closed, which reduced the chance that reports of such bids might impact negotiations during the core trading window.

146. Field buyers had no discretion to negotiate prices above the opening price level, but instead contended that this price represented the market rate.

147. In contrast, Regional Packers continued to purchase cash cattle across nearly every day of the week, thereby securing pens of high-quality cattle with limited competition. When operated alongside Defendants' slaughter restraint and other bidding practices (outlined above), this practice reduced competition amongst Defendants for cash cattle to a race to place the first bid on each pen during the Friday cash trade. This practice also deprived producers of a price discovery mechanism and limited the ability of producers who hedge their cattle on the CME to manage their positions in response to the bids offered by the packers.

148. For similar reasons, Defendants would also, at times, seek to set the market price lower by opening the weekly trade by purchasing a pen of poor-quality cattle at a discount.

149. The reported cash cattle trade across AMS LMR's price reporting regions confirms that starting around 2014 or 2015 Defendants reduced their participation in the cash cattle trade, increased the numbers of days they did not conduct any cash cattle trades at all, and that they conducted the bulk of their cash trading on Fridays.

150. The reported data are consistent with the existence of an agreement among Defendants to both: (1) limit their purchases of cash cattle; and (2) conduct all, or substantially all, of their cash cattle trade in a short window on Friday. If any single Defendant took these actions in the absence of such an agreement, that Defendant would risk failing to secure a sufficient quantity or quality of cattle to operate its plants at the most efficient capacity and/or meet customer demand, without any guarantee that its actions would have the desired impact on fed cattle or beef prices. The data are even more striking when one considers that Regional Packers continued to purchase cash cattle throughout the week and thus can be regarded as being responsible for the bulk of the transactions reported mid-week.

151. Defendants' increased reliance on formula and forward contracts and the corresponding decrease in the number of cash cattle transactions does not explain the pattern reflected in the data. While the number of cash cattle bought annually fell continuously from 2005 to 2015, it was not until 2014/2015 that the data show a dramatic increase in the number of days without any reported cash transaction. This rise is then sustained despite a slight increase in cash cattle buying year-on-year in 2016 and 2017.

152. In short, even though cash cattle slaughter numbers increased slightly after 2015, the number of days per month in which there were no cash cattle transactions also increased. Consequently, Defendants' coordinated reduction in the number of days on which they purchase cash cattle is not explained merely by the decline in the number of cash cattle purchased annually.

## C.    Defendants Uneconomically Imported Foreign Live Cattle to Depress Demand for U.S. Fed Cattle.

153. Defendants also engaged in coordinated imports and shipping practices that reduced demand for domestic fed cattle and suppressed the cash price transaction reports used to set the price of cattle procured under captive supply agreements. Defendants shipped cattle over uneconomically long distances to their slaughter plants from locations both inside the United States and from

Canada and Mexico to avoid bidding up the reported price of cattle in closer AMS LMR reporting regions.

154. Given the additional freight costs incurred in procuring fed cattle from Canada or Mexico, it is only economical for a Defendant to incur the additional costs when the prevailing price differences against domestic prices exceeded the additional costs. But the data indicate that Defendants' imports of live cattle from Canada and Mexico began to increase slightly in 2014, and continued, even after it became uneconomical for them to do so in or around mid-2015:[53]



**Figure 11: Live Slaughter Cattle Imports into the U.S. [54]**

---

[53] On information and belief, Defendants are responsible for the bulk of all live cattle imports for slaughter.

[54] Fed cattle slaughter volumes sourced from USDA Market News Service Report: LM_CT106-National Daily Direct slaughter, committed and delivered.

155. Live cattle imports gradually declined until 2014 when they stabilized and began a slight upward trend. While such imports were originally economical, considering the prevailing price differences (adjusted for shipping costs and exchange rates), from mid-2015 onwards, they were often uneconomical, and became increasingly so moving forward, particularly in relation to Canadian cattle, which comprised the majority of all live cattle imports for slaughter. Defendants nonetheless continued such uneconomic imports.



**Figure 12: Difference between Nebraska Fed Cattle Prices and Alberta Fed Cattle Prices Adjusted for Shipping Costs.**[55]

---

[55]  To construct comparable price series for Canadian imports, Alberta fed cattle prices were adjusted for shipping costs and the exchange rate between the U.S. dollar and the Canadian dollar. To do so, the following factors were accounted for that impact shipping cost per CWT: the cost per pound, per loaded truck to haul cattle, the capacity of the trailers used to haul cattle, the distance between Alberta and Nebraska, and fuel costs.

156. On information and belief, procuring Canadian and Mexican fed cattle from mid-2015 onwards was regularly more expensive than procuring fed cattle from the adjacent U.S. feeding regions.

157. Tyson Fresh and JBS USA/Swift/Packerland admit importing fed cattle from Canada for slaughter at their U.S. facilities. In 2016, an executive at JBS USA/Swift/Packerland acknowledged that "a lot of cattle [were] moving from Canada to U.S." and stated that such imports had an "important impact."[56] Similarly, Tyson Fresh admitted "buying cattle directly from Canadian cattle feeders" and is reportedly the third largest buyer of Canadian cattle, behind JBS USA/Swift/Packerland and CMS.[57]

158. Suppressing demand for U.S. fed cattle by strategically importing Canadian fed cattle is a practice that Tyson, JBS, and Cargill have used and

---

AMS LMR price series for Nebraska are selected as the appropriate proxies as they are the nearest U.S. price reporting regions to Alberta, which is the key cattle exporting region of Canada. ALBERTA GOV'T, *Livestock Prices*, accessed Dec. 26, 2018, https://economicdashboard.alberta.ca/LivestockPrices. Canadian dollars per CWT of live cattle in Alberta converted to USD per CWT.

[56] JBS, Q1 2016 Earnings Call, Bloomberg Transcript (May 12, 2016).

[57] *Tyson halts Canadian beef imports due to higher costs*, THE CATTLE BUSINESS WEEK (Oct. 31, 2013), https://www.cattlebusinessweekly.com/articles/tyson-halts-canadian-beef-imports-due-to-higher-costs/. While Tyson claimed it was halting Canadian cattle imports in late 2013 in opposition to Country of Origin Labeling (COOL) requirements, when COOL was repealed in early 2016, Tyson is understood to have increased its imports of live cattle for slaughter.

continue to use. Tyson, JBS, and Cargill have sought and received regulatory approval to import fed cattle for immediate slaughter at their packing facilities, including: a) Tyson's packing plants in Pasco, Washington and Joslin, Illinois; b) JBS's packing plants in Greeley, Colorado; Hyrum, Utah; Plainwell, Michigan; Omaha, Nebraska; Souderton, Pennsylvania; and Green Bay, Wisconsin; and c) Cargill's packing plants in Ft. Morgan, Colorado; Wyalusing, Pennsylvania; and Fresno, California.[58]

159. This concerted action is consistent with a conspiracy to depress U.S. fed cattle cash prices. No Defendant would incur the additional cost of importing and purchasing foreign or extra-regional cattle in the hope of lowering its captive supply procurement costs unless it knew that its major competitors would do the same thing, and therefore, also abstain from bidding up local cash cattle prices.

### D. Defendants Agreed Not to Expand Their Slaughtering Capacity.

160. To further their conspiracy, Defendants also agreed not to expand their respective slaughtering capacity, or to increase their use of existing capacity. Defendants' plant closures stripped out millions of head of cattle from the industry's annual slaughter capacity, thereby limiting demand for fed cattle.

---

[58] USDA, List of Plants Approved to Receive Immediate Slaughter Animals, https://www.aphis.usda.gov/import_export/downloads/slaughter_list.pdf.

161. During the run-up of fed cattle prices until their precipitous fall in mid-2015, Defendants sought to reduce demand through a series of plant closures: Cargill closed its Plainview, Texas and Milwaukee, Wisconsin plants (4,000 and 1,300-1,400 head/day capacities, respectively) in February 2013 and August 2014, respectively; National Beef shut its Brawley, California plant (2,000 head/day) in June 2014; Tyson closed its Denison, Iowa plant (2,000 head/day) in August 2015; and, JBS left the Nampa, Idaho plant it acquired in April 2013 closed.[59]

162. The 125,500 head per day of industry-wide capacity remaining after Defendants implemented their final plant closure was the lowest in the modern history of the industry.

163. For each closure, the relevant Defendant offered pre-textual reasons, such as a lack of available cattle in the adjacent regions and plant inefficiencies. National

---

[59] Tyson Fresh also closed Cherokee, Iowa beef processing plant in September 2014, telling local officials that it would not consider selling the facility to "any firm that they believe is competition." Kevin Hardy, *Held 'hostage' by Tyson: An Iowa town's dilemma*, DES MOINES REGISTER, July 8, 2016, updated July 16, 2016, https://www.desmoinesregister.com/story/money/business/2016/07/08/held-hostage-tyson-iowa-towns-dilemma/86449400/. It ultimately sold the facility to an independent food processing company with an agreement that "limits the amount of cattle that can be processed at the plant for ... 10 years", notwithstanding that Tyson did not use it to slaughter fed cattle. Kevin Hardy, *'No hard feelings': Tyson finally agrees to leave empty Iowa facility as new meat processor opens shop*, DES MOINES REGISTER, Sept. 19, 2018, https://www.desmoinesregister.com/story/money/business/2018/09/19/tyson-foods-cherokee-iowa-plant-iowa-food-group-moves-justin-robinson-pork-beef-chicken-processing/1356962002/. The plant was mostly used to produce hot dogs.

Beef even rejected a significant package of incentives offered by local government, utilities and nearby feedlots when it decided to close its Brawley plant.[60]

164. But by early 2013 the drought had passed, forage availability in cow-calf producing regions was above average, and producers' heifer retention rate – the percentage of heifers retained for breeding as opposed to being sent to the feedlot for slaughter – was already increasing, foreshadowing the gradual increase in slaughter weight fed cattle the industry witnessed from 2016 onwards.[61] Defendants knew of the expected gradual rebuild of the beef cattle herd, as they routinely tout their visibility of upcoming supply numbers.[62]

---

[60] "National Beef plant closing Brawley Facility," PROGRESSIVE CATTLEMAN (Mar. 24, 2014), https://www.progressivecattle.com/news/industry-news/national-beef-plant-closing-brawley-facility.

[61] Heifer placements in feedlots as a percentage of total placements fell from 38.2% in January 2012 to 36.2% in October 2012 before continuing to steadily decline to 31% in April 2015, signifying the retention of heifers for breeding. Thereafter, the heifer placement percentages gradually increased again, reaching 39.2% in October 2019.

[62] See, e.g., JBS, Q3 2013 JBS SA Earnings Conference Call, Nov. 15, 2013, https://www.bamsec.com/transcripts/5008262?hl_id=nj-0rvvot ("we've seen some heifer retention of the US -- some cow retention in the US, which indicates that we're at the beginning of a recovery in the herd size in the US, something we've been talking about for some time"); Tyson, Q3 2014 Tyson Foods Earnings Conference Call, July 28, 2014, https://www.bamsec.com/transcripts/5202502?hl_id=nydyaewjk ("we expect next year [2015] to look a lot like this year [2014] from a cattle supply ... and we're starting to see signs of heifer retention"); and Jefferies Financial Group Inc., "Leucadia National Corporate 2015 Investor Day" (Oct. 8, 2015), Slides 113-14 (noting increase in heifer retention, and projecting increase in slaughter weight fed cattle from 2016 onwards).

165. As a result, the United States has experienced both a decline in fed cattle slaughter capacity and an underutilization of that lowered capacity. This decline has been compounded in certain regions, where cattle producers now only have one or two slaughter plants at which to sell their cattle. This decline in slaughter capacity and underutilization of existing capacity has reduced demand (and thus prices) for indirect sales of feeder cattle ultimately slaughtered as fed cattle.

## III.   Defendants' Conduct Precipitated the Collapse in Prices in 2015

166. Defendants' conspiracy succeeded. Responding to the compression of their margins in late 2014, Defendants reduced their slaughter volumes, and this reduction had the desired effect.

167. In the first quarter, Tyson Fresh, Swift/Packerland and National Beef's year-on-year slaughter was down roughly -1.8%, -11.2%, and -8.5%, respectively. While CMS's quarterly slaughter volume rose slightly year-on-year, its slaughter volume was still down on its fourth quarter 2014 volume. These year-on-year declines were reflected in Defendants' public reporting. Tyson's May 4, 2015 10-Q noted that its "sales volume decreased [in the quarter ending March 28, 2015 year-on-year] due to a reduction in live cattle processed." Jefferies, National Beef's then majority shareholder, noted in its May 8, 2015 10-Q that National Beef's revenues

were down year-on-year for the first quarter "primarily to lower sales volume, as fewer cattle were processed."[63] JBS S.A.'s earnings presentation for the first quarter noted a 1.1% year-on-year decline in the "number of animals processed."[64]

168. The effect was seen quickly, as in the first half of 2015 prices fluctuated at or around $160 CWT, which was $10 CWT (or about $130 per head) lower than the high established in November 2014.

169. Not satisfied, Defendants began an unprecedented slaughter reduction in the second and third quarters of 2015. In the second quarter, Tyson Fresh, Swift/Packerland and National Beef's year-on-year slaughter was down by roughly -5.3%, -12.7%, and -6.1%, respectively. CMS continued to hold to its low 2014 volume, posting a modest year-on-year growth of 1.9% in the second quarter.

---

[63]    Jefferies 10-Q, May 8, 2015 at 57, http://ir.jefferies.com/reports-filings/sec-filings/sec-filings-details/default.aspx?FilingId=10683755.

[64]    JBS    S.A.,    1Q    2015    Results,    May    13,    2015    at    15,    https://mz-filemanager.s3.amazonaws.com/043a77e1-0127-4502-bc5b-21427b991b22/central-de-resultadoscentral-de-downloads/8bc0bd99f655d7c38a18d265a7ed397678c5e9774341f1efd1c98745f1a8a360/1q15_earnings_release.pdf. JBS USA Beef segment also encompasses JBS S.A.'s much smaller Australian and Canadian beef businesses and Australian sheep operations. Presentation also noted a -1.1% decline in cattle processing (both fed and non-fed) across its U.S., Australian and Canadian beef businesses. JBS USA's fed cattle to non-fed cattle slaughter ratio throughout the relevant period was 80% fed, 20% non-fed.

Again, this reduction in cattle purchases was also reflected in Tyson Foods[65], JBS

S.A.[66] and Jefferies (National Beef's)[67] financial reporting.

170. To further pressure cattle prices, Defendants drastically reduced their

purchase of cash cattle, leaning heavily on their own cattle and other captive

supplies to satisfy their curtailed kill numbers.[68] This strategy was immediately

---

[65]  Tyson recorded year-on-year declines in sales in its beef segment revenue due to a "reduction in live cattle processed." *See* Tyson Foods Aug. 2, 2015 10-Q, p.38; *see also* Nov. 23, 2015 10-K, p.29 noting reduction in sales revenue in FY 2015 as against FY 2014 due to lower cattle processing.

[66]  JBS S.A., 2Q 2015 Results, Aug. 13, 2015 at 15, https://mz-filemanager.s3.amazonaws.com/043a77e1-0127-4502-bc5b-21427b991b22/central-de-resultadoscentral-de-downloads/8bc0bd99f655d7c38a18d265a7ed397678c5e9774341f1efd1c98745f1a8a360/1q15_earnings_release.pdf (noting -0.9% decline in cattle processing (both fed and non-fed) across its U.S., Australian and Canadian beef businesses).

[67]  Jefferies 10-Q, Aug. 5, 2015 at 52, http://ir.jefferies.com/reports-filings/sec-filings/sec-filings-details/default.aspx?FilingID=10842029 (revenues for three and six month 2015 periods decreased year-on-year "primarily due to lower sales volume, as fewer cattle were processed"); Jefferies 10-Q, Nov. 5, 2015 at 53 (noting the same for 3Q 2015).

[68] Defendants' slaughter levels of their own cattle in the second half of 2015 were steady on a year-on-year basis. AMS LMR Report "LM_CT153 – National Weekly Direct Slaughter Cattle – Prior Week Slaughter and Contract Purchases," https://marketnews.usda.gov/mnp/ls-report-config; *see also* Cassie Fish, "*Cash Trade Volume Tiny; Futures Shake it Off*" THE BEEF (June 8, 2015), https://www.thebeefread.com/2015/06/08/cash-trade-volume-tiny-futures-shake-it-off/ ("A historically small number of negotiated fed cattle traded at the eleventh hour late Friday and Saturday at $155-$156…. But at least at this writing it appears it was enough to price formulas $4 lower than last week, jerking packer margins back to a positive. Only problem is, packers weren't able to secure enough cattle cheaper, even when relying on captives, to easily fill an even curtailed kill expected this week at 540,000 head."); and Fish, "*Futures Treading Water; Packers Keep Pressure On*" ("The … packer has the upper

successful, with cash cattle – and thus formula cattle – prices falling across June to about $150 CWT.[69] Meanwhile, with lower slaughter volumes and lower boxed beef output, the meat margin expanded rapidly, bloating Defendants' margins.

171. Tight fed cattle supplies do not explain Defendants' reduced slaughter volume. The available supply of fed cattle increased on a year-on-year basis, reflecting the continuing rebuild of the cattle herd. Fed cattle inventory was higher in almost every month of 2015, compared to 2014.

172. Industry analysts noted Defendants' determination to "break" cash cattle prices through their collective slaughter reductions and reduced cash cattle purchases. On June 12, 2015, analyst Cassandra Fish of "The Beef" and formerly a risk manager at Tyson, pondered when a Defendant might break ranks:

> All packers need to buy cattle inventory. Most have cut hours. So will someone break ranks, pay up for cattle and add hours to capture the better realization that the next boxed beef rally will bring? Will one short a customer only to find that order filled by a competitor?[70]

---

hand. Boxes are higher and margins are black but packers are keeping kills small. The reliance of packers on captive supply coupled with enormous kill cuts enabled the packer to buy a limited number of negotiated cattle in June and to buy them cheaper.").

[69] Cassie Fish, "*Smack Down*," THE BEEF (June 15, 2015), https://www.thebeefread.com/2015/06/15/smack-down/ ("Cash cattle prices broke hard Friday as packers successfully executed a strategy of slashed kills and limited negotiated purchases.").

[70] Cassie Fish, "Futures Holding Gains; Waiting on Cash," THE BEEF (June 11, 2015), https://www.thebeefread.com/2015/06/11/futures-holding-gains-waiting-on-cash/.

173. Ms. Fish answered her own question in the negative a few weeks later, remarking on June 25, 2015 that the "packers refuse to reach for cattle and are currently in command. After 3 weeks of sharply curtailed kills, packers are exhibiting incredible discipline and letting the kill increase gradually," limiting the ability "of feeders to get all cattle marketed in a timely fashion."[71]

174. Defendants tightened the screws during the remainder of 2015. Despite the negative effect on their margins, they continued to restrain their slaughter levels and curtail their purchases of cash cattle even after it became clear that slaughter-ready cattle had been "backed up" and were reaching historically heavy weights.[72]

175. Tyson's CEO, Donnie Smith, admitted as much August 3, 2015 when discussing Tyson's decreased purchases over the preceding quarter, noting:

> Because we run for margin and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and added costs. In the short-term, we are negatively impacted, but markets will equilibrate and conditions are expected to improve for the long term.

---

[71] Cassie Fish, "Another Round of the Blues," THE BEEF (June 25, 2015), https://www.thebeefread.com/2015/06/25/another-round-of-the-blues/.

[72] Cassie Fish, "Kills Too Small For Too Long," THE BEEF (Sept. 8, 2015), https://www.thebeefread.com/2015/09/08/kills-too-small-for-too-long/.

In response to a question regarding the consequent impact of Tyson's underutilization of its plant capacity Mr. Smith elaborated:

> In terms of quantifying the impact, we know when we're running 34s and 36s a week in our plants that that does cost us. It raises the cost in our plant, makes us a lot less efficient, so it does have a cost to us. I don't know that I can quantify that right off the bat, but it does impact margin.[73]

176. This was particularly evident in September 2015 when Defendants used their previously gained leverage to push prices down to $120 CWT, despite increasing their cash cattle purchases. Defendants demanded extended delivery periods of two to four weeks as a condition of trade throughout the month, providing them with further leverage over producers who still had cattle to sell.[74] As a result, large numbers of these cash cattle were not slaughtered until October.

177. Defendants' concerted actions to depress cattle prices across 2015 are summarized in Figures 13 and 14 comparing the price of fed cattle across 2015 against fed cattle slaughtered across 2014 and 2015 at packing plants subject to

---

[73]    Tyson Foods, Q3 2015 Earnings Call, Seeking Alpha Transcript (Aug. 3, 2015).

[74]    Cassie Fish, "No bottom in sight," THE BEEF (Sept. 16, 2015), https://www.thebeefread.com/2015/09/16/no-bottom-in-sight/.

AMS LMR reporting obligations.[75] These figures are a very good proxy for Defendants' cumulative slaughter volume as they operate the substantial majority of such plants and appear to provide over 90% of the reported transactions.

178. Figure 13 details the price and slaughter volumes of all fed cattle and Figure 14 details the price and slaughter volumes of cash cattle. The average monthly slaughter volumes between 2010 and 2014 are also detailed. As shown by these figures, the decline in cash cattle slaughter across the second and third quarters of 2015 depressed the price of all fed cattle. This enabled Defendants to increase their slaughter volumes in the final quarter of 2015 by purchasing cheaply the oversupply of cash cattle they had created across the preceding two quarters.[76]

---

[75]  Figures 13 and 14 are based on USDA Market News Service Reports data: LM_CT106-National direct slaughter, committed and delivered, LM_CT151-National Weekly-Formula, Forward, Negotiated Net (Domestic), and LM_CT154-Weekly National direct slaughter, negotiated. Fed cattle prices shown in Figure 13 is the weighted average price of all four purchase categories (formula, forward, negotiated (*i.e.*, cash), negotiated grid).

[76]  This was reflected in JBS S.A.'s 4Q 2015 earnings presentation, which noted that its JBS USA beef segment increased total cattle slaughter 1.5% year-over-year in the fourth quarter (p.20). Jefferies did not address year-over-year change in cattle processing across National Beef's quarter four in its 2015 annual report. And while Tyson Fresh noted a decline in cattle processed in its 10-Q ending it attributed this "primarily due to the closure of our Denison, Iowa [slaughter plant]" (p.29).



**Figure 13: Total Fed Cattle Slaughter Volumes and Fed Cattle Prices.**



**Figure 14: Cash Cattle Slaughter Volumes and Cash Cattle Prices.**

179. Despite increasing their respective slaughter volumes in the final quarter of 2015 on a relative basis to take advantage of the comparative glut they had created, Tyson Fresh, Swift/Packerland, and National Beef's annual slaughter volumes were still down 4%, 17%, and 6% on 2014 levels, respectively. While CMS's slaughter volume remained flat year-on-year, it was significantly below historic levels, having already reduced its annual purchase volume in 2014.[77] Moreover, as shown by Figure 14, CMS did not seek to take advantage of the other Defendants' reduced purchases by significantly increasing its cattle purchases.

180. Moreover, each Defendants' conduct stands apart from the Regional Packers who increased their annual slaughter volume in 2015 by 7.8% year-on-year.

181. Tight fed cattle supplies do not explain Defendants' coordinated reduction of their respective slaughter volume over the first three quarters 2015. Neither can the drastic drop in prices or Defendants' unseasonable rise in slaughter of cash cattle in the fourth quarter of 2015 be attributed to a significant increase in the availability of slaughter weight cattle.

---

[77]   CBW Top 30 Beef Packers.

182. An analysis of the USDA's Cattle on Feed reports confirms this.[78] This monthly publication reports data on the number of fed cattle in U.S. feedlots (inventory), the number of cattle being placed into feedlots during the report month (placements), the number of cattle shipped out of feedlots for slaughter during the report month (marketings) and other disappearances (*e.g.*, death loss or move to pasture).[79]

183. Figure 15 below compares fed cattle inventory across 2014 and 2015. It shows that fed cattle inventory was at or slightly above 2014 levels in almost every month of 2015. While these changes may reflect, in part, the continuing rebuild of the cow-herd, the key driver of the year-on-year increases in inventory across May to November 2015 was Defendants' respective slaughter reductions. These reductions forced producers to feed their cattle longer, causing feedlots to carryover cattle into subsequent reporting months.

---

[78] USDA National Agricultural Statistics Service ("NASS"), *Cattle on Feed*, ECONOMICS, STATISTICS AND MARKET INFORMATION SYSTEM, usda.library.cornell.edu/concern/publications/m326m174z?locale-en ("Cattle on Feed").

[79] Cattle on Feed reports estimates pertain to fed cattle fed in feedlots with a 1,000 head or greater capacity. Such feedlots typically hold between 80 and 85% of all fed cattle on feed in the United States.



**Figure 15: Cattle on Feed Inventory Levels in 1000+ Head Feedlots – 2014 vs 2015.**

180.   Figure 16 confirms these results. It estimates the number of cattle reaching slaughter weight in each month of 2014 and 2015, sometimes referred to as a placement against supply estimate, using monthly Cattle on Feed placement numbers and assumes a standard feeding period of around six months:[80]



**Figure 16: Slaughter Weight Fed Cattle in 1000+ Head Feedlots – 2014 vs 2015.**

---

[80]   For example, an estimate of the number of slaughter weight cattle in July 2015 is derived by advancing the placements numbers from January 2015 forward six months.

181. As can be seen from Figure 16, the number of fed cattle scheduled to reach slaughter weight in 2015 was down on a year-on-year basis. Therefore, the year-on-year increases in inventory levels experienced from May to November 2015 was not driven by an increase in the availability of slaughter weight fed cattle. Rather, it was driven by a decrease in each Defendant's slaughter volume, which caused an artificial glut of supply by forcing producers to feed their cattle beyond their optimal weight.

182. This artificial increase in inventory levels is also confirmed by Figure 17's comparison of Cattle on Feed reports' record of marketings across 2014 and 2015:



**Figure 17: Marketings in 1000+ Head Feedlots – 2014 vs 2015.**

183. Consistent with the Figures above, Figure 17 shows slaughter volume across the first three quarters of 2015 to be appreciably lower than 2014 levels before rising in the final quarter. In sum, there were more cattle in feedyards in 2015 than in 2014, despite the fact that there were fewer cattle due to reach slaughter weight in 2015 than in 2014 due to Defendants' slaughter reductions.

184. As Ms. Fish lamented on November 10, 2015, the "[p]ackers no longer compete against each other to buy fed cattle each week," and were consequently reaping "gangbuster profits."[81]

185. The financial impact of Defendants' conspiracy can be seen in the chart below, which estimates producers' and packers' respective per head margins:



**Figure 18: Producer vs Packer per-head margins across 2015.**

---

[81] Cassie Fish, "Whatever Happened to a Fair Fight" THE BEEF (Nov. 10, 2015) https://www.thebeefread.com/2015/11/10/whatever-happened-to-a-fair-fight/.

186. In second half of 2015, after Defendants embarked on their collusive reduction in slaughter volume, producer margins turned negative, while Defendants' margins remained positive and above their averages.

## A.    Defendants' Ongoing Conduct Continues to Depress Fed Cattle Prices.

187. Defendants continued to limit their collective slaughter numbers and cash cattle purchases in 2016. While monthly slaughter volumes for the first three quarters of 2016 were up after 2015's record lows, they remained flat or below 2014 levels despite the available supply of fed cattle having risen again.

188. By "ration[ing] their new purchases" of cattle and running shorter 32-hour weeks in early January, they dampened rising cattle prices and extended the rally in boxed beef prices.[82] Defendants sustained low kills across February and March.[83]

189. This rationing resulted in average weekly margins of approximately $63 per head amongst Defendants, making it one of their "best Q1 in history."[84]

---

[82] Cassie Fish, *Global Sell Off Smacks Cattle*, THE BEEF (Jan. 4, 2016), https://www.thebeefread.com/2016/01/04/global-sell-off-smacks-cattle/.

[83] Cassie Fish, *Yet More Consolidation*, THE BEEF (Jan. 6, 2016), https://www.thebeefread.com/2016/01/06/yet-more-consolidation/.

[84] Cassie Fish, *This Week's Cash Trade*, THE BEEF (Mar. 22, 2016), https://www.thebeefread.com/2016/03/22/sell-off-accelerates/ ("Packers continue to do a masterful job of matching throughput to supply and demand and margins, looking at the comprehensive cutout and $3 lower cash last week- are still solidly black.").

190. Knowing feedlots had been holding over cattle from the first quarter, Defendants increased their kills gradually in the spring. Defendants bought many of their cattle at this point with "time", meaning delivery periods longer than the standard one week. This caused fed cattle prices to drop in the second quarter.

191. By the end of July, analysts believed that a low had been reached at a price of $114/CWT.[85] However, Defendants increased their cash cattle purchases in August and maintained steady kills to ensure supply needs could be satisfied without increasing competition amongst them. Defendants further reduced their levels of negotiated cash purchases despite the high cattle availability.

192. These actions led to unprecedented prices that caused cattle industry expert Cassie Fish to state that "[t]his [2-year consecutive] break in cattle prices stands alone for its magnitude and its lack of an external market-moving event."[86]

193. Defendants bought cattle in September and October cheaper and with "time", displacing the typical fall fed cattle price rally. Defendants further reduced

---

[85] https://www.thebeefread.com/2016/07/28/onward-and-upward/; https://www.thebeefread.com/2016/08/24/erode-erode-erode/.

[86] Cassie Fish, *A Grave Time in History*, THE BEEF (Sept. 3, 2016), https://www.thebeefread.com/2016/09/02/a-grave-time-in-history/.

their slaughter volumes and/or reduced cattle purchases on any rare occasion that prices started to go up. This ensured that prices did not continue to rise.

194. For example, the number of fed cattle slaughtered dropped by 20,000 head the week beginning September 19, 2016,[87] exactly one week after cattle prices saw a minor $4/CWT increase.

195. As a result, the price of fed cattle continued to fall to a low of under $100 per cwt in mid-October. As in 2015, Defendants responded by dramatically increasing kill volumes in the fourth quarter of 2016. Defendants' fourth quarter kills were up an estimated 8.4%, 8.2%, 15.6% and 21.3% year-on-year, respectively. Industry wide kill levels in November 2016 alone were up 24% and 19% on a year-on-year basis as compared to 2014 and 2015, respectively.[88]

---

[87]  Cassie Fish, *Feeders Take the Lead; Packers Play It Cool*, THE BEEF (Sept. 22, 2016), https://www.thebeefread.com/2016/09/22/feeders-take-the-lead-packers-play-it-cool/ ("It has been the behavior of the packer that has slowed down the upward momentum this week. Taking 20k head out of this week's fed kill coupled with adequate inventories seems to have been enough to return the balance of power to the packer for now."); Cassie Fish, *Wild and Wooly*, THE BEEF (Sept. 26, 2016), https://www.thebeefread.com/2016/09/26/wild-and-wooly/ ("Last week's cash cattle trade was inadequate and lots of cattle were carried over into this week…. Unquestionably, last week was the lightest movement of negotiated cattle in months coming in at just under 50k. This volume is about half of the normal.").

[88]  Year-on-year comparisons calculated using USDA Market News Service Report: LM_CT106-National direct slaughter, committed and delivered.

196. Defendants' success in "backing-up" cash cattle in the summer of 2016 is confirmed by the fact that Defendants were able to raise cash cattle slaughter levels in the fourth quarter of 2016 over 2014 and 2015 levels without causing a dramatic rise in prices.[89] The gradual price increase was consistent with the seasonal rise in fed cattle prices typically experienced in the fourth quarter of each year as the availability of slaughter-weight cattle declines. But for the glut in slaughter-ready cattle created by Defendants' coordinated actions, the price of fed and feeder cattle prices would have risen significantly higher in response to the Defendants' dramatic increase in year-on-year slaughter numbers.

197. Each Defendants' refusal to break from their collective adherence to rationing the available cattle supply is even more remarkable given the margins on offer to Defendants throughout 2016. In the third and fourth quarters alone,

---

[89] *See* Cassie Fish, "*And it All Falls Down*," THE BEEF (Sept. 27, 2016), https://www.thebeefread.com/2016/09/27/and-it-all-falls-down/ ("The big carryover of unsold negotiated cattle from last week has gained negative status as the hours have rolled by, with packers willing and able to sit back and lower bids to $104, $6 lower than 2 weeks ago and $3 lower than the few that traded Friday and Saturday"); Cassie Fish, "*Despondency*," THE BEEF (Oct. 11, 2018), https://www.thebeefread.com/2016/10/11/despondency/ ("As if on cue, kills this week are now rumored to be cutback to 585k-595k, with a cooler cleaning and Saturday kills out....A pull back in the kill with record packer margins cements the reality that easily and efficiently killing our way through the numbers, which used to be a reality, isn't any longer. This makes it difficult for the market to return to fully current marketing status if there is any slowdown in kill.").

Defendants realized average margins of $123 and $153 per head on their fed cattle purchases. Not only were these margins significantly above pre-2015 averages ($25 and -$16 per head), but they also exceeded Defendants' most profitable third and fourth quarters in modern history by about $30 and $100 per head, respectively. Defendants thus had both the incentive and the ability to buy more cattle. Fed cattle producers, meanwhile, lost an average -$67 per head across 2016, causing parallel downward pressure on the prices feeder cattle received.

198. In 2017, Defendants continued to work together to ensure their slaughter volumes did not outpace slaughter cattle availability. Defendants each reduced their volumes in the first quarter and raised them together in the second quarter.

199. While prices rose from February to May consistent with traditional seasonal highs, Defendants responded by each reducing their number of kills. The result was another yearly low price of $105/cwt reached in mid-September, a far cry from historical season lows that were typically reached in July.

200. Similar to 2016, Defendants again posted record profits. The $128 and $147 per head margins in the second and third quarters of 2017 were the highest to date, and the first and fourth quarter margins of $42 and $88 per head were second only to the margins recognized in 2016.

201. Disregarding the potential to profit from these conditions, each Defendant refused to expand its market share, but instead continued to work in lockstep to keep production and supply in sync to ensure fed cattle prices remained low.

202. As more fed cattle became available for slaughter in 2017 and into 2018, Defendants, having already reduced their slaughter volumes below historic levels and curtailed their cash cattle purchases, told the market they lacked capacity to slaughter the supposed "wall of cattle" due to reach slaughter-weight in the summer of 2018.[90] Defendants thus coerced producers to prematurely sign captive supply agreements to ensure they could "get their cattle dead" before Defendants ran out of "hook" or "shackle space."[91] At the same time, Defendants managed their respective slaughter volumes to ensure that their collective demand did not exceed the available supply.[92]

---

[90] Cassie Fish, "*Still Green!?!*" THE BEEF (Mar. 27, 2018), https://www.thebeefread.com/2018/03/27/still-green/ ("The [packers'] mechanical [slaughter] capacity exceeds needs [across Q2 2018]. ... The perception of there being a limitation has created fear and inspired some cattle feeders to "get in line" by selling [cattle] out-front [i.e., on captive supply agreements].").

[91] *See* Cassie Fish, "*Holding Gain*," THE BEEF (Apr. 18, 2018), https://www.thebeefread.com/2018/04/18/holding-gains/ ("Cattle feeders, still fearful of growing supplies in May, June and beyond continue to sell cattle for May at substantially lower prices than current values.").

[92] Cassie Fish, "*Futures Trade Both Sides; Cash Poised to Trade Lower*," THE BEEF (Apr. 2, 2018), https://www.thebeefread.com/2018/04/02/futures-trade-both-sides-cash-poised-

203. Defendants' tactics succeeded. Prices fell during late Winter/Spring 2018, despite record strong beef demand and tight supplies of slaughter-ready cattle across March and April. Indeed, prices fell from approximately $129 per cwt at the beginning of March 2018 to $110 per cwt by the beginning of May 2018. Prices stayed at or around that mark until mid-November 2018, a significant extension of the one to two-month summer low typically experienced by the market. And of course, Defendants never did reach slaughter capacity.[93]

204. Once again, Defendants posted record profits in 2018, with the second, third, and fourth quarter margins per head of $229, $198, and $175 respectively being the highest ever to that date.

**B.    2019 Brings Continued Parallel Slaughter and Pricing Behavior, a Fire at a Plant, and Regulatory Investigations.**

205. Ferocious weather greeted cattle feeders in the 2018/2019 winter, particularly across Kansas, Nebraska, and the other northern feeding states.

---

to-trade-lower/ ("Looking back at March's fed slaughter rate, it underperformed expectations…. Packers appear to have responded to the tight supply of market-ready cattle in the north by keeping the kill constrained and margins profitable and stable.").

[93]    Cassie Fish, "*Quiet Conclusion,*" THE BEEF (June 1, 2018), https://www.thebeefread.com/2018/06/01/quiet-conclusion/ ("As each week goes by in June, the calendar will take the industry into the heart of one of the most well-advertised "walls" of market-ready cattle in memory. Now that it is a known fact that the industry can kill 540k head of fed cattle and that demand can absorb the largest beef production in 10-years, the panic experienced in March seems overdone.").

Snowstorms and bitterly cold weather stripped pounds off cattle in feed yards, driving down slaughter weights as much as 15 pounds year-on-year. After the snow thawed, cattle feeders were hit with a very wet spring, which further eroded their ability to add pounds to their cattle. At the same time, beef demand remained high, encouraging packers to run plants to meet customers' demand.[94] In ordinary times, this would portend a substantial rally in cattle prices, over and above the typical rise experienced in winter/early spring, as Defendants would be compelled to compete to secure a greater number of cattle to make up for their lower weights.

206. Defendants, however, worked to constrain and limit the advance in cattle prices that market conditions warranted. As with previous years, they each maintained comparably lighter slaughter volumes across the first three months of 2019, ensuring that their collective demand didn't exceed the available supply.[95]

---

[94] Cassie Fish, *How About That,* THE BEEF (Feb. 11, 2019), https://www.thebeefread.com/2019/02/11/how-about-that-3/ ("Rather obviously, beef demand is terrific. Even in February, notoriously a slow beef demand month. Packer margins are record wide for February.").

[95] *See, e.g.,* Cassie Fish, *And the Beat Goes On,* THE BEEF (Feb. 14, 2019), https://www.thebeefread.com/2019/02/14/and-the-beat-goes-on-2/ ("Packers also know that February is typically the lightest slaughter month and even though they are killing more cattle than a year ago – some plant 'dark days' began yesterday as plans to keep the balance between supply and demand are paramount. Some plants will undertake maintenance or upgrade projects and some will honor holidays such as Monday's President's Day. Others will pull back hours to 36-hour work week.").

207. Defendants further pressured prices by reducing their purchases of negotiated cash cattle during this period. To facilitate this, each Defendant pulled formula and forward contract cattle forward, and pressured cash sellers to sell with "time" (*i.e.*, more than one week before delivery, which is the industry standard).[96] By coordinating their actions to accumulate inventory in this manner, constraining weekly kill volume, and declining to increase production to meet beef demand, Defendants prevented producers from receiving fair market prices.[97]

208. Defendants' slaughter reductions were most pronounced in February, with only marginal increases in March. By April 2019, Defendants used a relative

---

[96] Cassie Fish, *Picking Up*, THE BEEF (Jan. 16, 2019), https://www.thebeefread.com/2019/01/16/picking-up/ ("In the country, packer bids are virtually non-existent as packers schedule as many formula and contracted cattle as possible."); *see also* Cassie Fish, *CME Cattle Retreat*, THE BEEF (Jan. 4, 2019), https://www.thebeefread.com/2019/01/04/cme-cattle-futures-retreat/ ("Packers are pulling contracts and using the board weakness to their advantage and next week's cash cattle prices may weaken a buck"); Fish, *Cash Market Slips and Bids Surface*, THE BEEF (Jan. 23, 2019), https://www.thebeefread.com/2019/01/23/cash-market-slips-and-bids-surface/ ("…packers have masterly utilized a large number of formula cattle received in January as leverage against negotiated sellers, which has kept a lid on prices").

[97] Cassie Fish, *Here We Are*, THE BEEF (Mar. 8, 2019), https://www.thebeefread.com/2019/03/08/here-we-are/ ("Packers have been masterful at keeping long inventory and forcing producers to sell with time all year thus far-something that will continue and only increase as 2019 goes forward. It's hard to force prices higher if the buyer owns inventory."); Cassie Fish, *Hogs on Fire*, THE BEEF (Mar. 20, 2019), https://www.thebeefread.com/2019/03/20/hogs-on-fire/ ("The packer has done a masterful job managing inventory….").

supply glut to "strategically back cash cattle prices down into summer and to keep them down."[98] As a result, prices rapidly fell from around $127 per/CWT on Friday April 26, 2019 to $123/CWT the following Friday May 3, and $120/CWT on May 10, 2019. Defendants then leveraged the pressure they had created, buying increasing volumes of cash cattle at knockdown prices throughout May 2019.

209. The same slaughter pattern detailed above is observed if one limits the analysis to fed cattle purchased by Defendants from the USDA AMS LMR Five Area states. As noted above, AMS LMR reports of cash cattle purchases from these states are commonly incorporated into Defendants' formula contracts.

210. Defendants' effort to create a glut of cattle at the start of 2019 is shown by Figure 19, which reflects that sales of cattle from 1000+ head feedlots in February through April were far less than the supply of slaughter weight cattle, and that cattle consequently held-over into the summer were bought across the summer:

---

[98] Cassie Fish, A Bounce, THE BEEF (May 1, 2019), https://www.thebeefread.com/2019/05/01/a-bounce/.



**Figure 19: 2019 Cattle on Feed Fed Cattle vs. Marketings in 1000+ Head Feedlots.**

211. Defendants' slaughter restraint at the start of 2019 and their adherence to a common pricing strategy reduced cash prices in summer, working their way to a bottom of about $109-110/CWT in June. Producers thus faced an average $106 per head loss while Defendants had an estimated per head profit of $257,[99] which decreased Plaintiffs' and the putative classes' prices for feeder cattle.

212. With continuing robust beef demand – wholesale beef prices remained higher on a year-on-year basis – fed cattle prices were expected to rise steadily into the fall high. However, prices largely moved sideways, as Defendants worked to extend the summer lows:

---

[99] *Sterling Beef Profit Tracker: week ending June 21, 2019*, STERLING MARKETING INC. (June 26, 2019), https://www.drovers.com/news/industry/profit-tracker-feeding-losses-reach-triple-digits.

Using the last two years as a roadmap, ***packers pressed feeders hard this week*** and successfully cheapened their inventory by $1 to $1.50 so far. The smaller packers more dependent on high grading cattle paid steady earlier in the week for the right kind, but the ***majors tipped the market over since***… [a]ttitudes in the country [amongst producers] are discouraged and fatigued. ***Most cattle being sold are losing money***, replacement costs are high and bargaining leverage is slim. Like another world, the ***wholesale beef news is sizzling, but zero of that money is being passed on to cattle feeders***.[100]

213. A slight $2-3/CWT rise in prices allowed fed cattle producers to realize a paltry profit of about $24/head by the week ending August 9, 2020, against the Defendants' profit of $192/head, with reduced profits at all life cycle stages.[101]

### 1. Defendants react to a processing plant fire by suppressing cattle prices and inflating beef prices.

214. Notwithstanding the predicted cash cattle strength across August, a fire at Tyson's Holcomb, Kansas slaughter and processing plant on August 9, 2019 provided an opportunity for Defendants to work cattle prices lower still, sending producers back into the red. Tyson closed the Holcomb plant indefinitely in the

---

[100] Cassie Fish, *Packers Press and Cash Softens*, THE BEEF (Aug. 9, 2019), https://www.thebeefread.com/2019/08/09/packers-press-and-cash-softens/.

[101] *Sterling Beef Profit Tracker: week ending August 9, 2019*, STERLING MARKETING INC. (Aug. 13, 2019), https://www.drovers.com/markets/profit-tracker/profit-tracker-margins-lower-soft-cash.

aftermath of the fire.[102] However, following the plant fire, Tyson Fresh, JBS, CMS, and National Beef all slashed their fed cattle bids and hiked their beef prices. These actions caused a $5/CWT drop in fed cattle prices and a $14/CWT rise in wholesale beef prices the following trading week.[103] This saw packer per head margins rise from $191 to $358 in the week ending August 16, 2019. The following week, packer margins continued to expand, with the spread between fed cattle prices and boxed beef values extending to a then-record high of $67.17/CWT, $39.51/CWT above the average spread for the same week across 2016-2018.

215. While Defendants blamed the loss of Holcomb's 5,500-6,000 head per day slaughter capacity for these price changes, weekly slaughter volume actually remained steady in the weeks following the fire (averaging around 521,900 head in the three weeks after the fire compared to 521,700 killed in the week of the fire).[104]

---

[102] *Over 3,800 workers at Tyson Foods beef plant in Kansas out of work after fire*, REUTERS (Aug. 11, 2019), https://www.reuters.com/article/us-tyson-foods-fire/over-3800-workers-at-tyson-foods-beef-plant-in-kansas-out-of-work-after-fire-idUSKCN1V10J1?source=content_type%3Areact%7Cfirst_level_url%3Anews%7Csection%3Amain_content%7Cbutton%3Abody_link.

[103] *Sterling Beef Profit Tracker: week ending August 16, 2019*, STERLING MARKETING INC. (Aug. 20, 2019), https://cdn.farmjournal.com/s3fs-public/inline-files/Beef%20Tracker%2081919.pdf. Live cattle futures contracts were also negatively impacted, with two limit-down trading days on September 12 and 13, 2019.

[104] These declines also reflected seasonally declining supplies of fed cattle.

216. That Swift/Packerland, CMS and National Beef all had steady slaughter volumes in August 2019 against prior months confirms they had each chosen to idle capacity rather than secure more cattle and take market share, despite voracious beef demand and excellent margins. The same is true for Tyson Fresh, who admitted that, notwithstanding the temporary closure of the Holcomb plant, its slaughter volume loss would be "somewhat minimal."[105]

217. To support their slashed fed cattle bids, Defendants drastically reduced their respective cash cattle purchases after the fire.[106] Tyson was largely absent from the cash cattle market in the weeks that followed the fire. This drop was severe in September. While National Beef's July and August cash slaughter volume increased quarter-over-quarter, this largely reflects its acquisition of Iowa Premium's Tama, IA plant in mid-June. The Tama plant sourced most of its 1,100 head per day capacity from cash cattle sellers while owned by Iowa Premium and continued to do so under National Beef's management until at least late 2019 when it finalized arrangements to accept formula grid cattle.

---

[105] *Tyson Plant Back Online by January,* Feedlot (Sept. 6, 2019), http://feedlotmagazine.com/tyson-plant-back-online-by-january/.

[106] Cassie Fish, *Back from the Brink,* THE BEEF (Sept. 3, 2019), https://www.thebeefread.com/2019/09/03/back-from-the-brink/ ("Last week's negotiated cash cattle trade was small for the fourth week running.…Prices were $2 to $3 lower, averaging $105.54, the lowest since 2018").

218. This reduction in cash cattle purchases in the aftermath of the fire placed further pressure on cash cattle prices (and thus reduced the price of each Defendants' contracted cattle). Tyson Fresh, Swift/Packerland, CMS, and National Beef continued to drop their bids in lockstep.

219. As a result, cash cattle prices continued to slide, bottoming out at around $100/CWT, with some trades as low as $97/CWT in the week ending September 13, 2019, down from $113/CWT ($183/CWT dressed) in the week of the fire.

220. Defendants' purchase and kill reductions in the aftermath of the Holcomb fire ensured their collective demand remained below the supply of cattle, as evidenced by Defendants' increased average carcass weights of slaughtered cattle.

221. Carcass weights increase the longer a steer or heifer is on feed. Thus, increasing carcass weights are a sign that producers have not been able to stay current with their marketings and have been forced to feed their cattle longer than is optimal. Consistent with the increase, reported carcass weights were up on average by 6 pounds across October and November 2019, year-on-year.

222. Defendants each reaped record high margins in the weeks following the Holcomb fire from lower fed cattle prices and higher beef prices. As cattle prices bottomed out the week ending September 13, 2019, the spread between packer and

producers' per head margin exceeded $600, with **_packers making over $400 per_**

**_head_** while **_producers sustained $200 per head losses_**.[107] *See* Figures 20-22 below:



**Figure 20: Weekly Packer Per-Head Meat Margin**



**Figure 21: Packers' Estimated Per Head Net Margins.**

---

[107] *Sterling Beef Profit Tracker: week ending September 13, 2019*, STERLING MARKETING INC. (Sept 18, 2019), https://cdn.farmjournal.com/s3fs-public/inline-files/Beef%20Tracker%2081919.pdf.



**Figure 22: Rolling 12 Month Operational Income Percentages of JBS, Tyson, and National Beef US Beef Operations.[108]**

223. Having left many cash cattle producers without a bid for the two months that followed the Holcomb fire, Defendants took advantage of battered producers in the final quarter of 2019, drastically increasing cash cattle purchases, and securing cattle with extended delivery periods. Fed cattle prices did not recover to their supposed yearly bottom, set in July, until November 2019, with producers continuing to sell fed cattle at a loss until that point.[109]

---

[108] These operational income percentages are derived from SEC filings or investor relations materials. JBS S.A. does not report operations income at the segment level, so the figure for JBS represents the EBITDA of its JBS USA beef operations. National Beef's operational incomes were reported by its shareholder U.S. Premium Beef, LLC. Tyson Foods' operational income for its U.S. beef business, operated by Tyson Fresh, was shifted to align with calendar quarters because Tyson's fiscal year is not a calendar year.

[109] Tyson did not initially take advantage of the glut of cash cattle to the same extent as Swift/Packerland, Cargill and National Beef, but it rapidly increased its cash cattle purchases after its Holcomb plant came back online in December. Press Release, Tyson

## 2.    USDA continues to investigate Defendants' price manipulation.

224. On August 28, 2019, along with the DOJ, the U.S. Secretary of Agriculture announced that the Packers and Stockyards Division, which is responsible for enforcing the Packers and Stockyards Act, was investigating Defendants' conduct in the aftermath of the fire at Tyson's Holcomb slaughter and processing plant.[110]

225. Disruptions in U.S. beef production peaked in late April 2020 when nearly 40 percent of the nation's beef processing capacity was idled due to COVID-19 illnesses among packing plant employees. During the second week of May, the largest difference – or spread – between the boxed beef cutout value and fed cattle prices since the inception of Mandatory Price Reporting in 2001 was recorded at just over $279/cwt. This constituted a 323% increase from the $66/cwt spread that existed in early April 2020, which was already close to the prior record set in the aftermath of the Holcomb fire. This gap between cattle and beef prices caused each

---

Foods Inc., *Tyson Beef Plant in Kansas to Resume Operations in December* (Nov. 18, 2019), https://www.tysonfoods.com/news/news-releases/2019/11/tyson-beef-plant-kansas-resume-operations-december.

[110] *Secretary Perdue Statement on Beef Processing Facility in Holcomb, Kansas*, U.S. DEP'T OF AGRIC. (Aug. 28, 2019), https://www.usda.gov/media/press-releases/2019/08/28/secretary-perdue-statement-beef-processing-facility-holcomb-kansas ("I have directed USDA's Packers and Stockyards Division to launch an investigation into recent beef pricing margins to determine if there is any evidence of price manipulation, collusion, restrictions of competition or other unfair practices.").

Defendant to realize startling margins estimated by Sterling Marketing to reach as high as $891/head in the first week of June 2020. In contrast, those producers able to find a marketing outlet for their cattle incurred triple digit losses per head.

226. On July 22, 2020, the USDA AMS issued The Boxed Beef & Fed Cattle Price Spread Investigation Report ("Report") summarizing market conditions, fed cattle prices, boxed beef values, and the spread before and during the COVID-19 pandemic, including the period just after the Holcomb plant fire.[111] The Report stated that the USDA's investigation into potential violations of the Packers and Stockyards Act was ongoing and that the Report did "not examine" such violations.[112] It further stated:

> Findings thus far do not preclude the possibility that individual entities or groups of entities violated the Packers and Stockyards Act during the aftermath of the Tyson Holcomb fire and the COVID-19 pandemic. The investigation into potential violations under the Packers and Stockyards Act is continuing. USDA does not solely own investigatory authority over anticompetitive practices in the meat packing industry and has been engaged in discussions with the Department of Justice (DOJ) regarding allegations of anticompetitive practices in the meat packing industry. Should USDA find a violation of the Packers and Stockyards Act, it is authorized to report the violation to DOJ for prosecution.[113]

---

[111] *Boxed Beef & Fed Cattle Price Spread Investigation Report*, USDA AMS (July 22, 2020), https://www.ams.usda.gov/sites/default/files/media/CattleandBeefPriceMarginReport.pdf.

[112] *Id.* at 2.

[113] *Id.* at 10.

227. Plaintiffs understand that the USDA's investigation, alongside the DOJ's Sherman Act investigation into the Defendants, remains ongoing.

## C.    Defendants Publicly Signaled Their Commitment to Supply Restraint.

228. Defendants' joint effort to periodically curtail slaughter levels to "balance" their demand to supply are further evidenced by their senior executives' statements about their firms' commitment to operating a "margin" rather than a "market share" business. Explicit and implicit in these statements was the importance of industry restrictions on slaughter levels and capacity.

229. For example, Tyson's COO stated that National Beef's closure of its Brawley, California plant "is consistent, I guess, with what we've been saying all along, as the calf crop declines and the noncompetitive feedlot areas or noncompetitive plants or the combination thereof, we'll probably have to curtail production ...."[114]

230. As prices continued to rise in 2014, JBS director Wesley Mendonca Batista responded to an analyst's question as to whether U.S. fed cattle slaughtering capacity needed to be rationalized by suggesting that JBS's recent acquisition of XL Foods' Omaha, Nebraska plant was probably a mistake, and that slaughtering

---

[114] Tyson Foods Q1 2014 Results Earnings Call Transcript (Jan. 31, 2014), at 4.

capacity needed to come out of California and at least one other U.S. region ("If you want to be balanced you need to have capacity to be shut there.").[115]

231. Even after fed cattle prices collapsed, Tyson's then-CEO Donald Smith still stressed the need for further slaughter reductions in August 2015: "[b]ecause we run for margin and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and added costs. In the short-term, we are negatively impacted, but markets will equilibrate, and conditions are expected to improve for the long term."[116]

232. JBS's André Nogueira de Souza went further and publicly praised Defendants' efforts to reduce industry-wide slaughter capacity through plant closures, noting that it had left the industry in "a very good position, [to achieve] balance in the industry in 2016, 2017, and 2018."[117]

233. Defendants' executives knew they needed to tread carefully in their public exhortations for slaughter restraint, as shown by Tyson's then-CEO Donnie

---

[115] JBS Q3 2014 Earnings Calls Transcript (Nov. 13, 2014), at 12.

[116] Tyson Foods Q3 2015 Results Earnings Call Transcript (Aug. 3, 2015), at 4.

[117] JBS Q3 2015 Results Earnings Call Transcript (Nov. 12, 2015), at 9.

Smith's slip during his discussion of output restraint during Tyson's Q4 2015 Earnings Call:[118]

> You've got relatively low cattle supply, you've got too much -- well, not to say too much, probably not the right way to say it, but you've got excess industry capacity. And that limits our ability to drive margins above the 1.5% to 3%, we think.

234. Such comments are typical in cartels like Defendants' because they serve to publicly affirm, in euphemistic terms, the conspirators' private understandings.

### D. Defendants' Conduct Directly Caused the Depression of Feeder Cattle Prices.

235. During the alleged conspiracy period, feeder cattle futures prices, which correspond to the prices paid for feeder cattle, tracked future fed cattle prices with a nearly constant $30/contract difference, as shown in Figure 23:



**Figure 23. Correlation in the price of feeder cattle and fed cattle.[119]**

---

[118] Tyson Foods Q4 2015 Earnings Call Transcript (Nov. 24, 2015).

[119]        https://www.beefmagazine.com/feedlots/feeder-cattle-prices-versus-fed-cattle-futures.

236. The price of feeder cattle makes up the majority of the cost of finishing cattle.[120] An industry expert determined feeder cattle prices represented 72% of the cost of finished (i.e., fed) cattle in 2018 and 2019 based on industry data.[121] Indeed, "[t]he most important factor influencing feeder cattle prices is the price of the animal when finished."[122]

237. Market research has confirmed the causal relationship between feeder and fed cattle price. One study revealed that "a change in the live cattle price of a dollar per hundred pounds leads to approximately 93% pass-through to the feeder cattle price in about one month."[123] Similarly, other studies have confirmed that fed cattle prices are one of the primary – if not the greatest – determinant of feeder cattle prices.[124]

---

[120] Roger Wayne Eldrige, *Kentucky Feeder Cattle Price Analysis: Model for Price Predictions and Grazing Management*, University of Kentucky Master's Theses, at p.67 (2005).

[121] *Sterling Beef Profit Tracker: week ending August 9, 2019*, Sterling Marketing Inc. (Aug. 13, 2019), https://www.drovers.com/markets/profit-tracker/profit-tracker-margins-lower-soft-cash.

[122] Jerry Klassen, *Key Factors that Influence Feeder Cattle Prices*, Grainews (Sept. 25, 2020), https://www.grainews.ca/cattlemans-corner/key-factors-that-influence-feeder-cattle-prices.

[123] Huan Zhao, Xiadong Du, David Hennessy, *Pass-Through in United States Beef Cattle Prices: A Test of Ricardian Rent Theory*, 40 Empirical Economics 497-508 (Feb. 4, 2010).

[124] Tonsor, T., Mollohan, E., *Price Relationships Between Calves and Yearlings: AN Updated Structural Change Assessment*, 1 J. of Applied Farm Economics 1:3 (2017).

238. Similarly, another study analyzing calf prices, corn prices, and expected live cattle prices from January 1993 through March 2016 determined that the impact of live cattle price expectations is three or more times larger than the same proportional impact of corn price, and that the relative impact of live cattle price expectations on feeder cattle prices has only become more influential in recent years.[125]

239. In fact, the link between feeder cattle and fed cattle prices is so strong, one industry expert explained that "[f]eeder cattle markets are expectation markets that are primarily driven by two things: (1) the expected value of fed cattle in the future and (2) the cost of getting those feeder cattle to that point."[126]

240. Accordingly, the depression of feeder cattle prices is inextricably tied and traceable to the price ultimately paid by Defendants' for fed cattle.

241. Defendants' unlawful conduct and conspiracy reduced the price of fed cattle, which almost immediately resulted in a depressed feeder cattle price.

---

[125] Glynn Tonsor & Emily Mollohan, *Price Relationship Between Calves and Yearlings: An Updated Structural Change Assessment*, 1 J. of Applied Farm Economics 1:3 (2017).

[126] Kenny Burdine, *Rising Feed Prices Create Divergence Between Fed and Feeder Cattle Values*, Ohio State University Beef Cattle Letter, (May 5, 2021), available at https://u.osu.edu/beef/2021/05/05/rising-feed-prices-create-divergence-between-fed-and-feeder-cattle-values/.

242. Defendants' internal documents admit they were aware of fed and feeder cattle's pricing relationship while implementing their conspiracy, and routinely monitored and tracked feeder cattle prices.

### E.    Economic Analysis Supports the Existence of the Alleged Conspiracy.

243. Economic data and analysis corroborate the direct and circumstantial evidence of the alleged conspiracy. In particular, data and analysis confirm that: (a) the collapse in fed cattle prices in 2015 cannot be explained by common supply or demand drivers; (b) from at least January 1, 2015, prices were artificially depressed; and (c) other explanations potentially offered for the 2015 price collapse do not withstand scrutiny.

### F.    Supply and Demand Drivers Do Not Explain the 2015 Price Collapse or Subsequent Low Prices.

244. Prices for fed and feeder cattle bought across the United States followed a discernible pattern: increasing consistently from 2009 through 2014 (accounting for seasonal fluctuations in prices), collapsing dramatically in 2015, and then stabilizing below the prior trend line.[127]

---

[127] The below graphs are not adjusted for seasonal changes in fed cattle prices, which do not explain the dramatic depression of fed cattle prices after 2014.

245. Seasonal changes do not explain the dramatic depression of prices after 2014. Historically, prices tend to gradually rise during the first quarter until the early part of the second quarter, peaking in March or April. Prices then tend to trend downwards to a summer low typically established in June or July, before commencing an upward trend that typically peaks in November. [128]

246. As evidenced from the chart below, **the collapse in fed cattle prices led directly to the collapse in feeder cattle prices:**



**Figure 25: Fed Cattle Input Costs - Feeder Cattle Cost**

247. Indeed, fed cattle producers enjoyed a profitable 2017 largely due to a significant drop in the input costs associated with fed cattle marketed during that year, and in particular, the price of feeder cattle. Defendants were able to constrain

---

[128] "Annual and Seasonal Price Patterns for Cattle," CORNHUSKER ECONOMICS, Univ. of Nebraska-Lincoln (Aug. 19, 2015), https://agecon.unl.edu/cornhusker-economics/2015/annual-and-seasonal-price-patterns-for-cattle.

the typical seasonal rise in fed cattle prices across the first half of 2017 and continued to profit from historic margins.

248. Nor do changes in beef demand or consumer preferences explain the drop in prices. While there was a 5.67% decline in retail beef prices from January 2015 to January 2016, prices rebounded in the months that followed, before going down, then up again thereafter. Importantly, the spread between retail beef prices and fed cattle prices continued a gradual increase, consistent with its upward trend during the past 20 years, suggesting beef demand remained robust.[129] On top of this, beef demand increased from its previous pre-collusion lows, as seen below:



**Figure 26: Monthly Beef Demand Indices, Jan. 1988 – Oct. 2017**[130]

---

[129] USDA, Economic Research Service ("ERS"), "Meat Price Spreads," accessed May 3, 2019 at https://www.ers.usda.gov/data-products/meat-price-spreads/.

[130] "Assessing Beef Demand Determinants" (Jan. 18, 2018), pp. 13-14, available at: https://www.beefboard.org/news/files/FY2018/Assessing%20Beef%20Demand%20Determinants_FullRe port.pdf.

249. This high demand for beef was expressly acknowledged by Tyson's Head of Fed Cattle Procurement, John Gerber, at a November 2018 industry conference:

> "[The] [c]onsumer will pay more for beef, and have to pay more for beef because it is worth more. There is value out there in chicken and pork, but unless you have been living under a great big rock the last two years, you know that *beef demand is off the charts*. We have a lot of supply coming at us, but we have been able to hold the price at a pretty good level, because of beef demand, it's been really good, and I think it will stay good."[131]

250. What did change in 2015 was the meat margin. The meat margins realized by Defendants in the aftermath of the 2015 price collapse – which at times exceeded $600 per head – were historically unprecedented. These unheard of meat margins due to Defendants' deliberate underutilization of their plant capacities 2015 and 2016 led to unheard-of profitability in Defendants' beef businesses.

251. This expanding meat margin was also expressly recognized by Tyson. It was stated during a Q4 2016 earnings call that "[t]he dynamic is that the livestock prices have not come – they've come down faster than the retail prices have, which has allowed us to make the margins that we have right now in both beef...."[132]

---

[131] Tyson Fresh Meats: What the Consumer Demands - John Gerber, VP, Cattle Procurement, Tyson Foods; Kevin Hueser, VP, Beef Pricing, Tyson Foods, Nov. 13-15, 2018, Overland Park, KS, USA, https://www.youtube.com/watch?v=qCip3WBcqzo.

[132] Tyson, Q4 2016 Earnings Call, Seeking Alpha Transcript (Nov. 21, 2016) at 15.

### G.     Other Explanations for the Drop in Prices Do Not Withstand Scrutiny.

252. The United States Government Accountability Office's ("GAO") 2018 Report suggests potential explanations for the price collapse proffered by Defendants and others. These explanations are not borne out by the facts.

253. For example, the GAO Report mentions that the droughts of 2011-2013 might have reduced the forage supply to raise feeder cattle, leading to fewer feeder cattle.[133] Under this explanation, ranchers expanded their inventory once the drought eased, thereby oversupplying the market and causing cattle prices to crash. Any purported oversupply of feeder cattle, though, should have caused a collapse in feeder cattle prices, which did not happen until after fed cattle prices collapsed. Further, while the cattle herd began to rebuild by 2015, the supply of slaughter weight fed cattle was similar to 2014 levels. As a result, while 2015 cattle on feed inventory numbers were at or slightly above 2014 levels, 2015 industry annual slaughter volume was slightly down compared to 2014 driven by Defendants' slaughter reductions and the continuing tight supply of fed cattle. If GAO's suggested oversupply of slaughter weight cattle were true, the industry would have seen low prices and high volume, not low prices and low volume.

---

[133] 2018 GAO Report at 12.

254. It has also been suggested that the increased corn supply seen after the 2011-2013 droughts "may have" led fed cattle producers to feed their cattle for longer.[134] The resulting fatter cattle then received lower prices per CWT, as is customary. This premise is faulty: most producers did not choose to overfeed their cattle but were forced to do so by Defendants' coordinated slaughter restrictions.

255. Finally, the strengthening U.S. dollar in 2014 and potentially related changes in U.S. imports and exports of live cattle and beef also cannot explain the price collapse.[135] These events were not even in lock-step with the price collapse in the second half of 2015. In fact, during the second half of 2014, when net imports of beef and the U.S. dollar were increasing, fed cattle prices still increased to their November 2014 peak. In the first half of 2015, net imports were transiently around 8% of total U.S. production, but by November 2015 – when fed cattle prices had bottomed out – net imports of beef had turned slightly negative.

256. Importantly, the GAO did not conclude that these factors were the sole or dominant cause of the 2015 price collapse and emphasized that an investigation into potential antitrust issues was beyond the scope of its review.[136]

---

[134] *Id.* at 13.

[135] *Id.* at 14.

[136] 2018 GAO Report at 29.

## The Cattle Market is Conducive to Collusion

257. The structure and characteristics of the market for the purchase of cattle make the market highly susceptible to collusion. These facts, when considered against the backdrop of Defendants' actions that are consistent with collusion and inconsistent with the proper functioning of a competitive market, support an inference that the anticompetitive agreement alleged herein existed.

## I.  The Beef Packer Industry Is Highly Consolidated and Highly Concentrated

258. The Beef Packer industry is highly concentrated.[137] Since JBS's acquisition of Smithfield Beef Group, Inc. in 2008, Defendants' cumulative share of annual purchases of U.S. fed cattle has approximated 81-89% each year, with each Defendant's individual share of annual purchases remaining largely static. No Independent Packer possesses a double-digit market share, with Greater Omaha,

---

[137] The U.S. national four-firm concentration ratio (CR4) for beef packers rose from 25% in 1977 to 71% in 1992, the first year in which the national Herfindahl-Hirschmann Index ("HHI") exceeded 1800. Since that time, the HHI index for the industry has only increased, particularly in certain regions. *U.S. v. JBS* Amended Compl., ¶¶ 36-37; Cai, Stiegert, and Koontz, Regime Switching and Oligopsony power: the case of US beef processing, Food System Research Group, Working Paper Series (2010 Cai, X., K. W. Stiegert, and S. R. Koontz. "Oligopsony Fed Cattle Pricing: Did Mandatory Price Reporting Increase Meatpacker Market Power?" Proceedings of the NCCC-134 Conference on Applied Commodity Price Analysis, Forecasting, and Market Risk Management.                    Available                    at http://www.farmdoc.illinois.edu/nccc134/conf_2011/pdf/confp24-11.pdf.

Defendants' nearest rival, maintaining a 2.5-3.5% market share through its Omaha, Nebraska plant. Unsurprisingly, the GAO's 2018 Report found that lower "packer competition in any given area was associated with lower fed cattle prices in that area."[138]

### A. The Supply of Cattle and Demand for Beef Are Relatively Insensitive to Short-Term Changes in Price.

259. Recent studies have shown that the quantity of beef U.S. consumers purchase has become less sensitive to changes in beef prices, and the impact of such price changes on beef demand is small relative to other factors.[139] Beef's own price elasticity for the period 2008-2017 was estimated at -0.479, indicating that a "10% price increase would reduce [beef] demand by 4.79%."[140] As a result, Defendants are incentivized to reduce fed cattle slaughter and beef production, as neither they, nor their immediate customers, are harmed by the resulting wholesale and retail price increases.

---

[138] 2018 GAO Report at 15-16.

[139] Glynn Tonsor, Jason Lusk, Ted Schroeder, "Assessing Beef Demand Determinants" (Jan. 18, 2018), at 7-9, www.beefboard.org/news/files/FY2018/Assessing%20Beef%20Demand%20Determinants_ FullReport.pdf.

[140] *Id.*

260. Reduced slaughter volumes and/or lower cattle prices are unlikely to significantly alter the immediately available supply of fed cattle. Because of cattle's comparably long life cycle, cattle producers typically require about 39 months to alter supply levels.[141] As a result, cattle supplies are relatively insensitive to short-term price changes, particularly given the absence of a substitute market into which cattle producers can sell their cattle.

## B.    Producers Face Significant Market Access Risk.

261. The risks due to the perishable nature of cattle, coupled with the absence of a substitute market to sell fed cattle, expose fed cattle producers to market access risk, namely "the availability of a timely and appropriate market outlet."[142]

262. That risk and the leverage it provides to Defendants is exacerbated by the significant information asymmetry faced by producers vis-à-vis Defendants regarding the available supply of fed cattle and Defendants' procurement needs. Producers have only limited information concerning the supply of fed cattle beyond the information conveyed by the USDA's Cattle on Feed Reports. By

---

[141] Tyson Foods Inc. "Investor Fact Book – Fiscal Year 2017" (2018), at 10, https://s22.q4cdn.com/104708849/files/doc_factbook/Tyson-Foods-FY17-Fact-Book-(rev-042518).pdf ("Tyson 2017 Fact Book"); 2018 GAO Report at 5.

[142] RTI International at 5-4.

contrast, Defendants can construct detailed inventories of upcoming fed cattle supplies through their regular contacts with all the fed cattle producers situated within their respective procurement territories.

263. The impact of market access risk on the parties' relative bargaining power is meaningful. As demonstrated by Defendants' threats regarding 2018's supposed "wall of cattle," the mere use of coordinated threats of increased market access risk can be sufficient to coerce producers to commit cattle to captive supply agreements or accept lower cash prices.

## C. There Are Many Trade Organizations and Opportunities for Defendants to Meet and Collude.

264. Defendants' management and employees have regular opportunities to meet and collude through their membership in various trade and industry associations, including: the National Cattlemen's Beef Association ("NCBA"); the U.S. Meat Export Federation ("USMEF"); the Global and U.S. Roundtables for Sustainable Beef ("USRSB") and the North American Meat Institute ("NAMI").

265. For example, the NCBA holds an annual convention (known as "CattleCon"), a summer conference, a legislative conference, and regional meetings. The NCBA Product Council, which includes Defendants, other packers, and certain retailers and restaurants, meets quarterly for the Beef Executive

Forum, an invitation-only event.[143] Representatives of each Defendant typically attend these events. For example, two of Defendants' executives, former CMS/Cargill Vice President of Cattle Procurement Bill Thoni and former Tyson SVP of Beef Margin Management and VP of Boxed Beef Pricing Kevin Hueser, were both officers, board members, or formally designated participants of the NCBA.[144] Defendants also participate in meetings of the Beef Checkoff program, run by the Federation of State Beef Councils, that are held in conjunction with the NCBA summer and winter meetings.[145]

266. Similarly, the USMEF – a trade association that develops export opportunities for U.S. protein producers, and whose leadership includes current and former employees and officers of Defendants – holds both spring and fall conferences and monthly international trade shows.[146] Numerous executives and employees of Defendants participated or held leadership roles in the USMEF. For

---

[143] NCBA Allied Indus. Membership, NAT'L CATTLEMEN'S BEEF ASS'N (2019), www.beefusa.org/CMDocs/BeefUSA/AboutUs/2019NCBA%20Allied%20Industry%20Brochure.pdf; https://us13.campaign-archive.com/?u=3ac0220907d479b33ff07dbbc&id=1d27f4a1b7.

[144] Hueser was also a formal participant of the USRB.

[145] *See The Association*, NAT'L CATTLEMEN'S BEEF ASS'N (2019), http://www.beefusa.org/theassociation.aspx; and *Federation*, NAT'L CATTLEMEN'S BEEF ASS'N (2019), http://www.beefusa.org/federation.aspx.
[146] *See* https://www.usmef.org/usmef-events/.

example, former CMS/Cargill Vice President of International Sales Pat Binger was an officer, board member, or formally designated participant of the USMEF; former Tyson Foods SVP of International Sales Roel Andriessen served as the Chair, Vice Chair, and on the Executive Committee of the USMEF; former Tyson Foods SVP of International Sales and VP International Sales Robert Shuey was a formal participant of the USMEF; National Beef International President and former Vice President of International Sales Peter Michalski served on the Export Committee of the USMEF; and former National Beef NBP International Sales President Mark Domanski served on the Export Committee of the USMEF. Also, in November 2017, Tyson's Roel Andriessen and CMS' Pat Binger both attended the USMEF Strategic Planning Conference in Tucson, Arizona.[147]

267. NAMI – a national trade association that represents companies that process 95% of red meat – conducts a series of annual conferences and educational workshops across the country.[148] Executives and employees of Defendants

---

[147] *USMEF Members Examine Challenges ahead, Elect New Officer Team*, U.S. MEAT EXP. FED'N (Nov. 3, 2017), https://www.usmef.org/news-statistics/member-news-archive/usmef-members-examine-challenges-ahead-elect-new-officer-team/.

[148] *See About NAMI*, NAT'L AM. MEAT ASS'N (2019), https://www.meatinstitute.org/index.php?ht=d/sp/i/204/pid/204; Events, NAT'L AMERICAN MEAT ASS'N (2019), https://www.meatinstitute.org/index.php?ht=d/sp/i/10422/pid/10422.

participated and held leadership positions in NAMI. For example, CMS President of Business Operations & Supply Chain and former Cargill Beef President John Keating was an officer, board member, or formally designated participant of NAMI; former Tyson Foods CEO, Group President of Fresh Meats & International, and COO Noel White served on the Executive Committee of NAMI; former Tyson Foods CEO and President Thomas Hayes also served on the Executive Committee of NAMI; National Beef President and CEO Timothy M. Klein served on the Executive Committee of NAMI; and JBS USA, Swift Beef, and Packerland CEO Andre Nogueira served on the Board of Directors of NAMI.

268. NAMI and the Food Industry Association host an annual Meat Conference that various executives and employees of Defendants attend every year. [149] In 2017, National Beef's Timothy Klein, Tyson Vice President of Boxed Beef Pricing Don Kieffer, JBS' Andre Nogueira, and CMS Vice President of Sales John Jay, amongst other Defendant executives, were listed as attendees of the Meat Conference.[150] In 2018, National Beef's Timothy Klein, JBS' Andre Nogueira, Cargill Vice President

---

[149] *Meat Conference*, NORTH AM. MEAT INST. AND FOOD INDUS. ASS'N, http://meatconference.com/ (last visited Dec. 9, 2020).

[150] *2017 Annual Meat Conference: Registered Attendees*, FOOD INDUS. ASS'N (Dec. 9, 2020) https://www.fmi.org/forms/meeting/MeetingRosterPublic/viewRoster?meetingId=43A3 5D00000DFE&sortBy=name.

of Retail Beef Business Lead Elizabeth Gutschenritter, and Tyson's Don Kieffer attended the Meat Conference.[151] In 2019, JBS' Andre Nogueira, Tyson's Noel White, National Beef's Timothy Klein, and Cargill's Elizabeth Gutschenritter were listed as attendees.[152] In 2020, Tyson's Noel White and National Beef's Timothy Klein again signed up to attend the Meat Conference along with various other Cargill and JBS executives and employees.[153]

269. Various Defendants' executives and employees attended "AgCon," a joint conference from the CFTC and the Center for Risk Management Education and Research at Kansas State University, in 2018.[154] CMS' Bill Thoni and Tyson's Kevin Hueser were listed as attendees of the 2018 AgCon along with other Defendants' executives and employees, including Tyson Fresh's VP of Sourcing & Risk

---

[151] *2018 Annual Meat Conference Attendee List as of 2.9.2018*, MEAT CONFERENCE (Feb. 9, 2018), http://meatconference.com/sites/default/files/books/2018%20AMC%20Attendee%20List.pdf.

[152] *Meat Conference 2019 Attendee List (as of 2/27)*, MEAT CONFERENCE (Feb. 27, 2019), http://meatconference.com/sites/default/files/books/2019-AMC-Attendee-List.pdf.

[153] *2020 Annual Meat Conference: Registered Attendees*, FOOD INDUS. ASS'N (Dec. 9, 2020), https://www.fmi.org/forms/meeting/MeetingRosterPublic/viewRoster?meetingId=571D81000004FF&includeUnpaid=1&sortBy=title.

[154] *Inaugural AgCon brings business, government together to discuss ag futures markets*, KANSAS STATE UNIV. (Mar. 8, 2018), https://www.ksre.k-state.edu/news/stories/2018/03/AgCon2018.html.

Management Randall Chambers; Tyson Fresh's VP of Cattle Procurement John Gerber; National Beef Vice President of Cattle Procurement Chad Barker; National Beef Vice President of Procurement and Risk Management Phil Groetken; and JBS USA Head of Risk Management Marco Sampaio.[155]

270. Tyson, JBS, and Cargill Defendant executives also had ample opportunities to meet privately, particularly at the beginning of the conspiracy, as a result of JBS's acquisition of Tyson and Cargill's Mexican and Brazilian chicken and U.S. pork operations, respectively. JBS S.A.'s purchase of Tyson's Brazilian and Mexican chicken operations was announced on July 28, 2014 and closed on December 1, 2014 and June 29, 2015, respectively,[156] while its purchase of Cargill's U.S. pork operations was announced on July 1, 2015 and closed on October 30, 2015. Cargill, Tyson, and JBS executives with responsibilities relating to beef and cattle such as then-Tyson CEO and President Donnie Smith;[157] JBS USA, Swift Beef,

---

[155] *2018 AgCon Attendees*, KANSAS STATE UNIV. (Mar. 28, 2018), https://www.k-state.edu/riskmanagement/documents/Ag_Con_2018_Attendees_Mar30.pdf.

[156] JBS Foods Int'l B.V., Registration Statement (Form F-1) at 112 (Dec. 5, 2016), https://www.sec.gov/Archives/edgar/data/1691004/000119312516785274/d304020df1.htm.

[157] *Tyson to sell Mexico, Brazil poultry businesses to JBS*, REUTERS (July 29, 2014, 1:32 PM), https://www.reuters.com/article/us-tyson-foods-results/tyson-to-sell-mexico-brazil-poultry-businesses-to-jbs-idUKKBN0FX0UR20140729.

and Packerland CEO Andre Nogueira;[158] and then-Cargill Senior Vice President Todd Hall[159] were all involved in the acquisition discussions. JBS S.A.'s Wesley Batista stated in July 2015 that its "courtship" with Cargill in relation to its U.S. pork operations "started years ago", with discussions intensifying at the beginning of 2015, the same year cattle prices plummeted.[160]

## D.    Defendants Benefit from High Barriers to Entry.

271. Defendants benefit from substantial barriers to entry into the market. Because of these barriers, the entry of new fed cattle slaughter businesses, or the repurposing of existing cow and bull slaughter facilities, is unlikely despite any decrease in the price of fed cattle or increase in the wholesale price of beef. Construction of large-scale fed cattle packing facilities require an upfront investment of over $250 million and can take years to get online due to permitting, planning, designing, and building requirements.[161]

---

[158] Lawrence Aylward, *Inside the JBS, Cargill deal*, MEAT + POULTRY (July 2, 2015), https://www.meatpoultry.com/articles/13164-inside-the-jbs-cargill-deal.

[159] Press Release, Cargill, JBS USA Pork agrees to purchase Cargill Pork business (July 1, 2015), https://www.cargill.com/news/releases/2015/NA31861255.jsp.

[160] Luciana Magalhaes, *With Cargill Purchase, Brazil's JBS Poised to Become No. 2 Pork Producer in U.S.*, WALL STREET JOURNAL (July 2, 2015, 3:18 PM), https://www.wsj.com/articles/with-cargill-purchase-brazils-jbs-poised-to-become-no-2-pork-producer-in-u-s-1435864508.

[161] *U.S. v. JBS* Amended Complaint, ¶41.

272. The construction of smaller plants, with capacity to slaughter 1,000 - 1,500 head per day, takes a similar amount of time and costs at least $150 million.[162] Re-purposing an existing plant, or reopening a similar sized, but previously shuttered, plant costs many millions of dollars.

273. Aside from the costs and time associated with opening a plant, new entrants face difficulties complying with a significant volume of regulations, finding and training a workforce of between 1,500 to 3,000 staff, and finding marketing outlets for the resultant beef. As such, the general principle in the industry is that a newly opened packing facility will lose at least 60% of its initial investment before it becomes profitable.

274. Given these substantial barriers, it is unsurprising that recent years have seen the failure of new or re-launched independent fed cattle Packer businesses, including Northern Beef Packers and Kane Beef.[163]

---

[162] Amanda Ranke, "*What's the Future for Northern Beef Packers?*" BEEF (July 22, 2013), www.beefmagazine.com/blog/whats-future-northern-beef-packers.

[163] Dirk Lammers, "*Aberdeen beef plant open again and slaughtering*" CAPITAL JOURNAL (Nov. 19, 2015), www.capjournal.com/news/aberdeen-beef-plant-open-again-and-slaughtering-cattle/article_b0a76552-8f0b-11e5-aab0-4747ca2759bc.html; Greg Henderson, "*Kane Beef Now under Court Receivership*," DROVERS (Oct. 16, 2018), www.drovers.com/article/kane-beef-now-under-court-receivership.

## DEFENDANTS HAVE SIMILAR COST STRUCTURES AND HAVE SIGNIFICANT OVERSIGHT OF EACH OTHER'S PRICE AND PRODUCTION DECISIONS

275. Because of their similar cost structures, Defendants have limited ability to steal market share from each other by operating with compressed meat margins (*i.e.*, bidding high for cattle and asking low for beef). But also because of their similar costs, Defendants have a common interest in manipulating the meat margin to extract increased profits from their existing market shares.

276. Defendants' field buyers' would routinely share market color obtained from weekly trips to inspect feedlots in their territory, including producers' reports of their competitors' activities, back to their respective head offices and their firm's other field buyers through daily conference calls.

277. For example, Witness 2 reported that the field buyers from Tyson Fresh, Swift, CMS, and National Beef assigned to his feedlot would call him each week to confirm who bought his cattle that week and on what terms. The field buyers would request this information even when they had not placed a bid that week. Witness 2 felt obligated to provide this information and did. Field buyers from Tyson Fresh, Swift/Packerland, CMS, and National Beef made similar requests of other producers and feedlots across the feeding regions. Most producers would provide this information, unwilling to risk alienating one of their buyers.

278. Defendants also directed their field buyers and other staff to drive past their competitors' plants to determine and report on those plants' operating levels (*e.g.*, whether the plant had reduced labor hours or was operating on Saturday). Tyson had a standing policy that precluded these directives, and the resulting reports about their competitors' operations, being put into writing and thus were done by phone call. On information and belief, JBS, Cargill, and National Beef had similar policies. The activities of their competitors, including their slaughter volumes, were discussed by those attending Defendants' daily planning meetings.

279. Tyson Fresh, Swift/Packerland, CMS, and National Beef also regularly purchased beef produced by each other. Each Defendant would typically use its competitor's beef to produce certain value-added beef products.

280. These realities, combined with widespread formal and informal reporting of fed cattle and beef bids, transactions and volumes, and each slaughter plant's current and planned output, enable Defendants to monitor each other's adherence to any anticompetitive agreement. The purchasing dynamics of the fed cattle

market, with its weekly cash trade, also provide Defendants with the ability to punish any suspected non-compliance with such an agreement.[164]

### DEFENDANTS ARE RECIDIVISTS WITH A HISTORY OF COLLUSION

281. Defendants' conduct is consistent with their previous use of production restraint to increase other commodities prices such as broiler chicken and pork, where JBS and Tyson have significant market shares. Cargill was the fourth largest U.S. pork processer until it sold its pork business to JBS in October 2015.

282. Broiler chicken and pork processers, including JBS and Tyson, are alleged to have engaged in a series of synchronized production cuts or restrictions designed to raise wholesale prices. The broiler chicken processors also allegedly manipulated the "Georgia Dock" price benchmark – a self-reported benchmark commonly used by market participants to set wholesale chicken prices.

283. In both cases, like here, the participants publicly called on each other to maintain supply discipline.

---

[164] Research shows that markets, such as the fed cattle market, where many sellers make repetitive sales to a small group of purchasers, facilitate the formation and maintenance of price-fixing agreements as they provide opportunities for the purchasers to agree, sustain and enforce market sharing arrangements. *See, e.g.,* "Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For," U.S. DOJ, ANTITRUST DIVISION, www.justice.gov/atr/public/guidelines/211578.htm.

284. Government investigations[165] and civil litigation[166] regarding the processers' alleged conspiracies are ongoing.

285. In addition, Defendants have a long history of other misconduct, spanning breaches of the Packers & Stockyards Act as well as antitrust, anti-corruption, environmental, health and safety regulation, both domestic and foreign.

### DEFENDANTS' CONDUCT IS THE SUBJECT OF ONGOING INVESTIGATIONS

## I. The DOJ is Investigating Defendants for Price-Fixing, Market Manipulation and Unfair Practices in the Cattle and Beef Markets

286. Defendants' conduct here is the subject of ongoing investigations by federal regulators and has elicited calls for investigations by numerous U.S. Senators, Members of Congress, State Attorneys General, and other state officials.

287. The CIDs were issued after appeals by numerous federal and state legislators and regulators calling for investigations into potential illegal and anti-competitive practices by Defendants.

288. For instance, starting in March 2020, numerous U.S. Senators urged the

---

[165] The Florida Attorney General's Antitrust Section opened an investigation into the broiler chicken processors' alleged anticompetitive practices, and the Georgia Department of Agriculture has suspended the Georgia Dock price index.

[166] *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772 (N.D. Ill. 2017) ("Defendants' business strategies during the relevant time period are indicative of a conspiracy."); *see also In re Pork Antitrust Litig.*, 18-cv-1776 (D. Minn).

DOJ to investigate anticompetitive practices in the cattle and beef packing industry including, among other things, price-fixing, market manipulation, and unfair practices.[167]

289. State Attorneys General and other state officials have also urged the DOJ to investigate "the dynamics that are depriving cattle ranchers and American

---

[167] *See* Mar. 19, 2020 Letter from U.S. Senators Rounds, Cramer, Hoeven, and Daines to U.S. A.G. William Barr and Assistant A.G. Makan Delrahim, https://www.rounds.senate.gov/imo/media/doc/Letter%20to%20Department%20of%20J ustice%20Regarding%20Cattle%20Prices.pdf; Mar. 31, 2020 Letter from U.S. Sen. Grassley to U.S. Dept. of Agric. Sec. Sonny Perdue and U.S. A.G. William Barr, https://www.grassley.senate.gov/sites/default/files/documents/2020-03-31%20CEG%20to%20DOJ%2C%20USDA%20%28Meat%20Packers%20Market%20Mani pulation%29.pdf; Apr. 9, 2020 Letter from U.S. Sen. John Thune to A.G. William Barr, https://www.thune.senate.gov/public/_cache/files/44f205ea-bdbf-42b0-aa17-5799f6f8069e/A5F971C3A71FD1DB1FC60E98C2416856.4.9.2020-final-cattle-market-doj-letter.pdf; Apr. 23, 2020 Letter from U.S. Sen. Tester, Booker, Jones, and Merkley to U.S. A.G. William Barr, https://www.jones.senate.gov/imo/media/doc/2020-04-23%20Letter%20to%20US%20AG%20Barr%20re%20Cattle%20Markets.pdf; May 12, 2020 Letter from U.S. Sen. Fischer, Daines, Enzi, Hoeven, Cramer, Barrasso, McSally, Blackburn, Ernst, Baldwin, Crapo, Jones, Rounds, Smith, Hyde-Smith, Risch, Sasse, Hawley, and Thune to U.S. A.G. William Barr, https://www.fischer.senate.gov/public/_cache/files/86f483c7-9bcb-41c0-9b7c-01cb3d029104/final-senate-letter-to-doj-packers-investigation-request-finalwsignature.pdf. Similarly, on July 15, 2020, U.S. Sen. Steven Daines requested the DOJ and the USDA to coordinate efforts in the ongoing investigations into the "allegations of market manipulation and anti-competitive behavior by meat packers in the cattle industry https://www.daines.senate.gov/imo/media/doc/2020.07.15%20USDA%20DOJ%20Cattle %20Investigation%20Expansion.pdf.

consumers of the benefits of a competitive cattle industry."[168] For example, in a letter to former Attorney General Barr dated May 5, 2020, numerous state Attorneys General offered to "work with [the DOJ] on a careful examination of the competitive dynamics of this industry." [169]

290. Other officials have called for investigations,"[170] including Texas Department of Agriculture Commissioner, Sid Miller[171] and U.S. Representative Lucas, who urged former Attorney General Barr "to share the findings of the Department's investigation with Congress as soon as possible so that

---

[168] *See* May 5, 2020 Letter from Attorneys General Wayne Stenehjem (ND), Philip Weiser (CO), Eric Schmitt (MO), Tim Fox (MT), Mark Brnovich (AZ), Lawrence Wasden (ID), Tom Miller (IA), Keith Ellison (MN), Douglas Peterson (NE), Jason Ravnsborg (SD), and Bridget Hill (WY) to U.S. A.G. William Barr (https://attorneygeneral.nd.gov/sites/ag/files/documents/MediaAttachments/2020-05-05-Barr%2C%20AG%20William.pdf) and May 21, 2020 Letter from Utah A.G. Reyes https://attorneygeneral.utah.gov/wp-content/uploads/2020/06/2020-05-21-Beef-Packing-Industry-Ltr-to-Attorney-General-William-Barr.pdf.

[169] *Id.*

[170] Letter from Kentucky Comm'r of Agric. Ryan Quarles and Kentucky A.G. Daniel Cameron to U.S. A.G. William Barr (May 15, 2020), https://kentucky.gov/Pages/Activity-stream.aspx?n=AttorneyGeneral&prId=914; Letter from Texas Dept. of Agric. Comm'r Sid Miller to U.S. A.G. William Barr (May 7, 2020), https://www.texasagriculture.gov/Portals/0/forms/COMM/Media/Beef_Ind_to_AG_Barr 20_v2.pdf.

[171] Letter from Texas Dept. of Agric. Comm'r Sid Miller to U.S. A.G. William Barr (May 7, 2020), https://www.texasagriculture.gov/Portals/0/forms/COMM/Media/Beef_Ind_to_AG_Barr 20_v2.pdf.

policymakers can address the concerns of their investigation and restore confidence back into cattle markets."[172]

291. The DOJ's investigation remains ongoing.

## A. The USDA is Investigating Defendants' Activities in Light of the Fire at Tyson's Holcomb Plant and Covid-19 related Market Disruptions.

292. As noted above, on August 28, 2019, the USDA launched an investigation into the conduct of Defendants and other beef packers in the aftermath of a fire at Tyson's Holcomb, Kansas slaughter and processing plant on August 9, 2019.

293. After the fire, Senator Thune, among others, raised concerns with the integrity of the cattle market, observing that "[t]he fact that losing just one beef plant in the United States created so much volatility in the cattle marketplace, including decreased cattle prices for producers and increased boxed beef prices, is deeply concerning."[173]

---

[172] Press Release, U.S. Rep. Frank Lucas, Lucas Statement on DOJ Investigation of Beef-Processing Industry (June 5, 2020), https://lucas.house.gov/news/press-releases/lucas-statement-doj-investigation-beef-processing-industry.

[173] Press Release, U.S. Sen. John Thune, Thune Hears From Livestock Industry Leaders on Market Transparency (Sept. 26, 2019), https://www.thune.senate.gov/public/index.cfm/2019/9/thune-hears-from-livestock-industry-leaders-on-market-transparency. Related concerns caused senators to request an investigation by the CFTC into whether parties were taking advantage of producers.[173] *See* U.S. Sen. Deb Fischer Letter to CFTC Chairman Heath Tarbert (Aug. 20, 2019), https://www.fischer.senate.gov/public/_cache/files/f33edda0-c81d-41bc-aa45-3ef1a7af3209/8.20.19-holcomb-letter-to-cftc.pdf.

294. Seven months later, in March 2020, when beef packing plants were forced to close due to infections of plant employees from the Covid-19 virus, Defendants' profits again soared—with the meat margin peaking at the highest level it had ever reached.

295. Following calls to expand USDA's investigation of beef pricing margins to include the market impacts arising from the COVID-19 plant shutdowns,[174] Secretary of Agriculture Sonny Purdue agreed, announcing on April 8, 2020, that the USDA would investigate cattle pricing throughout the pandemic, in conjunction with its continuing probe related to the 2019 Tyson plant fire.[175]

296. The USDA's July 22, 2020 report states that the "[f]indings thus far do not preclude the possibility that individual entities or groups of entities violated the Packers and Stockyards Act during the aftermath of the Tyson Holcomb fire and

---

[174] Letter from U.S. Sen. Deb Fischer to U.S. Dept. of Agric. Sec'y Perdue (Apr. 6, 2020), https://www.fischer.senate.gov/public/_cache/files/29ace091-e363-403e-b64d-96a35a31362e/4.6.20-df-letter-to-usda-psa---final.pdf; Letter from U.S. Sen. John Thune to U.S. Dept. of Agric. Sec'y Sonny Perdue (Apr. 8, 2020), https://www.thune.senate.gov/public/_cache/files/0ba58dff-e870-4e0e-98db-51f46b6f6d04/0A984CF95521AEFDB343398C84EE1564.4.8.2020-cattle-market-letter-to-perdue.pdf.

[175] Jacob Bunge & Brent Kendall, *Justice Department Issues Subpoenas to Beef-Processing Giants*, WALL STREET JOURNAL (June 5, 2020, 11:42 AM), https://www.wsj.com/articles/justice-department-issues-subpoenas-to-beef-processing-giants-11591371745.

the COVID-19 pandemic." It also states that the investigation into potential

violations of the Packers and Stockyards Act was ongoing. [176]

## B.    JBA S.A.'s Brazilian Parent and Related Companies are Guilty of Bribery and Corruption.

297. On October 14, 2020, J&F Investimentos, the parent company of defendant

JBS S.A, pleaded guilty to violations of the Foreign Corrupt Practices Act (FCPA),

and agreed to pay $128.25 million in criminal fines, half of the $256.5 million fines

levied, due to settlements made with Brazilian authorities.[177]

298. In referencing the investigations that led to the indictment and plea,

Senators Rubio and Menendez stated: "We are troubled that JBS S.A. used the ill-

gotten financing that it received ... , which totaled more than $1.3 billion, to acquire

American companies...." "[This] only underscores our concerns that the

questionable nature of JBS S.A.'s financial practices poses significant risks for its

---

[176] *Boxed Beef & Fed Cattle Price Spread Investigation Report*, USDA AMS, at 10 (July 22, 2020), https://www.ams.usda.gov/sites/default/files/media/CattleandBeefPriceMarginReport.pdf.

[177] Press Release, DOJ, J&F Investimentos S.A. Pleads Guilty and Agrees to Pay Over $256 Million to Resolve Criminal Foreign Bribery Case (Oct. 14, 2020), https://www.justice.gov/opa/pr/jf-investimentos-sa-pleads-guilty-and-agrees-pay-over-256-million-resolve-criminal-foreign; Jody Godoy & Sabrina Valle, *Parent of Brazil's JBS pleads guilty to U.S. foreign bribery charges*, REUTERS (Oct. 14, 2020, 11:07 AM), https://www.reuters.com/article/us-j-f-brazil-crime/parent-of-brazils-jbs-pleads-guilty-to-u-s-foreign-bribery-charges-idUSKBN26Z2FZ.

American subsidiaries and the U.S. food system."[178]

299. The SEC also commenced a civil case against J&F, JBS, and related entities. It alleged that these companies engaged in a massive bribery scheme of Brazilian officials and others to obtain investments that would facilitate JBS' acquisition of Pilgrim's Pride Corporation, a U.S. company, and through that acquisition, its entry into the United States markets.[179] "'Engaging in bribery to finance their expansion into the U.S. markets and then continuing to engage in bribery while occupying senior board positions at Pilgrim's reflects a profound failure to exercise good corporate governance,' said Charles Cain, Chief of the SEC Enforcement Division's FCPA Unit. 'This brazen misconduct flies in the face of what investors should expect from those occupying the role of an officer or director of a U.S. issuer' the SEC stated.'"[180]

300. J&F Investimentos S.A. and JBS S.A., a global protein producer, and its principals have agreed to pay nearly $27 million to resolve the SEC charges.[181]

---

[178] Letter from U.S. Senators Robert Menendez and Marco Rubio to Treasury Secretary Steven T. Mnuchin (Oct. 8, 2019), https://www.foreign.senate.gov/imo/media/doc/10-08-19%20RM%20Rubio%20letter%20Brazil%20CFIUS.pdf.

[179] *In the Matter of JBS, S.A. et al.*, Exchange Act Release No. 90170 (Oct. 14, 2020).

[180] Press Release, SEC, SEC Charges Brazilian Meat Producers with FCPA Violations (Oct. 14, 2020), https://www.sec.gov/news/press-release/2020-254.

[181] *Id.*

## STATUTE OF LIMITATIONS AND TOLLING

### I. Fraudulent Concealment

305. The statutes of limitations governing Plaintiffs' claims against Defendants were tolled under the doctrine of fraudulent concealment. The doctrine applies here because Defendants fraudulently concealed their misconduct through their own affirmative acts, and because Defendants' conduct was inherently self-concealing.

306. Defendants actively concealed their violations of law from Plaintiffs by, amongst other matters, (i) relying on non-public forms of communication; (ii) offering pre-textual justifications for their plant closures, slaughter reductions, low cattle prices and withdrawal from the cash cattle trade; (iii) explicitly and implicitly representing that the fed cattle bids and contract terms were the product of honest competition and not a conspiracy; (iv) affirmatively misrepresenting that they complied with applicable laws and regulations, including antitrust laws and (v) misrepresenting the nature of their agreements and their purported adherence to competitive safeguards to government officials and the general public. Below is a list of non-exhaustive examples of such statements and misrepresentations that each Defendant made after the initiation of the conspiracy:

a. Tyson's Code of Conduct extols its compliance with antitrust laws, stating that it "compete[s] in the market with integrity and compl[ies] with competition laws.... We comply with the letter and spirit of competition laws ... wherever we do business."[182] In SEC filings between 2015-2018, Tyson stated that they had "limited or no control" over the production and pricing of cattle, rather, the price is "determined by constantly changing market forces of supply and demand."[183] The Tyson Defendants also stated that they "ceased operations at our Denison, Iowa plant" to "better align our overall production capacity with current cattle supplies."[184] Further, the Tyson Defendants stated, "[t]he Beef segment earnings improved ... due to more favorable market conditions associated with an increase in cattle supply which resulted in lower fed cattle costs."[185]

---

[182] Tyson Code of Conduct, https://www.tysoncodeofconduct.com/suppliers-and-customers/competition (last accessed May 6, 2019).

[183] Tyson Foods, Inc., Annual Report (Form 10-K) at 7 (Oct. 3, 2015) ("Tyson 2015 Annual Report"); Tyson Foods, Inc., Annual Report (Form 10-K) at 7 (Oct. 1, 2016) ("Tyson 2016 Annual Report"); Tyson Foods, Inc., Annual Report (Form 10-K) at 6 (Sept. 30, 2017) ("Tyson 2017 Annual Report"); Tyson Foods, Inc., Annual Report (Form 10-K), at 7-8 (Sept. 29, 2018) ("Tyson 2018 Annual Report).

[184] Tyson 2015 Annual Report, at 56; Tyson 2016 Annual Report, at 54, 68; Tyson 2017 Annual Report, at 57, 72.

[185] Tyson 2016 Annual Report, at 23; *see also* Tyson 2017 Annual Report, at 23 ("The Beef segment experienced strong export demand and more favorable domestic market conditions associated with an increase in cattle supply."); Tyson 2018 Annual Report, at 25 (same).

b.  JBS's 2014 Annual Report detailed the policies it had in place to "ensure ethical conduct and integrity in the management of its business", including its Manual of Ethical Conduct, which "addresses issues related to violations, conflicts of interest, third-party contracts, employment practices, receiving gifts, decision making, anti-corruption practices and other sensitive topics."[186] JBS also launched an "Always Do The Right Thing" compliance program in June 2017 to "ensure that JBS implements the best global compliance program in the industry in order to restore the trust of its stakeholders."[187] Additionally, in November 2015, JBS executive, Andre Nogueira, stated that "Cattle price will go down [sic]" in the United States because "we are going to see more cattle available."[188] In March 2016, JBS CEO, Wesley Mendonca Batista, similarly stated that JBS would enjoy "better margin[s]" because of an "increase in the herd in the U.S."[189] Similar statements continued throughout 2016 and into 2017 and 2018, with JBS executives repeatedly stating that its strong financial performance in the United States was due to "more

---

[186]    JBS    2014    Annual    Report    at    45 – 46,    available    at https://jbss.infoinvest.com.br/enu/4362/20150601_RelatorioJBS_ingles_menor.pdf.

[187]    Available    at    https://jbss.infoinvest.com.br/enu/4197/JBS%20S.A.%20-%20Material%20Fact%20-%20Executive%20Committee2.pdf (last accessed May 6, 2019).

[188]    JBS, Q3 2015 Earnings Call, Bloomberg Transcript (Nov. 12, 2015) at 11.

[189]    JBS, Q4 2015 Earnings Call, Bloomberg Transcript (Mar. 17, 2016) at 6.

cattle available in the U.S.,"[190] "cattle price[s] ... [being] back to the normal level,"[191] "greater cattle availability,"[192] and "strong demand for beef."[193] JBS made these pre-textual public statements to conceal its participation in the conspiracy. Rather than disclose that the "improvement in EBITDA margin" JBS touted, in fact, reflected the supracompetitive profits of Defendants' unlawful conspiracy, it instead offered the innocuous pretexts of "greater cattle availability" and cattle prices mysteriously being "back to the normal level."

c.  Cargill stressed in its 2015 Corporate Responsibility report that "[w]e obey the law. Obeying the law is the foundation on which our reputation and Guiding Principles are built.... We conduct our business with integrity.... We compete vigorously, but do so fairly and ethically. We ... comply with the laws and regulations that support fair competition and integrity in the marketplace." Cargill reiterated this message in its subsequent Corporate Responsibility reports and on its website.[194] To further the conspiracy, Cargill also repeatedly issued pre-textual

---

[190]  JBS, Q2 2016 Earnings Call, Bloomberg Transcript (Aug. 11, 2016) at 6.

[191]  JBS, Q3 2016 Earnings Call, Bloomberg Transcript (Nov. 16, 2016) at 10.

[192]  JBS, Q1 2017 Earnings Call, Bloomberg Transcript (May 16, 2017) at 2.

[193]  JBS, Q2 2018 Earnings Call, Bloomberg Transcript (Aug. 15, 2018) at 4.

[194] *See* "Ethics & Compliance" https://www.cargill.com/about/ethics-and-compliance (last accessed May 6, 2019).

public statements to conceal Defendants' anticompetitive behavior. For example, in May 2018, Cargill reported that "excellent results in North American beef" led the company's Animal Nutrition & Protein segment to deliver the largest share of corporate earnings on the year. Cargill concealed the true reason for its "excellent results," instead attributing them simply to "lower cattle costs and rising demand in both domestic and export markets." Similarly, in its 2017 Annual Report, Cargill reported that "favorable market conditions in North America" were simply the product of "[r]enewed consumer demand for beef...." In 2018, Cargill announced that its Animal Nutrition & Protein business surpassed even the prior year's "strong performance," "fueled by rising domestic and export demand for North American beef...."

d.  National Beef's former majority shareholder, Jefferies Financial Group, Inc. (formerly Leucadia National Corporation) noted in its 2014 Annual Report that National Beef was "subject to extensive government regulation" and was subject to the Packers and Stockyards Act. To further the conspiracy, National Beef/Jefferies repeatedly issued pre-textual public statements to conceal Defendants' conspiracy. On information and belief, National Beef was the original and knowing source of every pre-textual public statement ostensibly made by

Jefferies and/or Marfrig to conceal Defendants' conspiracy. For example, in October 2015, Jefferies Financial Group stated that the expected expansion of the cow-herd "bodes well for [packing industry] margins as it will lead to an increase in the number of fed cattle available for slaughter."[195] In October 2016, Jefferies Financial Group touted that the "rebuilding of the domestic US cattle herd ha[d] dramatically affected the market for fed cattle" when explaining how "[f]rom June 27, 2015 to June 25, 2016, the average market price per pound of fed cattle has fallen from $1.48 to $1.16."[196] Jefferies Financial Group continued to offer similar explanations in 2017 and 2018, noting, for example, that: "National Beef generated record results for [Last Twelve Months] on the back of a more balanced supply of cattle and robust end market demand";[197] "an increased supply of cattle in 2017 has driven higher margins and greater capacity utilization versus 2016";[198] "pre-tax income grew by $78.3 million, as increased cattle availability and strong

---

[195]  Leucadia National Corp. (Jefferies Financial Group), 2015 Investor Day Presentation at 118 (Oct. 8, 2015).

[196]  Leucadia National Corp. (Jefferies Financial Group), 2016 Investor Meeting Presentation at 53 (Oct. 5, 2016).

[197]  Leucadia National Corp. (Jefferies Financial Group), 2017 Investor Meeting at 1 (Oct. 5, 2017).

[198]  *Id*. at 58.

demand for beef continued to support strong margins";[199] and "because the peak in supply of fed cattle ready for slaughter lags the peak size of the beef cowherd, throughput should continue to increase for at least the next several years, supporting continued above-average packer margins."[200] National Beef's CEO and President, Tim Klein, attended the Jefferies Financial Group Investor Day presentations in 2015, 2016, and 2017 at which the above statements were made.[201] Mr. Klein was the designated speaker for the portion of these events directed to National Beef's performance. Marfrig continued to offer similar pre-textual explanations for the low prices caused by Defendants' anticompetitive agreement after it bought a controlling stake in National Beef. For example, in November 2018, Marfrig reported that "[i]n the United States, the cattle availability combined with stronger domestic and international demand has been supporting better

---

[199]  Jefferies Financial Group, 2017 Annual Report (Form 10-K) at 33 (Feb. 28, 2018).

[200]  Jefferies Financial Group Inc, 2018 Investor Meeting at 61 (Oct. 4, 2018). National Beef director, and Jefferies Capital Partners Managing Director, Nick Daraviras, presented in relation to National Beef at this event, further noting that "favorable supply and demand dynamics continue, leading to an enhanced margin environment industry-wide".

[201]  Press Release, *Leucadia to Host Investor Day on October 8, 2015*, Leucadia National Corp. (Jefferies Financial Group) (Sept. 1, 2015), http://www.leucadia.com/All/1/1113; Press Release, *Leucadia to Host Investor Day on October 5, 2016*, Leucadia National Corp. (Jefferies Financial Group) (Sep. 12, 2015), http://www.leucadia.com/All/1/1113; Press Release, *Leucadia to Host Investor Day on October 5, 2017*, Leucadia National Corp. (Jefferies Financial Group) (Sept. 13, 2017), http://www.leucadia.com/All/1/1113.

margins."[202] Marfrig executives reiterated the point on the company's earnings call for the third quarter of 2018, stating that "the U.S. beef industry has delivered record results" thanks to "an ample supply of cattle" and "strong demands [sic] in both the domestic and international markets."[203] Marfrig acknowledged that it achieved these "record results" and "better margins" while reducing cattle slaughter volumes – but the company claimed that its reduced slaughter volumes were merely the result of there being "fewer weeks in the third quarter 2018 compared to the third quarter 2017."[204] National Beef CEO, Timothy M. Klein – referred to as "CEO of [Marfrig's] North American Operations" by Marfrig CEO, Eduardo de Oliveira Miron – participated in this call.[205] Similarly, in the fourth quarter of 2018, Marfrig announced that it achieved a "[s]olid result from North America Operation, sustained by strong demand for beef protein and the higher cattle availability."[206] Jefferies and Marfrig made these pre-textual public statements on behalf of National Beef – which, as pleaded above, was the original

---

[202]  Marfrig Global Foods S.A., Earnings Release 3Q18 (Nov. 5, 2018) at 2.

[203]  Marfrig, Q3 2018 Earnings Call, Bloomberg Transcript (Nov. 6, 2018) at 5.

[204]  *Id*. at 3.

[205]  *Id*. at 2.

[206]  Marfrig Global Foods, Earnings Conference Call 4Q18 and 2018 Presentation (Feb. 28, 2018) at 8.

and knowing source of the pre-textual public statements – to conceal its participation in the conspiracy. Rather than disclose that its "record results" and "better margins" in fact reflected the supracompetitive profits of Defendants' unlawful conspiracy, Jefferies and Marfrig echoed the innocuous pretexts offered up by the Tyson, JBS, and Cargill Defendants – suggesting, falsely, that "ample supply of cattle," "higher cattle availability," and "strong demand" were responsible for its supracompetitive profits. Because of Defendants' fraudulent concealment, Plaintiffs had insufficient information concerning Defendants' misconduct on which to base a complaint.

307. Defendants' conspiracy was inherently self-concealing because it relied on secrecy for its successful operation. Had the public learned that Defendants conspired to fix fed cattle prices, their conspiracy could not have continued for as long as it did. Accordingly, Plaintiffs could not have learned of Defendants' anticompetitive conduct until recently.

308. Because of Defendants' fraudulent concealment, Plaintiffs were not aware of Defendants' misconduct and could not have discovered it through the exercise of due diligence until recently. Plaintiffs acted diligently in seeking to bring their claims promptly.

309. Accordingly, Plaintiffs assert that the applicable statutes of limitations on Plaintiffs' claims were tolled. Defendants are also equitably estopped from asserting any statute of limitations defense.

310. Additionally, Defendants' conspiratorial conduct has caused and continues to cause continuing injuries to Plaintiffs. To the extent any statute of limitations was previously triggered – which is expressly disputed – these continuing injuries constitute continuing violations that start any statutory period running again.

311. The conspiracy alleged above began at least as early as January 1, 2015 and continued into the years beyond.

312. The Complaint alleges numerous conspiratorial acts and parallel conduct by each Defendant occurring within any applicable statutory period.

313. As a result of the anticompetitive conduct challenged in this Complaint, beginning at least as early as January 1, 2015 and to the present, Defendants were able to and did (i) purchase cash cattle at artificially suppressed cash prices, (ii) purchase cattle at artificially suppressed prices pursuant to formula, forward, and/or grid contracts, and (iii) transact in live cattle futures and options at artificially suppressed prices.

314. Thus, each Defendant's purchase of fed cattle, and its resulting impact on feeder cattle prices, at artificial and non-competitive prices constituted a new overt act causing injury to Plaintiffs and the proposed classes.

315. Defendants' unlawful conduct described above continues to this day.

CLASS ALLEGATIONS

316. Plaintiffs bring this action on behalf of themselves and under Federal Rule of Civil Procedure 23(a), (b)(1), and (b)(2) as representatives of two classes of indirect sellers seeking injunctive relief defined as:

> All natural persons and entities in the United States that sold cattle to any natural person or entity that in turn sold cattle to one or more of the Defendants from January 1, 2015, until the anticompetitive conduct alleged herein ends (the "Class Period") (the "Nationwide Injunctive Relief Class").[207]

> All natural persons and entities in the United States that sold cattle to an intermediary that itself sold cattle to another intermediary or to a member of the National Injunctive Relief Class during the Class Period (the "Upstream Nationwide Injunctive Relief Class").

---

[207] Direct sales to any Defendant are excluded from all proposed classes, as are sales made on a cost-plus basis. Also excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, officers, executives, and employees; defendants' attorneys in this case, federal government entities and instrumentalities, states or their subdivisions, and all judges assigned to this case.

317. Plaintiffs also bring this action under Fed. R. Civ. P. 23(a) and (b)(3) as representatives of two nationwide classes seeking damages for violations of the Packers and Stockyards Act, 7 U.S.C. §§ 181 – 229, defined as:

> All natural persons and entities in the United States that sold cattle to any natural person or entity that in turn sold cattle to one or more of the Defendants during the Class Period (the "Nationwide Damages Class").

> All natural persons and entities in the United States that sold cattle to an intermediary that itself sold cattle to another intermediary or to a member of the Nationwide Damages Class during the Class Period (the "Upstream Nationwide Damages Class").

318. Plaintiffs also bring this action under Fed. R. Civ. P. 23(a) and (b)(3) as representatives of two classes seeking damages for violations of various state antitrust and consumer protection laws, defined as:

> All natural persons and entities in the United States that sold cattle to any natural person or entity that in turn sold cattle to one or more of the Defendants during the Class Period in Alabama, Arizona, Arkansas, California, Colorado, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin ("State Law Damages Class").

> All natural persons and entities in the United States that sold cattle to an intermediary that itself sold to another intermediary or to a member of the State Law Damages Class during the Class Period in Alabama, Arizona, Arkansas, California, Colorado, Connecticut, the

District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin (the "Upstream State Law Damages Class").

### CLAIMS FOR RELIEF

### COUNT I: MARKET ALLOCATION AND PRICE-FIXING IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. §1 (ON BEHALF OF THE NATIONWIDE INJUNCTIVE RELIEF CLASSES)

319. Plaintiffs incorporate each prior paragraph as if set forth herein.

320. At all relevant times, Defendants controlled the slaughter of fed cattle in the United States and the available marketing outlets for fed cattle producers. Defendants are horizontal competitors in buying fed cattle.

321. From at least January 1, 2015 and continuing to the present, the exact dates being unknown to Plaintiffs, Defendants engaged in a continuing agreement, understanding and conspiracy in an unreasonable and unlawful restraint of trade to allocate the market for, and artificially fix, depress, suppress, or stabilize the price of, fed cattle in violation of Section 1 of the Sherman Act, 15 U.S.C. §1. Defendants' conspiracy is a *per se* violation of federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

154

322. Defendants' price fixing conspiracy deprived market participants up the supply chain in the relevant market of the benefit of price competition. The price impact on feeder cattle is traceable through the product distribution chain.

323. Defendants' conspiracy and the resulting impact on fed and feeder cattle received by producers occurred in and affected U.S. interstate commerce.

324. As a material and proximate result of Defendants' unlawful conduct, Plaintiffs suffered injury to their business and property. These injuries included, but were not limited to, receiving artificial and non-competitive prices for their feeder cattle. Plaintiffs were also deprived of the benefits of free and open competition.

325. Plaintiffs are threatened with future injury to their businesses and property unless Defendants are enjoined from further unlawful conduct.

326. Plaintiffs accordingly seek equitable and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable laws, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct and to assure that similar anticompetitive conduct and effects do not continue or reoccur in the future.

## COUNT II: VIOLATIONS OF PACKERS AND STOCKYARDS ACT, 7 U.S.C. §§ 192 AND 209 (ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE DAMAGES CLASSES)

327. Plaintiffs incorporate each prior paragraph as if set forth herein.

328. Title 7 U.S.C. §192 provides, in pertinent part, "[i]t shall be unlawful for any packer with respect to livestock ... to ... (a) [e]ngage in or use any unfair, unjustly discriminatory, or deceptive trade practice or device; or ... (e) [e]ngage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce; or (f) [c]onspire, combine, agree, or arrange with any other person (1) to apportion territory for carrying on business, or (2) to apportion purchases or sales of any article, or (3) to manipulate or control prices; or (g) [c]onspire, combine, agree, or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by subdivisions (a), (b), (c), (d), or (e)."

329. Title 7 U.S.C. §209 further provides that, "[i]f any person subject to this chapter violates any of the provisions of this chapter ... relating to the purchase, sale, or handling of livestock, ... he shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such

violation." Such liability may be enforced "by suit in any district court of the United States of competent jurisdiction[.]"

330. Deceptive trade practices under the Packers and Stockyards Act are addressed in 9 C.F.R. Part 201. Section 201.70 states "[e]ach packer and dealer engaged in purchasing livestock, in person or through employed buyers, shall conduct his buying operations in competition with, and independently of, other packers and dealers similarly engaged."

331. From at least January 1, 2015, and continuing to the present, the exact dates being unknown to Plaintiffs, Defendants violated 7 U.S.C. §192(a), (e), (f), and (g) by engaging in a course of business and doing acts for the purpose or with the effect of reaching and implementing a conspiracy, combination, agreement, or arrangement to allocate the market for, and artificially fix, depress, suppress, or stabilize the price of fed cattle, with the purpose or with the effect of suppressing and reducing competition among purchasers of fed cattle.

332. The effect of these acts and this conspiracy, combination, agreement, or arrangement, was to fix, depress, suppress, stabilize, or otherwise artificially manipulate the price of fed cattle bought by Defendants, with the purpose or with the effect of suppressing and reducing competition among purchasers of fed cattle.

Defendants had no legitimate business justification for these acts and this conspiracy, combination, agreement, or arrangement.

333. As a proximate result of Defendants' breaches of the Packers and Stockyards Act, Plaintiffs have been damaged in their business and property.

### COUNT III: VIOLATION OF STATE ANTITRUST LAW
### (ON BEHALF OF STATE LAW DAMAGES CLASSES)

334. Plaintiffs incorporate each prior paragraph as if set forth herein.

335. By engaging in the foregoing conduct, Defendants wrongfully engaged in conduct, a combination, and/or conspiracy in restraint of trade in violation of the following state antitrust laws, with respect to class sales in the below respective States and/or class sales made by residents of the below States:

    a.      Ala. Code §§ 8-10-1, et seq., and Ala. Code § 6-5-60(a);

    b.      Ariz. Rev. Stat. §§ 44-1402, et seq.

    c.      Ark. Code Ann. §§ 4-75-309, et seq.

    d.      Cal. Bus. and Prof. Code §§ 16720, et seq.

    e.      Conn. Gen. Stat. Ann. §§ 35-26, et seq.

    f.      D.C. Code §§ 28-4502, et seq.

    g.      Haw. Rev. Stat §§ 480-1, et seq.

    h.      740 Ill. Comp. Stat. 10/3, et seq.

i.       Iowa Code §§ 553.4, et seq.

j.       Kan. Stat. Ann. §§ 50-101, et seq. and 50-158, et seq.

k.       Me. Stat. tit. 10 §§ 1101, et seq.

l.       Md. Code, Com Law, §§ 11-204, et seq.

m.       Mich. Comp. Laws §§ 445.772, et seq.

n.       Minn. Stat. §§ 325D.49, et seq.

o.       Miss. Code Ann. §§ 75-21-3, et seq.

p.       Neb. Rev. Stat. §§ 59-801, et seq.

q.       Nev. Rev. Stat. §§ 598A.060, et seq.

r.       N.H. Rev. Stat. Ann. §§ 356:2, et seq.

s.       N.M. Stat. Ann. §§ 57-1-1, et seq.

t.       N.Y. Gen. Bus. Law §§ 340, et seq.

u.       N.C. Gen. Stat. §§ 75-1, et seq.

v.       N.D. Cent. Code §§ 51-08.1-02, et seq.

w.       Or. Rev. Stat. §§ 646.725, et seq.

x.       R.I. Gen. Laws §§ 6-36-4, et seq.

y.       S.D. Codified Laws §§ 37-1-3.1, et seq.

z.       Tenn. Code Ann. §§ 47-25-101, et seq.

aa.    Utah Code Ann. §§ 76-10-3104, et seq.

bb.    Vt. Stat. Ann. Tit. 9 §§ 2453, et seq.

cc.    W. Va. Code §§ 47-18-1, et seq.

dd.    Wis. Stat. §§ 133.03, et seq.

336. Plaintiffs and members of the State Law Damages Classes have been injured by Defendants' antitrust violations alleged in this Claim, including receiving lower prices for their feeder cattle, which were sold in a market dramatically and detrimentally impacted by Defendants' anticompetitive conduct. But for such conduct, Plaintiffs would have sold their feeder cattle in a properly functioning, competitive market for higher prices. These injuries are of the type that the foregoing laws are intended to prevent, and flow from that which makes Defendants' conduct unlawful.

337. Plaintiffs and the State Law Damages Classes seek all damages permitted by law for their injuries by Defendants' violations of the aforementioned statutes.

### COUNT IV: VIOLATION OF STATE CONSUMER PROTECTION LAW
### (ON BEHALF OF STATE LAW DAMAGES CLASSES)

338. Plaintiffs incorporate each prior paragraph as if set forth herein.

339. By engaging in the unfair and unlawful conduct alleged in this Complaint and with respect to class sales in the below respective States and/or class sales

made by residents of the below States, Defendants violated the following state consumer protection laws:

      a.      Ariz. Rev. Stat. Ann. §§ 44-1521, et seq.

      b.      Cal. Bus. & Prof. Code §§ 17200, et seq.

      c.      Colo. Rev. Stat. §§ 6-1-101, et seq.

      d.      Fla. Stat. §§ 501.201, et seq.

      e.      815 Ill. Comp. Stat. 505/1, et seq.

      f.      Nev. Rev Stat. Ann. §§ 598.0903, et seq.

      g.      N.M. Stat. Ann. §§ 57-12-1, et seq.

      h.      N.Y. Gen. Bus. Law §§, et seq.

      i.      N.C. Gen. Stat. §§ 75-1.1, et seq.

      j.      Or. Rev. Stat. §§646.605, et seq.

      k.      Tenn. Code Ann. §§ 47-18-101, et seq.

      l.      Wis. Stat. § 100.20.

340. On behalf of themselves and the State Law Damages Classes, Plaintiffs seek all appropriate relief provided for under the above statutes.

## PRAYER FOR RELIEF

341. Plaintiffs request relief as follows:

A. That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the federal laws set forth above;

B. That the Court award Plaintiffs damages, treble and multiple damages, interest, punitive damages, and/or restitution in an amount to be determined at trial;

C. That the Court issue appropriate injunctive and other equitable relief against Defendants;

D. That the Court award Plaintiffs pre- and post-judgment interest;

E. That the Court award Plaintiffs their costs of suit, including reasonable attorneys' fees and expenses, including costs of consulting and testifying experts; and

F. That the Court award any and all such other relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all matters so triable.

Dated: October 18, 2023

Mikal C. Watts
**WATTS GUERRA LLC**
Millennium Park Plaza RFO
Suite 410, CII2
Guaynabo, Puerto Rico 00966
Telephone: (210) 447-0500
mcwatts@wattsguerra.com

Frank Guerra
Alicia O'Neil
**WATTS GUERRA LLC**
5726 W. Hausman, Suite 119
San Antonio, Texas 78249
Telephone: (210) 447-0500
fguerra@wattsguerra.com
aoneill@wattsguerra.com

Respectfully submitted,

*/s/ Richard M. Paul III*
Richard M. Paul III
Ashlea Schwarz
David Bodenheimer
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone:  (816) 984-8100
Rick@PaulLLP.com
Ashlea@PaulLLP.com
David@PaulLLP.com

Tab Turner
**TURNER & ASSOCIATES, P.A.**
4705 Somers Avenue
North Little Rock, Arkansas 72116
Telephone: (501) 791-2277
tab@tturner.com

**ATTORNEYS FOR INDIRECT SELLER PLAINTIFFS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies on October 18, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

*/s/ Richard M. Paul III*