UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE CATTLE AND BEEF ANTITRUST LITIGATION | MDL No. 22-3031 (JRT/JFD) |
| *This Document Relates To:* <br><br> THE INDIRECT SELLER ACTION ("*Specht* Case"), Civil No. 22-2903 | MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THE *SPECHT* AMENDED COMPLAINT |

Richard M. Paul, III, **PAUL LLP**, 601 Walnut Street, Suite 300, Kansas City, MO 64106; Michael Montaño, **GUERRA LLP**, 875 East Ashby Place, Suite 1200, San Antonio, TX 78212, for Plaintiffs.

Kosta S. Stojilkovic, **WILKINSON STEKLOFF LLP**, 2001 M Street, Northwest, 10th Floor, Washington, D.C. 20036, for Defendants Cargill, Incorporated and Cargill Meat Solutions Corporation.

Chelsea A. Bollman, **JONES DAY**, 90 South Seventh Street, Suite 4950, Minneapolis, MN 55402, for Defendant National Beef Packing Company, LLC.

Jon B. Jacobs, **PERKINS COIE LLP**, 700 13th Street, Northwest, Suite 800, Washington, D.C., 20005, for Defendants Tyson Foods, Inc., and Tyson Fresh Meats, Inc.

Jessica J. Nelson, **SPENCER FANE**, 100 South Fifth Street, Suite 2500, Minneapolis, MN 55402, for Defendants JBS USA Food Company, JBS Packerland, Inc., Swift Beef Company, and JBS S.A.

The putative *Specht* Class Members ("Plaintiffs") filed an Amended Complaint on behalf of producers of feeder cattle who indirectly sell cows and calves to one or more

Defendants in this action. Defendants now move to dismiss Plaintiffs' Amended Complaint.

Because Plaintiffs have not clearly demonstrated that they are producers of feeder cattle as that term is understood by the CME Feeder Cattle Index and beef production industry at large, their new allegations fail to establish causation and a direct injury as would be necessary for antitrust standing. The Court will therefore dismiss Plaintiffs' Sherman Act, Packers and Stockyards Act, and state antitrust and consumer protection claims for lack of antitrust standing under *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983). The Court will also dismiss the remaining state law claims arising under Colorado and Florida laws.

## BACKGROUND

### I. FACTS

The Plaintiffs' factual allegations remain largely the same as those outlined in the Court's prior order. *See In re Cattle and Beef Antitrust Litig.*, No. 22-3031, 2023 WL 5310905, at *1–2 (D. Minn. Aug. 17, 2023). As such, the Court will only summarize and address newly alleged facts relevant to the current motion.

Cow-calf operations are the first step in the beef supply market. (Am. Compl. ¶ 62, Oct. 18, 2023, Docket No. 371.)[1]; *see also In re Cattle and Beef Antitrust Litig.*, 2023 WL 5310905, at *1 (depicting diagram of beef production market). Cow-calf entities retain

---

[1] Unless otherwise noted, all citations are to Case No. 22-3031.

cattle for the gestation period and then raise the calves until they are weaned from their mothers. (Am. Compl. ¶¶ 62–63.); *In re Cattle and Beef Antitrust Litig.*, 2023 WL 5310905, at *1. After the cattle are weaned, they are raised until they are large enough for finishing at the feedlots—generally, when they are between 600 to 800 pounds. (Am. Compl. ¶ 63.) Ranchers can raise the cattle until they are large enough for finishing and sell directly to a feedlot or, if the cattle are too small or light to enter the feedlot, to stockers or backgrounders, who will raise the cattle until they are large enough for finishing. (*Id.*); *In re Cattle and Beef Antitrust Litig.*, 2023 WL 5310905, at *1. Feedlots or finishing operations are the final phase of the beef production system, wherein the cattle are fed to harvest weight. (Am. Compl. ¶ 64.) Once cattle reach between 950 and 1,500 pounds, they become fed cattle. (*Id.*) The finishing process generally takes less than 6 months. (*Id.*) Fed cattle are sold and slaughtered at packing plants operated by packers like Defendants. (*Id.* ¶ 66.) The entire cattle production cycle from birth to slaughter is typically 15 to 24 months. (*Id.* ¶ 68.)

In their Amended Complaint, Plaintiffs relabel themselves as producers of feeder cattle who indirectly sell cattle to one or more Defendants in this case. (*Id.* ¶ 2.) Feeder cattle are ultimately sold as "fat" or "fed" cattle. (*Id.* ¶ 7.) Plaintiffs define feeder cattle as "calves, steers, or heifers raised by cow-calf-entities, ranchers, or backgrounders in the United States, which feedlots use to produce fed cattle." (*Id.* ¶ 1 n.1.) This expansion of Plaintiffs from cow-calf ranchers to producers of feeder cattle in effect expands to include

all indirect sellers, including cow-calf-entities, ranchers, and backgrounders. (*Compare* No. 22-2903, Class Action Compl. ¶ 1, Oct. 31, 2022, Docket No. 1, *with* Am. Compl. ¶ 2.)

Plaintiffs reassert the same price-fixing conspiracy by Defendants as in their original complaint. *See In re Cattle and Beef Antitrust Litig.*, 2023 WL 5310905, at *2. They assert that Defendants conspired to suppress the price of fed cattle, and that their coordinated conduct caused a collapse in fed cattle prices in 2015, which in turn caused the prices of feeder cattle to collapse. (Am. Compl. ¶¶ 1, 4.) Plaintiffs newly allege that Defendants' prices for fed cattle have a direct impact on the prices that they receive for feeder cattle. (*Id.* ¶ 3.) In support, they provide the following chart comparing the CME Feeder Cattle Index to fed cattle prices. (*Id.* ¶ 3, Fig. 1.)



As the chart illustrates, Plaintiffs claim there was a correlation between fed cattle prices and feeder cattle prices between 2016 and 2020 that demonstrates the causal relationship between those prices. (*Id.* ¶ 3.)

Plaintiffs bring two putative classes for each claim type: a nationwide class and an upstream nationwide class. (*See id.* ¶ 316.) The putative nationwide classes include Plaintiffs who sold cattle to natural persons or entities who in turn sold to Defendants, so are two links removed from Defendants' conduct. (*Id.*) The putative upstream nationwide classes include Plaintiffs who sold cattle to intermediaries who in turn sold to another intermediary or a member of the nationwide classes, so are multiple links removed from Defendants' conduct. (*Id.*)

## II. PROCEDURAL HISTORY

As with the factual history, the Court does not find it necessary to repeat the entire procedural history of this case, so it will only summarize the relevant history here. *See In re Cattle and Beef Antitrust Litig.*, 2023 WL 5310905, at *2–3. The Court granted Defendants' motion to dismiss Plaintiffs' original complaint without prejudice after finding that Plaintiffs failed to establish antitrust standing. *Id.* at *12. Plaintiffs filed the Amended Complaint with leave of the Court. (*See generally* Am. Compl.) Named Plaintiffs James Specht, Jerry Kelsey, Richard Settlemyer, and David Hyatt own and operate farms or ranches that raise and sell cattle at auctions, barn sales, or, for Mr. Hyatt, sometimes directly to a feedlot. (Am. Compl. ¶¶ 24–27.) Plaintiffs re-allege nationwide claims based on market allocation and price-fixing in violation of the Sherman Act (Count I) and the

Packers and Stockyards Act (Count II). (*Id.* ¶¶ 319–33.) They also re-allege state law claims based on violations of antitrust laws (Count III) and consumer protection laws (Count IV). (*Id.* ¶¶ 334–40.) Defendants moved to dismiss Plaintiffs' Amended Complaint. (Joint Mot. Dismiss, Nov. 21, 2023, Docket No. 453.)

## DISCUSSION

### I.   STANDARD OF REVIEW

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a "claim to relief that is plausible on its face." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). At the motion to dismiss stage, the Court may consider the allegations in the complaint as well as "those materials that are necessarily embraced by the pleadings." *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The Court construes the complaint in the light most favorable to the plaintiff, drawing all inferences in the plaintiff's favor. *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). Although the Court accepts the complaint's factual allegations as true and construes the complaint in a light most favorable to the plaintiff, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). In other words, a complaint

"does not need detailed factual allegations" but must include more "than labels and conclusions, and a formulaic recitation of the elements" to meet the plausibility standard. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## II.   ANALYSIS

Defendants argue that the Amended Complaint still fails to adequately establish antitrust standing as is required for many of Plaintiffs' claims under *Associated General Contractors of California, Inc. v. California State Council of Carpenters ("AGC")*, 459 U.S. 519 (1983). They also claim that Plaintiffs' remaining state law claims should be dismissed. The Court will address each issue in turn.

### A.   Antitrust Standing

The Amended Complaint brings antitrust claims under the Sherman Act and the antitrust laws of 30 states.[2] It also brings consumer protection claims under the laws of 12 states.[3] The Court previously found that Plaintiffs must show antitrust standing not only for their claims under the Sherman Act and many of the state antitrust laws, but also for their claims under the Packers and Stockyards Act ("PSA") and many of the state

---

[2] Plaintiffs bring antitrust claims on behalf of state law damages classes in Alabama, Arizona, Arkansas, California, Connecticut, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. (Am. Compl. ¶ 335.)

[3] Plaintiffs bring state consumer protection claims on behalf of state law damages classes in Arizona, California, Colorado, Florida, Illinois, Nevada, New Mexico, New York, North Carolina, Oregon, Tennessee, and Wisconsin. (Am. Compl. ¶ 339.)

consumer protection laws. *In re Cattle and Beef Antitrust Litig.*, 2023 WL 5310905, at *4, 8–9.

*AGC* establishes six factors to determine whether a plaintiff has antitrust standing:

> (1) The causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) Improper motive; (3) Whether the injury was of a type that Congress sought to redress with the antitrust laws; (4) The directness between the injury and the market restraint; (5) The speculative nature of the damages; (6) The risk of duplicate recoveries or complex damage apportionment.

*Midwest Commc'ns v. Minn. Twins, Inc.*, 779 F.2d 444, 450 n.6 (8th Cir. 1985). This inquiry essentially results in a determination of whether "the plaintiff [is] the target of the anticompetitive activity, not one who has merely suffered indirect, secondary, or remote injury." *Id.* at 451 (citation and internal quotations omitted). The Court will analyze each factor in turn.

### 1. Causal Connection

The Court must first consider the "causal connection between the alleged antitrust violation and the harm to the plaintiff." *McDonald v. Johnson & Johnson*, 722 F.2d 1370, 1374 (8th Cir. 1983). The Court previously found this factor weighed against antitrust standing because Plaintiffs failed to allege how manipulating fed cattle prices impacted cow-calf prices. *In re Cattle and Beef Antitrust Litig.*, 2023 WL 5310905, at *4–5. Plaintiffs, relabeled as producers of feeder cattle, newly allege that Defendants' conduct directly impacts the price of feeder cattle, as demonstrated by the chart comparing the CME Feeder Cattle Index to fed cattle prices. Plaintiffs also point to statements by industry

experts who claim that "[t]he most important factor influencing feeder cattle prices is the price of the animal when finished," and that "[f]eeder cattle markets are expectation markets that are primarily driven by two things: (1) the expected value of fed cattle in the future and (2) the cost of getting those feeder cattle to that point." (Am. Compl. ¶¶ 236, 239.)

While Plaintiffs have alleged that feeder cattle prices are determined—at least in part—by fed cattle prices, their allegations depend on one key fact: whether Plaintiffs are producers of feeder cattle as that term is understood by the industry. If they are not, then they have failed to establish a causal connection, because the CME Feeder Cattle Index and industry data on which they newly rely pertain to feeder cattle.

The industry appears to define feeder cattle as cattle that are put onto feedlots for slaughter that are of a certain weight and frame type.[4] Most notably, the CME Feeder Cattle Index, upon which Plaintiffs rely substantially in alleging a relationship between feeder cattle and fed cattle, refers to feeder cattle as medium and large frame cattle "being placed on feed at the feedlot" that are between 700 to 899 pounds.[5] This

---

[4] *See* Hedging with the CME Feeder Cattle Index (Dec. 21, 2018), https://www.cmegroup.com/education/articles-and-reports/hedging-with-the-cme-feeder-cattle-index-white-paper.html.

[5] *Compare* Hedging with the CME Feeder Cattle Index, *and* CME Rulebook Chapter 102, Feeder Cattle Futures, Section 10203.A, available at https://www.cmegroup.com/content/dam/cmegroup/rulebook/CME/II/100/102/102.pdf ("The CME Feeder Cattle Index™ is based upon a sample of transactions from these weight/frame score categories: 700 to 899 pound Medium and Large Frame #1 feeder steers, and 700 to 899 pound

definition of feeder cattle is far narrower than the one Plaintiffs are using and indicates that only Plaintiffs who sell cattle directly to feedlots of a certain weight and frame type are producers of feeder cattle as that term is understood by the CME Feeder Cattle Index and the industry at large.  And only one named plaintiff, Hyatt, has alleged that he sold cattle directly to a feedlot, although his allegations fail to specify the weight or frame type of the cattle he allegedly sold.  What's more, Hyatt only claims to have sold "one or two loads of feeder cattle directly to a feedlot," and only "[f]or the past two years."  (Am. Compl. ¶ 27.)  Thus, the causal connection between Defendants' conduct and Plaintiffs' harm is still attenuated, as only one named Plaintiff could conceivably qualify as a producer of feeder cattle, and even that characterization is a stretch.  More substantial allegations regarding Plaintiffs' direct-to-feedlot sales could be sufficient, but based on the allegations in the Amended Complaint the Court finds that Plaintiffs have not clearly demonstrated that they are producers of feeder cattle.

Moreover, Plaintiffs have still not clearly alleged that they were the target of the alleged conspiracy as required for antitrust standing.  *Minn. Twins*, 779 F.2d at 451.  It is insufficient for Plaintiffs to have "merely suffered indirect, secondary, or remote injury." *Id.* (quotation omitted).  Plaintiffs assert that they were the target of the alleged conspiracy because they are producers of feeder cattle, which is in the same market as

---

Medium and Large Frame #1-2 feeder steers."), *with* (Am. Compl. ¶ 3, Fig. 1 (citing to CME Feeder Cattle Index).).

the fed cattle. However, the Court previously determined that "the calves that Plaintiffs raise are inherently different than the full-grown cattle that Defendants process," and that Plaintiffs failed to demonstrate that they are in the same market as Defendants. *In re Cattle and Beef Antitrust Litig.*, 2023 WL 5310905, at *6. Furthermore, Plaintiffs continue to rely on inferences about the market generally, which the Court previously found insufficient. *See id.* at *5 (citing *McDonald*, 722 F.2d at 1374). This factor therefore continues to weigh against antitrust standing.

### 2. Improper Motive

The next factor is whether there was any improper motive on the part of the Defendants. *McDonald*, 722 F.2d at 1374. The Court previously held that "[w]hile motivation to increase profits is not inherently improper, this factor weighs in favor of antitrust standing given the broader context of Plaintiffs' price-fixing allegations." *In re Cattle and Beef Antitrust Litig.*, 2023 WL 5310905, at *5. Because the allegations upon which the Court reached that conclusion are substantially re-alleged in the Amended Complaint, this factor again weighs in favor of antitrust standing.

### 3. Type of Injury

The Court must next consider if "the injury was of a type that Congress sought to redress with antitrust laws." *McDonald*, 722 F.2d at 1374. A party can show that they have suffered the type of injury that Congress sought to protect if their injury is "inextricably intertwined with the injury the conspiracies sought to inflict on . . . the [relevant] market." *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 484 (1982). The

Court previously found this factor was neutral. *In re Cattle and Beef Antitrust Litig.*, 2023 WL 5310905, at *6.

The Court reaches the same conclusion here. On the one hand, Plaintiffs re-allege the same injuries which the Court previously found suggest the type of injury that Congress sought to redress. *Id.* For example, they contend that they were injured by Defendants' anticompetitive conduct, deprived of fair price competition at the top of the supply chain, and that consumers were overcharged at the bottom of the supply chain. (Am. Compl. ¶¶ 3, 6.) But on the other hand, the new allegations do not clearly demonstrate that Plaintiffs are in the same relevant market as the alleged conspiracy.

Although Plaintiffs newly allege that all cattle are inherently the same product, even though the ownership of the cattle may pass through several hands from birth to slaughter, the calves that Plaintiffs raise are inherently different than the full-grown cattle that Defendants process. *See In re Cattle and Beef Antitrust Litig.*, 2023 WL 5310905, at *6. That said, the markets for products and for sub-products contained in the product may be "inextricably linked." *E.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1123 (N.D. Cal. 2008). So, producers of feeder cattle may be in the relevant market because feeder cattle are raised to be fed cattle and the Plaintiffs have alleged a relationship between those markets. But whether Plaintiffs are producers of feeder cattle is not supported by the facts alleged in the Amended Complaint. Plaintiffs have not clearly established that they are producers of feeder cattle as that term is understood by the

industry. There are still too many chains in the link between Plaintiffs and Defendants that make Plaintiffs' alleged injury too remote. *See Southwest Suburban Bd. of Realtors, Inc. v. Beverly Area Plan. Ass'n*, 830 F.2d 1374, 1379 (7th Cir. 1987) ("[A]s a general rule suppliers of an injured customer may not seek recovery under the antitrust laws because their injuries are too 'indirect, secondary, or remote.'"). Accordingly, this factor is again neutral.

### 4. Directness

The Court must next consider the directness between the injury and the market restraint, which requires consideration of the "chain of causation." *McDonald*, 722 F.2d at 1374; *AGC*, 459 U.S. at 540. The Court previously found this factor weighs against antitrust standing because Plaintiffs failed to explain how their decreased profits are traceable to the Defendants' conduct. *In re Cattle and Beef Antitrust Litig.*, 2023 WL 5310905, at *6. Plaintiffs relied on inferences about the market, which the Court found to be unsupported by sufficient factual allegations. *Id.*

Here, Plaintiffs allege they are several steps removed from Defendants' alleged market manipulation, but that the relationship between the feeder cattle and fed cattle markets demonstrates a direct chain of causation between Defendants' conduct and Plaintiffs' harm. An indirect plaintiff's injury may be adequately traceable through the product distribution chain to show directness. *E.g.*, *In re Cattle and Beef Antitrust Litig.*, No. 19-1129, 2021 WL 7757881, at *11 (D. Minn. Sept. 14, 2021); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 814 (N.D. Ill. 2017). But Plaintiffs still must establish

directness that is not "too remote." *In re Dynamic Random Access Memory Antitrust Litig.*, 516 F. Supp. 2d 1072, 1092 (N.D. Cal. 2007).

While Plaintiffs have provided more substantial allegations regarding the traceability of Defendants' conduct to the feeder cattle market, the chain of causation depends on whether Plaintiffs are producers of feeder cattle. And, as explained above, Plaintiffs have not clearly demonstrated that they are such producers. Without that necessary fact, Plaintiffs' allegations are largely the same as before. This factor therefore weighs against standing.

### 5. Speculative Nature of Damages

The fifth factor is the speculative nature of the damages. *McDonald*, 722 F.2d at 1374. The Court previously found this factor neutral because even though other factors may affect cow-calf prices, similar meat packing antitrust cases have considered the speculative nature of damages and determined that there are means and methods for economic analysts to pinpoint prices that would have been paid but for the conspiracy. *In re Cattle and Beef Antitrust Litig.*, 2023 WL 5310905, at *7. Similarly, here, the fact that multiple other factors may affect the prices of the cattle Plaintiffs produce in addition to Defendants' conduct is not dispositive.

Defendants argue that Plaintiffs fail to account for certain complexities inherent in the new proposed classes, such as the fact that harm to one sector may benefit another. For example, if cow-calf prices drop, cow-calf ranchers are harmed, but backgrounders or stockers could be better off as their input costs to acquire calves decreases. But

regression analysis may be used to narrow down various supply and demand factors to pinpoint the damages exclusively caused by any alleged market manipulation, regardless of the complexities that the new proposed classes may bring.  *See In re Pork Antitrust Litig.*, 665 F. Supp. 3d 967, 991–92 (D. Minn. 2023).  This factor is therefore neutral.

### 6. Risk of Duplicative Recovery

The last factor is the "risk of duplicative recoveries or complex damage apportionment."  *McDonald*, 722 F.2d at 1343.  The Court previously found this factor weighed in favor of antitrust standing, unconvinced that it would be difficult for the parties to conduct economic analysis to ascertain an appropriate damages amount.  *In re Cattle and Beef Antitrust Litig.*, 2023 WL 5310905, at *7.  The Court reaches the same conclusion here.  Though Defendants argue that the expansion of Plaintiffs to include all indirect sellers makes apportionment more complex and creates a risk of duplicative recoveries, economic analyses are capable of ascertaining Plaintiffs' injuries to avoid duplicative recovery.  Therefore, this factor continues to favor antitrust standing.

\* \* \*

Weighing the six *AGC* factors, the Court finds that Plaintiffs failed to establish antitrust standing under *AGC*.  Because Plaintiffs have not clearly demonstrated that they are producers of feeder cattle as understood by the CME Feeder Cattle Index and beef production industry at large, the Amended Complaint's allegations regarding the relationship between the fed cattle and the feeder cattle markets do not support Plaintiffs' antitrust standing.  Without more substantial allegations that Plaintiffs are

producers of feeder cattle, they have not plausibly alleged a causal relationship between Defendants' conduct and their injury, or that their injury and damages are directly traceable to Defendants' conduct.

Because Plaintiffs have not established antitrust standing, the Court will dismiss Plaintiffs' Sherman Act, PSA, and state antitrust and consumer protection claims in the states that apply *AGC*. *See id.* at *7 n.5 (listing states). The Court will also dismiss the only remaining state antitrust law claim that does not apply *AGC*, which arises under Minnesota law. Even though Minnesota does not explicitly apply *AGC*, it similarly considers proximate causation and directness, which Plaintiffs failed to establish. *See id.* at *7.

### B. Remaining State Law Claims

The only remaining claims are Plaintiffs' consumer protection claims arising under Florida and Colorado law, which the Court previously dismissed for lack of proximate causation or insufficient pleading of specific harm. *Id.* at *9–10. Because Plaintiffs have again failed to establish proximate causation, the Court will dismiss the Florida consumer protection claim. Defendants argue that Plaintiffs' Colorado consumer protection claim fails because Plaintiffs failed to allege that they were injured by Defendants' misrepresentations, as required by Colorado law. *See id.* at *9. Though Plaintiffs allege they were unable to discern how Defendants' misrepresentations specifically injured them because of Defendants' fraudulent concealment, the Court previously found such these allegations were insufficient. *See id.* at *9. Thus, Plaintiffs have again failed to

demonstrate how Defendants' misrepresentations specifically injured Plaintiffs. The Court will therefore dismiss Plaintiffs' Florida and Colorado consumer protection claims.

## CONCLUSION

The Court will dismiss Plaintiffs' Sherman Act, PSA, and state antitrust and consumer protection claims for lack of antitrust standing under *AGC*. Though the Amended Complaint alleges a relationship between the prices and markets of feeder cattle and fed cattle, Plaintiffs have not clearly established that they are producers of feeder cattle, so these new allegations are insufficient to establish proximate causation and directness. The Court will also dismiss the remaining state law claims arising under Minnesota, Colorado, and Florida laws.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Dismiss the Amended *Specht* Complaint [Docket No. 453] is **GRANTED**; and

2. Plaintiffs' Amended Complaint [Docket No. 371] is **DISMISSED without prejudice**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: May 24, 2024
at Minneapolis, Minnesota.

*John N. Tunheim*
JOHN R. TUNHEIM
United States District Judge