# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE CATTLE AND BEEF ANTITRUST LITIGATION | Case No. 0:22-md-03031-JRT-JFD |
| This Document Relates To:<br>IN RE DPP BEEF LITIGATION | **<u>PUBLIC REDACTED VERSION</u>** |

## MEMORANDUM OF LAW IN SUPPORT OF DIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iv

GLOSSARY OF TERMS ............................................................................... ix

I.     INTRODUCTION ................................................................................. 1

II.    CLASS DEFINITION ........................................................................... 2

III.   STATEMENT OF FACTS .................................................................... 3

   A.   Common Evidence Regarding the Relevant Industry Background .................... 3

   B.   Common Evidence Demonstrates Defendants Colluded to Increase the Price of Beef ............................................................................................................. 4

   C.   Common Economic Evidence Demonstrates the Existence of the Conspiracy and its Common, Widespread Impact ................................................................ 13

      1.   Dr. Sunding is Eminently Qualified to Provide his Economic Opinion ..... 14

      2.   The Structure of the Beef Market Made it Conducive to Collusion ........... 15

         a)   Defendants dominated the market throughout the Class Period ...... 15

         b)   Significant barriers to entry ............................................................. 15

         c)   Commodity nature of Defendants' beef products ........................... 16

         d)   Inelastic demand for beef ................................................................ 17

      3.   Common Evidence Regarding Defendants' Conduct Is Consistent with the Alleged Conspiracy ..................................................................................... 17

      4.   Econometric Analysis Shows Common Antitrust Injury in the Form of Higher Beef Prices ..................................................................................... 18

      5.   Quantitative Modeling, Common to the Class, Demonstrates that Beef Slaughter was Artificially Restrained ........................................................ 20

      6.   Common Econometric Evidence Demonstrates that All or Nearly All Class Members Suffered Impact .......................................................................... 21

         a)   The structure of the beef market makes it conducive to common impact ................................................................................................ 21

b) Defendants' use of price indices (USDA) supports common impact ............................................................................ 23

c) Correlation analyses demonstrate beef prices moved together ........ 24

d) A "price movements" test further confirms common impact .......... 25

e) Documentary evidence demonstrates all Class Members were harmed ........................................................................ 26

IV. LEGAL STANDARD ................................................................... 27

V. ARGUMENT ............................................................................... 28

 A. DPPs Satisfy Rule 23(a) ............................................................ 28

 1. The Class is Sufficiently Numerous ........................................... 29

 2. Common Questions of Fact and Law Exist .................................. 29

 3. The Claims of the Class Representatives are Typical .................... 30

 4. The Named Plaintiffs Will Adequately Represent the Class ............ 32

 B. DPPs Satisfy Rule 23(b)(3) ....................................................... 33

 1. Questions Of Law and Fact Predominate Over Any Individual Questions 34

  a) Common questions about Defendants' violations of the antitrust laws predominate .............................................................. 35

  b) Antitrust impact and damages will be proven through common evidence ...................................................................... 36

   (1) Dr. Sunding's multiple regression analysis demonstrates widespread overcharges ....................................... 37

   (2) Dr. Sunding's structural analysis of the market is common evidence of widespread overcharges and impact ................. 38

   (3) Dr. Sunding's additional empirical tests scientifically demonstrate common impact ................................ 39

c)     Damages to Class Members are capable of measurement using a common, formulaic methodology ...................................................... 40

2.     A Class Action is Superior. ......................................................... 42

C.     The Proposed Class Is Ascertainable ................................................ 43

D.     Class Counsel are Adequate Under Rule 23(g) .................................. 44

VI.  CONCLUSION ...................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Alberts v. Nash Finch Co.*,
  245 F.R.D. 399 (D. Minn. 2007) ....................................................................... 28

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ................................................................................... 2, 35

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ......................................................................................... 35

*Ark. Ed. Ass'n v. Bd. of Ed. Of Portland, Ark. Sch. Dist.*,
  446 F.2d 763 (8th Cir. 1971) ........................................................................... 29

*Avritt v. Reliastar Life Ins. Co.*,
  615 F.3d 1023 (8th Cir. 2010) ......................................................................... 34

*Belles v. Schweiker*,
  720 F.2d 509 (8th Cir. 1983) ........................................................................... 29

*Blades v. Monsanto Co.*,
  400 F.3d 562 (8th Cir. 2005) ..................................................................... 35, 36

*Blue Shield of Va. v. McCready*,
  457 U.S. 465 (1982) ......................................................................................... 36

*City of Farmington Hills Emp. Ret. Sys. v. Wells Fargo Bank, N.A.*,
  281 F.R.D. 347 (D. Minn. 2012) ..................................................................... 32

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ........................................................................ 34, 36, 40, 41

*Custom Hair Design by Sandy v. Central Payment Co., LLC*,
  984 F.3d 595 (8th Cir. 2020) ..................................................................... 28, 30

*Edwards v. Nat'l Milk Producers Fed'n*,
  No. 11-CV-04766-JSW, 2017 WL 3616638 (N.D. Cal. June 26, 2017) ....................... 15

*H&T Fair Hills, Ltd. v. All. Pipeline L.P.*,
   No. 19-1095, 2021 WL 2526737 (D. Minn. June 21, 2021)..........................................43

*Hudock v. LG Elecs. U.S.A., Inc.*,
   12 F.4th 773 (8th Cir. 2021).............................................................................................34

*In re Blood Reagents Antitrust Litig.*,
   MDL No. 09-2081, 2015 WL 6123211 (E.D. Pa. Oct. 19, 2015) .................................38

*In re Broiler Chicken Antitrust Litig.*,
   No. 16 C 8637, 2022 WL 1720468 (N.D. Ill. May 27, 2022) ...........................15, 31, 44

*In re Bulk Popcorn Antitrust Litig.*,
   792 F. Supp. 650 (D. Minn. 1992) ...................................................................................41

*In re Cardizem CD Antitrust Litig.*,
   200 F.R.D. 326 (E.D.Mich.2001).....................................................................................39

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   308 F.R.D. 606 (N.D. Cal. 2015) .....................................................................................40

*In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*,
   No. 16-2709, 2019 WL 1418292 (W.D. Mo. Mar. 21, 2019).........................................44

*In re High Fructose Corn Syrup Litig.*,
   295 F.3d 651 (7th Cir. 2002).....................................................................................37, 38

*In re Monosodium Glutamate Antitrust Litig.*,
   205 F.R.D. 229 (D. Minn. 2001).......................................................................................32

*In re Mushroom Direct Purchaser Antitrust Litig.*,
   No. 06-0620, 2015 WL 5767415 (E.D. Pa. Jul. 29, 2015)..............................................37

*In re Packaged Seafood Prod. Antitrust Litig.*,
   332 F.R.D. 308 (S.D. Cal. 2019)......................................................................................15

*In re Pork Antitrust Litig.*,
   No. CV 18-1776 (JRT/JFD), 2024 WL 2060386 (D. Minn. May 8, 2024)............passim

*In re Potash Antitrust Litig.*,
  159 F.R.D. 682 (D. Minn. 1995)....................................................................... 30, 41

*In re Processed Egg Products Antitrust Litig.*,
  No. 08-md-2002, 2017 WL 3494221 (E.D. Pa. Aug. 14, 2017).................................... 37

*In re Rail Freight Fuel Surcharge Antitrust Litig.,*
  287 F.R.D. 1 (D.D.C. 2012)............................................................................. 39

*In re Rubber Chems. Antitrust Litig.*,
  232 F.R.D. 346 (N.D. Cal. 2005)....................................................................... 31

*In re St. Jude Med., Inc.*,
  425 F.3d 1116 (8th Cir. 2005).................................................................... 28, 34

*In re TFT-LCD (Flat Panel) Antitrust Litig*,
  . 267 F.R.D. 291 (N.D. Cal. 2010)...................................................................... 37

*In re Urethane Antitrust Litig.*,
  251 F.R.D. 629 (D. Kan. 2008)........................................................................... 2

*In re Urethane Antitrust Litig.,*
  768 F.3d 1245 (10th Cir. 2014)......................................................................... 39

*In re Wholesale Grocery Prods. Antitrust Litig.*,
  No. 09-MD-2090 ADM/TNL, 2016 WL 4697338 (D. Minn. Sept. 7, 2016).......... 34, 44

*In re Wirebound Boxes Antitrust Litig.*,
  128 F.R.D. 268 (D. Minn. 1989).................................................................. 30, 35

*In re Workers' Comp.*,
  130 F.R.D. 99 (D. Minn. 1990)........................................................................ 31

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
  267 F.R.D. 549 (D. Minn. 2010).............................................................. 29, 32, 42

*Kleen Prods. LLC v. Int'l. Paper Co.,*
  831 F.3d 919 (7th Cir. 2016).......................................................... 30, 36, 37, 40

*McKeage v. TMBC, LLC*,
    847 F.3d 992 (8th Cir. 2017)..................................................................43

*Messner v. Northshore University HealthSystem*,
    669 F.3d 802 (7th Cir. 2012)............................................................28, 42

*Nat'l Farmers Org., Inc. v. Assoc. Milk Producers, Inc.*,
    850 F.2d 1286 (8th Cir. 1988)................................................................41

*Rodriguez v. West Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009)..................................................................32

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*,
    821 F.3d 992 (8th Cir. 2016)............................................................27, 28

*Sonmore v. CheckRite Recovery Servs., Inc.*,
    206 F.R.D. 257 (D. Minn. 2001)............................................................42

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ..............................................................................29

## Rules

Fed. R. Civ. P. 23(a) ......................................................................28, 33

Rule 23(a)(1).............................................................................................29

Rule 23(a)(3).............................................................................................31

Rule 23(a)(4).............................................................................................32

Rule 23(b)(3) .......................................................................33, 34, 36, 42

Rule 23(g) .................................................................................................44

## Other Authorities

1 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 3:13 (4th ed. 2002)......31

7 C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 1781 at 228 (3d ed. 2005) ................................................................................................................... 36

## GLOSSARY OF TERMS

| Term | Definition |
|------|-----------|
| Beef | Boxed beef and case-ready beef (i.e., beef that has been cut into subprimals and packaged for resale) made from Fed Cattle in the United States that is sold fresh or frozen. With the exception of case-ready beef, "Beef" excludes other meat from Fed Cattle that is further processed at another plant (e.g., by grinding; adding other ingredients; or cooking or curing) and excludes drop byproducts (e.g., trim, fats, oils, hides, offal). The definition of "beef" is limited to products derived from the loin, chuck, rib, and round primal cuts. |
| Cargill | Defendant Cargill, Inc., and Cargill Meat Solutions Corporations |
| Class Period | January 1, 2015 to February 29, 2020 |
| Class Representatives | Trustee Howard B. Samuels,[1] Chapter 7 Trustee of the Estate of Central Grocers, Inc., R&D Marketing, LLC, and Redner's Markets, Inc. |
| Compl. | Direct Purchaser Plaintiffs' Third Consolidated Class Action Complaint, ECF No. 303 (Filed Jan. 18, 2022) |
| DPPs | Direct Purchaser Plaintiffs |
| Ex. | All exhibit references are to the Declaration of Michelle J. Looby in Support of Direct Purchaser Plaintiffs' Motion for Class Certification ("Looby Decl."), unless stated otherwise in the brief |

---

[1] DPPs filed an unopposed motion to substitute Gregg Szilagyi for Howard Samuels as Chapter 7 Trustee of the Estate of Central, Grocers, Inc. on August 12, 2024, which is currently under advisement. ECF No. 786.

| Fed Cattle | Steers and heifers raised in feedlots on a concentrated diet for the production and sale of beef before they are processed into beef and excludes culled cows. |
|---|---|
| JBS | Defendant JBS USA Food Company, Swift Beef Company, JBS Packerland, Inc., and JBS S.A. |
| National Beef (or "National") | National Beef Packing Company, LLC |
| Tyson | Tyson Foods, Inc. and Tyson Fresh Meats, Inc. |

I.      **INTRODUCTION**

The United States is the largest producer of beef in the world, and beef cattle is the largest agricultural industry in this country. This case involves a conspiracy among the largest beef packers in the United States – Defendants Tyson, Cargill, National Beef, and JBS – to fix prices, manipulate the market, and restrict the supply of beef in order to artificially increase the price and cause their customers to pay more for beef. The Direct Purchaser Plaintiffs ("DPPs") – Defendants' customers – move to certify a Class as defined below to ensure recovery of those overcharges for all DPPs.

DPPs, through evidence common to the Class, can demonstrate that Defendants colluded to increase the price of beef.  This evidence consists of Defendants' own documents and testimony, as well as common economic and expert evidence that demonstrates the magnitude of the conspiracy's effects and widespread common impact of the conspiracy. Emblematic of the kind of common evidence of the conspiracy is an exchange between two executives at JBS: reacting to unprecedented kill cuts by all Defendants, JBS executive Al Byers celebrated, stating ███████████████████ ████████████████████████████████████████████████████████ ██████[2]

In addition to Defendants' own words, DPPs proffer the expert opinion of Dr. David Sunding, a well-respected economist, who, via well-accepted econometric, economic, and statistical methodologies, demonstrates that beef production was restrained and prices were

---

[2] Ex. 1, JBS-0000167217.

1

elevated beyond competitive levels during the Class Period. Dr. Sunding's empirical analyses are scientifically rigorous, robust, and present exactly the type of economic evidence in support of class certification that courts have repeatedly accepted.

In cases like this alleging a conspiracy among horizontal competitors, the predominant focus is on Defendants' conduct and its market-wide effects.[3] As one court noted in an antitrust case, "defendants seeking to defeat class certification in a case alleging a horizontal price-fixing conspiracy 'face an uphill battle.'"[4] DPPs submit that Defendants will not be able to win this uphill battle because, as set forth in detail *infra*, DPPs easily satisfy the four threshold requirements of Rule 23(a) – numerosity, commonality, typicality, and adequacy. In addition, DPPs satisfy Rule 23(b)(3)'s requirement of predominance and superiority. Accordingly, the DPP Class should be certified.

## II.   CLASS DEFINITION

The proposed class definition for the DPP Class is:

All persons and entities who directly purchased Beef for use or delivery in the United States, whether fresh or frozen, made from one of the following primals: chuck, loin, rib or round from Defendants, or their respective subsidiaries or affiliates, from January 1, 2015, to February 29, 2020. For this lawsuit, beef excludes any product that is marketed as organic, grass-fed, kosher, halal, certified humane, Wagyu, "American-Style Kobe Beef", and

---

[3] *See, e.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (predominance "readily met in certain cases alleging [. . .] violations of the antitrust laws."); *In re Pork Antitrust Litig.*, No. CV 18-1776 (JRT/JFD), 2024 WL 2060386 (D. Minn. May 8, 2024) ("*Pork*") (certifying classes).

[4] *In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 635 (D. Kan. 2008), *aff'd*, 768 F.3d 1245 (10th Cir. 2014).

any product that is cooked, ground, marinated, seasoned, flavored, or breaded.[5]

## III.   STATEMENT OF FACTS

### A.   Common Evidence Regarding the Relevant Industry Background

Defendants are leading packers in the multi-billion-dollar United States' beef industry. As packers, Defendants purchase live cattle, slaughter the cattle, and process the slaughtered cattle into beef products for distribution to their customers—*i.e.*, the direct purchasers. Together, Defendants dominated the market for beef, controlling over ▮▮ of domestic beef produced from fed cattle from 2010-2020.[6] The popularity of steaks and other beef products resulted in robust domestic demand for Defendants' beef products before and during the Class Period.[7]

The cost of fed cattle is the largest input cost for beef, representing around 90% of variable costs.[8] The profit margin on beef – often referred to as "the margin," "spread," or "cutout" – is highly dependent on the price that beef producers pay for fed cattle and the price they charge for beef.[9] Thus, beef producers can increase margins by decreasing the

---

[5] Excluded from the Class are Defendants, the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir or assign of any Defendant; any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

[6] *See, e.g.*, Ex. 2, CARGILL000134521; Ex. 3, Expert Report of David L. Sunding, Ph. D ("Sunding Report") ¶¶ 49-50.

[7] *See, e.g.*, Ex. 4, CARGILL001235753 at slide 9.

[8] *See* Sunding Report ¶ 26.

[9] Ex. 5, TYSONBEEF02302002 at slides 13-14.

price they pay for fed cattle or increasing the prices for their beef charged to customers, including Plaintiffs, or both.[10]

The cost of fed cattle decreases and the price of beef increases—and the packers' margins improve—when the packers collectively reduce production.[11] As JBS put it, ███

████████████████████████████████████████████████████████████

██████████████████████[12] In a competitive market, however, one packer could not unilaterally impact margin by decreasing production without risking shorting customers and losing market share to competitors.[13] As shown below, Defendants acted collectively to restrain industry production (aka act with "discipline") in order to decrease the price of fed cattle, increase the price of beef, and ultimately improve their profit margins.

**B.**   **Common Evidence Demonstrates Defendants Colluded to Increase the Price of Beef**

At trial, DPPs will present documentary and testimonial evidence, common to the Class, that demonstrates Defendants engaged in a conspiracy to fix, increase, or stabilize the price of beef.

---

[10] Ex. 6, Lowe Depo at 55:1-19 ████████████████
████████████████████").

[11] *Id.* at 55:1-19 (███████████████████████████████████████████████
████████████████████████████████████████████████ ).

[12] Ex. 1, JBS-0000167217.

[13] *See* Ex. 6, Lowe Depo. at 55:20-56:7 ██████████████████████████
██████ ); Ex. 7, Brooks Depo. at 211:4-212:11.

Between 2010 and 2013, widespread drought in the central United States forced an unexpected reduction in the cattle herd, which, in turn, led to low profit margins for Defendants.[14]  In 2014, aware that they could capitalize on this rebuilding period for cattle herds and create record-high profit margins – but also cognizant that competition could result in production levels that would destroy those margins – Defendants colluded with their competition to fix prices, and limit supply.

On July 10-11, 2014, National CEO Tim Klein, JBS CEO Andre Nogueira, Tyson President of Fresh Meats Steve Stouffer, and Cargill President John Keating attended an industry conference hosted by the American Meat Institute.[15] On the second day of the conference, ███████████████████ ████████████████████████████ ████████████████████████████████████████ ███████████. National emails confirm Klein's trip to the NAMI conference was the impetus for █████████████████████████████.[17] Within minutes of the NAMI meeting, National's Senior EVP Monte Lowe proclaimed, we are "██████ ████████████████████████████[18]

---

[14] Ex. 8, JBS-0001150835 ("████████████████████████ ████████████████████████████████████████████████████ ).
[15] Ex. 9, NationalBeef-00950024.
[16] Ex. 10, NationalBeef-00267770.
[17] Ex. 11, NationalBeef-00023526. (████████████████████████ ████████████████████████████████████████████████████ ).
[18] Ex. 12, NationalBeef-01697714 (emphasis added).

JBS, Cargill, and Tyson all similarly reduced their kills in the subsequent weeks and months after the NAMI meeting, with Cargill proclaiming the packers were "████████":



"[19]

Realizing their collusion could move the beef and cattle markets in their favor, Defendants continued to act to fix, maintain, or stabilize prices in the summer of 2015:

- National's Monte Lowe emailed industry analyst Cassandra Fish, who communicated frequently with all Defendants, to remark, "████████████████ ████████████████████"[20]

- As the cuts began to take effect, Lowe emailed Fish, saying, "████████ ████████████████████████"[21]

- Cargill likewise recognized the importance of defendants acting collectively: ████████████████████████ [2]

The next week, Tyson informed the other Defendants that they were going to try to break the cattle market by further reducing hours and purchasing fewer cattle:

---

[19] Ex. 13, CARGILL000608451
[20] Ex. 14, CFish_0000095640.
[21] Ex. 15, NationalBeef-00511888.
[22] Ex. 16, CARGILL001156682. The phrase "████████████████████" refers to a Defendant making up for kills that were previously reduced under the auspices of the Defendant cleaning the hotbox refrigeration unit. *See, e.g.,* Ex. 17, TYSONBEEF01426757.

- █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"[23]

No one blinked, with Defendants reacting by further cutting hours within days.[24]

- Tyson executives internally noted it was "████████████████████████████████████████████████████"[25]

- At the end of the week, Defendants congratulated themselves for holding the line, with Steve Williams ████████████████████████████.[26] Williams told his supervisors, "████████████████████."[27]

Throughout the remainder of June, Defendants continued to suppress their kills in order to drive cattle prices lower and beef prices higher.[28]

- A Cargill economist noted that the industry was poised to reach "███████████████████████████████████████████████████████[29]

Defendants' collective action had the intended effect of decreasing cattle prices, increasing beef prices, and dramatically increasing their profit margins, which Defendants

---

[23] Ex. 18, TYSONBEEF01656908.
[24] *See, e.g.*, Ex. 19, JBS-0000302632; Ex. 20, JBS-0003326331.
[25] Ex. 21, TYSONBEEF00428026.
[26] Ex. 19, JBS-0000302632.
[27] *Id.*
[28] *See, e.g.*, Ex. 22, TYSONBEEF00465670; Ex. 23, Peterson-CB-00022559 ████████████████████████████████████████████████.").
[29] Ex. 24, CARGILL001169049 (emphasis added).

themselves attributed to packer "████████."[30] As industry analyst David Hales noted, "[w]e are continuing to see the results in the marketplace of limited packer competition. . . we don't find any packer breaking ranks and jumping their bids yet."[31] This and other evidence corroborates the account of Jason Fullerton, former JBS employee, who reported that Defendants had an agreement to reduce their purchase and slaughter volumes to decrease cattle prices.[32]

Following the success of the cartel in June and July of 2015, Tyson acted to permanently suppress industry capacity by closing its Denison, IA plant on August 14, 2015.[33] In discussing how to explain the plant closure, CEO Donnie King emphasized "████████████████████████████████████████ ████████████████████████████████████████ ████████████."[34] Tyson's Steve Stouffer added, "████████████████ ████████████████████████████████████████." Tyson's Dan Brooks likewise noted "████████████████████████████ ████████."[35] Competitors heard Tyson's messages, with National reacting, "████████

---

[30] Ex. 25, NationalBeef-00419886 ("████████████████████████████ ████████████████████████████ ").

[31] Ex. 26, HALES166437.

[32] Compl. ¶¶ 104-126.

[33] Ex. 27, TYSONBEEF03254057.

[34] Ex. 28, TYSONBEEF00416867.

[35] Ex. 29, TYSONBEEF00651230.

███████████████████████████████████████████.**"[36]** Tyson's message here was one of many times Defendants signaled to one another to further the conspiracy.[37]

Throughout the conspiracy, Defendants strategically closed boxed beef processing plants such as Denison, and employed restrictive covenants to prevent purchasers of previously-shuttered plants – such as Tyson's Cherokee or Cargill's Plainview plants – from re-opening and operating as full-capacity beef processing operations.[38] The purpose of these closures and restrictions was simple: limit competition and "████████████████████████████

████████████████████."[39]

Defendants were able to make long-term supply reduction decisions due in part to the constant reassurance from their competitors that they were running their business for "████████████████."[40] This phrase – "████████████████████" – became a rallying cry for the Defendants throughout the conspiracy, to assure one another that they could cut production without fear that a competitor would capitalize by processing more beef and stealing market share.[41]

---

[36] Ex. 30, NationalBeef-00001762 (emphasis added).
[37] *See, e.g.*, Ex. 7, Brooks Depo. at 119:3-120:4, 129:6-131:16 ██████████████████████
████████████████████████); Ex. 31, TYSONBEEF01665569; Ex. 32, JBS-0001336320; Ex. 33, TYSONBEEF01620051; Ex. 34, NationalBeef-00418832.
[38] Ex. 35, CARGILL001937377 at -406-407; Ex. 36, TYSONBEEF01661866.
[39] Ex. 37, CARGILL000099292 (emphasis added); *see also* Ex. 38, TYSONBEEF00619932.
[40] *See, e.g.*, Ex. 39, TYSONBEEF02079984 at -033.
[41] *See, e.g.*, Ex. 40, NationalBeef-00474570 ("██████████████████████████
████████████████████.'").

9

Throughout 2016, Defendants recognized that collective action in the form of coordinated production restraints would allow all of them to achieve record profits.[42] David Hales reported a "[r]umor packers will cut kills next week to slow competition," to which industry analyst Bruce Bass replied, "[H]ard to do that when you are making this much money . . . but *clearly they see competition taking a toll on that*[.]"[43]

By September, Defendants' conspiracy had created record profit margins that they would continue to enjoy as long as none of them "blinked":

- Lowe of National wrote, "██████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████"[44]

- In October 2016, Lowe again commented, "██████████████████████████
██████████████████████."[45]

Beyond slaughter restraint, Defendants frequently exchanged entire beef price lists to ensure higher beef pricing, which Defendants knew was improper.[46]  For example:

- In an October 2015 email exchange, Randy Johnston ██████████████████
██████████████, which was sent to National's VP of Pricing Bill McLaurin saying "████."[47] McLaurin responded, "██████████████████"[48]

---

[42] *See, e.g.*, Ex. 41, JBS-0001097563 (noting the industry could "█████████████
████████████████████████████").
[43] Ex. 42, HALES211313.
[44] Ex. 43, NationalBeef-00474947.
[45] Ex. 44, NationalBeef-00222732 (emphasis added).
[46] *See, e.g.*, Ex. 45, McLaurin Depo. at 65:18-65:22.
[47] Ex. 46, NationalBeef-00614810.
[48] *Id.*

10

- Referring to a JBS price list, Tyson's Kevin Hueser wrote to Tyson's Donald Kieffer "████████████████████████████████" to which Kieffer replied ████████████████████████████████"[49]

Throughout the conspiracy, Defendants frequently provided one another with their pricing levels—information that is highly sensitive in nature.[50] Defendants did not use the pricing information to compete but rather as a benchmark to eliminate competition and keep prices artificially inflated:

- JBS ████████████████████████████████████ as it did on countless occasions throughout the conspiracy. [51]

In addition to exchanging price lists, Defendants exchanged highly sensitive future production plans.[52] For example, in December 2016, Randy Johnston (at National before working at Tyson) ████████████████████████████████ ████████████████████████████.[53] As he ████████████████ ████████████████████████████████████████████"[54]

---

[49] Ex. 47, TYSONBEEF01212133.
[50] *See, e.g.*, Ex. 48, NationalBeef-00612343; Ex. 45, McLaurin Depo. at 71:7-15.
[51] *See e.g.*, Ex. 49, JBS-0000898122.
[52] *See, e.g.*, Ex. 50, CARGILL000542433 (████████████████████████); Ex. 45, McLaurin Depo. at 142:18-144:4; 160:24-162:3 (████████████████ ████████████).
[53] Ex. 51, NationalBeef-00316194.
[54] *Id.*

Johnston then ████████████████████████████, indicating this was something that ████████████████████████████.[55]

Defendants also communicated competitively sensitive information like future production plans to industry analysts, knowing that the information would be communicated to other Defendants.[56] For example, in 2017, National's Monte Lowe ████████████████████████████████████████████████████████ ████████████████████████████████████████████.[57] Lowe later ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████.[58]

At the beginning of 2018, National reacted to high cattle prices by indicating that Defendants could still achieve high margins by collectively increasing the price of beef.[59] Heading into a traditionally low demand period for beef, Lowe stressed to Klein that National would do its part to ensure high beef prices.[60]

---

[55] *Id.*

[56] *See, e.g.*, Ex. 7, Brooks Depo. at 105:1-24 ████████████████████████████ ████████████████████ ); *see, e.g.*, Ex. 52, Keiffer Depo. at 134:3-136:3 (" ████████████████████████████████████████████████ ████████ "); Ex. 6, Lowe Depo. at 177:19-24; Ex. 53, Williams Depo. at 360:3-362:6.

[57] *See* Ex. 54, NationalBeef-00423383.

[58] Ex. 55, NationalBeef-00425723; Ex. 56, Wilkerson Depo. at 119:18-120:3.

[59] Ex. 57, NationalBeef-00012621.

[60] Ex. 58, NationalBeef-00012623; Ex. 59, NationalBeef-00012624.

Throughout the remainder of the Class Period, Defendants continued to act collectively to restrain production and raise beef prices. For example:

- In July 2018, Cargill's Brian Highfill commented that ████████████ ████████████████████████████████████████████████████████ ████████████████████████ [61]

- In July 2018, Lowe discussed with Fish not running the Liberty Plant, stating, ███ ████████████████████████████████████████████████████ ███████████████████ "[62]

- In January 2019, JBS' Steve Cohron wrote to other JBS executives, ███████████████████████████████████████████████████████ ███████████████████████ ."[63]

As a result of their conspiracy, Defendants enjoyed period after period of record-high profit margins and collectively earned billions of dollars of cartel profits; in 2017 Cargill stated, "[██████████████████████████████████████████[.]"[64]

### C.   Common Economic Evidence Demonstrates the Existence of the Conspiracy and its Common, Widespread Impact

In addition to the foregoing common documentary and testimonial evidence, DPPs will present common economic and expert evidence demonstrating the magnitude of the conspiracy's effects, and the common impact of the conspiracy.

---

[61] Ex. 60, CARGILL000161967.
[62] Ex. 61, NationalBeef-00221630 (emphasis added).
[63] Ex. 62, JBS-0000384455 (emphasis added).
[64] Ex. 63, CARGILL001923663; Ex. 64, CARGILL001942989 ██████████████████████ ██████████████████████████████████████████████████ ); Ex. 65, TYSONBEEF03037744; Ex. 66, NationalBeef-00073998; Ex. 67, JBS-0002289064.

DPPs have proffered the expert opinion of Dr. David Sunding, who has set forth and applied well-accepted econometric, economic, and statistical methodologies to demonstrate that production was restrained and beef prices were elevated beyond competitive levels during the Class Period. As summarized below, Dr. Sunding's report outlines the methods that support his ultimate conclusions that (1) the structure of the beef market was conducive to collusion, (2) Defendants' conduct was economically consistent with the alleged conspiracy, (3) beef slaughter was artificially restrained as a result of the conspiracy, (4) beef prices were artificially elevated as a result of the conspiracy, and (5) the conspiracy impacted all, or nearly all, Class Members.

### 1.    Dr. Sunding is Eminently Qualified to Provide his Economic Opinion

Dr. Sunding – a Ph.D. economist – is highly qualified. Dr. Sunding has authored works on resource economics and econometrics; served as Senior Economist at the Council of Economic Advisers in the Clinton White House from 1996-1997; and taught economics and law at U.C. Berkeley and Boston College.[65] Dr. Sunding's opinions and techniques have been widely accepted by courts in evaluating class certification, utilizing statistical and econometric techniques to evaluate the magnitude of anticompetitive conduct, and in

---

[65] Sunding Report ¶¶ 2-8.

14

modeling and quantifying damages, including in cases analyzing meat protein markets such as chicken, that are similar in nature to the beef market.[66]

### 2. The Structure of the Beef Market Made it Conducive to Collusion

Dr. Sunding studied the structure of the beef market and concluded the following factors make that market conducive to successful collusion.

#### a) Defendants dominated the market throughout the Class Period

The beef market is highly concentrated and dominated by Defendants. Tyson, JBS, National, and Cargill are the four dominant players, controlling over 80% of domestic steer and heifer slaughter from 2010-2020.[67] This collective market power ensured that the cartel had sufficient market power to impose and maintain supra-competitive pricing.

#### b) Significant barriers to entry

There are significant barriers to entering the beef processing market, including high capital costs, vertical relationships with downstream buyers, specialized knowledge, and regulatory barriers.[68] Dr. Sunding determined that the entry costs that new firms would have to sink into the industry – such as developing, building, and maintaining an efficient

---

[66] *See, e.g.*, *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2022 WL 1720468, at *10-11 (N.D. Ill. May 27, 2022) (certifying the class and relying, in part, on Dr. Sunding's analysis); *In re Packaged Seafood Prod. Antitrust Litig.*, 332 F.R.D. 308 (S.D. Cal. 2019) (certifying the class and relying, in part, on Dr. Sunding's analysis); *Edwards v. Nat'l Milk Producers Fed'n*, No. 11-CV-04766-JSW, 2017 WL 3616638 (N.D. Cal. June 26, 2017).

[67] Sunding Report ¶¶ 48-54.

[68] *Id.* ¶¶ 55-67.

slaughter facility – are substantial.[69] These high fixed costs discourage new market entrants and make "[c]ollusion easier to sustain."[70] Dr. Sunding also found that "[p]otential entrants to the meat packing industry must also identify buyers," which "has become increasingly challenging due to concentration of wholesale and retail markets, as well as consumer demand."[71] The lack of vertical relationships and the homogeneity of beef products impose significant barriers to new market entrants.[72] Finally, Dr. Sunding determined that operating a beef processing plant requires substantial specialized knowledge, as well as knowledge and experience navigating the regulatory barriers relating to food safety, worker safety, and animal welfare, among others, which heavily disfavors new market entrants.[73]

### c)   Commodity nature of Defendants' beef products

Dr. Sunding analyzed the characteristics of beef such as differentiation between products, inter-firm sales, and Defendants' own records and conduct and concluded that beef is a prototypical commodity product.[74] Due to this commodity nature, the market of beef is susceptible to cartelization "because it is easier for firms to agree on price structure than on levels of other product attributes" and because "market price [] is determined by

---

[69] *Id.* ¶¶ 57-61.
[70] *Id.* ¶ 57.
[71] *Id.* ¶ 62.
[72] *Id.* ¶¶ 62-65.
[73] *Id.* ¶¶ 66-67.
[74] *Id.* ¶¶ 68-72.

the joint production of all suppliers," and therefore collective restraint would improve industry profits.[75]

### d)   Inelastic demand for beef

Finally, Dr. Sunding analyzed the demand for beef and determined that "[w]holesale beef demand is inelastic," which means that "there are no substitutes for the product."[76] Accordingly, "the probability of collusion increases" in the beef market because firms can "raise [their] price to increase revenues per unit sold without sacrificing much loss in sales."[77]

### 3.   Common Evidence Regarding Defendants' Conduct Is Consistent with the Alleged Conspiracy

In addition to scientifically sound economic modeling and statistical testing discussed further below, Dr. Sunding's analyses and empirical work are also informed by careful consideration of the record evidence. Dr. Sunding has identified conduct by Defendants which economists typically understand as more consistent with collusion than competition. Dr. Sunding analyzed inter-Defendant communications, Defendants' monitoring of one another's beef production and prices, plant closures (including years-long restrictive covenants on their sale and re-opening), and other documentary and testimonial evidence.[78] He concluded that there is common evidence consistent with DPPs'

---

[75] *Id.* ¶ 68.

[76] *Id.* ¶¶ 73-74.

[77] *Id.* ¶ 73.

[78] *Id.* ¶¶ 81-115.

allegations from an economist's perspective.[79] This conclusion reinforces Dr. Sunding's quantitative analysis.

### 4.   Econometric Analysis Shows Common Antitrust Injury in the Form of Higher Beef Prices.

To examine whether there was a common economic impact from Defendants' conspiracy, Dr. Sunding conducted a multiple regression analysis.[80] Dr. Sunding has previously used similar multiple regression analyses to measure the overcharges resulting from price-fixing and supply-reduction conspiracies in the markets for fluid milk, packaged seafood, and broiler chickens.[81] This approach is "the most common statistical method employed in antitrust litigation" for purposes of estimating overcharges.[82]

In his analysis, Dr. Sunding utilized Defendants' transactional data to examine the degree to which prices for class products were affected by the anticompetitive conduct, while controlling for other factors that affect prices. In Dr. Sunding's overcharge model, the transaction prices are the "dependent variable," and the "explanatory" or "independent" variables are those factors that are commonly understood as affecting prices in the beef market.[83]

He first uses his overcharge model to explore the relationship between prices and fundamental supply and demand factors during a "benchmark" period when the beef

---

[79] *Id.* ¶ 81.
[80] *Id.* ¶¶ 122-124.
[81] *Id.* ¶ 123.
[82] *Id.* ¶ 124.
[83] *Id.* ¶¶ 125-134.

market is expected to be competitive.[84] Dr. Sunding also identifies July to December 2014 as a "ramp up" period where there is evidence the market was not fully competitive, and accordingly does not utilize those transactions in the benchmark period.[85] His model controls for various supply and demand factors that could affect beef prices during the conspiracy period, other than the challenged conduct.[86] These supply and demand factors include: prices of potential substitute proteins (e.g., chicken and pork), demand variables that include Gross Domestic Product, exchange rates, diet trends, supply variables such as the breakeven cost of fed cattle, processor costs, and technological change impacting live weights of cattle.[87] Dr. Sunding's model also controls for the various "fixed effects" of a product line to capture structural differences in pricing between SKUs and to be sure no specific combination of product, Defendant, and customer could unduly affect the model.[88]

The result of Dr. Sunding's analysis shows an overcharge during the conspiracy period that is statistically significant at the 1% level, meaning that it is 99% certain this result did not occur by chance.[89] Dr. Sunding finds an R-Squared of 97%, which means that his model explains 97% of the variation in Beef prices reported in the Defendants' structured transactions data.[90] His model results in an estimated overcharge of 12.5%, a

---

[84] *Id.* ¶ 125.
[85] *Id.* ¶ 131.
[86] *Id.* ¶ 128.
[87] *Id.* ¶¶ 135-148.
[88] *Id.* ¶ 129.
[89] *Id.* ¶ 150.
[90] *Id.*

significant percentage increase that would affect pricing class-wide.[91] As a robustness check, Dr. Sunding further allowed the overcharges to vary by primal cut, Defendant, and top customers.[92] In each instance, the model showed statistically significant overcharges, meaning that no one customer who had large buying power, or only bought one type of primal, or from only one Defendant, could have escaped the overcharge.[93]

### 5. Quantitative Modeling, Common to the Class, Demonstrates that Beef Slaughter was Artificially Restrained

Because DPPs allege that Defendants achieved their supra-competitive prices, at least in part, through a conspiracy to restrict beef production, Dr. Sunding analyzed whether the quantity of beef produced in the market was lower during the Class Period than would be predicted by market fundamentals.[94] To do so, he again utilized a multiple regression analysis: a model derived from basic, structural relationships with production/supply as the dependent variable and explanatory variables that are known to affect production levels.[95] This model is analogous to the model which he used to test Defendants' pricing, using the same supply and demand variables.[96]

Dr. Sunding's model estimates that Beef production was approximately 6.3% lower during the Class Period than in the benchmark, while controlling for all factors that affect

---

[91] *Id.* ¶¶ 150-151.
[92] *Id.* ¶¶ 178-181.
[93] *Id.*
[94] *Id.* ¶ 152.
[95] *Id.* ¶ 153.
[96] *Id.*

production levels.[97] That output reduction is statistically significant at the 5% level, meaning there is a 95% probability that the result did not occur by chance.[98] Considering the demand elasticities in the beef market, such a supply reduction is consistent with the price overcharge that Dr. Sunding estimated, as even a small reduction in production would have a significant impact on prices in this market.[99] Additionally, in this regard, Dr. Sunding's production regression and its results serve as a further robustness check on his overcharge model and is further supportive of the reliability of this modeling.[100]

### 6.   Common Econometric Evidence Demonstrates that All or Nearly All Class Members Suffered Impact

#### a)   The structure of the beef market makes it conducive to common impact

Dr. Sunding describes how economic literature predicts that, given beef market conditions, Defendants' conduct would impact all, or nearly all, direct purchasers.[101]

First, because demand is highly inelastic, a slaughter restriction raises beef prices in a common manner.[102] Consequently, aggregate beef prices are expected to rise across the board from coordinated slaughter reductions.[103]  Second, the commodity nature of beef further suggests common impact. Because customers do not distinguish between beef

---

[97] *Id.* ¶ 154.
[98] *Id.*
[99] *Id.*
[100] *Id.* ¶ 152.
[101] *Id.* ¶¶ 168-177.
[102] *Id.* ¶¶ 169-171.
[103] *Id.*

processed from any one Defendant, conduct that raises the prices of one Defendant's beef – such as the conduct alleged here – would have the effect of raising the prices of the other Defendants' beef, as well as the overall market price.[104]

Third, each cattle processed yields the same amount of primals, and therefore a fixed ratio of the various cuts of beef.[105]  Accordingly, there is no reason to expect any class product would be spared a price increase due to Defendants' slaughter restriction as a slaughter reduction would affect the supply of each primal in a proportionate manner.[106] Fourth, Defendants' collective market share (above 80%) allowed them to raise beef prices without fear of losing market share to other processors.[107] Fifth, beef is largely immune from imports, as most imported cattle are used for ground-beef, a non-class product.[108] Sixth, beef is perishable, and there are limited storage options for Defendants, who must sell the perishable beef product upon slaughter.[109] Therefore, a slaughter reduction would have an immediate impact on pricing as Defendants would not be expected to make up for supply shortfalls from stored inventory.[110]

As the foregoing demonstrates, well-settled economic literature identifies these factors as contributing to common impact in a market.  Dr. Sunding's report has observed

---

[104] *Id.* ¶ 172.
[105] *Id.* ¶ 175.
[106] *Id.*
[107] *Id.* ¶ 176.
[108] *Id.*
[109] *Id.* ¶ 177.
[110] *Id.*

these factors in the beef market, further buttressing his conclusion that all, or nearly all, Class Members would have been impacted by Defendants' anticompetitive conduct.

**b)**     **Defendants' use of price indices (USDA) supports common impact**

The common impact of the conspiracy on beef prices is evident in the changes in USDA cutout value. USDA regulations require beef packers to report nearly every sale of boxed beef products. The USDA-Agricultural Marketing Service ("AMS") publishes a "USDA cutout" price, meant to represent the cash market value of a cattle carcass, and is derived from averaging the market prices for each individual beef product that comes from a carcass.[111] The report also provides baseline prices for different standard cuts of beef: the rib, chuck, round, loin – which are the cuts included in the Class Definition and which make up the vast majority of beef cuts – as well as brisket and short plate.[112]

The "USDA cutout" values are the universal starting point at which virtually all purchasers of beef start negotiations, to the extent there are even negotiations, with suppliers such as Defendants.[113] Defendants then incorporate the USDA cutout value into the final price they charge customers for beef.[114] Rarely are prices fixed for longer than a few months; rather, they move with the USDA cutout value.[115]

---

[111] *See e.*g., Ex. 68, NationalBeef-00312206.
[112] *See e.g.,* Ex. 69, NationalBeef-00295305.
[113] Sunding Report ¶¶ 173-174.
[114] *See e.g.,* Ex. 70, JBS-0003123576; Ex. 71, Keating Depo. at 83:22-24.
[115] Sunding Report ¶ 173.

A coordinated reduction in supply would have the effect of raising benchmark prices or price indices like the USDA boxed beef cutout.[116] Because of the strong relationship between the USDA cutout and Defendants' prices, coordinated action that raised the benchmark prices would raise prices for all customers including the largest customers, whose contracts moved with the USDA average.[117] Therefore, Defendants' conduct commonly impacted the prices that all Class Members paid for beef.

### c)   Correlation analyses demonstrate beef prices moved together

DPPs have also offered Dr. Sunding's price correlation analyses, which further support his finding of common impact.[118] Price correlation demonstrates whether the prices of products move together over time: if prices are highly correlated across various dimensions (such as location or customer), it tends to indicate that there is a pricing structure to Defendants' product and that those products respond similarly to common stimuli, such as reduced production or inflated prices.[119] Dr. Sunding's price correlation analyses all demonstrate high degrees of correlation within the four main beef primals that are in the DPP Class – chuck, loin, rib, and round – across Defendants, across customers, and across geographic areas (i.e., states).[120] Accordingly, Dr. Sunding's price correlations demonstrate that prices move in a common manner across a number of dimensions such

---

[116] *Id.* ¶ 174.

[117] *Id.*

[118] *Id.* ¶¶ 187-192.

[119] *Id.*

[120] *Id.* ¶¶ 190-192.

that it would not be possible for a meaningful number of direct purchasers to have avoided impact.[121]

Additionally, by further analyzing the correlation across Defendants and states, Dr. Sunding demonstrates that (1) customers could not escape an overcharge by shifting their purchases from one defendant to another; and (2) customers in all states were impacted by the conspiracy.[122]

### d) **A "price movements" test further confirms common impact**

In addition to a number of different quantitative tests performed by Dr. Sunding to demonstrate common impact, he also performed a "price movements" analysis, which looks at common price or cost shocks in a particular industry and then assesses the number of individual transactions that moved in response to those price or cost shocks. The test examines how prices move (or do not move) in tandem, in particular in response to an extraneous factor like a price shock or, as in this case, to a cartel imposing supracompetitive pricing.[123]

As shown in Dr. Sunding's Report, he studied two price shocks that occurred in the beef market prior to the Class Period and assessed the number of transactions that moved in the same direction of those price shocks.[124] In doing so, Dr. Sunding found that a

---

[121] *Id.* ¶¶ 191-192.

[122] *Id.*

[123] *Id.* ¶¶ 182-186.

[124] *Id.*

substantial share of products had price movements in the same direction as the aggregate beef price shock. Dr. Sunding's test "demonstrates that price shocks like those caused by the alleged conspiracy tend to produce price changes in the same direction across individual products."[125] In other words, because beef prices move together, no purchaser could have avoided an overcharge.

### e) Documentary evidence demonstrates all Class Members were harmed

Beyond Dr. Sunding's quantitative modeling, Defendants' own documents demonstrate that their coordinated actions led to widespread increases or stabilizations of beef prices. For example:

- In a Board of Directors presentation in March 2015, Tyson noted ███████

██████████████████████████████████████

"[126]

Third party analysts also took notice that Defendants' coordinated slaughter reductions caused the price of beef to increase. For example:

- Andy Gottschalk of Hedger's Edge reported in April, 2015 "█

██████████████████████████████████████

"[127]

---

[125] *Id.*
[126] Ex. 72, TYSONBEEF03055394.
[127] Ex. 73, CARGILL001428747.

- On June 9, 2015, Cassie Fish wrote in her daily blog: "Will packers cut kills enough, long enough to back up enough cattle to break prices further… [o]r will the kill cuts themselves cause a sharp rebound in boxed beef values as beef production dips to historical lows for June, which restores margins to an acceptable level and result in expanding kills[?]"[128]

## IV.   **LEGAL STANDARD**

"Congress has given private citizens rights of actions for injunctive relief and damages for antitrust violations…[Rule 23] provides for class actions that may enhance the efficacy of private actions by permitting citizens to combine their limited resources to achieve a more powerful litigation posture."[129] To certify a class, DPPs must show that the proposed class meets the requirements of Rule 23(a) and one subsection of Rule 23(b).[130] Accordingly, DPPs must satisfy the "four threshold requirements" of numerosity, commonality, typicality, and adequacy in Rule 23(a).[131] In addition, DPPs must also satisfy the Rule 23(b)(3) requirements of predominance and superiority.[132] Finally, the Eighth Circuit requires that class members can be identified through objective criteria, such that the class is ascertainable.[133]

---

[128]Ex. 74, Cassandra Fish, *Where is Enough?*, The Beef, Jun. 9, 2015, https://www.thebeefread.com/2015/06/page/16/.

[129] *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 266 (1972).

[130] *Pork*, 2024 WL 2060386 at *13; *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds,* 568 U.S.455, 459-60 (2013).

[131] *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 995 (8th Cir. 2016).

[132] *Id.*

[133] *Id*. at 996.

While courts must perform a rigorous analysis under Rule 23, DPPs do not need to prove their case on the merits.[134] Therefore, courts may "look beyond the pleadings" and scrutinize the record presented, including expert reports, but "that is not the same as determining whether the putative class is likely to succeed on the merits."[135] Merits questions may be considered "only to the extent" that they are "relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."[136]

Here, the conspiracy, the resulting class-wide impact, and class-wide damages will be proven with evidence that is common to the Class. Plaintiffs therefore satisfy all requirements for class certification under Rule 23(a) and 23(b)(3).

## V.    ARGUMENT

### A.    DPPs Satisfy Rule 23(a)

Under Rule 23(a), the Court must determine that:

> (1) The class is so numerous that joinder of all members is impractical; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. [137]

---

[134] *See id*. at 998.

[135] *Alberts v. Nash Finch Co.*, 245 F.R.D. 399, 408 (D. Minn. 2007); *Messner v. Northshore University HealthSystem,* 669 F.3d 802, 811 (7th Cir. 2012) ("the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits.");

[136] *Custom Hair Design by Sandy v. Central Payment Co., LLC*, 984 F.3d 595, 600 (8th Cir. 2020).

[137] Fed. R. Civ. P. 23(a); *see also In re St. Jude Med., Inc.*, 425 F.3d 1116, 1119 (8th Cir. 2005).

Plaintiffs meet each of these requirements.

### 1.    The Class is Sufficiently Numerous

Under Rule 23(a)(1), courts consider the number of persons involved, the nature of the action, the value of each individual claim, and the relative inconvenience of trying suits individually.[138] Where, as here, the proposed Class consists of thousands of members that purchased beef directly from Defendants, numerosity is satisfied.[139]

### 2.    Common Questions of Fact and Law Exist

To establish commonality, DPPs must show that resolution of an issue of fact or law "is central to the validity of each" class member's claim; even a "single question" satisfies the requirement.[140] The Eighth Circuit has explained that commonality requires only that "the course of conduct giving rise to a cause of action affects all class members, and that at least one of the elements of that cause of action is shared by all class members."[141] Moreover, the "presence of some dissimilarities does not defeat the existence of commonality provided there is a single common question that can drive answers."[142]

---

[138] *Belles v. Schweiker*, 720 F.2d 509, 515 (8th Cir. 1983).

[139] Sunding Report ¶ 1 n.1. *See Pork*, 2024 WL 2060386 at *14; *see also Ark. Ed. Ass'n v. Bd. of Ed. Of Portland, Ark. Sch. Dist.*, 446 F.2d 763, 765-66 (8th Cir. 1971) (17-20 member class satisfied numerosity).

[140] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011).

[141] *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 267 F.R.D. 549, 559 (D. Minn. 2010), *aff'd*, 644 F.3d 604 (8th Cir. 2011).

[142] *Pork*, 2024 WL 2060386 at *14.

Antitrust conspiracies are particularly conducive to common evidence and common questions that can be resolved classwide.[143]

Here, DPPs bring the same claims against Defendants; and their claims arise from the same course of Defendants' conduct. The questions central to this case include, but are not limited to, (1) whether Defendants conspired to fix, raise, maintain, and/or stabilize Beef prices; (2) whether the conspiracy resulted in supracompetitive Beef prices; (3) whether Defendants and their co-conspirators, via the conspiracy, injured DPPs and the proposed class; and (4) the appropriate measure of damages. These questions will be demonstrated (or refuted) with common evidence—*i.e.*, these questions can be answered with reference to a single body of evidence, and the answer to each of these questions is the same for the entirety of the proposed class. Therefore, because this case "involves primarily common issues of fact and law," commonality is satisfied.[144]

### 3.   The Claims of the Class Representatives are Typical

Typicality is "fairly easily met so long as other class members have claims similar to the named plaintiff."[145] The purpose of typicality is to determine "whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting class,

---

[143] *In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 268, 272 (D. Minn. 1989); *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 694 (D. Minn. 1995); *Kleen Prods. LLC v. Int'l. Paper Co.,* 831 F.3d 919, 923 (7th Cir. 2016)

[144] *Wirebound*, 128 F.R.D. at 271.

[145] *Custom Hair*, 984 F.3d at 604 (internal quotation and citation omitted).

so that the court may properly attribute a collective nature to the challenged conduct."[146] In the antitrust context, price-fixing claims are "sufficiently similar to satisfy Rule 23(a)(3)."[147]

Here, the named Plaintiffs allege that: (1) Defendants illegally conspired to fix, raise, maintain, and stabilize Beef prices; (2) the named Plaintiffs purchased Beef directly from a Defendant, or a subsidiary or affiliate of a Defendant, in the United States from at least January 1, 2015, until February 29, 2020; and (3) the named Plaintiffs suffered antitrust injury as a result.[148]

The named Plaintiffs will establish their claims by proving the same elements that other Class Members would need to prove, such as the existence and impact of the conspiracy, the resulting injury, and the quantification of the damages suffered. Even if there are "some disparities in the circumstances surrounding the proposed class representatives' purchases, such as different purchasing mechanisms, negotiation abilities, and geographic reach," such differences do not preclude a finding of typicality.[149] Accordingly, the named Plaintiffs satisfy typicality.

---

[146] 1 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 3:13 (4th ed. 2002).

[147] *In re Workers' Comp.*, 130 F.R.D. 99, 106 (D. Minn. 1990).

[148] Compl. ¶¶ 1, 3, 242-263, 328.

[149] *Pork*, 2024 WL 2060386, at *16; *Broilers*, 2022 WL 1720468, at *5 (typicality satisfied despite differences in plaintiffs' bargaining power, because defendants "fixed a market price that was the starting point for negotiations across the market."); *see also In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 351 (N.D. Cal. 2005) (typicality satisfied where plaintiffs and class "allege the same antitrust violations by defendants.").

**4.      The Named Plaintiffs Will Adequately Represent the Class**

Finally, under Rule 23(a)(4) the Court must determine that the proposed representatives and counsel will "fairly and adequately protect the interests of the Class." Adequacy is established by satisfying a two-part test: (1) "the class representatives have common interests with the members of the class;" and (2) "the class representatives will vigorously prosecute the interests of the class through qualified counsel."[150] "[A]dequacy…is satisfied as long as one of the class representatives is an adequate class representative."[151]

The named Plaintiffs satisfy adequacy. *First*, their interests align with those of the broader Class. They allege that they were harmed by the *same conduct* and in the *same manner* as the rest of the Class. Moreover, their claims, like all DPP Class members, arise from Defendants' conspiracy to fix, raise, maintain, and/or stabilize Beef prices, and accordingly, the named Plaintiffs share the same interest as the remainder of the Class in establishing Defendants' liability and establishing class-wide damages. Here, "[i]f the common claims of an antitrust conspiracy are not proven, none of the class members, including the named Plaintiffs, will recover."[152] Because the named Plaintiffs' claims and theory of liability are identical to those of the proposed Class, their claims will rise and fall

---

[150] *Zurn*, 267 F.R.D. at 560; *City of Farmington Hills Emp. Ret. Sys. v. Wells Fargo Bank, N.A.*, 281 F.R.D. 347, 353 (D. Minn. 2012).

[151] *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 961 (9th Cir. 2009).

[152] *In re Monosodium Glutamate Antitrust Litig.*, 205 F.R.D. 229, 233 (D. Minn. 2001).

with those of the Class—accordingly, the Class Representatives and the Class are aligned in their interests.

*Second*, the named Plaintiffs and their counsel have and will continue to effectively represent the interests of the proposed Class. Named Plaintiffs have already represented the proposed Class as engaged participants in this litigation dedicating significant time and resources to the case and will continue to do so as the case proceeds.[153] This Court has previously recognized Interim Co-Lead DPP Class Counsel are qualified, experienced, and thoroughly familiar with antitrust class action litigation.[154] Interim Co-Lead DPP Class Counsel have successfully litigated many significant antitrust actions, have diligently and effectively prosecuted this action, and will continue to represent the Class throughout this litigation.   Accordingly, the named Plaintiffs are adequate, rounding out the fourth prerequisite for class certification under Rule 23(a).

**B.     DPPs Satisfy Rule 23(b)(3)**

In addition to satisfying the requirements of Rule 23(a), under Rule 23(b)(3), named Plaintiffs must establish that (1) "questions of law or fact common to class members

---

[153] *See, e.g.*, Decl. of Daniel E. Gustafson in Support of Direct Purchaser Plaintiffs' Motion for Interim Payment of Attorneys' Fees and Service Awards, ECF No. 541 (Jan. 30, 2024), at ¶¶ 29-32.

[154] Order Granting Plaintiffs' Motion for Appointment of Interim Co-Lead Counsel for Proposed Direct Purchaser Class, ECF No. 71 (Sept. 4, 2020); *see also Pork,* 0:18-cv-1776-JRT-HB, ECF No. 151 (D. Minn. Oct. 15, 2018) (appointing Gustafson Gluek PLLC as Interim Co-Lead Counsel); *Broilers,* 1:16-cv-8637, ECF No. 144 (N.D. Ill. Oct. 14, 2016) (appointing Gustafson Gluek PLLC and Cotchett, Pitre & McCarthy as Interim Class Counsel).

predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."[155] Named Plaintiffs satisfy both requirements.

### 1.   Questions Of Law and Fact Predominate Over Any Individual Questions

Predominance under Rule 23(b)(3) requires the court take a "close look at whether common questions predominate over individual ones."[156] In this Circuit, "there are no bright lines for determining whether common questions predominate."[157] The critical inquiry is "whether questions of law or fact capable of resolution through common evidence predominate over individual questions."[158]

Accordingly, "if, to make a *prima facie* showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a *prima facie* showing, then it becomes a common question."[159] The predominance inquiry does not demand that Plaintiffs show that each element of their claim is susceptible to

---

[155] *See* Fed. R. Civ. P. 23(b)(3); *see also St. Jude*, 425 F.3d at 1119.

[156] *Hudock v. LG Elecs. U.S.A., Inc.*, 12 F.4th 773, 776 (8th Cir. 2021) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)).

[157] *Pork*, 2024 WL 2060386, at *19.

[158] *See In re Wholesale Grocery Prods. Antitrust Litig.*, No. 09-MD-2090 ADM/TNL, 2016 WL 4697338 at *8 (D. Minn. Sept. 7, 2016) (quoting *Zurn* 644 F.3d at 619).

[159] *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1029 (8th Cir. 2010).

classwide proof, nor that they show that predominating common questions will be resolved in their favor.[160]

"[P]redominance is a test readily met in certain cases alleging…violations of the antitrust laws."[161] In this case, issues common to the DPPs predominate with respect to proof of the elements of their antitrust claims: (1) Defendants violated federal antitrust laws, (2) the named Plaintiffs and Class members suffered injury as a result, and (3) there are measurable damages.

### a)      Common questions about Defendants' violations of the antitrust laws predominate

Proof used to establish an antitrust conspiracy is the quintessential common evidence that satisfies the predominance requirement, because such proof "involves primarily common issues of fact and law."[162] "The Eighth Circuit and Minnesota courts have acknowledged that evidence of a conspiracy relates solely to the defendant's conduct, so proof would not vary among class members."[163]

Here, DPPs' antitrust claims depend solely on Defendants' conduct. As described above in Section III, DPPs will use common evidence to show that Defendants conspired to fix, raise, maintain, and/or stabilize Beef prices. Proof of these allegations will depend on deposition testimony, telephonic and electronic communications, and Defendants'

---

[160] *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 468 (2013).

[161] *Amchem,* 521 U.S. at 625.

[162] *Wirebound*, 128 F.R.D. at 271; *Blades v. Monsanto Co.*, 400 F.3d 562, 572 (8th Cir. 2005).

[163] *Pork*, 2024 WL 2060386, at *30.

documents, all of which are common to the Class.[164] Since every DPP Class Member will rely on the same conduct by the same set of Defendants to establish this conspiracy, there are no individualized questions concerning the fact of Defendants' antitrust violations, which supports a finding of predominance.[165]

> **b)    Antitrust impact and damages will be proven through common evidence**

Classwide impact, or antitrust injury, can be demonstrated in this case on a common basis.[166] As many courts have held, the payment of supracompetitive prices "resulting from a dampening of competitive market forces is assuredly one type of [antitrust] injury."[167] Accordingly, in this Circuit, "plaintiffs can prove injury in a price-fixing case by showing that the plaintiff, as a result of the conspiracy, had to pay supracompetitive prices."[168] To be sure, to satisfy predominance at this stage, DPPs need not *prove* class-wide impact, but rather must show only that classwide antitrust impact is "capable of proof at trial through evidence that is common to the class rather than individual to its members."[169] In support of class certification, DPPs offer well-specified expert regression modeling, quantitative and qualitative analyses, and opinions supporting common impact.[170]

---

[164] *See, e.g.*, *Kleen*, 831 F.3d at 927.

[165] *See* 7 C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 1781 at 228 (3d ed. 2005) (proof of antitrust conspiracy "thought to predominate over other issues in the case and has the effect of satisfying the first prerequisite in Rule 23(b)(3).").

[166] *Blades*, 400 F.3d at 569.

[167] *Blue Shield of Va. v. McCready*, 457 U.S. 465, 482 (1982).

[168] *Pork*, 2024 WL 2060386 at *20 (quoting *Blades¸* 400 F.3d at 569).

[169] *Comcast*, 569 U.S. at 30.

[170] *See Pork*, 2024 WL 2060386 at *10.

36

### (1) Dr. Sunding's multiple regression analysis demonstrates widespread overcharges

As described more fully above at III.C.4-6, Dr. Sunding offers common evidence in the form of a multiple regression analysis, which demonstrates that Defendants' collusion caused higher prices.[171] The results of Dr. Sunding's regression model show that Defendants' conspiracy caused a statistically significant increase in Beef prices measured with a 99% confidence interval, meaning that there is less than one percent chance that the results are due to chance.[172]

Although not necessary, Dr. Sunding also estimated – through his production regression – the "but for" production of Beef in the market absent a conspiracy, demonstrating that supply was artificially restrained during the Class Period at a statistically significant 95% level.[173] Courts routinely rely on similar, mutually reinforcing, quantitative methodologies in certifying classes.[174] The production regression results

---

[171] Sunding Report ¶¶ 125-151; *see Pork*, 2024 WL 2060386 at *10 (collecting protein industry antitrust cases deeming regression analyses admissible and helpful in determining classwide impact); *see also Kleen,* 831 F.3d at 928; *In re High Fructose Corn Syrup Litig.*, 295 F.3d 651, 660-61 (7th Cir. 2002); *In re TFT-LCD (Flat Panel) Antitrust Litig,.* 267 F.R.D. 291, 313 (N.D. Cal. 2010) ("*LCDs I*").

[172] *Id.* ¶¶ 150.

[173] *Id.* ¶¶ 152-154.

[174] *See, e.g.*, *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2015 WL 5767415 at *17 (E.D. Pa. Jul. 29, 2015) (finding that regression and supply control test supported class certification); *In re Processed Egg Products Antitrust Litig.*, No. 08-md-2002, 2017 WL 3494221 (E.D. Pa. Aug. 14, 2017) (relying, *inter alia*, on the overcharge and production regressions).

support Dr. Sunding's ultimate conclusion that direct purchasers were overcharged on a common basis.

> **(2)    Dr. Sunding's structural analysis of the market is common evidence of widespread overcharges and impact**

Aside from Dr. Sunding's overcharge and production modeling, his structural analysis of the market also constitutes common evidence of collusion and widespread overcharges and impact. Courts routinely accept expert opinion concerning the structural characteristics of a market in support of common impact and class certification in antitrust conspiracy cases.[175]

As described in Section III.C., Dr. Sunding studied the key attributes of the beef market which made it impossible for a direct purchaser to escape the overcharge. These factors include: a high level of concentration and dominance by Defendants, commodity and homogeneous nature of beef products, low price elasticity of demand, fixed ratio of beef primal proportion for each cattle slaughtered, and the inability to store product long term.[176]

---

[175] *See, e.g.*, *Pork,* 2024 WL 2060386, at *21 (finding expert opinion that "market concentration, adequate pork substitutions, and standardization of pork all make it easier for competing firms to collude" permissible to show common antitrust impact); *Fructose*, 295 F.3d at 656 (crediting expert opinion that market structure conducive to cartelization and common impact); *In re Blood Reagents Antitrust Litig.*, MDL No. 09-2081, 2015 WL 6123211, at *31 (E.D. Pa. Oct. 19, 2015).

[176] *Id.* ¶¶ 47-54, 68-74, 172, 175-77.

Another important factor Dr. Sunding studied was Defendants' reliance upon the USDA price index as a benchmark in virtually all of their negotiations with customers, as noted in III.C.6.[177] Given that Defendants' prices are benchmarked against price indices that respond to the supply restriction, all, or nearly all, prices would be affected by the challenged conduct.[178] Courts find that the "inference of class-wide impact is especially strong where, as here, there is evidence that the conspiracy artificially inflated the baseline price negotiations."[179] Accordingly, Dr. Sunding's USDA price benchmark study further supports common impact. Importantly, all of the above factors are market-wide elements susceptible to common proof. They depend on generalized market conditions, the attributes of the beef product, and Defendants' common conduct. None of these elements are subject to individualized inquiries or issues among Class Members. Accordingly, Dr. Sunding's structural analysis of the beef market further supports classwide impact and damages and supports the predominance of common issues over individualized inquiries.

### (3) Dr. Sunding's additional empirical tests scientifically demonstrate common impact

Dr. Sunding's correlation analysis demonstrated that Beef prices moved together (1) across individual customers; (2) across Defendants; and (3) across states.[180] The high

---

[177] Sunding Report ¶¶ 173-174.

[178] *Id.*

[179] *In re Urethane Antitrust Litig.,* 768 F.3d 1245, 1254 (10th Cir. 2014)(citing *In re Rail Freight Fuel Surcharge Antitrust Litig.,* 287 F.R.D. 1, 61 (D.D.C. 2012)); *In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 326, 345–47 (E.D.Mich.2001)).

[180] *See* Section III.C.6.c.

degree of correlation shows when prices are elevated, all products will increase in price together, regardless of being a large customer, purchasing from a certain defendant or based on geographic location, further demonstrating common impact.[181] This Court and others have found that price correlation analysis – such as Dr. Sunding's here – supports a finding of common impact and militates in favor of granting class certification.[182]

In addition to the correlation analyses, Dr. Sunding's "price movements" test demonstrated that prices across a high percentage of transactions in the beef market move together when faced with a shock. Dr. Sunding concluded "beef market shocks, like a supply restriction, have a common effect on the prices customers pay."[183] The Seventh Circuit has endorsed the price movements test as supportive of a finding of common impact.[184]

### c)   Damages to Class Members are capable of measurement using a common, formulaic methodology

DPPs can use common proof to establish class-wide damages. At the certification stage, plaintiffs need only demonstrate that "damages are capable of measurement on a classwide basis," but this measurement "need not be exact."[185] Accordingly, DPPs must

---

[181] Sunding Report ¶¶ 187-192.

[182] *See Pork,* 2024 WL 2060386, at *21 (price correlation across defendants, customers, and class members is the "type of market-wide economic analysis [that] has been accepted by many courts to show predominance as to antitrust impact."); *Kleen,* 831 F.3d at 928; *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 629 (N.D. Cal. 2015).

[183] Sunding Report ¶ 190.

[184] *See, e.g.*, *Kleen,* 831 F.3d at 924-927.

[185] *Comcast*, 569 U.S. at 34-35.

present "evidence from which the fact finder may make a just and reasonable estimate of the damage that is not based on speculation or guess work."[186] Individual issues in calculating damages do not preclude certification.[187]

Dr. Sunding has presented a feasible and widely-accepted method to calculate classwide damages based on standardized statistical analyses of beef industry pricing based on Defendants' transactional data.[188] Dr. Sunding calculates the total volume of purchases by Class Members of products included in the class.[189] He then multiplies the total volume of purchases by Class Members by the applicable overcharge rate derived from his price regression analysis.[190]

Dr. Sunding's methodology aligns with the DPP's theory of liability because it "measure[s] damages resulting from the particular antitrust injury on which [] liability in this action is premised."[191] Here, DPPs allege that Defendants conspired to raise the price of Beef. Dr. Sunding's proposed damages methodology measures damages resulting from Defendants' conspiracy.[192]

---

[186] *In re Bulk Popcorn Antitrust Litig.*, 792 F. Supp. 650, 653 (D. Minn. 1992) (citing *Nat'l Farmers Org., Inc. v. Assoc. Milk Producers, Inc.*, 850 F.2d 1286, 1293 (8th Cir. 1988)).

[187] *Pork,* 2024 WL 2060386, at *25 (citing *Potash*, 159 F.R.D. at 697).

[188] Sunding Report ¶¶ 125-134.

[189] *Id.* ¶ 194.

[190] *Id.* ¶ 195.

[191] *Comcast*, 569 U.S. at 36.

[192] *Pork*, 2024 WL 2060386, at *25-26 (finding no *Comcast* problem).

## 2.    **A Class Action is Superior.**

Under Rule 23(b)(3), certification is appropriate if a classwide trial is "superior to other available methods for fairly and efficiently adjudicating the controversy."[193] There is no "bedrock standard" to determine superiority.[194] Rather, superiority is evaluated by several factors:

> (A) The interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of the class action.[195]

As an initial matter, a finding of predominance necessarily implies the superiority of class action treatment, because the prevalence of "common issues of law and fact" means that the superiority requirement "likely poses no serious obstacle to class certification."[196]

Here, DPPs have established predominance as explained above, and all four superiority factors weigh heavily in favor of Plaintiffs. *First*, while there have been opt-outs, a strong majority of the thousands of DPP Class Members have refrained from bringing their own actions and have accepted Interim Co-Lead Counsel for the DPP Class prosecuting this action on their behalf for the last five years. This has included participating in the $52.5 million settlement negotiated with Defendant JBS, to which no Class Member

---

[193] Fed. R. Civ. P. 23(b)(3).

[194] *Sonmore v. CheckRite Recovery Servs., Inc.*, 206 F.R.D. 257, 265 (D. Minn. 2001).

[195] *See id.*; *Zurn*, 267 F.R.D. at 566-67.

[196] *Messner,* 669 F.3d at 814 n.5.

objected. *Second*, there is no other pending action involving DPPs or Defendants concerning the claims and facts in this case, and this action has already progressed through dozens of depositions and the exchange of millions of pages of documents. *Third*, it is desirable to concentrate litigation in this forum, instead of the hundreds—if not thousands—of individual actions that would result from a denial of certification. And this District has already managed an antitrust class action alleging price-fixing in a similar industry—pork.[197] *Fourth*, the most feasible and efficient way for DPPs to pursue their claims is through a class action; as this District has previously explained, "managing a class action—though difficult—is certainly more efficient than juggling a multitude of individual actions."[198] Accordingly, because predominance is satisfied, and because all four factors weigh heavily in favor of certification, the superiority requirement is "readily satisfied."[199]

### C.   The Proposed Class Is Ascertainable

A class is ascertainable if its "members may be identified by reference to objective criteria."[200] DPPs need not identify all class members at this stage—they need only show that class members "*can* be identified."[201]

---

[197] *Pork*, 2024 WL 2060386 at *20.

[198] *Id.*

[199] *Id.*

[200] *McKeage v. TMBC, LLC*, 847 F.3d 992, 998 (8th Cir. 2017).

[201] *H&T Fair Hills, Ltd. v. All. Pipeline L.P.,* No. 19-1095, 2021 WL 2526737, at *5 (D. Minn. June 21, 2021) (emphasis added).

It is now well-established that direct purchasers of protein products satisfy the standard for an ascertainable class.[202] Here, DPPs have provided a precise and bounded class definition, and class members can be readily identified from Defendants' transactional sales data.[203] Moreover, Class Members may perform self-identification through, for example, affidavits, which also constitutes a permissible means of ascertaining class membership.[204] Accordingly, because the Class is readily identifiable with respect to objective criteria, the Class is ascertainable.

### D.        Class Counsel are Adequate Under Rule 23(g)

DPPs respectfully request that Gustafson Gluek PLLC, Hartley LLP, Hausfeld LLP, and Cotchett Pitre & McCarthy, LLP be appointed as Co-Lead DPP Class Counsel under Rule 23(g) for the DPP Class. These four firms have litigated this case on behalf of DPPs for over four years, securing a $52.5 million settlement from JBS, coordinating and reviewing millions of documents from Defendants and third parties, briefing and arguing motions, and retaining and working with experts, among many other duties. Each firm has devoted substantial time and resources to prosecute this action since its inception and each is committed to continuing to do so. Additionally, each firm has extensive knowledge and experience litigating similar antitrust actions to conclusion.[205]

---

[202] *Pork*, 2024 WL 2060386 at *29; *Broilers,* 2022 WL 1720468, at *20-21.

[203] *See Wholesale Grocery,* 2016 WL 4697338 at *5.

[204] *Pork¸* 2024 WL 2060386 at *29; *In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*, No. 16-2709, 2019 WL 1418292, at *16 (W.D. Mo. Mar. 21, 2019).

[205] *See, e.g.*, Plaintiff's Motion for Appointment of Interim Co-Lead Counsel for Proposed Direct Purchaser Class, ECF No. 58 (August 10, 2020) (attaching firm resumes).

## VI. <u>CONCLUSION</u>

For the foregoing reasons, the Court should certify the proposed Class, appoint the

named Plaintiffs as Class Representatives, and appoint Gustafson Gluek PLLC, Hartley

LLP, Hausfeld LLP, and Cotchett Pitre &McCarthy, LLP as Co-Lead DPP Class Counsel.


Dated: September 25, 2024                  Respectfully submitted,

                                           */s/ Michelle J. Looby*

                                           Daniel E. Gustafson (#202241)
                                           Daniel C. Hedlund (#258337)
                                           Michelle J. Looby (#0388166)
                                           Joshua J. Rissman (#0391500)
                                           Anthony J. Stauber (#0401093)
                                           Bailey Twyman-Metzger (#0400179)
                                           **GUSTAFSON GLUEK PLLC**
                                           Canadian Pacific Plaza
                                           120 Sixth Street, Suite 2600
                                           Minneapolis, MN 55402
                                           Telephone: (612) 333-8844
                                           Facsimile: (612) 339-6622
                                           dgustafson@gustafsongluek.com
                                           dhedlund@gustafsongluek.com
                                           mlooby@gustafsongluek.com
                                           jrissman@gustafsongluek.com
                                           tstauber@gustafsongluek.com
                                           btwymanmetzger@gustafsongluek.com

                                           Jason S. Hartley (*admitted pro hac vice*)
                                           Jason Lindner (*admitted pro hac vice*)
                                           Maureen E. Forsyth
                                           **HARTLEY LLP**
                                           101 W. Broadway, Suite 820
                                           San Diego, CA 92101
                                           Tel: (619) 400-5822

hartley@hartleyllp.com
lindner@hartleyllp.com
forsyth@hartleyllp.com

Megan E. Jones (*admitted pro hac vice*)
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
mjones@hausfeld.com

Adam J. Zapala (*admitted pro hac vice*)
Elizabeth T. Castillo (*admitted pro hac vice*)
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
azapala@cpmlegal.com
ecastillo@cpmlegal.com

*Proposed Co-Lead Counsel for the Proposed
Direct Purchaser Plaintiffs*