# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| *IN RE CATTLE & BEEF ANTITRUST LITIGATION* | Case No. 0:22-md-03031-JRT-JFD |
| This Document Relates To:<br><br>COMMERCIAL AND INSTITUTIONAL INDIRECT PURCHASER PLAINTIFF ACTIONS | **MEMORANDUM IN SUPPORT OF COMMERCIAL AND INSTITUTIONAL INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL** |

**REDACTED**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................III

I.     INTRODUCTION.....................................................................................1

II.    STATEMENT OF FACTS.........................................................................2

     A.    In Late 2014 and Early 2015, Defendants Began to Lay the Foundations for their Conspiracy. ....................................................................3

         1.    Direct Communications Among Competitors....................................4

         2.    Indirect Communications ...................................................................5

         3.    Defendants Allocate Market Share and Coordinate Production ........8

         4.    "[F]undamentals are about to turn up imminently" ........................12

     B.    Into 2016, Defendants Continued Production Cuts and Continued to Benefit. .........................................................................................13

     C.    Production Cuts and Inflated Prices Continued Into 2017 and Beyond......16

     D.    The Conspiracy Inflated Prices Throughout the Market and Broadly Impacted CIIPPs....................................................................20

III.   STANDARD FOR CLASS CERTIFICATION........................................22

IV.   CIIPPS SATISFY RULE 23(A)..............................................................24

     A.    Numerosity ........................................................................................25

     B.    Commonality......................................................................................25

     C.    Typicality...........................................................................................26

     D.    Adequacy of Representation ..............................................................27

V.    PLAINTIFFS SATISFY RULE 23(B)(2) ...............................................28

VI.   PLAINTIFFS SATISFY RULE 23(B)(3) ...............................................29

     A.    The Predominance Test Is Readily Met in Antitrust Cases. .............29

1.  Evidence of the Alleged Antitrust Violation is Common to the Class. .......................................................................... 29

2.  Evidence of Antitrust Impact Is Common to the Class and Shows Impact to All or Virtually All Class Members. ................................ 30

3.  CIIPPs Show a Reliable Method of Calculating the Class's Damages Using Evidence Common to the Class. ............................................. 35

4.  Any Remaining Individual Issues Are Easily Managed and Will Not Predominate Over Questions Common to the Class. ....................... 37

B.  A Class Action Is Superior to Individual Actions. ....................................... 39

VII.  THE COURT SHOULD APPOINT CLASS COUNSEL. .................................... 40

VIII.  CONCLUSION ................................................................................................ 40

# TABLE OF AUTHORITIES

**Cases**

*Amchem Prod., Inc. v. Windsor*, 521 U.S. 591 (1997) ................................................. 23, 29

*Amgen v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455 (2013) ............................... 23, 30

*Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005) .............................................. 30

*Brown v. Wells Fargo*, 284 F.R.D. 432 (D. Minn. 2012) ............................................ 28

*Burnett v. Nat'l Assoc. of Realtors*, No. 4:19-cv-00332-SRB, 2022 WL 1203100 (W.D.

   Mo. Apr. 22, 2022) ................................................................................................ 26, 30

*Carnegie v. Household Int'l, Inc.*, 376 F.3d 656 (7th Cir. 2004) ................................. 40

*City of Farmington Hills Emps. Ret. Sys. v. Wells Fargo Bank, N.A.*, 281 F.R.D. 347 (D.

   Minn. 2012) ............................................................................................................ 27

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ........................................................ 35, 36

*Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817 (8th Cir. 2016) ............................ 29

*DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171 (8th Cir. 1995) ...................................... 26

*Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011) ............................. 22, 37

*Gen. Tel. Co. of Sw. v. Falcon.*, 457 U.S. 147 (1982) ................................................ 25, 26

*Hale v. Emerson Elec.*, 942 F.3d 401 (8th Cir. 2019) ................................................ 37

*Hospital Auth. of Metro. Gov't of Nashville & Davidson Cty. v. Momenta Pharms.*, 333

   F.R.D. 390 (M.D. Tenn. 2019) .............................................................................. 27

*In re Broiler Chicken Antitrust Litig.*, No. 1:16-cv-0863716, 2022 WL 1720468 (N.D. Ill.

   May 27, 2022) ........................................................................................................ 24, 38

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008), *as amended* (Jan. 16, 2009) .................................................................................................. 23

*In re Lidoderm Antitrust Litig.*, No. 3:14-md-02521-WHO, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ........................................................................................... 30

*In re Monosodium Glutamate Antitrust Litig.*, 205 F.R.D. 229 (D. Minn. 2001) ............ 24

*In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015) .................................................. 30

*In re NorthShore Univ. HealthSystem Antitrust Litig.*, No. 1:07-cv-04446, 2018 WL 2383098 (N.D. Ill. Mar. 31, 2018) ................................................................... 27

*In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-02143-RS, 2016 WL 467444 (N.D. Cal. Feb. 8, 2016) ............................................................................................. 31

*In re Packaged Seafood Prod. Antitrust Litig.*, 332 F.R.D. 308 (S.D. Cal. 2019), *aff'd Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022), *cert. denied sub nom.*, 143 S. Ct. 424 (2022) .......................................... 24, 38, 39

*In re Pork Antitrust Litig.*, 665 F. Supp. 3d 967 (D. Minn. 2023) .................................... 22

*In re Pork Antitrust Litig.*, No. 0:18-cv-01776-JRT-JFD, 2024 WL 2060386 (D. Minn. May 8, 2024) ........................ 23, 24, 25, 26, 27, 28, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39

*In re Potash Antitrust Litig.*, 159 F.R.D. 682 (D. Minn. 1995) ............................. 24, 25, 26

*In re Pre-Filled Propane Tank Antitrust Litig.*, No. 4:14-md-02567-GAF, 2021 WL 5632089 (W.D. Mo. Nov. 9, 2021) ......................................................................... 31, 33

*In re TFT-LCD (Flat Panel) Antitrust Litig. (TFT-LCD I)*, 267 F.R.D. 583 (N.D. Cal. 2010) ................................................................................................................. 24

*In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108 (2d Cir. 2013) .......................... 37

iv

*In re Urethane Antitrust Litig.*, 768 F.3d 1245 (10th Cir. 2014) ........................................ 39

*In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 268 (D. Minn. 1989) ...................... 23

*In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604 (8th Cir. 2011) ............... 22, 23

*Payton v. County of Kane,* 308 F.3d 673 (7th Cir. 2002) .................................................... 27

*Phillips Petroleum v. Shutts*, 472 U.S. 797 (1985) .............................................................. 37

*Taqueria El Primo LLC v. Illinois Farmers Ins. Co.*, 577 F. Supp. 3d 970 (D. Minn.

    2021) ....................................................................................................................... 40

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) ............................................ 29, 36

*Wal-Mart v. Dukes*, 564 U.S. 338 (2011) .............................................................. 22, 23, 25

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100 (1969) ................................... 30

## Statutes

Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 18.25 (4th ed. 2002) .. 29

John M. Connor, *Cartel Overcharges*, 26 Res. L. & Econ. 249 (2014) ........................... 34

## Other Authorities

Fed. R. Civ. P. 23 .................................................................................................................... 29

## I.    INTRODUCTION

Commercial and Institutional Indirect Purchasers of beef products ("CIIPPs")[1] move for certification of a (1) nationwide class of restaurants, caterers, and other institutional food preparers to pursue injunctive and declaratory relief under Federal Rule of Civil Procedure 23(b)(2), and (2) certification of a damages class limited to the Indirect Purchaser States under Rule 23(b)(3).[2]

CIIPPs' Complaint alleges the Defendants[3] conspired to unlawfully constrain the supply of, and fix, raise, maintain, and stabilize the price of, beef in the United States, from at least January 1, 2015 to at least February 29, 2020 ("Class Period").[4] Defendants'

---

[1] As used herein, "CIIPPs" shall mean the following class representatives: The Grady Corporation II formerly d/b/a Whole hog Café; Steve Sizemore formerly d/b/a Longhorn's Steakhouse; Pearlz Oyster Bar; Park Tavern; Union Public House; Sandee's Bakery d/b/a Sandee's Catering Bakery & Deli; Grub Stake; Max and Bella's Smokehouse, LLC; Yoland Shegian d/b/a LA Shawarma; BW-SS, Inc.; Maquoketa Care Center; Fernando's Street Kitchen; Jim's Place Grille; and Farah's Courtyard Deli, Inc.

[2] The Indirect Purchaser States are: Arizona, Arkansas, California, the District of Columbia, Hawaii, Florida, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, Nevada, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

[3] Defendants are National Beef Packing Company ("National Beef" or "National"); Cargill, Inc., Cargill Meat solutions Corporation ("CMS"); JBS S.A., JBS USA Food Company, Swift Beef Company, JBS Packerland, Inc., ("JBS Defendants" or "JBS"); Tyson Foods, Inc., Tyson Fresh Meats, Inc. ("Tyson"). CIIPPs have settled with JBS Defendants. ECF. No. 451.

[4] The operative complaint is Commercial and Institutional Indirect Purchaser Plaintiffs' Third Amended and Consolidated Class Action Complaint, ECF No. 445 ("Compl."). *See also* Declaration of Michael J. Flannery in Support of Commercial and Institutional Indirect Purchaser Plaintiffs' Motion for Class Certification and Appointment of Class Counsel ("Flannery Decl."), Ex. 1, Expert Report of Michael A. Williams, Ph.D. ¶ 6 ("Williams Rep."). Unless otherwise noted, exhibit references refer to documents attached to Flannery Decl. filed concurrently herewith. CIIPPs join in the other plaintiff classes' arguments in favor of class certification to the extent they are not inconsistent with arguments herein.

1

scheme was implemented via multiple acts of anticompetitive conduct, allowing Defendants to reap increased profits at the expense of downstream purchasers, like CIIPPs, who were forced to pay inflated prices for beef products throughout the Class Period.

As courts have found in a series of recent protein industry antitrust cases, CIIPPs' claims are best resolved on a class action basis. From evidence of the conspiracy itself, to economic analysis of its price impacts, to damages, CIIPPs' case turns on evidence that is common to all class members. Any individual issues are minor and can easily be managed at trial. This matter thus presents a classic antitrust conspiracy case in which class proceedings provide the fairest and most efficient means of resolving the litigation.

## II.   STATEMENT OF FACTS

Defendants are the United States' leading beef packers, who acquire cattle and process it into beef products that are sold to purchasers nationwide. Collectively, they control 85 percent of the market.[5] Defendants' domination of this concentrated market reflects decades of consolidations and mergers; in 1977, the top four beef packers controlled only 25 percent of the market.[6] Defendants' position is entrenched, with high barriers to entry limiting potential new competitors.

CIIPPs, by contrast, are mostly small, localized food preparers, who purchase beef products indirectly from the Defendants via direct purchaser distributors such as Sysco and

---

[5] Ex. 2, James M. McDonald, Xiao Dong, and Keith Fuglie, *Concentration and Competition in U.S. Agribusiness*, U.S.D.A. Economic Research Service Report No. EIB-256, 25 (2023).

[6] Ex. 3, James M. MacDonald, Michael E. Ollinger, Kenneth E. Nelson, and Charles R. Handy, *Consolidation in U.S. Meatpacking*, U.S.D.A. Economic Research Service Report No. 785, 7 (2000).

US Foods. Defendants implemented their conspiracy to inflate the prices CIIPPs paid for beef products through a variety of mutually reinforcing levers.

**A.      In Late 2014 and Early 2015, Defendants Began to Lay the Foundations for their Conspiracy.**

[REDACTED]

---

[7] [REDACTED]

Ex. 4, CARGILL001280909.                       Ex. 5, TYSONBEEF01844489.

Ex. 6, TYSONBEEF01632653; Ex. 7, Gerber Dep. 80:10-20 [REDACTED]; Ex. 8, JBS-0000636429

[8] *See* Ex. 9, Nelson Dep. 75:12-76-8; 89:22-90:7 [REDACTED]

Ex. 10, TYSONBEEF01641481; Ex. 11, TYSONBEEF01656908 [REDACTED]; Ex. 12, TYSONBEEF01854604 [REDACTED]

; Ex. 13, TYSONBEEF00634446-47 [REDACTED]; Ex. 14,

TYSONBEEF01626335-37 [REDACTED]; Ex. 15, Billups Dep. 163:12-165:15.

[9] Ex. 16, Lowe Dep. 54:20-55:19.

[REDACTED]

[REDACTED]

[REDACTED]

1.    *Direct Communications Among Competitors*

A core channel for the conspiracy was direct communications among Defendants in

which they shared information non-colluding competitors would have safeguarded.

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

---

[10] Ex. 16, Lowe Dep. 55:24-56:7.

[11] *See, e.g.*, Ex. 17, JBS-0000150138; Ex. 18, CARGILL001447214; Ex. 19, NationalBeef-00267734; Ex. 20, JBS-0000149888-89; Ex. 21, Tim Klein Dep. 71:19-23; Ex. 22, Thoni Dep. 86:12-21.

[12] *See, e.g.*, Ex. 23, NationalBeef-00325456; Ex. 24, JBS-0000173777; Ex. 25, NationalBeef-00267192; Ex. 26, JBS-0000235014; Ex. 27, Wilkerson Dep. 78:25-79:4; Ex. 28, Holbrook Dep. 83:20-85:4; *see also* Williams Rep. ¶¶ 85-95.

[13] Ex. 29, CARGILL000520400 [REDACTED] *see also* Ex. 30, CARGILL000520398.

[14] Ex. 31, CARGILL000103792. [REDACTED] Ex. 27, Wilkerson Dep. 80:9-87:25.



2.   *Indirect Communications*

---

[15] Ex. 32, CARGILL000526137.

[16] Ex. 33, Sorensen Dep. 208:15-210:7.

[17] Ex. 34, CARGILL000520610; Ex. 22, Thoni Dep. 120:4-12.

[18] *See, e.g.*, Ex. 35, TYSONBEEF00694879; Ex. 36, NationalBeef-00295849; Ex. 37, TYSONBEEF00472828.

[19] *See, e.g.*, Ex. 38, NationalBeef-00072619; Ex. 39, TYSONBEEF01639203; Ex. 40, NationalBeef-00007105; Ex. 41, CARGILL000523378; Ex. 42, CARGILL000520609-10; Ex. 43, JBS-0000179060; Ex. 44, JBS-0001252240. *See also* Williams Rep. ¶¶ 133-44.

[20] *See, e.g.*, Ex. 45, CARGILL001252939; Ex. 46, JBS-0000150084; Ex. 47, CARGILL000239754; Ex. 48, JBS-0000149039; Ex. 28, Holbrook Dep. 85:22-86:17; Ex. 27, Wilkerson Dep. 80:9-87:25; Ex. 49, Hueser Dep. Pls.' Ex. 2267.

[21] *See, e.g.*, Ex. 16, Lowe Dep. 166: 2-19; 237:1-7; Ex. 50, CARGILL001057270; Ex. 51, CARGILL000841316.

[22] Ex. 16, Lowe Dep. 89:7-19, 166:2-19; 237:1-7, 325:9-12.

Defendants' executives frequently tasked their employees with seeking out and transmitting competitor intelligence. ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[23] *See, e.g.*, Ex. 5, TYSONBEEF01844489 ████████████████████████████
████████████████████████████████████████████████ Ex. 28,
Holbrook Dep. 172:12-15 ████████████████████████████████████████
████████████████████████████████████ *See* Ex. 52, Nogelmeier
Dep. 87:24-88:11 ██████████████████████████████████████████████
██████████████ Ex. 33, Sorensen Dep. 208:15-24.
[24] *See, e.g.*, Ex. 28, Holbrook Dep. 65:14-66:19; Ex. 53, TYSONBEEF01232796 ████
█████████████████████████████████████████████████████; Ex. 54,
TYSONBEEF01259388 █████████████████████████████████████████
████████████; Ex. 55, TYSONBEEF01843428 █████████████████████
[25] *See, e.g.*, Ex. 52, Nogelmeier Dep. 87:12-14; Ex. 54, TYSONBEEF01259388 ████
████████████████████████████████████████████████████; Ex. 56,
TYSONBEEF01220769 ████████████████
[26] *See, e.g.*, Ex. 52, Nogelmeier Dep. 79:24-80:6, 87:1-7; Ex. 54, TYSONBEEF01259388
███████████████████████████████████████████████████████
[27] *See, e.g.*, Ex. 52, Nogelmeier Dep. 82:4-18.
[28] Ex. 57, Crowl Dep. 153:20-178:18, 178:23-191:2, 192:6-201:7; Ex. 58,
TYSONBEEF02066228; Ex. 59, TYSONBEEF02067587.
[29] *See* Ex. 28, Holbrook Dep. 275:3-276:7. ████████████████████████████
████████████████████████████ *See, e.g.*, Ex. 60, TYSONBEEF03061304; Ex. 28,
Holbrook Dep. 153:6-154:7. ███████████████████████████████████████
████████████████████████████████████████████████ Ex. 60,
TYSONBEEF03061304; Ex. 28, Holbrook Dep. 72:7-21.

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

Defendants also used third-party conduits to share confidential information. One of the most prolific was Cassandra Fish, a self-proclaimed beef industry analyst. Fish frequently received information from Defendants concerning their future production, supply, and pricing plans and shared intelligence she gathered from other Defendants.

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

---

[30] *See* Ex. 33, Sorensen Dep. 69:21-77:6, 265:17-266:5; Ex. 61, TYSONBEEF02998833; Ex. 62, TYSONBEEF01356805.

[31] Ex. 63, Guettermann Dep. 141:9-145:16; *see, e.g.*, Ex. 64, NationalBeef-01294876.

[32] Ex. 65, CARGILL000178942-43.

[33] Ex. 16, LoweDep. 171:2-9, 175:9-11.

[34] *See, e.g.*, Ex. 66, NationalBeef-00409985 [REDACTED] ; Ex. 67, NationalBeef-00546826 [REDACTED] ; Ex. 68, NationalBeef-00006701; Ex. 69, NationalBeef-00474830; Ex. 70, NationalBeef_00474586; Ex. 71, NationalBeef-00544305; *see also* Ex. 72, Brooks Dep. 254:13-257:4.

[35] *See* Ex. 73, CFish_0000095690; Ex. 74, NationalBeef-00002722.

[36] *See, e.g., id.*



### 3.   *Defendants Allocate Market Share and Coordinate Production*

Whether through direct communications or indirect means, Defendants were able to effectively and consistently disseminate and receive forward-looking, competitive information they would not have shared if they were acting as genuine competitors. They used this information, along with certain metrics, to monitor one another's businesses and unlawfully coordinate cattle purchases, production levels, and beef prices.

---

[37] Ex. 7, Gerber Dep. 59:1-25 ███████████████████ Ex. 75, JBS-0000314482; Ex. 76, CFish_0000139820.
[38] Ex. 77, NationalBeef-01697714.
[39] ████████████████████████████████ Ex. 78, Groetken Dep. 191:24-192:16.
[40] *See, e.g.*, Ex. 79, NationalBeef-01703548.
[41] Ex. 80, Kieffer Dep. 123:17-123:25, 134:24-137:3; Ex. 81, TYSONBEEF01352488; Ex. 82, TYSONBEEF01259177; Ex. 83, TYSONBEEF00475650.
[42] *See* Ex. 80, Kieffer Dep. 134:24-137.

One metric Defendants monitored closely was their respective shares of slaughtered

cattle. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[43] *See, e.g.*, Ex. 84, NationalBeef-01003892; Ex. 85, NationalBeef-01575599; Ex. 86, CARGILL000517823; Ex.87, CARGILL000517823; Ex. 88, CARGILL000905651 ████████████████████████████████; Ex. 89, JBS-0000187553; Ex. 90, JBS-0001393079; Ex. Ex. 91, Hueser Dep. 165:15-17 ████████████████

████████████ *id.* at 75:8-10

████████████████████████ Ex. 92, TYSONBEEF03456550

████████████████████████████████████████████████████

[44] *See, e.g.,* Ex. 94, NationalBeef-00004859; Ex. 95, CARGILL00l113625; Ex. 96, CARGILL000100199; Ex. 97, CARGILL000234000; Ex. 98, JBS-0001063245.
[45] Ex. 21, Tim Klein Dep. 166:18-167:2.
[46] Ex. 99, NationalBeef-00950021. ████████████████
████████████████ Ex. 100, NationalBeef-00950024.
[47] Ex. 17, JBS-0000150138; Ex. 101, NationalBeef-00267770.

While egregious, these actions are only an early example of the production constraints Defendants employed more robustly going into 2015.

---

[48] Ex. 102, NationalBeef-00023526; Ex. 16, Lowe Dep, 146:1-8; Ex. 103, NationalBeef-00765862.
[49] Ex. 77, NationalBeef-01697714; Ex. 16, Lowe Dep, 144:12-18. Ex. 104, NationalBeef-00012111-12. Ex. 105, NationalBeef-00721530.
[50] Ex. 102, NationalBeef-00023526.
[51] Ex. 77, NationalBeef-01697714.
[52] Ex. 63, Guettermann Dep. 89:13-23.
[53] Ex. 106, TYSONBEEF00479421.



████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

░░░░░░░███████████████████████████

Defendants' anticompetitive actions began to bear fruit. ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

████████████████████; *see also* Ex. 116, TYSONBEEF01340139-40

████████████████████████

[60] Ex. 117, TYSONBEEF00428026; Ex. 91, Hueser Dep. 196:3-4 █████████

██████████████████████

[61] Ex. 117, TYSONBEEF00428026.

[62] Ex. 118, CARGILL001166919.

[63] Ex. 119, TYSONBEEF00637005. ███████████████████████

███████████ Ex. 91, Hueser Dep. 49:11-18.

[64] Ex. 119, TYSONBEEF00637005 (emphasis added).

[65] Ex. 120, TYSONBEEF00414270.

███████████████████████████████████████████████████

████████████████████████████████████████

**B.**   **Into 2016, Defendants Continued Production Cuts and Continued to Benefit.**

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[66] Ex. 116, TYSONBEEF01340139. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ *Id.* (capitalization in original) (emphasis added).

[67] *Id.;* Ex. 91, Hueser Dep. 182:6-24.

[68] Ex. 119, TYSONBEEF00637005.

[69] Ex. 121, CARGILL001338943; Ex. 122, CARGILL001348679.

[70] Ex. 123, CARGILL001445736.



[71] Ex. 124, NationalBeef-00299792.

[72] Ex. 125, NationalBeef-01110400.

[73] Ex. 126, NationalBeef-00005585.

[74] *See, e.g.,* Ex. 127, TYSONBEEF00621673; Ex. 128, TYSONBEEF00578579; Ex. 91, Hueser Dep. 256:9-259:18; Ex. 7, Gerber Dep. 236:17-237:17; Ex. 129, TYSONBEEF00390286.

[75] *See* Ex. 119, TYSONBEEF00637005.

[76] Ex. 130, TYSONBEEF00578291; Ex. 109, Strickholm Dep. 121:23-122:10, 163:10-16.

[77] Ex. 127, TYSONBEEF00621673; Ex. 91, Hueser Dep. 256:9-259:18.

[78] Ex. 128, TYSONBEEF00578579.

[79] Ex. 131, TYSONBEEF01641508-09 ██████████████████████; Ex. 7, Gerber Dep. 241:10-241:19; Ex. 15, Billups Dep. 177:17-178:2.

[80] **Ex. 132, CFish_0000079362.**



---

[81] *Id.*

[82] *Id.* (emphasis added)

[83] Ex. 107, CFish 0000079473 (emphasis added). ███████████
███████████████████████████████ Ex. 133, NationalBeef-00557871.

[84] Ex. 134, NationalBeef-00547032 ███████████████████████
████████████████ *See also* Ex. 67, NationalBeef-00546826 ████████
███████████████████████████ Ex. 135, NationalBeef-
00439091.

[85] *See* Ex. 136, TYSONBEEF01212133; Ex. 80, Kieffer Dep. 154:21-156:13.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

████████████████████████████████████████

**C.      Production Cuts and Inflated Prices Continued Into 2017 and Beyond.**

As Defendants' production restraint and margin growth continued, so did their

conspiratorial communications. ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

---

[86] Ex. 137, NationalBeef-01397707.
[87] Ex. 138, CARGILL000095128.
[88] Ex. 139, NationalBeef-00566958.
[89] Ex. 140, NationalBeef-00423383.
[90] *Id.*
[91] Ex. 141, NationalBeef-00425723.
[92] Ex. 27, Wilkerson Dep. Pls.' Ex. 1913.
[93] Ex. 142, NationalBeef-00222507 █████████████████████████

███████████████████

██ (emphasis added). *See* also Ex. 143, CFish_0000064279 █

████████████████████████████████████████████████████████

████████████████████████████████████████████████ ; Ex. 75, JBS-

These communications transpired while Defendants continued to maintain kill

levels well below capacity. █████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

0000314482 ████████████████████████████████████████████████████

[94] Ex. 144, JBS-0000668126.
[95] Ex. 145, CARGILL000589023.
[96] Ex. 146, Hueser Dep. Pls.' Ex. 2293; Ex. 91, Hueser Dep. 274:9-275:15.
[97] Ex. 147, TYSONBEEF00627573 ███████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████████

[98] Ex. 148, TYSONBEEF02060334-35 ████████████████████████████████████
███████████████████████████████████████████████ Ex. 49, Hueser
Dep. Pls.' Ex. 2267 █████████████████████████████████████████████
█████████ Ex. 149, TYSONBEEF02509672 ███████████████████████████
██████████████████████ ; Ex. 150, TYSONBEEF00583994 █████████████
██████████████████████████████████████████████ ; Ex. 151,
TYSONBEEF00597651 ███████████████████████████████████████████
████████████████ Ex. 91, Hueser Dep. 104:20-109:1, 119:1-127:8.



---

[99] *See* Ex. 143, CFish_0000064279

[100] *See* Ex. 152, NationalBeef-00598543

[101] Ex. 153, NationalBeef-00002537.
[102] *Id.*
[103] *See, e.g.*, Ex. 154, NationalBeef-00473816 Ex. 155, NationalBeef-00003526 Ex. 156, NationalBeef-00545859 Ex. 157, NationalBeef-00597426.

[104] *See, e.g.*, Ex. 97, CARGILL000234000; Ex. 158, CARGILL000269441; Ex. 159, CARGILL000290884; Ex. 95, CARGILL001113625.
[105] Ex. 160, CARGILL000834892.
[106] Ex. 161, CARGILL000200847; *see also* Ex. 162, JBS-0000309681
[107] Ex. 163, CARGILL000542433.
[108] *Id.*
[109] Ex. 32, CARGILL000526137.
[110] Ex. 96, CARGILL000100199.

**D.     The Conspiracy Inflated Prices Throughout the Market and Broadly Impacted CIIPPs.**

As Defendants intended, and as was seen throughout the period, their conspiratorial

conduct translated into increased prices and margins. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

111 Ex. 41, CARGILL000523378.
112 Ex. 143, CFish_0000064279.
113 Ex. 164, NationalBeef-00004142.
114 Ex. 165, TYSONBEEF00304735.
115 Ex. 166, CARGILL000642360.
116 Ex. 167, CARGILL000836242.
117 Ex. 168, CARGILL000725390.



[118] Ex. 52, Nogelmeier Dep. 213:2-214:10

Ex. 169, McLaurin Dep. 43:16-18

; *id.* at 47:4-10

Ex. 170, Vinson Dep. 246:2-8

[119] Ex. 171, Marvin L. Hayenga & Lev F. Shrader, *Formula Pricing in Five Commodity Marketing Systems*, American Journal of Agricultural Economics, Vol. 62, No. 4, at 753 (Nov. 1980).

[120] Ex. 52, Nogelmeier Dep. 210:1-212:24, 217:9-218:3; Ex. 28, Holbrook Dep. 241:23-242:8; Ex. 169, McLaurin Dep. 43:16-18, 47:4-10 ; Ex. 170, Vinson Dep. 246:2-8

[121] Ex. 52, Nogelmeier Dep. 214:12-14

*id.* 217:22-218:3

Ex. 169, McLaurin Dep. 47:4-10

Ex. 170, Vinson Dep. 246:2-8.

[122] Ex. 52, Nogelmeier Dep. 212:18-20.



As described below, CIIPPs' economic expert, Dr. Michael Williams, analyzed millions of transactions while controlling for lawful factors to empirically determine the conspiracy's effects on beef prices.

## III.   STANDARD FOR CLASS CERTIFICATION

Rule 23 requires a "rigorous" analysis of whether the proposed classes should be certified. *Wal-Mart v. Dukes*, 564 U.S. 338, 350 (2011). The question, however, is whether the requirements for class certification are satisfied, not whether Plaintiffs will prevail on the merits of their claims. *See In re Zurn Pex Plumbing Prod. Liab. Litig.* (*Zurn*), 644 F.3d 604, 613 (8th Cir. 2011). The Rule 23 inquiry is guided by "the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). The analysis here accordingly focuses on CIIPPs' proof "(1) that Defendants conspired to

---

[123] *See In re Pork Antitrust Litig.*, 665 F. Supp. 3d 967, 1006 (D. Minn. 2023) ("There is extensive evidence that market prices generally set the individual Defendants' prices. Individual differences between negotiations and transactions do not disrupt the fact that the Defendants' conspiracy, if true, would cause all prices to increase." (footnote omitted)).
[124] Ex. 172, TYSONBEEF03508288.

violate federal antitrust laws, (2) that class members suffered injury because of the violation ('impact'), and (3) [whether] plaintiffs can measure the damages." *In re Pork Antitrust Litig.* (*Pork*), No. 0:18-cv-01776-JRT-JFD, 2024 WL 2060386, at *20 (D. Minn. May 8, 2024). Although merits questions may overlap with the Rule 23 analysis, the Court should assess the merits "only to the extent . . . that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013); *Wal-Mart*, 564 U.S. at 352 n.6.

A district court has "broad discretion in determining whether to certify a class." *Zurn*, 644 F.3d at 616. In exercising that discretion, the Court should "resolve factual disputes by a preponderance of the evidence and make findings that each Rule 23 requirement is met or is not met, having considered all relevant evidence and arguments presented by the parties." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008), *as amended* (Jan. 16, 2009). As courts and the Advisory Committee on Civil Rules have reiterated, antitrust cases are well-suited for class certification. *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). This reflects the fact that anticompetitive conduct tends to impose harms throughout the market, giving rise to injuries that may fairly and efficiently be resolved on an aggregate basis. *See In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 268, 271 (D. Minn. 1989) ("Plaintiffs have alleged a nationwide horizontal price-fixing conspiracy in violation of section 1 of the Sherman Act. Proof of such an antitrust violation involves primarily common issues of fact and law."). Class certification furthers "'the important role class actions play in the private enforcement'" of the antitrust laws, so "'courts resolve doubts in [antitrust] actions in favor of certifying the class.'" *In*

23

*re Monosodium Glutamate Antitrust Litig.*, 205 F.R.D. 229, 231 (D. Minn. 2001) (quoting *In re Potash Antitrust Litig.* (*Potash*), 159 F.R.D. 682, 688-89 (D. Minn. 1995)). Courts have specifically found that class certification is warranted in appropriate indirect-purchaser antitrust cases such as this one. *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig. (TFT-LCD I)*, 267 F.R.D. 583, 592 (N.D. Cal. 2010) ("Courts have stressed that price-fixing cases are appropriate for class certification because a class-action lawsuit is the most fair and efficient means of enforcing the law where antitrust violations have been continuous, widespread, and detrimental to as yet unidentified consumers." (citation omitted)). Indeed, courts have certified classes in every protein industry indirect purchaser case that has proceeded to class certification to date. *See In re Packaged Seafood Prod. Antitrust Litig. (Tuna)*, 332 F.R.D. 308, 316 (S.D. Cal. 2019), *aff'd Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022), *cert. denied sub nom.*, 143 S. Ct. 424 (2022); *In re Broiler Chicken Antitrust Litig. (Broilers)*, No. 1:16-cv-0863716, 2022 WL 1720468, at *1 (N.D. Ill. May 27, 2022); *Pork*, 2024 WL 2060386, at *1.

## IV.     CIIPPs SATISFY RULE 23(a)

The Court must first determine whether Rule 23's prerequisites for class certification are satisfied, then find whether certification of the proposed classes is warranted under Rules 23(b)(2) and (b)(3). *See Pork*, 2024 WL 2060386, at *14. The Rule 23(a) prerequisites are easily satisfied in this case.

### A.      Numerosity

Rule 23(a)(1) "requires that a class be so numerous that joinder of all members is impracticable." As in *Pork*, the proposed classes "have thousands of members," so "[t]he Rule 23(a) numerosity requirement is plainly satisfied." 2024 WL 2060386, at *14.

### B.      Commonality

Rule 23(a)'s "commonality" and "typicality" requirements serve as "guideposts for determining . . . whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 153 n.13 (1982). "To establish commonality under Rule 23(a)(2), class claims 'must depend upon a common contention' that is 'capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Pork*, 2024 WL 2060386, at *14 (quoting *Wal-Mart*, 564 U.S. at 350).

As this Court recognized in *Pork*, antitrust cases turn on common questions. *See Pork*, 2024 WL 2060386, at *14. Whether Defendants engaged in a nationwide, horizontal conspiracy to restrain supply and artificially inflate prices; the mechanisms they used to coordinate the conspiracy and implement it; whether the conspiracy generally raised prices above a competitive level; Defendants' "innocent" explanations for their actions; the validity and interpretation of the experts' analysis; and the damages CIIPPs suffered all present common questions. Resolution of *any* of these issues will "drive the resolution of the litigation," *Wal-Mart*, 564 U.S. at 350, which is all commonality requires, *see Potash*, 159 F.R.D. at 689 ("Insofar as Plaintiffs allege that Defendants engaged in a conspiracy to

fix the wholesale price of potash, they have satisfied the commonality requirement of Rule 23(a).").

### C.    Typicality

"To establish typicality under Rule 23(a)(3), the Court must determine 'whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Pork*, 2024 WL 2060386, at *16 (quoting *Falcon*, 457 U.S. at 157 n.13). "The burden of demonstrating typicality is fairly easily met so long as other class members have claims similar to the named plaintiff[s]." *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995). Because plaintiffs impacted by an antitrust conspiracy have the same "grievance"— supracompetitive prices—typicality is easily satisfied in cases alleging antitrust violations. *See, e.g.*, *Potash*, 159 F.R.D. at 691; *In re Workers Comp.*, 130 F.R.D. at 106; *Burnett v. Nat'l Assoc. of Realtors*, No. 4:19-cv-00332-SRB, 2022 WL 1203100, at *6 (W.D. Mo. Apr. 22, 2022).

Here, each proposed class representative claims to have been injured by Defendants' conspiracy to inflate prices above competitive levels, an injury shared by every member of the proposed classes. Each proposed class representative likewise seeks injunctive and declaratory relief protecting them from future violations of antitrust laws and, where available, damages. Those remedies are common to the proposed classes and will benefit the classes as a whole. As such, the typicality requirement is "indisputably" satisfied. *See Pork*, 2024 WL 2060386, at *16.

26

### D.   Adequacy of Representation

"To demonstrate adequacy of representation, a plaintiff must show that '(1) the representative and its attorneys are able and willing to prosecute the action competently and vigorously; and (2) the representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge.'" *Id.* at *17 (quoting *City of Farmington Hills Emps. Ret. Sys. v. Wells Fargo Bank, N.A.*, 281 F.R.D. 347, 353 (D. Minn. 2012)). The proposed class representatives have worked diligently to advance the classes' interests throughout this litigation, and their interests are fully aligned with the class members they seek to represent. *See* Flannery Decl. ¶¶ 8-9. Class representatives are unaware of any conflicts of interest that compromise their representation of the proposed classes. Their efforts have already led to one substantial settlement.[125] Named plaintiffs thus possess the identity of interests with the CIIPP classes that is essential to a binding classwide judgment.[126]

CIIPPs' proposed class counsel—Sterling Aldridge of Barrett Law Group, P.A., Michael Flannery of Cuneo Gilbert & LaDuca, LLP, and Shawn M. Raiter of Larson King, LLP—have represented the classes zealously and are free of conflicts of interest. *Id.* ¶¶ 6-

---

[125] Order Granting CIIPPs' Mot. Final Approval with JBS, ECF No. 451.

[126] If this Court finds any of the proposed class representatives to be inadequate, other CIIPP class representatives who satisfy the Rule 23 criteria may adequately represent the class in their place. *See, e.g.*, *Payton v. County of Kane,* 308 F.3d 673, 680 (7th Cir. 2002); *Hospital Auth. of Metro. Gov't of Nashville & Davidson Cty. v. Momenta Pharms.*, 333 F.R.D. 390, 414 (M.D. Tenn. 2019). Should an additional or alternative class representative be necessary, CIIPPs respectfully request leave to substitute. *See, e.g., In re NorthShore Univ. HealthSystem Antitrust Litig.*, No. 1:07-cv-04446, 2018 WL 2383098, at *1 (N.D. Ill. Mar. 31, 2018).

7. As this Court has previously recognized, these attorneys and their firms bring a wealth of experience in complex antitrust matters and have been appointed lead counsel on behalf of CIIPPs in other matters where they have secured certification of multiple classes and significant monetary recoveries. *See Pork*, 2024 WL 2060386, at *18.[127]

## V.    PLAINTIFFS SATISFY RULE 23(b)(2)

Beyond the Rule 23(a) prerequisites, the proponent of class certification must show that a case satisfies the criteria for certification of one or more of the types of class actions in Rule 23(b). CIIPPs initially seek certification of a Rule 23(b)(2) class to pursue injunctive and declaratory relief protecting them from future anticompetitive conduct, particularly unlawful communications coordinating the supply of beef products.

"Although Rule 23(b)(2) does not include the predominance inquiry required by Rule 23(b)(3), 23(b)(2) class claims must still be cohesive because unnamed class members are bound to the outcome without the opportunity to opt out." *Pork*, 2024 WL 2060386, at *28. As this Court found in *Pork*, CIIPPs' requests for declaratory and injunctive relief present classic scenarios for certification of a Rule 23(b)(2) class. Because the class is united in seeking declaratory and injunctive relief and such relief cannot easily be limited to individual class members, certification of a (b)(2) class is warranted. *See id.*

---

[127] In addition to satisfying the explicit Rule 23(a) prerequisites, CIIPPs proffer "a precise definition of the class" that uses objective criteria to define class membership. Rule 23's implicit requirement of ascertainability is therefore satisfied. *See Brown v. Wells Fargo*, 284 F.R.D. 432, 444 (D. Minn. 2012).

## VI.    PLAINTIFFS SATISFY RULE 23(b)(3)

CIIPPs next seek certification of a damages class under Rule 23(b)(3) for class members in the Indirect Purchaser States. The Court may certify this class if it finds that (1) common questions predominate over any questions affecting only individual class members, and (2) proceeding on a class action basis is superior to other available methods for resolving the controversy fairly and efficiently. Fed. R. Civ. P. 23(b)(3). Both requirements are satisfied.

### A.    The Predominance Test Is Readily Met in Antitrust Cases.

"'The predominance inquiry requires an analysis of whether a prima facie showing of liability can be proved by common evidence or whether this showing varies from member to member.'" *Day v. Celadon Trucking Servs., Inc*., 827 F.3d 817, 833 (8th Cir. 2016) (citation omitted). Certification is warranted where "'the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted). "[C]ommon liability issues such as conspiracy or monopolization have, almost invariably, been held to predominate over individual issues." Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 18.25 (4th ed. 2002). The Supreme Court has thus observed that the predominance test is "readily met" in cases alleging "violations of the antitrust laws." *Amchem*, 521 U.S. at 625.

#### 1.    *Evidence of the Alleged Antitrust Violation Is Common to the Class.*

Every major component of CIIPPs' liability case turns on common evidence. To begin with, "[t]he Eighth Circuit and Minnesota courts have acknowledged that evidence

29

of a conspiracy relates solely to the defendant's conduct, so proof would not vary among class members." *Pork*, 2024 WL 2060386, at *20. Proof of the conspiracy is thus common to the class.

       2.     *Evidence of Antitrust Impact Is Common to the Class and Shows Impact to All or Virtually All Class Members.*

The next element of CIIPPs' liability case is antitrust "impact"—*i.e.*, "injury caused by an antitrust violation." *Pork*, 2024 WL 2060386, at *20. Antitrust injury refers to "the fact," as distinct from the "amount[,] . . . of damage" that CIIPPs suffered. *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 114 n.9 (1969). For purposes of the impact analysis, the payment of a single overcharge—even a penny—is sufficient. *See Burnett*, 2022 WL 1203100, at *15. This is true even if a purchaser made additional purchases that were not subject to an overcharge, and even if the purchaser enjoyed some offsetting benefits from the conduct at issue. *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27-28 (1st Cir. 2015); *In re Lidoderm Antitrust Litig.*, No. 3:14-md-02521-WHO, 2017 WL 679367, at *21 (N.D. Cal. Feb. 21, 2017).

At class certification, CIIPPs' burden is only to offer common proof *capable* of showing widespread harm to the class to establish common impact; CIIPPs need not *prove* such harm for the Court to certify a class. *See Amgen*, 568 U.S. at 459 ("Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class."); *see also Blades v. Monsanto Co.*, 400 F.3d 562, 569 (8th Cir. 2005).

> **a)** **Dr. Williams Followed a Reliable Methodology that Courts Have Repeatedly Approved to Assess Antitrust Impact.**

CIIPPs readily satisfy that burden. To analyze impact, CIIPPs' economic expert, Dr. Williams, followed the two-step methodology that this Court approved in *Pork*. *See Pork*, 2024 WL 2060386, at *20-24. At the first stage of analysis, Dr. Williams examined whether the alleged conspiracy caused "'a common impact—in the form of an overcharge—incurred by all or virtually all direct purchasers.'" *Pork*, 2024 WL 2060386, at *20 (citation omitted). At the second stage, Dr. Williams examined whether overcharges to direct purchasers "were passed on by the [direct purchasers] to all or nearly all of the end customers." *Id.* at *20 (quoting *In re Pre-Filled Propane Tank Antitrust Litig.* (*Pre-Filled Propane Tank*), No. 4:14-md-02567-GAF, 2021 WL 5632089, at *6-7 (W.D. Mo. Nov. 9, 2021)). Courts, including this one, have consistently upheld the use of this two-step methodology against *Daubert* and Rule 23 challenges to analyze antitrust impact in indirect-purchaser cases. *See, e.g.*, *Pork*, 2024 WL 2060386, at *20; *Pre-Filled Propane Tank*, 2021 WL 5632089, at *6; *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-02143-RS, 2016 WL 467444, at *7 (N.D. Cal. Feb. 8, 2016). Indeed, it has formed the basis for the certification of multiple indirect-purchaser classes in *Tuna*, *Broilers*, and *Pork*, in which Dr. Williams, among other experts, testified in support of class certification. *See Pork*, 2024 WL 2060386, at *4.

> **b)** **Common Evidence Shows Market-Wide Price Inflation and Overcharges to All or Virtually All Direct Purchasers.**

Dr. Williams began by isolating the conspiracy's price impacts on direct purchasers using a "dummy variable" regression model. Williams Rep. ¶¶ 150-53. His model

measured overcharges in prices by comparing (1) prices during a benchmark period in which prices were not affected by the conspiracy with (2) prices direct purchasers paid during the class period, "controll[ing] for factors unrelated to collusion." *See Pork*, 2024 WL 2060386, at *22.

*See* Williams Rep. ¶¶ 161-72 & tbl. 2.

*Id.* ¶ 175 & tbl. 2.

*Id.* ¶ 211.

*Id.* ¶¶ 238-40.

*Id.* ¶ 215.

*Id.* ¶ 216.[128]

---

[128] Williams Rep. ¶ 216 n.209.

███████████████████████████████████████

███████████████████████████████████████

████████ *See id.* ¶¶ 212-14 & tbls. 4, 5 & 6.

      **c)**     **Common Evidence Shows Pass Through of Overcharges to CIIPPS and that All or Virtually All CIIPPs Paid Inflated Prices as a Result of the Conspiracy.**

Having found large, statistically significant price effects to direct purchasers, Dr. Williams proceeded to the second stage of analysis and examined whether "'this impact—those overcharges—were passed on by the [direct purchasers] to all or nearly all of the end customers.'" *Pork*, 2024 WL 2060386, at *20 (quoting *Pre-Filled Propane Tank*, 2021 WL 5632089, at *6-7).

To do so, he again followed methodologies that this Court approved in *Pork*. Dr. Williams began by considering whether the structure of the beef market indicated that distributors would pass-through price increases to downstream buyers. ████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████ Williams Rep. ¶¶ 245-46. ████████████████████████████

████████████████████████████ *Id.* ¶¶ 68-75, 239, 244. ████

███████████████████████████████████████

███████████████████████ *Id.* ¶¶ 247-49. ████████████

███████████████████████████████████████

33

████████████████████████████████████████████████ *Id.* ¶ 241 (quoting

John M. Connor, *Cartel Overcharges*, 26 Res. L. & Econ. 249, 256 (2014)).[129]

The percentage of cost increases that distributors pass-through to downstream purchasers such as CIIPPs is known as the "pass-through rate." To determine the pass-through rate for beef, Dr. Williams used a multivariate pass-through regression methodology similar to those in *Pork*. *See Pork*, 2024 WL 2060386, at *22-23. ██████

██████████████████████████████████████████████████████████████

███████████████████████████████████ Williams Rep. ¶¶ 179,

207, 250 & tbl. 3. ████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████ *Id.* ¶ 179; *see also id.* ¶¶ 180-206.

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████ *Id.*

¶ 207. ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████ *Id.* ¶ 207 & tbl. 3.

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████ *Id.* ¶¶ 209-250 (including tables and figures). █████████████

[129] ████████████████████████████████████████████████ Williams Rep. ¶¶ 223, 241-43.



*Id.* ¶¶ 224-37.

*Id.* ¶ 217-20 & tbl. 7.[130]

*Id.* ¶ 219.

*Id.* ¶¶ 219-223 & tbl. 7.

Common evidence thus shows that all or nearly all CIIPPs paid supracompetitive prices due to the conspiracy.

      3.    *CIIPPs Show a Reliable Method of Calculating the Class's Damages Using Evidence Common to the Class.*

"As the final predominance component, the Court must consider if the Class Plaintiffs can use common evidence to show damages"—specifically whether "'damages are susceptible of measurement across the entire class.'" *Pork*, 2024 WL 2060386, at *25 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)). "When 'one or more of the

---

[130] Williams Rep. ¶ 217 & tbl. 7.

central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Tyson*, 577 U.S. at 453 (quoting 7AA Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1778 (3d ed. 2005)). Although "[c]alculations need not be exact . . . any model supporting a 'plaintiff's damages case must be consistent with its liability case.'" *Comcast*, 569 U.S. at 35 (citation omitted).

To calculate CIIPPs' damages, Dr. Williams again followed a methodology similar to those this Court approved in *Pork. See* 2024 WL 2060386, *25-26; Williams Rep. ¶¶ 251-52



*Id.* ¶ 258 & tbl. 27.

As this Court found in *Pork*, Dr. Williams' damages methodology is entirely consistent with CIIPPs' theory of liability. As in *Pork*, CIIPPs' theory of liability here "is that Defendants artificially raised [beef] prices by means including but not limited to restricting supply." *Pork*, 2024 WL 2060386, at *25. Dr. Williams' calculations capture the

36

combined effect of the "levers by which the Plaintiffs believe Defendants executed the alleged conspiracy." *Pork*, 2024 WL 2060386, at *26. And, as in *Pork* (and in contrast to *Comcast*), CIIPPs' theory of liability has remained consistent throughout the litigation. As such, "Class Plaintiffs have successfully shown that damages can be established with classwide evidence." *Id.*

> 4. *Any Remaining Individual Issues Are Easily Managed and Will Not Predominate Over Questions Common to the Class.*

When a proposed Rule 23(b)(3) class spans multiple states, the court must rigorously analyze whether differences in state law give rise to individual issues that defeat predominance. *See, e.g.*, *Hale v. Emerson Elec.*, 942 F.3d 401, 403 (8th Cir. 2019). Importantly, the predominance analysis trains on the plaintiffs' specific claims and the issues that will actually be contested at trial. *See Erica P. John Fund*, 563 U.S. at 809; *Phillips Petroleum v. Shutts*, 472 U.S. 797, 816 (1985). "[T]he crucial inquiry is not whether the laws of multiple jurisdictions are *implicated*, but whether those laws differ in a *material manner* that precludes the predominance of common issues." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 127 (2d Cir. 2013) (emphasis added).

As demonstrated in the appendices to this memorandum, the state laws that CIIPPs proceed under do not contain any differences material to CIIPPs' liability case. Apps. A, B, C. These states' antitrust laws are construed in harmony with the Sherman Act. *See* App. A. The remaining states in the damages class allow a party injured by a *per se* antitrust violation to recover damages via their consumer protection laws, a claim for unjust enrichment, or both. *See*, Apps. B, C. As this Court observed in *Pork*, "'differences in

consumer protection laws concerning reliance and intent are simply not relevant to a price-fixing claim,'" *Pork*, 2024 WL 2060386, at *27 (quoting *Broilers*, 2022 WL 1720468, at *10), and "unjust enrichment claims are nearly identical in the antitrust context." *Id.* While the Court in *Pork* described the materiality of state law differences as a "close call", *id.*, CIIPPs have refined the damages class in a way that they believe eliminates any question that differences in state law are immaterial.[131]

As in *Pork*, CIIPPs here have "conducted the necessary extensive analysis of the state law variations." 2024 WL 2060386, at *27 (D. Minn. May 8, 2024); *see* Apps. A, B, C. And "the Court may subdivide the classes in the future if necessary"—including by adopting the sub-classes CIIPPs propose in the alternative in their motion. *Id.* The proposed damages class is accordingly manageable and "will not confuse a jury." *Id.*

Defendants will also likely contend that the beef industry is uniquely complex, that Dr. Williams has overlooked some variable which makes all the difference, or that the effects of their conspiracy cannot be measured without considering thousands of sub-regressions that have been carefully engineered to avoid generating statistically significant results. The short answer to these likely arguments is that courts have repeatedly certified classes in similarly complex cases, including ones in which indirect purchasers seek relief for conspiracies similar to the one CIIPPs allege here. *See, e.g.*, *Tuna*, 332 F.R.D. at 316; *Pork*, 2024 WL 2060386 at *1, 22; *Broilers*, 2022 WL 1720468, at *1.

---

[131] For instance, CIIPPs do not press consumer protection claims in Minnesota and Wisconsin where they arguably require evidence of reliance in cases premised on a *per se* antitrust violation.

Those cases merited certification because the plaintiffs' claims were fundamentally about a common body of testimony, expert analysis, and documentary evidence, and any individual issues could be easily managed at summary judgment and trial. So too here. As Judge Ikuta reasoned for the en banc Ninth Circuit in *Tuna*, "[i]t is not implausible to conclude that a conspiracy could have a class wide impact, 'even when the market involves diversity in products, marketing, and prices . . . .'" 31 F.4th at 677 (quoting *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1255 (10th Cir. 2014)).

**B.    A Class Action Is Superior to Individual Actions.**

The final finding required by Rule 23(b)(3) is that proceeding on a class-action basis be "superior to other available methods for fairly and efficiently adjudicating the controversy." In *Pork*, this Court found a class action was superior in light of the complexity of the litigation and the reality that CIIPPs' claims could not realistically be litigated on an individual basis. *See Pork*, 2024 WL 2060386 at *26 ("Given that there are hundreds of millions of potential class members in this action, the difficulty for those class members to successfully bring individual claims, that the Court has controlled this litigation for five years, and managing a class action—though difficult—is certainly more efficient than juggling a multitude of individual actions, the superiority requirement is readily satisfied.").

The same analysis applies here. As demonstrated above, CIIPPs' claims rise or fall based on a common body of evidence. Individual litigation would not only be inefficient and unmanageable but sound the death knell for many class members' claims, undermining the enforcement of federal and state antitrust laws. To paraphrase Judge Posner, the

realistic alternative to a class action in this case is not thousands of individual suits, but zero. *See Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).

## VII. THE COURT SHOULD APPOINT CLASS COUNSEL.

Pursuant to Rule 23(g), the Court must appoint counsel who will "fairly and adequately" represent the proposed classes if it grants CIIPPs' motion. *See Taqueria El Primo LLC v. Illinois Farmers Ins. Co.*, 577 F. Supp. 3d 970, 994 (D. Minn. 2021). This Court already recognized that proposed class counsel satisfy Rule 23(g) when it appointed them interim lead counsel. *See* ECF No. 662; *see also In Re Cattle and Beef Antitrust Litigation*, No. 0:20-cv-01319-JRT-JFD, ECF No. 423. CIIPPs respectfully request that these counsel and their firms also be designated class counsel under Rule 23(g).

## VIII. CONCLUSION

For the foregoing reasons, CIIPPs' Motion for Class Certification and for Appointment of Class Counsel should be granted.

Dated: September 25, 2024

Respectfully submitted:

By: */s/ Michael J. Flannery*
Michael J. Flannery
**CUNEO GILBERT & LADUCA, LLP**
Two CityPlace Drive
Second Floor
St. Louis, MO 63141
Telephone: (314) 226-1015
mflannery@cuneolaw.com

Evelyn Riley
Cody McCracken
Lissa Morgans
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Ave., NW

Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
evelyn@cuneolaw.com
cmccracken@cuneolaw.com
lmorgans@cuneolaw.com

Sterling Aldridge
Katherine Barrett Riley
**BARRETT LAW GROUP, P.A.**
404 Court Square
Lexington, Mississippi 39095
Telephone: (662) 834-2488
Fax: (662) 834-2628
saldridge@barrettlawgroup.com
kbriley@barrettlawgroup.com

Shawn Raiter (MN#240424)
**LARSON · KING LLP**
30 East Seventh Street Suite
2800 St. Paul, MN 55101
Telephone: (651) 312-6518
sraiter@larsonking.com

*Co-Lead Counsel for Commercial and*
*Institutional Indirect Purchaser Plaintiffs and*
*the Proposed Class*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned, an attorney, hereby certifies that on September 25, 2024, a copy of the foregoing was filed electronically with the Clerk of the Court using the Court's CM/ECF system, which will send notification of the filing to all counsel of record.

By: _/s/ Michael J. Flannery_
Michael J. Flannery