## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| *IN RE CATTLE AND BEEF ANTITRUST LITIGATION* | Case No. 22-md-03031 (JRT/JFD) |
| This Document Relates To: | FILED UNDER SEAL |
| The Cattle Actions | |

## MEMORANDUM OF LAW IN SUPPORT OF CATTLE PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

INDEX OF DEFINED TERMS ................................................................. vi

I.     INTRODUCTION ............................................................................ 1

II.    FACTUAL BACKGROUND ........................................................... 4

    A.    The Fed Cattle Market Was Ripe for Collusion............................. 4

        1.    Fed Cattle Is a Distinct Product Market, and Defendants Dominate It ................................................................................ 4

        2.    The Fed Cattle Supply Is Highly Inelastic ......................... 6

        3.    Defendants' Set Their Production Plans to Only Kill Their "Natural" or "Capacity Share"............................................. 7

        4.    All Cattle Prices, Regardless of Procurement Type, Are Tied Directly to Prices Paid in the Cash Market ....................... 8

    B.    Challenging Economic Conditions Incentivized Defendants to Collude...... 9

        1.    Historically Low Cattle Supplies Compressed Defendants' Margins 9

        2.    Defendants Recognize that Collective Kill Cuts Were Required to Keep Demand Below Available Supplies and Suppress Prices ............................................................... 11

    C.    Defendants Agreed to Suppress Slaughter Levels Below Available Slaughter-Ready Cattle Supplies................................................. 14

        1.    Defendants' 2014 Attempt to Coordinate Cuts Fails ....................... 14

        2.    Defendants Conspire to "Break" Cattle Prices................................. 17

    D.    Common Evidence Demonstrates that Defendants Used a Variety of Devices in Furtherance of the Conspiracy .................................... 24

        1.    Defendants Carried Out Their Agreement by Exchanging Information Directly and Through Conduits.................................... 24

        2.    Procurement Practices in the Cash Market Reinforced Defendants' Agreement ....................................................................... 27

        3.    Defendants Monitored Competitors' Adherence to the Conspiracy and Punished Defections .................................................. 28

    E.    Plaintiffs' Experts Show that Common Evidence Is Capable of Demonstrating that All or Virtually All Class Members Were Injured ...... 29

III.    ARGUMENT ................................................................................ 30

    A.    The Producer and Exchange Classes Satisfy Rule 23(a) ............................ 31

        1.    Each Class Satisfies Numerosity (Rule 23(a)(1)) ............................. 31

2.      Questions of Law and Fact Are Common to the Classes (Rule 23(a)(2))...................................................................31

3.      Plaintiffs' Claims Are Typical (Rule 23(a)(3)) ...............................32

4.      Plaintiffs and Their Counsel Will Adequately Represent the Interests of the Classes (Rule 23(a)(4)) ...........................................................33

B.      The Producer and Exchange Classes Satisfy Rule 23(b)(3) Predominance ................................................................................35

     1.      Common Issues of Law and Fact Predominate Over Individual Issues on both the Antitrust and CEA Claims ...............35

         a.      Common Evidence Is Capable of Proving Defendants' Conspiracy.....................................................................36

         b.      Common Evidence Is Capable of Proving Classwide Injury 38

         c.      Producer Class's Damages Are Capable of Classwide Proof43

         d.      Common Evidence Is Capable of Proving the Exchange Class's CEA Claims .............................................45

C.      A Class Action Is the Superior Method for Adjudicating the Claims in this Action ................................................................................49

D.      The Producer and Exchange Classes are Ascertainable..............................50

E.      Certification under Rule 23(b)(2) of the Injunctive Relief Class is Appropriate...............................................................................51

IV.      CONCLUSION ...................................................................................52

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott v. Lockheed Martin Corp.*,
　725 F.3d 803 (7th Cir. 2013) ............................................................... 44

*Allen v. Dairy Farmers of Am., Inc.*,
　No. 5:09-CV-230, 2012 WL 5844871 (D. Vt. Nov. 19, 2012)................................... 38

*Amchem Prods., Inc. v. Windsor*,
　521 U.S. 591 (1997)...................................................................... 37

*Anderson v. Dairy Farmers of Am., Inc.*,
　No. 08-4726, 2010 WL 1286181 (D. Minn. Mar. 29, 2010) ...................................... 36

*Ark. Ed. Ass'n v. Bd. of Ed. of Portland*, *Ark. Sch. Dist.*,
　446 F.2d 763 (8th Cir. 1971) ............................................................. 31

*Avritt v. Reliastar Life Ins. Co.*,
　615 F.3d 1023 (8th Cir. 2010) ........................................................... 35

*Blades v. Monsanto*,
　400 F.3d 562 (8th Cir. 2005) ......................................................... 36, 38

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
　429 U.S. 477 (1977)...................................................................... 38

*In re Bulk Popcorn Antitrust Litig.*,
　792 F. Supp. 650 (D. Minn. 1992) ........................................................ 44

*Comcast Corp. v. Behrend*,
　569 U.S. 27 (2013)....................................................................... 44

*H & T Fair Hills, Ltd. v. All. Pipeline L.P.*,
　No. 19-CV-1095, 2021 WL 2526737 (D. Minn. June 21, 2021)................................. 50

*In re Amaranth Nat. Gas Commodities Litig.*,
　269 F.R.D. 366 (S.D.N.Y. 2010) .......................................................... 33

*In re Broiler Chicken Grower Antitrust Litigation (No. II)*,
　No. 6:20-md-02977, 2024 WL 2117359 (E.D. Okla. May 8, 2024) ...................*passim*

*In re Disposable Contact Lens Antitrust Litig.*,
　329 F.R.D. 336 (M.D. Fla. 2018)......................................................... 39

*In re Korean Ramen Antitrust Litig.*,
No. 13-CV-04115, 2017 WL 235052 (N.D. Cal. Jan. 19, 2017) ................................. 52

*In re Monosodium Glutamate Antitrust Litig.*,
205 F.R.D. 229 (D. Minn. 2001) ................................................................................... 33

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
169 F.R.D. 493 (S.D.N.Y. 1996) .................................................................................. 52

*In re Nexium Antitrust Litig.*,
777 F.3d 9 (1st Cir. 2015) ............................................................................................. 38

*In re Pork Antitrust Litig.*,
665 F. Supp. 3d 967 (D. Minn. 2023) .................................................................... *passim*

*In re Potash Antitrust Litig.*,
159 F.R.D. 682 (D. Minn. 1995) ................................................................................... 44

*In re Remicade Antitrust Litig.*,
No. 17-CV-04326, 2023 WL 2530418 (E.D. Pa. Mar. 15, 2023) ................................. 49

*In re Rubber Chems. Antitrust Litig.*,
232 F.R.D. 346 (N.D. Cal. 2005) .................................................................................. 33

*In re Urethane Antitrust Litig.*,
768 F.3d 1245 (10th Cir. 2014) ........................................................................ 29, 42, 44

*Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*,
334 U.S. 219 (1948) ...................................................................................................... 38

*McKeage v. TMBC, LLC*,
847 F.3d 992 (8th Cir. 2017) ........................................................................................ 50

*Med. Soc'y of the State of New York v. UnitedHealth Grp. Inc.*,
332 F.R.D. 138 (S.D.N.Y. 2019) .................................................................................. 51

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) ........................................................................................................ 3

*Messner v. Northshore University HealthSystem*,
669 F.3d 802 (7th Cir. 2012) ............................................................................... 37, 49

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) (*en banc*), *cert denied., Starkist Co. v.
Olean Wholesale Grocery Coop., Inc.*, 143 S. Ct. 424 (2022) ............................. 41, 43

*Ploss v. Kraft Foods Group, Inc.*,
431 F. Supp. 3d 1003 (N.D. Ill. 2020) ...................................................... 32, 36, 37, 45

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979) .......................................................................................... 3

*Rodriguez v. West Publ'g Corp.*,
563 F.3d 948 (9th Cir. 2009) ............................................................................. 33

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*,
821 F.3d 992 (8th Cir. 2016) ............................................................................. 50

*Tyson Foods v. Bouaphakeo*,
577 U.S. 442 (2016) ......................................................................................... 35

*Zurn Pex Plumbing Prods. Liab. Litig.*,
644 F.3d 604, 619 (8th Cir. 2011) ..................................................................... 35

## Statutes, Rules and Regulations

United States Code
15 U.S.C. §26 ................................................................................................. 51

Federal Rules of Civil Procedure
Rule 12(b)(6) .................................................................................................. 51
Rule 23 ....................................................................................................... 44, 51
Rule 23(a) ................................................................................................. 3, 31, 51
Rule 23(a)(1) ................................................................................................... 31
Rule 23(a)(2) ................................................................................................... 31
Rule 23(a)(3) ................................................................................................... 32
Rule 23(a)(4) ................................................................................................... 33
Rule 23(b)(2) ............................................................................................. 3, 51, 52
Rule 23(b)(3) ............................................................................................*Passim*
Rule 23(b)(3) ..................................................................................................... 3

| INDEX OF DEFINED TERMS | |
|---|---|
| **Term** | **Meaning** |
| Cargill | Cargill, Incorporated and Cargill Meat Solutions Corporation |
| *Cattle* | *In re Cattle Antitrust Litigation*, Civil No. 19-cv-1222 (JRT/HB) |
| CCMS | Cafferty Clobes Meriwether & Sprengel LLP |
| CEA | Commodity Exchange Act |
| Class Period | June 1, 2015 to February 29, 2020 |
| CME | Chicago Mercantile Exchange |
| Complaint or Compl. | Third Consolidated Amended Class Action Complaint, *Cattle* ECF No. 312 |
| Defendants | Tyson, JBS, Cargill, and National |
| DX | Defendant Deposition Exhibit |
| Ex. ___ | Exhibit to Joint Declaration of Patrick McGahan and Daniel Herrera |
| Exchange Class | All persons or entities who held a long position in Live Cattle Futures traded on the CME prior to June 1, 2015, and subsequently liquidated the long position through an offsetting market transaction at any point prior to November 1, 2016.<br><br>Excluded from this Class are the Defendants, their officers, directors, management, employees, subsidiaries, affiliates, the attorneys of record in this matter, and the court, its staff and their family members. |

| | |
|---|---|
| Exchange Class Representatives | Weinreis Brothers Partnership and Charles Weinreis |
| Injunctive Relief Class Representatives | R-CALF; NFU; Weinreis Brothers Partnership; Minatare Feedlot Inc.; Charles Weinreis; Eric Nelson; James Jensen d/b/a Lucky 7 Angus; and Richard C. Chambers as trustee of the Richard C. Chambers Living Trust |
| JBS | JBS S.A., JBS USA Food Company, Swift Beef Company, and JBS Packerland, Inc. |
| Joint Declaration or Joint Decl. | Joint Declaration of Patrick McGahan and Daniel Herrera |
| Lamb Ex. __ | Exhibit to September 25, 2024 Expert Report of Dr. Russell Lamb, Ph.D. |
| Lamb Rpt. | September 25, 2024 Expert Report of Dr. Russell Lamb, Ph.D. |
| LCF | Live cattle futures contracts traded on the CME |
| National | National Beef Packing Company, LLC |
| Plaintiffs | Ranchers Cattlemen Action Legal Fund United Stockgrowers of America ("R-CALF"); Farmers Educational and Cooperative Union of America ("NFU"); Weinreis Brothers Partnership; Minatare Feedlot Inc.; Charles Weinreis; Eric Nelson; James Jensen d/b/a Lucky 7 Angus; Richard C. Chambers as trustee of the Richard C. Chambers Living Trust |
| Producer Class and Injunctive Relief Class[1] | All persons or entities within the United States that directly sold to a Defendant one or more fed cattle for slaughter from June 1, 2015 to February 29, 2020 other than pursuant to a Cost-Plus Agreement and/or a Profit Sharing Agreement. |

---

[1]    The Producer Class seeks certification under Fed. R. Civ. P. 23(b)(3), whereas the Injunctive Relief Class seeks certification under Fed. R. Civ. P. 23(b)(2).

| | |
|---|---|
| | Excluded from this Class are the Defendants, their officers, directors, management, employees, subsidiaries, affiliates, the attorneys of record in this matter, and the court, its staff and their family members.   This exclusion includes, for the avoidance of doubt, lots of fed cattle harvested by Defendants: (a) in which Defendants, their subsidiaries and/or affiliates had a full or partial ownership interest; and/or (b) was finished at a feedlot owned by the Defendant, their subsidiaries and/or affiliates. |
| | "Cost Plus Agreement" means an agreement to purchase fed cattle at a price determined, in all or in part, by applying an agreed mark-up to an accounting of costs incurred by the fed cattle seller in providing finished fed cattle. |
| | "Profit Sharing Agreement" means an agreement to supply fed cattle to a Defendant pursuant to which the Defendant: (i) financed all or part of the costs incurred by the seller in connection with the seller's purchase of unfinished cattle and/or the seller's efforts to finish unfinished cattle to slaughter weight (e.g., feed); and/or (ii) agreed to share certain profits or losses of either the seller and/or the Defendant in relation to the cattle to be supplied. |
| Producer Class Representatives | Weinreis Brothers Partnership; Minatare Feedlot Inc.; Charles Weinreis; Eric Nelson; James Jensen d/b/a Lucky 7 Angus; and Richard C. Chambers as trustee of the Richard C. Chambers Living Trust |
| Producer or feeder | An individual or entity that sells fed cattle directly to a packer |
| PSA | Packers and Stockyards Act |
| PX | Plaintiff Deposition Exhibit |
| Rosevear Ex. ___ | Exhibit to September 25, 2024 Expert Report of Candice Rosevear |

| Rosevear Rpt. | September 25, 2024 Expert Report of Candice Rosevear |
|---|---|
| Scott+Scott | Scott+Scott Attorneys at Law LLP |
| Tyson | Tyson Foods, Inc., and Tyson Fresh Meats, Inc. |

## I.      INTRODUCTION

Plaintiffs move to certify three classes to prosecute their claims under the Sherman Act, the PSA, and the CEA arising from Defendants' conspiracy to suppress fed cattle prices, injuring thousands of cattle producers and LCF traders and causing them billions of dollars in losses.

Defendants are beef packers who dominate the market for the purchase of fed cattle.[2] In 2013–2014, Defendants' financial performance deteriorated due to steadily increasing fed cattle prices.  The price increases were caused by contractions in the cattle supply arising from the "cattle cycle"[3] and exacerbated by a multiyear drought.  These conditions worsened in the first half of 2015, when the U.S. fed cattle supply reached its lowest levels since the 1950s.  Competition for the dwindling fed cattle supply intensified throughout 2014 and early 2015, leading to higher prices and further deteriorating Defendants' margins.

Defendants had a choice: compete harder and smarter, as the antitrust laws encourage; or conspire, which the antitrust laws forbid.  Defendants chose conspiracy over competition and, from late spring 2015, worked together to suppress cattle purchase and slaughter volume below available supply by slaughtering no more than their "share" of fed cattle slaughtered in the United States.  In doing so, Defendants "backed-up" producers,

---

[2]      Fed cattle are steers and heifers, whether beef breeds or Holsteins, which are raised and fed specifically for beef production.

[3]      The "cattle cycle" refers to the cyclical expansion and contraction of the beef cattle herd.  Ex. 1, Expert Report of Dr. Russell Lamb, Ph.D. ("Lamb Rpt."), ¶103.

causing them to "carryover" their existing cattle inventory and sell their perishable commodity at whatever price Defendants eventually offered.  Defendants' conspiracy was an immediate success:  fed cattle prices dropped nearly 30% by December 2015.

Common evidence will show that close relationships and communications among key decision makers, and the habitual exchange of proprietary production information both directly and through conduits, facilitated the conspiracy's formation and its continuing operation.  Common evidence will also show that longstanding anticompetitive practices, such as the so-called queueing convention, reinforced the conspiracy's effects by further limiting competition in the cash market, thereby suppressing the negotiated cash prices on which all fed cattle prices are premised.

Using these levers, Defendants suppressed the prices they paid for fed cattle throughout the Class Period and increased their margins at the expense of Plaintiffs and the Classes.  Dr. Russell Lamb, the Producer Class's expert, has concluded that the Producer Class suffered damages of **$9.4 billion**[4] caused by Defendants' violations of the Sherman Act and the PSA.[5]

But the harm didn't stop there.  Because of the close relationship between fed cattle and LCF prices, Defendants' suppression of fed cattle prices also directly caused LCF prices to be artificially suppressed, damaging anyone holding long positions.  Ms. Candice

---

[4]     *See* Lamb Rpt., Table 25.

[5]     As this Court previously held, the Sherman Act violation Plaintiffs allege here is sufficient to state a PSA violation.  *See* Memorandum and Order at 22–23, *Cattle*, ECF No. 410 (Sept. 14, 2021) ("MTD Order").  Accordingly, the analysis required to certify Sherman Act claims is no different than certifying claims under the PSA.

Rosevear, the Exchange Class's expert, calculated that this artificiality caused Exchange Class members to suffer losses of at least $1.07 billion.[6]

To redress these substantial, classwide injuries, Plaintiffs seek certification of two classes under Rule 23(b)(3): (1) a Producer Class, comprised of persons or entities that sold fed cattle directly to one or more of the Defendants during the Class Period; and (2) an Exchange Class, comprised of persons or entities that held long positions in LCF prior to June 1, 2015 and subsequently liquidated those positions prior to November 1, 2016.[7] Plaintiffs also seek certification of an Injunctive Relief Class under Rule 23(b)(2).

As explained more fully below, both the Producer and Exchange Classes satisfy the requirements of Rule 23(a) and (b)(3) because each class has thousands of members, class members' claims arise from the same nucleus of facts, and those claims can be proven through common evidence.  Moreover, the injunctive relief sought by Injunctive Relief Class members under Rule 23(b)(2) is necessary to prevent and deter future misconduct.

Proceeding as a class action here furthers the legislative goals of the antitrust laws and the CEA, which were designed to ensure fair prices reflective of competitive forces and encourage private enforcement to deter wrongdoers – like the Defendants here – from distorting free markets to enrich themselves.  *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 342 (1979); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 401 n.9 (1982).

---

[6]     *See* Ex. 2, Expert Report of Candice Rosevear ("Rosevear Rpt."), Figs. 7–8 and ¶69.

[7]     October 31, 2016 is the expiration date of the farthest-dated LCF tradeable as of May 29, 2015.  Rosevear Rpt., Fig. 7.

Accordingly, the Court should:  (1) certify the Producer, Exchange, and Injunctive Relief Classes; (2) appoint the Producer, Exchange, and Injunctive Relief Class Representatives as representatives for their respective Classes; (3) appoint Scott+Scott and CCMS as Co-Lead Class Counsel for each Class; and (4) appoint Robins Kaplan LLP as Liaison Counsel and Kirby McInerney LLP, Pritzker Levine LLP, and Pearson Warshaw LLP to the Plaintiffs' Executive Committee.

## II.    FACTUAL BACKGROUND

### A.    The Fed Cattle Market Was Ripe for Collusion

#### 1.    Fed Cattle Is a Distinct Product Market, and Defendants Dominate It

Fed cattle are a perishable commodity product,[8] with 

[9] Fed cattle have no economic substitutes:  culled beef and dairy cows and bulls are a ████████████████████████████████████████████

---

[8]      Ex. 3 (Deposition of John Gerber, former Tyson VP of Cattle Procurement) at 75:11–76:4 ████████████████████████████████████████████ .

[9]      Ex. 5 (Deposition of Michael Zerr, Cargill's Head of Protein Analytics Team from 2017 to 2023 and Long-Term Model Lead from 2015 to the present) at 133:1–2. *See also* Ex. 6 (Deposition of Nate Birkhofer, Assistant VP of Financial Planning and Analysis, Supply Chain from 2016 to 2019) at 173:23–174:9; Ex. 7 (Deposition of Charles Weinreis, Partner, Weinreis Brothers Partnership and President, Minatare Feedlot, Inc.) at 247:12–248:15; Ex. 8 (Deposition of Brian Alsup, Tyson Cattle Buyer) at 293:20–294:21.

████████████████████████████ [10] Fed cattle are also fungible:  Defendants ███████

███████████ [11] and principally compete for those cattle on price.[12]

Defendants collectively control over 80% of domestic fed cattle meatpacking capacity.[13]  Thus, Defendants (and the market) refer to themselves as the "major" packers[14] and recognize that regional packers do not constrain their operations.[15]  But because Defendants are not vertically integrated, they must purchase fed cattle from producers, including Plaintiffs and Producer Class members.  Consequently, the supply and cost of fed cattle drive Defendants' profitability.[16]

---

[10]     Ex. 9 (Deposition of Al Byers, JBS President of Regional Beef from 2014 to 2020) at 210:15–22.  *See also* Lamb Rpt., ¶¶160-165.

[11]     Ex. 9 at 30:11–31:3.

[12]      Ex. 7 at 93:5–9 ████████████████████████████████████ ███████ ; Lamb Rpt., ¶¶220–21.

[13]     Lamb Rpt., ¶¶191–92, Table 10.

[14]     Ex. 10 (Deposition of Steven Williams, JBS Head of Cattle Procurement) at 294:14–20; Ex. 11 (Deposition of John Keating, Former Cargill President of Operations and Supply Chain, Protein, North America) at 475:12–18; Lamb Rpt., ¶197.

[15]     Ex. 12 ███████████████████████████████████ ; Ex. 13 at NationalBeef-00597432 █████████████████████████ .

[16]     Ex. 14 (Deposition of Kevin Hueser, former SVP of Margin Management at Tyson) at 58:15–59:5; 61:13–64:19; 69:3–6; 267:17–268:1 and Ex.15 █████████████████████ ████████████ ; Ex. 16 (Deposition of Fred Nichols, JBS Cattle Buyer) at 65:1–10.

### 2. The Fed Cattle Supply Is Highly Inelastic

It takes approximately three-and-one-half years for fed cattle to reach slaughter weight from the time a rancher decides to retain a heifer for breeding (as opposed to feeding it for slaughter).[17]

**Figure 1: Lamb Rpt., Figure 3: Biological Lags in Beef Production**



Supplies thus are inelastic in the short-run, and ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████[18]

---

[17]   Ex. 17 at Slide 5.  Ex. 18 at TYSONBEEF03291541.  *See also*, Ex. 16 at 48:18 – 53:3.

[18]   Ex. 5 at 265:4–7.

Producers' inability to reduce the cattle supply in the short run amplifies Defendants' market power.  Once cattle reach slaughter weight, producers are left with a Hobson's choice: sell the cattle to the highest bidder no matter the price; continue to feed them uneconomically; or allow the cattle to perish.[19]  Conversely, by reducing their collective demand by ██████████████████████████████████ Defendants can cause cattle prices to fall ████████████████████████[20]

### 3. Defendants' Set Their Production Plans to Only Kill Their "Natural" or "Capacity Share"

████████████████████████████████████████████

████████████████████████████████████

██████████████████████████  ████████████████

████████████████  ████████████████████

---

[19]     Ex. 7 at 248:17–249:1 ██████████████████████████████; *id.* at 247:8–128:16; Ex. 5 at 52:22–53:4; Lamb Rpt.,  ¶¶50–52.

[20]     Ex. 19.

[21]     Ex. 20 (Deposition of Bob Manning, National Beef VP of Scheduling from 2017 to Present) at 52:11–53:21; Ex. 19 at 61:6–15; Ex. 6 at 367:14–368:22; Ex. 21 (Deposition of Dan Brooks, Tyson General Manager of Beef Division from 2015 to 2022) at 31:16–33:18; Ex. 10 at 60:13–23; Ex. 11 at 37:5–9.

[22]     ████████████████████████████████████████████████████████████████████████████

[23]     Ex. 16 at 39:5–41:2; Ex. 22 (Deposition of Timothy Klein, National Beef CEO from 2009 to present) at 35:16–25; Ex. 23 ██████████████████████████████████████████;

██████████████████████████████████████████ █████████████

█████████████[25]

    **4.**    **All Cattle Prices, Regardless of Procurement Type, Are Tied Directly to Prices Paid in the Cash Market**

████████████████████████████████████████

█████████████████████████████████ █████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████ ████████████████████

██████████████████████████████████████████████

██████████████████████████████████[28]

---

Ex. 11 at 56:16–57:11; Ex. 10 at 225:8–14, 232:4–6 ███████████████████
██████████.

[24]    Ex. 24 and Ex. 11 at 174:18–176:6 ███████████████████████
█████████████.

[25]    *See, e.g.,* Ex. 25 ███████████████████████████████████
██████████████; Ex. 24; Ex. 26 (Deposition of Jarrod Gillig, Cargill General Manager of Plainview, TX plant from 2012 to 2013; General Manager of Schuyler, NE plant from 2013 to 2017; VP Protein BOSC Operation from 2017 to Present) at 152:13–159:15) ███████████████████████████████████████; Ex. 22 at 326:6–16; Ex. 27 (JBS tracks and benchmarks its "Native Cattle Market Share").

[26]    Lamb Rpt., ¶¶73-74, 144, Fig. 21.

[27]    *Id.*; Ex. 3 at  66:13–67:12;  195:19–24 ████████████████████████
██████████████████████████; Ex. 14 at 62:4–64:14, 68:16–69:2; Ex. 11 at 84:11–85:16; Ex. 16 at 161:13–23; Lamb Rpt., ¶¶73-74.

[28]    Ex. 3 at 275:19–276:25 ███████████████████████████.

███████████████████████████████████████████

██████,[29] these transactions have an outsized economic impact because cash trade prices set the prices for *all* fed cattle sold to Defendants by the Producer Class. This is because the prices of cattle delivered on formula, forward, and negotiated grid contracts all are tied to cash prices reported by the USDA or other sources.[30] Defendants thus needed only to suppress cash cattle prices to reduce the prices paid to the Producer Class, regardless of the contracting mechanism.[31]

**B.    Challenging Economic Conditions Incentivized Defendants to Collude**

**1.    Historically Low Cattle Supplies Compressed Defendants' Margins**

Due to historic declines in the fed cattle supply, ████████████████████████████ ████████████████[32] Historically low supplies were a function of the herd contraction typical of the end of the cattle cycle, which a multiyear drought exacerbated by constraining producers' abilities to retain heifers for breeding.[33] Due to these factors and the above-

---

[29]   Lamb Rpt.,Fig. 21.

[30]   *Id.*, ¶¶235-236; *see also* Lamb Rpt., §VI.A.2

[31]   Ex. 14 at 69:7–23; 72:15–16 ████████████████████████ ███████████████████████████████████████████████████. *See also* Ex. 3 at 43:11–44:13; 44:25–45:16; and 92:22–93:10; Ex. 11 at 85:11–86:3; Ex. 16 at 72:17–74:2; Ex. 28 (Deposition of William Thoni, Cargill VP of Cattle Procurement, 2011 to 2019) at 23:13–24:2; 25:17–26:4.

[32]   Ex. 29. *See also* Ex. 30.

[33]   Lamb Rpt., ¶¶106–10.

referenced biological production lags, ████████████████████████████████

██████████████████████████████████████████████████[34]

The resulting tight supplies threatened Defendants' margins. ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████[35]  These costs incentivize Defendants

to compete for cattle because "the more cattle we run, it lowers our fixed operating costs

per head."[36]

Defendants tried to relieve the pressure by closing plants.  Cargill idled its

Plainview, Texas plant in 2013 and closed its Milwaukee, Wisconsin plant in August 2014

████████████████████████████████████████████████████[37]

National followed suit in June 2014, closing its Brawley, California plant ██████████

██████.[38]

---

[34]     Ex. 31. *See also* Ex. 32 at 7 ██████████████████████████████████████████

██████; Ex. 11 at 60:15–61:1; Ex. 33 (Deposition of Bill Rupp, JBS President of Fed Beef, 2014 to 2106) at 182:21–183:3; Ex. 34 at CARGILL00194874950; Lamb Rpt., ¶¶111, 298.

[35]     Ex. 35 at CARGILL001245466 (2011 Congressional testimony of Kenneth Bull, Cargill's former head of cattle procurement).

[36]     Ex. 22 at 31:13–14.

[37]     Exs. 36 and 37; Ex. 38 ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████.

[38]     Ex. 39; Ex. 40; Ex. 41 ████████████████████████████████████████████

██████████████; Ex. 11 at 191:13–23 ██████████████████████.

Fed cattle prices nevertheless increased steadily through 2014 due to ██████ ███████████████████████████████████[39] ████████████████████████████ ███████[40]

Cattle prices were projected to remain high throughout 2015 before declining gradually once supplies began to expand in 2016.[41] ████████████████████ ███████████████████████[42] ████████████████████████████ ██████████████████████████████████████████████████████[43]

### 2. Defendants Recognize that Collective Kill Cuts Were Required to Keep Demand Below Available Supplies and Suppress Prices

Beef packing is a ████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████[44] ██████████████████████.[45] ████████████████████████████

---

[39]   *See, e.g.,* Ex. 42 ████████████████████████████████; Ex. 43 (Deposition of Dennis McDougall, National Beef Cattle Procurement, 2011 to 2020) at 75:4–15 ████████████████████████████████; Ex. 44 ████ ████████████████████████; Ex. 45 ████████████████████████████ ███████████████████████.

[40]   Ex. 5 at 133:23–134:1.

[41]   Lamb Rpt., ¶330; *see also* Ex. 31 at NationalBeef-00002782.

[42]   Ex. 33 at 182:21–183:3 ███████████████████████████████ ████████████████████████████████████████████████████████████ ███████████.

[43]   Ex. 46; Ex. 47 and Ex. 3 at 100:14–102:17; 113:3–115:9.

[44]   Ex. 14 at 58:15–24. *See also* Ex. 22 at 30:2–12; Ex. 11 at 289:6–3; Ex. 5 at 293:4– 294:14.

[45]   Ex. 5 at 114:5–10.

████████████████████████████████████████████████████████████ █

████████████████████████████████████████████████████████[47]

Kill cuts impact cattle prices by: (1) reducing demand for fed cattle, particularly cash cattle, thereby (2) "backing up" feeders, and (3) forcing them to continue incurring feeding costs until they can be sold in subsequent weeks.[48]  Once cattle reach slaughter weight and become marketable, producers have a ████████████████████████████ ██████████████████████[49] W███████████████████████████████ ██████████████████████████████████████████████████████ ██████[50]██████████████████████████████████████████████ ██████[51]██████████████████████████████████████████████

---

[46]     Ex. 14 at 69:3–6 ██████████████████████████████████ ██████████████████████████.

[47]     Ex. 11 at 72:1–18; 75:18–76:10; Ex. 3 at 120:9–23.

[48]     Ex. 48; Ex. 5 at 226:20–24 ████████████████████████; Ex. 14 at 68:11–14 ██████████████████████████████████████████████.

[49]     Ex. 49 (Deposition of James Jensen d/b/a Lucky 7 Angus) at 191:6–192:13.  *See also* Ex. 5 at 52:22–53:4.

[50]     Ex. 50.

[51]     Ex. 10 at 298:3–13 ██████████████████████████████████ ████████████████████████████████; Ex. 51; Ex. 3 at 66:18–6768:3 ████████████████████████; *id.* at 225:12–17; Ex. 52 (Deposition of Bradley Brandenburg, Tyson Director of Cattle Procurement, 2016 to 2015) at 138:21–139:8.

12



[52] ████ Ex. 53; *see also* Ex. 54 ████████

[53] ████ Lamb Rpt., ¶235 ████████ . *See also id.*, §VI.A2.

[54] ████ Ex. 52 at 139:24–140:2.

[55] ████ Ex. 55 ████

[56] ████ Ex. 56 ████ ; Ex. 10 at 133:5–12 ████ ; Ex. 57, ████ ; Ex. 3 at 260:1–10 ████ ; Ex. 58; Ex. 59.

[57]

[58]



**C.** **Defendants Agreed to Suppress Slaughter Levels Below Available Slaughter-Ready Cattle Supplies**

**1.** **Defendants' 2014 Attempt to Coordinate Cuts Fails**

---

[59] Ex. 60 and Ex. 14 at 78:7–84:7 ██████████████████████████████████ ██████████████████████████████.

[60] Ex. 3 at 117:3–118:14.

[61] Ex. 5 at 241:8–23 ██████████████████████████████████ ██████████████████; Ex. 62 at slide 9; Ex. 22 at 31:7–20.

[62] Ex. 3 at 116:1–25.

[63] Ex. 63 at 4 ██████████████████████████████████ ██████; and Ex. 11 at 216:21–220:23.

[64] Ex. 64; Ex. 22 at 121:03–122:13.



---

[65]   Ex. 65, and Ex. 66 (Monte E. Lowe - Text Message Record).

[66]   *See* Ex. 67; Ex. 68 ████████████████████████████████████

██████████████████████ ; Ex. 22 at 140:03–141:15 ███████████████████ .

[67]   Ex. 69 ████████████████████████████████████████ .

[68]   Ex. 70 at CARGILL0000185443; Ex. 11 at 28:25–229:22; 234:21–235:2; Ex. 71.

[69]   Ex. 72. *See also* n.39.

[70]   Ex. 73.  Unless otherwise stated, all cattle prices are stated on a dollar per cwt, live weight basis.

[71]   Ex. 74. *See also* Ex. 75 ████████████████████████████████████

████████████████████████████████ .

[72]   Ex. 3 at 88:13–89:5.



[74]



[73]

[74]     Ex. 79 at slide 8.

**Figure 2: 5-Area Region Weighted Average Cash Transactions: 2014**[75]



### 2.    Defendants Conspire to "Break" Cattle Prices

For the first five months of 2015, cattle prices traded between $159–$169, just below the record set in November 2014 – $170.[76]



---

[75]    "Steer Cash Price" is the weighted average price for live FOB steers that are greater than 80% choice from LM_CT150.

[76]    Ex. 73 at 2.

[77]    Ex. 80 ████████████████████████████████████████
████████████████████████████████.

[78]    Ex. 81.







---











---

[98]   Ex. 130 and Ex. 10 at 317:4–318:20.  *See also* Ex. 12 ██████████████████████████████████████.

[99]   *Id.*

[100]   Ex. 131.

[101]   Ex. 132.

[102]   Ex. 133; Ex. 134.

[103]   Ex. 3 at 225:18–21.

[104]   Ex. 135 (confirming Defendants all discounting overweight cattle); Ex. 136.



---

[105]   Ex. 137.

[106]   Ex. 138; Ex. 139.

[107]   Ex. 139; Ex. 140 ███████████████████████████████
██████████ .

[108]   Ex. 141 ███████████████████████████████████████
████████ ; Ex. 143 (Deposition of Randy Carlgren, Cargill Director of Financial Planning
and Analysis, 2016 to present) at 123:7–126:14.

[109]   Ex. 144; Ex. 145.

[110]   Ex. 14 at 251:21–255:3 (██████████████████████████████
███████████████████████████ ; Ex. 16 at 227:5–231:25 ██████████████
████████████████████████████████████ .

[111]   Ex. 3. at 228:11–229:7.

**Figure 3: 5-Area Region Weighted Average Cash Transactions: 2015**[112]



### D.   Common Evidence Demonstrates that Defendants Used a Variety of Devices in Furtherance of the Conspiracy

### 1.   Defendants Carried Out Their Agreement by Exchanging Information Directly and Through Conduits





---

[112]   "Steer Cash Price" is the weighted average price for live FOB steers that are greater than 80% choice from LM_CT150.

[113]   *See, e.g.,* Ex. 146 ); Ex. 147



114   *See, e.g.,* Ex. 151 (April 2015); Ex. 152 (July 2017); Ex. 153 (February 2018); Ex. 154 (April 2018); Ex. 155 (April 2019).

115

117   Ex. 161.

118   Ex. 33at 135:3–18



---

119  Ex. 162.

120  Ex. 163.

121  Ex. 163; Ex. 164; Ex.165; Ex. 166; Ex. 14 at 106:1–109:1.

122  *Cf.* Ex. 167 to Ex. 168; Ex. 14 at 126:18–127:8 ▮▮▮▮▮▮▮

123  Ex. 94; Ex. 14 at 115:3–116:12.  *See also supra* note 88.

124  Ex. 169 and Ex. 61 at 47:16–48:3; Ex. 43 at 241:7–242:18; Ex. 3 at 150:1–151:9.

125  Ex. 170.

126  Ex. 3 at 347:7–21; *see also id.* at 319:5–18 and Ex. 171.

127  Ex. 21 at 122:2–9.  *See also* Ex. 94.

128  Ex. 172; Lamb Rpt., ¶¶260–64.

129  Ex. 10 at 359:23–360:11; Exs. 173 and 174.



**2.** **Procurement Practices in the Cash Market Reinforced Defendants' Agreement**



### 3. Defendants Monitored Competitors' Adherence to the Conspiracy and Punished Defections





[141] Ex. 14 at 87:18–89:14; Ex. 190, Ex. 191, and Ex. 3 at 167:23–173:18; Ex. 192; Ex. 193; Ex. 194.

[142] *See, e.g.,* Ex. 195; Ex. 196; and Ex. 197.

[143] Ex. 10 at 292:22–293:6; Ex. 199; Ex. 198; and Ex. 200.

███████████████████  ████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

### E. Plaintiffs' Experts Show that Common Evidence Is Capable of Demonstrating that All or Virtually All Class Members Were Injured

Plaintiffs retained two preeminent economists – Dr. Russell Lamb and Ms. Candice Rosevear – to analyze whether common evidence is capable of showing that Defendants' conspiracy caused classwide injury and damages to the Producer and Exchange Classes. Both found common evidence exists.

***Dr. Lamb.*** Dr. Lamb is a highly credentialed economist, who has testified in numerous antitrust matters. Lamb Rpt., ¶¶1-5. Dr. Lamb analyzed the effects of the alleged conspiracy. Specifically, he constructed a well-specified multiple regression analysis[146] that estimated the price effect of the conspiracy, while controlling for other supply and demand factors that could affect fed cattle prices. He also conducted empirical correlation analyses of fed cattle prices across, among other things, feedyards, plants, and

---

[144]   Ex. 188; Ex. 187 at 178:24–180:12; Ex. 8 at 144:21–149:8; Ex. 201, PX670; Ex. 202.

[145]   *See, e.g.,* Ex. 203 ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████; Ex. 206; Ex. 207; Ex. 208.

[146]   "Multiple-regression analysis is a statistical tool used to determine the relationship between an unknown variable (the 'dependent' variable) and one or more 'independent' variables that are thought to impact the dependent variable." *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1260 (10th Cir. 2014).

procurement types to show a direct linkage across all price metrics. Finally, he conducted an in-sample prediction[147] to further demonstrate the widespread effect of the conspiracy. *Id.*, ¶15(c).

In sum, Dr. Lamb concludes that the Producer Class suffered aggregate damages of nearly ***$9.4 billion***. Lamb Rpt., Table 25.

***Ms. Rosevear.*** Ms. Rosevear analyzed the impact that the suppression of physical cattle prices found by Dr. Lamb had on LCF prices. Using standard, well-accepted methods, Ms. Rosevear found that there was a strong correlation between fed cattle prices and LCF prices. Rosevear Rpt., ¶¶39–40, Figs. 2–3.

Because of this strong correlation, Ms. Rosevear used a standard peer-reviewed cost of carry model to determine the but-for futures price for each LCF using Dr. Lamb's fed cattle suppression results. The difference between the but-for futures prices and the actual futures prices is the "artificiality" Defendants caused on each "long" LCF. In total, this artificiality caused at least $1.07 billion in losses on Exchange Class members' long LCF positions as defined in Ms. Rosevear's report. *Id.*, Figs. 7–8.

## III.   ARGUMENT

"It is the Court's duty to conduct a rigorous analysis before certifying a class, which necessarily requires that the Court consider some issues that bear on the merits … ." *In re*

---

[147]   An in-sample prediction is "a standard technique used to test whether the impact of an antitrust conspiracy is widespread." *In re Broiler Chicken Grower Antitrust Litigation (No. II)* ("*Growers*"), No. 6:20-md-02977, 2024 WL 2117359, at *12 (E.D. Okla. May 8, 2024). *See also* Lamb Rpt., ¶409.

*Pork Antitrust Litig.*, 665 F. Supp. 3d 967, 995 (D. Minn. 2023).[148]  "But courts considering class certification are not expected to resolve questions regarding the merits at this time." *Id.*  Rather, "Class Plaintiffs must provide evidentiary proof of each of Rule 23's elements." *Id.*  As shown below, Plaintiffs have done so here.

### A.    The Producer and Exchange Classes Satisfy Rule 23(a)

#### 1.    Each Class Satisfies Numerosity (Rule 23(a)(1))

There are thousands of members in each Class, geographically disbursed throughout the country.  *See* Ex. 14 at 315:9–22 ███████████████████████████; Ex. 3 at 413:3–8 ██████████████████████████; Lamb Rpt., Fig. 6 (showing geographic dispersion of cattle on feed); Rosevear Rpt., Figs. 7–8 (calculating damages for over 3,500 account holders in CME data).  Numerosity is therefore satisfied. *See Ark. Ed. Ass'n v. Bd. of Ed. of Portland*, *Ark. Sch. Dist.,* 446 F.2d 763, 765–66 (8th Cir. 1971) (17–20-member class satisfied numerosity).

#### 2.    Questions of Law and Fact Are Common to the Classes (Rule 23(a)(2))

"To establish commonality under Rule 23(a)(2), class claims 'must depend on a common contention' that is 'capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'"  *Pork*, 665 F. Supp. 3d at 995.  "Minnesota courts have previously found that allegations of a nationwide horizontal price-fixing conspiracy

---

[148]    Unless otherwise indicated, citations are omitted and emphasis is added.

in violation of Section 1 of the Sherman Act primarily involves common issues of fact and law." *Id.* at 996.

Common questions of law and fact abound, including, but not limited to:

- The participants in the alleged conspiracy;

- Start date and duration of conspiracy;

- Whether the conspiracy caused injury to the Producer Class;

- Whether the conspiracy caused LCF prices to be artificial; and

- The appropriate measure of damages to each Class arising from Defendants' conspiracy.

Accordingly, commonality is satisfied.  *See Pork*, 665 F. Supp. 3d at 996 (common questions included the existence of a price-fixing conspiracy); *Ploss v. Kraft Foods Group, Inc.*, 431 F. Supp. 3d 1003, 1014 (N.D. Ill. 2020) (common questions were "(1) whether Kraft engaged in the alleged long wheat futures scheme; and (2) whether that scheme inflated futures prices in the marketplace").

### 3.      Plaintiffs' Claims Are Typical (Rule 23(a)(3))

"Similar to commonality, 'typicality exists where … all class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances.'"  *Growers*, 2024 WL 2117359, at *9 (ellipsis in original).  "'The burden of demonstrating typicality is fairly easily met so long as other class members have claims similar to the named plaintiff[s].'"  *Pork*, 665 F. Supp. 3d at 998.  Typicality is readily satisfied here.

The Producer Class satisfies typicality because the "'[Producer] plaintiffs and all [Producer] class members alleg[e] the same antitrust violations by defendants.'"  *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 351 (N.D. Cal. 2005).  Likewise, the Exchange Class satisfies typicality because the "Proposed Representatives and the absent class members transacted in the same contracts, in the same centralized marketplace, were allegedly negatively impacted by the same common course of manipulative conduct for which the same group of defendants is alleged to be legally responsible for the damages." *In re Amaranth Nat. Gas Commodities Litig.*, 269 F.R.D. 366, 379 (S.D.N.Y. 2010).

### 4.    Plaintiffs and Their Counsel Will Adequately Represent the Interests of the Classes (Rule 23(a)(4))

"To demonstrate adequacy of representation, a plaintiff must show that '(1) the representative and its attorneys are able and willing to prosecute the action competently and vigorously; and (2) the representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge.'"  *Pork*, 665 F. Supp. 3d at 998.  "'[T]he adequacy-of-representation requirement is satisfied as long as one of the class representatives is an adequate class representative.'"  *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 961 (9th Cir. 2009).

Adequacy is met here because it is "clear that the interests of the named representatives are not antagonistic to those" of their respective Classes, and each will continue to vigorously represent their Class's interests as they have for over five years.  *In re Monosodium Glutamate Antitrust Litig.*, 205 F.R.D. 229, 233 (D. Minn. 2001), *accord Pork*, 665 F. Supp. 3d at 999.  Each Producer Class representative sold cattle to a Defendant

during the Class Period, and each seeks to redress the injury they suffered from Defendants' conspiracy.  *See generally* Exs. 218-21 (Chambers, Jensen, Nelson, and Weinreis Declarations). Likewise, each Exchange Class representative held a long LCF position and closed that position prior to the end of the Class Period.  Ex. 220, Weinreis Decl., ¶¶12-14.

Counsel for the Classes are also experienced at litigating antitrust and CEA claims and have the resources and commitment to litigate this matter through to conclusion.  *See also* Joint Decl., ¶¶15-18, Exs. 212-13 (firm resumes).  The Court previously appointed Scott+Scott and CCMS as Interim Co-Lead Class Counsel.  *Cattle* ECF No. 88.

Scott+Scott and CCMS have vigorously and effectively prosecuted this lawsuit to date and will continue to diligently represent the Classes through trials and appeals.  Joint Decl.,¶¶10-14.  Their efforts have been supported by the diligent efforts of Interim Liaison Counsel and the Executive Committee firms, each of which is likewise experienced in litigating antitrust and other complex class actions.  *Id.*, ¶5, Exs. 214-17 (firm resumes).

Accordingly, the Court should appoint Scott+Scott and CCMS as Co-Lead Counsel for the Producer and Exchange Classes; Robins Kaplan as Liaison Counsel; and Kirby McInerney, Pritzker Levine, and Pearson Warshaw as the Executive Committee.  Finally, each named Plaintiff supports these firms' appointments.  Joint Decl., ¶¶19-20 (citing Plaintiff declarations).

**B.   The Producer and Exchange Classes Satisfy Rule 23(b)(3) Predominance**

Predominance requires a demonstration that "questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  Both Classes meet this requirement.

**1.   Common Issues of Law and Fact Predominate Over Individual Issues on both the Antitrust and CEA Claims**

"At the core of Rule 23(b)(3)'s predominance requirement is the issue of whether the defendant's liability to all plaintiffs may be established with common evidence." *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1029 (8th Cir. 2010).  Common questions still predominate even when some individualized questions may need to be tried separately.  *See Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 453 (2016).

"Analysis of [predominance] may overlap with the merits of the case, but a court should not resolve the merits at this stage.  Rather, 'Rule 23 (b)(3) requires a showing that **questions** common to the class predominate, not that those questions will be answered, on the merits, in favor of the class.'"  *Pork*, 665 F. Supp. 3d at 1001 (emphasis in original).  Put another way, "[t]he question at class certification is … whether questions of law or fact ***capable of resolution*** through common evidence predominate over individual questions."  *Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 619 (8th Cir. 2011).

To prove a Sherman Act §1 claim, a plaintiff must show "(1) that Defendants conspired to violate federal antitrust laws, (2) that class members suffered injury because of the violation ('impact'), and (3) plaintiffs can measure the damages." *Pork*, 665 F. Supp. 3d at 1001.  To prove a CEA manipulation claim, a plaintiff must show that "(1) the

defendants possessed the ability to influence prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price."  MTD Order at 23 (quoting *Anderson v. Dairy Farmers of Am., Inc.*, No. 08-4726, 2010 WL 1286181, at *5 (D. Minn. Mar. 29, 2010)).

The elements of Plaintiffs' antitrust and CEA claims are "capable of resolution" through common evidence.

### a.      Common Evidence Is Capable of Proving Defendants' Conspiracy

Defendants' conspiracy violates both the Sherman Act and CEA.  For both claims, the focus is on ***Defendants'*** conduct – the existence and scope of the conspiracy and scheme.  In antitrust cases, "Evidence that appellees entered into a *conspiracy* that would affect all class members would perforce be evidence common to all class members for proving the conspiracy."  *Blades v. Monsanto*, 400 F.3d 562, 572 (8th Cir. 2005), *accord Pork*, 665 F. Supp. 3d at 1002.  "[D]efendants seeking to defeat class certification in a case alleging a horizontal price-fixing conspiracy 'face an uphill battle' … because, depending on the circumstances, 'the existence of a conspiracy [is] the overriding issue even when the market involves diversity in products, marketing, and prices.'"  *Growers*, 2024 WL 2117359, at *12 (brackets in original).

So too for CEA price manipulation cases, where proof of Defendants' scheme to suppress commodity prices, as alleged here, requires the use of common evidence of the ***Defendants'*** actions.  *Ploss*, 431 F. Supp. 3d at 1014 ("common questions do predominate

over individual questions in cases alleging price manipulation under the Commodity Exchange Act").[149]

And because Plaintiffs' antitrust and CEA claims both focus on the Defendants' conduct, predominance in both types of cases is usually satisfied. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623, 625 (1997) ("[p]redominance is a test readily met in certain cases alleging . . . violations of the antitrust laws."); *Messner v. Northshore University HealthSystem*, 669 F.3d 802, 816 (7th Cir. 2012) (showing predominance in commodities cases, which  involve "market[s] for a generic, undifferentiated commodity (i.e., corn, wheat, or pork bellies) traded on an exchange with standard contract terms" is "relatively simple").

As in other cases, Defendants' conduct – as evidenced by Defendants' documents, deposition testimony, and economic analysis relating to the nature and the structure of the industry – can and will be used to demonstrate the existence of Defendants' price-suppression conspiracy for fed cattle. *See Growers*, 2024 WL 2117359, at *16; *Ploss*, 431 F. Supp. 3d at 1015.   This evidence – common to all Producer and Exchange Class members – shows that Defendants coordinated their harvest schedules to suppress fed cattle and LCF prices.

Accordingly, the existence of Defendants' conspiracy, and the proof required to show its existence, is common to all Producer and Exchange Class members.

---

[149]    This is true for each of Plaintiffs' CEA claims for manipulation, manipulative device, aiding and abetting, and principal-agent liability.  Compl., Counts 3–6.

**b.**      **Common Evidence Is Capable of Proving Classwide Injury**

"Impact" refers to the injury caused by the alleged antitrust violation – here, the underpayments the Producer Class suffered.  *Blades*, 400 F.3d at 569.  Evidence tending to establish that "Defendants and their co-conspirators unlawfully suppressed [prices for all relevant producers] during the relevant time period … is sufficient to satisfy one requisite prong of antitrust injury for class certification purposes." *Allen v. Dairy Farmers of Am., Inc.*, No. 5:09-CV-230, 2012 WL 5844871, at *12 (D. Vt. Nov. 19, 2012).[150] Proving injury in a Section 1 case will generally consist of "some showing that the plaintiff, as a result of this conspiracy, 'had to pay supracompetitive prices.'"  *Pork*, 665 F. Supp. 3d at 1002.  "And to establish such impact, plaintiffs typically provide experts who 'construct a hypothetical market, a but-for market, free of the restraints and conduct alleged to be anticompetitive.'"  *Id*.

Importantly, "'[p]aying an overcharge caused by the alleged anticompetitive conduct on a single purchase suffices to show—as a legal and factual matter—impact or fact of damage.'"  *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015).  This rule applies equally to an antitrust victim who receives an underpayment on its sales to antitrust defendants because buyers' cartels (as alleged here) are mirror images of seller cartels – and both are forbidden.  *See Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235 (1948).

---

[150]      The second prong is whether "such an injury is 'of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful'" – a "legal question," common to each Producer Class member. *Id.*, at *12 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

Nor does variability in the prices paid or individualized price negotiations defeat the existence of common impact.  "[E]ven if there is considerable individual variety in pricing because of individual price negotiations, class plaintiffs may succeed in proving classwide impact by showing that the minimum baseline for beginning negotiations, or the range of prices which resulted from negotiation, was artificially raised (or slowed in its descent) by the collusive actions of the defendants."  *In re Disposable Contact Lens Antitrust Litig.*, 329 F.R.D. 336, 386 (M.D. Fla. 2018) (brackets in original).  In fact, "'under the prevailing view,'" antitrust conspiracies such as price-fixing conspiracies "'affect all market participants, creating an inference of class-wide impact even when prices are individually negotiated.'"  *Growers*, 2024 WL 2117359, at *30.

But an inference of injury is not necessary here because Dr. Lamb conducts a multi-faceted analysis using evidence common to the Producer Class to demonstrate classwide injury.

*First*, Dr. Lamb uses a multiple regression analysis to estimate the effect of the challenged conduct on the prices paid to the Producer Class.  To construct his model, Dr. Lamb reviewed and relied on materials produced by Defendants and third parties, including: (1) voluminous structured data reflecting nearly two million useable fed cattle observations; (2) contracts between Defendants and feedyards; (3) documents from Defendants' employees; and (4) reports and data series from federal agencies.  Dr. Lamb also reviewed the deposition testimony of dozens of witnesses, as well as economic and academic literature to support his modeling choices.  Lamb Rpt., ¶¶340–71; *see generally id.*, App'x B.

Dr. Lamb's multiple regression analysis used numerous variables that could explain changes in prices for fed cattle (*i.e.*, the dependent variable). These "independent" variables included:

- Demand variables – *e.g.*, disposable U.S. income, an alternative protein index to account for consumer demand for pork and chicken, and a weighted exchange rate index to account for cattle and beef imports and exports.

- Supply variables – *e.g.*, calf supply, drought-related effects, fed cattle production costs, and Mandatory Country of Origin Labeling variables to control for cattle imports.

- Lot-specific variables – *e.g.*, cattle weight, heifer and Holstein percentages, yield, quality grade, and a foreign-born cattle indicator.

- Other categorical variables – *e.g.*, procurement type, feedyard- and plant-specific fixed effects, and seasonality.

*Id.*, ¶¶352-68. Dr. Lamb also controlled for the effects of the Tyson Holcomb fire, which removed slaughter capacity from the industry. *Id.*, ¶369.[151]

Dr. Lamb's regression also included an indicator variable to measure effects of the alleged conspiracy itself. When Dr. Lamb turned this conspiracy variable "on" – indicating that the conspiracy was in effect – he found a statistically significant, negative effect on the prices Defendants paid to Producer Class members. *Id.*, ¶¶371-77, Table 14.

---

[151] Dr. Lamb did not include a variable for capacity utilization because doing so would create a misspecification error and "confound" (hinder) the model's ability to measure the effect of the alleged conspiracy. *Id.*, ¶371.

Specifically, Dr. Lamb's model shows that but-for the conspiracy Producer Class's prices have been about 6.7% higher. *Id.*, Table 14. Courts routinely accept multiple regression analyses like the one Dr. Lamb uses here to demonstrate the existence of classwide antitrust injury. *See, e.g., Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 677 (9th Cir. 2022) (*en banc*), *cert denied., Starkist Co. v. Olean Wholesale Grocery Coop., Inc.*, 143 S. Ct. 424 (2022) ("In antitrust cases, regression models have been widely accepted as a generally reliable econometric technique to control for the effects of the differences among class members and isolate the impact of the alleged antitrust violations on the prices paid by class members."); *Pork*, 665 F. Supp. 3d at 1003–04 (expert's use of multiple regression analysis "affirmatively demonstrates that [plaintiffs] can show common evidence of classwide impact").

**Second**, Dr. Lamb also concluded that there was a pricing structure connecting fed cattle prices across geographic regions, procurement types (*e.g.*, negotiated cash, negotiated grid, forward, and formula contracts), and cattle breeds and characteristics. Lamb Rpt., ¶15(c)(i) –(v). In addition to documents, testimony, and literature pointing to a pricing structure for fed cattle (*id.*, ¶¶174-87, 381-399), Dr. Lamb also demonstrated it empirically through correlation analyses for fed cattle prices across: (1) different locations, demonstrating that prices for fed cattle purchased from different feedyards and by different Defendants' plants were highly correlated (*id.*, Figs. 28–31, 41–45, Tables 8, 21); (2) different procurement types, showing that the prices set by different procurement types were highly correlated (*id.*, Figs. 33–36, Tables 15–19); (3) different cattle breeds Defendants' processed were highly correlated (*id.*, ¶399, Figs. 37–40, Table 20); and (4)

price deciles at Defendants' plants, which approximate premiums and discounts for different cattle characteristics, were highly correlated (*id.*, ¶404, Figs. 45–48, Table 23). The existence of a pricing structure – reinforced by Defendants' domination of the fed cattle market, the lack of fed cattle substitutes, and fed cattle's commodity nature (*id.*, §IV.A-C, ¶¶405–08) – demonstrates that Producer Class members could not avoid the effects of Defendants' conspiracy.  *See, e.g., Growers*, 2024 WL 2117359, at *12 ("[W]here plaintiffs present evidence of standardized pricing structures" in a conspiracy to suppress prices, "the evidence may support 'a reasonable conclusion that "price-fixing would have affected the entire market."'"); *Pork*, 665 F. Supp. 3d at 1003 (correlation analysis "bolsters" regression analysis because it shows that class members "'would not have been able to avoid the impact of the alleged conspiracy by switching from one Defendant to another'"); *Urethane*, 768 F.3d at 1255 (evidence of a price structure whereby base price served as starting point of price negotiations sufficient to show classwide injury).

***Third***, the robustness of Dr. Lamb's multiple regression model was further demonstrated through an in-sample prediction to show that all or nearly all Producer Class members suffered an underpayment on at least one fed cattle transaction.  Lamb Rpt., ¶¶409-13.  Dr. Lamb's in-sample prediction uses his multiple regression analysis to predict the but-for price that would have been received for each transaction and compares that against the actual price received.  If the actual price received is lower than the but-for price on a fed cattle transaction, then there is an underpayment on that transaction.

Dr. Lamb's in-sample prediction shows that 98.6% of feedyards during the Class Period showed at least one transaction with an underpayment. *Id.*, ¶412.[152]  Courts have held such results are sufficient to demonstrate classwide injury. *Cf. Olean*, 31 F.4th at 672 (affirming certification of class where in-sample prediction showed 94.5% of purchasers were injured on a single transaction); *Growers*, 2024 WL 2117359, at *19 (certifying class where in-sample prediction demonstrated that between 95-100% of class members were injured).

At bottom, Dr. Lamb's analyses rely on evidence common to Producer Class members.  And when combined with Dr. Lamb's separate analyses finding that "'the structure and characteristics of the [fed cattle] industry made it conducive to the formation and maintenance of the alleged price-fixing conspiracy,'" *Pork*, 665 F. Supp. 3d at 1002,[153] Dr. Lamb's econometric analyses demonstrate that common evidence is capable of proving classwide injury.

### c.   Producer Class's Damages Are Capable of Classwide Proof

Using his multiple regression analyses, Dr. Lamb also estimated the amount of classwide damages suffered by Plaintiffs and the Producer Class.  At class certification, plaintiffs must show that "damages are capable of measurement on a classwide basis," but

---

[152]   Although feedyards are not always synonymous with the identity of a Producer Class member, the results are robust.  Dr. Lamb further tested his in-sample prediction against Cargill's payee data field, which reflects the cattle owner – a field other Defendants did not provide. *Id.*, ¶413.  He found that 95.6% of payees had at least one transaction with an underpayment. *Id.*

[153]   *See* Lamb Rpt., §IV (analyzing economic evidence demonstrating that the U.S. cattle industry was conducive to the formation and operation of the alleged conspiracy).

they "need not be exact." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34–35 (2013). *See also Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 808 (7th Cir. 2013) (damages methodology at class certification is "provisional" and need be "useful only as a mechanism to ensure that the class meets the requirements of Rule 23" because "the damages measure will likely become more refined" after certification).

Thus, "[i]n proving the *amount* of damage, the antitrust plaintiff need only present evidence from which the fact finder may make a just and reasonable estimate of the damage that is not based on speculation or guesswork." *In re Bulk Popcorn Antitrust Litig.*, 792 F. Supp. 650, 653 (D. Minn. 1992)) (emphasis in original). "[T]he fact that the damages calculation may involve individualized analysis is not by itself sufficient to preclude certification when liability can be determined on a class-wide basis." *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 697 (D. Minn. 1995).

Dr. Lamb estimated the Producer Class damages to be **$9.4 billion** – a calculation he made "by multiplying the relevant [underpayment] to the [Defendants'] total [purchase] amount" from Producer Class members. *Pork*, 665 F. Supp. 3d at 1008; Lamb Rpt., ¶416, Table 25. Dr. Lamb's multiple regression analysis is common to all Producer Class members, and it is a well-accepted method to calculate damages in antitrust cases. *Pork*, 665 F. Supp. 3d at 1008 (classwide damages can be estimated through "a multiple regression analysis"); *Urethane*, 768 F.3d at 1260–61 (affirming jury award of damages based on expert's multiple-regression analysis and damages model).

Because common evidence can demonstrate classwide damages to the Producer Class, predominance is satisfied as to damages.

44

### d. Common Evidence Is Capable of Proving the Exchange Class's CEA Claims

Common evidence is also capable of proving the Exchange Class's CEA claims. Here, Plaintiffs' CEA claims arise from Defendants' conspiracy to suppress fed cattle prices which caused LCF prices to become artificial.[154]

This case is analogous to other CEA class actions, in which courts have certified futures trader classes, where: (1) plaintiffs demonstrated that defendants manipulated futures through a common scheme provable through defendants' own documents; and (2) plaintiffs' expert's econometric modeling was capable of proving that the defendants' scheme caused classwide injury and damages to futures trader classes. *E.g., Ploss*, 431 F. Supp. 3d at 1015–18 (certifying class of wheat futures traders). Exchange Plaintiffs' CEA claims are likewise capable of common proof.

***Defendants Possessed the Ability to Influence Prices.*** Defendants' ability to control and influence prices and their intent to cause artificial LCF prices are demonstrated by: (i) Defendants' over 80% share of the fed cattle procurement market, which is indicative of Defendants' monopsony power (Lamb Rpt., ¶¶191–95, Tables 10–11), (ii) Defendants' nearly 100% control of facilities certified by CME for the delivery of cattle for physically-settled LCF (Rosevear Rpt., n.16; Lamb Rpt., ¶180; *cf.* MTD Order at 23–24), and (iii) Dr. Lamb's analyses showing that Defendants exploited that power by suppressing fed cattle prices (Lamb Rpt., ¶377, Table 14)

---

[154]   There were nine LCFs that listed for trading as of May 29, 2015:  the June 2015, August 2015, October 2015, December 2015, February 2016, April 2016, June 2016, August 2016, and October 2016 contracts.  Rosevear Rpt., ¶18.

***Artificial Prices for LCFs Existed***.  As is the case with nearly all futures markets, there is a formulaic relationship between the price of the futures contract and the underlying commodity – namely, the futures price is equal to the spot price plus the "cost of carry," which reflects costs borne by the holder of the contract, such as storage and financing costs. Rosevear Rpt., ¶¶28–34.

To demonstrate the pricing relationship between these markets, Ms. Rosevear analyzed the prices for fed cattle and LCF and found that the fed cattle prices closely tracked LCF prices.  Specifically, Ms. Rosevear applied the well-accepted, peer-reviewed cost-of-carry model, which formulaically explains the relationship between futures and spot prices.  *Id.*, ¶¶39–40.  Figure 2 from Ms. Rosevear's report shows the "near perfect positive correlation" between fed cattle prices and LCF prices.[155]

---

[155]   *See also* Rosevear Rpt., Fig. 3 (showing correlation of 0.96 between June 1, 2015 – October 31, 2016, where perfect correlation is 1.0).

**Figure 4. Rosevear Figure 2: Actual Futures and Spot Prices**



Then, to estimate the effect of Defendants' price-suppression in the fed cattle market, Ms. Rosevear uses two variants of the cost-of-carry model – a fixed-cost model and a variable cost model. Ms. Rosevear incorporates Dr. Lamb's underpayment regression by substituting the actual fed cattle prices with Dr. Lamb's but-for fed cattle price into her model. *Id.*, ¶¶48–66. Regardless of whether Ms. Rosevear used the fixed-cost or variable cost model, the resulting substitution shows that LCF prices were artificially suppressed by at least 6.6% for each LCF contract. *Id.*, ¶¶53, 58, Rosevear Exs. 1–2.

47

***Defendants Caused Price Artificiality for LCF and Intended to Do So***.  As discussed above, Defendants possessed and wielded their dominant position in the U.S. fed cattle procurement market to suppress prices for fed cattle.  Moreover, Ms. Rosevear's analyses demonstrate the well-recognized relationship between fed cattle and LCF prices and show that changes in fed cattle prices resulted in corresponding price changes in LCF.

***Actual Damages Can Be Calculated on Classwide Basis.***  Ms. Rosevear also offers a common methodology that is capable of measuring classwide damages to the Exchange Class.  As explained above, Ms. Rosevear's model found that LCF were suppressed by at least 6.6%.  Here, Ms. Rosevear calculated classwide damages using a formulaic approach that can be applied to individual class member transactions.  The two key inputs to the common methodology are: (i) the estimate of price artificiality in each LCF traded, and (ii) each class member's LCF transactions.  Using the centralized records obtained from the CME and the price artificialities contained within Dr. Lamb's regression analyses, Ms. Rosevear calculated the amount of "artificiality" imparted to the Exchange Class as a whole and to for each LCF transaction by every market participant.  *Id.*, ¶¶62-68, Rosevear Exs. 3–4.  She ultimately concludes that Defendants' misconduct caused at least $1.07 billion in losses for Exchange Class members.  *Id.*, Figs. 7–8.

**C.     A Class Action Is the Superior Method for Adjudicating the Claims in this Action**

Under Rule 23(b)(3), certification is warranted if a classwide trial is "superior to other available methods for fairly and efficiently adjudicating the controversy."  *See* Fed. R. Civ. P. 23(b)(3).

Class adjudication is more efficient than any other procedure available for resolving the relevant factual and legal issues here.  *See Messner*, 669 F.3d at 814 n.5 ("There are so many common issues of law and fact relating to the issue of … liability, however, that the superiority requirement likely poses no serious obstacle to class certification here.").

The class mechanism is also superior to individual actions.  Given the time and expense of litigating an antitrust and CEA dispute, most class members would not get their day in court if forced to pursue their actions individually because the expense required to do so would vastly exceed the value of individual Class members' recovery.  *Pork*, 665 F. Supp. 3d at 1009.  Indeed, no members of the Producer or Exchange Classes have filed their own individual actions in this MDL, illustrating the significant disincentives to litigate these claims on an individual basis.  *See In re Remicade Antitrust Litig.*, No. 17-CV-04326, 2023 WL 2530418, at *13 (E.D. Pa. Mar. 15, 2023) ("The lack of opt-outs illustrates the superiority of adjudicating this controversy through a class action.").  Accordingly, certifying the proposed Classes will promote judicial economy and uniformity of decision.

Finally, there are no manageability issues that would preclude an efficient trial in this matter.  As this Court recently concluded, even where "there are hundreds of millions of potential class members," the "superiority requirement is readily satisfied" because

49

"managing a class action—though difficult—is certainly more efficient than juggling a multitude of individual actions," particularly where, as here, this Court has "controlled this litigation for five years." *Pork,* 665 F. Supp. 3d at 1009.  Thus, Rule 23(b)(3) superiority is satisfied here.

### D.     The Producer and Exchange Classes are Ascertainable

A class "must be adequately defined and clearly ascertainable." *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 995 (8th Cir. 2016).  The Eighth Circuit does not impose an "administrative feasibility" requirement. *Id.*  Moreover, "[a]scertainability does not require that a plaintiff must be able to identify all class members at the time of class certification; rather, a plaintiff need only show that class members can be identified." *H & T Fair Hills, Ltd. v. All. Pipeline L.P.*, No. 19-CV-1095 (JNE/BRT), 2021 WL 2526737, at *5 (D. Minn. June 21, 2021).

Each Class is defined by "objective criteria," which is all that is required. *McKeage v. TMBC, LLC*, 847 F.3d 992, 998 (8th Cir. 2017).  Producer Class membership is established by a direct sale of fed cattle to a Defendant during the Class Period; membership can be ascertained either through records from Defendants, feedyards, or class members themselves.  Exchange Class membership is established by possessing a long position at the start of the Class Period and closing out that position at any point prior November 1, 2016; membership can be ascertained from information and records from the CME, futures commission merchants, introducing brokers, or the class members themselves.

50

### E.     Certification under Rule 23(b)(2) of the Injunctive Relief Class is Appropriate

Plaintiffs also seek to certify the proposed Injunctive Relief Class under Rule 23(b)(2).

"If the Rule 23(a) requirements are met and the Plaintiffs seek injunctive or declaratory relief,

certification under Rule 23(b)(2) is generally appropriate." *Pork*, 665 F. Supp. 3d at 1010.

As noted above, numerosity and commonality are readily satisfied here. *See* Section

III.A.1–2, *supra*. The organizational plaintiffs R-CALF and NFU are also typical and

adequate class representatives, as demonstrated by their vigor and dedication in pursuing

this suit for more than five years. Ex. 222, Bullard (R-CALF) Decl., ¶¶8-11; Ex. 223,

Larew (NFU) Decl., ¶¶9-11.[156]

Certification under Rule 23(b)(2) has "a substantially lower bar to surpass than Rule

23(b)(3)" because it does not require showing predominance of common questions of law or

fact. *Pork*, 665 F. Supp. 3d at 1010. Rather, it requires Plaintiffs to show that Defendant "has

acted or refused to act on grounds that apply generally to the class, so that final injunctive relief

or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R.

Civ. P. 23(b)(2).

---

[156]     Defendants did not challenge R-CALF's and NFU's standing to seek injunctive or declarative relief at the Rule 12(b)(6) stage, and the Court previously observed that both plaintiffs are "entitled" to "pursue injunctive and declaratory relief" under 15 U.S.C. §26. MTD Order at 22 n.13.   In addition, courts have held that "Rule 23 permits an association, the members of which fall within the definition of the proposed class, to serve as a class representative." *Med. Soc'y of the State of New York v. UnitedHealth Grp. Inc.*, 332 F.R.D. 138, 151–52 (S.D.N.Y. 2019).  R-CALF and NFU members are named plaintiffs and class members who sold fed cattle to Defendants, and accordingly, both have standing and are adequate representatives. *See* Ex. 222, Bullard Decl., ¶7; Ex. 223, Larew Decl., ¶8.

Here, Plaintiffs allege that Defendants engaged in an anticompetitive conspiracy that affected all or nearly all Injunctive Relief Class members.  Moreover, the structure and nature of the cattle industry – *e.g.*, commodity nature of fed cattle, the high level of concentration, Defendants' overwhelming market share, etc. – remain unchanged since the end of the Class Period and make the prospects of future collusion a significant threat.  *See* Lamb Rpt., n.652.  The requested injunctive relief would put a halt to Defendants' antitrust violations and enjoin future anticompetitive conduct – an important component of the relief sought by all Plaintiffs.  *See, e.g., In re Korean Ramen Antitrust Litig.*, No. 13-CV-04115, 2017 WL 235052, at *18–19 (N.D. Cal. Jan. 19, 2017) ("In light of the evidence of continuing market power of defendants and concentration in the market, certification of the injunctive relief claims under Rule 23(b)(2) is appropriate."); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 515 (S.D.N.Y. 1996) (certifying injunctive and damage classes "'where injunctive relief and damages are both important components of the relief requested'").  Thus, certification of the Injunctive Relief Class is appropriate.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be granted.


Dated: September 25, 2024                    Respectfully submitted,

                                            */s/ Patrick J. McGahan*
                                            David R. Scott (*pro hac vice*)
                                            Amanda F. Lawrence (*pro hac vice*)
                                            Patrick J. McGahan (*pro hac vice*)
                                            Michael P. Srodoski (Bar No. 0398250)
                                            Isabella De Lisi (*pro hac vice*)
                                            **SCOTT+SCOTT**

**ATTORNEYS AT LAW LLP**
156 Main Street
P.O. Box 192
Colchester, CT 06415
Tel.: 860-537-5537
Fax.: 860-537-4432

david.scott@scott-scott.com
alawrence@scott-scott.com
pmcgahan@scott-scott.com
msrodoski@scott-scott.com
idelisi@scott-scott.com

Joseph P. Guglielmo (*pro hac vice*)
Matthew J. Perez (*pro hac vice*)
Anna Hunanyan (*pro hac vice*)
Michelle Conston (*pro hac vice*)
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Tel.: 212-223-6444
Fax: 212-223-6334
jguglielmo@scott-scott.com
matt.perez@scott-scott.com
ahunanyan@scott-scott.com
mconston@scott-scott.com

Sean C. Russell (*pro hac vice*)
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.:  619-233-4565
Fax:  619-233-0508
srussell@scott-scott.com

Ellen Meriwether *(pro had vice)*
Jennifer W. Sprengel (*pro hac vice*)
Daniel O. Herrera (*pro hac vice*)
Kaitlin Naughton (*pro hac vice*)

53

**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
150 S. Wacker, Suite 3000
Chicago, IL 60606
Tel.: 312-782-4882
Fax: 312-782-4485
emeriwether@caffertyclobes.com
jsprengel@caffertyclobes.com
dherrera@caffertyclobes.com
knaughton@caffertyclobes.com

*Interim Co-Lead Counsel for the Cattle Plaintiffs*

K. Craig Wildfang (Bar No. 0117043)
Thomas J. Undlin (Bar No. 0183751)
Stacey P. Slaughter (Bar No. 0296971)
Geoff Kozen (Bar No. 0398626)
Eric P. Barstad (Bar No. 0398979)
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Tel.: 612-349-8500
Fax: 612-339-4181
kcwildfang@robinskaplan.com
tundlin@robinskaplan.com
sslaughter@robinskaplan.com
gkozen@robinskaplan.com
ebarstad@robinskaplan.com

*Interim Liaison Counsel for the Cattle Plaintiffs*

David E. Kovel (*pro hac vice*)
Thomas W. Elrod (*pro hac vice*)
**KIRBY MC INERNEY LLP**
250 Park Avenue, Suite 820
New York, NY 10177
Tel.: 212-371-6600
Fax: 212-751-2540
dkovel@kmllp.com
telrod@kmllp.com

Anthony F. Fata (*pro hac vice*)
Anthony E. Maneiro (*pro hac vice*)
**KIRBY MC INERNEY LLP**
211 West Wacker Drive, Suite 550
Chicago, IL 60606
Tel.: 312-767-5180
Fax: 312-767-5181

afata@kmllp.com
amaneiro@kmllp.com

Daniel Warshaw (*pro hac vice*)
Bobby Pouya (*pro hac vice*)
Michael H. Pearson (*pro hac vice*)
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Tel.: 818-788-8300
Fax: 818-788-8104
dwarshaw@pwfirm.com
bpouya@pwfirm.com
mpearson@pwfirm.com

Michael Schrag (*pro hac vice*)
George Sampson (*pro hac vice*)
Elizabeth C. Pritzker (*pro hac vice*)
Caroline Corbitt (*pro hac vice*)
**PRITZKER LEVINE LLP**
1900 Powell Street, Ste. 450
Emeryville, CA 94602
Tel.: 415-692-0772
Fax: 415-366-6110
mls@pritzkerlevine.com
gws@pritzkerlevine.com
ecp@pritzkerlevine.com
ccc@pritzkerlevine.com

***Interim Executive Committee for the Cattle Plaintiffs***