**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

IN RE CATTLE AND BEEF ANTITRUST
LITIGATION

MDL No. 22-3031 (JRT/JFD)

*This Document Relates To:*

THE INDIRECT SELLER ACTION,
Civil No. 22-2903

**MEMORANDUM OPINION AND ORDER**
**GRANTING PLAINTIFFS LEAVE TO**
**AMEND FIRST AMENDED COMPLAINT**

---

Richard M. Paul III, **PAUL LLP**, 601 Walnut Street, Suite 300, Kansas City, MO 64106; Michael Montaño, **GUERRA LLP**, 875 East Ashby Place, Suite 1200, San Antonio, TX 78212, for Plaintiffs.

Michelle K. Fischer, **JONES DAY**, 901 Lakeside Avenue, Cleveland, OH 44114; Benjamin L. Ellison, **JONES DAY**, 90 South Seventh Street, Suite 4950, Minneapolis, MN 55402, for Defendant National Beef Packing Company, LLC.

Jon B. Jacobs, **PERKINS COIE LLP**, 700 Thirteenth Street, Northwest, Suite 800, Washington, DC 20005, for Defendants Tyson Foods, Inc. and Tyson Fresh Meats, Inc.

Sami H. Rashid and Jessica J. Nelson, **SPENCER FANE LLP**, 100 South Fifth Street, Suite 2500, Minneapolis, MN 55402, for Defendants JBS USA Food Company, JBS Packerland, Inc., Swift Beef Company, and JBS S.A.

Holley C. M. Horrell, **GREENE ESPEL PLLP**, 222 South Ninth Street, Suite 2200, Minneapolis, MN 55402, for Defendants Cargill, Inc. and Cargill Meat Solutions Corporation.

The putative Indirect Seller Class ("Plaintiffs") seek leave to amend their First

Amended Complaint on behalf of producers of feeder cattle who indirectly sold cattle to

one or more Defendants in this multidistrict litigation alleging price-fixing in the beef packing industry.   Defendants Cargill, Inc.; Cargill Meat Solutions Corporation; JBS Packerland, Inc.; JBS S.A.; JBS USA Food Company; National Beef Packing Company, LLC; Swift Beef Company; Tyson Foods, Inc.; and Tyson Fresh Meats, Inc. oppose Plaintiffs' motion.   Because the proposed Second Amended Complaint narrows the classes and claims to those on behalf of producers of feeder cattle and provides bolstered allegations that support antitrust standing, the Court is satisfied that the proposed amendment would cure the deficiencies previously identified by the Court at the pleading stage. Accordingly, because good cause exists, Defendants would not be unduly prejudiced, and the proposed amendment would not be futile, the Court will grant Plaintiffs leave to amend their First Amended Complaint.

**BACKGROUND**

The Court has comprehensively addressed the background of the Indirect Seller Action in prior orders, *see, e.g.*, *In re Cattle and Beef Antitrust Litig.*, 687 F. Supp. 3d 828, 834–36 (D. Minn. 2023), and Plaintiffs' allegations largely mirror those of the other Class Plaintiffs in this multidistrict litigation, *see In re Cattle Antitrust Litig.*, No. 19-1222, 2021 WL 7757881, at *1–2 (D. Minn. Sept. 14, 2021).   As such, the Court will only include the factual and procedural history necessary for the current motion.

The Second Amended Complaint narrows the putative class of plaintiffs.   In the original complaint, the Court construed the putative class to consist of cow-calf ranchers, who are the first step in the beef supply chain.   *In re Cattle and Beef Antitrust Litig.*, 687

F. Supp. 3d at 835 n.2.  Then, in the First Amended Complaint, Plaintiffs redefined themselves as producers of feeder cattle, including all indirect sellers, such as cow-calf ranchers, stockers, and backgrounders. *In re Cattle and Beef Antitrust Litig.*, No. 22-3031, 2024 WL 2728280, at *1 (D. Minn. May 28, 2024).  Now, the Second Amended Complaint narrows the putative class to indirect sellers who sold feeder cattle directly to a feedlot or finishing operation that in turn sold fed cattle to one or more Defendants.  (Aff. Richard M. Paul III ¶ 3, Ex. 1 ("2nd Am. Compl.") ¶¶ 1 & n.1, 316–18, July 3, 2024, Docket No. 720.)[1] Plaintiffs re-define "feeder cattle" in the Second Amended Complaint as:

> large or medium #1 or #2 steers or heifers sold directly to feedlots or finishing operations at a weight between 700 and 899 pounds via face-to-face sales, video auction sales, internet auction sales, and live auction sales, as understood by the industry at large, which are fed to slaughter weight and sold to packers for beef production. . . . A "feedlot" or "finishing operation" is a plot of land on which cattle are fed intensively to reach slaughter weight.

(*Id.* ¶ 1 n.1.)

The Second Amended Complaint also alleges several new facts about both the Plaintiffs and the Defendants.  As to Plaintiffs, the Second Amended Complaint includes new allegations to establish that Plaintiffs are producers of feeder cattle.  In particular, the allegations detail the named Plaintiffs' sales of feeder cattle, including the number, weight, and frame of the cattle sold and how they were sold.  The named Plaintiffs now

---

[1] Unless otherwise noted, all record citations are to ECF No. 22-3031.

include David Hyatt, who was included in the First Amended Complaint, as well as Expense

Reduction Services, Inc. ("ERS") and Terry Faul.  (*Id.* ¶¶ 26–28; *see also* Am Compl. ¶ 27,

Oct. 18, 2023, Docket No. 371.)  David Hyatt, a cattle rancher, alleges that he "raised and

sold approximately 100 medium and/or large frame #1 or #2 feeder cattle in the 700 to

899-pound range every year during the Class Period" to feedlots.  (2nd Am. Compl. ¶ 26.)

ERS, which owns and operates a cattle ranch in Texas, and Terry Faul, another cattle

rancher, similarly allege sales of 120 to 200 head of medium and/or large frame #1 or #2

feeder cattle to feedlots when they were between 700 and 899 pounds to feedlots since

2015.  (*Id.* ¶¶ 27–28.)  All three named Plaintiffs allege that, on information and belief,

their feeder cattle were fed to slaughter weight and sold directly to one or more

Defendants for the production of beef.  (*Id.* ¶¶ 26–28.)

As to Defendants, the factual allegations in the proposed Second Amended

Complaint remain largely the same as those outlined in the Court's prior orders.  *See In re*

*Cattle and Beef Antitrust Litig.*, 687 F. Supp. 3d at 834–35; *In re Cattle and Beef Antitrust*

*Litig.*, 2024 WL 2728280, at *1–2.  As before, Plaintiffs allege that Defendants conspired

to suppress the price of fed cattle they bought in the United States beginning no later

than January 2015, and that Defendants' coordinated conduct caused a collapse in fed

cattle prices and a consequent collapse in feeder cattle prices, which harmed Plaintiffs.

(2nd Am. Compl. ¶¶ 1, 4.)

However, the Second Amendment Complaint also provides bolstered allegations and documents to support the alleged relationship between feeder cattle prices and fed cattle prices.  (*See id.* ¶¶ 235–38, 240–42, 246–49.)  As demonstrated by the following figure, Plaintiffs allege a causal relationship between feeder cattle futures prices, which correspond to the prices paid for feeder cattle, and fed cattle futures prices during the alleged conspiracy period.  (*Id.* ¶¶ 237, 239.)



(*Id.* ¶ 237, Figure 22.)  Plaintiffs allege that "the demand and price of feeder cattle is primarily driven by the current price and future price of fed cattle."  (*Id.* ¶ 249.)  Plus, instead of relying on publicly available articles and journals from industry experts, the Second Amended Complaint features documents from Defendants' own production to support a causal relationship, including a letter from a feedlot (that at least some

Defendants allegedly do business with) explaining how fed cattle prices impact the price of feeder cattle.  (*Id.* ¶ 238.)

Plaintiffs also newly allege that Defendants tracked the price of feeder cattle and that at least some Defendants purchased and hedged feeder cattle futures to manage their financial risk during the relevant period.  (*See id.* ¶¶ 250–52.)  Additionally, the Second Amended Complaint provides analyses of USDA data to supplement Plaintiffs' allegations that the prices of feeder cattle and the prices of fed cattle are inextricably linked.  Specifically, Plaintiffs provide analyses of the relationship between daily feeder cattle and fed cattle prices during the relevant period across five USDA Livestock Mandatory Reporting Regions: (1) Colorado, (2) Iowa and Minnesota, (3) Kansas, (4) Nebraska, and (5) Texas, New Mexico, and Oklahoma.  (*See id.* ¶ 255, Figure 24.)

The parties have continued with discovery since the Court's Order dismissing the First Amended Complaint without prejudice.  (Stip. Concerning Specht Pls.' Mot. for Leave to Amend at 2, June 14, 2024, Docket No. 708.)  With the Court's permission, Plaintiffs moved to file their proposed Second Amended Complaint on July 3, 2024.  (Order on Stip. Concerning Specht Pls.' Mot. for Leave to Amend at 1, June 17, 2024, Docket No. 711; Pls.' Mot. to Alter/Amend/Suppl. Pleadings, July 3, 2024, Docket No. 717.)  Defendants oppose the motion.  (Defs.' Mem. Opp'n, July 24, 2024, Docket No. 746.)  The Court's pretrial scheduling order required motions to amend pleadings without leave of the Court to be filed by October 3, 2023.  (Order at 4, Jan. 24, 2023, Docket No. 129.)  Fact discovery is

set to close on January 7, 2025.  (2nd Order Amending Case Schedule at 4, Mar. 5, 2024,

Docket No. 575.)

## DISCUSSION

## I.   STANDARD OF REVIEW

Plaintiffs' motion for leave to amend implicates standards of review from two

federal rules of civil procedure.  *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 714–15

(8th Cir. 2008).  First, after an answer has been filed in response to a complaint, a party

may amend its pleading with leave from the Court, which should be "freely give[n] . . .

when justice so requires."  Fed. R. Civ. P. 15(a)(2).  In determining whether leave to amend

should be given, courts consider whether "there are compelling reasons such as undue

delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments

previously allowed, undue prejudice to the non-moving party, or futility of the

amendment."  *Moses.com Secs., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052,

1065 (8th Cir. 2005) (quoting *Hammer v. City of Osage Beach*, 318 F.3d 832, 844 (8th Cir.

2003)).  "[T]he grant or denial of an opportunity to amend is within the discretion of the

District Court."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Additionally, a pretrial scheduling order can be modified "only for good cause and

with the judge's consent."  Fed. R. Civ. P. 16(b)(4); *see also Freeman v. Busch*, 349 F.3d

582, 589 (8th Cir. 2003) ("When the district court has filed a Rule 16 pretrial scheduling

order, it may properly require that good cause be shown for leave to file an amended

pleading that is substantially out of time under that order.").  The movant bears the

burden of showing good cause exists, and "[e]ven then the district court retains discretion as to whether to grant the motion." *Bradford v. DANA Corp.*, 249 F.3d 807, 809 (8th Cir. 2001). "The primary measure of good cause is the movant's diligence in attempting to meet the order's requirements." *Sherman*, 532 F.3d at 716 (citation omitted).

## II.   PLAINTIFFS' MOTION FOR LEAVE TO AMEND

The parties' dispute largely centers around three issues: (1) whether good cause exists for granting Plaintiffs leave to amend; (2) if good cause exists, whether granting leave to amend at this stage of the multidistrict litigation would prejudice Defendants; and (3) whether Plaintiffs' proposed amendment would be futile given the heightened antitrust standing requirements. The Court will analyze each issue in turn.

### A.   Good Cause

Plaintiffs bear the burden of establishing that good cause exists to grant them leave to amend their complaint a second time, which would effectively modify the pretrial scheduling order's deadline for motions to amend pleadings.[2] *Bradford*, 249 F.3d at 809. Good cause exists if the movant was diligent in trying to meet the scheduling order's

---

[2] The parties dispute whether Federal Rule of Civil Procedure 16, which governs pretrial scheduling orders and management, is implicated. Because this case's pretrial scheduling order was silent as to the deadline for filing motions to amend pleadings with leave of the Court, Plaintiffs contend their motion does not violate any pretrial scheduling order deadlines. However, the Court finds that Rule 16 is implicated even though the scheduling order did not specify a deadline for motions to amend with leave. *See In re Milk Prod. Antitrust Litig.*, 195 F.3d 430, 437–38 (8th Cir. 1999) ("If we considered only Rule 15(a) without regard to Rule 16(b), we would render scheduling orders meaningless and effectively would read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure.").

deadlines. *Sherman*, 532 F.3d at 716. Still, while diligence is the primary factor for assessing good cause, nothing limits the Court's "broad discretion in establishing and enforcing the deadlines" in the scheduling order. *See Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006).

Plaintiffs have met their burden of demonstrating diligence in trying to meet the Court's scheduling order deadline. Plaintiffs filed their original complaint well before the close of fact discovery. And they have promptly tried to rectify their complaints' deficiencies after each round of motions to dismiss. *Cf. Pliam v. Cendant Mortg. Corp.*, No. 11-3720, 2012 WL 1439035, at *4 (D. Minn. Apr. 26, 2012). Plaintiffs' motion to amend came approximately nine months after the pretrial scheduling order's deadline for motions to amend pleadings without leave of the Court, but because the scheduling order did not set a specific deadline for the filing of motions to amend pleadings with leave of the Court, it is unclear exactly how late Plaintiffs filed their motion. At any rate, Plaintiffs' motion to amend comes six months before the fact discovery deadline and before summary judgment deadlines or a trial date have been set. Overall, these circumstances do not suggest that Plaintiffs have lacked diligence in trying to meet the Court's scheduling order deadline. In this complex antitrust multidistrict litigation, where Plaintiffs seek to represent indirect sellers, the Court rejects the notion that Plaintiffs' delay was unwarranted. *Cf. Sherman*, 532 F.3d at 717. Because Plaintiffs have been

sufficiently diligent in trying to meet the Court's scheduling order's deadline, the Court finds good cause exists to permit them to amend their First Amended Complaint.

**B.    Prejudice to Defendants**

Because the Court finds that good cause exists, it will now consider whether granting Plaintiffs leave to amend would unduly prejudice Defendants.  *Id.*  Delay alone is insufficient to justify denial of leave to amend.  *Moses.com Secs., Inc.*, 406 F.3d at 1065. In addition, there must be prejudice to the nonmovant, which Defendants bear the burden of showing.  *Id.*; *Sanders v. Clemco Indus.*, 823 F.2d 214, 217 (8th Cir. 1987).  The prejudice to the nonmovant "must be balanced against the hardship to the moving party if it is denied" leave to amend.  *Buder v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 644 F.2d 690, 694 (8th Cir. 1981).

Defendants argue that granting Plaintiffs leave to amend their complaint a second time would prejudice them because Plaintiffs' case has significantly transformed since their first complaint.  Plaintiffs seek to narrow their class and claims to a subset of direct-to-feedlot sellers of beef, effectively excluding upstream cow-calf ranchers who were named in the previous complaints.  However, Defendants have been on notice at least since October 2023, when Plaintiffs filed their First Amended Complaint, that Plaintiffs were intending to represent sellers of feeder cattle, some of whom made direct-to-feedlot sales.  Indeed, Plaintiff David Hyatt was named in the First Amended Complaint. Moreover, Plaintiffs' claims are substantially the same as before, merely narrowed.  *See*

*Buder*, 644 F.2d at 694 (finding no undue prejudice where the amended claims were substantially similar to those asserted in the original complaint).

Defendants also claim that allowing Plaintiffs to amend would disrupt the existing case schedule and thereby burden the Court and prejudice Defendants by "subjecting them to the inefficiencies and challenges of having to deal with yet another workstream" in this "already sprawling MDL." (Defs.' Mem. Opp'n at 12.) However, Plaintiffs have represented that they seek to proceed on the same schedule that governs all the other parties in the multidistrict litigation. And the parties have continued with discovery since the Court's Order dismissing the First Amended Complaint. Thus, Defendants' concerns of prejudice from a separate scheduling track are premature.

On balance, the Court finds that any prejudice to Defendants would be outweighed by the hardship to Plaintiffs in being denied the opportunity to try the merits of their claims in this large price-fixing multidistrict litigation. *Foman*, 371 U.S. at 182. As such, Defendants will not be unduly prejudiced by Plaintiffs' amendment.

### C.    Futility

Finally, the Court will consider whether Plaintiffs' proposed amendment would be futile. *Moses.com Secs., Inc.*, 406 F.3d at 1065. "Denial of a motion for leave to amend on the basis of futility 'means the district court has reached the legal conclusion that the amended complaint could not withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.'" *Zutz v. Nelson*, 601 F.3d 842, 850 (8th Cir. 2010) (quoting *Cornelia I. Crowell GST Tr. v. Possis Med., Inc.*, 519 F.3d 778, 782 (8th Cir. 2008)).

"[A] motion to amend should be denied on the merits only if it asserts clearly frivolous claims or defenses." *Becker v. Univ. of Nebraska*, 191 F.3d 904, 908 (8th Cir. 1999) (citation and internal quotations omitted).

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a "claim to relief that is plausible on its face." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The Court construes the complaint in the light most favorable to the plaintiff, drawing all inferences in the plaintiff's favor. *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). Still, although the Court accepts the complaint's factual allegations as true and construes the complaint in a light most favorable to the plaintiff, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286, (1986). In other words, a complaint "does not need detailed factual allegations" but must include more "than labels and conclusions, and a formulaic recitation of the elements" to meet the plausibility standard. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). At the motion to dismiss stage, the Court may consider the allegations in the complaint as well as "those materials that are necessarily

embraced by the pleadings.*"* *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014).

The primary issue is whether Plaintiffs satisfy antitrust standing requirements with their amendment.  In evaluating antitrust standing, the Court considers the six factors from *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"):

> (1) The causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) Improper motive; (3) Whether the injury was of a type that Congress sought to redress with the antitrust laws; (4) The directness between the injury and the market restraint; (5) The speculative nature of the damages; (6) The risk of duplicate recoveries or complex damage apportionment.

*Midwest Commc'ns v. Minn. Twins, Inc.*, 779 F.2d 444, 450 n.6 (8th Cir. 1985).[3]  The appropriate inquiry is whether "the plaintiff [is] the target of the anticompetitive activity, not one who has merely suffered indirect, secondary, or remote injury."  *Id.* at 451 (citation and internal quotations omitted).  The Court will analyze each antitrust standing factor in light of Plaintiffs' proposed amendment in turn.

---

[3] The Supreme Court has also held that indirect purchasers do not have standing to seek damages under federal antitrust law.  *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).  Though it is so far unclear whether that restriction also applies to indirect **sellers**, Plaintiffs nevertheless bring claims for injunctive relief under federal law and claims for damages under state law, both of which are exceptions to the *Illinois Brick* ruling.  *In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d 1047, 1058 (8th Cir. 2018); *California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989).

### 1.     Causal Connection

First, the Court must consider the "causal connection between the alleged antitrust violation and the harm to the plaintiff." *McDonald v. Johnson & Johnson*, 722 F.2d 1370, 1374 (8th Cir. 1983).  The Court previously found this factor weighed against antitrust standing because the causal connection between Defendants' alleged conduct and Plaintiffs' harm was too attenuated.  *In re Cattle and Beef Antitrust Litig.*, 2024 WL 2728280, at *3–4.  Additionally, Plaintiffs' allegations were insufficient to demonstrate that Plaintiffs were targeted by the alleged conspiracy.  *Id.*

Plaintiffs re-allege that Defendants conspired to suppress the price of fed cattle, which caused a corresponding suppression of the price of feeder cattle.  Plaintiffs newly allege they are producers of feeder cattle as that term appears to be defined by the industry and Chicago Mercantile Exchange ("CME").  *Compare* 2nd Am. Compl. ¶ 1 n.1 (redefining "feeder cattle"), *with In re Cattle and Beef Antitrust Litig.*, 2024 WL 2728280, at *4 (noting CME's definition of feeder cattle as "medium and large frame cattle being placed on feed at the feedlot that are between 700 to 899 pounds").  This amendment cures the disparity between the allegations and data related to feeder cattle and Plaintiffs' cattle operations, supporting a causal connection between Plaintiffs' harm and Defendants' alleged conduct.  Defendants' attacks regarding the difference between feeder cattle futures versus live cattle futures and between causation versus correlation do not defeat Plaintiffs' claims at the pleading stage.  *See Sanner v. Bd. of Trade of City of Chicago*, 62 F.3d 918, 929 (7th Cir. 1995) ("The fact that cash and futures markets may be

-14-

distinguished certainly does not show that they are unrelated for the purposes of antitrust standing analysis."); *see also Utesch v. Dittmer*, 947 F.2d 321, 323–24 (8th Cir. 1991) (discussing the cattle cash and future markets).  The factual allegations must allow the Court to draw the reasonable inference that the relationship is causal.  *Iqbal*, 556 U.S. at 678.  Plaintiffs allege that feeder cattle prices and fed cattle prices are connected through the futures data.  This is sufficient to connect Plaintiffs to Defendants' alleged price-fixing at the pleading stage.

Defendants argue that Plaintiffs' amendment impermissibly contradicts the First Amended Complaint such that Plaintiffs have not established that they are producers of feeder cattle.  *See ecoNugenics, Inc. v. Bioenergy Life Sci.*, 355 F. Supp. 3d 785, 794 (D. Minn. 2019); *Peirce v. Aswegan*, No. 22-2664, 2023 WL 2898595, at *4 (D. Minn. Apr. 11, 2023).  Specifically, Defendants contend that in the First Amended Complaint, named Plaintiff David Hyatt alleged that he sold "one to two loads of feeder cattle to a feedlot" for the past two years, but now in the Second Amended Complaint alleges that he sold feeder cattle to feedlots every year during the class period.  (Am. Compl. ¶ 27; 2nd Am. Compl. ¶ 26.)  However, both allegations can be true under Plaintiffs' new definition of feeder cattle: Hyatt could have sold feeder cattle under Plaintiffs' new definition to feedlots through video auctions every year of the class period and could have sold feeder cattle under the old definition to feedlots through sale barns for two years.  Such allegations do not necessarily contradict in the sense that courts have found

impermissible.  *See ecoNugenics, Inc.*, 355 F. Supp. 3d at 794 (finding previous allegation that defendant did not administer drug improperly contradicted with new allegation that defendant administered drug).

Defendants also argue that Plaintiffs should not be allowed to benefit from cases like *Plubell v. Merck & Co., Inc.*, 434 F.3d 1070, 1071–72 (8th Cir. 2006) in "switching" to a different part of the beef supply chain on behalf of a different roster of named plaintiffs. However, Federal Rule of Civil Procedure 15(c) permits an amendment if it relates back to the original complaint.  "[A]n amendment relates back if the defendant knew or should have known that it would be called on to defend against claims asserted by the newly-added plaintiff, unless the defendant would be unfairly prejudiced in maintaining a defense against the newly-added plaintiff." *Plubell*, 434 F.3d at 1072 (citation and internal quotations omitted).  Plaintiffs' narrowed class and claims relate back to their original complaint.  The claims remain substantially the same, and Defendants have been on notice since Plaintiffs' opposition to their first motion to dismiss that Plaintiffs were intending to represent more than just cow-calf ranchers.  *See In re Cattle and Beef Antitrust Litig.*, 687 F. Supp. 3d at 834 n.2.

Whether Plaintiffs have plausibly alleged that they were the target of the alleged conspiracy is another matter.  *Minn. Twins*, 779 F.2d at 451.  It is insufficient for Plaintiffs to have "merely suffered indirect, secondary, or remote injury."  *Id.* (quotation omitted).  On the one hand, Plaintiffs allege that the purpose of the alleged conspiracy was "to

suppress the price of fed cattle in the United States, causing a corresponding suppression of the price of feeder cattle." (2nd Am. Compl. ¶ 1.) This allegation weighs against antitrust standing because it suggests that Plaintiffs were tangentially harmed by Defendants' alleged conduct, not specifically targeted. However, new allegations support the plausibility of Defendants targeting Plaintiffs. For example, Plaintiffs newly allege that Defendants tracked the price of feeder cattle and that at least some Defendants purchased and hedged feeder cattle futures during the relevant period. (*See id.* ¶¶ 250–52.) Allegations that Defendants were tracking the prices of feeder cattle support a reasonable inference that Defendants were targeting the prices of feeder cattle as well as the prices of fed cattle. Because Plaintiffs' allegations regarding Defendants' targeting weigh for and against standing, the Court finds that the causal connection factor is now neutral, weighing neither for nor against antitrust standing.

## 2.    Improper Motive

The next factor is whether there was any improper motive on the part of the Defendants. *McDonald*, 722 F.2d at 1374. The Court has twice held that while motivation to increase profits is not inherently improper, this factor weighs in favor of antitrust standing given the broader context of Plaintiffs' price-fixing allegations. *In re Cattle and Beef Antitrust Litig.*, 2024 WL 2728280, at *5. Because nothing in Plaintiffs' proposed amendment would change this conclusion—which the parties do not challenge—the Court concludes that the improper motive factor still weighs in favor of standing.

-17-

###### 3.   Type of Injury

The Court must next consider whether "the injury was of a type that Congress sought to redress with antitrust laws." *McDonald*, 722 F.2d at 1374.  A party can show that they have suffered the type of injury that Congress sought to protect if their injury is "inextricably intertwined with the injury the conspiracies sought to inflict on . . . the [relevant] market." *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 484 (1982) (finding that a subscriber had standing to sue a health plan for conspiring with psychiatrists to deny reimbursement for care provided by psychologists because the subscriber's injury was "inextricably intertwined with the injury the conspirators sought to inflict on psychologist in the psychotherapy market"); *see also Henke Enterprises, Inc. v. Hy-Vee Food Stores, Inc.*, 749 F.2d 488, 489–90 (8th Cir. 1984) (finding a hardware store did not have standing to bring an antitrust claim involving the retail grocery store market because the hardware store's injury was not inextricably intertwined with the retail grocery store market).

The Court previously determined this factor was neutral.  Plaintiffs' alleged injury suggests it was the type of injury that Congress sought to protect, but Plaintiffs failed to clearly demonstrate they were in the same market.  *In re Cattle and Beef Antitrust Litig.*, 2024 WL 2728280, at *5.  In the First Amended Complaint, Plaintiffs had not alleged they were producers of feeder cattle specifically and were thus too many steps removed from Defendants.  *Id.*

However, the proposed amendment narrows Plaintiffs' claims to those on behalf of producers of feeder cattle—who are only one step removed from Defendants.  There are also additional allegations and data regarding the relationship between feeder cattle and fed cattle prices.  (*See, e.g.*, 2nd Am. Compl. ¶ 237, Figure 22.)  Plaintiffs newly allege that "[i]ndustry data demonstrates the impact fed cattle prices have on feeder cattle prices, including that feeder cattle price and demand is derivative of fed cattle price and demand.  That is, changes in the price of fed cattle cause changes in the price of feeder cattle."  (*Id.* ¶ 236 (emphasis omitted).)  In addition, Plaintiffs newly allege that feeder cattle prices "move in unison with the prices feedlots and other entities are receiving for their fed cattle," and that "[i]ndustry professionals and feedlots, with whom Defendants do business, speak with one voice as to the relationship between feeder cattle and fed cattle pricing."  (*Id.* ¶¶ 237–38.)  Furthermore, Plaintiffs add supplemental statements from industry experts regarding the relationship between the prices of fed cattle and feeder cattle to explain that "the demand and price of feeder cattle is primarily driven by the current price and future price of fed cattle."  (*Id.* ¶ 249.)  Finally, Plaintiffs provide analyses of USDA data from five USDA livestock mandatory reporting regions to supplement allegations that the price of feeder cattle and price of fed cattle are inextricably linked.  (*Id.* ¶ 255, Figure 24.)

Taken together, the proposed amendments link the price of feeder cattle and the price of fed cattle to support a reasonable inference that Plaintiffs' alleged injury is

"inextricably linked" with Defendants' conduct, at least at the pleading stage. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1123 (N.D. Cal. 2008) (finding that markets for products and sub-products contained in the product were "inextricably linked"). Because Plaintiffs are now only one step removed from Defendants, their alleged injury is not too remote. Defendants' argument that feeder cattle and fed cattle prices diverge at points does not mean those prices are implausibly interlinked. Thus, the Court finds that the injury factor now weighs in favor of standing.

### 4.    Directness

The fourth factor concerns the directness between the injury and the market restraint, which requires consideration of the "chain of causation." *McDonald*, 722 F.2d at 1374; *AGC*, 459 U.S. at 540. *See also Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp.*, 951 F.2d 1158, 1162 (9th Cir. 1991) ("[D]irectness in the antitrust context means close in the chain of causation."). Plaintiffs must establish directness that is not "too remote." *In re Dynamic Random Access Memory Antitrust Litig.*, 516 F. Supp. 2d 1072, 1092 (N.D. Cal. 2007). The Court previously determined this factor weighed against standing because there were too many links in the chain between Defendants' alleged conduct and Plaintiffs' alleged harm. *In re Cattle and Beef Antitrust Litig.*, 2024 WL 2728280, at *5–6.

Because Plaintiffs are now only one step removed from Defendants in the beef supply chain, they demonstrate a plausible traceability between their alleged harm and Defendants' conduct. *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 813–

14 (N.D. Ill. 2017).  The amendment establishes a plausible connection between feeder cattle prices and fed cattle prices to support a reasonable inference that Plaintiffs are inextricably intertwined with Defendants' alleged conspiracy, similar to the Producer Plaintiffs.  *See In re Cattle Antitrust Litig.*, 2021 WL 7757881, at *8; *see also In re Copper Antitrust Litig.*, 98 F. Supp. 2d 1039, 1051 (W.D. Wisc. 2000) (finding sufficient directness where indirect purchasers were harmed due to defendants' power over the relevant market).  However, Plaintiffs allege a connection to Defendants through the manipulation of fed cattle prices, not explicitly feeder cattle prices. (2nd Am. Compl. ¶ 1.)  Although this may suggest that Plaintiffs were tangentially harmed by Defendants' alleged conduct and not specifically targeted, Plaintiffs allege that "[b]ecause anticompetitive conduct that suppresses fed cattle prices necessarily reduces feeder cattle prices, a necessary target of Defendants' price-fixing conspiracy was the suppression of feeder cattle prices."  (*Id.* ¶ 252.)  Directness may be shown where the plaintiff's harm "was a necessary step in effecting the ends of the alleged illegal conspiracy."  *McCready*, 457 U.S. at 479.  On balance, therefore, the Court finds the directness factor is neutral, weighing neither for nor against antitrust standing.

### 5.    Speculative Nature of Damages

The Court must next consider the speculative nature of the damages.  *McDonald*, 722 F.2d at 1374.  The Court previously found this factor neutral.  Even though other factors may affect cow-calf prices, similar meat packing antitrust cases have considered the speculative nature of damages and determined there are means and methods for

economic analysts to pinpoint prices that would have been paid but for the conspiracy. *In re Cattle and Beef Antitrust Litig*., 2024 WL 2728280, at *6.

Defendants argue that the Second Amended Complaint improperly contradicts the original complaint, which alleged that the beef supply chain contains two sectors—backgrounding operations and stocker operations—between the cow-calf producers and the feedlots, not the single feeder cattle sector that Plaintiffs now narrow in on. (Compl. ¶ 68); *ecoNugenics, Inc.*, 355 F. Supp. 3d at 794; *Peirce*, 2023 WL 2898595, at *4. But Plaintiffs' narrowing to cattle producers who sold feeder cattle of a certain weight and frame type to feedlots does not equate to an allegation that backgrounding operations and stocker operations no longer co-exist in the beef supply chain. Plaintiffs' previous complaints allege that both backgrounders and stockers may sell cattle directly to feedlots. (*See* Compl. ¶¶ 5, 63, 68; Am. Compl. ¶¶ 7, 63.) Thus, Plaintiffs' amendment does not impermissibly contradict the allegations in the previous complaints.

The Second Amended Complaint's narrowing of the class and claims ultimately simplifies the analyses for economic analysts to determine the prices that would have been paid but for the conspiracy. However, multiple other factors still may have affected the prices of the feeder cattle in addition to Defendants' conduct. Thus, this factor continues to be neutral, weighing neither for nor against antitrust standing.

### 6.   Risk of Duplicative Recovery

The final factor is the "risk of duplicative recoveries or complex damage apportionment." *McDonald*, 722 F.2d at 1343. The Court previously found this factor

weighed in favor of antitrust standing because of the potential to conduct economic analyses to ascertain an appropriate damages amount. *In re Cattle and Beef Antitrust Litig.*, 2024 WL 2728280, at *6. Because nothing in Plaintiffs' proposed amendment would change this conclusion—which the parties do not challenge—the Court again finds that the duplicative recovery factor weighs in favor of standing.

*     *     *

Weighing the six *AGC* factors under Plaintiffs' proposed amendment, three of the factors are neutral and the other three factors weigh in favor of standing. On balance, the Court is satisfied that Plaintiffs have plausibly alleged antitrust standing at the pleading stage, such that their amendment would not be clearly frivolous.

## CONCLUSION

Because Plaintiffs have been sufficiently diligent in trying to meet the Court's scheduling order deadline, the Court finds good cause exists to permit them to amend their First Amended Complaint. Because any prejudice to Defendants would be outweighed by the hardship to Plaintiffs in being denied the opportunity to try the merits of their claims in this multidistrict litigation, Defendants would not be unduly prejudiced and the Court can think of no other possible prejudice Defendants would suffer. And finally, the Court is satisfied that Plaintiffs' proposed amendment would cure the identified deficiencies regarding antitrust standing at the pleading stage. Plaintiffs' amendment to narrow the putative class to producers of feeder cattle who are only one step removed from Defendants supports the reasonable inference that Plaintiffs' harm is

not too attenuated from Defendants' alleged conspiratorial conduct; and Plaintiffs'

bolstered allegations support the reasonable inference that the price of fed cattle and the

price of feeder cattle are sufficiently linked at the pleading stage.  As a result, the

amendment would not be futile.  Accordingly, the Court will grant Plaintiffs leave to

amend their First Amended Complaint.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that Plaintiffs' Motion for Leave to Amend First Amended Complaint

[Docket No. 717] is **GRANTED**.


DATED:  September 30, 2024
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge