# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| *IN RE CATTLE AND BEEF ANTITRUST LITIGATION*<br><br>This Document Relates To:<br><br>*In re Cattle Antitrust Litigation*,<br>Case No. 19-cv-1222 (JRT/JFD) | Case No. 22-md-03031 (JRT/JFD) |

### CATTLE PLAINTIFFS' MEMORANDUM IN SUPPORT OF UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CATTLE-JBS SETTLEMENT

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

OVERVIEW OF THE ACTION ...................................................................................... 3

I.      Procedural History ................................................................................................ 3

II.     Summary of Settlement Negotiations .............................................................. 5

III.    Summary of Key Cattle-JBS Settlement Terms ........................................... 6

IV.     Argument ................................................................................................................. 9

        A.      The Proposed Settlement Classes Satisfy the Requirements for Class
                Certification at the Preliminary Approval Stage ......................... 11

        B.      Rule 23(a) Requirements Are Satisfied ...................................... 11

                1.      Numerosity Is Easily Satisfied ......................................... 11

                2.      There Are Common Questions of Law and Fact ............... 12

                3.      Cattle Plaintiffs' Claims Are Typical of the Classes ....... 13

                4.      Cattle Plaintiffs and Co-Lead Counsel Have Fairly and Adequately
                        Protected the Interests of the Classes ............................... 14

        C.      The Classes May Be Certified Under Rule 23(b)(3) ................... 15

                1.      Common Questions Predominate ...................................... 15

                2.      A Class Action Is Superior to Individual Actions ............ 16

        D.      Rule 23(e) Factors Support Preliminary Approval of the Cattle-JBS
                Settlement .................................................................................... 18

                1.      The Class Representatives and Class Counsel Have Adequately
                        Represented the Classes and the Parties' Negotiations Were At
                        Arms' Length (Fed. R. Civ. P. 23(e)(2)(A)-(B)) ............. 18

                2.      The Proposed Relief Under the Cattle-JBS Settlement Is Adequate
                        (Fed. R. Civ. P. 23(e)(2)(C)) .......................................... 18

                3.      The Cattle-JBS Settlement Treats Settlement Class Members
                        Equitably Relative to Each Other (Fed. R. Civ. P. 23(e)(2)(D)) ...... 21

        E.      The Eighth Circuit Factors Also Support a Finding that the Cattle-JBS
                Settlement Is Fair, Reasonable, and Adequate ........................... 22

V.      The Court Should Appoint Cattle Plaintiffs As Settlement Class Representatives
        and Co-Lead Counsel as Settlement Class Counsel ...................................... 24

VI.     The Court Should Approve The Proposed Class Notice Plan And Angeion Group
LLC As Claims Administrator ............................................................................ 25

VII.    The Court Should Approve the Plan of Allocation ................................................ 27

VIII.   The Court Should Appoint Huntington Bank As Escrow Agent ............................. 30

IX.     Proposed Schedule of Cattle-JBS Settlement Events.............................................. 31

CONCLUSION ...................................................................................................................... 32

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alberts v. Nash Finch Co.*,
245 F.R.D. 399 (D. Minn. 2007) ................................................................. 11

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ....................................................................... 11, 17

*Barfield v. Sho-Me Power Elec. Co-op.*,
No. 11-CV-04321, 2013 WL 3872181 (W.D. Mo. July 25, 2013), *aff'd
sub nom. Barfield v. Sho-Me Power Elec. Coop.*, 852 F.3d 795 (8th Cir.
2017) ........................................................................................... 25

*Dirks v. Clayton Brokerage Co. of St. Louis, Inc.*,
105 F.R.D. 125 (D. Minn. 1985) ................................................................. 13

*Dryer v. Nat'l Football League*,
No. 09-cv-2182-PAM-AJB, 2013 WL 5888231 (D. Minn. Nov. 1, 2013) ................ 22

*Grier v. Chase Manhattan Auto Fin. Co.*,
No. CIV. A. 99-cv-180, 2000 WL 175126 (E.D. Pa. Feb. 16, 2000) ........................ 10

*In re Carrier IQ, Inc., Consumer Privacy Litig.*,
No. 12-md-2330, 2016 WL 4474366 (N.D. Cal. Aug. 25, 2016) ............................... 21

*In re Centurylink Sales Pracs. & Sec. Litig.*,
No. CV 18-296, 2021 WL 3080960 (D. Minn. July 21, 2021) .................................... 9

*In re Control Data Corp. Sec. Litig.*,
116 F.R.D. 216 (D. Minn. 1986) ................................................................. 13

*In re Disposable Contact Lens Antitrust Litig.*,
No. 3:15-MD-2626-HES-LLL, 2023 WL 11914918 (M.D. Fla. Nov. 29,
2023), *objections overruled*, No. 3:15-MD-2626-HES-LLL, 2024 WL
3988972 (M.D. Fla. Feb. 29, 2024) ............................................................. 30

*In re Employee Benefit Plans Sec. Litig.*,
No. 3-92-cv-708, 1993 WL 330595 (D. Minn. June 2, 1993) .................................... 10

*In re Marsh ERISA Litigation*,
265 F.R.D. 128 (S.D.N.Y. 2010) ................................................................. 27

*In re Monosodium Glutamate Antitrust Litig.*,
205 F.R.D. 229 (D. Minn. 2001).............................................................. 14

*In re PaineWebber Ltd. P'ships Litg.*,
171 F.R.D. 104 (S.D.N.Y. 1997) ............................................................. 27

*In re Platinum & Palladium Commodities Litig.*,
No. 10CV3617, 2014 WL 3500655 (S.D.N.Y. July 15, 2014)................................... 27

*In re Pork Antitrust Litig.*,
665 F. Supp. 3d 967 (D. Minn. 2023) ........................................................ 12

*In re Pork Antitrust Litig.*,
No. CV 18-1776, 2022 WL 22861485 (D. Minn. July 22, 2022)................................ 20

*In re Pork Antitrust Litig.*,
No. CV 18-1776, 2023 WL 11892594 (D. Minn. Nov. 4, 2023) ............................... 23

*In re Remicade Antitrust Litig.*,
No. 17-CV-04326, 2022 WL 3042766 (E.D. Pa. Aug. 2, 2022) ............................... 30

*In re Select Comfort Corp. Sec. Litig.*,
202 F.R.D. 598 (D. Minn. 2001)......................................................... 13, 15

*In re Sturm, Ruger, & Co., Inc. Sec. Litig.*,
No. 3:09CV1293 VLB, 2012 WL 3589610 (D. Conn. Aug. 20, 2012)...................... 28

*In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*,
No. 11-MD-2247-ADM-JJK, 2012 WL 2512750 (D. Minn. June 29,
2012) ................................................................................... 9, 22

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*,
396 F.3d 922 (8th Cir. 2005) ............................................................. 22

*KPH Healthcare Servs., Inc. v. Mylan*
No. 2:20-CV-02065-DDC-TJJ, 2024 WL 1494314, at *3 (D. Kan. Apr.
3, 2024) ................................................................................ 30

*Kruger v. Lely N. Am., Inc.*,
No. 0:20-CV-00629-KMM/DTS, 2023 WL 5665215 (D. Minn. Sept. 1,
2023) ................................................................................... 20

*Lockwood Motors, Inc. v. General Motors Corp.*,
162 F.R.D. 569 (D. Minn. 1995)......................................................... 13, 14

*Marshall v. Nat'l Football League*,
787 F.3d 502 (8th Cir. 2015) ............................................................................. 22, 23

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
339 U.S. 306 (1950) ........................................................................................... 25, 26

*Paxton v. Union Nat. Bank*,
688 F.2d 552 (8th Cir. 1982) .................................................................................. 13

*Petrovic v. Amoco Oil Co.*,
200 F.3d 1140 (8th Cir. 1999) .................................................................................. 9

*Rasberry v. Columbia Cnty., Arkansas*,
No. 16-cv-1074, 2017 WL 3259447 (W.D. Ark. July 31, 2017) .............................. 11

*Smith v. United Health Care Servs., Inc.*,
No. 00-cv-1163, 2002 WL 192565 (D. Minn. 2002) ................................................ 13

*Swinton v. SquareTrade, Inc.*,
No. 4:18-CV-00144-SMR-SBJ, 2019 WL 617791 (S.D. Iowa Feb. 14,
2019) ................................................................................................................... 19, 22

*Taqueria El Primo LLC v. Illinois Farmers Ins. Co.*,
630 F. Supp. 3d 1121 (D. Minn. 2022) .................................................................... 25

*Van Horn v. Trickey*,
840 F.2d 604 (8th Cir. 1988) .................................................................................. 22

*W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
325 F.R.D. 280 (D. Minn. 2018) .............................................................................. 17

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ................................................................................................ 12

*Welsch v. Gardenbring*,
667 F. Supp. 1284 (D. Minn. 1987) ........................................................................ 10

*White v. Nat'l Football League*,
822 F. Supp. 1389 (D. Minn. 1993) .......................................................................... 9

**Federal Regulations**

Federal Rules of Civil Procedure

Fed. R. Civ. P. 23(a)...................................................................................... 11

Fed. R. Civ. P. 23(b)(3)............................................................................ *passim*

Fed. R. Civ. P. 23(c)(2)(B)............................................................................ 25

Fed. R. Civ. P. 23(e)(1) ................................................................................. 10

Fed. R. Civ. P. 23(e)(2)(A)-(B)...................................................................... 18

Fed. R. Civ. P. 23(e)(2)(C)............................................................................ 18

Fed. R. Civ. P. 23(e)(2)(D) ........................................................................... 21

Fed. R. Civ. P. 23(g) ............................................................................... 3, 24

Fed. R. Civ. P. 23(g)(1)(A) ........................................................................... 24

Fed. R. Civ. P. 23(c)(1)(B)............................................................................ 24

Fed. R. Civ. P. 23(e)(2) ................................................................................... 9

# INTRODUCTION

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, plaintiffs Ranchers Cattlemen Action Legal Fund United Stockgrowers of America, Farmers Educational and Cooperative Union of America, Weinreis Brothers Partnership, Minatare Feedlot, Inc., Charles Weinreis, Eric Nelson, James Jensen d/b/a Lucky 7 Angus, and Richard Chambers as trustee of the Richard C. Chambers Living Trust (collectively, the "Cattle Plaintiffs") on behalf of themselves and the other members of the proposed Settlement Classes[1] defined below, move for preliminary approval of the Cattle-JBS Settlement with JBS USA Food Company, Swift Beef Company, JBS Packerland, Inc., and JBS S.A. (collectively, "JBS"). The Cattle-JBS Settlement, if approved, will completely resolve Cattle Plaintiffs' and the Settlement Classes' claims against JBS and establish an $83,500,000 Settlement Fund, plus other cooperative relief.  JBS does not oppose the filing of this motion.

Cattle Plaintiffs achieved the Cattle-JBS Settlement following years of hard-fought litigation and arm's length settlement negotiations with JBS with the assistance of a mediator.  In light of the benefits the Cattle-JBS Settlement provides and the risks of this Action, Cattle Plaintiffs and Interim Co-Lead Counsel, Scott+Scott Attorneys at Law LLP ("Scott+Scott") and Cafferty Clobes Meriwether & Sprengel LLP ("CCMS") (collectively

---

[1]    Unless otherwise defined herein or in the proposed Plan of Allocation, all capitalized terms have the same meanings as defined in the Stipulation and Agreement of Settlement between Cattle Plainitffs and JBS USA Food Company, Swift Beef Company, JBS Packerland, Inc., and JBS S.A. ("Stipulation").

"Co-Lead Counsel") consider the Cattle-JBS Settlement to be fair, reasonable, and adequate.

The Cattle-JBS Settlement fully satisfies the requirements for preliminary approval from this Court. First, the Settlement is procedurally fair, as Cattle Plaintiffs and Co-Lead Counsel are adequate representatives for the Settlement Classes, and the Cattle-JBS Settlement itself resulted from hard-fought, non-collusive negotiations with the assistance of an experienced mediator. Second, the terms of the Cattle-JBS Settlement are substantively fair, providing substantial relief for all Class Members that submit valid claims. Third, the Court has ample basis upon which to conditionally certify the Settlement Classes under Rules 23(a) and (b)(3) because Cattle Plaintiffs meet each of the requirements of Rule 23. Finally, the proposed Notice Plan is robust and will fully apprise Class Members of their rights and options, and the Plan of Allocation fairly apportions the Net Settlement Fund to members of the Settlement Classes.

Cattle Plaintiffs therefore request this Court to grant their motion and enter the accompanying Preliminary Approval Order, which:

- Preliminarily approves the Cattle-JBS Settlement subject to later, final approval;

- Conditionally certifies the Settlement Classes with respect to the claims against JBS;

- Preliminarily approves the proposed Plan of Allocation (Joint Decl., Ex. 4);[2]

---

[2]    All references to "Joint Decl." refer to the accompanying Joint Declaration of Patrick J. McGahan and Daniel O. Herrera in Support of Cattle Plaintiffs' Unopposed Motion for Preliminary Approval of Cattle-JBS Settlement, filed herewith.

- Appoints Cattle Plaintiffs as representatives of the Settlement Classes;

- Appoints Scott+Scott and CCMS as Co-Lead Counsel for the Settlement Classes under Fed. R. Civ. P. 23(g);

- Appoints Huntington Bank as the Escrow Agent for the Settlement Fund;

- Appoints Angieon Group as the Claims Administrator for the Cattle-JBS Settlement;

- Approves the proposed forms of Notice to the Settlement Classes (Joint Decl., Ex. 2 ("Angieon Declaration"), Exs. B, D, E) and the proposed notice plan (*id.*, Ex. 2); and

- Sets a schedule leading to the Court's evaluation of whether to grant final approval of the Cattle-JBS Settlement, including: (1) the date, time, and place for a hearing to consider the fairness, reasonableness, and adequacy of the Cattle-JBS Settlement (the "Fairness Hearing"); (2) the deadline for Settlement Class Members to exclude themselves (*i.e.*, opt out) from the Cattle-JBS Settlement; (3) the deadline for Co-Lead Counsel to submit a petition for attorneys' fees and reimbursement of expenses and for Cattle Plaintiffs to file their application for a Service Award; and (4) the deadline for Class Members to object to the Cattle-JBS Settlement and any of the related petitions.

*See* [Proposed] Preliminary Approval Order filed herewith.

## OVERVIEW OF THE ACTION

## I.    PROCEDURAL HISTORY

After extensive investigation and economic analysis, including the screening of multiple then-confidential witnesses and work with economic consultants, Cattle Plaintiffs filed the first complaint in this now-MDL in the Northern District of Illinois, alleging that Defendants conspired to fix, depress, suppress, or stabilize the price of fed cattle they purchased in the United States and to manipulate the price of live cattle futures and options traded on the Chicago Mercantile Exchange in violation of the Sherman Act, the

Commodity Exchange Act ("CEA"), and the Packers and Stockyard Act ("PSA"). Joint Decl., ¶2 Shortly thereafter, related complaints were filed in the District of Minnesota. Joint Decl., ¶3. In order to streamline these cases, on May 7, 2019, Cattle Plaintiffs dismissed their pending Illlinois action and re-filed their complaint in the District of Minnesota. Joint Decl., ¶3. On July 10, 2019, the Court entered an order appointing CCMS and Scott+Scott as interim co-lead counsel and consolidating the cases. Joint Decl., ¶3.

Following Defendants' first and second motions to dismiss and the Court's order on Defendants' second motions to dismiss, Cattle Plaintiffs filed a Third Amended Complaint on December 28, 2020 (the "Complaint"). Joint Decl., ¶4. On February 18, 2021, Defendants moved to dismiss the Complaint. Joint Decl., ¶5. Cattle Plaintiffs then moved to approve alternative service on JBS S.A. on March 30, 2021. Joint Decl., ¶5. Following briefing on these motions, on September 14, 2021, the Court denied Defendants' motions to dismiss Cattle Plaintiffs' Complaint in their entirety and granted Cattle Plaintiffs' motion to approve alternative service on JBS S.A. Joint Decl., ¶5.

Even prior to the Court's Order denying Defendants' motions to dismiss, however, Cattle Plaintiffs began to issue and negotiate discovery requests with Defendants pursuant to the Court's April 14, 2020 Order on Discovery Pending Resolution of the Motions to Dismiss allowing certain discovery to proceed pending resolution of Defendants' motions to dismiss. Joint Decl., ¶5. Over the next three years, the parties engaged in extensive discovery, including the production of nearly nine million documents from the parties and non-parties (including over 1.2 million documents from JBS), vast amounts of structured data records, and depositions of over 80 Defendant witnesses, with over a dozen of

additional party and non-party witnesses having been noticed by plaintiffs and Defendants. Joint Decl., ¶¶6-9.

After extensive fact discovery and consultation with their experts, on September 25, 2024, Cattle Plaintiffs filed their motion for class certification and submitted the expert reports of Dr. Russell Lamb, Ph. D. and Candice Rosevear in support of that motion. Joint Decl., ¶10. Defendants' responses were filed on January 24, 2025. Joint Decl., ¶11.

## II.    SUMMARY OF SETTLEMENT NEGOTIATIONS

The Stipulation was the product of a long, hard-fought, and arm's length negotiations between Cattle Plaintiffs and JBS. Shortly after the Court's order denying Defendants' motions to dismiss, Cattle Plaintiffs and JBS began settlement negotiations with the assistance of a nationally-recognized mediator. Joint Decl., ¶12. The parties exchanged mediation statements and engaged in an in-person mediation session in New York, New York on November 5, 2021. The settlement discussions did not yield agreement at that time, and the Cattle Plaintiffs and JBS made no attempts to reach a settlement for another 3 years.

Following another round of extensive and hard-fought negotiations, and with the assistance of mediator Miles Ruthberg of PADRE, and after extensive, hard-fought negotiations, the Parties ultimately accepted a mediator's proposal. Joint Decl., ¶13. Cattle Plaintiffs and JBS executed the Stipulation on January 17, 2025. Joint Decl., ¶14.

Prior to negotiating the Cattle-JBS Settlement, given the many years of work invested in this litigation, Cattle Plaintiffs and Co-Lead Counsel were well-informed about the strengths and weaknesses of their claims against JBS. In negotiating the Cattle-JBS

Settlement, Cattle Plaintiffs also had the benefit of information developed through the extensive document and deposition discovery, and their expert's analysis of the evidence and market conditions in the fed cattle and live cattle futures markets. Joint Decl., ¶¶6-9.

The Cattle-JBS Settlement was further facilitated by the work of a well-known mediator, Miles Ruthberg. His involvement provides a well-recognized basis for finding that the settlement negotiations were serious, hard-fought, and conducted at arm's length.

## III.    SUMMARY OF KEY CATTLE-JBS SETTLEMENT TERMS

JBS has agreed to provide monetary and non-monetary compensation for the benefit of the Settlement Classes defined as:

> **The Producer Class** (Fed. R. Civ. P. 23(b)(3)): All persons or entities within the United States that directly sold to a Defendant one or more fed cattle for slaughter from June 1, 2015 to February 29, 2020 other than pursuant to a Cost-Plus Agreement[3] and/or a Profit Sharing Agreement.[4]

> **The Exchange Class** (Fed. R. Civ. P. 23(b)(3)): All persons or entities who held a long position in Live Cattle Futures traded on the Chicago Mercantile Exchange prior to June 1, 2015, and subsequently liquidated the long position through an offsetting market transaction at any point prior to November 1, 2016.

---

[3]    "Cost Plus Agreement" means an agreement to purchase fed cattle at a price determined, in all or in part, by applying an agreed mark-up to an accounting of costs incurred by the fed cattle seller in providing finished fed cattle.

[4]    "Profit Sharing Agreement" means an agreement to supply fed cattle to a Defendant pursuant to which the Defendant: (i) financed all or part of the costs incurred by the seller in connection with the seller's purchase of unfinished cattle and/or the seller's efforts to finish unfinished cattle to slaughter weight (*e.g.*, feed); and/or (ii) agreed to share certain profits or losses of either the seller and/or the Defendant in relation to the cattle to be supplied.

Stipulation, ¶1.46.  Excluded from the Settlement Classes are Defendants, their parent companies, subsidiaries, any entity in which any Defendant has a controlling interest, affiliates, officers, directors, employees, assigns, successors, agents, legal representatives, heirs, or co-conspirators; the court, court staff, defense counsel, jurors, all respective immediate family members of these excluded entities, federal governmental entities and instrumentalities of the federal government, and states and their subdivisions, agencies and instrumentalities, and local governmental entities and instrumentalities.[5]  *Id.*

Specifically, in consideration for the release of claims and dismissal of the Action, JBS has agreed to pay $83,500,000 into a Settlement Fund and to provide cooperation to assist Cattle Plaintiffs in their prosecution of claims against the remaining Defendants. Stipulation, ¶¶2.1-2.2.  As part of JBS's cooperation, it has agreed to, among other things: (a) provide documents or data produced by JBS in response to discovery taken by other plaintiffs in the MDL, (b) allow Cattle Plaintiffs to notice up to an additional three depositions of JBS witnesses, (c) use its best efforts to produce up to three current or former employees to testify at trial, and (d) provide best efforts to authenticate or lay evidentiary foundation for the admissibility of documents produced by JBS in the MDL.  Stipulation, ¶2.2.

---

[5]    The Producer Class excludes, for the avoidance of doubt, lots of fed cattle harvested by Defendants: (a) in which Defendants, their subsidiaries, and/or affiliates had a full or partial ownership interest; and/or (b) was finished at a feedlot owned by the Defendant, their subsidiaries, and/or affiliates.  Also excluded from the Settlement Class are any Persons that exclude themselves by submitting a request for exclusion that is accepted by the Court.  *Id.*

Class Members who do not request exclusion from the Settlement Classes and who submit a timely and valid claim may receive a *pro rata* share of the Net Settlement Fund, based on a calculation of their transactions as described in the accompanying Plan of Allocation.  Joint Decl., Ex. 4.  JBS has agreed to deposit half of the Settlement Amount into an Escrow Account within 14 days following entry of the Preliminary Approval Order, and the remainder of the Settlement Amount within 45 days of the Initial Payment. Stipulation, ¶2.1(a).  The cost of settlement administration, including the costs to implement the notice plan and any taxes and tax-related expenses, will be paid from the Settlement Fund.  Stipulation, ¶3.1.  In exchange, the Cattle-JBS Settlement provides that Cattle Plaintiffs, each Settlement Class Member, and Released Cattle Plaintiffs shall "fully, finally, and forever release[], waive[], relinquishe[] and discharge[], and shall forever be enjoined from prosecuting, all Cattle Plaintiffs' Released Claims against JBS and Released Defendants, whether or not such Cattle Plaintiff, Settlement Class Member, or Released Plaintiff executes and delivers a Claim Form."  Stipulation, ¶4.2.

The Cattle-JBS Settlement further discloses that Co-Lead Counsel may apply to the Court for an award of Attorneys' Fees and Expenses, including for: (a) attorneys' fees and payment of incurred and anticipated litigation costs and expenses in connection with the investigation, filing, prosecution, and settlement of the Action, plus interest on such amounts awarded at the same rate as earned on the Settlement Fund until paid; and (b) Service Awards to Cattle Plaintiffs.  Stipulation, ¶8.1.

* * *

Cattle Plaintiffs and Co-Lead Counsel worked tirelessly to obtain this excellent result for the Settlement Classes. After thoroughly investigating the factual and legal issues in the Action, litigating their claims against JBS for five years, and engaging in hard-fought settlement negotiations, Cattle Plaintiffs and Co-Lead Counsel are confident that the Cattle-JBS Settlement is in the best interests of Class Members. As described below, the Cattle-JBS Settlement meets the standard for preliminary approval, and notice of the Cattle-JBS Settlement may be issued.

## IV.    ARGUMENT

"'The policy in federal court favoring the voluntary resolution of litigation through settlement is particularly strong in the class action context.'" *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, No. 11-MD-2247-ADM-JJK, 2012 WL 2512750, at *7 (D. Minn. June 29, 2012) (quoting *White v. Nat'l Football League*, 822 F. Supp. 1389, 1416 (D. Minn. 1993)). As the Eighth Circuit has directed, "'strong public policy favors [settlement] agreements, and courts should approach them with a presumption in their favor.'" *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999).[6]

In reviewing class action settlements, courts must ensure that they are "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In assessing whether a settlement should receive preliminary approval, the fairness, reasonableness, and adequacy "'standard is lowered, with emphasis only on whether the settlement is within the range of possible approval due to an absence of any glaring substantive or procedural deficiencies.'" *In re*

---

[6]       Unless otherwise indicated, citations are omitted, and emphasis is added.

*Centurylink Sales Pracs. & Sec. Litig.*, No. CV 18-296 (MJD/KMM), 2021 WL 3080960, at *5 (D. Minn. July 21, 2021). A court properly grants preliminary approval and approves class notice if the parties "will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1).

Rule 23(e)(2) directs courts to approve a settlement after considering several factors, namely: (i) that the class was adequately represented by counsel and the class representatives; (ii) that the proposed settlement was negotiated at arm's length; (iii) that the settlement provides adequate relief to the class; and (iv) that the settlement treats class members equitably relative to each other.

"The court is entitled to rely on the judgment of experienced counsel in its evaluation of the merits of a class action settlement." *In re Employee Benefit Plans Sec. Litig.*, No. 3-92-cv-708, 1993 WL 330595, *5 (D. Minn. June 2, 1993); *see also Welsch v. Gardenbring*, 667 F. Supp. 1284, 1295 (D. Minn. 1987) (affording "great weight" to opinions of experienced counsel); *see also Grier v. Chase Manhattan Auto Fin. Co.*, No. CIV. A. 99-cv-180, 2000 WL 175126, at *5 (E.D. Pa. Feb. 16, 2000) (stating that courts attach "[a]n initial presumption of fairness . . . to a class settlement reached in arms-length negotiations between experienced and capable counsel after meaningful discovery").

**A.** **The Proposed Settlement Classes Satisfy the Requirements for Class Certification at the Preliminary Approval Stage**

At the preliminary approval stage, the Court must also determine if the proposed Settlement Classes should be certified for settlement purposes only, as permitted under Rule 23. *See, e.g., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).[7]

To qualify for settlement-class certification, an action must satisfy all provisions of Federal Rule of Civil Procedure 23(a), plus one of the subdivisions of Rule 23(b) – for purposes of the Cattle-JBS Settlement, Rule 23(b)(3). *See* Fed. R. Civ. P. 23(a), 23(b)(3). The proposed Settlement Classes here satisfy each of the requirements of Rule 23(a) (numerosity, commonality, typicality, and adequacy of representation) and the predominance and superiority requirements of Rule 23(b)(3).

**B.** **Rule 23(a) Requirements Are Satisfied**

**1.** **Numerosity Is Easily Satisfied**

Rule 23(a)(1) requires that the class be so numerous as to make joinder of its members "impracticable." Fed. R. Civ. P. 23(a)(1). Generally, a class of more than 40 members is believed to be sufficiently numerous for Rule 23 purposes. *See Rasberry v. Columbia Cnty., Arkansas*, No. 16-cv-1074, 2017 WL 3259447, at *2 (W.D. Ark. July 31, 2017) (citing *Alberts v. Nash Finch Co.*, 245 F.R.D. 399, 409 (D. Minn. 2007) ("[A] putative class exceeding 40 members is sufficiently large to make joinder impracticable.")). Based on Cattle Plaintiffs' investigation, there are thousands of geographically dispersed

---

[7] As set forth in the Stipulation, the "Parties' agreement as to certification of the Settlement Classes is only for purposes of effectuating this Cattle-JBS Settlement, and for no other purpose." Stipulation, ¶10.1.

11

persons and entities in each of the proposed classes.  *See* Memorandum of Law in Support of Cattle Plaintiffs' Motion for Class Certification at 41, ECF No. 880 (Sept. 25, 2024) ("Plaintiffs' Class Cert. Memo.").  Therefore, joinder would be impracticable, and Rule 23(a)(1) is satisfied.

### 2.    There Are Common Questions of Law and Fact

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Plaintiffs must show that resolution of an issue of fact or law "is central to the validity of each" class member's claim and "[e]ven a single [common] question will" satisfy the commonality requirement.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 359 (2011).

"Minnesota courts have previously found that allegations of a nationwide horizontal price-fixing conspiracy in violation of Section 1 of the Sherman Act primarily involves common issues of fact and law." *In re Pork Antitrust Litig.*, 665 F. Supp. 3d 967, 996 (D. Minn. 2023).  Proof of this alleged conduct will be common to all Class Members. Additional questions of law and fact common to the proposed Settlement Classes include, among others:

- whether Defendants' conspiracy existed,

- whether Defendants' conspiracy suppressed the prices Cattle Plaintiffs paid for fed cattle during the class period; and

- the appropriate measure of the damages suffered by the Classes.

The proof required to establish the existence of the conspiracy and JBS's unlawful participation in it is common to all Class Members and, therefore, Rule 23(a)(2) is satisfied.

### 3. Cattle Plaintiffs' Claims Are Typical of the Classes

Rule 23(a)(3) requires that the class representatives' claims be "typical" of class members' claims. Typicality exists "when the claims of the named plaintiffs emanate from the same event or are based on the same legal theory as the claims of the class members." *Lockwood Motors, Inc. v. General Motors Corp.*, 162 F.R.D. 569, 575 (D. Minn. 1995); *see also Paxton v. Union Nat. Bank*, 688 F.2d 552, 561-62 (8th Cir. 1982); *Dirks v. Clayton Brokerage Co. of St. Louis, Inc.*, 105 F.R.D. 125, 133 (D. Minn. 1985). "When the claims or defenses of the representatives and the class are based on the same course of conduct or legal theory, it is thought that the representatives will advance the interest of the class members by advancing his or her own interests." *In re Control Data Corp. Sec. Litig.*, 116 F.R.D. 216, 220 (D. Minn. 1986); *see also Smith v. United Health Care Servs., Inc.*, No. 00-cv-1163, 2002 WL 192565, at *3-4 (D. Minn. 2002) (plaintiffs typical of class despite varying degree of damages due to "strong similarity of legal theories").

Here, the named Cattle Plaintiffs' and the putative Settlement Classes' legal claims arise out of the same alleged conduct. *See, generally,* Complaint. In short, Cattle Plaintiffs' claims arise out of the same course of conduct and the same injury – namely the suppression of fed cattle and Live Cattle Futures prices – and they seek the same relief. *See In re Select Comfort Corp. Sec. Litig.*, 202 F.R.D. 598, 604 (D. Minn. 2001) ("Typicality is closely related to commonality as a 'finding of one generally compels a finding of the other.'"). Because Cattle Plaintiffs' claims are typical of the Settlement Classes' claims, this requirement is similarly met.

### 4.    Cattle Plaintiffs and Co-Lead Counsel Have Fairly and Adequately Protected the Interests of the Classes

Under Rule 23(a)(4), a class representative must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  In order to meet this requirement, the Court must find that: (1) the representatives and their counsel are able and willing to prosecute the action competently and vigorously; and (2) each representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge. *See In re Monosodium Glutamate Antitrust Litig.*, 205 F.R.D. 229, 233 (D. Minn. 2001); *Lockwood Motors*, 162 F.R.D. at 576.

As demonstrated through their work in this Action, Cattle Plaintiffs and Co-Lead Counsel have diligently prosecuted the case by, among other things:

(i)     conducting an extensive and thorough investigation prior to filing their complaint;

(ii)    successfully opposing Defendants' motions to dismiss;

(iii)   engaging in extensive document and deposition discovery, including obtaining, reviewing, and analyzing millions of pages of documents produced by the Defendants, noticing or cross-noticing over 80 Defendant witnesses and 25 non-party witnesses, and sitting for over 13 Plaintiff depositions;

(iv)    engaging and working with experts to understand the economic impact of Defendants' conduct on the fed cattle and live cattle futures markets;

(v)     moving for certification of litigation classes, with supporting expert reports;

(vi)    preparing for and participating in mediation; and

(vii)   negotiating the proposed Cattle-JBS Settlement with a payment of $83,500,000 for the benefit of the Classes.

*See* Joint Decl., ¶¶2-10.

Further, Co-Lead Counsel have decades of experience leading some of the most complex class actions.  *See* Joint Decl., Exs.5-6 (firm résumés).  Co-Lead Counsel's

extensive antitrust, CEA, and complex class action experience, combined with their extensive efforts in this litigation, demonstrate Co-Lead Counsel's adequacy. The collective tenacity and dedication of Cattle Plaintiffs and Co-Lead Counsel directly led to the Cattle-JBS Settlement, which will provide significant and immediate relief to members of the Settlement Classes.

### C. The Classes May Be Certified Under Rule 23(b)(3)

To satisfy Rule 23(b)(3), plaintiffs must conditionally establish: (1) "that the questions of law or fact common to class members predominate over any questions affecting only individual members;" and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). As detailed below, the Classes satisfy these requirements.

#### 1. Common Questions Predominate

Minnesota district courts recognize that "[a]s with the commonality and typicality requirements, the predominance inquiry is directed toward the issue of liability." *Select Comfort*, 202 F.R.D. at 610. When determining whether common questions predominate, courts "'focus on the liability issue . . . and if the liability issue is common to the class, common questions are held to predominate over individual questions.'" *Id.* (elipsis in original).

Here, multiple common questions lie at the heart of all Class Members' claims, including whether Defendants conspired to suppress fed cattle and live cattle futures prices. Moreover, the same evidence – documentary and testimonial – that will be used to establish Defendants' alleged violation of the antitrust laws and the CEA, and to demonstrate Cattle

Plaintiffs' claimed damages arising from those violations, would be used by all other Class Members to establish Defendants' alleged violations of law in their claims against Defendants and the Class Members' damages. *See also generally* Cattle Plaintiffs' Class Cert. Memo. at 35-48 (explaining the common evidence capable of establishing Defendants' liability under the Sherman Act and CEA). Likewise, Cattle Plaintiffs maintain that common evidence, described by Dr. Lamb and Ms. Rosevear in their respective expert reports, is capable of showing that: (a) Defendants caused fed cattle prices to be suppressed throughout the Class Period, and (b) Defendants' suppression of prices in the fed cattle market, caused prices of Live Cattle Futures to become artificial.

Because the timing, nature, and impact of Defendants' alleged conspiratorial conduct serve as a common nucleus of facts that link together each Class Member's claim, the predominance requirement under Rule 23(b)(3) is satisfied.

### 2.    A Class Action Is Superior to Individual Actions

Plaintiffs must also show that a class action is superior to individual actions, which involves four considerations:

(A)    the interest of the members of the class in individually controlling the prosecution or defense of separate actions;

(B)    the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(C)    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)    the difficulties likely to be encountered in the management of the class action.

Fed. R. Civ. P. 23(b)(3).  Here, any Class Member's interest in individually controlling the prosecution of a separate claim is likely low, given that the cost of litigating a claim individually would necessarily exceed the potential individual recovery.  Further, because there are hundreds of individuals and entities in the Classes, a class settlement conserves both judicial and private resources and hastens Class Members' recovery.

In addition, while Cattle Plaintiffs see no management difficulties in litigating this case, manageability considerations are not pertinent to approving a settlement class.  *See Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial.").  In sum, resolving all Class Members' claims jointly, particularly through a class-wide settlement negotiated on their behalf by counsel well-versed in class action litigation, is superior to a series of individual lawsuits and promotes judicial economy.  *See W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 290 (D. Minn. 2018) ("the [c]ourt finds that—due to the large number of possible class members—a class action is necessary to avoid potentially crowding the docket with thousands of similar cases").

\* \* \*

Because the requirements of Rule 23(a) and Rule 23(b)(3) are satisfied, conditional certification of the proposed Settlement Classes is appropriate.

### D.    Rule 23(e) Factors Support Preliminary Approval of the Cattle-JBS Settlement

As discussed above, courts may only approve settlements after considering the enumerated Rule 23(e)(2) factors, which are discussed in turn.

#### 1.    The Class Representatives and Class Counsel Have Adequately Represented the Classes and the Parties' Negotiations Were At Arms' Length (Fed. R. Civ. P. 23(e)(2)(A)-(B))

As discussed above in Section IV.B.4, Co-Lead Counsel and the class representatives have diligently represented the interests of the Settlement Classes in all phases of the litigation.    In addition, as described above in Section II and in the Joint Declaration, the Parties negotiated the Cattle-JBS Settlement at arms' length and under the supervision of a well-regarded mediator, Miles Ruthberg.  Thus, Rule 23(e)(2)(A) and (B) are satisfied.

#### 2.    The Proposed Relief Under the Cattle-JBS Settlement Is Adequate (Fed. R. Civ. P. 23(e)(2)(C))

The relief secured by the Cattle-JBS Settlement – $83.5 million – is substantial and will inure to the benefit of the Settlement Classes.  This is supported by the additional factors provided under Rule 23(e)(2)(C), discussed below.

***The costs, risks, and delays of trial and appeal, Fed. R. Civ. P. 23(e)(2)(C)(i).***  Co-Lead Counsel have expended substantial resources litigating Cattle Plaintiffs' and the Classes claims to this point.  This includes tens of thousands of hours in uncompensated attorney time and millions of dollars in expert costs and other case-related expenses over nearly six years of litigation.

Defendants, including JBS, have vigorously contested Cattle Plaintiffs' claims at every turn, having moved to dismiss Cattle Plaintiffs' complaints multiple times and fought efforts to obtain discovery from them. Defendants have also noticed and taken multiple depositions of individual Cattle Plaintiffs, served voluminous discovery requests, including document requests, interrogatories, and requests for admissions to each Cattle Plaintiff. Cattle Plaintiffs anticipate that Defendants will continue their vigorous opposition against Cattle Plaintiffs' claims at class certification, summary judgment, and trial. The risks faced by Cattle Plaintiffs are substantial. To prevail on their claims, Cattle Plaintiffs must clear each of these hurdles; Defendants, in contrast, need only be successful in one of these tasks to either defeat or substantially weaken Cattle Plaintiffs' case. Regardless of the outcome at these litigation stages, the non-prevailing party would likely appeal, causing further delay, costs, and expenses. *See Swinton v. SquareTrade, Inc.*, No. 4:18-CV-00144-SMR-SBJ, 2019 WL 617791, at *7 (S.D. Iowa Feb. 14, 2019) (evaluating Rule 23(e)(2)(C)(i), and concluding that "[a] comparison of the settlement against the costs, risks, and delay of trial and appeal strongly favors approving the settlement. If the settlement fails and this matter proceeds, it will likely take years to resolve, assuming it makes it to trial.").

**Method of Distributing Relief, Fed. R. Civ. P. 23(e)(2)(C)(ii).** Under the proposed Plan of Allocation, each Settlement Class Member will submit a claim form detailing their qualifying transactions. After processing and validating each claim form, the Claims Administrator shall distribute the proceeds of the Net Settlement Fund to Settlement Class Members submitting qualifying claims.

*Proposed Attorneys' Fee Award, Fed. R. Civ. P. 23(e)(2)(C)(iii).* Co-Lead Counsel anticipate seeking an award of up to one-third of the Settlement Fund ($27.83 million) as compensation toward their attorneys' fees. Co-Lead Counsel also anticipate asking for an award of no more than $8.5 million, for unreimbursed litigation costs and expenses, and that a sum of no more than $3.5 million be set aside for future litigation expenses. Joint Decl., ¶24. Co-Lead Counsel may also seek an award of no more than $30,000 as a Service Award for each Cattle Plaintiff in connection with their representation of the Classes. Joint Decl., ¶24. The requested fee and cost reimbursements, as well as the requested service awards, are well within the range of such awards routinely approved in litigations of similar size and complexity. *See In re Pork Antitrust Litig.*, No. CV 18-1776 (JRT/JFD), 2022 WL 22861485, at *3-5 (D. Minn. July 22, 2022) (awarding attorneys' fees equal to 33 1/3% of common fund, $2.5 million in incurred litigation expenses, $2.49 million for future litigation expenses, and $25,000 in service awards). *See also Kruger v. Lely N. Am., Inc.*, No. 0:20-CV-00629-KMM/DTS, 2023 WL 5665215, at *6 (D. Minn. Sept. 1, 2023) (finding service awards of $50,000, $25,000, and $15,000 were approprirate).

*Any Additional Agreements Connected to the Cattle-JBS Settlement.* Rule 23(e)(3) requires that "[t]he parties seeking approval must file a statement identifying any agreement made in connection with the proposal." Fed. R. Civ. P. 23(e)(3). The Stipulation sets out the full scope of Cattle Plaintiffs' agreement with JBS. In particular, the Stipulation identifies that JBS has a qualified right to terminate the Stipulation should a specified number of class members validly exercise their rights to exclude themselves from

the Cattle-JBS Settlement. *See* Stipulation, ¶12.5. The terms of this qualified right to terminate are set out in a Supplemental Agreement between the Cattle Plaintiffs and JBS.[8]

Although the Stipulation does not identity the opt-out threshold that would trigger this provision, this type of qualified termination right is typical in complex class actions and does not impact the fairness of the Cattle-JBS Settlement. *See, e.g.*, *In re Carrier IQ, Inc., Consumer Privacy Litig.*, No. 12-md-2330, 2016 WL 4474366, at *5, 7 (N.D. Cal. Aug. 25, 2016) (observing that such "opt-out deals are not uncommon as they are designed to ensure that an objector cannot try to hijack a settlement in his or her own self-interest," and granting final approval of class action settlement); *accord* MANUAL FOR COMPLEX LITIGATION (FOURTH) §21.631 (2004) (explaining that "[k]nowledge of the specific number of opt outs that will vitiate a settlement might encourage third parties to solicit class members to opt out.").

### 3. The Cattle-JBS Settlement Treats Settlement Class Members Equitably Relative to Each Other (Fed. R. Civ. P. 23(e)(2)(D))

Under the Stipulation and the Plan of Allocation, Settlement Class Members that submit timely Claim Forms are eligible to receive a distribution from the Net Settlement Fund. In addition, as described in the Plan of Allocation, and in Section VII below, the Net Settlement Fund will be apportioned into two distinct allocation pools for purposes of distributing proceeds to Class Members. One pool will be dedicated to members of the Producer Class, and the other pool will be dedicated to members of the Exchange Class

---

[8]    Although this Supplemental Agreement will not be filed on the public docket, upon the Court's request, Cattle Plaintiffs will submit this Supplemental Agreement for *in camera* review.

(the "Allocation Pools"). Settlement Class Members are eligible to receive a *pro rata* distribution of their respective Allocation Pools, subject to eligible claims exceeding a *de minimis*, \$10 threshold. This is sufficient to satisfy this requirement.[9]

\* \* \*

In sum, each of the Rule 23(e) considerations weigh in favor of preliminarily approving the Cattle-JBS Settlement.

### E.    The Eighth Circuit Factors Also Support a Finding that the Cattle-JBS Settlement Is Fair, Reasonable, and Adequate

The Eighth Circuit has established four factors for determining whether a proposed settlement is fair, reasonable and adequate: (1) the merits of plaintiffs' case, weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement. *See Marshall*, 787 F.3d at 508 (citing *Uponor*, 716 F.3d at 1063); *Dryer v. Nat'l Football League*, No. 09-cv-2182-PAM-AJB, 2013 WL 5888231, at \*2 (D. Minn. Nov. 1, 2013). At the preliminary approval stage, only the first three factors are considered, *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 932 (8th Cir. 2005), and the first is the most important, *Van Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir. 1988). Here, the first and third factors favor preliminary approval of the Cattle-JBS Settlement, while the second fact is neutral.

---

[9]    "There is no requirement that all class members in a settlement be treated equally." *Swinton*, 2019 WL 617791, at \*8 (citing *Marshall v. Nat'l Football League*, 787 F.3d 502, 510 (8th Cir. 2015)).

As to the first factor – the merits of plaintiffs' case weighed against the terms of the settlement – without the Cattle-JBS Settlement, the outcome of the litigation as to JBS would be far from certain.  Although Cattle Plaintiffs defeated JBS's motion to dismiss, motions for class certification and summary judgment, as well as trial, will be strenuously contested.[10]  Furthermore, favorable decisions at class certification and trial are not guaranteed, and will likely face an appeal.  In lieu of the uncertainties and delay inherent in continued litigation, the Cattle-JBS Settlement provides for substantial, direct, and certain benefits to the classes.  This factor favors approval of the Cattle-JBS Settlement.

As to the third factor, this case has been, and will continue to be, complex and expensive.  Counsel for all parties have vigorously represented their clients and will continue to do so.  As this Court has previously found in a similar case, this factor supports approval of the Cattle-JBS Settlement here.  *See In re Pork Antitrust Litig.*, No. CV 18-1776 (JRT/JFD), 2023 WL 11892594, at *1 (D. Minn. Nov. 4, 2023).

Finally, the second factor – JBS's financial condition – is a neutral factor.  There is no indication that JBS's financial condition is not secure.  *See Marshall*, 787 F.3d at 512 ("The district court found that the NFL is in good financial standing, which would permit it to adequately pay for its settlement obligations or continue with a spirited defense in the litigation.  No party disagrees with this finding.  As such, we find this factor neutral.").

---

[10]    For its part, "JBS denies Cattle Plaintiffs' allegations, denies any and all wrongdoing in connection with the facts and claims that have been or could have been alleged against it in the Action" but "has nevertheless agreed to enter into this Cattle-JBS Settlement to avoid further expense, exposure, inconvenience, and the distraction of burdensome and protracted litigation."  Stipulation, at 2.

However, given that first and third factors clearly support preliminary approval of the Cattle-JBS Settlement, this factor should not be determinative.

## V.    THE COURT SHOULD APPOINT CATTLE PLAINTIFFS AS SETTLEMENT CLASS REPRESENTATIVES AND CO-LEAD COUNSEL AS SETTLEMENT CLASS COUNSEL

"An order certifying a class action . . . must also appoint class counsel under Rule 23(g)."  Fed. R. Civ. P. 23(c)(1)(B).  In appointing class counsel, courts should consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the classes.  Fed. R. Civ. P. 23(g)(1)(A).

As discussed above, both Cattle Plaintiffs and Co-Lead Counsel have adequately represented the interests of all Class Members through vigorous prosecution of this case from its inception.  *See* Sections I-III, *supra*.  Co-Lead Counsel devoted substantial efforts and resources in developing the claims in this case and filed the first complaint in this matter without the benefit of any preceding government actions.

As top-tier class action law firms, Scott+Scott and CCMS not only have extensive experience with complex class actions, but also have ample resources to dedicate to such lawsuits and have done so here, all without any guarantee that those resources would be recovered.  In particular, Co-Lead Counsel have frequently prosecuted violations of the Sherman Act and the CEA related to conspiracies and manipulative schemes and are very familiar with the applicable law.  *See* Joint Decl., ¶18.

24

Thus, the Court should appoint Scott+Scott and CCMS, as Co-Lead Counsel, and Cattle Plaintiffs, who have ably represented the interests of all Class Members, as class representatives.

## VI.    THE COURT SHOULD APPROVE THE PROPOSED CLASS NOTICE PLAN AND ANGEION GROUP LLC AS CLAIMS ADMINISTRATOR

If the Court preliminarily approves the Cattle-JBS Settlement, it must separately consider whether the proposed notice is appropriate. Class Members are entitled to "'the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.'" *Taqueria El Primo LLC v. Illinois Farmers Ins. Co.*, 630 F. Supp. 3d 1121, 1125 (D. Minn. 2022) (citing Fed. R. Civ. P. 23(c)(2)(B)). But "'[s]omething less than actual notice to all class members is tolerated in order to strike a balance between the due process concerns and the need for a mechanism, i.e., the class action, to efficiently litigate certain cases involving numerous parties.'" *Barfield v. Sho-Me Power Elec. Co-op.*, No. 11-CV-04321, 2013 WL 3872181, at *13 (W.D. Mo. July 25, 2013), *aff'd sub nom. Barfield v. Sho-Me Power Elec. Coop.*, 852 F.3d 795 (8th Cir. 2017).

The proposed Notice Plan and related forms of notice (*see* Angeion Declaration, Exs. B, D, and E) are "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). The Notice Plan here will explain in simple and easy-to-understand terms: (1) the litigation and the material terms of the Cattle-JBS Settlement, (2) how Settlement Class Members

can object or exclude themselves from the Cattle-JBS Settlement, (3) how to participate in the Cattle-JBS Settlement, and (4) how to find out more information about the Cattle-JBS Settlement, including visiting the settlement website.

The Notice Plan will include a direct-mailing component that will involve sending the mailed notice (Angeion Declaration, Ex. B) and Claim Form (*id.*, Ex. C) via First-Class Mail, postage prepaid to potential Class Members, as well as sending mail notice to the feedlots in which Class Members fed their cattle and trade associations which represented their interest, and to brokers and other nominees for the Exchange Class. *See* Angeion Declaration, ¶¶32, 33. The Supreme Court has consistently found that mailed notice satisfies the requirements of due process. *See, e.g., Mullane*, 339 U.S. at 319.

The Claims Administrator also will publish the banner and publication notice in various periodicals, industry publications, websites, and other digital media. *See* Angeion Declaration ¶23. Any Settlement Class Members that do not receive the Class Notice via direct mail likely will receive the Class Notice through the foregoing publications or word of mouth.

The Settlement Website, www.cattleantitrustsettlement.com, will serve as an information source regarding the Cattle-JBS Settlement. Settlement Class Members can review and obtain: (i) a blank Proof of Claim and Release form to claim from the Net Settlement Fund; (ii) the mailed and publication notices; (iii) the proposed Plan of Allocation; (iv) the Stipulation; and (v) key pleadings and Court orders. The Claims Administrator will also operate a toll-free telephone number to answer Class Members' questions and facilitate claims filing. *See* Angeion Declaration ¶¶37-38.

Co-Lead Counsel recommend that Angeion Group LLC ("Angeion") be appointed as Claims Administrator. With Co-Lead Counsel, Angeion developed the notice plan and has experience in administering class action settlements involving securities in over-the-counter and exchange markets, including in cases involving futures and options.

## VII.    THE COURT SHOULD APPROVE THE PLAN OF ALLOCATION

Cattle Plaintiffs also seek approval of the proposed Plan of Allocation. *See* Joint Decl., Ex. 4. "'As a general rule, the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information.'" *In re Platinum & Palladium Commodities Litig.*, No. 10CV3617, 2014 WL 3500655, at *13 (S.D.N.Y. July 15, 2014). (quoting *In re PaineWebber Ltd. P'ships Litg.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997)). Here, Co-Lead Counsel are well-positioned to understand the strengths and weaknesses of Cattle Plaintiffs' claims. They are also experienced in developing and implement plans of distribution in antitrust and commodities class actions. *See In re Marsh ERISA Litigation*, 265 F.R.D. 128 (S.D.N.Y. 2010) ("In determining whether a plan of allocation is fair, courts give substantial weight to the opinions of experienced counsel.").

The Plan of Allocation[11] describes the manner in which the Net Settlement Fund will be fairly apportioned between the Producer and Exchange Classes and how qualifying claimants will be paid from the Net Settlement Fund.

---

[11]    Capitalized terms in this section are defined in the Plan of Allocation filed herewith.

***First,*** the Plan of Allocation describes that the Net Settlement Fund will be apportioned between the Producer and Exchange Classes. The Plan of Allocation creates two pools of funds to pay eligible claims: the Producer Pool and the Exchange Pool. These two Allocation Pools were based, upon: (1) Dr. Lamb and Ms. Rosevear's expert analyses in supporting Cattle Plaintiffs' Motion for Class Certification (ECF No. 883 at Exs. 1 and 2); (2) the relative strengths and weaknesses of the claims asserted on behalf of each Class, including, but not limited to: (a) the strength of the evidence supporting misconduct, injury, and damages to each Class (*e.g.*, the nature of Defendants' conduct in the physical cattle market versus the exchange-traded market) and (b) legal risks, including the statute of limitations for claims asserted by each Class (*e.g.*, CEA claims that are brought only by Exchange Class Members have a two-year limitation period). Joint Decl., Ex. 4, ¶9. *Cf. In re Sturm, Ruger, & Co., Inc. Sec. Litig.*, No. 3:09CV1293 VLB, 2012 WL 3589610, at *8 (D. Conn. Aug. 20, 2012) ("'Allocation formulas, including certain discounts for [different products], are recognized as an appropriate means to reflect the comparative strengths and values of different categories of the claim. There is no rule that settlements benefit all class members equally.'"). Accordingly, Co-Lead Counsel concluded that 95% of the Net Settlement Fund should be dedicated to the Producer Pool, with the remaining 5% of the Net Settlement Fund dedicated to the Exchange Pool. Joint Decl., Ex. 4, ¶8.

***Second,*** for each Settlement Class, the Claims Administrator will calculate an Authorized Claim Amount based on the information provided in the Claim Form and subject to adjustments described in the Plan of Allocation. For the Producer Class, the Authorized Claim Amount is determined by the total dollar volume of eligible fed cattle

sales, subject to the following multipliers: fed cattle sales during the period June 1, 2015 through February 29, 2020, will receive a 1.0 multiplier, while fed cattle sales after February 29, 2020 will receive a 0.05 multiplier. These multipliers are based on an assessment of the relative strength and weaknesses of Cattle Plaintiffs' claims over these two time periods, including the evidence demonstrating Defendants' misconduct, injury, and damages over each period. Joint Decl., Ex. 4, ¶12.

For the Exchange Class, the Claims Administrator will calculate an Authorized Claim Amount based on the information submitted in the Claim Forms. The Authorized Claim Amount is the product of: (i) the number of futures contracts traded; (ii) the futures contract price, denominated in U.S. cents per pound, on the date of liquidating that position; and (iii) the futures contract unit, denominated as pounds per futures contract (40,000 pounds). Joint Decl., Ex. 4, ¶16.

***Third,*** the Net Settlement Fund will be distributed to each Producer and Exchange Class Member based on their *pro rata* fraction of each Producer and Exchange Class Member's Authorized Claim Amount divided by the total of all Authorized Claim Amounts in each pool. Joint Decl., Ex. 4, ¶18. To the extent an individual or entity is a member of both the Producer and Exchange Classes, then it shall receive the sum of its *pro rata* fraction from each Allocation Pool. Joint Decl., Ex. 4, ¶19.

The exception to this *pro rata* distribution will be for Class Members whose Distribution Amounts calculate to less than $10.00. If a Class Member's Distribution Amount calculates to less than $10.00, no distribution will be made to such Class Member,

and such payment will be reallocated to Class Members whose Distribution Amounts exceed $10.00 for the relevant Allocation Pool. Joint Decl. Ex. 4, ¶20.[12]

Because the Plan of Allocation is fair and reasonable, it should be approved.

## VIII. THE COURT SHOULD APPOINT HUNTINGTON BANK AS ESCROW AGENT

Co-Lead Counsel have designated Huntington Bank to serve as Escrow Agent, to which JBS has consented. Huntington Bank has served as escrow agent in more than 6,500 settlements, representing more than $80 billion. Joint Decl., Ex. 3, ¶3. Recent matters where Huntington Bank has been appointed as escrow agent include *KPH Healthcare Servs., Inc. v. Mylan*, N.V., No. 2:20-CV-02065-DDC-TJJ, 2024 WL 1494314, at *3 (D. Kan. Apr. 3, 2024); *In re Disposable Contact Lens Antitrust Litig.*, No. 3:15-MD-2626-HES-LLL, 2023 WL 11914918, at *1 (M.D. Fla. Nov. 29, 2023), *objections overruled*, No. 3:15-MD-2626-HES-LLL, 2024 WL 3988972 (M.D. Fla. Feb. 29, 2024); and *In re Remicade Antitrust Litig.*, No. 17-CV-04326, 2022 WL 3042766, at *3 (E.D. Pa. Aug. 2, 2022). Huntington Bank has agreed to provide its services at market rates. Joint Decl., ¶38.

---

[12] Further, under paragraph 5.15 of the Stipulation, "[i]f any balance remains in the Net Settlement Fund six (6) months after the date of the initial distribution of the Net Settlement Fund (by reason of tax refunds, uncashed checks, or otherwise), Interim Co-Lead Counsel shall request the Claims Administrator, if economically feasible and reasonable, to reallocate such balance among those Authorized Claimants who have cashed their checks, in an equitable fashion, after payment of any unpaid Notice and Administration Costs incurred in administering the Net Settlement Fund for such redistribution. Such redistributions shall be repeated until the remaining balance in the Net Settlement Fund is de minimis and such remaining balance shall be donated to an appropriate 501(c)(3) non-profit organization selected by Interim Co-Lead Counsel and approved by the Court." Joint Decl. Ex. 4, ¶21.

Based on Huntington Bank's experience and familiarity with performing the services of an escrow agent, Co-Lead Counsel are confident Huntington Bank will properly perform the duties of Escrow Agent as ordered by the Court. *See* Joint Decl. ¶39,

## IX. PROPOSED SCHEDULE OF CATTLE-JBS SETTLEMENT EVENTS

In connection with preliminary approval of the Cattle-JBS Settlement, the Court must set a Fairness Hearing date, set dates for initial mailing of the mailed notice and distribution of the publication notice, and set deadlines for requesting exclusion from the Classes, objecting to the Cattle-JBS Settlement, and filing claims. In addition to considering final approval of the Cattle-JBS Settlement and the Plan of Allocation, Co-Lead Counsel will also file a motion for fees and expenses, and Cattle Plaintiffs may file an application for a Service Award.

Cattle Plaintiffs propose the following schedule:

| Event | Deadline |
|---|---|
| Begin distribution of mailed notice to Class | No later than 60 days after entry of the Preliminary Approval Order ("Notice Date") |
| Commencement of the distribution of the publication notice; launch of Settlement Website | No later than the Notice Date |
| Complete initial distribution of mailed and publication notices | 30 days after the Notice Date |
| Deadline to file motions for final approval of the Cattle-JBS Settlement, an award of attorneys' fees and expenses, and service awards | 63 days prior to the Fairness Hearing |
| Deadline to object to the Cattle-JBS Settlement, Plan of Allocation for settlement proceeds, request for an award of attorneys' fees and expenses, or application for service awards | 42 days prior to the Fairness Hearing |

| Event | Deadline |
|---|---|
| Deadline to request exclusion from the Settlement Classes | 42 days prior to the Fairness Hearing |
| Deadline to file reply papers in support of final approval of the Cattle-JBS Settlement, request for an award of attorneys' fees and expenses, and request for service awards | 7 days prior to the Fairness Hearing |
| Fairness Hearing | At the Court's convenience, but no earlier than 175 days after entry of the Preliminary Approval Order |
| Last day for submitting Proof of Claim and Release forms | 30 days after Fairness Hearing |

*See* Proposed Preliminary Approval Order.

## CONCLUSION

For the foregoing reasons, the proposed Cattle-JBS Settlement warrants the Court's preliminary approval. Cattle Plaintiffs respectfully request that the Court enter the accompanying proposed order that among other things: (a) preliminarily approves the Cattle-JBS Settlement, subject to later, final approval; (b) conditionally certifies the Settlement Classes; (c) approves the Plan of Allocation with respect to the Net Settlement Fund; (d) appoints Cattle Plaintiffs as representatives of the Settlement Classes; (e) appoints Scott+Scott and CCMS as Co-Lead Counsel for the Settlement Classes; (f) appoints Huntington Bank as Escrow Agent for purposes of the Settlement Fund; (g) appoints Angeion as the Claims Administrator for the Cattle-JBS Settlement; (h) approves the proposed forms of Notice to the Settlement Classes of the Cattle-JBS Settlement and

the proposed Notice plan; and (i) sets a schedule leading to the Court's consideration of final approval of the Cattle-JBS Settlement.

Dated:  January 31, 2025

Respectfully submitted,

/s/ Patrick J. McGahan
David R. Scott (*pro hac vice*)
Amanda F. Lawrence (*pro hac vice*)
Patrick J. McGahan (*pro hac vice*)
Michael P. Srodoski (Bar No. 0398250)
**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
156 Main Street
P.O. Box 192
Colchester, CT 06415
Tel.: 860-537-5537
Fax.: 860-537-4432
david.scott@scott-scott.com
alawrence@scott-scott.com
pmcgahan@scott-scott.com
msrodoski@scott-scott.com

Joseph P. Guglielmo (*pro hac vice*)
Matthew J. Perez (*pro hac vice*)
Anna Hunanyan (*pro hac vice*)
Michelle Conston (*pro hac vice*)
**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Tel.: 212-223-6444
Fax: 212-223-6334
jguglielmo@scott-scott.com
matt.perez@scott-scott.com
ahunanyan@scott-scott.com
mconston@scott-scott.com

Sean C. Russell (*pro hac vice*)
Isabella De Lisi (*pro hac vice*)

/s/ Ellen Meriwether
Ellen Meriwether (*pro hac vice*)
Jennifer W. Sprengel (*pro hac vice*)
Daniel O. Herrera (*pro hac vice*)
Kaitlin Naughton (*pro hac vice*)
**CAFFERTY CLOBES
MERIWETHER & SPRENGEL LLP**
135 S. LaSalle Street, Suite 3210
Chicago, IL 60603
Tel.: 312-782-4882
Fax: 312-782-4485
jsprengel@caffertyclobes.com
dherrera@caffertyclobes.com
knaughton@caffertyclobes.com

***Interim Co-Lead Counsel for the Cattle
Plaintiffs***

K. Craig Wildfang (Bar No. 0117043)
Thomas J. Undlin (Bar No. 0183751)
Stacey P. Slaughter (Bar No. 0296971)
Geoff Kozen (Bar No. 0398626)
Eric P. Barstad (Bar No. 0398979)
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Tel.: 612-349-8500
Fax: 612-339-4181
kcwildfang@robinskaplan.com
tundlin@robinskaplan.com
sslaughter@robinskaplan.com
gkozen@robinskaplan.com
ebarstad@robinskaplan.com

***Liaison Counsel for the Cattle Plaintiffs***

**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.:  619-233-4565
Fax:  619-233-0508
srussell@scott-scott.com
idelisi@scott-scott.com

David E. Kovel (*pro hac vice*)
Thomas W. Elrod (*pro hac vice*)
**KIRBY MC INERNEY LLP**
250 Park Avenue, Suite 820
New York, NY 10177
Tel.: 212-371-6600
Fax: 212-751-2540
dkovel@kmllp.com
telrod@kmllp.com

Anthony F. Fata (*pro hac vice*)
**KIRBY MC INERNEY LLP**
211 West Wacker Drive, Suite 550
Chicago, IL 60606
Tel.: 312-767-5180
Fax: 312-767-5181
afata@kmllp.com

Daniel Warshaw (*pro hac vice*)
Bobby Pouya (*pro hac vice*)
Michael H. Pearson (*pro hac vice*)
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Tel.: 818-788-8300
Fax: 818-788-8104
dwarshaw@pwfirm.com
bpouya@pwfirm.com
mpearson@pwfirm.com

Michael Schrag (*pro hac vice*)
George Sampson (*pro hac vice*)
Elizabeth C. Pritzker (*pro hac vice*)
Caroline Corbitt (*pro hac vice*)
**PRITZKER LEVINE LLP**
1900 Powell Street, Ste. 450
Emeryville, CA 94602
Tel.: 415-692-0772
Fax: 415-366-6110
mls@pritzkerlevine.com
gws@pritzkerlevine.com
ecp@pritzkerlevine.com

ccc@pritzkerlevine.com

***Interim Executive Committee for the
Cattle Plaintiffs***