## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| *IN RE CATTLE AND BEEF ANTITRUST LITIGATION*<br><br>This Document Relates to:<br><br>*Consumer Indirect Purchaser Plaintiff Action* | No. 0:22-md-03031-JRT-JFD |

## MEMORANDUM IN SUPPORT OF CONSUMER INDIRECT PURCHASER PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENTS WITH CARGILL AND TYSON DEFENDANTS AND <u>APPROVAL OF NOTICES, PLAN OF NOTICE AND PLAN OF ALLOCATION</u>

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................1

II.   SUMMARY OF LITIGATION ...........................................................................2

III.  SUMMARY OF SETTLEMENT NEGOTIATIONS AND TERMS.....................4

    A.    Consumer IPPs' Settlement with Cargill ........................................................4

    B.    Consumer IPPs' Settlement with Tyson.........................................................7

IV.   THE SETTLEMENTS FALL WITHIN THE RANGE OF
    POSSIBLE APPROVAL....................................................................................9

    A.    The settlements were reached in arms-length negotiations
        between experienced and capable counsel. ..................................................10

    B.    Consumer IPPs have had adequate opportunity to assess the
        merits of their claims and Cargill's and Tyson's defenses. ........................11

    C.    The settlements provide significant relief to the Consumer
        IPP class. .....................................................................................................12

V.    THE COURT SHOULD CERTIFY THE .............................................................14

PROPOSED SETTLEMENT CLASS .............................................................................14

    A.    The proposed settlement class satisfies Rule 23(a)......................................14

        1.    Numerosity. ........................................................................................14

        2.    Commonality ......................................................................................14

        3.    Typicality. ..........................................................................................15

        4.    Adequacy............................................................................................16

    B.    The proposed settlement class satisfies Rule 23(b)(3). ...............................16

    C.    Co-Lead Class Counsel request appointment under Rule
        23(g). ...........................................................................................................18

VI.   THE COURT SHOULD APPOINT THE HUNTINGTON
    NATIONAL BANK AS ESCROW AGENT.......................................................18

VII.    THE COURT SHOULD APPROVE THE PLAN OF NOTICE AND
        PLAN OF ALLOCATION..................................................................................... 19

        A.    Class Counsel selected an experienced claims administrator
              through a fair selection process, and the administrator has
              agreed to a cap on costs. ................................................................................ 20

        B.    The proposed form of class notice clearly and fairly apprises
              class members of the nature of this action and the scope of
              their rights. ...................................................................................................... 21

        C.    The proposed manner of notice dissemination is reasonable
              and represents the best notice practicable under the
              circumstances. .................................................................................................. 23

        D.    The proposed claims process and plan of allocation are fair
              and reasonable. ................................................................................................. 27

VIII.   PROPOSED SCHEDULE.................................................................................... 29

IX.     CONCLUSION ................................................................................................... 30

# TABLE OF AUTHORITIES

**Page**

### CASES

*Alpern v. UtiliCorp United, Inc.*,
  84 F.3d 1525 (8th Cir. 1996) ................................................................. 15

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ............................................................................. 14

*In re Broiler Chicken Antitrust Litig.*,
  2022 WL 2028237 (N.D. Ill. May 4, 2022) ............................................ 7

*Custom Hair Designs by Sandy v. Cent. Payment Co., LLC*,
  984 F.3d 595 (8th Cir. 2020) ............................................................... 17

*DeBoer v. Mellon Mortg. Co.*,
  64 F.3d 1171 (8th Cir. 1995) ......................................................... 11, 15

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974) ....................................................................... 22, 23

*In re Emp. Benefit Plans Sec. Litig.*,
  1993 WL 330595 (D. Minn. June 2, 1993) ............................................ 10

*Grier v. Chase Manhattan Auto Fin. Co.*,
  2000 WL175126 (E.D. Pa. Feb. 16, 2000) ............................................ 10

*Grunin v. Int'l House of Pancakes*,
  513 F.2d 114 (8th Cir. 1975) ............................................................... 10

*Huyer v. Wells Fargo & Co.*,
  295 F.R.D. 332 (S.D. Iowa 2013) ........................................................ 15

*McAdams v. Robinson*,
  26 F.4th 149 (4th Cir. 2022) ............................................................... 22

*In re Monosodium Glutamate Antitrust Litig.*,
  205 F.R.D.229 (D. Minn. 2001) ........................................................... 14

*Paxton v. Union Nat. Bank*,
  688 F.2d 552 (8th Cir. 1982) ............................................................... 16

*Petrovic v. Amoco Oil Co.*,
200 F.3d 1140 (8th Cir. 1999) ..................................................................... 11

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985)..................................................................................... 22

*In re Pork Antitrust Litig.*,
2022 WL 4238416 (D. Minn. Sept. 14, 2022) ........................................... 27

*In re Resideo Techs., Inc., Secs. Litig.*,
2022 WL 872909 (D. Minn. Mar. 24, 2022) .............................................. 26

*Richter v. Bowen*,
669 F. Supp. 275 (N.D. Iowa 1987).............................................................. 14

*In re Titanium Dioxide Antitrust Litig.*,
2013 WL 5182093 (D. Md. Sept. 12, 2013) ............................................... 24

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)..................................................................................... 15

*White v. Nat'l Football League*,
822 F. Supp. 1389 (D. Minn. 1993)........................................................ 9, 10

*White v. Nat'l Football League*,
836 F. Supp. 1458 (D. Minn. 1993)............................................................. 10

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
2013 WL 716088 (D. Minn. Feb. 27, 2013) ............................................... 10

## OTHER AUTHORITIES

Fed. R. Civ. P. 23......................................................................................*passim*

## I.    INTRODUCTION

Consumer Indirect Purchaser Plaintiffs ("Consumer IPPs") move the Court for preliminary approval of their first two settlements reached in this case, with Defendants Cargill, Inc. and Cargill Meat Solutions Corporation (collectively "Cargill"), and Tyson Foods, Inc. and Tyson Fresh Meats, Inc. (collectively "Tyson"). Cargill will pay the Consumer IPP class **$32.5 million** in monetary relief and Tyson will pay **$55 million** in monetary relief, for a total of **$87.5 million** in recovery for the Consumer IPP class to date. Both settled Defendants have also agreed to cooperate in Consumer IPPs' case against the remaining two Defendants. These settlements are the result of arm's-length negotiations, and in the case of the Tyson settlement, made with the assistance of an experienced mediator, Fouad Kurdi. These settlements will provide certain recovery for the Consumer IPP class. Respectfully, Consumer IPPs request that this Court grant preliminary approval of the settlements and certify the proposed Settlement Class for settlement purposes.

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Consumer IPPs also move for an order directing notice of the settlements to the settlement class and approving the plan of allocation. For this process, Class Counsel retained a skilled notice and claims administrator following a competitive bidding process and negotiated a cost ceiling to protect the settlement funds from unnecessary expense. The proposed notices are clear and inform class members of their rights; the notice plan meets the requirements of Rule 23; the allocation plan is fair, adequate, and reasonable; and the distribution plan ensures the disbursement of settlement funds to class members efficiently and with minimal expense.

Defendants Cargill and Tyson have been provided a copy of this motion and proposed notices. Defendant Tyson has no objections. Cargill does not object to the motion but disagrees with the inclusion of named parties in this litigation in the Plaintiffs distribution plan, to include the naming of Kroger in the distribution plan. Scarlett Decl., ¶ 4.[1] Plaintiffs respond to Cargill's concern below.

## II.    SUMMARY OF LITIGATION

This litigation has been pending for six years. Fact discovery is closed. Consumer IPPs' motion for class certification is due to be heard at the beginning of November 2025. These settlements were reached with all counsel very familiar with the strengths and weaknesses of the claims and defenses. Because the Court is familiar with the details of this case, Consumer IPPs only briefly review the history of this litigation below.

The Consumer IPP lawsuit was filed on April 26, 2019, and was later consolidated into an MDL before this Court. The Court appointed Hagens Berman Sobol Shapiro LLP ("Hagens Berman") and Lockridge Grindal Nauen PLLP ("LGN") as Interim Co-Lead Counsel. ECF No. 68. Defendants moved to dismiss the complaint, which this Court granted with leave to amend on September 29, 2020. ECF No. 205 (19-cv-1129). After amendment and a second round of motions to dismiss, on September 14, 2021, the Court largely denied Defendants' motions to dismiss. ECF No. 331 (19-cv-1129).

---

[1] "Scarlett Decl." refers to the Declaration of Shana E. Scarlett in Support of Consumer Indirect Purchaser Plaintiffs' Motion for Preliminary Approval of Settlement Agreements with Cargill and Tyson Defendants and Approval of Notices, Plan of Notice and Plan of Allocation, filed concurrently herewith.

On September 25, 2024, Consumer IPPs moved for class certification. ECF No. 866. With their motion, Consumer IPPs submitted the declaration of an expert economist, Dr. Russell W. Mangum, who testifies as to how common evidence demonstrates liability, impact on the Consumer IPP class, the amount of the overcharge, and pass-through of the overcharge to Consumer IPPs. Using well-accepted econometric methods, including a market structure analysis, a correlation analysis, an overcharge regression analysis, and a pass-through regression analysis, Dr. Mangum measures first the impact of the conspiracy on the direct purchaser class, and then traces this overcharge through to the Consumer IPP class. ECF No. 874. Defendants filed their oppositions to class certification, contrary expert opinions, and a motion to exclude certain portions of Dr. Mangum's opinions on January 24, 2025. ECF Nos. 1139, 1150, 1200. A hearing is currently scheduled for the beginning of November 2025.

From the beginning of the litigation, Hagens Berman and LGN have acted as Co-Lead Counsel on behalf of the Consumer IPP class. As Co-Lead Counsel, these two firms have spent tens of thousands of hours pursuing the claims of the class. This case has involved an intense deposition schedule: 79 depositions of Defendant employees, and 13 non-party depositions noticed by plaintiffs; 25 non-party depositions noticed by Defendants; defending the depositions of the 28 Consumer IPP class representatives; deposing Defendants' class certification expert (Dr. Stiroh), and defending the deposition of Consumer IPPs' class certification expert (Dr. Mangum). Scarlett Decl., ¶ 5.

Document discovery in this case has been no less intense. Defendants have produced over 3.6 million documents that have been reviewed, catalogued, and distilled by attorneys

representing the classes, including many attorneys representing the Consumer IPPs. And Consumer IPPs subpoenaed 36 non-parties for data and information relating to their claims and data to perform an analysis of the pass-through of overcharges to the consumer class. Scarlett Decl., ¶ 6.

Unlike many other civil antitrust actions, this case was developed and brought without the benefit of any adverse findings by the U.S. Department of Justice ("DOJ") or the assistance of a leniency applicant under the DOJ's Corporate Leniency Program. Rather, alleged the conspiracy was identified by Consumer IPPs through the use of investigators and economists, leading to their initial complaint filed against beef producers by downstream purchasers – the Consumer IPP complaint. Scarlett Decl., ¶ 7. Cargill and Tyson deny the alleged conspiracy and any involvement in it.

### III.    SUMMARY OF SETTLEMENT NEGOTIATIONS AND TERMS

### A.    Consumer IPPs' Settlement with Cargill

The settlement between Cargill and Consumer IPPs is the product of confidential, intense, arm's-length negotiations and includes both monetary relief for the class and cooperation in the Consumer IPPs' litigation against the non-settling Defendants. Both parties were represented by experienced and highly sophisticated counsel. The negotiations were contentious, hard-fought, and fully informed and lasted nearly five months. The long-form settlement agreement was signed by both parties on August 22, 2025 ("Cargill Settlement Agreement"). Scarlett Decl., ¶ 8, Ex. A.

The Cargill Settlement Agreement includes a Settlement Class defined as:

All persons and entities who indirectly purchased for personal consumption one or more of the following beef products in the Repealer Jurisdictions[2] between August 1, 2014 to December 31, 2019: beef from Defendants (whether fresh or frozen) made from chuck, loin, rib or round primal cuts. For this lawsuit, beef excludes any product that is marketed as USDA Prime, organic, No Antibiotics Ever ("NAE"), antibiotic free, 100% grass-fed, kosher, halal, certified humane, Wagyu, "American-Style Kobe Beef," as well as any products that are ground, marinated, seasoned, flavored, breaded, or cooked.

Excluded from the class are Defendants, the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir or assign of any Defendant; any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action. Further excluded are purchases of products that contain ingredients other than beef (except for salt or water).

Scarlett Decl., Ex A at ¶ 5. The Settlement Class is the same as the one currently proposed in Consumer IPPs' pending motion for class certification.

The settlement provides that Cargill will pay $32.5 million into a settlement fund that will be used to compensate the Consumer IPP class and cover litigation fees and expenses, including the cost of notifying class members and administering the settlement. Scarlett Decl., Ex. A at ¶¶ 6(b)-(c), 9-10. Co-Lead Counsel believe this sum is fair and reasonable in light of Cargill's market share of class products, the factual record as to Cargill, and the significant cooperation that Cargill agrees to provide. Scarlett Decl., ¶ 8.

---

[2] The Repealer Jurisdictions are: Arizona, California, District of Columbia, Florida, Illinois, Iowa, Kansas, Massachusetts, Maine, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, West Virginia, and Wisconsin.

Cargill agrees to provide the following categories of cooperation to the Consumer IPP class:

- Access to Witnesses. Access to witnesses at any trial if the Defendants are allowed access to those witnesses. Scarlett Decl., Ex. A at ¶ 3.

- Authentication and Admissibility of Documents. Cargill has agreed to cooperate in establishing the authenticity or admissibility of documents produced by Cargill in the action; provided, however, that it is not required to assist in the authenticity or admissibility of documents for summary judgment or at a trial in which non-Consumer IPP claims are contested. *Id.*

- Experts. Cargill has jointly retained experts with non-settling Defendants but will make explicit in any such joint experts, and in any joint expert reports, that they are not offering testimony or opinions on behalf of Cargill against any of the Consumer IPPs. *Id.*

- Summary Judgment. Cargill will not advance arguments at summary judgment against the Consumer IPP case. *Id.*

The Cargill Settlement Agreement sets forth the full terms of the release. By way of summary, upon this Court's decision on final approval of the settlement, Consumer IPPs agree to release and discharge Cargill from any and all claims seeking relief that Consumer IPPs have or ever may have relating in any way to their indirect purchase of beef produced, processed, or sold by Cargill at prices that were allegedly inflated by the claimed anticompetitive conduct between Cargill and its co-conspirators. Scarlett Decl., Ex. A at ¶ 14.

The Cargill Settlement Agreement allows Cargill to terminate the agreement at its sole discretion if a certain number of class members request exclusion. Scarlett Decl., Ex. A at ¶ 21. In the opinion of Co-Lead Counsel, the likelihood of such a provision being

invoked is very low and does not present a significant risk to this settlement. Scarlett Decl., ¶ 9.[3]

Consumer IPPs' settlement with Cargill contains a provision relating to the judgment sharing agreement between the Defendants. Scarlett Decl., Ex. A at ¶ 11. The settlement agrees to remove Cargill's portion of damages from any award after a Consumer IPP trial. *Id.* This type of judgment sharing agreement has been found to be appropriate by other courts.[4]

**B.    Consumer IPPs' Settlement with Tyson**

The settlement between Consumer IPPs and Tyson required the work of an experienced mediator, Fouad Kurdi. The parties first began discussing settlement in April 2025. Discussions lasted months, and were the product of confidential, intense, arm's-length negotiations. Both parties were represented by experienced and highly sophisticated counsel. The long-form settlement agreement was signed by both parties on September 29, 2025 ("Tyson Settlement Agreement"). Scarlett Decl., ¶ 10, Ex. B.

---

[3] With the agreement of all settling parties, Plaintiffs are filing the number of opt-outs required to terminate the agreement in redacted form. If the Court would like to know the number, Plaintiffs will submit sealed versions of the settlement agreement.

[4] *See, e.g.*, *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2022 WL 2028237, at *3 (N.D. Ill. May 4, 2022) ("It is not the Court's role to interfere with that private cost-benefit analysis or the ensuing private agreements unless there is something illegal about those agreements. As discussed, the Court rejects Plaintiffs' arguments that JSAs in general and this JSA in particular are illegal.").

The proposed Tyson Settlement Class is the same as the one contained in the Cargill Settlement Agreement, and the same as the one currently proposed in Consumer IPPs' motion for class certification. Scarlett Decl., ¶ 11, Ex. B at ¶ 5.

Under the Tyson Settlement Agreement, Tyson will pay $55 million into a settlement fund that will be used to compensate the Consumer IPP class and cover litigation fees and expenses, including the cost of notifying class members and administering the settlement. Scarlett Decl., Ex. B at ¶¶ 6, 10, 12, 13. Co-Lead Counsel believe this sum is fair and reasonable in light of Tyson's market share of class products, the factual record as to Tyson, and the significant cooperation that Tyson agrees to provide. Scarlett Decl., ¶ 10.

Tyson agrees to provide the following categories of cooperation to the Consumer IPP class:

- Access to Witnesses. Access to witnesses at any trial if the Defendants are allowed access to those witnesses. Scarlett Decl., Ex. B at ¶ 3.

- Authentication and Admissibility of Documents. Tyson has agreed to cooperate in establishing the authenticity or admissibility of documents produced by Tyson in the action; provided, however, that it is not required to assist in the authenticity or admissibility of documents for summary judgment or at a trial in which non-Consumer IPP claims are contested. *Id.*

- Experts. Tyson has jointly retained experts with non-settling Defendants but will make explicit to any such joint experts, and in any joint expert reports, that they are not offering testimony or opinions on behalf of Tyson against any of the Consumer IPPs. *Id.*

- Summary Judgment. Tyson will not advance arguments at summary judgment against the Consumer IPP case. *Id.*

The Tyson Settlement Agreement sets forth the full terms of the release. By way of summary, upon this Court's decision on final approval of the settlement, Consumer IPPs

agree to release and discharge Tyson from any and all claims seeking relief that Consumer IPPs have or ever may have relating in any way to their indirect purchase of beef produced, processed, or sold by Tyson at prices that were allegedly inflated by the claimed anticompetitive conduct between Tyson and its co-conspirators. Scarlett Decl., Ex. B at ¶¶ 1(p), 14-15.

The Tyson Settlement Agreement allows Tyson to terminate the agreement at its sole discretion if a certain number of class members request exclusion. In the opinion of Co-Lead Counsel, the likelihood of such a provision being invoked is very low and does not present a significant risk to this settlement. Scarlett Decl., ¶ 12.

Consumer IPPs' settlement with Tyson also contains a provision relating to the judgment sharing agreement between the Defendants, removing Tyson's portion of damages from any award after a Consumer IPP trial. Scarlett Decl., Ex. B at ¶ 11. Both Cargill and Tyson are signatories to the same judgment sharing agreement.

## IV.    THE SETTLEMENTS FALL WITHIN THE RANGE OF POSSIBLE APPROVAL

"The policy in federal court favoring the voluntary resolution of litigation through settlement is particularly strong in the class action context."[5] However, courts must review class action settlements to ensure that they are "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

At this preliminary approval stage, the court determines whether the settlement is within the range of possible approval and whether class members should be notified of the

---

[5] *White v. Nat'l Football League*, 822 F. Supp. 1389, 1416 (D. Minn. 1993).

terms of the proposed settlement.[6] Generally, before directing notice to class members, courts preliminarily evaluate the proposed class action settlement pursuant to Rule 23(e).[7] In other words, the court must consider whether it "will likely be able to" approve the settlement as fair, reasonable, and adequate.[8]

As set forth below, Consumer IPPs' agreements with Cargill and Tyson are fair, reasonable, and adequate. Courts attach "[a]n initial presumption of fairness . . . to a class settlement reached in arm's-length negotiations between experienced and capable counsel after meaningful discovery."[9]

## A.    The settlements were reached in arms-length negotiations between experienced and capable counsel.

Courts consistently find that the terms of a settlement are appropriate where the parties, represented by experienced counsel, have engaged in extensive negotiations at an appropriate stage in the litigation and can properly evaluate the strengths and weaknesses of the case and the propriety of the settlement.[10]

---

[6] *White*, 822 F. Supp. at 1399; 2 Newberg on Class Actions, § 11.24 (3d ed. 1992) ("The first step in district court review of a class action settlement is a preliminary, pre-notification hearing to determine whether the proposed settlement is 'within the range of possible approval.'").

[7] *See* Manual for Complex Litigation, (Fourth) § 21.632 (2004).

[8] Fed. R. Civ. P. 23(e)(1)(B)(i); *see* Fed. R. Civ. P. 23(e)(2).

[9] *Grier v. Chase Manhattan Auto Fin. Co.*, No. A.99-180, 2000 WL175126, at *5 (E.D. Pa. Feb. 16, 2000); *see also Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975); *White v. Nat'l Football League*, 836 F. Supp. 1458, 1476–77 (D. Minn. 1993).

[10] *See, e.g., In re Emp. Benefit Plans Sec. Litig.*, Civ. No. 3-92-708, 1993 WL 330595, at *5 (D. Minn. June 2, 1993) (noting that "intensive and contentious negotiations likely result in meritorious settlements . . . ."); *In re Zurn Pex Plumbing Prods. Liab. Litig.*, No. 08-MDL-1958, 2013 WL 716088, at *6 (D. Minn. Feb. 27, 2013) (observing that

Here, all counsel involved are experienced in antitrust matters. Cargill and Tyson are represented by sophisticated defense counsel. Consumer IPPs are represented by two firms who specialize in antitrust matters. The negotiations between counsel were conducted at arm's length – and the Tyson settlement negotiations were overseen by an experienced mediator, Fouad Kurdi, who has been involved in many settlements in the protein litigation cases. The judgment of the litigants and their counsel concerning the adequacy of the settlements weighs in favor of preliminary approval.[11]

**B.    Consumer IPPs have had adequate opportunity to assess the merits of their claims and Cargill's and Tyson's defenses.**

There can be no question that Consumer IPPs have had a chance to adequately assess the merits of their claims and Cargill's and Tyson's defenses. The investigation into this conspiracy began months before the filing of the complaint, as Consumer IPP counsel engaged expert economists and case investigators. Attorneys combed public statements by Defendants, press releases, transcripts of investor calls, and filings with the Securities and Exchange Commission. Scarlett Decl., ¶ 13.

After the motions to dismiss were mostly denied in September 2021, discovery began in earnest. Discovery was intense, involving several rounds of written discovery, dozens of defense witness depositions, production of millions of pages of documents, and

---

"[s]ettlement agreements are presumptively valid, particularly where a 'settlement has been negotiated at arm's-length, discovery is sufficient, [and] the settlement proponents are experienced in similar matters . . . .'") (citation omitted).

[11] *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1149 (8th Cir. 1999); *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995).

subpoenas to dozens of non-parties. In his expert report in support of the Consumer IPPs' motion for class certification, Dr. Russell W. Mangum relied upon approximately 118 gigabytes of cleaned data from Defendants (which equals 46,616,919 transactions (rows) with 78 fields (columns)), and 143 gigabytes of cleaned data from non-parties (which equals 138,296,057 transactions (rows) with 72 fields (columns)). To put this vast amount of data in context, a single Microsoft Word document with a file size of 261 gigabytes would be approximately 16,965,000 pages in length. The work behind this litigation has been significant. Scarlett Decl., ¶ 14.

Access to this volume of information has given the Consumer IPPs sufficient understanding of the strengths and weaknesses of their claims and both Cargill's and Tyson's defenses. The settlements should therefore be accorded a presumption of fairness.

**C.    The settlements provide significant relief to the Consumer IPP class.**

Fed. R. Civ. P. 23(e)(2)(C) requires that a proposed settlement provide "adequate" relief for the class. The proposed settlements easily meet this standard. Consumer IPPs' expert, Dr. Mangum, estimates that Cargill has approximately 21.8 percent of the market for Consumer IPP class products; Tyson is estimated to have 34 percent. The Cargill settlement reflects a valuation of approximately $1.49 million for every market share point. Said differently, if all Defendants settled on the same terms as Cargill, adjusted for their market shares, the case would settle in total for $149 million. The Tyson settlement reflects a valuation of $1.62 million per market share point, reflecting a total settlement of $162 million if all Defendants settled on the same terms as Tyson. Scarlett Decl., ¶ 15.

Viewed through a different lens, Cargill settled for approximately 8 percent of the single damages attributable to them by Dr. Mangum in this litigation, and Tyson settled for approximately 8.6 percent of the single damages attributable to them by Dr. Mangum in this litigation.[12] The following chart shows these measurements:

| Def. | Mkt. Share Class Products | Settlement | Consumer Mkt. Share Pt. | Damages | % Recovery |
|---|---|---|---|---|---|
| Cargill | 21.8% | $32,500,000 | $1.49 | $408,662,702 | 8.0% |
| Tyson | 34.0% | $55,000,000 | $1.62 | $636,466,772 | 8.6% |
| **Total** | | **$87,500,000** | | | |

This is an outstanding result. In addition to the financial compensation, the cooperation that Consumer IPPs have secured from the settlement will bolster Consumer IPPs' claims against the two remaining Defendants.

The proposed settlements also "treat[] class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). Funds will be awarded based on the purchase of qualifying class products. Consumer IPPs propose that class members be allowed to submit claims through a simplified and open online claims process. The funds will then be distributed through an electronic method, *pro rata*, to each class member based on qualifying purchases.

---

[12] Dr. Mangum estimates total damages to the Consumer IPP class as $1,921,687,107. Mangum Reply ¶ 269. ECF No. 1267. *See also* Scarlett Decl., ¶ 16.

## V.    THE COURT SHOULD CERTIFY THE
## PROPOSED SETTLEMENT CLASS

At the preliminary approval stage, the Court must also determine whether to certify the proposed Settlement Class for settlement purposes under Rule 23.[13] Certification of a settlement class must satisfy each requirement set forth in Rule 23(a), as well as at least one of the separate provisions of Rule 23(b).[14] As explained below, this Settlement Class satisfies all the requirements of Rule 23.

### A.    The proposed settlement class satisfies Rule 23(a).

### 1.    Numerosity.

The numerosity requirement of Rule 23(a)(1) is satisfied where joinder of all putative class members is "impracticable." Generally, a class of forty or more plaintiffs is sufficient to satisfy the numerosity requirement.[15] Certainly here, where the proposed class spans over a decade, and the product (beef) is nearly ubiquitous in American households, the low threshold of numerosity is satisfied.

### 2.    Commonality

There are also "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality exists where plaintiffs' claims depend on a "common contention . . . of such a nature that it is capable of classwide resolution—which means that

---

[13] *See, e.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

[14] *Id.* at 613–14; *see also In re Monosodium Glutamate Antitrust Litig.*, 205 F.R.D.229, 231 (D. Minn. 2001) (*citing Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).

[15] *Richter v. Bowen*, 669 F. Supp. 275, 281 n.4 (N.D. Iowa 1987) (citing 3B J. Moore, Moore's Fed. Procedure 23.05[1]).

determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."[16] Here, this case is centered on Defendants' conduct. Consumer IPPs have extensively outlined their collusive conduct in the pending motion for class certification, but certainly issues of: (i) liability; (ii) impact; and (iii) damages are common to the class.

### 3. Typicality.

Under Rule 23(a), typicality is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a). Typicality is closely related to commonality and "a finding of one generally compels a finding of the other."[17] Typicality "is fairly easily met so long as other class members have claims similar to the named plaintiff."[18] "Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims and gives rise to the same legal or remedial theory."[19]

Here, typicality is satisfied because Consumer IPPs' claims are based on the same antitrust conspiracy. Each class member has allegedly suffered the same harm through the purchase of beef in grocery stores that was subject to an overcharge. Each individual class representative has the same interests in pursuing these claims on behalf of the absent Consumer IPP class members. Their claims are therefore typical.

---

[16] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

[17] *Huyer v. Wells Fargo & Co.*, 295 F.R.D. 332, 339 (S.D. Iowa 2013).

[18] *DeBoer*, 64 F.3d at 1174.

[19] *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996).

4.       **Adequacy.**

The named plaintiffs are adequate representatives of the proposed Consumer IPP class. Fed. R. Civ. P. 23(a)(4). Courts ask whether "(1) the class representatives have common interests with the members of the class, and (2) whether the class representatives will vigorously prosecute the interests of the class through qualified counsel."[20]

Here, the named plaintiffs have no material conflict with other class members. Each purchased beef from grocery stores, unaware of the existence of Defendants' alleged agreement to stabilize the supply and price of beef. No one individual class member could avoid the claimed overcharges. Each named plaintiff is aligned with the class in establishing Defendants' liability and maximizing class-wide damages.

The named plaintiffs have fulfilled their duties as class representatives by actively participating in the litigation. Each representative has approved the terms of this settlement and remains apprised of the status of the case. Scarlett Decl., ¶ 17.

**B.      The proposed settlement class satisfies Rule 23(b)(3).**

Under Rule 23(b)(3), plaintiffs must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Consumer IPPs satisfy both of these requirements here.

---

[20] *Paxton v. Union Nat. Bank*, 688 F.2d 552, 562-63 (8th Cir. 1982).

*First*, common questions of law or fact predominate over individual questions. "Slight variation in *actual damages* does not defeat predominance if there are common legal questions and common facts."[21] Here, Consumer IPPs allege that a series of common questions lies at the heart of every class member's claims, including: whether Defendants conspired to lower beef output and raise prices; whether Defendants' information exchange was anticompetitive; whether Defendants' conspiracy caused market-wide supra-competitive beef prices; and whether higher beef prices were passed on to beef consumers.

*Second*, a class action is the superior mechanism for trying Consumer IPPs' claims. Rule 23 instructs that the matters pertinent to this inquiry include: (a) class members' interests in individually controlling the prosecution of separate actions; (b) whether other litigation exists concerning this controversy; (c) the desirability of concentrating the litigation in this forum; and (d) any difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3). In this case, the first three factors weigh heavily in favor of class certification: class members have little economic incentive to sue individually based on the amount of potential recovery involved, and no other known litigation exists regarding these claims.

The Court need not consider the final factor (whether a trial would be manageable) when assessing a potential settlement, as a settlement obviates the need for a trial.

---

[21] *Custom Hair Designs by Sandy v. Cent. Payment Co., LLC*, 984 F.3d 595, 602 (8th Cir. 2020) (emphasis in original).

*Finally*, the proposed Settlement Class is ascertainable. Here, a class member may self-identify simply by reviewing the class definition. Consumer IPPs discuss this further below. *See* section VII.D.

## C.    Co-Lead Class Counsel request appointment under Rule 23(g).

The Consumer IPPs respectfully request that Hagens Berman and LGN be appointed as Settlement Class Counsel under Rule 23(g) for the Consumer IPP class. These two firms have litigated this case on behalf of Consumer IPPs for nearly five years. Each firm has devoted considerable time and resources to prosecute this action since its inception, and each is committed to continuing to do so. The firms have overseen the litigation strategy, the briefing and argument of motions, the coordination and review of millions of documents from Defendants and third parties, the taking and defending of dozens of depositions, and the retention of experts. Moreover, both firms know the relevant law and have experience litigating similar antitrust actions to a successful end.[22]

## VI.    THE COURT SHOULD APPOINT THE HUNTINGTON NATIONAL BANK AS ESCROW AGENT

Consumer IPPs respectfully ask the Court to appoint The Huntington National Bank as the escrow agent for the Settlements, to maintain the Qualified Settlement Funds as called for in the Settlement Agreements (*see* Settlement Agreements ¶ 12), and to provide escrow services for the Settlements. The Huntington National Bank's qualifications are attached as Exhibits A and B to the Declaration of Robyn Griffin filed contemporaneously

---

[22] Decl. of Shana E. Scarlett in Supp. of Consumer Indirect Purchaser Pls.' Mot. for Class Certification, ECF No. 869, Exs. 102-103 (Firm Resumes of Hagens Berman and LGN).

herewith.

## VII.  THE COURT SHOULD APPROVE THE PLAN OF NOTICE AND PLAN OF ALLOCATION

Class Counsel retained of Epiq Class Action & Claims Solutions, Inc. ("Epiq") to serve as notice and claims administrator; the claims administrator has the expertise to oversee notice and distribution to this nationwide class of consumer indirect purchasers. Azari Decl., ¶¶ 4-7.[23] Moreover, counsel has the expertise to supervise this set of notices and distribution, being well familiar with indirect purchaser and direct purchaser antitrust cases. In addition, as a safeguard to the class, class counsel has negotiated a cap on the costs of the notice and claims administration in this case of $1.772 million. If further funds are needed, class counsel will seek court approval. In this way, class counsel continues to be zealous advocates on behalf of the class. *See* section VII.A

Working together, Epiq and class counsel have a set of proposed notices to send to the class regarding these settlements. Three notices are proposed for the Court's review – (1) an email notice, (2) a set of "Frequently Asked Questions" or FAQs to be put on the settlement website, and (3) an example banner advertisements that will be used in the indirect notice campaign. These notices were drafted with simple, clear language, to apprise class members of their rights and options. *See* section VII.B.

And the proposed notice plan includes a robust combination of direct and indirect notices. Over 35 million class members will receive direct email notice of the settlements;

---

[23] "Azari Decl." refers to the Declaration of Cameron R. Azari, Esq. Regarding Notice Program, filed concurrently herewith.

and an online digital campaign over six weeks will provide notice to many remaining class members. The claims administrator opines that this notice program will reach at least 70 percent of the class. *See* section VII.C.

Finally, Consumer IPPs request preliminary approval of the plan of allocation and distribution. Consumer IPPs propose that the funds will be allocated according to the amount of beef class products purchased by a class member. Plaintiffs submit a claims form with this motion for the Court's approval, and briefly describe the intended plan of distribution. Consumer IPPs also address Cargill's concern that the distribution plan includes a Direct Action Plaintiff (DAP), Kroger, as one of the proposed distribution points. *See* section VII.D.

## A.    Class Counsel selected an experienced claims administrator through a fair selection process, and the administrator has agreed to a cap on costs.

In selecting a notice and claims administrator, class counsel sent a request for proposal to multiple nationwide claims administrators. Class Counsel reviewed the bids and tried to align the bids to be as close a comparison as possible. Class Counsel required each vendor to make the following commitments:

- *[The Administrator] will disclose all related entities that it intends to engage in this litigation.*

- *[The Administrator] does not have and will not enter into an agreement or financial arrangement with another entity by which it receives any financial compensation in any way related to this Settlement or Litigation other than compensation expressly agreed to and directed by Class Counsel.*

- *[The Administrator] does not have a personal relationship (including but not limited to familial, romantic, or financial/business) with any Class Counsel employee, partner, and/or owner.*

- *[The Administrator] agrees that any digital payment cards and gift cards that are never redeemed, claimed, or activated shall be treated the same as uncashed checks.*

Scarlett Decl., ¶¶ 18-19. In addition to these commitments, Class Counsel asked each vendor to commit to a cap of costs for notice and distribution in this case. Epiq met all of these conditions. Epiq has committed to a cap of $1.772 million for the notice and claims distribution in this case. Azari Decl., ¶ 46. If there is a change of circumstances that warrants a deviation, Class Counsel will return to this Court to provide an explanation. Epiq has agreed to this process. Class Counsel believes that these disclosures and commitments are in the best interests of the class and ensure that the class's funds are being zealously guarded. Scarlett Decl., ¶ 19. Consumer IPPs request appointment of Epiq as the notice and claims administrator.

**B.    The proposed form of class notice clearly and fairly apprises class members of the nature of this action and the scope of their rights.**

In any class action certified under Rule 23(b)(3), the court must direct notice of class certification to class members using "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The class notice "must clearly and concisely state in plain, easily understood language" the following: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on class members. *Id.*

Because the results of a certified Rule 23(b)(3) class action bind class members unless they affirmatively opt out, this notice protects the constitutional due process rights of absent class members.[24] To satisfy Rule 23 and due process, the class notice should be "reasonably calculated, under all the circumstances, to apprise [absent class members] of the pendency of the action and afford them an opportunity to present their objections."[25]

The notice must "fairly apprise" prospective class members of both the settlement terms and their options.[26] In particular, the notice must describe the settlement terms "in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard."[27] Notices generally need not estimate the amount of class members' individual recovery as it is "difficult, if not impossible, for parties to reliably predict the number of valid claims when drafting notices."[28]

Plaintiffs and the claims administrator worked to propose forms of notice that are highly informative and readily accessible. In clear, simple language, the proposed notices describe the settlement classes' definitions, the allegations and claims, the objection and opt-out procedures, and the right of any class member who does not opt out to appear at

---

[24] *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173–74 (1974).

[25] *McAdams v. Robinson*, 26 F.4th 149, 157 (4th Cir. 2022) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)).

[26] *Id.* (quoting *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 114 (2d Cir. 2005)).

[27] *Id.* (quoting *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 946 (9th Cir. 2015)).

[28] *Id.* at 158.

the fairness hearing. If class members require additional information, the proposed website notice provides the claims administrator's and Class Counsel's contact information. Plaintiffs provide three forms of notice here – the proposed email notice, proposed Frequently Asked Questions (FAQs), and proposed sample digital ads. Azari Decl., Exs. 2-4. Plaintiffs have also worked with the claims administrator to create a list (which will be included in the form of a lookup table on the website), to allow class members to identify qualifying product by the names which these beef products are commonly found at a grocery store. *Id.*, Ex. 5. Plaintiffs believe this will assist class members to easily complete their claims form confident in what products will qualify for settlement funds. Plaintiffs also request the ability to amend the Frequently Asked Questions from time-to-time, to ensure that class members stay updated on developments in this litigation.

The proposed notices plainly satisfy the requirements of due process and the specific requirements of Rule 23(c)(2)(B). Plaintiffs respectfully request that the Court approve the contents of the proposed notices.

**C.    The proposed manner of notice dissemination is reasonable and represents the best notice practicable under the circumstances.**

Class actions certified under Rule 23(b)(3) require "the best notice practicable under the circumstances," including "individual notice to all members who can be identified through reasonable effort."[29] Notice that is mailed to each member of a settlement class "who can be identified through reasonable effort" constitutes the best notice practicable.[30]

---

[29] *Eisen*, 417 U.S. at 173.

[30] *Id.* at 176.

Notice may also be by electronic means. Fed. R. Civ. P. 23(c)(2)(B). And when class members cannot be individually identified, notice by publication "constitutes a reasonable effort to provide notice to class members."[31]

Consumer IPPs propose a state-of-the-art notice program designed by an experienced notice and claims administrator. The notice program includes (1) direct email notice, (2) a case-specific website, (3) supplemental paid media, (4) earned media, and (6) a case-specific toll-free number.

**Direct Email Notice**. Consumer IPPs subpoenaed and received contact information for approximately 36 million potential class members (although deduplication has not yet occurred), from non-parties Walmart, Sam's Club, and Costco. Amazon has agreed to provide direct notice to a significant number of additional class members who purchased class products. Scarlett Decl., ¶ 20. For these more than 36 million class members, they will receive individual email notice either through Amazon or the claims administrator. For those receiving email notice, the claims administrator will perform several tasks to maximize deliverability and avoid spam and junk filters. These tasks include running the list of recipient email addresses through a deliverability analysis to ensure the email addresses are valid and working with email service providers to develop sending strategies to achieve optimal deliverability. The claims administrator will also incorporate certain best practices to maximize deliverability, such as ensuring no inclusion of words or phrases

---

[31] *See, e.g.*, *In re Titanium Dioxide Antitrust Litig.*, No. RDB-10-0318, 2013 WL 5182093, at *5 (D. Md. Sept. 12, 2013).

known to trigger spam or junk filters, not including attachments to the email, and sending the emails in tranches over a period of days or weeks. Azari Decl., ¶ 27.

**Website Notice**: Consumer IPPs have already purchased a website, www.overchargedforbeef.com to communicate with class members. This website is in the process of being populated with important information regarding this case, including the complaint, the Court's motion to dismiss order, this motion for preliminary approval, the settlement agreements themselves, and the redacted versions of Consumer IPPs' class certification motion and expert reports. Upon approval of this notice program, Consumer IPPs will ensure that the website contains the notices, answers to set of "frequently asked questions" or FAQs (which will be updated by class counsel as the case progresses), and relevant deadlines for class members. Azari Decl., ¶ 41. The current list of FAQs and the answer is submitted for review of this Court. Azari Decl., Ex. 3.

The entire media campaign and settlement website will use a standard logo that will help class members identify the correct official settlement website. Each piece of the campaign – the simple text, standard logo, and eye-catching colors on the online banner ads and social media newsfeed ads – is designed to alert class members about the case. The logo is as follows:



**Supplemental Paid Media**. Plaintiffs also propose a paid media campaign on both digital and social media to reach class members who did not receive direct email notice. The ads – which will appear on desktops, tablets, and mobile devices for up to six weeks on Google Display Network, YouTube, Facebook, Instagram, and Reddit – are estimated to achieve approximately 307 million gross impressions. The ads will appear nationally and also be geotargeted within the class states. Azari Decl., ¶ 36. An example of a sponsored advertisement is submitted for the Court's review. Azari Decl., Ex. 4.

Sponsored search listings will also appear on Google, the most-visited search engine, and other search partners. A person will be able to use specific target phrases or keywords to search for information, and the link to the case-specific website may appear on the search result pages. This supplemental paid media is flexible and will be adjusted as necessary to provide sufficient notice coverage. Azari Decl., ¶ 38.

**Earned Media.** The proposed notice plan also includes a press release calculated to reach traditional media outlets (television, radio, newspapers, magazines), news websites, and journalists nationwide. News about the settlements will also be distributed via X (formerly known as Twitter) to thousands of media outlets, journalists, and other followers. Azari Decl., ¶ 39.

**Toll-Free Number**. The claims administrator will maintain a case-specific toll-free telephone number with an automated interactive voice response system. The automated interactive voice response system will present callers with a series of choices to hear prerecorded information concerning the settlements. Azari Decl., ¶ 42.

\*    \*    \*

It is the opinion of the claims administrator, experienced in complex class actions, that this notice program is constitutional and guarantees that 70 percent of the class will receive notice. Azari Decl., ¶ 52.

**D.    The proposed claims process and plan of allocation are fair and reasonable.**

Allocation plans must pass muster under Fed. R. Civ. P. 23(e)(2)(C)(ii). Courts evaluate the fairness, reasonableness, and adequacy of proposed allocation plans to determine whether class members are treated "equitably relative to each other."[32] *Pro rata* allocation plans are routinely approved by courts as fair, adequate, and reasonable.[33]

Here, Consumer IPPs propose that the funds will be allocated according to the amount of beef class products purchased by a class member. The claims form asks for simple details regarding the number of qualifying purchases through a brief, simple set of questions. No documentation is required unless there is a potentially suspicious number of purchases or amount of costs claimed. Azari Decl., ¶ 44.

Consumer IPPs also propose a distribution plan which will provide for efficient and cost-effective disbursement of the settlement funds to class members. Settlement Class members must submit a timely, valid claim through the settlement website or by mail to be eligible to receive payment. Payments will be sent electronically to each eligible claimant

---

[32] *In re Resideo Techs., Inc., Secs. Litig.*, No. 19-CV-2863, 2022 WL 872909, at \*3 (D. Minn. Mar. 24, 2022) (citing Fed. R. Civ. P. 23(e)(2)(D)); *see also In re Pork Antitrust Litig.*, No. CV 18-1776, 2022 WL 4238416, at \*7 (D. Minn. Sept. 14, 2022).

[33] *See, e.g.*, *Resideo*, 2022 WL 872909, at \*3; *Pork*, 2022 WL 4238416, at \*7.

using the email address provided on the Claim Form. At the time of distribution, each eligible claimant will be provided with several electronic options to instantaneously receive their payment. Working with the claims administrator, Class Counsel selected six digital options for class members to receive money (Walmart, Amazon, Starbucks, Kroger, PayPal, Venmo) and the option of a hard copy check. It is the opinion of both the claims administrator and Co-Lead Class Counsel, that this represents the right balance of accessibility for class members, a direct relationship to the good at issue (a commonplace staple in people's grocery carts), and the ease of digital payments.

Upon hearing a concern from Cargill regarding the use of Kroger as and end-point in the distribution plan, Class Counsel sought the advice of the experienced claims administrator whether there was a different and equal option. It is the opinion of the claims administrator that Kroger would be the best grocery store option for this class. If the administrators were required to find a substitute, more than one grocery store would have to be selected to replace a grocery store of the magnitude of Kroger (and its many sub-brands). Azard Decl., ¶ 45.

Consumer IPPs propose that class members be able to submit claims through June 30, 2026. If that deadline needs to be moved, because of additional settlements or for another reason, Consumer IPPs will make such a request to the Court. After the initial round of settlements, Consumer IPPs propose a second round of distribution be made to class members which would take into account the efficiencies of administrative costs.

This may mean that the second-round distribution will be made only to class members who participated in the first round of distribution, and a flat amount for

distribution, or tiered amounts of distribution, would be the most efficient way to effect a second round. Any remaining funds after the second round of distribution would escheat to the relevant governmental authorities responsible for enforcing the antitrust laws.

Thus, Consumer IPPs respectfully request that the Court approve the proposed claim form, as well as the proposed plan of allocation.

## VIII. PROPOSED SCHEDULE

The last step in the settlement approval process is the final approval hearing at which the court may hear all evidence necessary to evaluate the proposed settlements. At that hearing, proponents of the settlements may explain and describe their terms and conditions and offer argument in support of the settlements' approval, and members of the Settlement Class or their counsel may be heard regarding the proposed settlements if they choose.

Consumer IPPs propose the following schedule for the dissemination of notice, period for objections, and motion for final approval:

| Task | Proposed Deadline |
|---|---|
| Notice campaign begins through direct email and implementation of publication notice campaign | No later than 75 days after order directing notice |
| Last day for Co-Lead Counsel to move for attorneys' fees, expenses, and service awards for named representatives | 76 days from commencement of notice campaign |
| Last day for Settlement Class members to request exclusion from the class, to object to Settlement, to file notices to appear at the final approval hearing | 90 days from order directing notice |
| Co-Lead Counsel to provide Cargill and Tyson with a list of all persons and | 97 days from order directing notice |

| Task | Proposed Deadline |
|---|---|
| entities who have timely and adequately requested exclusion from the Settlement Class | |
| Co-Lead Counsel shall file a motion for final approval of the Settlement and all supporting documents, as well as responses to any objections to the settlement or attorneys' fees | 14 days before the Final Approval Hearing |
| Final Approval Hearing, and Hearing on Request for Attorneys' Fees and Expenses | 40 days after the last day to request exclusion from the Settlement, or as soon thereafter as may be heard by the Court |

## IX.    CONCLUSION

For these reasons, Consumer IPPs respectfully request that the Court preliminarily approve the settlements with Cargill and Tyson, certify the Settlement Class, and direct notice in the form and manner and on the schedule, proposed here.

DATED: October 6, 2025                    Respectfully submitted,

  *s/ Shana E. Scarlett*                          *s/ Brian D. Clark*
Shana E. Scarlett (*pro hac vice*)          Brian D. Clark (#0390069)
Abby R. Wolf (*pro hac vice*)               W. Joseph Bruckner (#0147758)
**HAGENS BERMAN SOBOL SHAPIRO LLP**         Arielle S. Wagner (#0398332)
715 Hearst Avenue, Suite 300                Simeon A. Morbey (#0391338)
Berkeley, California 94710                  Olivia T. Levinson (#0402953)
T: (510) 725-3000                           **LOCKRIDGE GRINDAL NAUEN PLLP**
F: (510) 725-3001                           100 Washington Avenue South, Suite 2200
shanas@hbsslaw.com                          Minneapolis, MN 55401
abbyw@hbsslaw.com                           T: (612) 339-6900
                                            wjbruckner@locklaw.com
Steve W. Berman (*pro hac vice*)            bdclark@locklaw.com
Breanna Van Engelen (*pro hac vice*)        aswagner@locklaw.com
**HAGENS BERMAN SOBOL SHAPIRO LLP**         samorbey@locklaw.com
1301 Second Avenue, Suite 2000              otlevinson@locklaw.com

Seattle, Washington 98101
T: (206) 623-7292
F: (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

Elaine T. Byszewski (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
301 North Lake Avenue, Suite 920
Pasadena, California 91101
T: (213) 330-7150
elaine@hbsslaw.com

Kyle Pozan (*pro hac vice*)
**LOCKRIDGE GRINDAL NAUEN PLLP**
1165 North Clark Street, Suite 700
Chicago, Illinois 60610
T: (312) 470-4333
kjpozan@locklaw.com

*Interim Co-Lead Class Counsel for the*
*Consumer Indirect Purchaser Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney of record hereby certifies that a true and correct copy of the foregoing was filed electronically through the Court's CM/ECF system. Notice and a copy of this filing will be served upon all counsel of record by operation of the Court's CM/ECF system.

DATED: October 6, 2025

                                        *s/ Shana E. Scarlett*
                                        SHANA E. SCARLETT