**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| IN RE: CATTLE AND BEEF ANTITRUST LITIGATION | MDL No. 22-3031 (JRT/JFD) |
| This Document Relates To: | **MEMORANDUM OPINION AND ORDER GRANTING IN PART DIRECT PURCHASER PLAINTIFFS', CONSUMER INDIRECT PURCHASER PLAINTIFFS', AND COMMERCIAL AND INSTITUTIONAL INDIRECT PURCHASER PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION AND DENYING DEFENDANTS' MOTIONS TO EXCLUDE EXPERT TESTIMONY** |
| DIRECT PURCHASER PLAINTIFFS, COMMERICAL AND INSTITUTIONAL INDIRECT PURCHASER PLAINTIFFS, CONSUMER INDIRECT PURCHASER PLAINTIFFS ACTIONS | |

In this multidistrict litigation alleging price-fixing in the cattle and beef industry, five groups of plaintiffs seek class certification. This Order addresses the motions of three of the five groups—namely, the plaintiffs who directly or indirectly buy beef from Defendants: (1) the Direct Purchaser Plaintiffs (DPPs),[1] (2) the Commercial and Institutional Indirect Purchaser Plaintiffs (CIIPPs),[2] and (3) the Consumer Indirect

---

[1] As further discussed herein, the DPPs are generally people or entities that purchased beef directly from Defendants.

[2] As further discussed herein, CIIPPs are generally restaurants, caterers, and other institutional food preparers that indirectly purchased beef from Defendants for their use in commercial food preparation.

Purchaser Plaintiffs (Consumer IPPs)[3] (collectively, "Downstream Plaintiffs").  Each Downstream Plaintiff seeks certification of a damages class.  The CIIPPs also seek certification of an injunctive relief class.  Each Downstream Plaintiff submitted expert testimony in support of their motions for class certification.  Defendants oppose the motions for class certification and request that the Court exclude portions of the experts' testimony.

Because the Court finds that the less stringent *Daubert* standard employed at the class certification stage is satisfied, it will deny Defendants' motions to exclude the experts' testimony.  The Court will grant each Downstream Plaintiff's motion for class certification with respect to the proposed damages classes because the Court finds that, after rigorous analysis, the Downstream Plaintiffs have met their burden for these proposed classes under Federal Rule of Civil Procedure 23(b)(3).  The Court will decline to certify the CIIPPs' injunctive relief class at this time, but it will allow the CIIPPs to renew their motion for certification of a Rule 23(b)(2) class at a later date, should they choose to do so.

---

[3] As further discussed herein, the Consumer IPPs are persons who indirectly purchased beef from Defendants for their personal consumption.

**BACKGROUND**

I.    **FACTS**

Beginning in 2019, a series of class actions and individual actions were filed against the leading American beef packers alleging a conspiracy to generate elevated beef profit margins in violation of federal and state antitrust laws, the Packers & Stockyards Act, 7 U.S.C. §§ 181–229, and the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*  Those actions have been consolidated into this multidistrict litigation under 28 U.S.C. § 1407.[4]

Plaintiffs include both Upstream Plaintiffs,[5] who directly or indirectly sell cattle either to Defendants, and Downstream Plaintiffs, who directly or indirectly purchase beef from Defendants.[6]

---

[4] *In re Cattle Antitrust Litig.*, Civ. No. 19-1222; *In re Cattle and Beef Antitrust Litig.*, Civ. No. 20-1319; (*see also* Certified Copy of Transfer Order, MDL No. 22-3031, June 3, 2022, Docket No. 1.).

[5] Upstream Plaintiffs include (1) the Indirect Seller Plaintiffs (who also refer to themselves as the Feeder Plaintiffs) and (2) the Cattle Plaintiffs.  The motions of the Upstream Plaintiffs and Defendants' motions to exclude Upstream Plaintiffs' experts are addressed in a concurrent order.

[6] For ease, all record citations in this Order are presented in a short form.  Full record citations for all documents cited in this Order (and in the concurrent order addressing Upstream Plaintiffs) are included in Appendix 1.

Defendants[7] are beef packers who purchase cattle from feedlots ("fed cattle"), slaughter the cattle, and then process the resulting carcasses into beef to be sold. Defendants' profits are driven by both the cost they pay for the fed cattle and the price they charge for the sale of beef. Collectively, Defendants account for over 80 percent of the fed cattle bought, slaughtered, and sold as beef in the United States. (*See* Defs.' Omnibus Br. at 18, Docket No. 1200 (noting that the combined market share of the four largest beef packers has not significantly changed since the early 1990s).)

## II.    PROCEDURAL HISTORY

In September 2021, the Court began consolidating the direct purchaser plaintiff cases filed in the District of Minnesota for pretrial proceedings. (*See, e.g.*, Civil No. 19-1222, Order, Sept. 1, 2021, Docket No. 408.) The Cattle Class Plaintiffs, Consumer IPPs, CIIPPs, and some direct action plaintiffs requested that all cases be coordinated for pretrial purposes to simplify the proceedings. (Civil No. 20-1319, Stipulation, Oct. 8, 2021, Docket No. 246.) The Court agreed coordination would be efficient and coordinated the cases for pretrial proceedings under Civil No. 20-1319, which it renamed to *In re Cattle*

---

[7] "Defendants" refer to Cargill, Inc. and Cargill Meat Solutions Corporation (collectively, "Cargill"); JBS S.A., JBS USA Food Company, Swift Beef Company, and JBS Packerland, Inc. (collectively, "JBS"); National Beef Packing Company, LLC ("National Beef"); and Tyson Foods, Inc. and Tyson Fresh Meats, Inc. (collectively, "Tyson"). (*See, e.g.*, DPPs' Third Consol. Am. Class Action Compl. at 1; CIIPPs' Third Am. Class Action Compl. at 1; CIPPs' Sixth Am. Class Action Compl. ¶¶ 59–76.)

*and Beef Antitrust Litigation.* (Civil No. 20-1319, Order on Stipulation, Oct. 13, 2021, Docket No. 252.)

In 2022, additional cases brought by individual plaintiffs were filed in other federal district courts involving the same issues. (MDL No. 22-3031, Certified Copy of Transfer Order at 1, June 3, 2022, Docket No. 1.) Pursuant to 28 U.S.C. § 1407(a), the United States Judicial Panel on Multidistrict Litigation formed MDL No. 3031 and transferred three cases to this Court on June 3, 2022, finding that the cases involved common questions of fact and centralization in this Court would "serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation." (*Id.* at 1.)

The Court then consolidated the MDL Cases for pretrial proceedings under a master docket case entitled "*In re: Cattle and Beef Antitrust Litigation.*" (*See* MDL No. 22-3031, Pretrial Order No. 1, Docket No. 21, Oct. 4, 2022.) In Pretrial Order No. 2, the Court appointed liaison counsel for the Direct Action Plaintiffs (DAPs), Indirect Seller Plaintiffs, Cattle Plaintiffs, DPPs, Consumer IPPs, and CIIPPs. (MDL No. 22-3031, Dec. 1, 2022, Docket No. 91.) In Pretrial Order No. 3, the Court outlined the process by which future direct action plaintiffs could join the MDL. (MDL. No. 22-3031, Feb. 3, 2023, Docket No. 139.) Numerous additional DAPs have since joined the litigation.[8]

---

[8] Since the DAPs are not relevant to the present motions for class certification and motions to exclude expert testimony, they will not be discussed in detail.

### III.    PROPOSED CLASSES

All Plaintiffs filed motions for class certification on September 25, 2024. Defendants oppose Plaintiffs' class certification motions. In this section, the Court will summarize the classes proposed by the Downstream Plaintiffs.

### A.    Direct Purchaser Plaintiffs

Direct Purchaser Plaintiffs (DPPs) are, generally, people or entities that bought beef directly from Defendants. (*See* DPPs' Third Consol. Class Action Compl. ¶¶ 32–34.) The DPPs seek relief under the Sherman and Clayton Acts and ask the Court to certify the following class under Rule 23(b)(3):

> All persons and entities who directly purchased Beef for use or delivery in the United States, whether fresh or frozen, made from one of the following primals: chuck, loin, rib or round from Defendants, or their respective subsidiaries or affiliates, from January 1, 2015, to February 29, 2020. For this lawsuit, beef excludes any product that is marketed as organic, grassfed, kosher, halal, certified humane, Wagyu, "American-Style Kobe Beef", and any product that is cooked, ground, marinated, seasoned, flavored, or breaded.[9]

(DPPs' Mot. at 1.)

---

[9] Excluded from the class are Defendants, the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir or assign of any Defendant; any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action. (DPPs' Mot. at 1–2.)

DPPs propose naming the following named plaintiffs as Class Representatives: Gregg Szilagyi,[10] solely in his capacity as Chapter 7 trustee for the bankruptcy estate of Central Grocers, Inc.; R & D Marketing, LLC; and Redner's Markets, Inc.  (*Id.* at 1.)

DPPs ask the Court to appoint their interim co-lead counsel, Gustafson Gluek, PLLC; Hartley LLP; Hausfeld LLP; and Cotchett Pitre & McCarthy, LLP, as Class Counsel.  (*Id.* at 2.)

### B.      Commercial and Institutional Indirect Purchaser Plaintiffs

Commercial and Institutional Indirect Purchaser Plaintiffs (CIIPPs) are, generally, restaurants, caterers, and other institutional food preparers that indirectly purchased beef from Defendants for their use in commercial food preparation.  (*See* CIIPPs' Third Am. Class Action Compl. ¶¶ 31–46.)  The CIIPPs move to certify two classes: a CIIPP Injunctive Relief Class, pursuant to Rule 23(b)(2), and a CIIPP Monetary Damages Class, pursuant to Rule 23(b)(3).

### 1.      CIIPP Injunctive Relief Class

For the Injunctive Relief Class, CIIPPs seek relief under the Sherman Act and ask the Court to certify the following class under Rule 23(b)(2):

> All entities in the United States that indirectly purchased one or more of the following types of raw beef, fresh or frozen: brisket, chuck, loin, rib, or round, sold by Defendants in the United States from January 1, 2015, to February 29, 2020, for their own use in commercial food preparation.  For this lawsuit, beef products exclude[]: non-fed beef, ground beef, trim beef, beef identified as cooked, beef products with non-

---

[10] Gregg Szilagyi has been substituted for Howard Samuels as Chapter 7 Trustee of the Estate of Central Grocers, Inc. (Order, May 5, 2026, Docket No. 1589).

beef ingredients other than seasonings, or any product that is marketed as USDA Prime.[11]

(CIIPPs' Mot. at 2.)

### 2.      Damages Class

For the Damages Class (also referred to as the "CIIPP Monetary Damages Class"), CIIPPs seek relief under the applicable state antitrust and consumer protection statutes and state common law claims for unjust enrichment and ask the Court to certify the following class under Rule 23(b)(3):

> All entities in the Indirect Purchaser States[12] that indirectly purchased one or more of the following types of raw beef, fresh or frozen: brisket, chuck, loin, rib, or round, sold by Defendants in the Indirect Purchaser States from January 1, 2015, to February 29, 2020, for their own use in commercial food preparation.  For this lawsuit, beef products exclude[]: non-fed beef, ground beef, trim beef, beef identified as

---

[11] Excluded from this Class are: natural persons who purchased beef for their personal use and not for commercial food preparation; purchases of beef for resale in unaltered form; purchases of beef from an intermediary who has further processed the beef; the Defendants and their Co-Conspirators; the officers, directors or employees of any Defendant or Co-Conspirator; any entity in which any Defendant or their Co-Conspirator has a controlling interest; any entity with an interest, controlling or non-controlling, in a Defendant or their Co-Conspirator; any (in whole or in part), affiliate, legal representative, heir or assign of any Defendant or their Co-Conspirator; any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any Co-Conspirator identified in this action.  (CIIPPs' Mot. at 2.)

[12] The Indirect Purchaser States consist of Arizona, Arkansas, California, the District of Columbia, Hawaii, Florida, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, Nevada, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.  (*Id.* at 2 n.1.)

cooked, beef products with non-beef ingredients other than seasonings, or any product that is marketed as USDA Prime.[13]

(*Id.* at 2–3.)

In the alternative, CIIPPs request the certification of subclasses by claim type or certification of subclasses for each state in which a CIIPP class representative is located. (*See id.* at 2 n.1.)

### 3.    Class Representatives & Class Counsel

For both proposed classes, CIIPPs request that the Court appoint the following named plaintiffs as Class Representatives: The Grady Corporation II formerly d/b/a Whole hog Café; Steve Sizemore formerly d/b/a Longhorn's Steakhouse; Pearlz Oyster Bar; Park Tavern; Union Public House; Sandee's Bakery d/b/a Sandee's Catering Bakery & Deli; Grub Stake; Max and Bella's Smokehouse, LLC; Yoland Shegian d/b/a LA Shawarma; BW-SS, Inc.; Maquoketa Care Center; Fernando's Street Kitchen; Jim's Place Grille; and Farah's Courtyard Deli, Inc.  (*Id.* at 1.)

---

[13] Excluded from this Class are: natural persons who purchased beef for their personal use and not for commercial food preparation; purchases of beef for resale in unaltered form; purchases of beef from an intermediary who has further processed the beef; the Defendants and their Co-Conspirators; the officers, directors or employees of any Defendant or Co-Conspirator; any entity in which any Defendant or their Co-Conspirator has a controlling interest; any entity with an interest, controlling or non-controlling, in a Defendant or their Co-Conspirator; any (in whole or in part), affiliate, legal representative, heir or assign of any Defendant or their Co-Conspirator; any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any Co-Conspirator identified in this action.  (*Id.* at 2.)

CIIPPs ask the Court to appoint their interim co-lead counsel, Sterling Aldridge of Barrett Law Group, P.A.; Michael Flannery of Cuneo Gilbert & LaDuca, LLP; and Shawn M. Raiter of Larson King, LLP, as Class Counsel.  (*See* CIIPPs' Mem. at 27.)

### C.       Consumer Indirect Purchaser Plaintiffs

Consumer Indirect Purchaser Plaintiffs (Consumer IPPs) are, generally, people who purchased beef from Defendants for their personal consumption.  (*See* CIPPs' Sixth Am. Class Action Compl. ¶¶ 31–58.)  The Consumer IPPs seek relief under the Sherman and Clayton Acts and ask the Court to certify the following class under Rule 23(b)(3):

> All persons and entities who indirectly purchased for personal consumption one or more of the following beef products in the Repealer Jurisdictions between August 1, 2014 to December 31, 2019: beef from Defendants (whether fresh or frozen) made from chuck, loin, rib or round primal cuts.  For this lawsuit, beef excludes any product that is marketed as USDA Prime, organic, No Antibiotics Ever ("NAE"), antibiotic free, 100% grass-fed, kosher, halal, certified humane, Wagyu, "American-Style Kobe Beef," as well as any products that are ground, marinated, seasoned, flavored, breaded, or cooked.[14]

---

[14] Excluded from the class are Defendants, the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir or assign of any Defendant; any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action.  Further excluded are purchases of products that contain ingredients other than beef (except for salt or water).  (CIPPs' Mot. at 2 n.2.)

(CIPPs' Mot. at 1–2.)  The Repealer Jurisdictions are those states that have legislatively repealed the Supreme Court's holding in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and conferred standing to indirect purchasers.[15]  (*Id.* at 1 n.1.)

Consumer IPPs propose naming the following named plaintiffs as Class Representatives: Andrew Cohen (Arizona); Marcelo Lopez (California); Stacey Troupe (California); William Gee (District of Columbia); Lisa Melegari (Florida); Eric Gauchat (Illinois); Sharon Killmon (Iowa); Harold M. Nyanjom (Kansas); Mark Sperry (Maine); Karen Carter (Massachusetts); John Shupe (Michigan); Charlie Morgan (Minnesota); Sharon Dawson-Green (Missouri); Brent Rasmussen (Montana); David Renz (Nebraska); Kenneth Peterson (Nevada); Martin Jarmulowicz (New Hampshire); Kent Winchester (New Mexico); Brenda King (New York); Robert Trepper (North Carolina); Michelle Oversen (North Dakota); Dan Campbell (Oregon); Lindsey Lemoi (Rhode Island); Craig Margulies (South Dakota); Jacquelyn Watson (Tennessee); Cindy Abernathy (Utah); Leigh Tiller (West Virginia); and Jason Falbo (Wisconsin).  (*Id.* at 2.)

Consumer IPPs ask the Court to appoint their interim co-lead counsel, Hagens Berman Sobol Shapiro LLP and Lockridge Grindal Nauen P.L.L.P., as Class Counsel.  (*Id.*)

---

[15] For the purposes of their class certification motion, Consumer IPPs defined the Repealer Jurisdictions as Arizona, California, District of Columbia, Florida, Illinois, Iowa, Kansas, Massachusetts, Maine, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, West Virginia, and Wisconsin.  (*Id.* at 1 n.1.)

## IV.      MOTIONS TO EXCLUDE EXPERT TESTIMONY

The Downstream Plaintiffs each submitted expert testimony, including an expert's report to support their motions for class certification.  The DPPs offer Dr. David L. Sunding's testimony, the CIIPPs offer Dr. Michael A. Williams' testimony, and the Consumer IPPs offer Dr. Russell Mangum's testimony.  (*See generally* Sunding Expert Report, Williams Expert Report, Mangum Expert Report.)

Defendants ask the Court to exclude portions of each expert's report and testimony.  (Defs.' Mot. Exclude Sunding, Defs.' Mot. Exclude Williams, Defs.' Mot. Exclude Mangum.)   Defendants also offer the testimony of their own expert: Dr. Lauren J. Stiroh.  (*See* Stiroh Expert Report.)  Downstream Plaintiffs do not move to exclude the testimony of Defendants' experts.

### MOTIONS TO EXCLUDE EXPERT TESTIMONY

The expert testimony is a necessary component of each of the Downstream Plaintiffs' class certification motions.  Therefore, the Court will first consider Defendants' motions to exclude before turning to the Downstream Plaintiffs' class certification motions.

## I.      STANDARD OF REVIEW

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  An expert's opinion testimony is admissible if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In essence, there are three prerequisites to admitting expert testimony: (1) the evidence is relevant and helpful for the finder of fact, (2) the proposed witness is qualified to assist the finder of fact, and (3) the proposed evidence must be reliable. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).  For evidence to be reliable, it must be based upon sufficient facts or data, be a product of reliable principles and methods, and the witness must have applied the principles and methods reliably to the facts of the case.  *Id.*

The district court acts as a gatekeeper to the consideration of expert testimony by engaging in a *Daubert* analysis to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *Lauzon,* 270 F.3d at 686.  *Daubert* and its progeny have generated several nonexclusive factors for courts to consider in this analysis.  *Lauzon*, 270 F.3d at 686–87.  And "the inquiry envisioned by Rule 702 is . . . a flexible one."  *Daubert*, 509 U.S. at 594.

At the class certification stage, the Court conducts a "focused" *Daubert* inquiry to assess whether the opinions of the proposed experts, based on their areas of expertise and the reliability of their analyses of the available evidence, should be considered in

deciding the issues relating to class certification.  *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 610 (8th Cir. 2011); *see also Smith v. ConocoPhillips Pipe Line Co.*, 801 F.3d 921, 925 n.2 (8th Cir. 2015).  The main purpose of the full *Daubert* analysis is for the district court to act as a gatekeeper to protect "juries from being swayed by dubious scientific testimony."  *In re Zurn Pex*, 644 F.3d at 613.  Because there is less need for the Court to protect only itself, the Court may conduct a less stringent application of Rule 702 and *Daubert* at the class certification stage.  *See id.*

As a result, when deciding whether to exclude testimony at this preliminary stage, where evidence is still evolving and uncertain, the Court considers "the expert testimony in light of the criteria for class certification and the current state of the evidence."  *Id.* at 614.  The Court need not decide conclusively if the evidence it considers at this stage "will ultimately be admissible at trial."  *Id*. at 611.  "Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility."  *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006).  And the Eighth Circuit has generally stated that "district courts are admonished not to weigh or assess the correctness of competing expert opinions." *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014).

Because many of the Defendants' arguments overlap between the Downstream Plaintiffs' experts, the Court will consider them together.

## II.    ECONOMETRIC MODELS

Before turning to its analysis, the Court will briefly introduce the regression models that occupy much of the parties' briefing.  Each of the experts for Downstream Plaintiffs uses a regression model, a type of econometric model that:

> uses a mathematical equation or equations to describe the economic relationship between a variable of interest (e.g., price of the product or service that is the subject of an antitrust claim) and one or more explanatory variables (e.g., various production costs, the structure of the relevant market, and the contested or alleged conduct).

Econometrics: Legal, Prac and Tech. Issues § 5.A (A.B.A. 2014).  "In an econometric equation, each explanatory variable is associated with a 'coefficient,' which characterizes how the variation in the explanatory variable is statistically related to the variation in the dependent variable," which is the variable of interest.  *Id.*  For example, a regression model might include an equation like the following:

> Price =   [coefficient a]*[explanatory variable 1] +
>             [coefficient b]*[explanatory variable 2] +
>             [coefficient c]*[explanatory variable 3] + . . . .

*See id.*  A much more detailed explanation of these models may be found in Econometrics or similar texts, but for the purposes of this order, it is sufficient to understand that the parties dispute the selection of the models, the selection of the explanatory variables used in the models, the way the models are applied to the data, the data selected for input into the models, and the ways the model results are verified.

### III.    EXPERT REPORTS

#### A.    Dr. Sunding

The DPPs submit Dr. Sunding's expert report in support of their motion for class certification.  Dr. Sunding's expert report uses econometric, economic, and statistical methods to test whether beef production was restrained and beef prices were elevated during the class period.  (*See generally* Sunding Expert Report.)  Dr. Sunding purports to have used economic theory and documentary evidence to determine if conduct challenged by the DPPs would have had market-wide effects.  (*Id.* ¶¶ 9(d), 47–80.)  He reviewed documentary and testimonial evidence for behavior consistent with collusion. (*Id.* ¶¶ 81–115.)  To determine if members of the proposed DPP class were overcharged during the class period and to calculate damages, Dr. Sunding created a multiple regression model, which he refers to as his "overcharge regression model."  (*Id.* ¶¶ 9(c), 122–24.)  To determine if beef production was lower during the proposed class period compared to a benchmark period, Dr. Sunding also created and used a regression analysis, which he refers to as his "production model."  (*Id.* ¶¶ 9(c), 152–54.)  From an estimated overcharge—which was calculated using his overcharge regression model—and an estimated total volume of commerce, he further estimated damages incurred by the putative DPP class.  (*Id.* ¶¶ 9(e), 195.)

#### B.    Dr. Williams

The CIIPPs submit Dr. Williams' expert report in support of their motion for class certification.  Like Dr. Sunding, Dr. Williams' expert report uses econometric, economic,

and statistical methods to test whether beef production was restrained and beef prices were elevated during the class period. (*See generally* Williams Expert Report.) Dr. Williams used a two-step method to evaluate the impact of the alleged conspiracy on the putative CIIPP class. First, he examined whether all or virtually all **direct purchasers** incurred an overcharge; then he examined whether the direct purchasers passed on some or all of the overcharge to **end customers** like CIIPPs. (*See id.* ¶¶ 20–23.) With respect to the first step, Dr. Williams used economic evidence to determine if the structure of the beef packing and processing industry was conducive to collusion. (*E.g., id.* ¶¶ 10, 47.) He used econometric analyses and evidence to determine whether Defendants' alleged anticompetitive conduct would have caused widespread effects. (*Id.* ¶¶ 13, 145–46.) Then he created an overcharge regression model to calculate the impact of Defendants' conduct on beef product prices. (*Id.* ¶¶ 15, 150–54.) With respect to the second step of his analysis, Dr. Williams used a multivariate regression analysis to estimate a pass-through rate—that is, the amount a direct purchaser is overcharged that is passed through to an indirect purchaser like the CIIPPs. (*Id.* ¶¶ 16, 176–207.) He further created "common impact" models to assess whether customers (at both the DPP and CIIPP levels) would have been able to avoid price effects caused by the alleged conspiracy. (*Id.* ¶¶ 17–20, 209–23.) Finally, Dr. Williams used the overcharge and pass-through models to estimate damages to proposed CIIPP class members. (*Id.* ¶¶ 24, 251.)

C.    Dr. Mangum

The Consumer IPPs submit Dr. Mangum's expert report in support of their motion for class certification. Like Dr. Sunding and Dr. Williams, Dr. Mangum's expert report uses econometric, economic, and statistical methods to test whether beef production was restrained and beef prices were elevated during the class period. (*See generally* Mangum Expert Report.) Dr. Mangum, like Dr. Williams, used a two-step method to determine the impact on the proposed Consumer IPP class. First, he examined whether all or virtually all **direct purchasers** incurred an overcharge; then he examined whether the direct purchasers passed on some or all of the overcharge to **end customers** like Consumer IPPs. (*E.g.*, *id.* ¶ 21.) With respect to the first step, Dr. Mangum analyzed whether the structure of the beef packing and processing industry was conducive to collusion. (*E.g.*, *id.* ¶¶ 24, 90.) He analyzed whether all or nearly all direct purchasers would have been affected. (*Id.* ¶¶ 24, 387–88.) He then used a multiple regression model (also referred to as a "direct overcharge model") to estimate overcharges on direct purchases of beef. (*Id.* ¶¶ 24, 407–437.) With respect to the second step of his analysis, Dr. Mangum used a regression analysis or "pass-through model" to estimate a pass-through rate—that is, the amount a direct purchaser is overcharged that is passed through to an indirect purchaser like the putative Consumer IPP class members. (*Id.* ¶¶ 24, 438–39, 487.) Finally, using the overcharge and pass-through estimates, Dr. Mangum calculated the damages suffered by putative Consumer IPP class members. (*Id.* ¶¶ 24, 492.)

IV.     RELEVANCE

The Court will first consider if each expert's testimony is relevant. Opinion testimony is admissible only if it is "relevant to the task at hand." *Daubert*, 509 U.S. at 597. This means that the Court should consider whether the "opinion offered by the expert is sufficiently related to the facts of the case such that it will aid the jury in resolving the factual dispute." *Lauzon*, 270 F.3d at 694.

As an initial matter, each expert's analysis is relevant to the corresponding class certification motion because the Court must consider if there are questions of law or fact common to class members that predominate over individual questions. Fed. R. Civ. P. 23(b)(3). This inquiry requires the Court to consider if there is classwide impact, and if it is possible to calculate classwide damages. Each expert's report addresses these issues.

Defendants do not dispute that Dr. Mangum's expert testimony is relevant to the Consumer IPPs' class certification motion. Defendants argue, however, that Dr. Sunding's and Dr. Williams' regression overcharge models are irrelevant and unreliable because they omit an explanatory variable that Defendants allege should be included—namely, fed cattle prices.[16] Specifically, Defendants argue that fed cattle prices are the largest variable cost in the production of beef, yet neither Dr. Sunding nor Dr. Williams used fed cattle prices as an explanatory variable in their regression models. (*See, e.g.*, Stiroh Expert

---

[16] To the extent that Defendants argue that Dr. Williams' opinions are irrelevant and unreliable because he did not conduct a but-for beef production analysis, these arguments will be addressed below in the Reliability section.

Report ¶¶ 82–83.)  Had this variable been included, Defendants contend, the models would not have demonstrated any statistically significant overcharge.  (*See, e.g.*, *id.* ¶ 61.)

In his rebuttal expert report, Dr. Williams notes that he uses other variables in his model to "account for the costs incurred by beef producers," and these variables are an adequate substitute for a fed cattle price variable.  (Williams Rebuttal Report ¶ 120.) Similarly, in his rebuttal expert report, Dr. Sunding also explains that he has used alternate variables in his model.  (Sunding Rebuttal Report ¶ 9.)  In short, the experts disagree on which explanatory variables should be included in an overcharge regression model. (Sunding Rebuttal Report ¶¶ 16–22; Williams Rebuttal Report ¶¶ 126–36.)

An expert's failure to account for each and every possible supply and demand variable is not grounds for excluding their testimony.  It is impossible to perfectly consider every factor that might impact the market.  "[A] regression analysis does not become inadmissible as evidence simply because it does not include every variable that is quantifiable and may be relevant to the question presented." *Maitland v. Univ. of Minn.*, 155 F.3d 1013, 1017 (8th Cir. 1998).  The Eighth Circuit has instructed district courts to consider an expert's ability to rule out other possibilities when contemplating admissibility of an expert's testimony, but it has further cautioned that "this requirement cannot be carried to a quixotic extreme." *Lauzon*, 270 F.3d at 693.  An expert's conclusion should not be excluded "because he or she has failed to rule out *every* possible alternative cause." *Id.* (citation omitted).  Rather, existence of causes not eliminated pertains to

weight—not admissibility. *Id.* Ultimately, both Dr. Sunding and Dr. Williams accounted for numerous variables that impact the market (*see, e.g.*, Sunding Expert Report ¶¶ 126–31; Williams Expert Report ¶¶ 164–72), and that is sufficient at the class certification stage. *E.g.*, *Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585, 605 (N.D. Ill. 2015) (finding that defendants' criticism of an expert's selection of variables for multiple regression analysis "is a merits question that the Court does not need to resolve in order to decide whether to certify the class").

The Court concludes that the content of each of the experts' reports is relevant and that the omission of a particular variable from Dr. Sunding's and Dr. Williams' reports does not render them so irrelevant as to be inadmissible.

## V.   QUALIFICATIONS

The parties do not dispute the experts' qualifications, and the Court, having reviewed their experience and their reports, concludes that each of the experts is sufficiently qualified to testify on the matters presented to them by the Downstream Plaintiffs. (*See, e.g.*, Sunding Expert Report ¶¶ 2–7 & App. A; Williams Expert Report ¶¶ 1–5 & App. I; Mangum Expert Report ¶¶ 2–6 & Ex. A.)

## VI.   RELIABILITY

Having concluded that the proposed evidence is relevant and the expert witnesses are qualified, the Court will consider if the experts' testimony is reliable. For evidence to be admissible, it must be "reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires[.]"

*Lauzon*, 270 F.3d at 686 (quoting 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 702.02[3] (2001)).  Evidence is reliable if (1) it is based upon sufficient facts or data, (2) it is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts.  *Id.*; Fed. R. Evid. 702.

The second and third prongs are at issue here.  The parties do not dispute that each of the expert reports is based on sufficient facts and data.  But Defendants argue that the regression models used by each expert are not the product of reliable principles and methods or that the expert has not applied the principles and methods reliably to the facts.  Specifically, Defendants argue that the overcharge regression models used by each expert are unreliable, that the experts should have used a but-for production model and did not (or, in the case of Dr. Sunding, did but did not use the right data).  Defendants also dispute the reliability of Dr. Williams' common impact models.  The Court will address the models in turn.

### A.    Overcharge Models

With respect to the overcharge regression models, Defendants argue that the regression models used by each expert are unreliable because the models used do not adequately exclude or control for uninjured class members.[17]  And with respect to Dr.

---

[17] With respect to Dr. Sunding and Dr. Williams, the Defendants further challenge the reliability of the overcharge models because of a failure to include fed cattle prices as a variable and because the experts failed to adequately test the accuracy of the model used.  The Court has already addressed exclusion of fed cattle prices as a variable in the Relevance section, above, and concluded that because both Dr. Sunding and Dr. Williams accounted for numerous other

Mangum's model, Defendants argue that his overcharge model misattributes impact from market factors unrelated to the alleged conspiracy.

### 1.    Uninjured Class Members

Defendants and their expert, Dr. Stiroh, argue that each of the Downstream Plaintiffs' experts' overcharge regression models are flawed because each model uses "only one overcharge coefficient and forc[es] it to be the same for all class members." (Stiroh Expert Report ¶ 33.)  Dr. Stiroh argues that:

> [r]emoving the unnecessary and unwarranted restriction that impact must be the same across all customers from Plaintiffs' experts' regression models, and instead allowing the overcharge to be separately estimated for individual customers, reveals that numerous proposed Class Members were not subject to *any* overcharge at all . . . .

(*Id.*)  Defendants argue that because the Downstream Plaintiffs' experts' models mask uninjured class members at the direct purchaser level, the methods are unreliable not just for the DPPs but also for the indirect purchasers (the CIIPPs and Consumer IPPs).  (*See id.* ¶ 34.)

Downstream Plaintiffs' experts dispute Dr. Stiroh's conclusions.  Dr. Sunding argues that Dr. Stiroh's model for estimating uninjured direct purchasers is unreliable because "there are insufficient data to reliably identify specific overcharges for all such

---

variables that impact the market, the omission of the fed cattle variable goes to the weight, not the admissibility of the evidence.  The Court will address whether the experts adequately validated the models used below.

customers." (Sunding Rebuttal Report ¶ 55.)  Dr. Sunding concludes that even under Dr.

Stiroh's approach, "96.2% of customers are estimated to have incurred a statistically

significant overcharge at the 5% significance level or better." (*Id.* ¶ 62.)  Dr. Stiroh and

Dr. Sunding also disagree on the correct way to implement the statistical tests used to

measure significance.  (*See, e.g.*, *id.* ¶¶ 63–64.)  Similarly, Dr. Williams and Dr. Mangum

also argue that Dr. Stiroh's model for estimating uninjured direct purchasers is unreliable.

(*E.g.*, Williams Rebuttal Report ¶ 209; Mangum Rebuttal Report ¶¶ 28, 133–39, 155.)

The Court concludes that the disputed models do not provide grounds for

excluding the analysis of Downstream Plaintiffs' experts.  Because each expert employed

widely-accepted regression methodology, the Court concludes that Defendants'

objections speak only to weight—not admissibility.  As is the case here, whether or not

the methodologies used are "capable of showing common impact is a matter best left for

the Rule 23 analysis."  *See In re Pork Antitrust Litig.*, Civ. No. 18-1776, 2024 WL 2060386,

at *11 (D. Minn. May 8, 2024) (discussing the use of averaging methodologies).

### 2. Market Factors

Defendants also argue that Dr. Mangum's overcharge model is unreliable because

it misattributes impact from market factors unrelated to the alleged conspiracy.  In

particular, Defendants argue that Dr. Mangum did not "parse out . . . a series of plant

closures or idling occurring before the alleged conspiracy began."  (Defs.' Mem. Exclude

Mangum at 15.)  Dr. Mangum counters that his model includes the "plant closings were

not exogenous events – they were business decisions based on market conditions, and as

such they are appropriately and explicitly controlled for through relevant controls (*i.e.*, demand and supply variables) in my direct purchaser overcharge model." (Mangum Rebuttal Report ¶ 174.) He further argues that because his "assessment of damages . . . is coincident with the alleged conspiracy, and only reflects incremental price effects during the Class Period," his "model does not 'misattribute' price impact from the plant closures that occurred prior to the start of the conspiracy." (*Id.*)

Here, again, the Court concludes that the disputed factors do not render Dr. Mangum's model so unreliable that the entire analysis should be excluded. To the extent that Defendants' objections undermine Dr. Mangum's conclusions, they go to the weight—not the admissibility of his opinion. *See, e.g.*, *In re Processed Egg Prod. Antitrust Litig.*, 81 F. Supp. 3d 412, 431–32 (E.D. Pa. 2015) (discussing that the omission of certain factors may make an expert's opinion less persuasive, but their absence does not make the opinion inadmissible when the factors were not "crucial to creating a reliable regression").

### B.   But-For Production Models

Defendants further argue that the experts should have validated their overcharge models with a "but-for beef production regression to determine whether the alleged conspiracy reduced production and, if so, by how much." (Defs.' Mem. Exclude Williams at 14; *see also* Defs.' Mem. Exclude Mangum at 17.) With respect to Dr. Sunding, Defendants argue that his analysis is unreliable because he used an "inferior data set" for his production model. (Defs.' Mem. Exclude Sunding at 20.) With respect to Dr. Williams

and Dr. Mangum, Defendants argue that their overcharge models are unreliable because neither expert conducted a but-for beef production model.

Defendants argue that Dr. Sunding should have used data provided by Defendants, not the USDA's monthly estimates of industry-wide cattle slaughter when estimating the restriction on beef supply using his production model.  Using this data, Dr. Stiroh opines that Dr. Sunding would have seen "no statistically significant decline in Defendants' slaughter during the Class Period."  (Stiroh Expert Report ¶ 122.)  Dr. Sunding counters that the USDA beef production data is "high-quality" and was selected and used because he could be "assured the data [is] complete."  (Sunding Rebuttal Report ¶¶ 111–12.)  He further notes that his intent was to "show a reduction in *market* supply as opposed to Defendant supply."  (*Id.* ¶ 113.)

Defendants argue that Dr. Williams and Dr. Mangum's opinions that high prices are caused by the Defendants' conduct are unreliable because neither expert separately analyzed a "model of production to assess what Defendants' slaughter levels would have been but-for the alleged conspiracy."  (Stiroh Expert Report ¶ 120.)  But both Plaintiffs' experts explain that they did present analyses to address this point, even if they did not create a separate model.  (*E.g.*, Williams Rebuttal Report ¶ 311 (explaining his use of a "dummy variable regression methodology to estimate the price effects of the alleged conspiracy" which, he states "does not require separate variables for specific alleged actions taken by the Defendants (e.g., constraining beef supplies) in formulating and

carrying out the challenged conduct in order to reliably estimate the total effect of the challenged conduct"); Mangum Rebuttal Report ¶ 47 (explaining that "modelling the level of but-for supply is not a necessary modelling step in order to establish the price effects of an alleged conspiracy" and that his "overcharge model directly answers" "whether Class members sustained impact and injury from the alleged conspiracy").

In each case, the Court concludes that the dispute regarding the type of model needed (or the data that should be input in the model) does not render Downstream Plaintiffs' regression models so unreliable that the experts' analyses should be excluded. Again, Defendants' objections go to the weight, not the admissibility of the opinions.

### C.   Common Impact Model

To show common impact on the proposed class, CIIPPs relied on a two-step method used by their expert, Dr. Williams.  Defendants argue that Dr. Williams' analysis is unreliable in both steps.  In the first step, Dr. Williams concluded that direct purchasers were subjected to a 12.6 percent overcharge.  (Williams Expert Report ¶ 15.)  Defendants argue that Dr. Williams inappropriately applied this 12.6 percent overcharge "to every beef purchase by every direct purchaser, even those that were uninjured."  (Defs.' Mem. Exclude Williams at 16.)  In the second step of his analysis, Dr. Williams examined whether the direct purchasers passed on the overcharge to the CIIPPs.  Defendants argue this step is also unreliable because Dr. Williams "conflated impact from the alleged conspiracy with the random error of his regression."  (*Id.*)

Dr. Williams determined that "the mean or average prices for each customer-product combination in the Class Period is 12.6% higher than the corresponding combination in the benchmark period." (Williams Rebuttal Report ¶ 210 n.174.) He admits that setting the overcharge to 12.6 percent for all direct purchasers was done "to simplify the exercise" and "for ease of comparison." (*Id.* ¶ 210 & n.174.) As the Court has previously stated, "averaging methodologies are not inherently unreliable and are permissible in some circumstances." *In re Pork*, 2024 WL 2060386, at *11. While Dr. William's averaging methodology certainly conceals variations among direct purchasers, the Court concludes that using it as a first step in an analysis to determine whether direct purchasers passed on an overcharge to the CIIPPs is acceptable.[18] Its use is also accepted by the Court in this instance because Dr. Williams has also "laid a sufficient foundation for the inferential finding that the impact reflected in a single average overcharge was shared by virtually every class member." *Id.* (quoting *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 171, 199 (E.D. Pa. 2015)). For example, Dr. Williams cited to extensive evidence in the record (Williams Expert Report ¶ 149) and to basic economic theory (*id.* ¶ 148) to support his conclusion that virtually every class member would have been injured by the alleged conspiracy.

---

[18] Further, while the experts disagree on the interpretation of the application of the experts' models, Dr. Williams argues that even using Defendants' expert's models, he can demonstrate all customers were overcharged. (*See, e.g.*, Williams Rebuttal Report ¶¶ 20–24, 176 (discussing the Stiroh method and criticisms).)

With respect to the second step of his analysis, Dr. Stiroh, Defendants' expert, concluded that "Dr. Williams' common impact regression analysis conflates the random residual of his regression model with impact." (Stiroh Expert Report ¶ 102.)  Dr. Williams disagrees.  (Williams Rebuttal Report ¶¶ 263–71.)  The Court is not convinced that Dr. Williams has misinterpreted his regression analyses.  *Cf. In re Turkey Antitrust Litig.*, No. 19-8318, 2025 WL 264021, at *10 (N.D. Ill. Jan. 22, 2025) ("The Court also credits Williams' explanation that Defendants mistakenly use error term and residual interchangeably and therefore, their arguments in this regard do not undermine the reliability of his in-sample prediction method.").

The Court concludes that Dr. Williams' common impact analysis is not so unreliable that his analysis should be excluded.

*    *    *

Having considered the relevance, qualifications, and reliability requirements, the Court concludes that all three of the Downstream Plaintiffs' experts satisfy the less stringent *Daubert* standard employed at the class certification stage.  The Court will therefore deny Defendants' motions to exclude the testimony of Dr. Sunding, Dr. Williams, and Dr. Mangum.

**MOTIONS FOR CLASS CERTIFICATION**

Having determined the admissibility of the experts' testimony, the Court turns to the class certification motions.

I.    **STANDARD OF REVIEW**

To certify a class, the Downstream Plaintiffs must demonstrate compliance with Federal Rule of Civil Procedure 23.  Rule 23 sets forth more than "a mere pleading standard*." Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  Rather, Downstream Plaintiffs must provide evidentiary proof of each of Rule 23's elements. *Id.*  It is the Court's duty to conduct a "rigorous analysis" before certifying a class, which necessarily requires that the Court consider some issues that bear on the merits of a claim. *Id.* at 33–35.  But courts considering class certification are not expected to resolve questions regarding the merits at this stage.  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459–60 (2013).

To certify a class, Downstream Plaintiffs must first show they meet the requirements of Rule 23(a).  *See generally* Fed. R. Civ. P. 23; *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1119 (8th Cir. 2005).  These requirements are:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

If the Downstream Plaintiffs meet Rule 23(a)'s requirements, then the Downstream Plaintiffs must satisfy one of the three 23(b) categories to be certified. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).

## II.    RULE 23(a) ANALYSIS

The Court will first consider if the requirements of Rule 23(a) are met. *In re St. Jude*, 425 F.3d at 1119. These requirements are numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a). Each of these elements will be analyzed in turn.

### A.    Numerosity

There is no clear-cut rule for numerosity. Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a). Though there are no arbitrary rules regarding the necessary size of classes, courts typically consider the number of persons involved in the class, the nature of the action, the value of each individual claim, and the inconvenience of trying individual suits. *Belles v. Schweiker*, 720 F.2d 509, 515 (8th Cir. 1983); *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 559–60 (8th Cir. 1982).

Here, the parties do not dispute that each of the three proposed classes satisfies the numerosity requirement. DPPs are composed of thousands of entities that purchased beef directly from Defendants. (Sunding Expert Report ¶ 1 n.1.) There are estimated to be millions of individuals within the Consumer IPP class (Mangum Expert Report ¶ 498), and counsel represents that the CIIPPs also have thousands of members (CIIPPs' Mem. at

25).  The Rule 23(a) numerosity requirement is plainly satisfied.

### B.    Commonality

To establish commonality under Rule 23(a)(2), class claims "must depend upon a common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  In other words, the Court considers whether proceeding as a class will "generate common *answers* apt to drive resolution of the litigation."  *Id.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).  For Rule 23(a)(2) commonality, dissimilarities between class members may be relevant if they preclude a finding that there is "even a single common question."  *Id.* at 359 (cleaned up).

The parties do not dispute that each of Downstream Plaintiffs' proposed classes brings claims that satisfy the commonality requirement.  "Proof of and defenses to the Defendants' alleged conspiracy will be common to all class members, as is typical of all nationwide horizontal price-fixing conspiracy class actions."  *In re Pork*, 2024 WL 2060386, at *14 (citing *In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 268, 271 (D. Minn. 1989)).  The Downstream Plaintiffs satisfy the commonality requirement.

### C.    Typicality

To establish typicality under Rule 23(a)(3), the Court must determine "whether the named plaintiff's claim and the class claims are so interrelated that the interests of the

class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). "The burden of demonstrating typicality is fairly easily met so long as other class members have claims similar to the named plaintiff[s]." *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995).

Variations between class members will not preclude finding typicality "if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996). "An antitrust price fixing case generally will involve claims sufficiently similar to satisfy Rule 23(a)(3)." *In re Workers' Comp.*, 130 F.R.D. 99, 106 (D. Minn. 1990); *see also In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 207 (E.D. Pa 2001) (explaining that where "it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical") (citation omitted).

The parties do not dispute that the Downstream Plaintiffs satisfy the typicality requirement. The named representatives in each putative class purchased beef during the class period, represent others in the same position, and the Defendants' alleged conspiracy impacted the prices those representatives paid. Though there may be some factual variation among class members, those differences will not preclude class certification because their claims arise under the same legal or remedial theory. *See Khoday v. Symantec Corp.*, Civ. No. 11-180, 2014 WL 1281600, at *16 (D. Minn. Mar. 13,

2014).  The Downstream Plaintiffs satisfy the typicality requirement.

### D.    Adequacy of Representation

Finally, the Court must decide whether the "representative parties will fairly and adequately protect the interests of the Class."  Fed. R. Civ. P. 23(a)(4).  "To demonstrate adequacy of representation, a plaintiff must show that '(1) the representative and its attorneys are able and willing to prosecute the action competently and vigorously; and (2) the representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge.'"  *In re Pork*, 2024 WL 2060386, at *17 (quoting *City of Farmington Hills Emps. Ret. Sys. v. Wells Fargo Bank, N.A.*, 281 F.R.D. 347, 353 (D. Minn. 2012)).

Defendants do not dispute that the DPPs' proposed class representatives are adequate.  They do, however, challenge the adequacy of the Consumer IPPs' and the CIIPPs' representatives.

With respect to the Consumer IPPs, Defendants argue that "some named Plaintiffs almost exclusively purchased beef products that are *excluded* from the proposed class definition."  (Defs.' Opp. CIPPs' Mot. at 9.)  Defendants further argue that no named plaintiff "has submitted proof that any of the beef they purchased was processed by any of the Defendants, or was even a product included within the claim."  (*Id.* at 10.)  But to prove harm, a named plaintiff need not show they only bought products that fall within the class definition.  Most Consumer IPP class representatives purchased multiple beef products routinely.  (*See generally* CIPPs' Mem., Appendix C (highlighting portions of

representatives' testimony that illustrate repeated purchase of proposed class products).) And class representatives may self-identify using affidavits. *See In re Pork*, 2024 WL 2060386, at \*29; *In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Practices Litig.*, MDL No. 16-2709, 2019 WL 1418292, at \*16 (W.D. Mo. Mar. 21, 2019). Because the proposed class representatives purchased beef products like the absent class members and they face no material conflicts of interest with such class members, the Court is satisfied the Consumer IPPs' proposed class representatives are adequate.

With respect to CIIPPs, Defendants argue the proposed class representatives are inadequate because CIIPPs have legal flaws in the allegations under state laws in Mississippi, Kansas, and Vermont. With respect to Mississippi[19] and Kansas,[20] it is possible that these specific claims may be precluded; nevertheless, the Court finds that the class representatives are adequate. With respect to Vermont, while it is true that only consumers may bring claims under the Vermont Consumer Protection Act (VCTA), *In re Cattle & Beef Antitrust Litig.*, 687 F. Supp. 3d 828, 846 (D. Minn. 2023) (citing Vt. Stat. Ann.

---

[19] Defendants point out that the Court "a claim made pursuant to [] Mississippi's antitrust law must involve, in part, transactions occurring wholly within the state." (Defs.' Opp. CIIPPs' Mot. at 44 (alteration in original) (quoting *In re Cattle Antitrust Litig.*, Civ. No. 19-1222, 2021 WL 7757881, at \*12 (D. Minn. Sept. 14, 2021)). Defendants' argument has no bearing on the adequacy of the named plaintiffs; it goes only to the merits of the CIIPPs' Mississippi antitrust claim, which the Court declines to address at this time.

[20] Defendants argue that an exemption to the Kansas Restraint of Trade Act (KRTA) would preclude CIIPPs' Kansas antitrust claim. If the exemption applies—which the Court declines to address at this time—it would simply preclude CIIPPs' Kansas antitrust claim; the named plaintiffs would still be adequate representatives.

tit. 9, § 2461(b)), the Court declines to decide at this stage if the CIIPPs are "consumers" within the meaning of the VCTA. *See* Vt. Stat. Ann. tit. 9, § 2451a(a). But even if the CIIPPs are not consumers for the purposes of the VCTA, the named plaintiffs would still be adequate representatives.

Defendants also argue there must be a class representative for every state encompassed in the proposed damages claim or that CIIPPs would lack standing to sue under the laws of those states. The Court previously addressed this issue in *In re Pork* and concluded that "Defendants' position conflates the requirements of Article III with those of Rule 23." 2024 WL 2060386, at *18 (citing *Langan v. Johnson & Johnson Consumer Co.*, 897 F.3d 88, 93 (2d Cir. 2018)). Here, as in *Pork*, there is no issue of standing because the named plaintiffs have each alleged that they suffered an injury in fact sufficient to confer standing and "[r]equiring that the claims of the class representative be in all respects identical to those in each class member in order to establish standing would confuse the requirements of Article III and Rule 23." *Id.* (quoting *In re Asacol Antitrust Litig.*, 907 F.3d 42, 49 (1st Cir. 2018)) (cleaned up). What matters at this stage is that the claims of the named plaintiffs "parallel those of the putative class members" so that "success on the claim[s] under one state's law will more or less dictate success under another state's law." *In re Asacol*, 907 F.3d at 49. Therefore, the Court concludes the CIIPPs' class representatives are adequate even though they do not reside in all states in which the CIIPPs seek class certification.

* * *

Having found the Downstream Plaintiffs' representatives adequate, the Court concludes that they meet Rule 23(a)'s preliminary class certification requirements. The Court will next consider if the Downstream Plaintiffs' proposed classes qualify under one of the Rule 23(b) categories.

## III. RULE 23(b) ANALYSIS

If a class meets the Rule 23(a) requirements, it must also qualify as one of three Rule 23(b) class action types to be certified. *Amchem Prods.*, 521 U.S. at 614. As previously noted, Rule 23(b)(1) covers cases in which separate actions by class members would "risk establishing incompatible standards of conduct for the party opposing the class." *Id.* (internal quotation omitted). Rule 23(b)(2) specifically allows declaratory or injunctive relief when "the party opposing the class has acted or refused to act on grounds generally applicable to the class." *Id.* (quoting Fed. R. Civ. P. 23(b)(2)). And Rule 23(b)(3) actions secure judgments that bind all class members—except for those class members who affirmatively elect to be excluded from the class. *Id.* at 614–15. Rule 23(b)(3) actions are appropriate when common questions predominate over individual ones, and the class action is superior to other methods for adjudicating the action. *Id.* at 615 (citing Fed. R. Civ. P. 23(b)(3)). All Downstream Plaintiffs claim that their proposed Damages Classes satisfy the requirements of Rule 23(b)(3), and the CIIPPs also seek an Injunctive Relief Class pursuant to Rule 23(b)(2). The Court will first analyze the requirements of Rule 23(b)(3) and will separately address Defendants' assertion that the indirect purchaser

classes cannot satisfy Rule 23(b)(3) due to material variations in state laws.  The Court will

then consider if the CIIPPs satisfy Rule 23(b)(2).

### A.    Rule 23(b)(3)

Rule 23(b)(3) requires "that the questions of law or fact common to class members

**predominate** over any questions affecting only individual members, and that a class

action is **superior** to other available methods for fairly and efficiently adjudicating the

controversy."  Fed. R. Civ. P. 23(b)(3) (emphasis added).  Thus, there are two main

requirements: (1) predominance and (2) superiority.   In analyzing these two

requirements, courts must consider:

> (A) The class members' interests in individually controlling the
>     prosecution or defense of separate actions;
>
> (B) The extent and nature of any litigation concerning the
>     controversy already begun by or against class members;
>
> (C) The desirability or undesirability of concentrating the
>     litigation of the claims in the particular forum; and
>
> (D) The likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  Defendants challenge predominance for each of the Downstream

Plaintiffs.

### 1.    Predominance

"The predominance requirement is 'demanding'; a court considering certification

pursuant to Rule 23(b)(3) must take a 'close look at whether common questions

predominate over individual ones.'"  *Hudock v. LG Electronics U.S.A., Inc.*, 12 F.4th 773,

776 (8th Cir. 2021) (quoting *Comcast*, 569 U.S. at 34).  However, "there are no bright lines

for determining whether common questions predominate." *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 693 (D. Minn. 1995). A claim will meet the predominance requirement "when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position." *Id.*

Analysis of predominance may overlap with the merits of the case, but a court "should not resolve the merits of the case at class certification." *In re Zurn Pex*, 644 F.3d at 617. Rather, "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc.*, 568 U.S. at 459. While rigorous, the inquiry at this stage is limited to determining whether common evidence **could** suffice to make out a prima facie showing of liability on the plaintiffs' theory. *In re Zurn Pex*, 644 F.3d at 618.

The Eighth Circuit has advised that the "closer any dispute at the class certification stage comes to the heart of the claim, the more cautious the court should be in ensuring that it must be resolved in order to determine the nature of the evidence the plaintiff would require." *Blades v. Monsanto Co.*, 400 F.3d 562, 567 (8th Cir. 2005). Factual and merits disputes "may be resolved only insofar as resolution is necessary to determine the nature of the evidence that would be sufficient, if the plaintiff's general allegations were true, to make out a prima facie case for the class." *Id.* Plaintiffs may use any admissible evidence at this stage in the litigation. *In re Zurn Pex*, 644 F.3d at 612–14.

Predominance is "readily met in certain cases alleging . . . violations of the antitrust laws." *Amchem Prods.*, 521 U.S. at 625; *see also In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 268, 271 (D. Minn. 1989) ("Plaintiffs have alleged a nationwide horizontal price-fixing conspiracy . . . [p]roof of such an antitrust violation involves primarily common issues of fact and law."). But predominance is also often the determining factor in declining to certify a class in an antitrust action. *E.g., Blades,* 400 F.3d at 572 (refusing to certify a class because the plaintiffs could not prove classwide injury with common evidence, as required for predominance).

To be successful in this litigation, Downstream Plaintiffs must prove (1) that Defendants conspired to violate federal antitrust laws, (2) that class members suffered injury because of the violation ("impact"), and (3) that plaintiffs can measure the damages. *Blades*, 400 F.3d at 566. Common evidence must be used to satisfy all three of these elements to meet Rule 23(b)(3)'s predominance requirement.

### a.    Antitrust Conspiracy

Downstream Plaintiffs must show that common evidence can be used to prove the existence of the alleged antitrust conspiracy. Defendants do not dispute that common evidence can be used here. The Eighth Circuit and Minnesota courts have acknowledged that evidence of a conspiracy relates solely to the defendant's conduct, so proof would not vary among class members. *Blades*, 400 F.3d at 572 ("Evidence that appellees entered into a conspiracy that would affect all class members would perforce be evidence

common to all class members for proving the conspiracy."); *In re Potash*, 159 F.R.D. at 694. Accordingly, this element is satisfied as to all Downstream Plaintiffs.

### b.    Impact

Next, the Court must consider whether common evidence can show classwide impact of the Defendants' conspiracy. "Impact" generally refers to the injury caused by an antitrust violation. *See Blades*, 400 F.3d at 569. The Supreme Court has noted that an increase in price resulting from "a dampening of competitive market forces is assuredly one type" of common injury. *Blue Shield of Va. v. McCready*, 457 U.S. 465, 482 (1982). The Eighth Circuit has repeatedly held that plaintiffs can prove injury in a price-fixing case by showing that the plaintiff, as a result of the conspiracy, "had to pay supracompetitive prices." *Blades*, 400 F.3d at 569. And to establish such impact, plaintiffs typically provide experts who "construct a hypothetical market, a 'but-for' market, free of the restraints and conduct alleged to be anticompetitive." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000) (citation omitted). Regression analysis is one way to accomplish this. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC,* 31 F.4th 651, 663, 676 (9th Cir. 2022); *In re Broiler Chicken Antitrust Litig.*, Civ. No. 16-8637, 2022 WL 1720468, at *12 (N.D. Ill. May 27, 2022).

While direct purchasers must show common evidence of classwide impact, indirect purchasers must take their analysis one step further. Consumer IPPs and CIIPPs "must first demonstrate a common impact—in the form of an overcharge—incurred by all or nearly all" direct purchasers. *In re Pre-Filled Propane Tank Antitrust Litig.*, MDL No. 14-

2567, 2021 WL 5632089, at *6–7 (W.D. Mo. Nov. 9, 2021).  They "must then demonstrate that this impact—those overcharges—were passed on by the [direct purchasers] to all or nearly all of the end customers [in this case, the Consumer IPPs or the CIIPPs]."  *Id; see also In re Fla. Cement & Concrete Antitrust Litig.*, 278 F.R.D. 674, 682 (S.D. Fla. 2012) (noting that indirect purchasers "have a 'double burden' . . . [of] first prov[ing] common impact on direct purchasers who bought . . . from the Defendants, and then show[ing] that impact was passed through to the indirect purchaser class").

The Court will first briefly summarize the reports used by each proposed class as evidence of common impact before addressing the Defendants' arguments as to why the analyses fail to demonstrate common impact.

### i.    Direct Purchaser Plaintiffs

The DPPs use Dr. Sunding's report to demonstrate evidence of common impact. Dr. Sunding analyzed the characteristics of the U.S. beef market and concluded that those characteristics made the market "susceptible to successful collusion."  (Sunding Expert Report ¶ 9(b).)  Dr. Sunding also created an overcharge regression model that he used to calculate how much the "challenged conduct by Defendants . . . elevated prices for class products" and concluded "that wholesale beef prices were elevated by an average 12.5% during the class period."  (*Id.* ¶ 9(c).)  He found that the evidence and his economic models were "consistent with [DPPs'] allegations of Defendants' conspiracy to collude over cattle slaughter."  (*Id.* ¶ 162.)  Dr. Sunding concluded that "substantially all class products sold by Defendants to substantially all direct purchasers across the class period" would have

- 42 -

been affected. (*Id.* ¶ 168.) Dr. Sunding next estimated the total volume of purchases that would have been made by putative DPP class members during the class period (i.e., the volume of commerce). (*Id.* ¶ 194.) Finally, by using his estimates of the volume of commerce and the amount of overcharge, he calculated an estimated total damage to putative DPP class members to be $13.79 billion. (*Id.* ¶ 195.)

ii.    **Commercial and Institutional Indirect Purchaser Plaintiffs**

The CIIPPs rely on Dr. Williams' report to demonstrate evidence of common impact. Dr. Williams, like Dr. Sunding, first considered the structure of the beef and cattle industry and determined that characteristics of that industry make it "conducive to cartel behavior." (Williams Expert Report ¶ 10; *see also id.* ¶ 128 ("[A] cartel elevates price and reduces quantity relative to what would be accomplished if the sellers simply act as oligopolists in a repeated game without explicit collusion.") (citation omitted).) He considered economic and other evidence supporting a conclusion of common impact. (*Id.* ¶¶ 10–12.) Dr. Williams used a regression model to calculate the average overcharge to **direct** purchasers. (*Id.* ¶¶ 13–15.) He then used a pass-through analysis to determine whether and to what extent these overcharges were passed on from the direct purchasers to the proposed **CIIPP** class members. (*Id.* ¶¶ 16–23). Finally, he estimated the damages to the proposed CIIPP class members to be $1.89 billion. (*Id.* ¶ 24.)

### iii.   Consumer Indirect Purchaser Plaintiffs

The Consumer IPPs rely on Dr. Mangum's report to demonstrate evidence of common impact.  Like Dr. Williams and Dr. Sunding, Dr. Mangum first considered the structure of the beef and cattle industry and determined that the "industry was conducive to the formation and success of the alleged conspiracy."  (Mangum Expert Report ¶¶ 24, 385.)   He also considered economic and other evidence supporting a conclusion of common impact.  (*Id.* ¶¶ 24, 388, 407.)  Like Dr. Williams and Dr. Sunding, Dr. Mangum also used a regression model to calculate the average overcharge to **direct** purchasers. (*Id.* ¶¶ 24, 408.)  He then used a pass-through analysis to determine whether and to what extent these overcharges were passed on from the direct purchasers to the proposed **Consumer IPP** class members.  (*Id.* ¶¶ 24, 438–40.)  Finally, he estimated the damages to the proposed Consumer IPP class members to be $1.94 billion.  (*Id.* ¶¶ 24, 492–99.)

### iv.   Overcharge Model as Proof of Common Impact

Defendants argue that Dr. Sunding did not demonstrate common impact because his overcharge model assumes, rather than proves, common impact.  (*See, e.g.*, Stiroh Expert Report ¶ 35 & n. 96.)  But Dr. Sunding did not use his model to prove common impact. (*See, e.g.*, Sunding Expert Report ¶ 168 ("I first explain that economic theory and the characteristics of the beef industry which dictate there would be a common impact of the challenged conduct.").)  He instead relied on his analysis of market structure— combined with economic theory.  (*See, e.g.*, Sunding Expert Report ¶¶ 12, 47, 169–77.)

Only then did Dr. Sunding estimate the overcharge imposed by Defendants' conduct during the class period. (*Id.* ¶ 178.)

While it is true that Dr. Sunding's model masks variations—as all averages typically do—this type of market-wide economic analysis has been accepted by many courts to show predominance as to antitrust impact. *See e.g., In re Pork*, 2024 WL 2060386, at *23; *Olean*, 31 F.4th at 677; *In re Blood Reagents Antitrust Litig.*, MDL No. 09-2081, 2015 WL 6123211, at *18–19 (E.D. Pa. 2015) (collecting cases). Because Dr. Sunding presented other evidence that supports common impact and does not rely merely on his model,[21] the Court concludes that his expert report is sufficient to support predominance. "Moreover, though each DPP must show injury to ultimately recover, courts 'have not insisted on this level of proof at the class certification stage.'" *In re Pork*, 2024 WL 2060386, at *21 (quoting *Kleen Prods.*, 831 F.3d at 927). Dr. Sunding's report satisfies the impact predominance requirement.[22]

---

[21] Dr. Sunding also further validated his common impact model with other tests including testing the overcharge across primal cuts, Defendants, and large customers (*see* Sunding Expert Report ¶ 178) and price movement tests (*id.* ¶ 182). While the Court agrees with Defendants that any one of these tests alone likely would not **establish** common impact, they do provide further evidence of common impact and validation of Dr. Sunding's model.

[22] Defendants also argue that Dr. Sunding's production model does not support his analysis. The Court concludes that Defendants' arguments with respect to the production model do not significantly undermine the Court's conclusion that Dr. Sunding's report supports a finding of common impact. To the extent Defendants' arguments are based on Dr. Sunding's selection of a USDA data set, Dr. Sunding has presented reasonable arguments for his selection of the data set used. To the extent Defendants argue that Dr. Sunding did not determine whether Defendants could have actually produced 6.3% more beef during the class period (*cf.* Sunding

**v.        Common Impact to Direct Purchasers**

Defendants argue that Dr. Williams' and Dr. Mangum's expert reports do not adequately show that all or nearly all direct purchasers were injured (and, without a classwide overcharge to direct purchasers, there is no overcharge to be passed on to downstream CIIPPs or Consumer IPPs).

Many circuits have instructed district courts to "ensure that the class is not defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1138 (9th Cir. 2016) (internal quotation marks omitted). *See also Blades*, 400 F.3d at 571 (refusing to certify classes where "not every member of the proposed classes can prove with common evidence that they suffered impact from the alleged conspiracy").

A class cannot be certified if more than a *de minimis* portion of the class is uninjured. The Eighth Circuit has not yet determined what constitutes *de minimis*, but other courts have held between approximately five and ten percent would justify refusing to certify the class. *See e.g., In re Asacol*, 907 F.3d at 58 (reversing certification after concluding that ten percent of class members were uninjured); *Vista Healthplan, Inc. v. Cephalon, Inc.*, Civ. No. 2:06-1833, 2015 WL 3623005, at *20 (E.D. Pa. June 10, 2015)

---

Expert Report ¶ 154 (concluding that "beef production was approximately 6.3% lower during the class period")), the Court is not convinced that Dr. Sunding or the DPPs must make necessarily make that showing, at least at this stage.

(finding that five percent combined with a "substantial" likelihood that other categories mentioned of uninjured class members would be within the proposed class to be more than *de minimis*).

Defendants argue that both Dr. Williams' and Dr. Mangum's single-overcharge regression models for direct purchasers are flawed and fail to establish that all direct purchasers paid an overcharge. (*E.g.*, Stiroh Expert Report ¶ 51.) Defendants argue that more complex models that do not assume impact on all members of the class should be used to verify these models and test for classwide impact. And Defendants argue that when their expert ran these models, a large number of direct purchaser plaintiffs did not incur an overcharge. (*See, e.g.*, *id.* ¶ 41 (concluding that "between 33.4 percent and 63.6 percent of tested customers did not incur an overcharge").)

Downstream Plaintiffs argue that Defendants' expert used overly restricted data sets and measured the wrong thing (e.g., testing the percentage of direct purchasers injured instead of specific products purchased). By modifying the models used by Defendants' expert, Dr. Williams and Dr. Mangum calculated that at least 95% and up to "99% of Defendants' sales to direct purchasers have positive and statistically significant overcharges." (Williams Rebuttal Report ¶¶ 234–36; *see also* Mangum Rebuttal Report ¶¶ 198.)

In short, this issue "presents the familiar 'battle of the experts.'" *In re Potash*, 159 F.R.D. at 697. But "[t]he certification stage . . . is not, however, the proper forum in which

to resolve this battle." *Id.* The Court concludes that Dr. Williams' and Dr. Mangum's single-overcharge regression models are not so flawed that they would be inadmissible. *E.g. id.* ("[I]n assessing whether to certify a class, the Court's inquiry is limited to whether or not the proposed methods are so insubstantial as to amount to no method at all.") *See also In re Turkey*, 2025 WL 264021, at *17 ("Williams' argument that Stiroh's application of his overcharge regression model is a flawed methodology that creates artificially small sample sizes is a classic battle of the experts about the proper approach to the regression analysis that must be left for the factfinder to resolve. It is not a reason to reject Williams' overcharge regression model at the class certification stage.").

The Court concludes that CIIPPs and Consumer IPPs have established, through Dr. Williams' and Dr. Mangum's reports, that it is possible to show that all DPPs suffered a common injury with common evidence.

### vi.    Common Impact to Downstream Purchasers

Defendants also argue that the methods used by Dr. Williams to estimate the overcharges to the CIIPPs were flawed. Again, the experts apply different versions of the same model to reach wildly different results. (*E.g.*, Stiroh Expert Report ¶ 115 (concluding that the share of the top 1,000 indirect purchasers that did not incur an overcharge varies from 24.8 percent to 79.2 percent); Williams Rebuttal Report ¶¶ 223–29 (arguing that Dr. Stiroh's model includes estimates that are not statistically significant but her model, if modified, would show 99% of CIIPP class members were injured).)

Here again, the Court declines to find that Dr. Williams' model is so flawed that it would be inadmissible.  Defendants' critiques are inadequate bases for the Court to conclude that Dr. Williams' approach is insufficient evidence to demonstrate classwide impact.  As the court in *In re Broiler Chicken* explained it, "from Plaintiffs' perspective, [Defendants' expert's] calculations miss the forest for the trees, whereas Defendants argue that the forest can only be properly understood by examining the trees."  2022 WL 1720468, at *16.  The Court concludes here, as there, that "such a dispute is factual and is resolved at summary judgment or trial.  It is not a reason to exclude either perspective or deny class certification."  *Id.*

*    *    *

In conclusion, the Court concludes that the evidence put forward by the Downstream Plaintiffs, including the experts' market structure analyses and overcharge regression and other models, is sufficient to show common questions predominate as to common impact.

### c.    Damages

As to the final predominance component, the Court must consider if the Downstream Plaintiffs can use common evidence to show damages.  Plaintiffs must show that "damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."  *Comcast*, 569 U.S. at 35.  "Calculations need not be exact, but at the class-certification stage . . . any model supporting a plaintiff's damages case must be consistent with its liability case."  *Id.* (citation modified).  Here, the Downstream Plaintiffs' theory of

liability is that Defendants artificially raised beef prices by means including (but not limited to) restricting supply. Therefore, a successful damages model must align with that price-raising theory.

Defendants argue that the Downstream Plaintiffs have failed to establish common proof of classwide damages for any of the proposed classes. The Court will address each proposed class in turn.

On behalf of the DPPs, Dr. Sunding calculated the total value of purchases by DPPs of products included in the class, for the class period. (Sunding Expert Report ¶ 193.) He then used this value and the applicable overcharge calculated from his overcharge regression to calculate estimated damages, which he found to be $13.79 billion. (*Id.* ¶¶ 193–95.) Defendants argue that Dr. Sunding's estimate inappropriately relied on averages for an industry that lacks uniformity and so relying on Dr. Sunding's analysis would result in DPPs receiving damages for transactions where they did not pay overcharges.

But, as the court explained in *In re Broiler Chicken*, "as long as 'the aggregate classwide damages is something that can be handled most efficiently as a class action,' then 'the allocation of that total sum among the class members can be managed individually' without undermining predominance or superiority." 2022 WL 1720468, at *19 (quoting *Kleen Prods.*, 831 F.3d at 929). The Court is convinced that Dr. Sunding has provided an adequately reliable measure of classwide damages. *See, e.g.*, *In re Turkey*,

2025 WL 264021, at *25 (discussing the use of averages for determining aggregate damages).  Moreover, having considered Defendants' objections to predominance as to DPPs' damages, the Court is satisfied that any individualized damages issues will not overwhelm the questions of law and fact that are common to the class.

With respect to the CIIPPs, Dr. Williams calculated classwide damages based on the percentage overcharges to direct purchasers, pass-through rates, and the share of Defendants' sales of class products to direct purchasers ultimately purchased by class members. (Williams Expert Report ¶ 251.)  Defendants argue that Dr. Williams' damages calculations are flawed because he failed to show common impact to all class members and failed to use a fed cattle price variable.  The Court has already addressed these criticisms above.  Additionally, Defendants argue that "Dr. Williams's distributor-specific overcharge estimates also demonstrate that individualized determinations of damages would be required."  (Defs.' Opp. CIIPPs' Mot. at 30.)  But "the fact that the damages calculation may involve individualized analysis is not by itself sufficient to preclude certification when liability can be determined on a class-wide basis."  *In re Potash*, 159 F.R.D. at 697.  At the class certification stage, the Downstream Plaintiffs need only demonstrate that they have a reasonable method for calculating damages.  The Court concludes that CIIPPs have done so.

Finally, with respect to the Consumer IPPs, Dr. Mangum—similar to Dr. Williams— calculated classwide damages by first calculating overcharges to direct purchasers, then

determining pass-through rates, and finally estimating the share of Defendants' sales of class products to direct purchasers ultimately purchased by class members.  (Mangum Rep. ¶¶ 24, 492–99.)  Defendants argue that Dr. Mangum's approach to calculating pass-through disguises significant variation and therefore makes calculating an individual consumer plaintiff's purported damages virtually impossible.  Here again, "the fact that the damages calculation may involve individualized analysis is not by itself sufficient to preclude certification when liability can be determined on a class-wide basis."  *In re Potash*, 159 F.R.D. at 697.  At the class certification stage, the Downstream Plaintiffs need only demonstrate that they have a valid method for calculating damages.  The Court concludes that the Consumer IPPs, like the CIIPPs and the DPPs, have done so.

### d.    Superiority

To certify a class under Rule 23(b)(3), the Court must also consider if a class action is the superior method of adjudicating this controversy.  "There is no bedrock standard upon which a Court determines that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  *In re Pork*, 2024 WL 2060386, at *26 (quoting *Sonmore v. CheckRite Recovery Servs., Inc.*, 206 F.R.D. 257, 265 (D. Minn. 2001)).  Rather, courts generally look to the following non-exhaustive list of relevant factors: (1) the interest of class members in individually controlling their claims, (2) the extent to which litigation has already begun, (3) the desirability of concentrating the litigation in a particular forum, and (4) the likely difficulties of managing a class action. Fed. R. Civ. P. 23(b)(3)(A)–(D).  Class actions are also superior if the alleged damages of

each plaintiff are small and, absent a class action, most plaintiffs would not realistically have a day in court.  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985).

Defendants do not dispute that a class action is the superior method for the Downstream Plaintiffs to bring their claims.  Given the large number of potential class members in this action, the significant difficulty those members would face in bringing individual claims, the Court's more than four years of oversight of this litigation, and the fact that managing a class action—though challenging—is certainly more efficient than juggling a multitude of individual actions, the superiority requirement is readily satisfied.

### B.    State Law Claims

Defendants contend that the Consumer IPPs and CIIPPs failed to show predominance and superiority because they bring state law claims under the theories of antitrust, unjust enrichment, and consumer protection.  Defendants believe that material variations in state law prohibit class certification under Rule 23(b)(3).

The Eighth Circuit has acknowledged that "[v]ariations in state law **may** swamp any common issues and defeat class certification under Rule 23(b)(3)."  *Hale v. Emerson Elec. Co.*, 942 F.3d 401, 403 (8th Cir. 2019) (emphasis added) (internal quotation omitted); *see also Johannessohn v. Polaris Indus. Inc.*, 9 F.4th 981, 985–86 (8th Cir. 2021) (affirming denial of class certification of a case involving material misrepresentations under six states' laws because they would require individual investigations and would create challenges for trial management); *Webb v. Exxon Mobil Corp.*, 856 F.3d 1150, 1157 (8th Cir. 2017) (affirming denial of class certification because the class would join claims arising

- 53 -

under four states' contract, property, and tort law due to potential conflicts between state laws).

Here, as in *Pork*, the Court concludes that the variations in states' antitrust, consumer protection, and unjust enrichment laws Defendants identified are not material. *In re Pork*, 2024 WL 2060386, at *27. Rather, the slight differences between state laws do not "swamp any common issues." *Hale*, 942 F.3d at 403. For instance, any differences in antitrust duplicative liability provisions are not material because most states have such provisions, and the states' antitrust laws are harmonious with the Sherman Act. (*See* CIPPs' Mem., Appendix A (identifying the relevant state antitrust statutes and harmonization with federal law); CIIPPs' Mem., Appendix A (same); CIPPs' Mem., Appendix B (identifying the relevant state consumer protection statutes and harmonization with federal law); CIIPPs' Mem., Appendix B (same).)

It is true that state consumer protection laws ordinarily differ greatly. *See In re St. Jude*, 425 F.3d at 1120 (identifying those differences as "material variances"). But those differences are irrelevant within the antitrust context because states provide a remedy under consumer protection laws for antitrust violations. *See In re Broiler Chicken*, 2022 WL 1720468, at *20 ("[T]he differences in consumer protection laws concerning reliance and intent are simply not relevant to a price-fixing claim.").

Similarly, state unjust enrichment laws typically vary greatly because they have different approaches and elements, making them often ill-suited for class actions. *In re*

*Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 164 (E.D. Pa. 2015) (collecting cases).

Accordingly, numerous courts have found that the variation in state unjust enrichment laws "prevents common issues of law from predominating over a proposed class." *In re Dollar Gen.*, 2019 WL 1418292, at *17. To overcome state law variances and show predominance, Plaintiffs may undertake an "extensive analysis" of the variances. *Id.*

Here, the Court concludes, as it did in *Pork*, that the differences that may defeat class certification in other cases are not material in this matter because unjust enrichment claims are nearly identical in the antitrust context. *See In re Pork*, 2024 WL 2060386, at *27; *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 697 n.40 (S.D. Fla. 2004) (certifying a class for unjust enrichment claims in the antitrust context because "[t]he standards for evaluating each of the various states classes' unjust enrichment claims are virtually identical").[23] Consumer IPPs and CIIPPs also conducted the necessary extensive analysis of the state law variations. (*See e.g.*, CIPPs' Mem., Appendix A–Appendix B; CIIPPs' Mem., Appendix A–Appendix C.)

Moreover, many of the variations Defendants identified relate only to damages—not liability. The Court is confident that such differences will not confuse a jury. Further,

---

[23] *See also In re McCormick & Company, Inc.*, 217 F. Supp. 3d 124, 145 (D.D.C. 2018) (noting that in some cases, "special situations [have] allowed the plaintiffs to demonstrate injustice without addressing individual circumstances"); *In re Broiler Chicken*, 2022 WL 1720468, at *20 (finding variations in unjust enrichment laws to not be material because "any state where the unjust enrichment claim is the primary basis for recovery will be satisfied by proof of a Sherman Act violation").

the Court may subdivide the classes in the future if necessary. *See In re Dollar Gen.*, 2019 WL 1418292, at *17 ("Variances of state law may also be overcome through the use of subclasses to allow common issues of fact or law to predominate over individual issues of state law.").

### C.    Ascertainability

Defendants challenge the ascertainability of the putative Consumer IPP class. Though not an explicit requirement under Rule 23, most courts acknowledge that ascertainability is inherently required for class certification. The Eighth Circuit has explained that "[i]t is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *Ihrke v. N. States Power Co.*, 459 F.2d 566, 573 n.3 (8th Cir. 1972), *vacated due to mootness*, 409 U.S. 815 (1972). The Eighth Circuit does not view ascertainability as a separate, preliminary requirement, but rather requires district courts to conduct "a rigorous analysis of the Rule 23 requirements, which includes that a class 'must be adequately defined and clearly ascertainable.'" *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016); *see also Brown v. Wells Fargo & Co.*, 284 F.R.D. 432, 444 (D. Minn. 2012).

Defendants argue that no objective **classwide** criteria exists with which to identify class members. Defendants' argument fails because *Sandusky* merely requires that objective criteria be used to identify the entire class; it does not require classwide criteria. *See Sandusky*, 821 F.3d at 996. And Consumer IPPs have clearly defined the proposed

class members as "persons and entities who indirectly purchased for personal consumption one or more of" the specifically listed beef products.  (CIPPs' Mot. at 1–2.)

Moreover, at least some records of who purchased products are available from retailers (e.g., Walmart/Sam's Club, Costco, Amazon) which would allow for direct notice to those class members of their claims.  (*See* CIPPs' Reply at 26–27.)  For consumers without records, individual consumers are capable of self-identifying using affidavits, which is a permissible means of ascertaining class membership.  *See, e.g.*, *In re Dollar General Corp.*, 2019 WL 1418292, at *16.

Defendants argue that affidavits would be improper for this case because Consumer IPPs provided no details on the use of a claim forms process or affidavits. Defendants argue that the potential class here is akin to the one in *St. Louis Heart Center, Inc. v. Vein Centers for Excellence, Inc.*, where the court concluded that reliance on claims forms or affidavits was "especially troublesome because of the nature of the proof required."  Civ. No. 12-174, 2017 WL 2861878, at *4 (E.D. Mo. July 5, 2017).  The Court disagrees.  Unlike in *St. Louis Heart Center,* where the question was whether a plaintiff received "a specific junk fax sent many years earlier[,]" *id.*, here, the consumers typically purchase beef repeatedly and regularly and can rely on their own patterns of behavior (*see, e.g.*, CIPPs' Mem., Appendix C).  *See also In re Broiler Chicken*, 2022 WL 1720468, at *20–21 (concluding that end-users of meat products are an ascertainable class); *In re Pork*, 2024 WL 2060386, at *27 (concluding "individual consumers are capable of self-

identifying using affidavits").   The Court concludes that the Consumer IPPs are an ascertainable class.

*      *      *

All three damages classes proposed by the Downstream Plaintiffs have satisfied the rigorous requirements of Rule 23(b)(3).  The Court will, therefore, certify all three damages classes proposed by the Downstream Plaintiffs.

## IV.    RULE 23(B)(2) ANALYSIS

In addition to their Rule 23(b)(3) damages class, CIIPPs ask the Court to certify an injunctive relief class pursuant to Rule 23(b)(2).  Rule 23(b)(2) provides that a class action may be appropriate if:

> the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole . . . .

Fed. R. Civ. P. 23(b)(2).

The Court will decline to certify the CIIPPs' Injunctive Relief Class at this time, but it will allow the CIIPPs to renew their motion for certification of a Rule 23(b)(2) class at a later date, should they choose to do so.  The Court reaches this conclusion for two reasons.

First, "[c]lass certification under Rule 23(b)(2) is proper only when the primary relief sought is declaratory or injunctive."  *In re St. Jude*, 425 F.3d at 1121.  At this time, the CIIPPs are primarily seeking monetary damages, which precludes certification under

Rule 23(b)(2).[24] *See Dukes*, 564 U.S. at 360 (holding that certification under Rule 23(b)(2) is not appropriate if the monetary relief sought by the class "is not incidental to the injunctive or declaratory relief").

Second, the CIIPPs have not been specific about what injunctive relief they seek and how that relief would provide appropriate relief to the class as a whole.   Rule 23(c)(1)(B) requires that "[a]n order that certifies a class action must define the class and the class claims, issues, or defenses . . . ."  Federal Rule of Civil Procedure 65(d) provides that "[e]very order granting an injunction . . . must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail . . . the act or acts restrained or required."   Although CIIPPs indicate that the requested injunctive relief would "protect[] them from future anticompetitive conduct, particularly unlawful communications coordinating the supply of beef products" (CIIPPs' Mem. at 28), CIIPPs do not provide sufficient detail about the proposed relief to allow the Court to determine whether it would provide relief for the class as a whole or for the Court to properly scope its order certifying their proposed Injunctive Relief Class.

---

[24] The court in *In re Processed Egg Prod. Antitrust Litig.*, 312 F.R.D. 124, 166 (E.D. Pa. 2015) noted that courts are divided over the propriety of certifying a Rule 23(b)(2) class where monetary damages predominate but the claims for damages and injunctive relief arise under different statutes.  Because the Court finds that, in any event, the proposed injunctive relief is not yet clearly enough defined to certify the class, the Court will address this issue only if the CIIPPs choose to renew their motion at a later date.

The Court will, therefore, decline to certify the injunctive relief class at this time. As noted above, however, the Court will allow CIIPPs, should they choose to do so, to renew their motion for certification under Rule 23(b)(2) at a later date—provided they address why injunctive relief is proper and provide additional detail on the relief being sought.

## V.    CLASS COUNSEL

Lastly, when certifying a class, the Court must also appoint class counsel.  Fed. R. Civ. P. 23(g)(1).  When considering whether to appoint class counsel, courts

> (A) must consider:
>
> > (i) the work counsel has done in identifying or investigating potential claims in the action;
> >
> > (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
> >
> > (iii) counsel's knowledge of the applicable law; and
> >
> > (iv) the resources that counsel will commit to representing the class; [and]
>
> (B) may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class . . . .

*Id.*  Additionally, "[c]lass counsel must fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(4).  Only if class counsel is adequate under all of these considerations may a court appoint the applicant as class counsel.  Fed. R. Civ. P. 23(g)(2).

Because the firms that currently serve as interim co-lead counsel for the Downstream Plaintiffs have vigorously represented each class thus far in the litigation and

are all well-versed in antitrust law, the Court will appoint them as class counsel:

1. Gustafson Gluek, PLLC; Hartley LLP; Hausfeld LLP; and Cotchett Pitre & McCarthy, LLP, for the DPPs.

2. Barrett Law Group, P.A.; Cuneo Gilbert & LaDuca, LLP; and Larson King, LLP, for the CIIPPs.

3. Hagens Berman Sobol Shapiro LLP and Lockridge Grindal Nauen P.L.L.P., for the Consumer IPPs.

**CONCLUSION**

In this multidistrict litigation alleging price-fixing in the cattle and beef industry, five groups of plaintiffs seek class certification, including the DPPs, CIIPPs, and Consumer IPPs.

Each Downstream Plaintiff submitted expert testimony in support of its motion. Because each expert report satisfies the less stringent *Daubert* standard employed at the class certification stage, the Court will deny Defendants' motions to exclude the experts' testimony.  After conducting the rigorous analysis required under Federal Rule of Civil Procedure 23, the Court finds that all three proposed classes satisfy the requirements of Rule 23(b)(3).  The Court will therefore certify their damages classes accordingly.  The Court will decline to certify the CIIPPs' proposed injunctive relief class at this time, but the CIIPPs' may, should they choose to do so, renew their motion for certification of a Rule 23(b)(2) class at a later date.

- 61 -

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.  Direct Purchaser Plaintiffs' Motion for Class Certification (Docket No. [852]) is

    **GRANTED**;

2.  Commercial and Institutional Indirect Purchaser Plaintiffs' Motion for Class

    Certification (Docket No. [862]) is **GRANTED in part** and **DENIED in part**, as

    follows:

    a.    **GRANTED** with respect to the Damages Class:

    i.    The following class is hereby certified under Federal Rule of

          Civil Procedure 23(b)(3):

          All entities in the Indirect Purchaser States that
          indirectly purchased one or more of the following types
          of raw beef, fresh or frozen: brisket, chuck, loin, rib, or
          round, sold by Defendants in the Indirect Purchaser
          States from January 1, 2015, to February 29, 2020, for
          their own use in commercial food preparation. For this
          lawsuit, beef products exclude: non-fed beef, ground
          beef, trim beef, beef identified as cooked, beef
          products with non-beef ingredients other than
          seasonings, or any product that is marketed as USDA
          Prime.

          The Indirect Purchaser States consist of Arizona,
          Arkansas, California, the District of Columbia, Hawaii,
          Florida, Illinois, Iowa, Kansas, Maine, Massachusetts,
          Michigan, Minnesota, Mississippi, Montana, Nebraska,
          New Hampshire, New Mexico, Nevada, New York,
          North Carolina, North Dakota, Oregon, Rhode Island,

South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

Excluded from this Class are: natural persons who purchased beef for their personal use and not for commercial food preparation; purchases of beef for resale in unaltered form; purchases of beef from an intermediary who has further processed the beef; the Defendants and their Co-Conspirators; the officers, directors or employees of any Defendant or Co-Conspirator; any entity in which any Defendant or their Co-Conspirator has a controlling interest; any entity with an interest, controlling or non-controlling, in a Defendant or their Co-Conspirator; any (in whole or in part), affiliate, legal representative, heir or assign of any Defendant or their Co-Conspirator; any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any Co-Conspirator identified in this action.

ii.   The Grady Corporation II formerly d/b/a Whole hog Café; Steve Sizemore formerly d/b/a Longhorn's Steakhouse; Pearlz Oyster Bar; Park Tavern; Union Public House; Sandee's Bakery d/b/a Sandee's Catering Bakery & Deli; Grub Stake; Max and Bella's Smokehouse, LLC; Yoland Shegian d/b/a LA Shawarma; BW-SS, Inc.; Maquoketa Care Center; Fernando's Street Kitchen; Jim's Place Grille; Farah's Courtyard Deli, Inc. are appointed as class representatives.

b.   **DENIED without prejudice** with respect to the Injunctive Relief Class.

3.   Consumer Indirect Purchaser Plaintiffs' Motion for Class Certification (Docket

No. [867]) is **GRANTED**;

4.    The following firms are appointed as class counsel:

    a.    Gustafson Gluek, PLLC; Hartley LLP; Hausfeld LLP; and Cotchett Pitre & McCarthy, LLP, for the DPPs.

    b.    Barrett Law Group, P.A.; Cuneo Gilbert & LaDuca, LLP; and Larson King, LLP, for the CIIPPs.

    c.    Hagens Berman Sobol Shapiro LLP and Lockridge Grindal Nauen P.L.L.P., for the Consumer IPPs.

5.    Defendants' Motion to Exclude Expert Testimony of Dr. David L. Sunding (Docket No. [1119]) is **DENIED**;

6.    Defendants' Motion to Exclude Expert Testimony of Dr. Michael A. Williams (Docket No. [1124]) is **DENIED**; and

7.    Defendants' Motion to Exclude Expert Testimony of Dr. Russell W. Mangum (Docket No. [1146]) is **DENIED**.

DATED:  July 16, 2026
at Minneapolis, Minnesota.

        _____/s/ John R. Tunheim_____
            JOHN R. TUNHEIM
         United States District Judge